ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1094

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
———————————————————

NEXTERA ENERGY RESOURCES, LLC AND
NEXTERA ENERGY SEABROOK, LLC,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*
———————————————————

On Petition for Review
———————————————————

**INITIAL BRIEF FOR PETITIONERS NEXTERA ENERGY
RESOURCES, LLC AND NEXTERA ENERGY SEABROOK, LLC**
———————————————————

Joel D. Newton
Senior FERC Counsel
NextEra Energy Resources, LLC
801 Pennsylvania Ave., N.W.
Suite 220
Washington, DC 20004
(202) 347-7126

John N. Estes III
Matthew E. Price
Juliana Brint
Arjun Ramamurti
JENNER & BLOCK LLP
1099 New York Ave, NW Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Petitioners NextEra Energy Resources, LLC
and NextEra Energy Seabrook, LLC*

July 28, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Petitioners NextEra Energy Resources, LLC, and NextEra Energy Seabrook, LLC hereby certifies the following as to parties, rulings, and related proceedings in this case:

## PARTIES

The parties to this proceeding are as follows:

### Petitioners

NextEra Energy Resources, LLC
NextEra Energy Seabrook, LLC

### Respondent

Federal Energy Regulatory Commission

### Intervenors

Avangrid, Inc.
NECEC Transmission, LLC

### Amici

None at this time

### Parties in the Proceeding Below

American Clean Power Association
Anbaric Development Partners, LLC
Avangrid, Inc.
Calpine Corporation
Connecticut Department of Power and Environmental Protection
Dominion Energy Services, Inc. (renamed Constellation Energy Generation, LLC)
Electric Power Supply Association

Eversource Energy Service Company

Exelon Corporation

H.Q. Energy Services (U.S.) Inc.

ISO New England Inc.

Massachusetts Attorney General Maura Healey

Massachusetts Department of Energy Resources

Massachusetts Department of Public Utilities

Massachusetts Municipal Wholesale Electric Company

National Grid operating companies Massachusetts Electric Company, Nantucket Electric Company, the Narragansett Electric Company, and New England Power Company

NECEC Transmission, LLC

New England Power Generators Association, Inc.

New England States Committee on Electricity

NextEra Energy Resources, LLC

NextEra Energy Seabrook, LLC

NRG Power Marketing, LLC

Public Citizen, Inc.

Vistra Corp.

FPL Energy Wyman, LLC and FPL Energy Wyman IV, LLC were named in the original complaint filed in FERC Docket No. EL21-6-000 on October 13, 2020, but were removed from the revised complaint filed in that docket on March 26, 2021.

**ORDERS UNDER REVIEW**

Petitioners seek review of the following orders:

- *NextEra Energy Seabrook, LLC*, Order Denying Complaint in Part, Granting Complaint in Part, and Dismissing Petition for Declaratory Order, Docket Nos. EL21-3-000 and EL21-6-000, 182 FERC ¶ 61,044 (Feb. 1, 2023).

- *NextEra Energy Seabrook, LLC*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. EL21-3-001 and EL21-6-001, 183 FERC ¶ 62,001 (Apr. 3, 2023).

- *NextEra Energy Seabrook, LLC*, Order Addressing Arguments Raised on Rehearing and Terminating Section 206 Proceeding, 183 FERC ¶ 61,196 (June 15, 2023).

**RELATED CASES**

To the best of counsel's knowledge, there are currently no related proceedings

in this Court or other courts, as that term is defined by D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

*/s/ John N. Estes III*
John N. Estes III
*Counsel for Petitioners NextEra
Energy Resources, LLC and NextEra
Energy Seabrook, LLC*

July 28, 2023

iii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, petitioners NextEra Energy Resources, LLC ("NextEra Resources") and NextEra Energy Seabrook, LLC ("Seabrook") submit the following disclosure statement. Seabrook is a wholly owned direct subsidiary of ESI Energy, LLC, which in turn is a wholly owned direct subsidiary of NextEra Resources. NextEra Resources is a wholly owned direct subsidiary of NextEra Energy Capital Holdings, Inc., which in turn is a wholly owned direct subsidiary of NextEra Energy, Inc., a Florida corporation ("NextEra"). NextEra is a publicly held company with shares listed on the New York Stock Exchange. No publicly held company has a 10 percent or greater ownership interest in NextEra. While not publicly held, The Vanguard Group, Inc. reported that, as of the end of Q1 2023, its family of funds held 10.94 percent of NextEra's outstanding voting securities. *See The Vanguard Group, Inc.*, Quarterly Compliance Filing for Q1 2023, FERC Docket No. EC19-57 (filed May 11, 2023).

Respectfully submitted,

*/s/ John N. Estes III*
John N. Estes III
*Counsel for Petitioners NextEra*
*Energy Resources, LLC and NextEra*
*Energy Seabrook, LLC*

July 28, 2023

iv

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iv

TABLE OF CONTENTS ............................................................v

TABLE OF AUTHORITIES ................................................... vii

GLOSSARY ................................................................... xi

INTRODUCTION ...............................................................1

JURISDICTIONAL STATEMENT ...............................................4

STATUTES AND REGULATIONS ..............................................5

STATEMENT OF ISSUES ......................................................5

STATEMENT OF THE CASE ...................................................6

I.      Background...........................................................6

        A.      The FPA ....................................................6

        B.      The NECEC Project and the Seabrook Generator Breaker.................10

II.     Agency Proceedings .................................................16

        A.      Seabrook's Petition and Avangrid's Complaint...................16

        B.      FERC's Initial Order ......................................19

        C.      The Rehearing Stage .......................................21

SUMMARY OF ARGUMENT ................................................23

STANDING ...................................................................26

ARGUMENT ..................................................................26

I.      Standard of Review ................................................26

II.   FERC Lacks Authority to Require Generators to Upgrade Their
      Generation Facilities. .......................................................................28

III.  The LGIA Cannot Reasonably Be Read to Confer Jurisdiction Over the
      Breaker Replacement. .....................................................................31

      A.   The LGIA Does Not Create Obligations to Third Parties .................31

      B.   The LGIA Provisions on Which FERC Relies Do Not Require
           Seabrook to Replace the Breaker. .........................................32

           1.   Appendix C-1, Section B.III .....................................32

           2.   Good Utility Practice ..............................................36

           3.   Section 9.7.5 ........................................................38

      C.   FERC's Suggestion that Seabrook Seeks to Exercise Veto
           Power Over the NECEC Project Is Arbitrary and Capricious. ...........45

IV.   To the Extent Seabrook Did Have an Obligation to Replace the Generator
      Breaker, FERC's Cost-Allocation Determination Was Arbitrary and
      Capricious. ....................................................................................47

      A.   FERC's Reasoning Is Incoherent. ........................................48

      B.   FERC Arbitrarily Dismissed the Prospect of Unforeseen Delays
           and the Evidence of Costs Arising from Extended Outages. ..............49

      C.   FERC Departed from Longstanding Interconnection Cost
           Allocation Rules Without Adequate Explanation. ..............................53

CONCLUSION ...................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES[*]

## CASES

*Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc) .........21

*\*Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C. Cir. 1987)................50

*Cherokee County Cogeneration Partners, LLC v. FERC*, 40 F.4th 638 (D.C. Cir. 2022) ...................................................................................................32

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)...............................................................................27

*Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459 (D.C. Cir. 2005)........29

*Connecticut Department of Public Utility Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009) ...................................................................29

*Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028 (D.C. Cir. 2022).........48

*Detroit Edison Co. v. FERC*, 334 F.3d 48 (D.C. Cir. 2003).....................................6

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016).....................................27

*Entergy Services, Inc.*, 99 FERC ¶ 61,127 (2002)...................................................42

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................42

*\*ISO New England Inc.*, 137 FERC ¶ 61,112 (2011)..............................................54

*ISO New England Inc.*, 147 FERC ¶ 61,172 (2014), *reh'g denied*, 153 FERC ¶ 61,223 (2015) ...................................................................51

*Johnson v. Guzman Chavez*, 141 S. Ct. 2271 (2021) .............................................27

*\*Long Island Power Authority v. FERC*, 27 F.4th 705 (D.C. Cir. 2022)..........27, 33

*Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023) .............................27

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Midwest Independent Transmission System Operator, Inc*., 100 FERC ¶ 61,262 (2002) ...............................................................54

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001) ..................................26

*Michigan Public Power Agency v. FERC*, 405 F.3d 8 (D.C. Cir. 2005)................28

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co*., 463 U.S. 29 (1983)....................51

*\*National Ass'n of Regulatory Utility Commissioners v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) ........................................................8, 27, 29, 30

*New York v. FERC*, 535 U.S. 1 (2002) ...................................29

*Newmont Nevada Energy Investment LLC v. Sierra Pacific Power Co.*, 147 FERC ¶ 61,030 (2014) ..............................................42

*NextEra Desert Center Blythe, LLC v. FERC*, 852 F.3d 1118 (D.C. Cir. 2017) ..........................................................................45

*NRG Power Marketing, LLC v. Maine Public Utility Commission*, 558 U.S. 165 (2010) ..........................................................................47

*Oklahoma Natural Gas Co v. FERC*, 906 F.2d 708 (D.C. Cir. 199 .......................28

*Pacific Gas & Electric Co. v. FERC*, 533 F.3d 820 (D.C. Cir. 2008).......................8

*\*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 61 Fed. Reg. 21,540), *on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 62 Fed. Reg. 12,274), *on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).............................................................7

*Sierra Club v. FERC*, 68 F.4th 630 (D.C. Cir. 2023) .................................5

*\*South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ..........................................................................54

*Southern California Edison Co. v. FERC*, 502 F.3d 176 (D.C. Cir. 2007) ..... 27, 34

*Southern Co. Services, Inc. v. FERC*, 416 F.3d 39 (D.C. Cir. 2023) .................... 27

*Standardization of Generator Interconnection Agreements & Procedures*, Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 (cross-referenced at 106 FERC ¶ 61,220), *order on reh'g*, Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004) (cross-referenced at 109 FERC ¶ 61,287), *order on reh'g*, Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005) (cross-referenced at 111 FERC ¶ 61,401), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) ...................... 8, 16, 44

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 10 (2003) (cross-referenced at 104 FERC ¶ 61,103), *order on reh'g*, Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 (cross-referenced at 106 FERC ¶ 61,220), *order on reh'g*, Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004) (cross-referenced at 109 FERC ¶ 61,287), *order on reh'g*, Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005) (cross-referenced at 111 FERC ¶ 61,401), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) ........................................................ 8, 30, 31-32

*United States Department of Interior v. FERC*, 952 F.2d 538 (D.C. Cir. 1992) ................................................................................................. 51

*West Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) .................... 56

**STATUTES**

5 U.S.C. § 706(2)(C) ................................................................................. 26

16 U.S.C. § 824(a) ..................................................................................... 7

*16 U.S.C. § 824(b)(1) ............................................................. 3, 7, 23, 28, 40

16 U.S.C. § 824a(b) ................................................................................. 28

16 U.S.C. § 825*l*(b) ................................................................................. 5

**OTHER AUTHORITIES**

Charles Perrow, *Normal Accidents: Living with High-Risk Technologies* (1999) ................................................................................................. 51

Proposed Rule, Building for the Future Through Electric Regional
     Transmission Planning and Cost Allocation and Generator
     Interconnection, 87 Fed. Reg. 26,504 (May 5, 2022).........................................46

Nassim Nicholas Taleb, *The Black Swan: the Impact of the Highly Improbable*
     (2007) ...............................................................................................................52

# GLOSSARY

| | |
|---|---|
| Add. | Addendum |
| Avangrid | NECEC Transmission, LLC and Avangrid LLC |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| ISO-NE | ISO New England Inc. |
| Initial Order | *NextEra Energy Seabrook, LLC*, Order Denying Complaint in Part, Granting Complaint in Part, and Dismissing Petition for Declaratory Order, 182 FERC ¶ 61,044 (Feb. 1, 2023), JA__-__ |
| LGIA | Large Generator Interconnection Agreement |
| Modification Order | Order Addressing Arguments Raised on Rehearing and Terminating Section 206 Proceeding, 183 FERC ¶ 61,196 (June 15, 2023), JA__-__ |
| NECEC Project | The New England Clean Energy Connect transmission line being developed by Avangrid |
| New Hampshire Transmission | New Hampshire Transmission, LLC |
| NRC | Nuclear Regulatory Commission |
| Orders | Initial Order, Rehearing Order, and Modification Order |
| Rehearing Order | *NextEra Energy Seabrook, LLC*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,001 (Apr. 3, 2023), JA__-__. |
| Seabrook | NextEra Energy Seabrook, LLC |

xi

Seabrook Station          Seabrook Nuclear Power Plant

Tariff                    ISO-NE's FERC-approved tariff governing transmission
                          services

# INTRODUCTION

This case is about whether the Federal Energy Regulatory Commission ("FERC" or "the Commission") can force a nuclear power plant owner to replace a massive generator circuit breaker at its plant for the economic benefit of an unrelated entity, at significant uncompensated cost to the power plant owner.

Petitioner NextEra Energy Resources, LLC is the indirect parent of Petitioner NextEra Energy Seabrook, LLC ("Seabrook"). Seabrook is the majority owner and operator of the Seabrook Nuclear Power Plant ("Seabrook Station"), a 1,250 megawatt nuclear power plant in Seabrook, New Hampshire.[1] Intervenors NECEC Transmission, LLC and Avangrid, Inc. (collectively, "Avangrid") seek to build a new electric transmission line in New England. That line is *not* needed either for reliability or for grid-wide economic benefits, JA__ (Petition for Declaratory Order at 11); it is instead a "voluntary" project that Avangrid undertook for its own commercial reasons, JA__ (*id.* at 10-11).

Computer modeling by ISO New England Inc. ("ISO-NE")—the system operator for the region—shows that the proposed new Avangrid transmission line (which is not yet constructed) will change power flows on the regional grid, causing Seabrook Station's 32,000-pound generator circuit breaker to become overloaded.

---

[1]    Seabrook owns 88.2 percent of Seabrook Station. Various municipal utilities own the rest.

Therefore, under the ISO-NE Tariff, the proposed new line could not be energized unless the Seabrook Station breaker is upgraded.  Replacing this massive breaker is a complicated and lengthy task that can only realistically be undertaken when Seabrook Station is offline for a planned refueling outage.

All parties agree that Avangrid should pay the cost of buying and installing the new breaker.  This case concerns other economic costs that Seabrook will incur to replace the breaker for Avangrid's benefit.  If everything goes according to plan, the plant is projected to remain offline for up to ten additional days to replace the breaker.  The additional outage time will cause Seabrook and the minority owners of Seabrook Station to lose energy revenues alone estimated in 2020 to be $5.6 million, though current loss estimates are higher.  In addition, if circumstances arise during the extended outage, such as energy shortage conditions or construction problems during installation of the breaker, Seabrook's losses will be higher— potentially by tens of millions of dollars, if not more, particularly if the outage needs to be further extended.

The only reason for Seabrook to replace the breaker is to accommodate Avangrid's New England Clean Energy Connect transmission line ("NECEC Project").  Seabrook is willing to do so if it is made economically whole.  FERC, however, ruled that Seabrook is obligated to install the breaker without being made

2

economically whole.  That ruling exceeded FERC's statutory jurisdiction and was arbitrary and capricious for three reasons.

*First*, FERC lacks jurisdiction under the Federal Power Act ("FPA") to order Seabrook to replace the generator breaker in the first place.  As FERC recognizes, the breaker is a component of a generation facility.  JA__, __, __ (Initial Order PP 25, 76, 78.  And under the FPA, FERC does not regulate generation facilities.  *See* 16 U.S.C. § 824(b)(1).  FERC acknowledges this statutory limitation, but nevertheless attempts to circumvent it by relying on certain provisions found in Seabrook's Large Generator Interconnection Agreement ("LGIA"), a contract that governs the terms of Seabrook Station's interconnection to the transmission grid.  However, LGIAs were intended to protect generators from discriminatory treatment by transmission owners—not to allow FERC to expand its authority beyond that given by Congress.  And regardless, FERC cannot use a contract to create jurisdiction the agency otherwise would lack.

*Second*, FERC's reliance on the LGIA fails on its own terms.  Avangrid is not a party to the LGIA, and the LGIA explicitly forbids interpretations that create third-party beneficiaries.  Moreover, the LGIA does not create construction obligations in these circumstances.  FERC cannot disregard the plain text and invent new obligations out of whole cloth.  The economic terms on which Seabrook replaces the breaker should be left to the commercial negotiations of the parties.

*Third*, even if Seabrook were somehow obligated to replace the breaker for Avangrid's benefit, FERC acted arbitrarily and capriciously in determining that Seabrook must do so without compensation for its lost revenue and other economic costs. FERC's rationale for imposing these costs on Seabrook is incoherent. FERC locates the obligation to install the breaker in the LGIA rather than the ISO-NE Tariff, but then turns to the ISO-NE Tariff, which governs transmission services, to justify forcing Seabrook to absorb the lost revenue and other costs. When Seabrook pointed out that FERC's own precedent on transmission cost causation required those costs to be paid by Avangrid, FERC then switched gears again and rejected Seabrook's argument on the grounds that Seabrook would not be providing "electric service" to Avangrid. That, of course, underscores why FERC had no jurisdiction to order a generator to replace its own breaker in the first place. At the end of the day, Avangrid will cause Seabrook to lose substantial revenue and incur other costs, including potential penalties, due to an extended outage undertaken for Avangrid's benefit. Accordingly, Avangrid should bear those costs. FERC's contrary conclusion was arbitrary and capricious.

## JURISDICTIONAL STATEMENT

Petitioners seek review of three FERC orders: Order Denying Complaint in Part, Granting Complaint in Part, and Dismissing Petition for Declaratory Order, 182 FERC ¶ 61,044 (Feb. 1, 2023) ("Initial Order"), JA__-__; Notice of Denial of

Rehearing by Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,001 (Apr. 3, 2023) ("Rehearing Order"), JA__-__; and Order Addressing Arguments Raised on Rehearing and Terminating Section 206 Proceeding, 183 FERC ¶ 61,196 (June 15, 2023) ("Modification Order"), JA__-__ (collectively, "Orders").  These Orders are final and aggrieve Petitioners by directing Seabrook to replace Seabrook Station's generator circuit breaker at a financial loss.  Petitioners timely requested rehearing of the Initial Order at FERC on March 3, 2023.  That rehearing request was deemed denied by operation of law in the Rehearing Order on April 3, 2023.  Petitioners then timely petitioned for judicial review on April 4, 2023.  On June 15, 2023, before filing the agency record with this Court, FERC issued the Modification Order.  This Court has jurisdiction to review all three Orders under 16 U.S.C. § 825*l*(b); *see Sierra Club v. FERC*, 68 F.4th 630, 646 (D.C. Cir. 2023) (no separate petition for review required for order addressing arguments raised on rehearing).

## STATUTES AND REGULATIONS

The relevant statutes and regulations are included in the Addendum.

## STATEMENT OF ISSUES

1.  Whether FERC has authority under the FPA to require an electric generator (Seabrook) to replace a generator component—here, a generator circuit breaker— regardless of who pays for it.

5

2. Whether FERC erred as a matter of law in holding that the LGIA obligates Seabrook to replace the generator circuit breaker for Avangrid's benefit.

3. Whether, if Seabrook is obligated to replace the generator circuit breaker, FERC acted arbitrarily and capriciously in holding that Avangrid need not make Seabrook economically whole.

## STATEMENT OF THE CASE

### I.    Background

#### A.    The FPA

1. The "electric industry provides three principal services: the generation of electric energy, the transmission of that energy, and the distribution of that energy from the transmission facilities to individual customers." *Detroit Edison Co. v. FERC*, 334 F.3d 48, 49 (D.C. Cir. 2003). "Generating facilities," like Seabrook Station, are "used to produce energy"; "transmission facilities [are] used to transmit energy in bulk over long distances"; and "local distribution facilities [are] used to distribute the energy to individual customers." *Id.* Electricity services can be further divided into "[w]holesale service," which "involves the transmission or distribution of electric energy to customers that will resell the energy to end users," and "[r]etail service," which "denotes transmission or distribution to end users." *Id.*

6

When Congress enacted the FPA in 1935, it carefully delineated the authority granted to FERC.[2]  On the one hand, Congress found that federal regulation of "transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce" was "necessary in the public interest." FPA § 201(a), 16 U.S.C. § 824(a).  Accordingly, it vested FERC with "jurisdiction over all facilities for such transmission or sale."  FPA § 201(b)(1), 16 U.S.C. § 824(b)(1). On the other hand, Congress specified in the very same sentence that FERC "shall *not* have jurisdiction … over facilities used for the generation of electric energy" (subject to exceptions not relevant here).  *Id.* (emphasis added).

2.  In 1996, FERC sought to encourage competition in the electric industry by issuing Order No. 888, which, among other things, required transmission owners to provide generators with non-discriminatory open access to their transmission facilities.[3]  In the years following Order No. 888, FERC supervised the process by

---

[2]    At the time, the relevant agency was the Federal Power Commission; FERC replaced it.

[3]    *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 61 Fed. Reg. 21,540) ("Order No. 888"), *on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 62 Fed. Reg. 12,274), *on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

which generation facilities interconnected with the transmission system on a case-by-case basis. FERC observed that some transmission owners were using their control over the interconnection process to favor affiliated generation. *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1279-80 (D.C. Cir. 2007) ("*NARUC*"). Accordingly, in 2003, FERC issued Order No. 2003,[4] which required utilities "to file revised open access transmission tariffs that include *pro forma* Large Generator Interconnection Procedures and a *pro forma* Large Generator Interconnection Agreement" that contained provisions governing generators' interconnection to the transmission system. *Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 823 (D.C. Cir. 2008). FERC explained that it regarded interconnection as an element of transmission service. Order No. 2003, 104 FERC ¶ 61,103 at P 20. Consistent with Order No. 2003 (and ISO-NE procedures), Seabrook entered an LGIA with the transmission owner with which it interconnects, New Hampshire

---

[4]    *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 10 (2003) (cross-referenced at 104 FERC ¶ 61,103) ("Order No. 2003"), *order on reh'g*, Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 (cross-referenced at 106 FERC ¶ 61,220) ("Order No. 2003-A"), *order on reh'g*, Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004) (cross-referenced at 109 FERC ¶ 61,287), *order on reh'g,* Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005) (cross-referenced at 111 FERC ¶ 61,401), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007).

Transmission, LLC ("New Hampshire Transmission"), and ISO-NE.  JA__-__ (NextEra Answer to Complaint, Exh. 6 ("Seabrook LGIA")).

3.  In New England, where this dispute arose, ISO-NE is the system operator of the bulk power grid under a FERC-approved tariff governing transmission services ("Tariff").  The ISO-NE Tariff sets forth procedures by which "Elective Transmission Upgrades," like the NECEC Project, can interconnect to the transmission system.  *See* JA__ (Tariff, Schedule 25).  These projects are not necessary for reliability or economic purposes.  JA__ (Petition for Declaratory Order at 11).  They are, instead, voluntary transmission upgrades that must be funded by their sponsor—here, Avangrid.  JA__ (*Id*. at 10-11); JA__ (Tariff, Schedule 25, § 1).

As the entity seeking the transmission upgrade, the transmission developer must submit a request to ISO-NE.  As the system operator, ISO-NE then undertakes a system impact study to assess whether, among other things, the proposed transmission upgrade will result in a "significant adverse effect" on the ISO-NE transmission system or anything connected to it, like Seabrook Station.  If the study indicates such a significant adverse effect, the upgrade cannot proceed until the entity proposing the upgrade—*i.e.*, Avangrid—"constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect."  JA__ (Tariff § I.3.10). However, the Tariff does not entitle the entity

9

proposing the upgrade to force the construction to occur, nor does it specify what costs the proposing entity would be obligated to incur to complete the construction.

**B.    The NECEC Project and the Seabrook Generator Breaker**

1. In 2017, the Commonwealth of Massachusetts selected Avangrid to construct the NECEC Project, which will run an overhead high-voltage transmission line from the Quebec-Maine border to the Larrabee Road substation in Lewiston, Maine, a part of ISO-NE's transmission system.  As required by the ISO-NE Tariff, the Central Maine Power Company, an Avangrid affiliate acting on behalf of the NECEC Project, submitted a request in April 2017 to interconnect the NECEC Project to the ISO-NE transmission system at Larrabee Road substation.  JA__-__ (Avangrid Complaint at 12-13); JA__ (Initial Order P 4).

In March 2020, ISO-NE completed a system impact study finding that Seabrook Station would suffer a "significant adverse effect" as a result of the interconnection of the NECEC Project to the ISO-NE grid:  the interconnection would cause the generator circuit breaker at Seabrook Station to become overloaded. *See* JA__  (Petition for Declaratory Order at 13).  As ISO-NE later explained, the "Interconnection System Impact Study for the [NECEC] Project showed the duty on the Seabrook Station circuit breaker within its ratings until the addition of the Project, but over its ratings after the addition of the Project."  JA__ (ISO-NE Letter at 2).

10

Accommodating the NECEC Project would require the Seabrook Station circuit breaker to be upgraded—and absent the NECEC Project, no upgrade would be needed. As ISO-NE made clear, the "Seabrook Station circuit breaker upgrade was not required 'but for' the interconnection of [the NECEC] Project." *Id.* The Nuclear Regulatory Commission ("NRC"), the federal regulatory agency with primary jurisdiction over nuclear safety issues, agreed and attested to the safety of the breaker in the status quo. *See* JA__ (NextEra Motion to Lodge NRC Letter at 2 (stating that "inspectors have reasonable assurance that the Seabrook main generator output breaker can perform its intended function with the current margin available to the rated short circuit current capability of the breaker")); *see also* JA__ (NextEra Answer to Amended Complaint, Exh. 1 at 6; *id.* Exh. 3 at 2).

Under the terms of the ISO-NE Tariff, this meant that the NECEC Project could not interconnect until the breaker was upgraded. JA__ (Initial Order P 4).

2. The Seabrook Station "generator circuit breaker is a large, complex piece of equipment." JA__ (Petition for Declaratory Order, Attach. D at 5). It has been in place since 1990, when Seabrook Station began commercial operation. Weighing over 32,000 pounds, it is about 20 feet long, 15 feet wide, and occupies 700 square feet of floor space. JA__ (*Id.* at 4). It sits on an interior mezzanine deck 75 feet above the ground, *see id.*, and is too tall to fit on one floor—hence the cut-out ceiling seen below:

11



*See also* JA__-__ (*id.* at 3-8) (photo and diagrams).

The breaker replacement needs to take place during a planned refueling outage at Seabrook Station.  Planned refueling outages occur every eighteen months, and the next outage is scheduled to occur in Fall 2024.  JA__ (Petition for Declaratory Order at 14).  The breaker replacement is expected to extend that outage by about ten days.  JA__ (*Id.* at 4).

The breaker replacement project "is extremely complicated."  JA__ (NextEra Answer to Complaint, Exh. 7 at 3).  The breaker replacement will be performed "inside the power block of a nuclear power plant."  JA__ (*Id.* at 4).  "Seabrook Station's turbine building is a rather difficult area to work in."  JA__ (NextEra Answer to Amended Complaint, Exh. 1 at 4).  The job will require "lifting and rigging an approximately 32,000-pound breaker" on an inside platform 75 feet above

ground, navigating "tight physical clearances." JA__ (NextEra Answer to Complaint, Exh. 7 at 4). In addition to the breaker itself, additional equipment— "the control system and the high-pressure air system"—also must be replaced. JA__ (*Id*. at 3). The replacement project must be "choreographed with other work" that will be done during the nuclear power plant refueling outage. JA__ (NextEra Answer to Amended Complaint, Exh. 1 at 4). And it "is possible" that replacing the breaker "will be even more complex than currently contemplated if the removal and replacement of such a system exposes further complexities." JA__ (NextEra Answer to Complaint, Exh. 5 at 8).

For uncommon nuclear power plant construction projects, like the breaker replacement, NextEra follows protocols of the Institute of Nuclear Power Operations. JA__ (*Id*. at 6). These protocols impose "stringent performance standards" that are based on "actual nuclear industry events where owners experienced severe difficult[y] in the execution of major projects." JA__ (*Id.* Exh. 7 at 4). The protocols "prescribe[] additional actions for high consequence, low probability, station operational and project risks that could affect the viability of the facility,"—that is, "enterprise risk." JA__ (Petition for Declaratory Order, Attach. D at 1).

The breaker replacement creates "enterprise risk"—it literally could "affect the viability" of Seabrook. JA__ (Avangrid Complaint, Exh. C at 1); *see* JA__

(NextEra Answer to Complaint, Exh. 5 at 6-7); *see also* JA__ (Avangrid Amended Complaint, Exh. D at 4:11-13).  There is a risk of substantial or catastrophic failures during execution of the replacement project.  JA__ (NextEra Answer to Protest, Exh. 3).  The project could "impact safety systems" at Seabrook.  JA___ (NextEra Answer to Amended Complaint, Exh. 1 at 3).  The breaker "circuitry interfaces with the plant's reactor protection systems."  *Id*.  In addition, when the breaker is being replaced, Seabrook must use a particular secondary source of off-site backup power.  JA__ (*Id*. at 5).  Maintaining proper operation of that power supply is necessary to "maintain[] the safety of the reactor core" during the outage.  JA__ (*Id*. at 3).

3.  Seabrook Station's interconnection to the ISO-NE transmission grid is governed by the LGIA.  The parties to the LGIA are Seabrook, New Hampshire Transmission—the electric utility through which Seabrook Station interconnects with the transmission grid—and ISO-NE.  The LGIA includes four provisions relevant to FERC's decision.

*First*, section 30.5 of the LGIA states that the LGIA "is not intended to and does not create" any third-party "rights, remedies, or benefits," and that the "obligations [t]herein assumed are solely for the use and benefit of the Parties."  *See* JA__ (Seabrook LGIA § 30.5).

*Second*, Appendix C-1, section B.III of the LGIA includes a provision that governs the allocation of costs between Seabrook and New Hampshire Transmission

14

in the event that (1) one of those two parties makes a "modification or functional change to its own facilities that is not required by Applicable Laws and Regulations or Governmental Authority" and (2) that change in turn "makes it necessary for the other [of those two parties] to make a modification or functional change to its own facilities that is required in accordance with Good Utility Practice." JA__ (*Id.* at 107). If those two events occur, then the first party "shall bear the cost of" the second party's modification or change. *Id.* This provision has nothing to do with changes made by any entity other than Seabrook and New Hampshire Transmission.

*Third*, section 1 of the LGIA defines the term Good Utility Practice as "any of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition." JA__ (Seabrook LGIA § 1).

*Fourth*, section 9.7.5 of the LGIA states that, "[i]n accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and compliance with Good Utility Practice," Seabrook shall "provide, install, own, and maintain" a circuit breaker "necessary to remove any fault contribution of the Large Generating Facility to any short circuit occurring on the

15

New England Transmission System not otherwise isolated by Interconnecting Transmission Owner's equipment."  JA__ (*Id.* § 9.7.5).  FERC has stated that the "specifications for System Protection Facilities . . . are determined during the Interconnection Stud[y]" process, Order No. 2003-A, 106 FERC ¶ 61,220 at P 153, which occurs well before the interconnecting generator commences operation.

4.    Beginning in May 2020, Seabrook and Avangrid began negotiating commercial terms for replacing the breaker.  The parties were able to resolve most of their differences.  The main exception was whether Avangrid was obligated to make Seabrook economically whole for costs incurred during the breaker replacement, including lost revenues due to the extended outage needed to replace the breaker.  The parties each separately sought clarity on this point from FERC.

## II.    Agency Proceedings

### A.    Seabrook's Petition and Avangrid's Complaint

On October 5, 2020, Seabrook filed a Petition for Declaratory Order with FERC.  JA__ (Petition for Declaratory Order).  One week later, Avangrid filed a complaint against NextEra, JA__ (Avangrid Complaint), which it subsequently amended.  JA__ (Avangrid Amended Complaint).

Avangrid argued that Seabrook was obligated to replace the breaker under FERC's open access regulations and the ISO-NE Tariff.[5]  Neither the Complaint nor the Amended Complaint ever argued that Seabrook's LGIA created any obligation to replace the breaker.

Seabrook asked FERC to declare that Seabrook was "not required to incur a financial loss to upgrade" the breaker "for [Avangrid's] sole benefit."  JA__ (Petition for Declaratory Order at 1).  In the alternative, Seabrook requested that FERC clarify that "nothing in . . . [the ISO-NE] Tariff … requires Seabrook to enter into an agreement to replace the [g]enerator [b]reaker."  JA__ (*Id*. at 1-2).

Seabrook also proposed a formula under which it would recover from Avangrid only those costs Seabrook actually incurred by extending the outage, subject to any challenge by Avangrid that the costs were incurred imprudently.  JA__ (NextEra Answer to Amended Complaint at 7).  Seabrook submitted an affidavit detailing the categories of foreseeable costs Seabrook proposed to recover under the formula—but only to the extent they were actually and prudently incurred.  JA___ (NextEra Answer to Complaint, Exh. 2).

---

[5]    Avangrid also requested that Seabrook file an engineering and procurement Agreement and disagreed on a revision to the definition of Good Utility Practice. The parties have since submitted that agreement to FERC, mooting these aspects of this dispute.  *See* JA__ (Initial Order P 16 n.27, P 77).

Some of those costs were referred to as "opportunity costs." *Id*. at 1-6. By extending the outage, neither Seabrook nor the minority owners of Seabrook Station will be able to earn revenues selling (and hedging) energy in the ISO-NE market or bilaterally. In 2020, Seabrook estimated that revenue losses, excluding bonus payments, will amount to about $560,000 per day, "though given current market volatility and pricing the actual lost revenue during the extended outage period may well be higher." JA__ (Request for Rehearing at 7). In addition, Seabrook also pointed to the potential to lose "bonus payments" that will be received from ISO-NE if a "capacity shortage condition" occurs during the outage extension. *Id*. at 7-8.

Seabrook also identified other costs that the extended outage will impose, including incremental labor and legal costs, as well as potential penalties imposed by ISO-NE for failing to perform if capacity shortage conditions occur during the outage extension. Seabrook estimated that capacity penalties would amount to about $5.1 million per hour; hence, if only a single shortage event occurs during the 2024 outage that is similar to an event that occurred in 2018, that would cost Seabrook about $14.3 million. JA__ (Request for Rehearing at 8 n.17).

Finally, one of Seabrook's experts identified several examples of expensive unexpected construction problems at other nuclear power plants that arose during outages for plant repairs. JA___ (Answer and Motion for Leave to Answer, Exh. 3 at 4-5). If a construction problem occurs and surrounding equipment is damaged,

Seabrook Station could be forced off-line for months and incur massive repair costs, opportunity costs, and potential capacity market penalties.

In September 2021, FERC issued an order requesting additional briefing. *See* JA__-__ (Briefing Order). The Briefing Order raised, for the first time, the question of "what obligations, if any, Seabrook has under its LGIA with respect to replacement of the breaker." JA__ (*Id.* at P 18).

### B. FERC's Initial Order

On February 1, 2023, after almost 28 months with no substantive action, FERC issued an Initial Order denying Avangrid's Complaint in part, granting the complaint in part, and dismissing Seabrook's Petition for Declaratory Order. JA__-__ (Initial Order). FERC rejected all the arguments offered in Avangrid's Amended Complaint as to why Seabrook was required to replace the generator breaker under FERC's open access requirements and the ISO-NE Tariff. JA__ (Initial Order P 74). That conclusion was based on FERC's factual finding that the generator breaker "is a component of [Seabrook's] generating facility" and "therefore cannot be reasonably considered a Network Upgrade to the Administered Transmission System." JA__, __ (Initial Order PP 25, 76).

Nonetheless, relying solely on the LGIA, FERC determined that "Seabrook may not refuse to replace the breaker because it is needed for reliable operation of Seabrook Station and required by Good Utility Practice." JA__ (*Id.* at P 74). As the

19

basis for this obligation, FERC oddly pointed to Appendix C-1, section B.III.  FERC found the provision, described above, to be "highly relevant," JA__ (*id.* at P 81), even though it deals only with allocating costs between Seabrook and New Hampshire Transmission when one of these parties makes voluntary changes to its facilities that affect the other's facilities.  Nevertheless, based on that provision, FERC asserted that "Good Utility Practice [as defined in the Seabrook LGIA] requires Seabrook to replace the breaker before Avangrid interconnects because the breaker will be overdutied following the interconnection."  *Id.*  It concluded that the "Seabrook LGIA does not permit Seabrook to refuse to replace the breaker when replacement is needed for reliable operation of the Seabrook Station and given the concerns in the record related to the impact of any unreliable Station operation on the reliable operation of the system."  JA__ (*Id.* at P 79).

FERC also determined that Seabrook will not be made whole for its opportunity costs and other economic costs.  Even though (according to FERC) Seabrook's purported obligation to replace its breaker stemmed from the LGIA, not the ISO-NE Tariff, FERC reached its conclusion that Seabrook was not entitled to be made whole based on an ISO-NE Tariff provision.  JA__ (*Id.* at P 101 (quoting Tariff § I.3.10)).  That provision obligates Avangrid to "construct[] at its expense such facilities as the ISO determines to be reasonably necessary to avoid" adverse effects.  *Id.*  According to FERC, this provision obligates Avangrid to pay only the

direct cost of the breaker and its installation, and not costs arising from the extended outage. Although FERC recognized that it "has allowed recovery of opportunity costs in specific circumstances," it concluded that "such circumstances are not present here" because Seabrook is not "providing an ancillary or other electric service" to Avangrid. JA__ (*Id*. at P 102). FERC did not explain why, if Seabrook was not providing any such service to Avangrid, its entitlement to cost recovery should be controlled by the ISO-NE Tariff.

Finally, FERC dismissed Seabrook's petition for a declaratory order. JA__ (*Id*. at P 112).

## C.    The Rehearing Stage

On March 3, 2023, Seabrook timely requested rehearing. JA__-__ (Request for Rehearing). On April 3, 2023, FERC stated that Seabrook's request for rehearing was denied by operation of law but "will be addressed in a future order." JA__ (Rehearing Order at 1). As permitted under the FPA and this Court's en banc decision in *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc), Seabrook petitioned for review in this Court the following day.

After Seabrook petitioned for review in this Court but before the agency record was filed with this Court, FERC issued an additional order addressing Seabrook's arguments in its rehearing petition. *See* JA__-__ (Modification Order). FERC "continue[d] to find that, pursuant to the terms of the Seabrook LGIA,

21

Seabrook must replace the breaker because it is needed for reliable operation of Seabrook Station and required by Good Utility Practice." JA__ (*Id*. at P 17). In response to Seabrook's argument that the LGIA governed only the parties to that agreement, which did not include Avangrid, and that the agreement expressly did not create any third-party beneficiaries, FERC responded that it "is enforcing the terms of the Seabrook LGIA to ensure that Seabrook abides by the standard of Good Utility Practice." JA__ (*Id.* at P 25).

FERC also pointed for the first time to section 9.7.5 of the LGIA, which it said "refers specifically to the installation and maintenance of breakers." JA__ (*Id.* at P 22). As described above, that provision requires Seabrook, "[i]n accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and compliance with Good Utility Practice," to "provide, install, own, and maintain" a circuit breaker "necessary to remove any fault contribution of the Large Generating Facility to any short circuit occurring on the New England Transmission System not otherwise isolated by Interconnecting Transmission Owner's equipment." JA__ (Seabrook LGIA § 9.7.5). FERC determined that this provision applied here and required Seabrook to "replace the breaker as needed to respond to changing transmission system conditions," *id.*— even though FERC did not identify any ISO New England Operating Document or Applicable Reliability Standard requiring Seabrook to upgrade a circuit breaker to

facilitate the future interconnection of a third party's proposed elective transmission project.

With respect to costs incurred to extend the outage, FERC "continue[d] to find that Seabrook is not entitled to reimbursement from Avangrid of the potential opportunity costs and legal costs associated with the breaker replacement that might arise if Seabrook is unable to replace the breaker within the period of its normal refueling outage."  JA__ (*Id.* at P 36).

## SUMMARY OF ARGUMENT

FERC lacks authority to order Seabrook to replace the generator breaker at Seabrook Station.  The FPA expressly prohibits FERC from exercising jurisdiction "over facilities used for the generation of electric energy."  16 U.S.C. § 824(b)(1).  FERC does not dispute that the generator breaker is a component of a generating facility.  Nor does it claim authority to directly regulate the breaker located inside the turbine building of Seabrook's nuclear power plant.  *See, e.g.*, JA__, __, __ (Initial Order PP 25, 76, 78) (repeatedly recognizing that the generator breaker is a "generator component" not part of the transmission system).

Instead, FERC invokes the LGIA as the sole basis to require Seabrook to replace the breaker.  But FERC cannot expand its jurisdiction through a private contract.  FERC's rationale for supervising LGIAs is that they are intended to benefit generation facilities by ensuring their non-discriminatory open access to the

transmission system.  FERC cannot now use LGIAs to assert authority over generation facilities, which the FPA prohibits.

FERC's reliance on the LGIA also fails on its own terms.  Its reasoning is flatly inconsistent with the plain text of the agreement.  Most fundamentally, the LGIA creates rights and obligations among the three parties to the agreement: Seabrook, New Hampshire Transmission, and ISO-NE.  It expressly excludes any third-party beneficiaries.  Avangrid is a third party and has no rights under the LGIA whatsoever.

The specific provision on which FERC primarily relies—Appendix C-1, section B.III—only underscores the problem.  That provision by its terms is limited to New Hampshire Transmission and Seabrook.  It creates no rights or obligations with respect to any other party—not even to ISO-NE, which is a party to the agreement.  Nor, by its terms, does the provision create any obligation to engage in construction.  FERC nevertheless found the provision "highly relevant" and then contorted it to create construction obligations owed to Avangrid.  *See* JA__ (Initial Order P 81).  FERC's countertextual reasoning must be reversed.

The second provision cited by FERC, section 9.7.5 of the LGIA, is also inapplicable on its face.  The language FERC relies upon applies by its terms only to address a "short circuit occurring on the New England Transmission System." JA__ (Seabrook LGIA § 9.7.5).  There is no short circuit occurring.  The breaker is

24

not in need of replacement and functions well. Nothing in the LGIA requires Seabrook to undertake a complicated and risky construction project inside of a nuclear power plant to accommodate a third party's commercial desire to develop a voluntary transmission project unneeded for reliability or grid-wide economic benefits.

Finally, to the extent Seabrook did have an obligation to replace the breaker, FERC offers an incoherent rationale for refusing to require Avangrid to make Seabrook economically whole. According to FERC, Seabrook's obligation to replace the breaker stems from the LGIA, and FERC recognizes that Seabrook is not providing any transmission service to Avangrid. Yet then, when it comes to cost recovery, FERC pivots to the ISO-NE Tariff, which governs transmission services, to find that Avangrid is responsible only for the direct costs of the breaker and its installation. Faced with Seabrook's response that FERC's ordinary rules of cost causation in the transmission context require Avangrid to compensate Seabrook for the lost revenue associated with the extended outage, FERC pivots again and contends that these principles do not apply because Seabrook is not providing any transmission service. FERC's game of hopscotch fails to satisfy its obligation for reasoned decision-making.

The Court should vacate and hold that Seabrook does not have any obligation to install the breaker, leaving cost allocation to commercial negotiations between the

parties.  To the extent Seabrook does have an obligation to replace the breaker, then FERC should have applied its usual cost-causation principles and required Avangrid to make Seabrook economically whole.  Those principles protect generators like Seabrook from being forced to spend their own money to upgrade their facilities for the benefit of unknown, unnamed, and unnumbered third parties, stretching out unlimited years into the future.

## STANDING

Petitioners have suffered direct injury in fact due to FERC's Orders because they have been directed to replace a generator breaker while potentially suffering millions of dollars in lost revenue and also facing possible additional other economic costs.  These injuries are caused by FERC's Orders and are redressable by vacatur of those Orders.

## ARGUMENT

### I.    Standard of Review

Under the APA, this Court must "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  "To determine whether the agency's action is contrary to law, [the Court] look[s] first to determine whether Congress has delegated to the agency the legal authority to take the action that is under dispute."  *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).  Although FERC's "interpretations of the jurisdictional

provisions of the Federal Power Act . . . enjoy *Chevron* deference," *NARUC*, 475 F.3d at 1279, *Chevron* deference "does not apply where the statute is clear," *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2291 n.9 (2021) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Similarly, while the Court may defer to FERC's interpretation of an ambiguous tariff provision, it must enforce unambiguous text. *Long Island Power Auth. v. FERC*, 27 F.4th 705, 716 (D.C. Cir. 2022). Likewise, "[i]n reviewing FERC's interpretation of a FERC-approved contract," the Court "consider[s] *de novo* whether the [contract] unambiguously addresses the matter at issue. If so, the language of the agreement controls for we must give effect to the unambiguously expressed intent of the parties." *S. Cal. Edison Co. v. FERC*, 502 F.3d 176, 181 (D.C. Cir. 2007) (internal quotation marks omitted). Seabrook also preserves the argument that *Chevron* deference does not apply in light of the Supreme Court's grant of *certiorari* in *Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023).

In addition, this Court "must set aside an agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *So. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 46 (D.C. Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

## II.    FERC Lacks Authority to Require Generators to Upgrade Their Generation Facilities.

FERC has the "responsibility to assert an adequate basis in law for its exercise of jurisdiction." *Mich. Pub. Power Agency v. FERC*, 405 F.3d 8, 16 (D.C. Cir. 2005) (Henderson, J., concurring); *see Okla. Nat. Gas. Co v. FERC*, 906 F.2d 708, 709 (D.C. Cir. 1990). FERC failed to do so here. FERC correctly found that Seabrook's breaker is a "generator component." JA__ (Initial Order P 76). And that is fatal to FERC's assertion of authority to require Seabrook to replace the breaker, because FERC may not regulate generation facilities.

The FPA sharply delineates the sphere of federal jurisdiction over electricity. On the one hand, FPA section 201(b)(1) provides that the "Commission shall have jurisdiction over all facilities for" (1) the "transmission of electric energy in interstate commerce" and (2) the "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). On the other hand, the FPA places strict limits on FERC's jurisdiction. As relevant here, it provides that FERC "shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy." *Id*. The FPA expressly confirms FERC's limited authority over generators in the interconnection context by specifying that FERC may not order the "enlargement of generating facilities" to promote interconnected operations. *Id.* § 824a(b).

Accordingly, FERC itself has previously recognized that it is "obviously correct that the [Act] prohibit[s] the Commission from directly regulating generating facilities." *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (quoting FERC Br. 22). As FERC's orders here purport to direct Seabrook to replace a generator component, that should be the end of this case.

FERC nevertheless relies on the LGIA as providing it with authority to direct the replacement of the breaker. That argument fails on its own terms, as discussed below in Part III. But more fundamentally, the argument fails because FERC cannot rely on the LGIA to expand its authority beyond the bounds that Congress set in the FPA. "[J]urisdiction cannot arise from the absence of objection, or even from affirmative agreement. To the contrary, 'as a statutory entity, the Commission cannot acquire jurisdiction merely by agreement of the parties before it.'" *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 463 (D.C. Cir. 2005).

Consistent with the lines Congress drew, the LGIA is intended to govern "relationships between parties with respect to electricity flowing over facilities," *NARUC*, 475 F.3d at 1280, not to give FERC authority over the generating facilities of interconnected generators. As this Court has explained, in 1996 FERC adopted Order No. 888, which required "transmission providers, which typically have a natural monopoly, to give generators equal access to transmission facilities." *Id.* at 1279; *see New York v. FERC*, 535 U.S. 1, 11-12, 14 (2002). "In the period directly

after issuing Order No. 888, FERC had monitored one element of the process—the interconnection agreements between operators of generators and transmission facilities—on a case-by-case basis," but found that approach to be "inadequate." *NARUC*, 475 F.3d at 1279. Specifically, FERC was concerned that transmission owners could use the interconnection process to subvert the goals of Order No. 888, by preferring affiliated generation and delaying interconnection with non-affiliated generation. Order No. 2003, 104 FERC ¶ 61,103 at PP 10-12. FERC reiterated that "[i]nterconnection is a critical component of open access transmission service," *id.* at P 12, and determined that it therefore "may order generic interconnection terms and procedures pursuant to its authority to remedy undue discrimination and preferences" by public utilities owning or controlling jurisdictional transmission facilities. *Id.* at P 20. Accordingly, FERC directed transmission owners to adopt *pro forma* interconnection agreements to "achiev[e] transparency and prevent[] transmission facility owners from favoring affiliated generators over independents in interconnection." *NARUC*, 475 F.3d at 1279.

Put simply: LGIAs regulated *transmission owners* for the benefit of unaffiliated generators *seeking* to interconnect. Yet here, FERC relies on an LGIA to regulate the owner of a previously interconnected generation facility and interconnection customer under the LGIA, Seabrook, to benefit a transmission

30

developer, Avangrid, with which Seabrook has no relationship at all. That contradicts the jurisdictional rationale for Order No. 2003.

Indeed, FERC's reliance on the LGIA in this case has no limiting principle. Virtually every large generator in the United States (outside of Alaska, Hawaii, and portions of Texas) is interconnected with the interstate transmission grid. If mere interconnection were enough for FERC to regulate generation facility components, so long as FERC could point to some other entity somewhere on the grid that would benefit, the FPA's careful jurisdictional scheme would be obliterated. FERC cannot use the LGIA to bootstrap its way to a far broader authority than Congress intended.

## III. The LGIA Cannot Reasonably Be Read to Confer Jurisdiction Over the Breaker Replacement.

FERC's reliance on the LGIA also fails on its own terms. Indeed, Avangrid did not even argue in either its Complaint or its Amended Complaint that the LGIA obligated Seabrook to replace the generator breaker. The plain text of the LGIA explains why.

### A. The LGIA Does Not Create Obligations to Third Parties.

The LGIA states in unmistakable terms that there are "[n]o [t]hird [p]arty [b]eneficiaries" to the agreement. JA__ (Seabrook LGIA § 30.5). It also provides that the "obligations herein assumed are solely for the use and benefit of the Parties, their successors in interest and, where permitted, their assigns." *Id*. Avangrid is not a party to the LGIA. JA__ (*Id*. at 4); *cf.* Order No. 2003, 104 FERC ¶ 61,103 at P 31

31

& n.33; *Cherokee Cnty. Cogeneration Partners, LLC v. FERC*, 40 F.4th 638, 641 (D.C. Cir. 2022).

FERC blows past the LGIA's prohibition on third-party beneficiaries without the slightest pause. In a classic *ipse dixit*, FERC asserts that it is merely holding Seabrook to the terms of the LGIA and the Good Utility Practice standard. *See* JA__ (Modification Order P 25) (stating that section 30.5 "bar[s] a third-party who benefits from the contract's terms from enforcing a contract as if it were a party to the contract," but that "here the Commission is enforcing the terms of the Seabrook LGIA to ensure that Seabrook abides by the standard of Good Utility Practice"); *see also* JA__ (Initial Order P 85). That does not satisfy the requirement for reasoned explanation. FERC is holding that Seabrook owes obligations under the LGIA to Avangrid, a non-party to the contract. The bar on third-party beneficiaries forecloses exactly that.

### B. The LGIA Provisions on Which FERC Relies Do Not Require Seabrook to Replace the Breaker.

FERC relies on three LGIA provisions to justify its position, but none of these provisions support FERC's conclusions. Even if the bar on third-party beneficiaries is ignored, these provisions do not obligate Seabrook to replace the breaker.

#### 1. Appendix C-1, Section B.III

FERC first relies on a blatant misreading of Appendix C-1, section B.III. That provision states:

> [I]n the event Interconnecting Transmission Owner or Interconnection Customer make a modification or functional change to its own facilities that is not required by Applicable Laws and Regulations or Governmental Authority, and thereby makes it necessary for the other entity to make a modification or functional change to its own facilities that is required in accordance with Good Utility Practice, the entity making the modification or functional change not required by Law or Governmental Authority shall bear the cost of the modification or functional change to the other entity's facilities required in accordance with Good Utility Practice.

JA__ (Seabrook LGIA Appx. C-1, § B.III).  In FERC's view, this provision is "highly relevant" because it "contemplates Seabrook making modifications to its facilities that are made necessary by another entity's actions."  JA__ (Initial Order P 80).  Based on that alone, FERC determines that the other "entity" can be Avangrid.

a.  The text of this provision unambiguously forecloses FERC's interpretation. *See, e.g.*, *Long Island Power Auth.*, 27 F.4th at 716-17.  Even putting aside the contract's general prohibition on third-party beneficiaries, the plain terms of section B.III make clear that the provision is triggered only when changes to facilities are made by "Interconnecting Transmission Owner" (New Hampshire Transmission), "or Interconnection Customer" (Seabrook).  The provision does not apply if a change is made by someone else, somewhere else on the transmission system.  Indeed, the provision by its terms does not even apply to ISO-NE, the third signatory to the LGIA.  *See* JA__ (Seabrook LGIA § 1).

33

FERC candidly "acknowledge[s]"—as it must—"that [this provision] generally pertains to changes made by the interconnection customer or the interconnecting transmission owner, which in this case would be Seabrook and its interconnecting transmission owner, New Hampshire Transmission." JA__ (Initial Order P 81). Inexplicably, however, it then reads the provision to impose "a requirement for Seabrook to make future modifications to its facilities that are triggered by another entity's actions" more generally. JA__ (Initial Order P 82).

That is not how contract interpretation works. FERC is not free to conjure up new and broader contractual obligations based on its sense of what the text "reflects" or by analogy to a provision that it deems to be "highly relevant." As this Court has said many times, "[i]n reviewing FERC's interpretation of a FERC-approved contract … the language of the agreement controls for we must give effect to the unambiguously expressed intent of the parties." *S. Cal. Edison Co.*, 502 F.3d at 181 (internal quotation marks omitted). FERC is not free to rewrite Seabrook's obligations under the LGIA to create duties to new parties not contemplated by the agreement itself—indeed, duties that are foreclosed by the agreement's express terms.

b. Moreover, even as between New Hampshire Transmission and Seabrook, the text of section B.III is concerned only with cost allocation. It governs how costs are to be divided between Seabrook and New Hampshire Transmission in the event

34

that certain modifications to the generation or interconnection facilities are made. *See* JA__ (Seabrook LGIA Appx. C-1, § B.III) (focusing on who will "bear the cost"). It does not impose construction obligations. The provision is framed in the conditional: "in the event" (1) that one party makes certain modifications to its facilities, and if (2) those modifications "thereby make[] it necessary" for the second party to make reciprocal modifications to its own facilities to accord with Good Utility Practice, then (3) the second party is entitled to recover costs from the first party. Nothing in the plain terms of this provision creates any obligation for Seabrook to make modifications at its sole risk and expense—let alone some free-floating obligation to do so whenever FERC later finds that might help a third party interconnect to a different part of the New England transmission system.

FERC admits as much. The Orders recognize that the "provision sets out the cost responsibilit[ies] related to modifications to the generating facility post-interconnection." JA__ (Initial Order P 82); *see also* JA__ (Modification Order P 21) ("We do not dispute that Appendix C-1, section B.III also serves as a cost allocation provision"). Yet FERC nevertheless asserts that the provision also "provid[es] for future modifications to account for changing conditions on the system in order to maintain reliability." JA__ (Initial Order P 82). In FERC's view, this narrow bilateral obligation in fact broadly serves to "notif[y] the parties that certain modifications may be required in order to continue the facility's operation in

35

accordance with Good Utility Practice." *Id.* But that is not what the words say: they address the allocation of costs between two specific parties created by future modifications to their facilities made under a specific sequence of events—none of which has actually occurred here.

The Modification Order, meanwhile, is entirely unresponsive to Seabrook's rehearing petition. It asserts only that "[t]he terms 'modification' and 'functional change' are not reasonably read to preclude construction." JA__ (Modification Order P 21). That misses the point: FERC needs to find a basis to *require* construction, and it has not done so. A provision about cost allocation does not create the obligation to undertake construction in the first instance—and certainly not on the facts here, where New Hampshire Transmission has not made any change at all.

### 2.    Good Utility Practice

FERC also seizes on section B.III's reference to Good Utility Practice and concludes that "Seabrook is similarly required to modify or change its facilities consistent with Good Utility Practice here, when that modification or change is necessary for reliability." JA__ (Initial Order P 83). But the reference to Good Utility Practice in section B.III is linked to changes in facilities by New Hampshire Transmission or Seabrook. It is not a free-floating obligation to undertake

construction to facilitate elective transmission projects proposed by unrelated third parties.

However, even once again putting aside the LGIA's express bar on third-party beneficiaries, and the text of section B.III creating reciprocal obligations only between New Hampshire Transmission and Seabrook, FERC's rationale still fails.

The LGIA defines Good Utility Practice as:

> any of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition.

JA__ (Seabrook LGIA § 1).

FERC has not explained why Good Utility Practice requires incurring incremental and potentially substantial new costs to replace a breaker that is currently reliable and meets all applicable NRC safety requirements.

The scenario FERC claims to fear—where the NECEC Project is interconnected without the breaker first being replaced—can never occur. That is because the ISO-NE Tariff, which indisputably governs when the NECEC can interconnect, is clear that the NECEC Project cannot interconnect or be energized unless and until the breaker is replaced. *See* JA__ (Briefing Order, Danly, Comm'r, dissenting at P 4) (explaining that "[a]ny adverse effects identified by ISO-NE's

37

study must be mitigated *before* the interconnection is placed in operation." (emphasis added)); *accord* JA__ (ISO-NE Brief at 9 n.22). Good Utility Practice does not require replacing a breaker that remains entirely adequate and functional.

In reality, FERC is using the label of "Good Utility Practice" to force a nuclear power plant to undertake a costly and risky project that is not currently needed, and that Good Utility Practice would discourage, for the benefit of an unrelated entity's voluntary transmission project that is not needed either for grid reliability or for grid efficiency. That is not something Good Utility Practice requires. It is not a practice "engaged in or approved by a significant portion of the electric utility industry during the relevant time period," JA__ (Seabrook LGIA § 1)—indeed, to Seabrook's knowledge, the obligation imposed here is unprecedented. Nor is it a practice "which … could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition." *Id*. Extending an outage at a cost of millions—if not tens of millions—of dollars of lost revenue and other costs for the benefit of an unrelated party is not a "reasonable cost consistent with good business practices" that a utility manager would reasonably and voluntarily undertake.

### 3.    Section 9.7.5

Finally, FERC's belated reliance at the rehearing stage on section 9.7.5 of the LGIA is misplaced for several reasons.

38

*First*, section 9.7.5 by its plain terms does not apply. The provision states that Seabrook is obligated to install a circuit breaker "[i]n accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and compliance with Good Utility Practice." JA__ (Seabrook LGIA § 9.7.5). FERC does not identify any ISO New England Operating Document or Applicable Reliability Standard that requires Seabrook to replace the breaker. Instead, its contention that section 9.7.5 applies rests, once again, on the misplaced notion that Good Utility Practice requires the breaker's replacement. As already explained, that conclusion is baseless and ignores how Good Utility Practice is actually defined. *See supra* at 36-38.

Moreover, section 9.7.5 applies to the provision or installation (along with other verbs) of a breaker only to remove the fault contribution "to any short circuit occurring on the New England Transmission System." JA__ (Seabrook LGIA § 9.7.5). But there is no "short circuit occurring" and no one has claimed otherwise. To the contrary, the duty on the Seabrook Station circuit breaker is currently "within its ratings," JA__ (ISO-NE Letter at 2), and the breaker replacement is "not required 'but for' the interconnection of [the NECEC] Project." *Id.* The Nuclear Regulatory Commission confirmed that "inspectors have reasonable assurance that the Seabrook main generator output breaker can perform its intended function with the current margin available to the rated short circuit current capability of the breaker." JA__

39

(NextEra Motion to Lodge NRC Letter at 2). And because NECEC cannot interconnect and energize unless and until the breaker is replaced, there is no prospect of a short circuit occurring.

FERC offers a vague observation that the text of section 9.7.5 "does not limit the events" that may prompt the need to provide circuit breakers. JA__ (Modification Order P 22). But in reality, section 9.7.5 is quite specific. FERC is not free to conjure up new obligations that go beyond what the text of the agreement provides.

FERC also states that "section 9.7.5 *appears to contemplate* that transmission system conditions change over time, as they have here in response to a third-party's interconnection." JA__ (*Id.* at P 22) (emphasis added). But again this ignores that Avangrid, the third party, has not yet interconnected and cannot interconnect unless and until the breaker is replaced. As things stand now, transmission system conditions have not changed. FERC is not free to turn this tailored provision to address present needs into a grant of roving authority to order Seabrook to physically enlarge the breaker inside its nuclear power plant—something Congress expressly prohibited FERC from doing, 16 U.S.C. § 824(b)(1)—to accommodate the future interconnection of a voluntary transmission project that is not yet even under construction. The plain text of section 9.7.5 is inconsistent with the obligation FERC seeks to foist onto Seabrook.

FERC additionally refers to a sentence in section 9.7.5 stating that the "Interconnection Customer shall be solely responsible to disconnect the Large Generating Facility and Interconnection Customer's other equipment if conditions on the New England Transmission System could adversely affect the Large Generating Facility."  JA__ (Modification Order P 22 n.61); JA__ (Seabrook LGIA § 9.7.5).  But that sentence says nothing about installing new protective equipment— let alone giving third parties an entitlement to require Seabrook to do so.  It just says that if adverse system conditions occur, Seabrook has the obligation to disconnect its generator.

Tellingly, ISO-NE, the only party to raise section 9.7.5 in response to the Briefing Order, agrees that section 9.7.5 does not obligate Seabrook to replace the breaker for Avangrid's benefit.  ISO-NE stated: "Article 9.7.5 does *not* require Seabrook to upgrade the Seabrook Breaker for the benefit of another entity's interconnection to the system."  JA__ (ISO-NE Brief at 13) (emphasis added). FERC cited ISO-NE's discussion of section 9.7.5, but completely ignored the fact that ISO-NE drew a contrary conclusion about that provision's meaning.  JA__ (Modification Order P 22).  That fails the test of reasoned decision-making.

*Second*, FERC's reading of section 9.7.5 is at odds with FERC's established policy that once a generator pays for the upgrades needed to reliably interconnect its generation facility, it cannot be on the hook for funding additional upgrades so

someone else can interconnect in the future.  For example, in *Entergy Services., Inc.*, 99 FERC ¶ 61,127 (2002), FERC rejected a provision that the transmission provider included in the interconnection agreement that would have "require[d] generators to make changes to their facilities when necessary because of changes made to Entergy's system."  *Id.* at 61,544; *see also Newmont Nev. Energy Inv. LLC v. Sierra Pac. Power Co.*, 147 FERC ¶ 61,030 at P 41 (2014) (confirming that "[i]n *Entergy Services, Inc.*, [FERC] rejected the transmission provider's proposal to include in its *pro forma* interconnection agreement a requirement for generators to make changes to their facilities when necessary because of changes made to the transmission system.").  FERC does not even attempt to reconcile the obligations it imposes here with that policy, which is arbitrary and capricious.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." (emphasis in original)).

*Third*, FERC's interpretation of section 9.7.5 not only conflicts with prior precedent, but also creates a conflict between the LGIA and the ISO-NE Tariff. According to FERC, Seabrook's failure to install the breaker before the NECEC Project energizes—potentially even if the failure is due to events outside Seabrook's

42

control[6]—would constitute a breach of its obligations under the LGIA, and the remedy under the LGIA is to disconnect Seabrook Station from the transmission system if the breach cannot be timely cured.  JA__, __-__ (Seabrook LGIA §§ 2.5, 17.1).  But that conflicts with the Tariff, which (as noted above) states that a voluntary transmission upgrade cannot go forward until the transmission developer "constructs at its expense such facilities as the ISO determines to be reasonably necessary" to avoid adverse effects on Affected Systems.  JA__ (Tariff § I.3.10).  FERC's interpretation of the LGIA thus places Seabrook Station at the risk of disconnection if Seabrook fails to facilitate an elective transmission project—the exact inverse of what the Tariff provides.

*Fourth*, FERC's reading of section 9.7.5 ignores the purpose of that provision.  Section 9.7.5 is substantively identical to a provision in the standard LGIA adopted by FERC in Order No. 2003; and Order No. 2003-A makes clear there is no ongoing duty to continually add new protective equipment.  There, in the course of rejecting an argument by Avangrid's affiliate, Central Maine Power, FERC explained that "[t]he specifications for System Protection Facilities . . . are determined during the

---

[6] FERC states in the Modification Order: "Any unforeseen delays caused by manufacturing specification errors or geopolitical issues will not result in Seabrook being in default under the Seabrook LGIA, provided that Seabrook continues to proceed with the replacement work under the Reasonable Efforts/Good Utility Practice requirement in the E&P Agreement."  JA__ (Modification Order P 26).  But unforeseen delays can result from other causes as well.

Interconnection Studies." Order No. 2003-A, 106 FERC ¶ 61,220 at P 153. Those studies are undertaken *before* a generator interconnects to the transmission system.

It is telling that in the 20 years since FERC originally adopted this provision in Order No. 2003—and on rehearing determined that it required system protection facilities to be addressed during the interconnection study process—it has never previously interpreted the language to require ongoing construction obligations.

\*    \*    \*

In sum, the purpose of the LGIA is to interconnect Seabrook Station to the transmission system administered by ISO-NE, not to create obligations on generators to facilitate the interconnection of others. Accepting FERC's holding— which has no basis in the LGIA's text—will have sweeping implications. Every large generator in the country has an LGIA with similar provisions. FERC freely concedes that, under its interpretation, interconnections hundreds of miles away can give rise to construction obligations. *See* JA__ (Modification Order P 24) ("The geographic distance between Avangrid's point of interconnection with ISO-NE to the Seabrook Station, which Seabrook estimates to be approximately 100 miles, is irrelevant."). Surely the parties to LGIAs, having included prohibitions on third-party beneficiaries, could not have anticipated that they were signing up to make any changes to their own facilities, no matter how costly, necessitated by subsequent interconnections by unnamed parties no matter how distant those facilities might be.

44

As explained above, the purpose of an LGIA was to prevent *transmission owners* from circumventing FERC's open access rules. LGIAs were not intended to obligate *generators* (interconnection customers) to subsidize, at their own expense, interconnections by distant new transmission projects or generators.

Because FERC's orders rest on "its flawed interpretation of the … Interconnection Agreement," and lack any basis in substantial evidence, they cannot stand. *See NextEra Desert Ctr. Blythe, LLC v. FERC*, 852 F.3d 1118, 1122 (D.C. Cir. 2017).

### C.    FERC's Suggestion that Seabrook Seeks to Exercise Veto Power Over the NECEC Project Is Arbitrary and Capricious.

In the Modification Order, FERC implies that it must have jurisdiction to order Seabrook to replace the generator breaker because Seabrook otherwise might exercise "veto power over the interconnections of new and competing interconnection customers." JA__ (Modification Order P 23). That is arbitrary and capricious.

From the beginning of this dispute, Seabrook has always been clear that it is willing to replace the breaker to facilitate Avangrid's interconnection on commercially reasonable terms. Contrary to FERC's suggestion, Seabrook is not seeking to exercise a "veto." Seabrook simply seeks to hold Avangrid to its obligations as the developer of a voluntary Elective Transmission Upgrade to reimburse identified costs for a breaker replacement that would not be necessary

45

"but for" the proposed interconnection.  JA__ (ISO-NE Letter at 2).  Seabrook should not be expected to incur losses likely amounting to millions—if not tens of millions—of dollars to facilitate a new project's interconnection to the transmission grid.

Regardless, FERC's purported policy concern about completion of the NECEC Project is not a basis to assert jurisdiction where none exists.  To the extent FERC is concerned about an existing generator "vetoing" new entrants, it has ample tools at its disposal beyond exceeding its jurisdictional ambit.  It has already taken steps to improve the interconnection process, both generally by revisiting the procedures governing the interconnection process as a whole, *see* Proposed Rule, Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection, 87 Fed. Reg. 26,504 (May 4, 2022), and specifically by instituting a section 206 proceeding in this case (which it subsequently dismissed) to investigate the justness and reasonableness of the ISO-NE Tariff as applied to generating facilities that are Affected Parties charged with making upgrades.  *See* JA__-__ (Briefing Order PP 20-26); JA__ (Modification Order P 50).  FERC cannot, however, arbitrarily distort the terms of the Seabrook LGIA to reach its desired result.

Indeed, if anything, the broader policy implications of this case point in favor of rejecting FERC's unprecedented reading of the LGIA.  As noted above, most of

the LGIA provisions FERC invokes are standard LGIA terms that appear in essentially the same form in hundreds of agreements governing the interconnection of large generators across the country.  If the Court blesses FERC's assertion of authority here, FERC could rely on that decision to reopen every LGIA in existence to require generators of all types around the country to subsidize new third-party entrants through expansion or replacement of generation facility components.  That would create substantial uncertainty in the electric industry, which is capital-intensive and relies on long-term certainty to support commercial financing of the massive investments required.  *Cf. NRG Power Marketing, LLC v. Maine Pub. Util. Comm'n*, 558 U.S. 165, 174 (2010) ("Competitive power markets simply cannot attract the capital needed to build adequate generating infrastructure without regulatory certainty" (quoting *Nevada Power Co. v. Duke Energy Trading & Mktg., L.L.C.*, 99 FERC ¶ 61,047 at 61,184, 61,190 (2002), *clarified on reh'g*, 100 FERC ¶ 61,273 (2002))).

## IV.    To the Extent Seabrook Did Have an Obligation to Replace the Generator Breaker, FERC's Cost-Allocation Determination Was Arbitrary and Capricious.

If Seabrook did have an obligation to replace the generator breaker, it was arbitrary and capricious for FERC to require Seabrook to replace the breaker without recovering any of the lost revenue or other economic costs associated with that work.

### A.    FERC's Reasoning Is Incoherent.

An "order with apparent contradictions as to a dispositive issue is not reasoned decisionmaking and requires remand for clarification." *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1055 (D.C. Cir. 2022).  That fatal flaw plagues FERC's refusal to direct Avangrid to make Seabrook economically whole and warrants reversal.

As discussed at length above, FERC rooted Seabrook's purported obligation to replace the breaker in the LGIA.  In the course of reaching that conclusion, it expressly held that Seabrook was not providing any transmission service to Avangrid, so ISO-NE Tariff obligations did not apply to Seabrook.  JA__ (Initial Order P 76 ("[T]he breaker is used not for the transmission of energy but to connect the generator to offsite power and to protect the generator from faults on the Administered Transmission System.")).  Yet then, when it came to absolving Avangrid of any obligation to make Seabrook economically whole for the extended outage, FERC looked to the ISO-NE Tariff.  JA__ (Initial Order P 101 (citing Tariff § 1.3.10)).

Having mixed and matched the Tariff and the LGIA, FERC then compounded the incoherence of its analysis by pivoting away from the Tariff once again when presented with its own precedent on transmission cost allocation.  Seabrook pointed out to FERC that the cost causation principle (from the transmission context)

requires compensation for its lost revenue associated with the extended outage. FERC responded that the cost causation principle does not apply because Seabrook is not providing transmission service, JA__ (Initial Order P 102)—fatally contradicting its own reliance on a transmission services tariff provision to find that Avangrid bears no cost responsibility. Agency orders beset with such contradictions fall far short of the reasoned decisionmaking standard.

### B.   FERC Arbitrarily Dismissed the Prospect of Unforeseen Delays and the Evidence of Costs Arising from Extended Outages.

Seabrook submitted uncontested evidence regarding the need to extend the outage to accommodate the breaker installation and the resulting economic harm to Seabrook. Nevertheless, FERC held that this harm should go uncompensated. That conclusion was arbitrary and capricious for three reasons.

*First*, FERC claims that Seabrook failed to preserve at least some of its arguments about financial harm by waiting until rehearing to raise such arguments. *See* JA__-__ (Modification Order P 39). That is incorrect. Seabrook has raised exactly the same cost concerns since the beginning of this case, when it proposed a formula rate to capture very specific cost categories. *See supra* at 17.

In the Declaratory Order proceeding, Seabrook and Avangrid argued about whether the costs at issue were consequential damages. *See, e.g.*, JA__ (NextEra Answer to Protest at 20). Contrary to Avangrid's claims, they are direct, identifiable costs that Seabrook will incur by replacing the breaker for Avangrid's profit-seeking

49

benefit.  But regardless how one might label them, the specific underlying costs were raised both at the outset and repeatedly throughout this case.    FERC's non-preservation claim is nonsense.

*Second*, FERC discounted the economic harm posed to Seabrook on the ground that Seabrook had not definitively determined, with 100% certainty, that an extended outage would be required.  *See* JA__ (Initial Order P 105); JA__, ___ (Modification Order PP 36-37, 39).  However, FERC cannot brush aside Seabrook's detailed presentation of likely and possible cost burdens based on the inherent uncertainty surrounding future events.  As an economic regulator, FERC is perfectly capable of exercising predictive judgment.  *See, e.g.*, *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1008-09 (D.C. Cir 1987) ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall; nor need they do so for predictions that competition will normally lead to lower prices").  FERC therefore is obligated to at least attempt to grapple with the merits and the evidence—and cannot duck that obligation by simply claiming uncertainty about future events.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) ("Recognizing that policymaking in a complex society must account for uncertainty, however, does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions.  The agency must explain the evidence which is available, and must offer

a 'rational connection between the facts found and the choice made.'" (citation omitted)); *U.S. Dep't of Interior v. FERC*, 952 F.2d 538, 546 (D.C. Cir. 1992).

Here, the record evidence showed that the lost energy revenues are virtually certain to occur. The potential capacity market losses (both foregone bonuses and penalties) are less likely, but still possible—and if they occur, they could cost Seabrook over $10 million. The entire purpose of the pay-for-performance capacity model that FERC approved is to make generators focus on keeping their plants online to perform when the system is stressed. *See ISO New England Inc.*, 147 FERC ¶ 61,172 at PP 36-40 (2014), *reh'g denied*, 153 FERC ¶ 61,223 (2015). Seabrook is tailor-made for this because nuclear power plants are immune to the weather and fuel-supply issues that can bedevil other generator types. Seabrook should not be required to extend an outage and face potentially large and uncompensated capacity market losses entirely for Avangrid's commercial benefit. And if it somehow turns out that the outage will not need to be extended, then Avangrid will pay nothing under Seabrook's formula rate proposal.

The importance of appropriately allocating the risk of uncertainty is particularly important where Seabrook is risking damage inside a nuclear power plant, posing enterprise risk to Seabrook for Avangrid's economic benefit. Unlikely events occur all the time, sometimes with catastrophic consequences. *See generally* Charles Perrow, *Normal Accidents: Living with High-Risk Technologies* (1999) (the

51

first two chapters of this book are titled *Normal Accident at Three Mile Island* and *Nuclear Power as a High Risk System: Why We Have Not Had More TMIs–But Will Soon*); Nassim Nicholas Taleb, *The Black Swan: the Impact of the Highly Improbable* (2007).  Perhaps more than any other industry, the nuclear power industry engages in complex analyses of scenarios that are unlikely but, if they were to occur, would have weighty consequences.  It is arbitrary and capricious for FERC to willfully disregard those risks here.

*Third*, FERC repeatedly relies on the faulty premise that "Seabrook is in the best position to ensure it need not extend its refueling outage in order to complete this breaker replacement."  JA__ (Modification Order P 36); *see also* JA__ (*id.* at P 43 n.123) ("[W]e continue to find that Seabrook is in the best position to ensure it does not extend the outage period with the design and implementation choices it makes."); JA__ (Initial Order P 105) (same).  The record evidence squarely shows, however, that extending the outage is likely unavoidable.  *See, e.g.*, JA__-__ (Petition for Declaratory Order, Attach. D at 7-9).  Nonetheless, under FERC's novel approach, there is no limit to the cost burdens that an existing generator may need to bear.  If the outage extends for weeks or months, FERC's reasoning would dictate that Seabrook remain on the hook for all the lost revenue and other costs that result despite the fact that the outage is created by an investment decision that Seabrook

had nothing to do with.  FERC has not explained why such a draconian and arbitrary rule is reasonable.

Moreover, as noted above, FERC itself recognizes elsewhere in the Modification Order that unforeseen developments could arise for which Seabrook bears no responsibility: "[A]ny unforeseen delays caused by manufacturing specification errors or geopolitical issues will not result in Seabrook being in default under the Seabrook LGIA, provided that Seabrook continues to proceed with the replacement work under the Reasonable Efforts/Good Utility Practice requirement in the E&P Agreement."  JA__ (Modification Order P 26).  If that is so, then it was unexplained and arbitrary for FERC elsewhere to rely on the background premise that Seabrook has meaningful control over whether the outage will need to be extended.

### C.    FERC Departed from Longstanding Interconnection Cost Allocation Rules Without Adequate Explanation.

The appropriate venue for deciding the economic terms on which Seabrook replaces the breaker is the commercial negotiations among the parties.  But to the extent the LGIA imposes an obligation, as FERC found below, then FERC's longstanding precedent on assigning cost responsibility should apply.  By unreasonably departing without adequate explanation from that precedent, FERC's orders are arbitrary and capricious.

53

FERC has acknowledged under similar circumstances, when generators are required to reschedule outages, that generators are entitled to *receive identifiable lost opportunity costs* to ensure they are compensated "fairly."  *See Midwest Indep. Transmission Sys. Operator, Inc.*, 100 FERC ¶ 61,262 at P 46 (2002).  Providing for recovery of lost revenue and other economic costs in this context is consistent with longstanding "cost causation" principles and makes sense as a matter of policy.  The general "cost causation" rule provides that costs must be "'allocated to those who cause the costs to be incurred and reap the resulting benefits.'"  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 85 (D.C. Cir. 2014) (quoting *NARUC*, 475 F.3d at 1285).  If an upgrade would not be needed "but for" an interconnection request, the interconnection customer pays the full costs of the upgrade.  *See, e.g.*, *ISO New England Inc.*, 137 FERC ¶ 61,112 at P 9 (2011).  And here, ISO-NE squarely found that the "Seabrook Station circuit breaker upgrade was not required 'but for' the interconnection of [the NECEC] Project."  JA__ (ISO-NE Letter at 2).

In the Modification Order, FERC justified its refusal to allow opportunity costs on its assertion that it has only allowed recovery of such costs in limited circumstances "to combat perverse incentives that are not present here."  JA__ (Modification Order P 40); *see also* JA__ (*id.* at P 41 (asserting that "there is no perverse incentive in the instant case that requires remedy through the recovery of opportunity costs," and that "[t]o the contrary, perverse incentives are more likely to

54

result if Seabrook is assured recovery of opportunity costs")). But FERC never explained why those perverse incentives are not equally present here, where an existing resource is being asked to subsidize a new interconnecting entity pursuing its own economic self-interest. After all, the entire premise of the cost-causation rule is that an interconnection customer pays for the costs caused by its interconnection in exchange for deliverability going forward. In other words, the existing customer knows that it is protected by the same cost-causation principles that led it to incur interconnection costs in the first place. That certainty is important, and it encourages project developers to reduce the costs of their interconnections, which in turn reduces customer costs. And, of course, FERC did not address how Seabrook's proposed formula rate could ever create perverse incentives, given that opportunity costs would be recoverable only following a subsequent Commission determination that they were prudently incurred. *See supra* at 17.

FERC also rejected this conclusion by arbitrarily and capriciously relying on Order No. 2003-A, which states that "if authorized contractually, recovery [of outage costs] may be justified on a case-by-case basis, depending on the facts of individual cases." JA__ (Initial Order P 103 (quoting Order No. 2003-A, 106 FERC ¶ 61,220 at P 647) (alteration in original)). But the mere fact that a question is decided on a "case-by-case basis" is not, without more, a reason to deny Seabrook the benefit of a rule that is applied in some of those cases. "That is because

55

identifying the relevant factors that would govern a case-by-case analysis is critical to ensuring that the Federal Power Act's requirements of openness, equal treatment, and predictability in rates are enforced." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 21 (D.C. Cir. 2014).  Here none of FERC's reasons supports its approach.  FERC's failure to apply the ordinary cost-allocation rules was arbitrary and capricious.

## CONCLUSION

The Court should grant the petition and vacate the Orders under review.

Respectfully submitted,

/s/ John N. Estes III

| | |
|---|---|
| Joel D. Newton | John N. Estes III |
| Senior FERC Counsel | Matthew E. Price |
| NextEra Energy Resources, LLC | Juliana Brint |
| 801 Pennsylvania Ave., N.W. | Arjun Ramamurti |
| Suite 220 | JENNER & BLOCK LLP |
| Washington, DC 20004 | 1099 New York Ave, NW Suite 900 |
| (202) 347-7126 | Washington, DC 20001 |
| | (202) 639-6000 |

July 28, 2023

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7) and D.C.

Circuit Rule 32(e), I certify that the foregoing brief has been prepared in Microsoft

Word 2013 using 14-point Times New Roman typeface and is double-spaced (except

for headings, footnotes, and block quotations).  I further certify that the brief is

proportionally spaced and contains 12,710 words, excluding the parts of the brief

exempted by D.C. Circuit Rule 32(a)(7).  Microsoft Word 365 was used to compute

the word count.

/s/ John N. Estes III
John N. Estes III
JENNER & BLOCK LLP
1099 New York Ave, NW, Ste. 900
Washington, DC 20001
(202) 639-6000
jestes@jenner.com

*Counsel for Petitioners NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC*

July 28, 2023

## CERTIFICATE OF SERVICE

I certify that, on July 28, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ John N. Estes III
John N. Estes III
JENNER & BLOCK LLP
1099 New York Ave, NW, Ste. 900
Washington, DC 20001
(202) 639-6000
jestes@jenner.com

*Counsel for Petitioners NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC*

July 28, 2023

**ADDENDUM**

# INDEX

5 U.S.C. § 706 ................................................................................. Add. 1

16 U.S.C. § 824 ............................................................................... Add. 1

16 U.S.C. § 824a ............................................................................ Add. 4

16 U.S.C. § 825*l* ............................................................................ Add. 8

**5 U.S.C. § 706**

**§ 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**16 U.S.C. § 824**

**§ 824. Declaration of policy; application of subchapter**

(a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and

subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

(b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

(c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

(d) "Sale of electric energy at wholesale" defined

Add. 2

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

(e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f)1, 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

(g) Books and records

    (1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of--

       (A) an electric utility company subject to its regulatory authority under State law,

       (B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

       (C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall--

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005.

## 16 U.S.C. § 824a

### § 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

(a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof

Add. 4

the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

(b) Sale or exchange of energy; establishing physical connections

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: Provided, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

(c) Temporary connection and exchange of facilities during emergency

(1) During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party.

(2) With respect to an order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, the Commission shall ensure that such order requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation and minimizes any adverse environmental impacts.

(3) To the extent any omission or action taken by a party, that is necessary to comply with an order issued under this subsection, including any omission or action taken to voluntarily comply with such order, results in noncompliance with, or causes such party to not comply with, any Federal, State, or local environmental law or regulation, such omission or action shall not be considered a violation of such environmental law or regulation, or subject such party to any requirement, civil or criminal liability, or a citizen suit under such environmental law or regulation.

(4)(A) An order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation shall expire not later than 90 days after it is issued. The Commission may renew or reissue such order pursuant to paragraphs (1) and (2) for subsequent periods, not to exceed 90 days for each period, as the Commission determines necessary to meet the emergency and serve the public interest.

(B) In renewing or reissuing an order under subparagraph (A), the Commission shall consult with the primary Federal agency with expertise in the environmental interest protected by such law or regulation, and shall include in any such renewed or reissued order such conditions as such Federal agency determines necessary to minimize any adverse environmental impacts to the extent practicable. The conditions, if any, submitted by such Federal agency shall be made available to the public. The Commission may exclude such a condition from the renewed or reissued order if it determines that such condition would prevent the order from adequately addressing the emergency necessitating such order and provides in the order, or otherwise makes publicly available, an explanation of such determination.

(5) If an order issued under this subsection is subsequently stayed, modified, or set aside by a court pursuant to section 825l of this title or any other provision of

law, any omission or action previously taken by a party that was necessary to comply with the order while the order was in effect, including any omission or action taken to voluntarily comply with the order, shall remain subject to paragraph (3).

(d) Temporary connection during emergency by persons without jurisdiction of Commission

During the continuance of any emergency requiring immediate action, any person or municipality engaged in the transmission or sale of electric energy and not otherwise subject to the jurisdiction of the Commission may make such temporary connections with any public utility subject to the jurisdiction of the Commission or may construct such temporary facilities for the transmission of electric energy in interstate commerce as may be necessary or appropriate to meet such emergency, and shall not become subject to the jurisdiction of the Commission by reason of such temporary connection or temporary construction: Provided, That such temporary connection shall be discontinued or such temporary construction removed or otherwise disposed of upon the termination of such emergency: Provided further, That upon approval of the Commission permanent connections for emergency use only may be made hereunder.

(e) Transmission of electric energy to foreign country

After six months from August 26, 1935, no person shall transmit any electric energy from the United States to a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may by its order grant such application in whole or in part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate.

(f) Transmission or sale at wholesale of electric energy; regulation

The ownership or operation of facilities for the transmission or sale at wholesale of electric energy which is (a) generated within a State and transmitted from the State across an international boundary and not thereafter transmitted into any other State,

or (b) generated in a foreign country and transmitted across an international boundary into a State and not thereafter transmitted into any other State, shall not make a person a public utility subject to regulation as such under other provisions of this subchapter. The State within which any such facilities are located may regulate any such transaction insofar as such State regulation does not conflict with the exercise of the Commission's powers under or relating to subsection (e).

(g) Continuance of service

In order to insure continuity of service to customers of public utilities, the Commission shall require, by rule, each public utility to--

(1) report promptly to the Commission and any appropriate State regulatory authorities any anticipated shortage of electric energy or capacity which would affect such utility's capability of serving its wholesale customers,

(2) submit to the Commission, and to any appropriate State regulatory authority, and periodically revise, contingency plans respecting--

(A) shortages of electric energy or capacity, and

(B) circumstances which may result in such shortages, and

(3) accommodate any such shortages or circumstances in a manner which shall--

(A) give due consideration to the public health, safety, and welfare, and

(B) provide that all persons served directly or indirectly by such public utility will be treated, without undue prejudice or disadvantage.


**16 U.S.C.A. § 825*l***

**§ 825*l*. Review of orders**

(a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to

grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification

or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

(c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.