ORAL ARGUMENT NOT YET SCHEDULED

Nos. 23-1094 and 23-1215 (consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――――――

NEXTERA ENERGY RESOURCES, LLC AND
NEXTERA ENERGY SEABROOK, LLC,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

―――――――――――――――――

On Petitions for Review

―――――――――――――――――

**JOINT APPENDIX**
**VOLUME I OF II**
**(PAGES JA1 – JA398)**

―――――――――――――――――

Richard P. Bress
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Intervenors NECEC*
*Transmission LLC and Avangrid, Inc.*

Matthew R. Christiansen
General Counsel
Federal Energy Regulatory
Commission
Washington, DC 20426

John N. Estes III
JENNER & BLOCK LLP
1099 New York Ave, NW Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Petitioners NextEra*
*Energy Resources, LLC*
*and NextEra Energy Seabrook, LLC*

# INDEX

## VOLUME I

Certified Index to the Record ................................................................. JA1

*NextEra Energy Seabrook, LLC*, Docket No. EL21-3-000, Petition for Declaratory Order of NextEra Energy Seabrook, LLC (filed Oct. 5, 2020) ("Petition for Declaratory Order"), R.1 ............................................................. JA19

    Attachment B - Prepared Affidavit of Joshua Marcum............................ JA60

    Attachment D - Seabrook Main Generator Breaker Upgrade Evaluation ...................................................................................... JA73

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Complaint and Request for Shortened Answer Period and for Fast Track Processing of NECEC Transmission LLC and Avangrid, Inc. (filed Oct. 13, 2020) ("Avangrid Complaint"), R.4............................................ JA84

    Exhibit A - Affidavit of Thorn C. Dickinson ........................................ JA130

    Exhibit C - Seabrook Main Generator Breaker Upgrade Evaluation..... JA163

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, NextEra Answer to Complaint of NECEC Transmission LLC and Avangrid, Inc. (filed Nov. 2, 2020) ("NextEra Answer to Complaint"), R.26 ............................................................................................................. JA174

    Exhibit 1 - Prepared Supplemental Affidavit of Joshua Marcum .......... JA238

    Exhibit 2 - Prepared Affidavit of Joshua Marcum ................................ JA249

    Exhibit 5 - Prepared Affidavit of Eric McCartney ................................ JA262

    Exhibit 6 - Standard Large Generator Interconnection Agreement by and Among ISO New England Inc. and NextEra Energy Seabrook, LLC and New Hampshire Transmission, LLC ("Seabrook LGIA") .... JA273

    Exhibit 7 - Prepared Affidavit of Lawrence Weber ............................... JA390

# VOLUME II

*NextEra Energy Seabrook, LLC*, Docket No. EL21-3-000, Protest of NECEC Transmission LLC and Avangrid, Inc. (filed Nov. 4, 2020), R.30 .... JA399

*NextEra Energy Seabrook, LLC*, Docket No. EL21-3-000, Answer and Motion for Leave to Answer of NextEra Energy Seabrook, LLC (filed Nov. 19, 2020) ("NextEra Answer to Protest"), R.33, Page 20 ............................... JA423

 Exhibit 3 - Prepared Affidavit of Lawrence Weber .............................. JA425

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC and Avangrid, Inc. (filed Mar. 26, 2021) ("Avangrid Amended Complaint"), R.37 ........................................................ JA434

 Exhibit D - Affidavit of Mark McBurnett .............................................. JA451

 Exhibit E - Affidavit of Glen Palmer ...................................................... JA460

 Exhibit F - Affidavit of Tracy Rolstad .................................................... JA468

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, NextEra Answer to Amended Complaint of NECEC Transmission LLC and Avangrid, Inc. (filed Apr. 15, 2021) ("NextEra Answer to Amended Complaint"), R.38, Pages 1-7 ........................................ JA477

 Exhibit 1 - Prepared Second Supplemental Affidavit of Eric McCartney, Pages 2-7 ............................................................................ JA484

 Exhibit 3 - Siemens PTI Report, Pages 1-3 .......................................... JA493

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-000 & EL21-6-000, Letter of ISO New England Inc. (filed May 6, 2021) ("ISO-NE Letter"), R.40 ................................................................................................................ JA497

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket Nos. EL21-6-000 & EL21-94-000, Order Establishing Additional Briefing and Instituting Section 206 Proceeding, 176 FERC ¶ 61,148 (Sept. 7, 2021) ("Briefing Order"), R.44 .................................................................................. JA500

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Motion to Lodge of NECEC Transmission LLC and Avangrid, Inc. (filed Sept. 20, 2021) ("Motion to Lodge"), R.46 .................... JA517

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Brief of ISO New England Inc. (filed Oct. 7, 2021) ("ISO-NE Brief"), R.53 ................................................................................................ JA522

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Comments of Massachusetts Attorney General (filed Oct. 7, 2021), R.59 ................................................................................................ JA545

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-000 & EL21-6-000, Motion to Lodge of NextEra Energy Seabrook, LLC (filed Nov. 17, 2021) ("NextEra Motion to Lodge NRC Letter"), R.68 ............................................. JA547

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-000 & EL21-6-000, Order Denying Complaint in Part, Granting Complaint in Part, and Dismissing Petition for Declaratory Order, 182 FERC ¶ 61,044 (Feb. 1, 2023) ("Initial Order"), R.76 ............................................................................ JA575

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-0001 & EL21-6-001, Request for Rehearing of NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC (filed Mar. 3, 2023) ("Request for Rehearing"), R.77 ............................................................................................ JA627

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-001 & EL21-6-001, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,001 (Apr. 3, 2023) ("Rehearing Order"), R.81 ................................................................................................ JA683

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-001, EL21-6-001 & EL21-94-000, Order Addressing Arguments Raised on Rehearing and Terminating Section 206 Proceeding, 183 FERC ¶ 61,196 (June 15, 2023) ("Modification Order"), R.84 ...................................................................... JA684

ISO New England Inc. Transmission, Markets and Services Tariff ............... JA714

§ I.2.2 (Definitions for "Asset"; "Good Utility Practice"; and "ISO New England Operating Documents") ................................................... JA717

§ I.3.2 ....................................................................................................... JA722

§ I.3.10 ................................................................................ JA724

§ II.47.4 .............................................................................. JA725

Schedule 25 (§ 1 (Definition for "Affected System"); § 7.3; § 9;
App'x 6, § 11.4.4) ............................................................... JA728

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NextEra Energy Resources, LLC and    )
  NextEra Energy Seabrook, LLC,    )
                  Petitioners,    )
                            )
      v.                     )     No. 23-1094
                            )
Federal Energy Regulatory Commission,  )
               Respondent.    )

## CERTIFIED INDEX TO THE RECORD

Pursuant to the provisions of section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), the provisions of 28 U.S.C. § 2112, and Rule 17 of the Federal Rules of Appellate Procedure, the Federal Energy Regulatory Commission hereby certifies that the materials listed and described below are: (1) the orders complained of, "Order Denying Complaint In Part, Granting Complaint In Part, And Dismissing Petition For Declaratory Order," 182 FERC ¶ 61,044, issued February 1, 2023, "Notice Of Denial Of Rehearing By Operation Of Law And Providing For Further Consideration," 183 FERC ¶ 62,001, issued April 3, 2023, in *NextEra Energy Seabrook, LLC, et al.*, FERC Docket Nos. EL21-3 and EL21-6; and (2) the complete record upon which such orders were entered.

**Record**
**Item No.**    **Description**

**Docket Nos. EL21-3 and EL21-6**

1.        Filed By:  NextEra Energy Seabrook, LLC
            Filed Date:  10/05/2020
            Accession No.:  20201005-5169
            Description:  Petition for Declaratory Order of NextEra Energy
            Seabrook, LLC under EL21-3.

2.        Issued By:  Secretary Of The Commission, FERC
            Filed Date:  10/06/2020
            Accession No.:  20201006-3048
            Description:  Notice of Petition for Declaratory Order re NextEra
            Energy Seabrook, LLC under EL21-3.

3.        Filed By:  Public Citizen, Inc.
            Filed Date:  10/13/2020
            Accession No.:  20201013-5023
            Description:  Motion to Intervene of Public Citizen, Inc. under
            EL21-3.

4.        Filed By:  NECEC Transmission LLC, Avangrid, Inc.
            Filed Date:  10/13/2020
            Accession No.:  20201013-5357
            Description:  Complaint, et al. of NECEC Transmission LLC, et al.
            under EL21-6.

5.        Issued By:  Secretary Of The Commission, FERC
            Filed Date:  10/15/2020
            Accession No.:  20201015-3048
            Description:  Notice of Complaint re NECEC Transmission LLC et al.
            v. NextEra Energy Resources, LLC et al. under EL21-6.

6.        Filed By:  New England States Committee on Electricity
            Filed Date:  10/16/2020
            Accession No.:  20201016-5055
            Description:  Motion to Intervene of New England States Committee
            on Electricity under EL21-3.

2

**JA2**

| Record Item No. | Description |
|---|---|

7.     Filed By:  New England States Committee on Electricity
       Filed Date:  10/16/2020
       Accession No.:  20201016-5056
       Description:  Motion to Intervene of New England States Committee
       on Electricity under EL21-6.

8.     Filed By:  Calpine Corporation
       Filed Date:  10/16/2020
       Accession No.:  20201016-5063
       Description:  Motion to Intervene of Calpine Corporation under
       EL21-3.

9.     Filed By:  Exelon Corporation
       Filed Date:  10/19/2020
       Accession No.:  20201019-5009
       Description:  Motion to Intervene of Exelon Corporation under
       EL21-6.

10.    Filed By:  Exelon Corporation
       Filed Date:  10/19/2020
       Accession No.:  20201019-5011
       Description:  Motion to Intervene of Exelon Corporation under
       EL21-3.

11.    Filed By:  Public Citizen, Inc.
       Filed Date:  10/21/2020
       Accession No.:  20201021-5021
       Description:  Motion to Intervene of Public Citizen, Inc. under
       EL21-6.

12.    Filed By:  H.Q. Energy Services (U.S.) Inc.
       Filed Date:  10/21/2020
       Accession No.:  20201021-5096
       Description:  Motion to Intervene of H.Q. Energy Services (U.S.) Inc.
       under EL21-6.

| **Record Item No.** | **Description** |
|---|---|

13.    Filed By:  H.Q. Energy Services (U.S.) Inc.
Filed Date:  10/21/2020
Accession No.:  20201021-5099
Description:  Motion to Intervene of H.Q. Energy Services (U.S.) Inc. under EL21-3.

14.    Filed By:  New England Power Company, et al.
Filed Date:  10/22/2020
Accession No.:  20201022-5026
Description:  Motion to Intervene of New England Power Company, et al. under EL21-3.

15.    Filed By:  Calpine Corporation
Filed Date:  10/29/2020
Accession No.:  20201029-5094
Description:  Motion to Intervene of Calpine Corporation under EL21-6.

16.    Filed By:  Avangrid, Inc., et al.
Filed Date:  10/29/2020
Accession No.:  20201029-5120
Description:  Motion to Intervene of Avangrid, Inc., et al. under EL21-3.

17.    Filed By:  Eversource Energy Service Company
Filed Date:  10/30/2020
Accession No.:  20201030-5131
Description:  Motion to Intervene of Eversource Energy Service Company under EL21-6.

18.    Filed By:  Eversource Energy Service Company
Filed Date:  10/30/2020
Accession No.:  20201030-5133
Description:  Motion to Intervene of Eversource Energy Service Company under EL21-3.

**Record
Item No.**      **Description**

19.          Filed By:  NRG Power Marketing LLC
             Filed Date:  11/02/2020
             Accession No.:  20201102-5028
             Description:  Motion to Intervene of NRG Power Marketing LLC
             under EL21-3.

20.          Filed By:  NRG Power Marketing LLC
             Filed Date:  11/02/2020
             Accession No.:  20201102-5030
             Description:  Motion to Intervene of NRG Power Marketing LLC
             under EL21-6.

21.          Filed By:  Massachusetts Municipal Wholesale Electric Company
             Filed Date:  11/02/2020
             Accession No.:  20201102-5130
             Description:  Motion to Intervene of Massachusetts Municipal
             Wholesale Electric Company under EL21-6.

22.          Filed By:  Dominion Energy Services, Inc.
             Filed Date:  11/02/2020
             Accession No.:  20201102-5141
             Description:  Motion to Intervene of Dominion Energy Services, Inc.
             under EL21-3.

23.          Filed By:  Massachusetts Attorney General Maura Healey
             Filed Date:  11/02/2020
             Accession No.:  20201102-5142
             Description:  Motion to Intervene of Massachusetts Attorney General
             Maura Healey under EL21-6.

24.          Filed By:  Dominion Energy Services, Inc.
             Filed Date:  11/02/2020
             Accession No.:  20201102-5144
             Description:  Motion to Intervene of Dominion Energy Services, Inc.
             under EL21-6.

| Record Item No. | Description |
|---|---|

25.      Filed By:  National Grid USA
Filed Date:  11/02/2020
Accession No.:  20201102-5193
Description:  Motion to Intervene and Comments of New England Power Company, Massachusetts Electric Company, Nantucket Electric Company, and Narragansett Electric Company d/b/a National Grid under EL21-6.

26.      Filed By:  NextEra Energy Resources, LLC, et al.
Filed Date:  11/02/2020
Accession No.:  20201102-5256
Description:  Answer of NextEra Energy Resources, LLC, et al. to October 13, 2020 Complaint by NECEC Transmission LLC, et al. under EL21-6.

27.      Filed By:  Massachusetts Municipal Wholesale Electric Company
Filed Date:  11/04/2020
Accession No.:  20201104-5098
Description:  Motion to Intervene and Comments of Massachusetts Municipal Wholesale Electric Company under EL21-3.

28.      Filed By:  Eversource Energy Service Company
Filed Date:  11/04/2020
Accession No.:  20201104-5052
Description:  Comments of Eversource Energy Service Company under EL21-3.

29.      Filed By:  New England Power Generators Association Inc.
Filed Date:  11/04/2020
Accession No.:  20201104-5148
Description:  Comments of the New England Power Generators Association Inc. in Support of October 5, 2020 Petition for Declaratory Order by NextEra Energy Seabrook, LLC under EL21-3.

| Record Item No. | Description |
|---|---|

30.    Filed By:  Avangrid, Inc., NECEC Transmission LLC
       Filed Date:  11/04/2020
       Accession No.:  20201104-5151
       Description:  Protest of Avangrid, Inc. and NECEC Transmission to
       October 5, 2020 Petition for Declaratory Order by NextEra Energy
       Seabrook, LLC under EL21-3.

31.    Filed By:  NextEra Energy Seabrook, LLC, et al.
       Filed Date:  11/13/2020
       Accession No.:  20201113-5254
       Description:  Correction to November 2, 2020 Answer (Joshua
       Marcum Supplemental Affidavit and Answer) of NextEra Energy
       Resources, LLC, et al. under EL21-6.

32.    Filed By:  NECEC Transmission LLC, Avangrid, Inc.
       Filed Date:  11/17/2020
       Accession No.:  20201117-5197
       Description:  Motion for Leave to Answer and Limited Answer of
       NECEC Transmission LLC and Avangrid, Inc. under EL21-6.

33.    Filed By:  NextEra Energy Seabrook, LLC
       Filed Date:  11/19/2020
       Accession No.:  20201119-5190
       Description:  Answer and Motion for Leave to Answer of NextEra
       Energy Seabrook, LLC under EL21-3.

34.    Filed By:  NextEra Energy Resources, LLC, et al.
       Filed Date:  11/30/2020
       Accession No.:  20201130-5257
       Description:  Answer and Motion for Leave to Answer of NextEra
       Energy Resources, LLC, et al. under EL21-6-000.

35.    Filed By:  NECEC Transmission LLC, Avangrid, Inc.
       Filed Date:  12/04/2020
       Accession No.:  20201204-5238
       Description:  Motion for Leave to Answer and Limited Answer of
       NECEC Transmission LLC and Avangrid, Inc. under EL21-3.

| Record Item No. | Description |
| --- | --- |

36.   Filed By:  NECEC Transmission LLC, Avangrid, Inc.
Filed Date:  12/07/2020
Accession No.:  20201207-5167
Description:  Motion for Leave to Answer and Limited Supplemental Answer of NECEC Transmission LLC and Avangrid, Inc. under EL21-6.

37.   Filed By:  NECEC Transmission LLC, Avangrid, Inc.
Filed Date:  03/26/2021
Accession No.:  20210326-5273
Description:  Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC, and Avangrid, Inc. under EL21-6.

38.   Filed By:  NextEra Energy Seabrook, LLC, NextEra Energy Resources, LLC
Filed Date:  04/15/2021
Accession No.:  20210415-5350
Description:  NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC submits Answer to Amend Complaint of NECEC Transmission LLC and Avangrid under EL21-6.

39.   Filed By:  NECEC Transmission LLC, Avangrid, Inc.
Filed Date:  04/30/2021
Accession No.:  20210430-5716
Description:  Motion for Leave to Answer and Limited Answer of NECEC Transmission LLC and Avangrid, Inc. under EL21-6.

40.   Filed By:  ISO New England Inc.
Filed Date:  05/06/2021
Accession No.:  20210506-5183
Description:  Letter of ISO New England Inc. expressing the importance of prompt resolution of the matters before the Commission under EL21-3, et al.

| **Record Item No.** | **Description** |

41.  Filed By:  Massachusetts Department of Public Utilities
     Filed Date:  05/14/2021
     Accession No.:  20210514-5121
     Description:  Motion to Intervene of Massachusetts Department of
     Public Utilities under EL21-3.

42.  Filed By:  Massachusetts Department of Public Utilities
     Filed Date:  05/14/2021
     Accession No.:  20210514-5122
     Description:  Motion to Intervene of Massachusetts Department of
     Public Utilities under EL21-6.

43.  Filed By:  NECEC Transmission LLC, Avangrid, Inc.
     Filed Date:  05/17/2021
     Accession No.:  20210517-5201
     Description:  NECEC Transmission LLC and Avangrid, Inc. submits
     Response to Letter Dated May 6, 2021 under EL21-6.

44.  Issued By:  Secretary Of The Commission, FERC, Commissioners
     And Immediate Staff (The Commission)
     Filed Date:  09/07/2021
     Accession No.:  20210907-3052
     Description:  Order Establishing Additional Briefing and Instituting
     Section 206 Proceeding re NECEC Transmission LLC and Avangrid,
     Inc. v. NextEra Energy Resources, LLC et al. under EL21-6 et al.
     Commissioner Danly is dissenting with a separate statement attached.

45.  Filed By:  Electric Power Supply Association
     Filed Date:  09/16/2021
     Accession No.:  20210916-5112
     Description:  Motion to Intervene of Electric Power Supply
     Association under EL21-6.

**Record**
**Item No.**     **Description**

46.     Filed By:  NECEC Transmission LLC, Avangrid, Inc.
        Filed Date:  09/20/2021
        Accession No.:  20210920-5075
        Description:  Motion to Lodge of NECEC Transmission LLC and
        Avangrid, Inc. under EL21-6-000.

47.     Filed By:  NextEra Energy Seabrook, LLC
        Filed Date:  09/20/2021
        Accession No.:  20210920-5145
        Description:  Motion to Lodge of NextEra Energy Seabrook, LLC
        under EL21-3.

48.     Filed By:  Connecticut Department of Energy and Environmental
        Protection
        Filed Date:  09/21/2021
        Accession No.:  20210921-5008
        Description:  Motion to Intervene of Connecticut Department of
        Energy and Environmental Protection under EL21-6

49.     Filed By:  American Clean Power Association
        Filed Date:  09/28/2021
        Accession No.:  20210928-5112
        Description:  Motion to Intervene of American Clean Power
        Association under EL21-6.

50.     Filed By:  ISO New England Inc.
        Filed Date:  09/28/2021
        Accession No.:  20210928-5065
        Description:  ISO New England Inc. (doc-less) Motion to Intervene of
        ISO New England Inc. in Docket No. EL21-6.

51.     Filed By:  Anbaric Development Partners, LLC
        Filed Date:  09/28/2021
        Accession No.:  20210928-5131
        Description:  Motion to Intervene of Anbaric Development Partners,
        LLC under EL21-6.

| Record Item No. | Description |
|---|---|

**52.**  
Filed By:  New England Power Generators Association Inc.  
Filed Date:  09/30/2021  
Accession No.:  20210930-5125  
Description:  Out-of-Time Motion to Intervene of New England Power Generators Association Inc. under EL21-6.

**53.**  
Filed By:  ISO New England Inc.  
Filed Date:  10/07/2021  
Accession No.:  20211007-5087  
Description:  Brief of ISO New England Inc. under EL21-6.

**54.**  
Filed By:  ISO New England Inc.  
Filed Date:  10/07/2021  
Accession No.:  20211007-5088  
Description:  Brief of ISO New England Inc. under EL21-6.

**55.**  
Filed By:  Vistra Corporation  
Filed Date:  10/07/2021  
Accession No.:  20211007-5157  
Description:  Out-of-Time Motion to Intervene of Vistra Corporation under EL21-6.

**56.**  
Filed By:  New England Power Generators Association Inc.  
Filed Date:  10/07/2021  
Accession No.:  20211007-5161  
Description:  Comments of New England Power Generators Association Inc. and Electric Power Supply Association under EL21-6.

**57.**  
Filed By:  Avangrid, Inc., NECEC Transmission LLC  
Filed Date:  10/07/2021  
Accession No.:  20211007-5167  
Description:  Supplemental Brief of Avangrid, Inc. and NECEC Transmission LLC under EL21-6.

| Record Item No. | Description |
|---|---|

58.  Filed By:  NextEra Energy Resources, LLC, NextEra Energy Seabrook, LLC
Filed Date:  10/07/2021
Accession No.:  20211007-5173
Description:  Initial Brief of NextEra Energy Seabrook, LLC and NextEra Energy Resources, LLC, under EL21-6.

59.  Filed By:  Massachusetts Attorney General Maura Healey
Filed Date:  10/07/2021
Accession No.:  20211007-5061
Description:  Comments of Massachusetts Attorney General Christina H. Blew et al. under EL21-6.

60.  Filed By:  The Attorney General Of The Commonwealth Of Massachusetts
Filed Date:  10/18/2021
Accession No.:  20211018-4001
Description:  Office of the Attorney General of the Commonwealth of Massachusetts submits comments concerning issues raised by this litigation etc. for the New England Clean Energy Connect transmission project under EL21-6 et al.

61.  Filed By:  Massachusetts Department of Energy Resources
Filed Date:  10/21/2021
Accession No.:  20211021-5094
Description:  Motion to File Comments Out of Time and Comments of the Massachusetts Department of Energy Resources under EL21-6.

62.  Filed By:  Avangrid, Inc., NECEC Transmission LLC
Filed Date:  10/22/2021
Accession No.:  20211022-5189
Description:  Reply Brief of Avangrid, Inc. and NECEC Transmission LLC under EL21-6.

**JA12**

**Record
Item No.**      **Description**

63.       Filed By:  NextEra Energy Resources, LLC, NextEra Energy
          Seabrook, LLC
          Filed Date:  10/22/2021
          Accession No.:  20211022-5179
          Description:  Reply Brief of NextEra Energy Resources, LLC and
          NextEra Energy Seabrook, LLC under EL21-6.

64.       Filed By:  ISO New England Inc.
          Filed Date:  10/22/2021
          Accession No.:  20211022-5178
          Description:  Reply Brief of ISO New England Inc. under EL21-6.

65.       Filed By:  NextEra Energy Resources, LLC, NextEra Energy
          Seabrook, LLC
          Filed Date:  11/04/2021
          Accession No.:  20211104-5143
          Description:  Motion for Leave to Answer and Answer of NextEra
          Energy Resources, LLC, et al. under EL21-6.

66.       Issued By:  Chair And Immediate Staff
          Filed Date:  11/05/2021
          Accession No.:  20211105-4000
          Description:  Response to Attorney General Maura Healey's et al.
          10/07/2021 letter re the ongoing disputes related to the New England
          Clean Energy Connect transmission project under EL21-6 et al.

67.       Filed By:  NECEC Transmission LLC, Avangrid, Inc.
          Filed Date:  11/09/2021
          Accession No.:  20211109-5182
          Description:  Limited Answer of NECEC Transmission LLC and
          Avangrid, Inc. under EL21-6.

68.       Filed By:  NextEra Energy Seabrook, LLC
          Filed Date:  11/17/2021
          Accession No.:  20211117-5206
          Description:  Motion to Lodge of NextEra Energy Seabrook, LLC
          under EL21-3, et al.

| **Record Item No.** | **Description** |
|---|---|

69.    Filed By:  Avangrid, Inc., NECEC Transmission LLC
       Filed Date:  11/29/2021
       Accession No.:  20211129-5244
       Description:  Answer of Avangrid, Inc. and NECEC Transmission
       LLC to Motion to Lodge of NextEra Energy Seabrook, LLC under
       EL21-6 et al.

70.    Filed By:  Eversource Energy Service Company
       Filed Date:  01/11/2022
       Accession No.:  20220111-5052
       Description:  Request to Update Service List Information of
       Eversource Energy Service Company under AD20-14, et al.

71.    Filed By:  Constellation Energy Generation, LLC
       Filed Date:  02/04/2022
       Accession No.:  20220204-5115
       Description:  Motion to Intervene Out-of-Time of Constellation
       Energy Generation, LLC under ER19-1486, et al.

72.    Filed By:  Anbaric Development Partners, LLC
       Filed Date:  05/09/2022
       Accession No.:  20220509-5151
       Description:  Request to Update Official Service Lists of Anbaric
       Development Partners, LLC under EL20-10, et al.

73.    Filed By:  Massachusetts Attorney General Maura Healey
       Filed Date:  10/06/2022
       Accession No.:  20221006-5115
       Description:  Massachusetts Attorney General Maura Healey submits
       Request to Update Service List under ER18-1509, et al.

74.    Filed By:  NECEC Transmission LLC, Avangrid, Inc.
       Filed Date:  12/09/2022
       Accession No.:  20221209-5224
       Description:  Motion to Lodge and Request for Expedited
       Consideration of NECEC Transmission LLC and Avangrid, Inc. under
       EL21-6.

**JA14**

**Record**
**Item No.**      **Description**

75.          Filed By:  New England States Committee on Electricity
             Filed Date:  12/20/2022
             Accession No.:  20221220-5278
             Description:  Request to Update Service List Information of New
             England States Committee on Electricity under ER18-1639, et al.

76.          Issued By:  Secretary Of The Commission, FERC, Commissioners
             And Immediate Staff (The Commission)
             Filed Date:  02/01/2023
             Accession No.:  20230201-3035
             Description:  Order Denying Complaint in Part, Granting Complaint
             in Part, and Dismissing Petition for Declaratory Order re NextEra
             Energy Seabrook, LLC et al. v. NextEra Energy Resources, LLC et al.
             under EL21-3 et al.

77.          Filed By:  NextEra Energy Resources, LLC, NextEra Energy
             Seabrook, LLC
             Filed Date:  03/03/2023
             Accession No.:  20230303-5229
             Description:  NextEra Energy Resources, LLC, et al. submit Request
             for Rehearing of the February 1, 2023, Order under EL21-3, et al.

78.          Filed By:  New England States Committee on Electricity
             Filed Date:  03/03/2023
             Accession No.:  20230303-5110
             Description:  New England States Committee on Electricity submits
             Request to Update Official Service Lists under ER23-980, et al.

79.          Filed By:  Avangrid, Inc., NECEC Transmission LLC
             Filed Date:  03/17/2023
             Accession No.:  20230317-5140
             Description:  Motion for Clarification of Avangrid, Inc., et al. under
             EL21-6.

| **Record Item No.** | **Description** |
|---|---|

80.    Filed By:  NextEra Energy Resources, LLC, NextEra Energy
        Seabrook, LLC
        Filed Date:  04/03/2023
        Accession No.:  20230403-5319
        Description:  Answer of NextEra Energy Resources, LLC, et al.
        Opposing the March 17, 2023 Motion for Clarification of NECEC
        Transmission LLC and Avangrid, Inc. under EL21-6.

81.    Issued By:  Secretary Of The Commission, FERC
        Filed Date:  04/03/2023
        Accession No.:  20230403-3009
        Description:  Notice of Denial of Rehearing by Operation of Law and
        Providing for Further Consideration re NextEra Energy Seabrook,
        LLC et al. v. NextEra Energy Resources, LLC et al. under EL21-3 et
        al.

82.    Filed By:  NextEra Energy Resources, LLC, NextEra Energy
        Seabrook, LLCD
        Filed Date:  04/06/2023
        Accession No.:  20230406-5208
        Description:  Petition for Review filed in United States Court of
        Appeals for the District of Columbia Circuit of NextEra Energy
        Resources, LLC, et al. under EL21-3, et al. (Case No. 23-1094).

83.    Filed By:  Latham & Watkins LLP
        Filed Date:  04/24/2023
        Accession No.:  20230424-0005
        Description:  Motion to Intervene of NECEC Transmission LLC and
        Avangrid, Inc. filed in the United States Court of Appeals for the
        District of Columbia Circuit of NextEra Energy Resources, LLC et al.
        under EL21-3 et al. (Case No. 23-1094)

| Record Item No. | Description |
| --- | --- |
| 84. | Issued By:  Secretary Of The Commission, FERC, Commissioners And Immediate Staff (The Commission)<br>Filed Date:  06/15/2023<br>Accession No.:  20230615-3059<br>Description:  Order Addressing Arguments Raised on Rehearing and Terminating Section 206 Proceeding re NextEra Energy Seabrook, LLC et al. v. NextEra Energy Resources, LLC et al. under EL21-3 et al. |

> In witness whereof I have hereunto subscribed and caused the seal of the Federal Energy Regulatory Commission to be affixed this 21st day of July, 2023, at Washington, DC.

/s/ *Kimberly D. Bose*

Kimberly D. Bose,
Secretary.

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d) and the Court's Administrative Order Regarding Electronic Case Filing, I hereby certify that I have, this 21st day of July 2023, served the foregoing upon the counsel listed in the Service Preference Report via email through the Court's CM/ECF system.


*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney


Federal Energy Regulatory
  Commission
888 First Street, NE
Washington, DC  20426
Tel.:  (202) 502-8904
Email:  Robert.Kennedy@ferc.gov

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**NextEra Energy Seabrook, LLC**          )          **Docket No. EL21-___-000**

**PETITION FOR DECLARATORY ORDER OF**
**NEXTERA ENERGY SEABROOK, LLC**

# TABLE OF CONTENTS

I.   Executive summary ................................................................................. 2

II.  Communications ................................................................................. 9

III. Statement of the Case ......................................................................... 9

    A.   Parties ......................................................................................... 9

        1.   Seabrook and Joint Owners ..................................... 9

        2.   NECEC ........................................................................ 10

    B.   ISO-NE's Tariff prohibits construction of Elective Transmission Upgrades if they will have a significant adverse effect upon an Affected System, but does not require owners of Affected System generators to undertake construction to accommodate Elective Transmission Upgrades .................................. 10

    C.   The NECEC Elective Upgrade ......................................................... 13

    D.   Replacing the Generation Breaker will be complex and time consuming, but the exact amount of time required for the project cannot be predicted ..................... 14

    E.   Opportunity costs of any extended outage could be in the range of $560,000 per day, based on energy prices during the last refueling outage, but can be calculated with certainty after a Generation Breaker Replacement Outage using a formula  16

IV.  Requested Declaration I:  Seabrook is not required to upgrade the Generation Breaker at Seabrook Station at a loss to accommodate the NECEC Elective Upgrade, and the Formula Rate Template Seabrook proposes is an appropriate means of calculating opportunity and other costs that NECEC should pay ....................................................... 21

    A.   Fundamental ratemaking principles, Commission precedent, and sound policy support collection of all costs incurred by Seabrook in providing the requested service ............................................................................. 21

        1.   The FPA prohibits confiscatory rates ...................................... 21

        2.   The FPA requires that costs be recovered from those who caused the costs ................................................................................. 22

        3.   Recovery of opportunity costs is appropriate here .................................. 24

        4.   Recovery of legal costs is appropriate here .............................. 27

    B.   Seabrook appropriately proposes to collect actual costs incurred in providing the requested service ................................................................... 28

    C.   The ISO-NE Tariff limitations provision is not applicable here .......................... 31

    D.   It is immaterial that the costs of the Generation Breaker replacement project are not within NECEC's control ............................................................ 32

V.   Requested Declaration II: "Good Utility Practice" for replacement of the Generation Breaker at Seabrook Station should be defined in terms of the practices of the nuclear power industry, such that Seabrook's proposed definition is appropriate for use in a facilities agreement with NECEC ............................................................ 33

VI.      Requested Declaration III: Seabrook will not be liable for consequential damages under a facilities agreement with NECEC ..................................................................... 35

VII.     Alternative Declaration: The ISO-NE Tariff does not require Seabrook to enter into a facilities agreement for replacement of the Generation Breaker ...................................... 37

VIII.    Seabrook is not asking the Commission to rule in advance that costs will be prudently incurred ............................................................................................................ 37

IX.      Attachments ......................................................................................................... 38

X.       Conclusion ........................................................................................................... 38

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

**NextEra Energy Seabrook, LLC**          )                **Docket No. EL21-\_\_\_-000**

PETITION FOR DECLARATORY ORDER OF
NEXTERA ENERGY SEABROOK, LLC

Pursuant to Rule 207(a)(2) of the Federal Energy Regulatory Commission's ("FERC" or "Commission") Rules of Practice and Procedure,[1] NextEra Energy Seabrook, LLC ("Seabrook") hereby submits this Petition for a Declaratory Order ("Petition"). Seabrook seeks to understand the scope of its FERC-jurisdictional regulatory obligations with respect to NECEC Transmission, LLC's ("NECEC") New England Clean Energy Connect project ("NECEC Elective Upgrade"), to resolve a dispute with NECEC.

Seabrook requests that the Commission declare that: (1) Seabrook is not required to incur a financial loss to upgrade, for NECEC's sole benefit, a 24.5 kV generator circuit breaker and ancillary equipment ("Generation Breaker") at Seabrook Station;[2] (2) "Good Utility Practice" for replacement of the nuclear plant Generation Breaker is defined in terms of the practices of the nuclear power industry, such that Seabrook's proposed definition of that term is appropriate for use in a facilities agreement with NECEC; and (3) Seabrook will not be liable for consequential damages for the service it provides to NECEC under a facilities agreement (collectively, the "Requested Declarations"). Alternatively, Seabrook requests that the Commission declare that nothing in ISO New England Inc.'s ("ISO-NE") Transmission, Markets

---

[1] 18 C.F.R. § 385.207(a)(2) (2020).

[2] Two major ancillary systems of the Seabrook Station require replacement as part of the Generation Breaker replacement project to accommodate the NECEC Elective Upgrade: the Control Cabinet and Interlock and the Compressed Air System.

1

and Services Tariff ("Tariff")[3] requires Seabrook to enter into an agreement to replace the Generation Breaker, and therefore, Seabrook and the Joint Owners (defined below) are entitled to bargain for appropriate terms and conditions to recover their costs, define Good Utility Practice, and limit liability associated with providing the service ("Alternative Declaration").

Pursuant to 18 C.F.R. § 381.302, Seabrook has paid the required filing fee of $30,060.00.[4]

## I.    Executive summary

The principal dispute in this case involves two areas of costs that would not be incurred by Seabrook and the Joint Owners but for the work needed to accommodate the NECEC Elective Upgrade:  opportunity costs, in the form of any lost profits and Pay for Performance ("PFP") bonuses incurred during any Seabrook Station extended outage period required to perform work to accommodate NECEC; and, other costs, such as any PFP penalties, legal costs, station power costs, and incremental labor costs (including, but not limited to, overtime), incurred in connection with provision of the requested service.   The Federal Power Act ("FPA"), Commission precedent, and sound policy firmly support recovery by Seabrook of both categories of costs.

NECEC has initiated a process to construct an Elective Transmission Upgrade – i.e., an upgrade that NECEC desires to build, but that ISO-NE did not plan or require.  As part of that process, ISO-NE undertook a system impact study of the project.  ISO-NE has determined that Seabrook Station is an "Affected System," and that Seabrook is an "Affected Party," finding that

---

[3]    ISO New England Inc. Transmission, Markets and Services Tariff ("Tariff").  Section I of the Tariff includes the general terms and conditions and Section II of the Tariff includes the ISO-NE Open Access Transmission Tariff ("OATT").

[4]    18 C.F.R. § 381.302.  Seabrook submitted the $30,060.00 filing fee prior to submitting this filing via the United States government's www.pay.gov website, which was accessed through the Commission's eFiling system.  *See Annual Update of Filing Fees*, 169 FERC ¶ 62,167 (2019).

Seabrook would have to uprate/replace the existing Generation Breaker to accommodate the NECEC Elective Upgrade.  Replacement of the Generation Breaker would not be required but for the NECEC Elective Upgrade.

Seabrook Station is a 1,250 MW (nameplate) nuclear power plant located in Seabrook, New Hampshire.[5]  Seabrook Station is located within the control area operated by ISO-NE and sells into the ISO-NE energy and capacity markets.

The existing Generation Breaker is a massive, 32,000-pound auxiliary breaker used solely in connection with the operation of Seabrook Station.  Under normal plant operating conditions, electrical power from the station main generator is supplied to the electrical grid through the Generation Breaker.  Seabrook Station is a generator, and the Generation Breaker is not a transmission facility.  Nonetheless, as is typical with nuclear facilities, Seabrook Station is connected to the grid through a substation[6] and three 345 kV high voltage lines.  Seabrook Station serves approximately 4.4% of the peak load in ISO-NE, and as much as 12.5% of the load in off-peak times.[7]

Seabrook Station cannot generate electricity while the Generation Breaker is being upgraded – indeed, the plant's design and Nuclear Regulatory Commission ("NRC") regulations

---

[5]     Seabrook Station is owned by Seabrook, with an approximate 88.23% interest; the Massachusetts Municipal Wholesale Electric Company, ("MMWEC"), with an approximate 11.59% interest; Taunton Municipal Lighting Plant ("Taunton"), with an approximate 0.10% interest; and Hudson Light & Power Department ("Hudson," together, with MMWEC and Taunton, the "Joint Owners"), with an approximate 0.08% interest.  Seabrook manages the Seabrook Station pursuant to its authority under the Agreement for Joint Ownership, Construction and Operation of New Hampshire Nuclear Units, dated May 1, 1973 (as amended from time to time), and the Managing Agent Operating Agreement dated June 29, 1992 (as amended).

[6]     The substation is majority-owned by Seabrook's affiliate, New Hampshire Transmission, LLC.

[7]     *See* Prepared Affidavit of Eric McCartney at 2 ("McCartney Affidavit").

3

**JA24**

prohibit it.[8]   Accordingly, in order to limit outage time and for other good reasons, the Generation Breaker should be replaced during a refueling outage.[9]   Due to the complexity and scope of the Generation Breaker replacement project, Seabrook's operations team has concluded that the lead time necessary to prepare for such a major undertaking dictates that the replacement cannot occur during Seabrook Station's next refueling outage in October 2021 ("2021 Outage").[10]   The following refueling outage is scheduled in April 2023.   However, the actual date for the execution of the work cannot be known until after an engineering study of the project is completed, at which point the appropriate outage for conducting the Generation Breaker replacement will be identified ("Generation Breaker Replacement Outage").[11]

Replacement of the Generation Breaker may, and likely will, require Seabrook to remain off-line for a period when it would not otherwise be off-line but for the work required to accommodate the NECEC Elective Upgrade.   Seabrook Station operates in ISO-NE's energy market as a price-taker, i.e., on an "always on" basis, when it is not in an outage.   Seabrook currently estimates that replacing the Generation Breaker will extend a Generation Breaker Replacement Outage by 10 days.[12]   Thus, if a Generation Breaker Replacement Outage had extended the April 2020 refueling outage, Seabrook and the Joint Owners would have lost on

---

[8]   *See id.* at 4.  NRC regulations require two sources of auxiliary power to a nuclear generating plant at all times. 10 C.F.R. pt. 50, Appendix A, Criterion 17-Electric power systems (requiring plant design to incorporate two physically independent circuits of offsite power designed to minimize the likelihood of simultaneous failure). One of the two ways auxiliary power needed for Seabrook Station startup and during shutdown may be taken from the 345-kV system is back-fed to the onsite distribution system through the generator step-up transformer and unit auxiliary transformer when the Generation Breaker is open.

[9]   *Id.* at 8.

[10]   *Id.* at 7.

[11]   *Id.* at 6.

[12]   *See Id.* at 8.  For planning purposes, this good faith estimate is based on the size and complexity of replacing the Generation Breaker, but a better estimate will be known after completing an engineering study.

4

**JA25**

average about $560,000 per day.[13]  This was calculated by evaluating actual energy prices for the 10 days following the April 2020 refueling outage as well as actual power sales contract prices during this period.[14]  Seabrook Station will also run the risk of losing PFP bonus payments during an extended outage.[15]  Any such losses therefore are opportunity costs attributable solely to accommodation of the NECEC Elective Upgrade.  Other costs incurred during any extension of the outage, such as PFP penalties,[16] likewise will be attributable solely to accommodation of the NECEC Elective Upgrade.

Seabrook will also incur costs prior to the outage to engineer and procure required equipment, and to conduct related outage planning for the NECEC Elective Upgrade.  In doing so, Seabrook must comply with Institute of Nuclear Power Operations ("INPO") guidance, as well as the practices for plant modifications implemented across the fleet of nuclear generators indirectly owned by NextEra Energy, Inc. ("NextEra"), so as not to adversely affect safe and reliable plant operations and run afoul of stringent NRC requirements.  The lead time necessary to prepare for such a major undertaking dictates that the Generation Breaker replacement cannot occur during the 2021 Outage.

NECEC and Seabrook agree that NECEC should pay the equipment engineering, procurement, removal, and installation costs that will be incurred to replace the Generation Breaker.  However, after negotiation, the parties have been unable to resolve the issue of whether

---

[13]  For purposes of highlighting the relative impact resulting from a Seabrook Station extended outage period required to perform work to accommodate NECEC, this calculation assumes the Generation Breaker Replacement Outage occurred in April 2020, the last refueling outage at Seabrook Station.  As explained below, Seabrook proposes that NECEC would be liable for actual opportunity costs and losses incurred at the time of an extended outage.

[14]  Prepared Affidavit of Joshua Marcum at 5 ("Marcum Affidavit").

[15]  *Id.* at 7.  PFP bonus payments are described in Section III.E, below.

[16]  PFP penalties are discussed in Section IV.B., below.

5

Seabrook and the Joint Owners should replace the Generation Breaker at the risk of a financial loss. Specifically, NECEC maintains that it need not reimburse Seabrook or the Joint Owners for opportunity costs in the form of lost profits or revenue losses, as applicable, or PFP penalties incurred during the extended portion of an outage where Seabrook Station would not be offline but for replacement of the Generation Breaker to accommodate NECEC, and that it need not compensate Seabrook for legal costs incurred solely in connection with the Generation Breaker replacement.[17] Seabrook maintains that NECEC must compensate Seabrook and the Joint Owners for those costs, as applicable, because neither would be incurred but for the Generation Breaker replacement necessitated solely by the NECEC Elective Upgrade, and nothing in the FPA or the ISO-NE Tariff requires Seabrook and the Joint Owners to provide the requested service at a financial loss.

Seabrook is not asking the Commission at this time to approve particular dollar amounts, or determine whether any particular cost will be prudently incurred, but rather to confirm that Seabrook may charge NECEC for its and the Joint Owners' actual prudently incurred opportunity costs and reimbursement for PFP penalties incurred as a result of an extended outage, and Seabrook's actual prudently incurred legal costs and incremental labor and electricity costs associated therewith. All of these costs would be determined after the fact, and charged pursuant to a Formula Rate Template supported by Joshua Marcum's affidavit attached to this pleading as Attachment B. Among other things, this Formula Rate Template would entitle Seabrook to recovery of opportunity and other costs associated with extended outages, unless Seabrook's gross negligence or willful misconduct caused the extension of the outage.

---

[17]   It is not expected that the Joint Owners will incur legal costs in connection with the Generation Breaker replacement project.

Seabrook asks the Commission to approve the Formula Rate Template as part of the declaratory order request. Seabrook would then include the Formula Rate Template in a facilities agreement with NECEC, which would be filed with the Commission prior to service being provided.

The work to replace the Generation Breaker during the refueling outage will initially run concurrently with refueling, subject of course to any limitation imposed by NRC requirements, INPO guidance, and Good Utility Practice. If the outage does not run past the time otherwise required to address refueling, there would be no opportunity costs associated with Generation Breaker replacement, and hence no charge for opportunity costs. The actual amount of any opportunity costs will be determined as lost profits or revenue losses (in the case of the Joint Owners), less fuel cost savings, if any.

Seabrook also requests that the Commission resolve a dispute between Seabrook and NECEC concerning the definition of Good Utility Practice that would be utilized in a facilities agreement between the two parties. NECEC requests a definition that defines Good Utility Practice in terms of the practices of the electric utility industry as a whole. Seabrook believes that, for a major equipment replacement project at a nuclear facility, Good Utility Practice should refer to the higher standards employed by the heavily regulated and self-policed nuclear industry. While it may seem counter-intuitive that a service provider is seeking a higher standard in a facilities agreement, that is the standard to which Seabrook is already effectively subjected, and it is the standard by which the timing and duration of any nuclear refueling and extended outage, if contested, should be judged.

Further, Seabrook requests that the Commission declare that Seabrook is not required to accept liability for consequential damages under a facilities agreement with NECEC. NECEC does not believe that Seabrook should be shielded from consequential damages in replacing the

Generation Breaker. Seabrook disagrees with NECEC's position because potentially subjecting Seabrook to consequential damages in upgrading the Generation Breaker is contrary to Commission policy and precedent. This is no different from NECEC being shielded from consequential damages when it provides transmission service over the NECEC Elective Upgrade; under the same principle, Seabrook should be protected from consequential damages when it provides a service to NECEC in upgrading the Generation Breaker.

In the event that the Commission is unwilling to issue an order granting Seabrook's Requested Declarations, Seabrook alternatively asks that the Commission confirm that nothing in the ISO-NE Tariff requires Seabrook to agree to enter into a facilities agreement to replace the Generation Breaker. As Seabrook will show, the only affirmative construction obligations in the ISO-NE Tariff to enter into a facilities agreement with a generator that is an "Affected Party" are placed on the proponent of the Elective Transmission Upgrade, not the generation owner. To be clear, Seabrook is not saying that it would not enter into such a facilities agreement to replace the Generation Breaker, but rather that in doing so, it would insist on being made whole and having limits to its liabilities, as is its fundamental right under the FPA. While NextEra Energy Resources, LLC ("NextEra Resources") has publicly opposed the NECEC Elective Upgrade, Seabrook's request here does not have that goal, but is instead aimed at protecting Seabrook's rights as it proceeds with helping NECEC get its project built.[18]

---

[18]  Seabrook notes that NextEra Resources and its subsidiaries that operate or are developing projects in the states of Massachusetts and Maine have been actively involved in litigation and other efforts concerning the NECEC Elective Upgrade. This Petition is unrelated. In Maine, for example, the NextEra Resources' subsidiaries litigated before the Maine Public Utilities Commission and Department of Environmental Protection and in Maine's appellate courts that the NECEC Elective Upgrade did not comport with Maine's renewable generation and transmission siting statutes. In Massachusetts, the NextEra Resources subsidiaries litigated before the Department of Public Utilities and the Supreme Judicial Court that the power purchase agreements with Hydro Quebec for hydroelectric energy generation were inconsistent with the statutory mandates of Massachusetts renewable solicitation.

## II.    Communications

Seabrook requests that all notices, correspondence, and other communications concerning this filing be directed to the following persons:[19]

| | |
|---|---|
| Joel D. Newton | Noel Symons |
| NextEra Energy Resources, LLC | Colin Francis |
| 801 Pennsylvania Avenue, NW | Mary-Kaitlin Rigney |
| Suite 220 | McGuireWoods LLP |
| Washington, DC 20004 | 2001 K Street, NW, Suite 400 |
| (202) 347-7126 | Washington, DC 20006 |
| joel.newton@nee.com | (202) 857-2929 |
| | nsymons@mcguirewoods.com |
| | cfrancis@mcguirewoods.com |
| | mrigney@mcguirewoods.com |

Seabrook has served a copy of this Petition on NECEC.

## III.    Statement of the Case

### A.    Parties

#### 1.    Seabrook and Joint Owners

Seabrook is a Delaware limited liability company and a wholly-owned indirect subsidiary of NextEra Resources, which in turn is a wholly-owned indirect subsidiary of NextEra.  NextEra is one of the leading energy holding companies in the United States, and is publicly traded on the New York Stock Exchange.  NextEra Resources is the parent company of NextEra's competitive generation and trading businesses.  Its subsidiaries currently own or operate generating facilities in 36 States and Canada with a combined generating capacity of approximately 24,000 MW, including the interests owned in part and controlled by NextEra Energy Partners, LP.  NextEra

---

[19]    Seabrook respectfully requests waiver of the Commission's regulations, to the extent necessary, to permit more than two persons to be placed on the service list for this proceeding.

Resources' subsidiaries have been granted blanket waivers from the Commission's open access requirements in Order No. 807.[20]

Seabrook holds an 88.23% ownership interest in Seabrook Station. The remaining 11.77% of Seabrook Station is owned by the Joint Owners. The Joint Owners rely on the output of Seabrook Station as a physical hedge to the power they purchase to serve their load. Seabrook is authorized by the Commission to sell power at market-based rates.[21]

### 2. NECEC

NECEC is a Delaware limited liability company and a wholly-owned direct subsidiary of Avangrid Networks, Inc., which in turn is a wholly-owned direct subsidiary of Avangrid, Inc. NECEC was created for the sole purpose of acquiring the NECEC Elective Upgrade from Central Maine Power Company ("CMP").[22] NECEC will own, develop, construct, operate, and maintain the NECEC Elective Upgrade. NECEC is a public utility that is subject to the Commission's jurisdiction.[23]

**B. ISO-NE's Tariff prohibits construction of Elective Transmission Upgrades if they will have a significant adverse effect upon an Affected System, but does not require owners of Affected System generators to undertake construction to accommodate Elective Transmission Upgrades**

Under ISO-NE's Tariff, participant-funded transmission lines are defined as Elective Transmission Upgrades.[24] Elective Transmission Upgrades are voluntary transmission upgrades

---

[20] *See Open Access & Priority Rights on Interconnection Customer's Interconnection Facilities*, Order No. 807, 150 FERC ¶ 61,211 at P 89 (2015).

[21] *See NextEra Energy Seabrook, LLC*, Docket No. ER09-990-000 (July 16, 2009) (unpublished letter order).

[22] *See Cent. Me. Power Co.*, 170 FERC ¶ 62,145 (2020) (granting authorization for CMP to transfer to NECEC seven transmission service agreements that funded the construction, operation, and maintenance of CMP's portion of the Elective Upgrade).

[23] *See Cent. Me. Power Co.*, 165 FERC ¶ 61,034 (2018) (accepting transmission rate schedules).

[24] *See* OATT, Schedule 25, at § 1. Specifically, ETUs are defined as:

funded by an entity that has agreed to pay for all of the costs of the upgrade. Elective Transmission Upgrades are not identified through ISO-NE's Regional System Plan ("RSP") as being necessary for reliability or economic purposes.[25]

Section II.47.5 of the Tariff contains provisions that provide for the study, regional review, and ISO-NE approval of Elective Transmission Upgrades.[26] Schedule 25 of the Tariff governs the interconnection of Elective Transmission Upgrades.[27] After an interconnection request is submitted, ISO-NE assigns a queue position and studies the request to determine whether there will be a "significant adverse effect" upon the "stability, reliability or operating characteristics" of the system.[28] If ISO-NE determines that the Elective Transmission Upgrade will have a "significant adverse effect" upon the "stability, reliability or operating characteristics" of the system, the proponent of the Elective Transmission Upgrade is not permitted to proceed with its plan unless it "takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect."[29]

---

"a new Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is interconnecting to the Administered Transmission System, or an upgrade to an existing Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is part of or interconnected to the Administered Transmission System for which the Interconnection Customer has agreed to pay all of the costs of said Elective Transmission Upgrade and of any additions or modifications to the Administered Transmission System that are required to accommodate the Elective Transmission Upgrade."

*Id.*

[25]   The RSP is a comprehensive planning report on system needs and the resource and transmission facilities needed to maintain the reliability of ISO-NE's power system, while also accounting for market efficiencies and economic and environmental considerations. *See id.*, Attachment K, at § 3.1.

[26]   *See id.*, at § II.47.5.

[27]   *See id.*, at Schedule 25.

[28]   *See* Tariff, at § I.3.9.

[29]   *Id.*, at § I.3.10.

11

**JA32**

When the adverse impact is on an "Affected System,"[30] which can include a generator, the Elective Transmission Upgrade proponent cannot build the upgrade unless it enters into a "facilities agreement" with the Affected Party[31] (the owner of the Affected System) to remediate the problem on the Affected System.[32]   Specifically, the *pro forma* Elective Transmission Upgrade Interconnection Agreement ("IA") in Schedule 25 of the Tariff, which is entered into among the Interconnection Customer,[33] Interconnecting Transmission Owner,[34] and ISO-NE, instructs the Interconnection Customer to "enter into separate related *facilities agreements* to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection" of the Elective Transmission Upgrade.[35]

There are no rules for facilities agreements of this nature.  The ISO-NE Tariff does not define "facilities agreement," provide a form of such an agreement, or offer any guidance as to what it must contain, other than the above-quoted language that it must "address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection" of the Elective Transmission Upgrade.[36]  The ISO-NE Tariff also does not purport to require an Affected Party,

---

[30]   The ISO-NE Tariff defines an "Affected System" as "any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection."  *See* OATT, Schedule 25, at § 1.

[31]   The ISO-NE Tariff defines an "Affected Party," as "the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process."  *Id.*

[32]   *See id.*, Schedule 25, Appendix 6, at Article 11.4.4.

[33]   An Elective Transmission Upgrade "Interconnection Customer" is defined as "any entity, including a transmission owner or its Affiliates or subsidiaries, that interconnects or proposes to interconnect" its Elective Transmission Upgrade with the Administered Transmission System under Schedule 25 of the OATT.  *See id.*, Schedule 25, at § 1.

[34]   An "Interconnecting Transmission Owner" is a Participating Transmission Owner, Merchant Transmission Owner, or Other Transmission Owner that "owns, leases or otherwise possesses an interest in the portion of the Administered Transmission System at the Point of Interconnection" and is a party to the Elective Transmission Upgrade IA.  *Id.*

[35]   *See id.*, Schedule 25, Appendix 6, at Article 11.4.4 (emphasis added).

[36]   *See id.*

12

whose Affected System is a generator, to enter into a facilities agreement, or any agreement for the construction of a generation upgrade to accommodate an Elective Transmission Upgrade. The "facilities agreement" requirement with respect to generators is found only in the Elective Transmission Upgrade IA, to which the Affected Party is not a party.[37]

### C.     The NECEC Elective Upgrade

The NECEC Elective Upgrade is a proposed 1,200 MW 320 kV overhead high voltage direct current transmission line, approximately 145 miles in length, that will run between Hydro Québec's Appalaches 735 kV substation in Quebec and CMP's Larrabee Road substation in Lewiston, Maine.  The Larrabee Road substation is a part of ISO-NE's transmission system.  The estimated cost of the NECEC Elective Upgrade is $1 billion.

The NECEC Elective Upgrade System Impact Study determined that the NECEC Elective Upgrade would have a significant adverse effect on Seabrook Station's existing Generation Breaker.  The basis for this determination is not public information and is not particularly pertinent because neither party disputes the finding.

Over more than a three-month period, Seabrook and NECEC have negotiated in good faith, and resolved many issues, but have been unable to agree upon the issues identified in this Petition.[38]

---

[37]  *See id.*, Schedule 25, Appendix 6, at Article 1 (providing that a "Party" to the Elective Transmission Upgrade IA includes the Interconnection Customer, ISO-NE, and the Interconnecting Transmission Owner).

[38]  Through these good faith negotiations, Seabrook has generally raised the broad issues presented in this Petition.  However, as discussions on particular topics broke down, discussions on some topics did not progress to the level of detail provided in this Petition.  As such, some of the nuances of Seabrook's positions will be new to NECEC.

13

**JA34**

### D.    Replacing the Generation Breaker will be complex and time consuming, but the exact amount of time required for the project cannot be predicted

Nuclear power plants like Seabrook Station refuel every 18 to 24 months, often during the fall and spring when electricity demand is lower.  During a refueling outage, nuclear power plants typically schedule required plant maintenance, and modifications to, or replacements of, equipment while the plant is offline.  Removing and replacing the Generation Breaker and associated systems can only be accomplished during a refueling outage, both for practical reasons and in order to comply with stringent NRC requirements and INPO guidance.

In preparation for a refueling outage, Seabrook engages in an in-depth planning process to facilitate the orchestration of the numerous outage activities that will occur during the outage, including refueling of the reactor, required plant maintenance, and modifications or replacement of equipment.  To this end, NextEra, which owns one of the largest nuclear fleets in the United States and currently operates seven nuclear units, has established a fleet-wide set of protocols intended to ensure that outage projects, such as replacement of the Generation Breaker, are engineered, procured, and installed in a safe and reliable manner and that outages are implemented safely and predictably.  Those protocols are set out in mandatory procedures and broken down into numerous activities with established deadlines set for planning milestones that must occur prior to the start of the refueling outage.  As explained in the affidavit of Eric McCartney, Site Vice President for Seabrook Station, for the replacement of the Generation Breaker it is not feasible to meet several major milestones for the 2021 Outage, including one that passed in December 2019.[39]

---

[39]    *See* McCartney Affidavit at 5-6.

14

**JA35**

The Generation Breaker is comprised of large, complex pieces of equipment. The existing Generation Breaker is approximately 20 feet long by 15 feet wide, weighs over 32,000 pounds, and occupies approximately 700 square feet on the mezzanine level on a platform inside the north wall of the Turbine Generator Building, located inside the plant's power block. Not only would the Generation Breaker project involve removal and replacement of the existing Generation Breaker, the upgrade would also require the replacement of the Control Cabinet and Interlock and the Compressed Air System. Due to the size and complexity of the Generation Breaker replacement project, with access confined to a mezzanine level platform, the need to coordinate nuclear fuel movement and other activities around the project, and the current stage of planning, it is not possible to know in advance with a level of certainty how long the installation of the upgrade will take.[40]

For planning purposes, NextEra's good faith estimate is that upgrading the Generation Breaker could take 10 days longer than all other activities slated to be completed during a Generation Breaker Replacement Outage, though until an engineering study for Generation Breaker replacement is completed, this is only an estimate of a potential outage extension.[41] This estimate is based primarily on the size and complexity of the Generation Breaker, Control Cabinet and Interlock, and Compressed Air System that must be replaced.[42] Also, as Mr. McCartney explains, there is a possibility that the removal and replacement of such a system will expose further complexities that are not foreseeable at this time or even during the planning

---

[40]  *Id.* at 8-9.

[41]  *Id.*

[42]  *Id.*

stage.[43]  Thus, even after engineering studies are complete, it is possible that the time planned for the outage will have to be extended, and the estimate likewise does not take into account the possibility of an unplanned outage extension that can result from issues identified during the refueling outage itself.[44]

It is also possible that the outage will take less than 10 extra days, and it is possible that no extension of the outage will be required.  Mr. McCartney's Affidavit on this point is offered to show that Seabrook has given the issue careful thought, and concluded that due to the significant likelihood of an extended outage, Seabrook is acting reasonably in determining that it is not willing to shoulder the risk of such an extended outage to accommodate NECEC's Elective Upgrade.

### E.    Opportunity costs of any extended outage could be in the range of $560,000 per day, based on energy prices during the last refueling outage, but can be calculated with certainty after a Generation Breaker Replacement Outage using a formula

As explained below, the calculation of opportunity costs requires evaluation of several categories:   (1) lost revenue of the Joint Owners; (2) Seabrook's lost revenues from unit-contingent power purchase agreement sales; (3) Seabrook's lost revenues from day-ahead sales in the ISO-NE market; and (4) lost PFP bonus payments.[45]  These opportunity costs are adjusted by any fuel cost savings.[46]

---

[43]   *Id.* at 9.

[44]   *Id.* at 6, 8.

[45]   *See* Marcum Affidavit at 3-4.  Seabrook has proposed to include a term in a facilities agreement providing that NECEC would not be liable for opportunity costs or PFP penalties to the extent a Seabrook Station outage extension period was determined to result solely from Seabrook's gross negligence or willful misconduct. NECEC has neither accepted this limitation of liability nor the concept of being responsible for opportunity costs incurred during an extended outage period required to perform work to accommodate NECEC.

[46]   *Id.* at 3.

The first category of opportunity costs concerns the Joint Owners and their approximate 147 MW (nameplate) interest in Seabrook Station. NextEra is not the sole owner of the Seabrook Station. The Joint Owners collectively own 11.77% of the Seabrook Station and rely on the output of Seabrook Station as a physical hedge to the power they purchase to serve their load. Under ordinary operation, when the output of Seabrook Station is sold at the locational marginal price ("LMP"), the Joint Owners use the revenues from their share to offset purchase power costs at LMP in their load zone. So, for the Joint Owners, the loss of sales, and corresponding revenues, effectively eliminates their hedge.

The second category of opportunity costs is Seabrook's lost revenues from power sales contracts. Seabrook occasionally enters into power sales contracts with unaffiliated third parties, which specify the price at which a customer will pay Seabrook to purchase power from Seabrook Station.[47] Currently, Seabrook has almost 25% of the plant under contract as of January 2022 and additional power sales contracts may be entered into prior to a Generation Breaker Project Outage.[48] For each day that a Generation Breaker Replacement Outage is extended due to the Generation Breaker replacement project, Seabrook will forgo revenues from these unit power sales contracts.

The third category of opportunity costs is Seabrook's lost revenues from day-ahead sales in the ISO-NE market. The remainder of the output of Seabrook Station that is not pursuant to a power sales contract or used to serve the Joint Owners' load is sold into the market at the LMP.[49] As described in Mr. McCartney's Affidavit, Seabrook Station typically generates electricity 24

---

[47] *Id.* at 4.

[48] *Id.*

[49] *Id.*

hours a day, 7 days a week by virtue of being a baseload nuclear generator.[50]   The plant also always runs because it is operated as a price taker.  In other words, Seabrook Station is always selected in the day-ahead market unless it is in an outage.

The final category of opportunity costs is lost PFP bonus payments.  As Mr. Marcum explains, if a capacity scarcity condition were to occur during any days that a Generation Breaker Replacement Outage is extended solely due to a Generation Breaker replacement, Seabrook and the Joint Owners would likely lose a PFP bonus payment.[51]  If, for example, Seabrook Station was online and operating at full power during a capacity scarcity condition in 2020, Mr. Marcum testifies that Seabrook and the Joint Owners would likely earn a PFP bonus payment of approximately $0.75 million for each hour under the PFP design.[52]   On the flip side of the PFP bonus payment is the risk of PFP penalties during an extended outage, which is discussed in greater detail in Section IV.B. below.

As explained in the affidavit of Mr. Marcum, because opportunity costs are a result of foregone output, it is also appropriate to consider, and net out, any cost savings that may accrue to Seabrook and the Joint Owners if an outage is extended to accommodate the NECEC Elective Upgrade.[53]  There is only one potential benefit from a brief extended outage resulting from upgrading the Generation Breaker:  potential nuclear fuel cost savings.[54]  As described in the affidavit of Ruben Rodriguez, fuel prices for Seabrook, like other nuclear plants, are not

---

[50]   *See* McCartney Affidavit at 8.

[51]   *See* Marcum Affidavit. at 8.

[52]   *Id.*

[53]   *Id.* at 4-5.

[54]   *Id.* at 5.

variable.[55]  Nuclear fuel must be acquired far in advance, and if there is any unused nuclear fuel that remains in the nuclear fuel assemblies at the time of a refueling outage, the unused fuel is discharged with the used fuel, moved into storage, and replaced with new fuel assemblies.[56] Accordingly, the only time that there is a savings in fuel costs is if a decision is made not to procure a quantity of nuclear fuel to accommodate a planned outage.[57]  In the absence of such an adjustment, unburned nuclear fuel is wasted and there are no cost savings associated with an outage.

If upgrading the Generation Breaker had occurred in April 2020 and extended a Generation Breaker Replacement Outage by 10 days, it would have cost Seabrook and the Joint Owners about $5.6 million in revenues that they would otherwise have earned in the market or through power sales to third parties.[58]  Mr. Marcum's Affidavit calculated this figure based on existing contracts and actual energy prices and found that for the 10 days following the April 2020 refueling outage, Seabrook and the Joint Owners would have foregone about $560,000 a day, every day, from those contracts and from selling energy in the market.[59]  This revenue is necessary to properly maintain and run Seabrook Station in compliance with NRC regulations and INPO requirements.[60]  As Mr. Marcum explains, while it is unknown what the LMP will be at the time of a Generation Breaker Replacement Outage, $560,000 per day in foregone revenue from lost energy sales is representative of the order of magnitude of the problem had a

---

[55]  *See* Prepared Affidavit of Ruben Rodriguez at 3 ("Rodriguez Affidavit").

[56]  *Id.* at 4.

[57]  *Id.* at 4-5.

[58]  Marcum Affidavit at 5-6.

[59]  *See id.*

[60]  *Id.* at 6.

Generation Breaker Project Outage occurred in 2020.[61]   Because the actual opportunity costs cannot be known in advance, Seabrook proposes to use a formula rate.  As Mr. Marcum explains, the proposed Formula Rate Template will calculate lost profits and revenues after a Generation Breaker Replacement Outage ends based on actual day-ahead LMP at the Seabrook Station node during the extended portion of the outage.[62]   In other words, NECEC would pay actual opportunity costs.

The $5.6 million estimate is just that – an estimate based on historical prices.  It is impossible today to accurately calculate the opportunity costs that Seabrook and the Joint Owners will incur solely due to the Generation Breaker Replacement Outage.[63]   Unknown variables include exactly how long a Generation Breaker Replacement Outage will be extended due to completing the Generation Breaker replacement project, what the day-ahead LMP will be during that time, and whether ISO-NE declares a PFP event during the time that a Generation Breaker Replacement Outage is extended.[64]   Given these circumstances, the only just and reasonable approach to calculating opportunity cost is via a formula rate with the formula decided now and the inputs later, when they are actually known.[65]  This approach appropriately allows Seabrook and the Joint Owners to have regulatory certainty that they will recover the actual costs incurred for a project they do not want and will receive no benefit from, while allowing NECEC to proceed with its plans with a clear understanding in advance of the nature of the costs for which it will be responsible, and the assurance that it will pay no more than actual

---

[61]  *Id.* at 6.

[62]  *Id.* at 8-9.

[63]  *Id.* at 8.

[64]  *Id.*

[65]  *Id.* at 8-9.

costs.  Seabrook's proposed Formula Rate Template (which also includes other forms of costs that will be plugged in after the work is done) is discussed further below.

IV.    **Requested Declaration I:  Seabrook is not required to upgrade the Generation Breaker at Seabrook Station at a loss to accommodate the NECEC Elective Upgrade, and the Formula Rate Template Seabrook proposes is an appropriate means of calculating opportunity and other costs that NECEC should pay**

    A.    **Fundamental ratemaking principles, Commission precedent, and sound policy support collection of all costs incurred by Seabrook in providing the requested service**

        1.    **The FPA prohibits confiscatory rates**

It is a constitutional requirement and a fundamental principle of ratemaking that rates cannot be confiscatory.[66]  Rates that fail to sufficiently compensate a company for its costs of providing service are deemed confiscatory and therefore constitute an unconstitutional taking under the Fifth and Fourteenth Amendments.

Seabrook Station is being asked to provide a service to NECEC in furtherance of NECEC's Elective Upgrade, and based upon ISO-NE's determination that the replacement of the Generation Breaker is a necessary pre-condition to NECEC's provision of service to the public.  Seabrook therefore is entitled to receive sufficient compensation for such service.  As such, Seabrook must be able to recover its legitimate costs of providing service, or the rates would be confiscatory.[67]  As Mr. Marcum explains, "because [Seabrook] sells the Seabrook Station output at market and does not receive cost-of-service recovery, it must cover its costs through market-

---

[66]    *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989) ("*Duquesne*") ("[T]he Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory."); *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923) (holding that rates that are confiscatory deprive a company of its property in violation of the Fourteenth Amendment; *Algonquin LNG, Inc. v. FERC*, 570 F.2d 1043, 1050 (D.C. Cir. 1978) ("The prohibition of confiscatory rates is constitutional.").

[67]    *See N.Y. Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,004 at P 111 (2015) ("Absent a showing that costs have been imprudently incurred, the Commission allows utilities the opportunity to recover their costs.").

based sales . . . . The revenue Seabrook earns in the energy markets is necessary to properly maintain and run Seabrook Station in compliance with Nuclear Regulatory Commission regulations and guidance from the Institute of Nuclear Power Operations."[68] NECEC's proposal to require Seabrook to incur a financial loss in order to allow NECEC to build its Elective Transmission Upgrade is certainly so "unjust" as to be confiscatory.[69]

### 2. The FPA requires that costs be recovered from those who caused the costs

Under the FPA, costs must be allocated in accordance with principles of cost causation – that is, rates must allocate costs in a manner that is at least "roughly commensurate" with causation of those costs.[70] The cost causation principle requires that "rates reflect to some degree the costs actually caused by the customer who must pay them."[71] In evaluating compliance with the cost causation principle, the Commission compares the costs assessed against a party to the burdens imposed or benefits drawn from that party.[72]

Here, the costs are caused solely by NECEC, because Seabrook and the Joint Owners would not incur them but for NECEC's service request. Barring Seabrook and the Joint Owners from recovering these costs would be equivalent to allocating the costs to Seabrook and the Joint

---

[68]    Marcum Affidavit at 6.

[69]    *See Duquesne*, 488 U.S. at 307; *PJM Interconnection, LLC*, 115 FERC ¶ 61,079 at P 36 (2006) (stating that "[i]t is questionable whether PJM could impose, or the Commission could enforce, a requirement that generators continue to operate at a loss").

[70]    *See Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 474 (7th Cir. 2009) ("*ICC v. FERC*"); *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 at P 622 (2011) ("Order No. 1000") (holding that "[t]he cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits"), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

[71]    *See Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) ("*Midwest ISO*") (quoting *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)).

[72]    *Midwest ISO*, 373 F.3d at 1368.

22

Owners, because Seabrook and the Joint Owners would then have to pay them (unless the Alternative Declaration is granted). The costs Seabrook and the Joint Owners are facing are substantial. As described above, had a Generation Breaker Replacement Outage occurred in April 2020 (the last refueling outage), Seabrook and the Joint Owners estimate that they would lose about $560,000 per day for each day of an extended outage caused to accommodate the NECEC Elective Upgrade, plus the risk of lost PFP bonuses of approximately $0.75 million per hour during a capacity scarcity condition.[73]

Additionally, neither the NECEC Elective Upgrade nor the Generation Breaker replacement confers benefits to Seabrook and the Joint Owners. Cost causation principles specify that, "[t]o the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred [because] without the expectation of its contributions[,] the facilities might not have been built, or might have been delayed."[74] It cannot be claimed that Seabrook "caused" the NECEC Elective Upgrade to be built, or that Seabrook and the Joint Owners derive material benefits from the NECEC Elective Upgrade. Instead, any alleged benefits Seabrook and the Joint Owners receive from the NECEC Elective Upgrade are "trivial in relation to the costs sought to be shifted."[75] As Mr. Marcum testifies, the Generation Breaker would not be replaced but for the NECEC request.[76] Neither Seabrook nor the Joint Owners benefit from work on Seabrook Station that they do not need to undertake, and would not undertake of their own choice.

---

[73] *See* Marcum Affidavit at 5-7.

[74] *ICC v. FERC*, 576 F.3d at 476.

[75] *Id.*

[76] *See* Marcum Affidavit at 7-8.

Accordingly, requiring Seabrook and the Joint Owners to pay these costs, for a project that they have no interest in, did not cause in any way, or from which they derive minimal benefits, would be contrary to principles of cost causation, and therefore the FPA.

### 3. Recovery of opportunity costs is appropriate here

Opportunity costs are, among other things, "the revenues lost or costs incurred because a utility must reduce its own off-system purchases or sales in order to overcome a constraint on the grid."[77] Opportunity costs therefore include, in this case, lost profits, lost revenues, and forgone PFP bonuses.[78] All of these are "revenues lost" due to the "reduc[tion in] sales" that Seabrook must make to accommodate the NECEC Elective Upgrade.

The Commission has long authorized recovery of opportunity costs for generators who are forced to back down output in a variety of regional transmission organization ("RTO")

---

[77] *See Ne. Utils. Serv. Co.*, Opinion No. 364-A, 58 FERC ¶ 61,070, at 61,201 (1992) ("*NU I*"), *reh'g denied*, Opinion No. 364-B, 59 FERC ¶ 61,042 (1992), *order on reh'g*, 59 FERC ¶ 61,089 (1992), *aff'd in relevant part*, *Ne. Utils. Serv. Co. v. FERC*, 993 F.2d 937 (1st Cir. 1993) ("*NU v. FERC*"); *see also Pa. Elec. Co.*, 58 FERC ¶ 61,278, at 61,871 (1992) ("*Penelec I*") (explaining that in the context of transmission, opportunity costs are incurred "when the utility accommodates a third party's request for transmission service (*i.e.,* wheeling request) and thereby foregoes an opportunity to reduce its own costs, to the economic detriment of the utility's native load customers"), *reh'g denied*, 60 FERC ¶ 61,034 (1992) ("*Penelec II*"), *aff'd*, *Pa. Elec. Co. v. FERC*, 11 F.3d 207 (D.C. Cir. 1993).

[78] *See PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,030 at P 19 (2004) (stating that "[a] formula purporting to provide opportunity cost compensation should be designed such that the formula as nearly as possible results in full opportunity cost (i.e., lost profits) compensation"); *RockGen Energy, LLC*, 100 FERC ¶ 61,261 at P 18 (2002) (approving recovery of "any amounts necessary to keep [the generator] whole with respect to costs or penalties incurred or revenues lost" in providing service).

24

**JA45**

market contexts.[79]  Commission precedent also supports recovery of opportunity costs in cost of

service contexts.[80]  Specifically, the Commission has held that "opportunity costs can be a valid

basis for rates."[81]  This is particularly true where denying recovery of opportunity costs would

result in a confiscatory rate.[82]  The fact that the opportunity costs at issue here will be recovered

through a service agreement is irrelevant.[83]

Revenues foregone to accommodate the NECEC Elective Upgrade "are an important part

of Seabrook's bottom line," because Seabrook needs such revenues to cover its costs.[84]

Seabrook and the Joint Owners will incur opportunity costs in the form of: (1) lost revenues and

profits from foregone power sales of the output of Seabrook Station to perform the NECEC

Elective Upgrade; and (2) potential lost PFP bonus, as a result of not generating power to

---

[79]  *See, e.g.*, *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,282 at P 17 (2016) (explaining that in PJM, generators providing reactive service are eligible to recover "lost opportunity cost credits" in order to ensure that they are adequately compensated for any lost revenues resulting from PJM's dispatch instructions); *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 at P 2 (2008) (explaining that under the Midwest Independent Transmission System Operator, Inc.'s ("MISO") tariff, generators providing reactive service are eligible to recover opportunity costs associated with reducing the MW output of the generator below rated capability to produce additional reactive power), *aff'd in relevant part and vacating in part*, *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (D.C. Cir. 2011); *N.Y. Indep. Sys. Operator, Inc.*, 91 FERC ¶ 61,218 at 61,801-02 (2000) ("*NYISO*") (noting that in NYISO, suppliers of spinning and non-spinning reserves are compensated for their lost opportunity costs), *reh'g denied*, 97 FERC ¶ 61,155 (2001), *reh'g denied*, 99 FERC ¶ 61,125 (2002), *remanded on other grounds sub nom.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003), *order on remand*, 110 FERC ¶ 61,244 (2005), *order on reh'g*, 113 FERC ¶ 61,155 (2005).

[80]  *See, e.g.*, *Ameren Energy Mktg. Co.*, 117 FERC ¶ 61,334 at PP 15-16 (2006) ("*Ameren*") (approving proposal to include, as a component of cost based rates, lost opportunity costs related to ancillary services but setting the matter for hearing to determine the appropriate mechanism to calculate such costs); *NU I*, 58 FERC ¶ 61,070, at 61,203 (concluding that opportunity cost pricing is appropriate for firm transmission service); *Penelec*, 58 FERC ¶ 61,278, at 61,873-74 (holding that Penelec may recover opportunity costs to the extent of holding its native load customers harmless as a result of providing third-party transmission service); *New England Power Co.*, 65 FERC ¶ 61,153, at 61,757 (1993) (approving a utility's proposal to charge all transmission customers a pro rata share of average system costs, including average system opportunity costs).

[81]  *See Ameren*, 117 FERC ¶ 61,334 at P 16.

[82]  *See ISO New England, Inc.*, 120 FERC ¶ 61,087 at P 52 (2007) (recognizing that requiring an existing generating resource to offer capacity at a price less than its net risk-adjusted going forward and opportunity costs raises the possibility of confiscatory ratemaking).

[83]  *See Entergy Ark., Inc.*, 143 FERC ¶ 61,299 at P 74 (2013) (finding that the service agreements at issue appropriately compensated Entergy Arkansas's opportunity costs from lost revenues that it would otherwise have realized).

[84]  Marcum Affidavit at 6.

accommodate the NECEC Elective Upgrade.[85]  Although impossible to accurately project at this time, had a Generation Breaker Replacement Outage occurred in April 2020, Seabrook estimates that it and the Joint Owners would collectively lose about $560,000 in lost profits and revenues for each day of outage.[86]  To the extent a Generation Breaker replacement project causes an extension to the Generation Breaker Replacement Outage beyond the original schedule, these lost opportunity costs would not be incurred but for the NECEC Elective Upgrade.  Seabrook and the Joint Owners should therefore be made whole for their opportunity costs of not being able to participate in the energy market for the time it is executing a project to support an elective upgrade for a third party.

It is appropriate for Seabrook and the Joint Owners to recover any lost PFP bonus incurred as a result of the extended outage.  Seabrook and the Joint Owners would have likely earned a bonus payment of approximately $0.75 million for each hour if Seabrook Station was online operating at full power during a capacity scarcity condition in 2020.[87]  Lost PFP bonus payment costs should be borne by NECEC because, but for the replacement of the Generation Breaker conducted solely at NECEC's request for its benefit, Seabrook Station would be online during those days, and would likely earn a PFP bonus payment.[88]  Granting Seabrook's request is consistent with Commission precedent and policy and will ensure that Seabrook and the Joint Owners are fully compensated for their services.

---

[85]  *See id.* at 3-4.

[86]  *See id.* at 5-6.  Because no scarcity events occurred in the 10 days following the April 2020 refueling outage, no PFP bonus payments are included in the estimate of lost opportunity costs herein.

[87]  *Id.*

[88]  *Id.*

### 4.    Recovery of legal costs is appropriate here

The Commission's longstanding precedent is that regulated utilities "are entitled to recover their reasonably incurred rate litigation costs" as a legitimate cost of rendering public utility service.[89]  The general rule is that "[r]ate case expenses should be collected in the rates that result from the proceedings in connection with which they were incurred."[90]  Courts have taken "a somewhat broad view of which litigation costs entities regulated under rate-of-return ratemaking should be permitted to recover."[91]

The services requested here will be provided on a cost of service basis.  Therefore, the legal costs incurred by Seabrook in advocating and defending its rights to collect the cost of service for Seabrook Station are equivalent to costs incurred in ratemaking proceedings.[92]  These include costs of both internal and external counsel incurred to negotiate the agreement with NECEC; costs to bring this action and any other action needed to resolve rate disputes; costs to prepare contracts to procure and install the Generation Breaker; and costs to defend any challenge related to the work.  As such, it would be contrary to general ratemaking principles and public policy to deny Seabrook recovery of the legal costs incurred to accommodate the NECEC Elective Upgrade.

---

[89]    *See Potomac-Appalachian Transmission Highline, LLC*, Opinion No. 554, 158 FERC ¶ 61,050 at P 135 (2017), *order on reh'g*, Opinion No. 554-A, 170 FERC ¶ 61,050 (2020).

[90]    *Pub. Serv. Co. of N.M.*, Opinion No. 133, 17 FERC ¶ 61,123, at 61,251 (1981) (citing *Ala.-Tenn. Nat. Gas Co.*, 11 FPC 75, 82-83 (1952) and *Sierra Pac. Power Co.*, 53 FPC 1795, 1805 (1975)), *order on reh'g*, Opinion No. 133-A, 18 FERC ¶ 61,036 (1982), *order on reh'g*, Opinion No. 133-B, 21 FERC ¶ 61,215 (1982), *aff'd in relevant part*, *Pub. Serv. Co. of N.M.* v. FERC, 832 F.2d 1201 (10th Cir. 1987).

[91]    *See BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1296 (D.C. Cir. 2004).

[92]    *See SFPP, L.P.*, Opinion No. 435-A, 91 FERC ¶ 61,135, at 61,512 (2000) ("Litigation related to the pipeline's cost of service and the structure of its tariff are part of its normal, ongoing operations, and such costs are recoverable as part of the pipeline's cost of service."), *aff'd in relevant part and vacated in part*, *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263 (D.C. Cir. 2004).

**B.    Seabrook appropriately proposes to collect actual costs incurred in providing the requested service**

The Commission permits recovery of opportunity costs if they are "legitimate and verifiable."[93]    The Formula Rate Template that Seabrook proposes here will ensure that Seabrook and the Joint Owners will charge NECEC only for actually experienced opportunity costs, and other costs that would not occur but for the work requested by NECEC, as explained by Mr. Marcum.[94]

Seabrook's proposed approach would net out any cost savings from its nuclear fuel costs. As Mr. Rodriguez explains, Seabrook must order its nuclear fuel supply at least 10 months in advance of a scheduled outage, and it takes Seabrook at least 3 months before that to design and optimize the characteristics of the fuel order.[95]    So, all told, the lead time to plan and order nuclear fuel is at least 13 months.[96]    The only way to reduce fuel costs is to reduce the amount of fuel loaded in each nuclear fuel assembly.[97]    However, once that decision is made, it is irreversible: Seabrook cannot operate on days for which it has not procured nuclear fuel.[98]    As observed by Mr. Rodriguez, actual savings on nuclear fuel costs would be somewhat small relative to opportunity costs that would be locked in by a decision to reduce fuel loaded on to

---

[93]    *See Penelec*, 58 FERC ¶ 61,278, at 61,871; *NU I*, 58 FERC 61,070, at 61,201 n.102; *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,739 (1996) ("Order No. 888") (stating that the Commission's policy is to allow utilities to charge opportunity costs), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[94]    *See* Marcum Affidavit at 8.

[95]    *See* Rodriguez Affidavit at 3-4.

[96]    *Id.* at 4.

[97]    *Id.* at 4-5.

[98]    *Id.*

fuel rods during a Generation Breaker Replacement Outage.[99]  Accordingly, Seabrook is willing to negotiate with NECEC to reduce the opportunity costs by fuel savings, so long as NECEC commits that it will pay opportunity costs for each day of reduced fuel purchase.[100]  If NECEC agrees to that, NECEC would choose the number of days' worth of reduced fuel that Seabrook would buy for Seabrook Station in anticipation of the outage.[101]  NECEC must do so with sufficient notice so Seabrook may adjust its nuclear core design development and subsequent nuclear fuel purchase in advance of a Generation Breaker Replacement Outage.[102]  And this adjustment would require an additional study, which itself would cost NECEC about $250,000.[103]  For these reasons, Seabrook does not recommend that NECEC take the financial risk involved in trying to realize fuel savings, but we nonetheless provide that opportunity, in case NECEC wishes to take advantage of it.

Seabrook proposes to use its Formula Rate Template to calculate the charge for the items discussed in this Petition on an after-the-fact basis.[104]  That would ensure that only actual costs of this nature are passed through.  As Mr. Marcum explains, the Formula Rate Template calculates the opportunity costs and other costs that Seabrook will incur for each day that replacement of the Generation Breaker extends the Generation Breaker Replacement Outage.[105]  In addition to opportunity costs, the Formula Rate Template also contemplates Seabrook recovering potential PFP penalties, incremental labor costs, and electricity expenses due to an

---

[99]  *Id.*

[100]  *Id.* at 6-7.

[101]  *Id.*

[102]  *Id.*.

[103]  *Id.* at 6.

[104]  *See* Marcum Affidavit at 11.

[105]  *Id.* at 8-9.

outage extension to accommodate the NECEC Elective Upgrade, as well as all legal costs associated solely with upgrading the Generation Breaker.[106]

Like lost profits and revenues, any PFP penalties that occur during an outage extended to replace the Generation Breaker would be a direct consequence of power production foregone as a direct result of accommodating NECEC's request.  The PFP penalty rate in effect for the April 2020 refueling outage was $2,000/MWh.[107]   The PFP penalty rate increases to $3,500/MWh starting June 1, 2021, and to $5,455/MWh starting June 1, 2024.[108]  Because Seabrook Station's Capacity Supply Obligation was 1,251.35 MW at the time of the April 2020 refueling outage, it could have incurred a PFP penalty of approximately $1.75 million for each hour of a capacity scarcity condition (assuming a balancing ratio of 70%) that it was offline.[109]

Under the Formula Rate Template, the total amount NECEC will owe Seabrook is the sum of foregone revenues, PFP penalties, legal fees, incremental labor costs, and incremental electricity costs, less any fuel savings.[110]  Because NECEC is a special purpose entity formed solely for the purpose of developing and owning the NECEC Elective Upgrade, a backstop form of credit support (parent guaranty or letter of credit from a creditworthy entity acceptable to Seabrook) will be required prior to commencing the Generation Breaker Replacement

---

[106]  *Id.* at 6-7.

[107]  *Id.* at 7.  Under the two settlement system for capacity payments, if a resource provides less than its Capacity Supply Obligation, it will receive a negative Capacity Performance Payment.  The Capacity Performance Payment is calculated using an administratively-determined rate specified in the Tariff, known as the Capacity Performance Payment Rate.  The Capacity Performance Payment rate increases to $3,500/MWh starting June 1, 2021.  *See ISO New England Inc.*, 147 FERC ¶ 61,172 at P 6 and n.8 (2014).

[108]  Marcum Affidavit at 7.

[109]  *Id.*

[110]  *Id.* at 9.  Seabrook notes that since NECEC in negotiation of the proposed facilities agreement objected to the underlying concept of having responsibility for opportunity costs incurred during an extended outage period required to perform work to accommodate NECEC, Seabrook has not provided NECEC with a copy of the proposed Formula Rate Template.

30

**JA51**

Outage.  Such credit support is required to ensure payment of any amounts owed to Seabrook arising out of a Generator Breaker Replacement Outage that would not be prepaid pursuant to the terms of a facilities agreement.

### C.    The ISO-NE Tariff limitations provision is not applicable here

NECEC has informed Seabrook that it believes that the ISO-NE Tariff's limitations on liability provision is applicable here.  NECEC is wrong.

Section I.5.2 of the Tariff contains ISO-NE's general limitations on liability.[111]  Section I.5.2 of the Tariff applies only to any "loss of revenues or profits, attorneys' fees or costs arising out of, or connected in any way with the performance or non-performance under this Tariff or any Service Agreement thereunder."[112]  As explained above, the Tariff does not require Seabrook to replace the Generation Breaker.  As such, upgrading the Generation Breaker would not constitute "performance or non-performance" under the Tariff.[113]  Moreover, a "facilities agreement" would not be a Service Agreement under the Tariff.  A "Service Agreement" under the Tariff only includes a Transmission Service Agreement or a Market Participant Service Agreement.[114]  Therefore, Seabrook Station's "performance or non-performance" would not be pursuant to any Service Agreement under the Tariff.[115]

Perhaps more fundamentally, the ISO-NE Tariff's limitations provision is a limitation on damages for breach of contract, not a limitation on ratemaking.  There are provisions of the ISO-

---

[111]  *See* Tariff, at § I.5.2.

[112]  *Id.*

[113]  *Id.*

[114]  *Id.*, at § I.2.2.

[115]  *Id.*, at § I.5.2.

31

**JA52**

NE Tariff that permit charging of opportunity costs,[116] and transmission providers in ISO-NE are permitted to collect legal costs booked to Account 928 as part of the revenue requirements collected under the ISO-NE Tariff.[117]  Such charges would not be possible if the limitations provision served to limit the recovery of opportunity costs and legal costs incurred in providing a service.

### D.    It is immaterial that the costs of the Generation Breaker replacement project are not within NECEC's control

NECEC has informed Seabrook that it does not believe it should have to pay for costs associated with an extended outage because such an extended outage would not be within NECEC's control.  This is contrary to the standard for cost of service rates.  Indeed, the construction and engineering costs that NECEC already has agreed to pay are not within NECEC's control.  No interconnection customer has control of the costs of interconnection.  No transmission customer has control of the costs of transmission.

---

[116]  For example, resources providing reactive power voltage support service under Schedule 2 of the OATT may be paid "Lost Opportunity Costs."  *See* OATT, Schedule 2, at § II.A.

[117]  The revenue requirements for the transmission-owning utilities in ISO-NE are determined through a formula rate set forth in Attachment F to the OATT.  *See* OATT, at Attachment F.  The formula rate provides that the revenue requirement for each transmission owner shall include Transmission Related Administrative and General ("A&G") Expenses.  *Id.*  "Transmission Related A&G Expenses" equals the sum of the transmission owner's (1) A&G expenses, multiplied by the Transmission Wages and Salaries Allocation Factor, (2) Property Insurance multiplied by the Transmission Plant Allocation Factor, and (3) Expenses included in Account 928 (excluding Merger-Related Costs included in Account 928) related to FERC Assessments multiplied by Plant Allocation Factor, plus any other Federal and State transmission related expenses or assessments, plus specific transmission related expenses included in Account 930.1 plus Transmission Merger-Related Costs.  *Id.*, Attachment F Implementation Rule, at § II.H.  Therefore, the formula rate includes expenses included in Account 928.  Account 928 (Regulatory Commission Expenses) includes "all expenses . . . incurred by the utility in connection with formal cases before regulatory commissions, or other regulatory bodies, or cases in which such a body is a party."  18 C.F.R. pt. 101, Account 928 (2020).  Expenses recorded in Account 928 include "[s]alaries, fees, retainers, and expenses of counsel, solicitors, attorneys, accountants, engineers, clerks, attendants, witnesses, and others engaged in the prosecution of, or defense against petitions or complaints presented to regulatory bodies."  *Id.*; *see also Ameren Ill. Co.*, 170 FERC ¶ 61,267 at P 71 (2020) ("[E]xpenses associated with responding to and defense against formal challenges and expenses incurred in connection with other formal cases before a regulatory body would fall within the instructions of Account 928, and those expenses should therefore be recorded to Account 928.").

Moreover, in this case, third party contractors will perform the underlying engineering studies and will be hired to supply components and to execute the Generation Breaker replacement project. The amount of time to complete the project is not solely in the hands of Seabrook or any affiliate. Seabrook, however, commits to work with NECEC in coordinating with third party contractors to complete the project in a timely manner. Nevertheless, as discussed above, the Generation Breaker is located in an enclosed space within the power block at a nuclear power plant, thus limiting how the work can reasonably be completed, and performing the Generation Breaker replacement project cannot interfere with other work scheduled to be undertaken during a Generation Breaker Replacement Outage. NECEC's wariness of the risk that an outage may run longer than expected is not a ground for shifting that risk to Seabrook and the Joint Owners, and disregarding the settled legal and policy principles discussed above.

V.      **Requested Declaration II: "Good Utility Practice" for replacement of the Generation Breaker at Seabrook Station should be defined in terms of the practices of the nuclear power industry, such that Seabrook's proposed definition is appropriate for use in a facilities agreement with NECEC**

Under any agreement with NECEC, Seabrook would agree to use Reasonable Efforts to complete the Generation Breaker replacement, as defined in the ISO-NE Tariff.[118] The term Reasonable Efforts is defined, in part, as being timely and consistent with "Good Utility Practice," which as used in the normal course under the Tariff would mean the practices of the electric industry as a whole. NECEC argues that the facilities agreement also should define "Good Utility Practice" in this fashion. However, in the case of a nuclear refueling outage and the Generator Breaker replacement, relying on the standards and practices of the electric industry

---

[118] The ISO-NE Tariff defines "Reasonable Efforts" as "efforts that are timely and consistent with Good Utility Practice and are otherwise substantially equivalent to those a Party would use to protect its own interests." Tariff, Schedule 25, at § 1.

33

**JA54**

as a whole is misplaced.  As explained in Mr. McCartney's Affidavit, Seabrook Station remains subject to NRC requirements and INPO guidelines and, as such, the Generator Breaker replacement project itself should not be subject to an inapplicable standard.[119]  Given NECEC's objection to use of a nuclear-specific definition, Seabrook is concerned that NECEC intends to use an inapplicable standard to attempt to argue that any extended outage was overlong or otherwise improperly conducted, even if everything was done in accordance with the actually applicable nuclear industry standards.

Seabrook's performance of the Generation Breaker replacement should be evaluated solely by reference to the standards used to conduct that replacement.  As Mr. McCartney explains, replacing a generation breaker at a nuclear plant is not like replacing a generation breaker at a fossil plant.[120]  Indeed, this very replacement will be subject to after-the-fact review by INPO, using INPO's standards.[121]  Seabrook is unwilling to enter into a contract that uses an inapplicable standard to evaluate its performance.  Accordingly, Seabrook has proposed the following definition of "Good Utility Practice" for use in the facilities agreement, with italics used to denote the key language, and asks the Commission to declare that this language is appropriate for a facilities agreement with NECEC:

> For purposes of this Agreement . . . Good Utility Practice means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business

---

[119] *See* McCartney Affidavit at 8; *Essential Reliability Servs. & the Evolving Bulk-Power Sys.—Primary Frequency Response*, Order No. 842, 162 FERC ¶ 61,128 at P 202 (2018) (exempting nuclear generating facilities from certain interconnection requirements "due to the[ir] unique regulatory and technical requirements"), *order on clarification and reh'g*, 164 FERC ¶ 61,135 (2018).

[120] *See* McCartney Affidavit at 7.

[121] *Id.*

34

**JA55**

practices, reliability, safety and expedition; *provided, however, that during the Planning and Construction Phase, including a Refueling Outage, Planned Outage Extension or Unplanned Outage Extension, the phrase "electric utility industry" above is understood to mean the "U.S. nuclear industry."* Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather includes all acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4). [Emphasis added].[122]

## VI.  Requested Declaration III: Seabrook will not be liable for consequential damages under a facilities agreement with NECEC

NECEC has informed Seabrook that it does not believe that Seabrook should be shielded from consequential damages in replacing the Generation Breaker if, for example, the conduct or timing of the Generation Breaker Replacement Outage delays the proposed commercial operations date of the NECEC Elective Upgrade.  Specifically, Seabrook seeks Commission authorization for the inclusion of the following *pro forma* limitation of liability provision:  "In no event shall Seabrook be liable to NECEC for consequential, incidental, punitive, exemplary, or indirect damages, lost profits, or other business interruption damages, by statute, in tort or contract, under any indemnity provision of any agreement, or otherwise."

NECEC's attempt to remove a limitation on damages provision from Seabrook's proposed facilities agreement is contrary to Commission policy and precedent.  Unlike the request above in Section IV.C, which is focused on whether there should be a limitation on

---

[122]   The Planning and Construction Phase is defined in the draft facilities agreement as "activities" to be identified in an exhibit following completion of the engineering agreement that are "associated with planning, permitting, the procurement of the necessary materials and equipment, and the construction" of the Generation Breaker replacement project.  A Planned Outage Extension is defined in the draft facilities agreement as a time "prior to the commencement of a Refueling Outage [when Seabrook] definitively determines that construction cannot be completed during the limited timeframe of the Critical Path" for returning Seabrook Station to full power operation after a refueling outage (exclusive of any activities associated with the Generation Breaker Replacement Outage).  An Unplanned Outage Extension is defined in the draft facilities agreement as a time when "[Seabrook] during a Refueling Outage determines that it cannot complete activities associated with the Planning and Construction Phase within the established schedule (and consistent with the Critical Path) and such failure causes a Refueling Outage to be extended."  NECEC has not disputed these definition.  Seabrook respectfully asks the Commission to assume these definitions will remain in all material manner unchanged in ruling on the requested declaration.

35

including opportunity costs in determining the *rate* for providing a service, this request addresses whether there should be a limitation on *damage*s that can be claimed for alleged breach of the service agreement.  These are two different requests and should therefore be treated differently.

In the absence of a provision limiting consequential damages, there is no reason for entities such as Seabrook to enter into agreements that provide no benefits but create risks.  The Commission has adopted service agreement provisions limiting consequential damages as a means to reduce litigation.[123]  The limitation on damages provision that Seabrook proposed is consistent with such service agreement provisions.  As a practical matter, if Commission policy were that every time an upgrade was delayed a service provider was liable for consequential damages, the Commission would be faced with endless litigation.  As such, exposing Seabrook to consequential damages in upgrading the Generation Breaker does not comport with Commission policy.  Moreover, NECEC will be shielded from consequential damages in connection with the service it provides over the NECEC Elective Upgrade, once constructed.[124] There is no basis for determining that Seabrook should not receive the same protection when it provides a service to NECEC in upgrading the Generation Breaker.[125]

---

[123] *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 at P 906 (2003) (stating that a provision limiting consequential damages will reduce litigation), *order on reh'g,* Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008).

[124] *See* Tariff, at § I.5.2 (stating that a transmission owner shall not be liable for consequential damages arising out of, or connected in any way with its performance or non-performance under the Tariff or any Service Agreement thereunder).

[125] *See Am. Elec. Power Serv. Corp. v. PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,121 at P 62 (2019) (rejecting a transmission provider's proposed amendments to the limitation on damages provision of a service agreement because the provision was not "bilateral" and required the interconnection customer, and only the interconnection customer, to be liable for certain damages).

36

**VII.    Alternative Declaration: The ISO-NE Tariff does not require Seabrook to enter into a facilities agreement for replacement of the Generation Breaker**

This question is posed in the alternative because the Commission need not address it if the Commission grants the Requested Declarations above.  However, if the Commission declines to grant any of the Requested Declarations, Seabrook requests confirmation that the ISO-NE Tariff does not require it to enter into a facilities agreement to replace the Generation Breaker to accommodate the NECEC Elective Upgrade.  Seabrook has every intention of entering into such a contract if it is made whole, and receives the protection of an appropriate definition of Good Utility Practice and appropriate protection from consequential damages, and so seeks this Alternative Declaration to confirm that, even if the Commission is not prepared to affirmatively declare Seabrook's rights on these issues, Seabrook is free under the Tariff to bargain for cost recovery and protections, and decline to enter into an agreement without recovery of such costs and agreement on such protections.

This declaration is warranted because, as explained in Section III.B above, only NECEC has an obligation under the Tariff to enter into a facilities agreement.  Seabrook, as an Affected Party owner of generation that is not a transmission provider, has no reciprocal obligation under the Tariff to upgrade its generation facility.

**VIII.    Seabrook is not asking the Commission to rule in advance that costs will be prudently incurred**

With respect to both the Requested Declarations and the Alternative Declaration, Seabrook is not requesting any sort of advance determination of prudence.  While Seabrook fully expects its incurrence of costs to be prudent, Seabrook recognizes that based on this record, the Commission has no factual basis for such a determination.  If NECEC wishes it, and the declarations are otherwise granted, Seabrook will provide in the facilities agreement Formula Rate Template protocols for providing NECEC with information about Seabrook's costs,

37

answering questions from NECEC, and filing of a challenge, if NECEC decides it wants to dispute prudence.

## IX.  Attachments

The following materials are attached in support of Seabrook's Petition:

- **Attachment A:**  Affidavit of Eric McCartney
- **Attachment B:**  Affidavit of Joshua Marcum
- **Attachment C:**  Affidavit of Ruben Rodriguez
- **Attachment D:**  Seabrook Main Generator Breaker Upgrade Evaluation

## X.  Conclusion

For the reasons set forth above, Seabrook respectfully requests that the Commission issue an order granting the Requested Declarations provided above, or the Alternative Declaration.

Respectfully submitted,

*/s/ Joel D. Newton*
Joel D. Newton
NextEra Energy Resources, LLC
801 Pennsylvania Avenue, NW
Suite 220
Washington, DC 20004
(202) 347-7126
joel.newton@nee.com

*/s/ Noel Symons*
Noel Symons
Colin Francis
Mary-Kaitlin Rigney
McGuireWoods LLP
2001 K Street, NW, Suite 400
Washington, DC 20006
(202) 857-2929
nsymons@mcguirewoods.com

Dated: October 5, 2020

# Attachment B

# Prepared Affidavit of Joshua Marcum

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**NextEra Energy Seabrook, LLC**       )       **Docket No. EL21-___-000**

**PREPARED AFFIDAVIT OF JOSHUA MARCUM**
**ON BEHALF OF**
**NEXTERA ENERGY SEABROOK, LLC**

**I.    Introduction**

My name is Joshua Marcum.  My business address is 700 Universe Boulevard, Juno Beach, Florida 33408. I am the Regional Business Director responsible for Seabrook Station for NextEra Energy Resources, LLC ("NextEra").  I have been employed by NextEra since 2015, and I have served in my current position since 2018.  My responsibilities include managing the business aspects of Seabrook Station including marketing of power sales, oversight of operating and capital expenditures, and nuclear decommissioning trust management through the utilization of resources across a matrixed organization.

The purpose of my affidavit is to describe the formula rate ("Formula Rate Template") for calculating NextEra Energy Seabrook, LLC's ("Seabrook") and the Joint Owners' (defined further below) recovery of direct costs and opportunity costs from NECEC Transmission, LLC ("NECEC") for replacing the 24.5 kV generator circuit breaker ("Gen Breaker") at Seabrook Station to accommodate NECEC's New England Clean Energy Connect project ("NECEC Project").  Seabrook is authorized to represent the interests of the Joint Owners in this proceeding in its capacity as agent pursuant to its authority under the Agreement for Joint

1

**JA61**

Ownership, Construction and Operation of New Hampshire Nuclear Units, dated May 1, 1973 (as amended), and the Managing Agent Operating Agreement dated June 29, 1992 (as amended).

The first part of my affidavit explains why it is appropriate for Seabrook and the Joint Owners to use the Formula Rate Template to recover lost profits from NECEC. In the second part of my affidavit, I describe how the Formula Rate Template operates to calculate direct costs and opportunity costs, and I demonstrate that it produces a reasonable result.

## II.    Support for use of the Formula Rate Template

My understanding is that the Gen Breaker removal and replacement ("Breaker Project") could occur during a refueling outage ("Breaker Project Outage") after being adequately engineered and planned at Seabrook Station. I also understand from the affidavit of Eric McCartney that it is impossible to know how long the Breaker Project could extend a Breaker Project Outage, but that the current best estimate is about 10 days. This will impose significant costs on Seabrook and the Joint Owners, including opportunity costs that occur because Seabrook Station will be offline for a period of time when it would not otherwise be offline, and will lose the opportunity to make sales, and the profits from those sales, during that period.

Seabrook is a wholly-owned subsidiary of NextEra, and holds an approximate 88.23% ownership interest in Seabrook Station. The remaining 11.77% ownership interest is held by a number of municipalities and municipal utilities: Massachusetts Municipal Wholesale Electric Company ("MMWEC"), Taunton Municipal Lighting Plant ("Taunton"), and Hudson Light & Power Department ("Hudson" and together with MMWEC and Taunton, the "Joint Owners").

The calculation of the economic harm due to an extended outage requires evaluation of several categories: (1) lost revenue of the Joint Owners; (2) Seabrook's lost revenues from unit-contingent power purchase agreement ("PPA") sales; (3) Seabrook's lost revenues from day-

2

**JA62**

ahead sales in the ISO New England, Inc. ("ISO-NE") market; (4) potential Pay for Performance ("PFP") penalties, as provided for in the ISO-NE Forward Capacity Market rules, and lost PFP bonus payments; (5) other costs incurred by Seabrook in furtherance of the Breaker Project for the benefit of NECEC; and (6) a potential reduction in fuel costs, which could in part offset the lost revenues. The first three economic harms together with a component of the fourth (lost PFP bonus payments), as adjusted by any fuel cost savings, are opportunity costs. The other costs are incurred costs, and include potential PFP penalties, incremental labor, electricity expenses, and legal costs.

<u>Opportunity Costs</u>

In this case, Seabrook and the Joint Owners will incur opportunity costs if they forego sales of output of Seabrook to do the work to accommodate the NECEC Elective Upgrade, and so lose revenues or profits as described below.

NextEra schedules the output of Seabrook Station on behalf of Seabrook and the Joint Owners. As described in the testimony of Eric McCartney, Seabrook Station typically operates 24 hours a day, 7 days a week by virtue of being an approximately 1,250 MW baseload nuclear generator. Seabrook Station virtually always runs because it is bid in the day-ahead market as a "must-run" unit, and thus receives the resulting clearing price. In other words, unless there is an outage, Seabrook Station is always selected and committed in the day-ahead energy market.

The first category of lost revenue concerns the Joint Owners and their approximate 147 MW (nameplate) interest in Seabrook Station. I have conferred with the Joint Owners, and it is my understanding that each of the Joint Owners rely on their ownership interests from the output of Seabrook Station as a physical hedge to the power they purchase to serve their load. Under ordinary operation, when the output of Seabrook Station is sold at the locational marginal price

3

("LMP") at the Seabrook node (ISO-NE node 555), the owners use the revenues from their share to offset purchase power costs at LMP in the load zones where they are located.

The second category of lost revenue is from Seabrook's PPA sales. From time to time, Seabrook enters into PPAs with unaffiliated third parties, which specify the price at which a customer will pay Seabrook to purchase power from Seabrook Station. Currently, Seabrook has entered into seven (7) unit-contingent PPAs representing about 303.5 MW (or 24.3% of 1,250 MW). Additional PPAs may be entered into prior to the Breaker Project Outage. Seabrook would lose the associated revenue from these PPA sales for each hour that the Breaker Project Outage is extended due to the Breaker Project incurred at NECEC's request.

Third, the remainder of the output of the Seabrook Station that does not serve PPAs or the Joint Owners' load is sold for Seabrook into the market at the day-ahead energy market LMP. Seabrook thus would forgo all revenues and profits from these sales during an extended outage caused by the replacement of the Gen Breaker. Note that the calculation of this revenue impact for Seabrook in the Formula Rate Template is identical to that used to calculate the revenue impact to the Joint Owners as detailed above, with the only difference being the volume of nameplate capacity to use in the calculation.

The final category of opportunity costs is lost PFP bonus payments. If a capacity scarcity condition were to occur during any days that a Breaker Project Outage is extended solely due to the Breaker Project, Seabrook and the Joint Owners would likely have earned a PFP bonus payment for each hour under the PFP design if Seabrook Station was online operating at full power during a capacity scarcity condition. The foregone PFP bonus amount would be determined in accordance with the Forward Capacity Market rules. On the flip side, an additional cost of an extended outage is a PFP penalty. If a capacity scarcity condition were to

occur during any days that the Breaker Project Outage is extended solely due to the Breaker Project, the foregone PFP bonus amount would be calculated as the product of (1) the PFP penalty rate, (2) the duration of the capacity scarcity condition, and (3) the number determined by subtracting the product of Seabrook Station's Capacity Supply Obligation ("CSO") and the actual balancing ratio from Seabrook Station's nameplate capacity of 1250 MW.

Because opportunity costs are a result of foregone output, it is also appropriate to consider, and net out, any cost savings that may accrue to Seabrook and the Joint Owners if an outage is extended to accommodate NECEC.  In discussing this potential with plant operators and others within the NextEra organization, there appears to be only one quantifiable potential benefit from a brief extended outage resulting from the Breaker Project: potential nuclear fuel savings.  As described in the affidavit of Ruben Rodriguez, fuel costs for Seabrook Station, like other nuclear plants, are not variable.  Fuel must be acquired far in advance, and if there is fuel left unused at the time of a refueling outage, it is discarded when new fuel assemblies are swapped for existing fuel assemblies.  Accordingly, the only time that there is a savings in fuel costs is if a decision is made not to procure a certain amount of nuclear fuel to accommodate a planned outage.  In the absence of such an adjustment, there are no cost savings associated with an outage extension.

Estimate of Opportunity Costs from Lost Power Sales

As discussed below, it is not possible to accurately project opportunity costs at this time. In order to give an idea of the order of magnitude of the potential lost profits of Seabrook and the Joint Owners, for illustrative purposes only, I looked at the actual energy prices for the 10 days following the April 2020 refueling outage as well as the actual PPA contract prices during this period.  Based on this, had this outage been extended, Seabrook and the Joint Owners would

5

**JA65**

have foregone about $560,000 a day, every day, from energy sales, inclusive of PPA sales. While I do not know what LMPs will be at the time the Breaker Project will be undertaken, $560,000 per day in foregone revenue from lost energy sales is representative of the order of magnitude of the problem had a Breaker Project Outage extension occurred in 2020.[1]  This shows that the dispute over recovery of opportunity costs in this case is not trivial – based on historic prices and reasonable assumptions, I would expect total opportunity costs for a 10-day outage extension to be in the neighborhood of $5.6 million.

Those foregone revenues are an important part of Seabrook's bottom line and to the customers served by the Joint Owners.  In the case of Seabrook, because it sells the Seabrook Station output at market and does not receive cost-of-service recovery, it must cover its costs through market-based sales.  Nuclear plants are not inexpensive or simple to run.  For example, Seabrook directly employs over 400 people at Seabrook Station.  The revenue Seabrook earns in the energy markets is necessary to properly maintain and run Seabrook Station in compliance with Nuclear Regulatory Commission regulations and guidance from the Institute of Nuclear Power Operations.  Seabrook should not have to lose out on significant needed revenues to accommodate a project from which it receives no benefit.  Conversely, NECEC should not have to pay for foregone revenues on outage days that do not occur.  Because the total amount of opportunity costs (if any) will be based on variables not currently known, below I propose a formula for the recovery of actual opportunity costs and other costs from NECEC on an after-the-fact basis.  My understanding is that if the Commission approves the formula, it would be included in a facilities agreement with NECEC addressing the Breaker Project.

---

[1]  The Joint Owners portion of foregone revenue is approximately $60,000 per day, with the remainder being Seabrook's foregone revenues.

<u>Other Costs</u>

Another category of potential costs that Seabrook should not be forced to incur are ISO-NE PFP penalties.  PFP is a design feature of the Forward Capacity Market that provides incentives for resources that perform during capacity-scarcity conditions and penalizes those that do not perform.  A capacity-scarcity condition occurs when one or more of the three reserve requirements is deficient and the reserve-constraint penalty factor ("RCPF") is setting the real-time reserve price.  A capacity scarcity condition can occur in one or more five-minute pricing intervals.  Seabrook Station, like all generators with a CSO, is subject to PFP penalties when the generator is unavailable due to outage during a critical time of power supply shortages.  ISO-NE assesses a generator with PFP penalties when its actual energy production over the duration of a capacity scarcity condition is less than the product of its CSO and a balancing ratio, which is a number calculated by ISO-NE on an after-the-fact basis and is a function of system load during the capacity scarcity condition.  The resulting energy production shortfall is then multiplied by the prevailing PFP penalty rate to determine the actual PFP penalties that a generator is assessed.  The PFP penalty rate in effect for the April 2020 refueling outage was $2,000/MWh, and will increase over time.[2]  Again, for illustrative purposes, since Seabrook Station's CSO was 1,251.35 MW at that time, it could have incurred a PFP penalty of approximately $1.75 million for each hour of a capacity scarcity condition (assuming a balancing ratio of 70%) that it was offline.  Seabrook and the Joint Owners should not be responsible for paying any PFP penalties that may be incurred during the days that the Breaker Project Outage is extended solely due to the Breaker Project.  These costs should instead be borne by NECEC, because but for the

---

[2]    The PFP penalty rate increases to $3,500/MWh starting June 1, 2021 and increases to $5,455/MWh starting June 1, 2024.  The PFP penalty rates after June 1, 2025 have not been finalized.

7

**JA67**

Breaker Project conducted solely at NECEC's request for its benefit, Seabrook Station would be online during those days, and would not incur any PFP penalties.

Incremental labor costs (including, but not limited to, overtime) and electricity expenses due to an outage extension needed to accommodate NECEC, as well as legal costs associated solely with the Breaker Project, also should be borne by NECEC, for the same reason as opportunity costs, i.e., Seabrook would not incur them but for its accommodation of NECEC's elective project.

## III.    Description of the Formula Rate Template methodology

The opportunity costs described above are impossible to calculate at this time.  This is true for a number of reasons, not least of which are that: (1) it is not knowable whether, and for how long, the Breaker Project will extend a Breaker Project Outage; (2) the LMPs during any extension of a Breaker Project Outage are not knowable today; and (3) it is unknown whether Seabrook will incur any PFP penalties during the time that a Breaker Project Outage is extended solely due to the Breaker Project.  What is known is that Seabrook runs 24 hours a day, 7 days a week unless there is an outage, and that the general measure of opportunity costs will be any lost revenues minus any associated fuel cost savings, and that additional costs that should be included are legal costs, incremental labor and electricity costs associated solely with the Breaker Project, plus any PFP penalties incurred during the extended outage days attributable to the Breaker Project.  In other words, the categories and ranges of risks and costs can be identified today, but the precise costs cannot be known until a Breaker Project Outage occurs.

Therefore, the most reasonable way to accommodate NECEC's request that Seabrook perform the Breaker Project for NECEC's sole benefit is to implement a Formula Rate Template to calculate the opportunity costs and PFP penalties that Seabrook will incur for each day that the

8

**JA68**

Breaker Project extends the Breaker Project Outage. This approach fairly balances the interests of Seabrook and NECEC by ensuring that NECEC will reimburse Seabrook for the actual costs – no more, no less – that Seabrook would not incur but for replacing the Gen Breaker for NECEC's sole benefit.

For the portion of Seabrook Station's output that is not under contract at specified prices via PPAs, the actual day-ahead energy market clearing price is the most appropriate measure of the opportunity cost of the foregone power sales.

Other costs will be determined after the fact on an as-incurred basis. I note here that the Formula Rate Template does not include engineering, procurement or construction costs that NECEC has agreed to pay, which will be subject to different terms and conditions in a facilities agreement.

Set forth below is a formula rate template that I propose be adopted for the categories of costs addressed in this affidavit.

- **NECEC Payment Amount = Foregone Revenue + PFP Penalties + Legal Fees + Incremental Labor + Incremental Electricity – Fuel Savings**, where

  **Foregone Revenue = Foregone Market Revenue + Foregone PPA Revenue + Foregone PFP Bonus**,

  **Foregone Market Revenue = Nameplate Capacity** x **Merchant Percentage** x **Average Actual Day-Ahead Clearing Price**[3] **During Outage Extension** x **Outage Extension**,

  **Foregone PPA Revenue = Nameplate Capacity** x **PPA Percentage** x **Weighted Average Stated PPA Price During Outage Extension** x **Outage Extension**,

  **Foregone PFP Bonus** means the amount of payment that Seabrook and the Joint Owners would have received as a bonus from ISO-NE for performing during a capacity scarcity condition but did not receive due to the fact that Seabrook Station could not perform because it was offline owing to an Outage Extension,

---

[3]    At Seabrook Node (ISO-NE Node 555).

**PFP Penalties** means any actual amounts charged to Seabrook and the Joint Owners (or otherwise used to offset revenue) by ISO-NE for not performing during a capacity scarcity condition that occurs during an Outage Extension,

**Legal Fees** means all legal costs incurred by Seabrook and the Joint Owners in advocating or defending their rights to collect the cost of service for Seabrook Station, including but not limited to costs of both internal and external counsel incurred to negotiate the agreement with NECEC; costs to bring this action and any other action needed to resolve rate disputes; costs to prepare contracts to procure and install the Gen Breaker; and costs to defend any challenge related to the work,

**Incremental Labor** means direct salary and overtime costs incurred by Seabrook and the Joint Owners during the time by which an outage is extended for purposes of accommodating the Breaker Project, only to the extent by which such costs are not otherwise addressed in any agreement with NECEC,

**Incremental Electricity** means costs reflected on an electricity invoice during the time by which an outage is extended for purposes of accommodating the Breaker Project, only to the extent by which such costs are not otherwise addressed in any agreement with NECEC,

**Fuel Savings** means cost savings determined in accordance with the affidavit of Ruben Rodriguez,

**Nameplate Capacity** = 1250 MW,

**Merchant Percentage** (includes Joint Owners) = the amount of Seabrook output sold into the market at Day-Ahead LMP, which currently is 94.1% and will be, as of this writing, 75.7% starting 1/1/2022,[4]

**PPA Percentage** = the amount of Seabrook's output sold bilaterally at a negotiated price, which currently is 5.9% and will be, as of this writing, 24.3% starting 1/1/2022,

**Outage Extension** means the number of hours that an outage is extended for purposes of accommodating the Breaker Project.

---

[4]    The Merchant Percentage and PPA Percentage will be adjusted to reflect the actual PPAs in effect during the Breaker Project Outage.

**JA70**

<u>Illustrative Example Application of Template</u>
<u>for assumed 10-day extension to the April 2020 outage</u>

I have calculated an illustrative example of the application of my proposed formula rate template, using the following actual values from the 2020 outage as well as certain hypothetical values:[5]

**Average Actual Day-Ahead Clearing Price During Outage Extension** = for 2020 outage, $16.90/MWh[6]

**Weighted Average Stated PPA Price During Outage Extension** = for 2020 outage, $46.99/MWh

**Foregone PFP Bonus** = $0

**PFP Penalties** = $0

**Legal Fees** = $200,000

**Incremental Labor** = $50,000

**Incremental Electricity** = $100,000

**Fuel Savings** = $1,000,000

**Foregone Market Revenue** = 1250 MW x 94.1% x $16.90/MWh x 10 days x 24 hours/day = $4,770,870

**Foregone PPA Revenue** = 1250 MW x 5.9% x $46.99/MWh x 10 days x 24 hours/day = $831,723

**NECEC Payment Amount** = $4,770,870 + $831,723 + $0 + $0 + $200,000 + $50,000 + $100,000 - $1,000,000 = $4,952,593

---

[5]    Energy market and PPA prices are actual based on 2020 and not hypothetical values, including the use of the PPA Percentage applicable in 2020.

[6]    Averages will be prorated to the actual extension.

11

**JA71**

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746 (2012), I state under penalty of perjury that the foregoing

testimony is true and correct to the best of my knowledge, information, and belief.

Executed this 5th day of October, 2020.

_____

Joshua Marcum
Regional Business Director
NextEra Energy Resources, LLC

# Attachment D

# Seabrook Main Generator Breaker Upgrade Evaluation

**Seabrook Main Generator Breaker Upgrade Evaluation**

**Executive Summary**

NextEra Energy Resources' Seabrook Station received a request to upgrade the main generator output breaker to support proposed changes to the connected 345 KV transmission system. Specifically, the project would entail replacing the existing Delle-Alsthom air blast circuit breaker with an upgraded, but not yet identified, breaker (**Breaker Project**). A team comprised of senior engineering, outage, and construction personnel was asked to evaluate the feasibility of, and timeline required for, implementing the Breaker Project for the next scheduled refueling outage, scheduled for the fall of 2021 (**2021 Outage**).

The main generator output breaker is located on a platform inside the north wall of the Turbine Generator Building inside the protected area boundary of Seabrook Station. The three pole breaker is approximately 20 feet long by 15 feet wide. The existing breaker and supporting cabinets occupy approximately 700 square feet on the Turbine Generation Building's mezzanine deck, with combined equipment weight exceeding 32,000 pounds. The Breaker Project would involve, among other things, removal of existing equipment, and the design, procurement, installation, and testing of a replacement breaker and supporting auxiliary equipment.

This evaluation determined that it is not possible to implement the Breaker Project during the 2021 Outage due to:

- *Size and complexity of the Breaker Project.* NextEra's processes and procedures for work at its nuclear power plants outline robust milestones and associated activities that must be observed prior to outage implementation to ensure the safety and reliability of such projects. Several of the significant design and engineering milestones have already passed for the planning for the 2021 Outage.
- *Long-lead Delivery Times.* Which material and components are needed will not be known until design is complete. The delivery times for the type of material and components used for Breaker Projects typically have long lead times. The breaker is not available off the shelf and will have to be built by the manufacturer. Before an order can be placed a specification for the breaker must be produced.
- *Impact on available resources.* The station staff and associated project managers are currently resource loaded to plan the current scope for the 2021 Outage.
- *Required critical reviews.* NextEra follows the recommendations of the Institute of Nuclear Power Operations (INPO) Event Report (IER) 14-20, *Integrated Risk – Healthy Technical Conscience* that prescribes additional actions for high consequence, low probability, station operational and project risks that could affect the viability of the facility (i.e., enterprise risk), such as the Breaker Project.

For compliance with internal processes and procedures for projects of a magnitude similar to the Breaker Project, the Breaker Project cannot be completed during the 2021 Outage.

JA74

## A - Main Generator Breaker

**Function**

The transmission grid connections that provide offsite power to Seabrook Station consist of three 345-kV transmission lines. These three lines terminate at separate terminating structures. From the terminating structures, each circuit is routed in a metal-enclosed, SF6 gas-insulated bus to a common switching station.

Under normal plant operating conditions, the main generator supplies electrical power from the station main generator to the electrical grid via isolated phase bus duct (i) to the utility grid through the generator step-up transformers (**GSU**) and unit auxiliary transformers (**UAT**) and (ii) to the plant through the UAT ((See Figure 1). The main generator is connected to the GSU and the UAT through a generator circuit breaker. One of the two ways auxiliary power needed for plant startup and during shutdown may be taken from the 345-kV system is back-fed to the onsite distribution system through the GSU and UAT when the generator circuit breaker is open (See Figure 2). This provides power for all the loads supporting engineered safety features and other functions.

**JA75**

USCA Case #23-1094     Document #2024393     Filed: 10/30/2023     Page 81 of 403

Figure 1 - 345kV One Line Diagram



**JA76**

Figure 2 – On-line and Back-feed Operation



## Main Generator Breaker Details

The equipment that requires replacement as part of the Breaker Project is located on the mezzanine level on a platform inside the north wall of the Turbine Generator Building. The three-pole breaker is approximately 20 feet long by 15 feet wide. The existing breaker and supporting cabinets occupy approximately 700 square feet, with combined equipment weight exceeding 32,000 pounds. The Breaker Project would involve, among other things, removal of existing equipment and the design, procurement, installation, and testing of a replacement breaker and supporting auxiliary equipment. The project for the replacement of such large components must prevent interfering with, or causing damage to, equipment in the surrounding area. See Figure 3.

**JA77**

**Figure 3:  Breaker Mezzanine Layout**



A generator circuit breaker, rated at 25 kV, 35-kA rated continuous current, 165-kA rated short circuit current, is provided between the main generator and the connections to the GSU and UAT. This circuit breaker consists of three single pole units mounted in line with, and forming part of, the isolated phase bus duct.

The high current-carrying capacity generator circuit breaker is an air blast type using high pressure air to operate the breaker, as an arc-extinguishing medium, and as a cooling medium.  The generator circuit breaker is an adaptation of an extra-high voltage air blast circuit breaker design modified for installation in isolated phase bus duct. The use of forced air cooling of the conductors provides the required current-carrying capability to support the reliability of performance of the generator circuit breaker.

The generator circuit breaker is a large, complex piece of equipment.  Additional information is provided below to illustrate the scale of the project. Figure 4 provides a schematic representation of the generator circuit breaker, while figure 5 shows the general arrangement drawing.  Figure 6 shows a picture from the top of the generator circuit breaker.

Figure 4 - Generator Circuit Breaker Schematic Representation

USCA Case #23-1094    Document #2024393    Filed: 10/30/2023    Page 85 of 403

Figure 5 - Generator Circuit Breaker General Arrangement Drawing



JA80

Figure 6 – Generator Circuit Breaker (picture taken from top)



Two major ancillary systems also require replacement as part of the Breaker Project: the Control Cabinet and Interlock and the Compressed Air System. When the generator is online, operational control of this generator circuit breaker is from the main control room. However, when the generator is offline, breaker testing can be performed locally from the three-pole control cabinet located adjacent to the breakers. The compressed air system is comprised of two high-pressure compressors and air receivers. The air receivers have sufficient storage capacity for five close-open operations. A forced air cooling system is provided for each circuit breaker pole consisting of an air-to-air heat exchanger with redundant fans and circulators mounted on top of the main interruption chamber.

## B – Project Planning

### Outage Milestones

Installation of the generator output breaker can only be accomplished when Seabrook Station is not on line. In preparation for a refueling outage, the station engages in an in-depth planning process to facilitate orchestrating the numerous outage activities, including refueling of the reactor, required plant maintenance, and modifications or replacement of equipment. NextEra has established a series of milestones intended to ensure that outage projects, such as the Breaker Project, are engineered, procured, and installed in a safe and reliable manner and that outages are implemented safely and predictably.

Page | 8

**JA81**

NextEra Nuclear Fleet Procedure OM-AA-101-1013, "Fleet Outage Milestones" establishes the Nuclear Fleet standard for managing outage milestones. Each milestone requires a carefully laid out plan prior to commencing work that considers the resources required to complete the actions, the minimum schedule upon which those actions must be completed, competing priorities or other constraints that may challenge the ability to complete the required actions, and how the actions will be monitored to ensure that the plan remains on track. It is important to note that the milestones and related schedule is based on the Nuclear Fleet's typical refueling outage and the timing by which the milestones must be met will vary based on the complexity and scope of non-refueling related outage activities.

The procedure outlines 47 milestones for each major outage activity. Broadly, once the modification is issued, there are a number of required activities including work package preparation, review and field walk-down of work packages, determination of required craft and support resources, equipment clearance preparation, develop and issue operating and maintenance procedure changes, award of implementation contracts, development of contingency plans, and development and review of an integrated outage schedule. However, for the purpose of this discussion, the following four key milestones necessary for engineering design and scope development, equipment and service procurement, work package preparation and equipment availability have been assessed to determine if implementation of the Breaker Project is viable during the 2021 Outage:

| Milestone Title | Milestone Due | Additional information |
|---|---|---|
| **MS01: Design Change Scope Freeze** | 22 months prior to start of outage | Identify and freeze the Design Change Scope for major and minor modifications. This allows sufficient time to perform the engineering and analysis required to implement the modification. Activities required once the scope is determined include bidding and issuing contracts for engineering for equipment specification, vendor engineering, supporting calculations, and development of the modification package to implement the modification. Additionally, normal practice is to perform detailed walk-downs in the outage prior to the outage at which the Breaker Project will be implemented to ensure all interconnections and interferences are understood. |
| **MS08: Order Long Lead and Critical Materials and Services** | Approximately 12 months prior to start of outage | All orders for long lead materials and critical procurement services required to support the outage including contingencies are placed with vendors, which include estimated delivery dates that support the outage. The breaker is not available off the shelf and will have to be built by the manufacturer. |

Page | 9

JA82

| | | |
|---|---|---|
| **MS09: Issue Modifications** | 12 months prior to start of outage | All approved design change packages, and specific field verification and validation packages have been issued to the respective discipline planner for work package preparation. |
| **MS32: Planned Parts Onsite and Ready for Use** | 1 month prior to start of outage | All long Lead materials are on-site and available for issue or are tracked by the materials exception list. |

The first milestone due date for MS01 for the 2021 Outage has already passed.  Although as of October 1, 2020, we are slightly more than a year away from the start of the 2021 Outage, it is not feasible to finalize the scope, complete the design, and order the material to support meeting the MS08 and MS09 milestones.

## Institute of Nuclear Power Operations Commitments

INPO is a member-governed organization that sets industry-wide performance objectives, criteria, and guidelines for nuclear power plant operations that are intended to promote "operational excellence" and nuclear safety and to improve the sharing of operational experience between nuclear power plants. Membership is comprised of most U.S. nuclear power plant owners and operators and other nuclear entities. Failure to follow INPO guidance can result in additional inspections and a sliding scale of peer intervention.

The evaluation of the Breaker Project indicates it would have enterprise risk, which would add to the duration and level of preparation needed. In addition to the normal planning process, NextEra follows the recommendations of INPO Event Report (IER) 14-20, *Integrated Risk – Healthy Technical Conscience*.  This report cited concerns that engineering and technical errors – both within utilities and by outside vendors – were contributing to consequential events throughout the industry.  The report focused attention on high consequence, low probability, station operational and project risks that could affect the viability of the unit, such as the Breaker Project.  As a result of this Event Report, NextEra and the other U.S. nuclear operators adopted a series of actions to ensure technical rigor is maintained and the risk of the modification is understood and mitigated.  These actions include detailed risk assessment and mitigation, and executive reviews of various aspects of such projects, including engineering and technical details, vendor oversight, and critical implementation steps.

**\* <u>COMPLAINT REQUESTING FAST TRACK PROCESSING</u> \***

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| | ) | |
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
| Complainants | ) | |
| | ) | Docket No. EL21-___-000 |
| v. | ) | |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC, and | ) | |
| FPL Energy Wyman IV LLC., | ) | |
| Respondents | ) | |

**COMPLAINT AND REQUEST FOR SHORTENED ANSWER PERIOD**
**AND FOR FAST TRACK PROCESSING OF**
**<u>NECEC TRANSMISSION LLC AND AVANGRID, INC.</u>**

Pursuant to Sections 206, 210 and 306 of the Federal Power Act ("FPA")[1] and Rule 206

of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("FERC"

or the "Commission"),[2] NECEC Transmission LLC ("NECEC Transmission") and Avangrid,

Inc. (together with NECEC Transmission, "Avangrid") hereby submit this complaint

("Complaint") against NextEra Energy Resources, LLC ("NextEra Energy Resources"), NextEra

Energy Seabrook, LLC ("NextEra Seabrook"),[3] FPL Energy Wyman LLC ("Wyman"), and FPL

---

[1]     16 U.S.C. §§ 824e, 824i, 825e (2018).

[2]     18 C.F.R. § 385.206 (2020).

[3]     NextEra Seabrook is a wholly owned subsidiary of NextEra Energy Resources, and it owns an 88.23 percent share of the 1,250 MW Seabrook Nuclear Generating Station ("Seabrook Station") and operates the Seabrook Station.  The remaining 11.77 percent ownership shares of the Seabrook Station are held by unaffiliated, municipal entities.

Energy Wyman IV LLC[4] ("Wyman IV" and collectively "NextEra").  This Complaint seeks Commission action to stop NextEra from unlawfully interfering with the interconnection of the New England Clean Energy Connect transmission project ("NECEC Project").

This Complaint requests that the Commission issue an initial order on an expedited basis, and then following further fact-finding, issue a subsequent order on the remaining issues.  The first order will not require any fact-finding.  In the first expedited order, within 60 days of the filing of this complaint, Avangrid requests that the Commission:  (i) order NextEra to comply with its interconnection obligations as Affected Parties and/or Affected Systems under the ISO New England Inc. ("ISO-NE") Open Access Transmission Tariff ("ISO-NE OATT");[5] (ii) direct NextEra to cease and desist all attempts to block, delay or unreasonably increase the costs associated with the interconnection of the NECEC Project to the ISO-NE Administered Transmission System; (iii) determine that NextEra's refusal to file the Affected System Agreement unexecuted is unjust and unreasonable and direct NextEra to file the Affected System Agreement within 10 days of the Commission's order, including any justification for any deviations from the ISO-NE *pro forma* terms and conditions with respect to the issues discussed herein; (iv) temporarily revoke NextEra's blanket waiver under Part 358 of the Commission's regulations (with a permanent revocation pending the outcome of the fact-finding discussed

---

[4]    Wyman is a wholly owned subsidiary of NextEra Energy Resources, and owns Yarmouth unit 3, a 134 MW steam generator located in Yarmouth, Maine.  Wyman IV owns Yarmouth unit 4, a 680 MW steam generator located in Yarmouth, Maine.  Yarmouth units 3 and 4 (collectively, the "Yarmouth units") are considered affected generators based on the results of the NECEC System Impact Study.

[5]    Capitalized terms used but not defined in this pleading are intended to have the meaning given to such terms in the ISO-NE Transmission, Markets and Services Tariff, the Second Restated New England Power Pool Agreement, and the Participants Agreement.  Section II of the Tariff contains the ISO-NE OATT, while Section III contains Market Rule 1, the Standard Market Design.

2

**JA85**

below); and (v) initiate an investigation and require NextEra to preserve and provide documents related to the interconnection of the NECEC Project.

The Commission need not make any findings of fact in order to issue this initial expedited order. The first three forms of relief sought are simply to comply with existing law and obligations, and nothing more (*i.e.*, to comply with the ISO-NE OATT, to comply with open access requirements, and to cease and desist unlawful interference with the NECEC Project). The fourth form of relief requested will ensure that as this proceeding and negotiations continue, NextEra will not contaminate its transmission function work (*i.e.*, work relating to the transmission upgrades) by seeking to enhance or protect value for its merchant function (*i.e.*, impacts on generation). The fifth form of relief requested is simply an effort to begin fact-finding, both at the FERC Office of Enforcement, as well as discovery in this proceeding. The Commission should initiate this fact-finding proceeding to determine the gravity of NextEra's misconduct and whether such misconduct warrants any penalties or the granting of other relief to Avangrid and NECEC Transmission, as the Commission deems appropriate. This fact-finding effort and any subsequent order should not delay the issuance of an expedited order described above. Rather, the results of this fact-finding could form the basis for a subsequent order, after the Commission has sufficient time to conduct such an inquiry.

Time is of the essence with respect to the initial order because NextEra has now delayed any progress for many months and has refused to begin any work that would allow it to construct certain facilities during a planned refueling outage of its Seabrook Station scheduled for the autumn of 2021 ("Planned 2021 Outage"), which would allow the interconnection of the NECEC Project in a timely manner. Delays in obtaining relief from the Commission might allow

3

**JA86**

NextEra to continue to delay its legally required actions to accommodate interconnection of the NECEC Project beyond the NECEC Project's targeted in-service date of May 31, 2023.

Since Avangrid and its affiliates prevailed in the Commonwealth of Massachusetts' 2017 Section 83D Clean Energy RFP,[6] NextEra has consistently opposed the NECEC Project by all means necessary in order to maintain value for its existing northern New England merchant generation fleet.[7] Now that NextEra's many efforts to oppose the regulatory and environmental approvals sought by Avangrid and its affiliates in Maine and Massachusetts have failed, NextEra is now using its position as an Affected System and Affected Party to try to slow down or stop the development of the NECEC Project. But these actions violate NextEra's obligations under Order No. 888,[8] Order No. 2003[9] and Order No. 845,[10] as well as the ISO-NE Tariff. As this

---

[6]      2008 MASS. ACTS CH. 169 § 83D(a).

[7]      NextEra had submitted competing proposals for the RFP, including one proposal that contemplated the construction of an HVAC transmission line in the same corridor that will be used by the NECEC Project. *See* Maine Clean Power Connection Project Proposal submitted by NextEra, *available at* https://macleanenergy.files.wordpress.com/2017/08/nextera-cmp.zip. NextEra's proposals were not selected.

[8]      *Promoting Wholesale Competition Through Open-Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[9]      *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103, at P 826 (2003) ("Order No. 2003"), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008).

[10]      *Reform of Generator Interconnection Procedures and Agreements*, Order No. 845, 163 FERC ¶ 61,043 (2018), *errata notice*, 167 FERC ¶ 61,123, *order on reh'g*, Order No. 845-A, 166 FERC ¶ 61,137, *errata notice*, 167 FERC ¶ 61,124, *order on reh'g*, Order No. 845-B, 168 FERC ¶ 61,092 (2019).

Complaint and the Affidavit of Thorn C. Dickinson ("Dickinson Aff.")[11] demonstrate, NextEra's actions and inactions reflect NextEra's intentional efforts to interfere with the interconnection of the NECEC Project. Avangrid respectfully requests fast track processing and requests an initial order within 60 days on the items described above, with fact-finding in this proceeding and a Commission investigation, with a subsequent order after the Commission has time to conduct a full inquiry.

It is therefore essential that the Commission take expedited action to grant the relief Avangrid has requested herein and direct NextEra to immediately commence engineering, design, planning and procurement activities that are necessary for NextEra to construct the generator owned transmission upgrades during Seabrook Station's Planned 2021 Outage.

## I.    BACKGROUND

### A.    Description of NECEC Project

NECEC Transmission is a Delaware limited liability company and a wholly owned subsidiary of Avangrid Networks, Inc.,[12] formed to own, develop, construct, operate and maintain the NECEC Project, a proposed 320 kV overhead HVDC transmission line, approximately 145 miles in length, from the Québec-Maine border to a new converter station in Lewiston, Maine, and a new 1.6 mile 345 kV AC transmission line from the new converter station to the existing Larrabee Road Substation and certain required upgrades, which will enable the delivery of up to 1,200 megawatts ("MW") of hydroelectric energy from Québec to New

---

[11]    *See* Dickinson Aff., attached hereto as Exhibit A.

[12]    Avangrid Networks, Inc. ("Avangrid Networks") is a wholly-owned subsidiary of Avangrid, Inc. Avangrid Networks, through its electric transmission-owning subsidiaries that include Central Maine Power Company, Maine Electric Power Company, Inc., NECEC Transmission, New York State Electric & Gas Corporation, Rochester Gas and Electric Corporation, and The United Illuminating Company, is an ISO-NE and New York Independent System Operator Inc. transmission owner responsible for a transmission network of over 8,700 miles.

England for a period of at least 20 years[13] under Commission jurisdictional transmission contracts.[14]  The NECEC Project will allow power to be injected into the Administered Transmission System in Maine, conferring significant and long-term benefits for electricity customers, while also enhancing bulk electric system reliability and fuel security both within Maine and throughout the ISO-NE region.[15]

The Maine Public Utilities Commission ("MPUC") conditioned its approval of Central Maine Power Company's ("CMP") request for a Certificate of Public Convenience and Necessity ("CPCN") on CMP transferring the NECEC Project to a separate and distinct corporate entity.[16]  As required by the MPUC CPCN Order, CMP has since submitted a petition to the MPUC seeking approval of the transfer of the NECEC Project to NECEC Transmission.[17]

---

[13]    Dickinson Aff. at P 10.

[14]    *Central Maine Power Co.*, 165 FERC ¶ 61,034 (2018) (order accepting the original CMP TSAs for filing).  The Commission subsequently accepted first amendments to the CMP TSAs in 2019.  *Central Maine Power Co.*, Docket Nos. ER19-324-000 and ER19-324-001 (Feb. 8, 2019) (delegated letter order); *Central Maine Power Co.*, Docket Nos. ER19-325-000 and ER19-325-001 (Feb. 8, 2019) (delegated letter order); *Central Maine Power Co.*, Docket Nos. ER19-326-000 and ER19-326-001 (Feb. 8, 2019) (delegated letter order); *Central Maine Power Co.*, Docket No. ER19-939-000 (Mar. 27, 2019) (delegated letter order).  Most recently, CMP filed second amendments to the CMP TSAs, which include the agreement of the counterparties to the disposition of the CMP TSAs to NECEC Transmission.  Docket Nos. ER20-2674-000, ER20-2675-000, ER20-2676-000, ER20-2677-000, ER20-2678-000, ER20-2679-000, ER20-2680-000.

[15]    Dickinson Aff. at P 10.

[16]    *See Cent. Me. Power Co., Request for Approval of CPCN for the New England Clean Energy Connect Consisting of Construction of a 1,2000 MW HVDC Transmission Line from the Quebec-Maine Border to Lewiston (NECEC) and Related Network Upgrades*, Docket No. 2017-00232, Order Granting Certificate of Public Convenience and Necessity and Approving Stipulation at 7-8 (May 3, 2019) ("MPUC CPCN Order").

[17]    Specifically, CMP sought approval of the creation of NECEC Transmission pursuant to 35-A M.R.S. § 708.1 and approval, pursuant to 5 35-A M.R.S. §§ 707, 708, 901, 902 and 1101, of, among other, certain affiliate arrangements to effectuate the transfer of the NECEC Project from CMP to NECEC Transmission, intercompany services agreements, and the incurrence of indebtedness by NECEC Transmission.  *Cent. Me. Power Co., Request for Approval of Petition Pursuant to 35-A M.R.S.A. 707, 708, 901 and 1101 Related to the Transfer of the New England*

6

**JA89**

CMP has also submitted and the Commission has approved[18] CMP's FPA Section 203 application authorizing it to transfer certain paper jurisdictional facilities to NECEC Transmission.[19]

### B. Historic and Continuous Opposition of NextEra to the NECEC Project

NextEra, on behalf of its existing fossil (Wyman and Cape Station in Maine) and nuclear (Seabrook Station in New Hampshire) electric generating facilities that participate in the ISO-NE wholesale markets, as well as on behalf of its solar and wind generation projects in development in Maine, has mounted an aggressive legal and political effort to obstruct the successful permitting, construction, and interconnection of the NECEC Project. NextEra has taken every opportunity, both in the open and behind the scenes, to oppose, delay, and derail the NECEC Project, all to benefit its existing fossil and nuclear generation located in Maine and New Hampshire and its renewable projects in Maine. In doing so, NextEra is purposely trying to thwart the goals of Maine and Massachusetts to obtain more renewable power, which will have a negative impact to the climate and to the people of the region.

Shortly after the NECEC Project was selected as the winner of the Massachusetts RFP, NextEra intervened before the MPUC to oppose the issuance of a CPCN for the NECEC Project.[20] NextEra submitted testimony from multiple witnesses arguing that the NECEC Project was not in the public interest and would negatively impact NextEra's thermal generation facilities and renewable energy projects in Maine and the regional transmission grid in New

---

*Clean Energy Connect to NECEC Transmission LLC Pertaining to Central Maine Power Company*, Docket No. 2019-00179 (filed Aug. 13, 2019).

[18]    *See Central Maine Power Co.*, 170 FERC ¶ 62,145 (2020).

[19]    *See supra* n. 14.

[20]    *See* MPUC CPCN Order.

England.[21]  The MPUC rejected each of these arguments, finding NextEra's evidence

unpersuasive, and granted a CPCN for the NECEC Project on May 3, 2019.[22]

NextEra appealed the MPUC's order to the Maine Supreme Judicial Court (the "Maine

Law Court") arguing that the MPUC committed errors of law by granting the CPCN.  On March

17, 2020, the Maine Law Court, noting that the MPUC found "little merit" in NextEra's

assertions and that NextEra's numerous arguments were unpersuasive, rejected NextEra's appeal

and affirmed the MPUC's CPCN order.[23]

NextEra was also an active intervenor before the Massachusetts Department of Public

Utilities ("MA DPU") opposing the department's approval of the power purchase agreements

related to the NECEC Project and the NECEC transmission services agreements.  NextEra

submitted testimony from multiple witnesses and argued that the MA DPU should deny the

requested approvals on the grounds that the NECEC Project and the related agreements did not

comply with Massachusetts law.  By order dated June 25, 2019, the MA DPU rejected NextEra's

arguments and granted the requested approvals.[24]  NextEra appealed the MA DPU's order to the

Massachusetts Supreme Judicial Court.  On September 3, 2020, the Supreme Judicial Court

issued its decision rejecting all of NextEra's arguments on appeal and affirmed the MA DPU's

order, finding that the department "reasonably and realistically interpreted" applicable

---

[21]     Among other arguments, NextEra's witnesses claimed that the NECEC Project would impede the development of renewable generation in Maine, cause the existing thermal generation in Maine to retire because of reductions in the wholesale market prices resulting from the NECEC Project, and undermine the reliability of the New England Transmission System by increasing congestion.

[22]     MPUC CPCN at 30, 39, 43, 73-74.

[23]     *See NextEra Energy Res., LLC v. Me. Pub. Utils. Comm'n,* 2020 ME 34, 227 A.3d 1117.

[24]     *See Petition of NSTAR Electric Company d/b/a Eversource Energy for approval by the Department of Public Utilities of a long-term contract for procurement of clean energy generation, pursuant to Section 83D of An Act Relative to Green Communities, St. 2008, c. 169, as amended by St. 2016, c. 188, § 12,* D.P.U. 18-64 (Jun. 25, 2019).

Massachusetts law and the department's rulings were "supported by substantial evidence and sufficient rationale."[25]

NextEra has also actively opposed the environmental permitting and siting of the NECEC Project, as an active intervenor in the consolidated proceedings before the Maine Land Use Planning Commission ("Maine LUPC") and the Maine Department of Environmental Protection ("Maine DEP") and as an active party in the proceedings before the U.S. Army Corps of Engineers ("USACE"). In these proceedings, NextEra has submitted testimony and numerous motions and other filings opposing the issuance of the requested Maine LUPC certification, and Maine DEP and USACE permits for the NECEC Project.[26] After the Maine LUPC granted the certification on January 8, 2020 and the Maine DEP issued the requested permits on May 11, 2020, NextEra appealed the Maine DEP order to the Kennebec County Superior Court in Maine.[27] NextEra's appeal and those asserted by other intervenors were consolidated and remanded to the Board of Environmental Protection ("Board") to be heard by the full Board *en banc*. On August 26, 2020, the Board denied several appellants' requests to stay the Maine DEP's order[28] pending the outcome of the appeal, finding that the appellants neither made the

---

[25]    *See NextEra Energy Res., LLC v. Dep't of Pub. Utils.*, __ N.E.3d. __, Docket SJC-12886 (Mass. 2020).

[26]    *See Site Location of Development Act Certification*, Docket No. SLC-9, Maine Land Use Planning Comm'n, Dep't of Agric., Conservation & Forestry, Bureau of Parks & Lands (Jan. 8, 2020); *DEP Findings of Fact and Order*, Docket No. L-27625, Maine Dep't of Envtl. Prot. (May 11, 2020); U.S. Army Corps of Engineers, New England Dist. Regulatory Division, File No. NAE-2017-01342 (Initial Proffered Permit Aug. 19, 2020).

[27]    *See NextEra Energy Resources, LLC v. State of Maine, Dept. of Envt'l Prot.*, Docket No. KEN-AP-27 (Kennebec Co. Sup. Ct., June 9, 2020), consolidated with SOM-AP-20-04 and remanded to Bd. of Envt'l Prot. (Aug. 11, 2020).

[28]    An order granting the requests to stay the Maine DEP order would toll NECEC Transmission's ability to construct the NECEC Project pending the outcome of the Board appeals.

showings necessary to justify a stay of the Maine DEP's order nor established a strong likelihood of success on the merits of their appeal.[29]

Not content to simply oppose the NECEC Project in the applicable regulatory and permitting processes, NextEra has also worked in efforts to kill the project politically in Maine, both openly and covertly. In particular, NextEra was an active supporter of a citizens' initiative referendum, which proposed to have the voters of Maine rescind the CPCN granted for the NECEC Project. NextEra also was an active party advocating that the initiative be included on the ballot in two lawsuits brought to challenge the initiative before the Maine courts. NextEra's challenge was concluded when the Maine Law Court determined that the ballot initiative failed to meet the requirements for inclusion on the November 2020 ballot under the Maine Constitution.[30]

NextEra appears to have worked through shadow organizations in its attempts to frustrate and prevent development and construction of electric transmission infrastructure.[31] There is strong circumstantial evidence linking NextEra to various organizations formed to oppose the NECEC Project, including Say No to NECEC,[32] Stop the Corridor,[33] and No CMP Corridor.[34]

---

[29]   *See West Forks v. State of Maine, Dept. of Envt'l Prot.*, Board of Environmental Protection, (letter order denying request to stay May 11, 2020 Order conditionally approving the application of CMP to construct the NECEC Project) (Aug. 26, 2020).

[30]   *See Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶39, __ A.3d __.

[31]   Dickinson Aff. at PP 41-45.

[32]   Lobbyists were paid nearly $30,000 by Say No to NECEC to lobby on bills impacting the NECEC Project in the Maine Legislature, but the firm does not list Say No to NECEC as a client on its website – instead it lists NextEra's principal subsidiary, the Florida Power & Light Company ("FPL"), as its client, despite not being registered to lobby on FPL's behalf. *Id.* at 44.

[33]   Avangrid believes that NextEra funded a portion of the signature gathering process for the initiative clandestinely through Stop the Corridor (also known as "Clean Energy for ME, LLC"), a coalition that actively opposes the NECEC Project through social media and other activities. Stop the Corridor made significant financial and in-kind contributions to support the

10

For example, NECEC Transmission believes Stop the Corridor is drawing significant funding from NextEra and using this money in a campaign to halt the NECEC Project.[35]  Stop the Corridor operates a website and describes itself as "a coalition of concerned citizens and organizations."[36]  It lists a post office box address located in Westbrook, Maine, but indicates no other staff, board of directors or executive committee.[37]  The website was regularly running Twitter and Facebook updates encouraging visitors to sign the petition against the NECEC Project and providing contact information and locations to do so.[38]  The lengths that the opposition campaign, including Say No to NECEC, Stop the Corridor, and No CMP Corridor,

---

gathering of signatures for the NECEC initiative, but has refused to identify the source of these funds in violation of Maine law.  In May, the Maine Commission on Governmental Ethics & Election Practices voted unanimously to investigate whether Stop the Corridor failed to properly file as a ballot question committee and, further, to require this entity to disclose the identity of its funder, vendors and allied organizations.  *See* Maine Commission on Governmental Ethics and Election Practices, Minutes for May 22, 2020 Meeting, *available at* https://www.maine.gov/ethics/sites/maine.gov.ethics/files/2020-06/05222020_Minutes_Final.pdf. Stop the Corridor has subsequently filed a lawsuit in the Superior Court for Cumberland County, Maine challenging the statutory authority of the Ethics Commission to conduct this investigation.  *Clean Energy for ME v. Commission on Governmental Ethics and Election Practices*, Docket No. AP-20-14 (Cum).

[34]  Dickinson Aff. at P 45.  No CMP Corridor, upon information and belief, was given aid by NextEra in the form of coordination and potentially funding of over $50,000 to compensate staff and finance other activities to oppose the NECEC Project, including hiring the same legal counsel that was used by similar shadow organizations aligned with NextEra in its opposition to the Northern Pass project.  *Id.*

[35]  *Id.* at P 42.

[36]  *Id.* at P 43.

[37]  *Id.*

[38]  *Id.*  Stop the Corridor's website was registered by Domains By Proxy, LLC, which also registered the websites for three other NextEra-linked front groups:  Protect the Granite State, Consumers for Sensible Energy, and North Dakotans for Comprehensive Energy Solutions.  The *Portland Press Herald* reported that Domains By Proxy is "an Arizona corporation set up to obscure website ownership" whose website's "home page states: 'Your identity is nobody's business but ours.'"  Tux Turkel, *Dark money and blurred alliances drum up resistance to CMP power line project*, Portland Press Herald (Sep. 13, 2018), https://www.pressherald.com/2018/09/13/dark-money-and-blurred-alliances-drum-up-resistance-to-cmp-project/.

have gone to conceal leaders and funding resemble NextEra's efforts to oppose Eversource Energy's ("Eversource") Northern Pass transmission project in New Hampshire.[39]

NextEra's continuing efforts to oppose, delay, and derail the NECEC Project derive directly from its financial interests in its existing fossil and nuclear generation fleet in Maine and New Hampshire and its proposed renewable energy project pipeline in Maine. NextEra is a direct competitor to the NECEC Project and stands to lose significant revenues and profits as a result of the successful development of the NECEC Project, both from reduced energy and capacity revenues in the organized ISO-NE wholesale markets from NextEra's existing generation resources.

### C.    NECEC Project Interconnection

ISO-NE's OATT requires participant-funded electric transmission projects to interconnect to the Administered Transmission System as Elective Transmission Upgrades[40] ("ETU") using similar tariff-required interconnection procedures as electric generation projects. Schedule 25 to the ISO-NE OATT establishes a process whereby a transmission developer may submit a request to interconnect an ETU to the Administered Transmission System. On April 18, 2017, CMP submitted a request to interconnect the NECEC Project as an External ETU with 1,200 MW of CNI Interconnection Service pursuant to Schedule 25 to the ISO-NE OATT, and

---

[39]    Dickinson Aff. at P 45.

[40]    "Elective Transmission Upgrade" is defined as a "new Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is interconnecting to the Administered Transmission System, or an upgrade to an existing Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is part of or interconnected to the Administered Transmission System for which the Interconnection Customer has agreed to pay all of the costs of said Elective Transmission Upgrade and of any additions or modifications to the Administered Transmission System that are required to accommodate the Elective Transmission Upgrade. An Elective Transmission Upgrade is not a Generator Interconnection Related Upgrade, a Regional Transmission Upgrade, or a Market Efficiency Upgrade." ISO-NE OATT, Schedule 25 § 1.

12

**JA95**

this request was assigned Queue Position 639.[41]  On June 30, 2017, ISO-NE and CMP each duly

executed the Interconnection System Impact Study Agreement prompting ISO-NE to commence

an Interconnection System Impact Study ("SIS") to assess the impact of the NECEC Project to

the Administered Transmission System, and any Affected Systems.[42]

On March 12, 2020, RLC Engineering on behalf of ISO-NE completed the SIS and

issued a draft SIS report identifying (1) the Network Upgrades the NECEC Project would be

responsible for on CMP's transmission system; (2) the need for certain Affected System

Upgrades on Eversource's transmission system, as an affected transmission owner; (3) that a

certain circuit breaker (the "Seabrook Breaker"), located at NextEra's Seabrook Station in

southeastern New Hampshire, may need to be uprated or replaced ("Seabrook Breaker

Replacement"); and (4) a potential risk of sub-synchronous torsional interaction ("SSTI")

between the NECEC Project and several affected generators (the Yarmouth units and

Westbrook) requiring that a detailed study (the "SSTI Study") be conducted by NECEC

Transmission to determine if any action is required to mitigate the risk of SSTI on such

generators.[43]  The Yarmouth units are NextEra affiliates, and NextEra has already delayed the

execution of the SSTI Agreements for six months before executing them.[44]  In order to complete

the SSTI Study, NECEC Transmission must acquire data from NextEra pertaining to the

---

[41]     Dickinson Aff. at P 47.  An External ETU is an ETU "that interconnects the New England
         Control Area with another Control Area."  ISO-NE OATT, Schedule 25, Section 1.

[42]     Dickinson Aff. at P 48.

[43]     *Id*. at P 50.  To facilitate the sharing of data to be used in the SSTI Study, NECEC Transmission
         has entered into agreements with Wyman and Wyman IV (the "SSTI Study Agreements").

[44]     *Id*. at P 86.

Yarmouth units and their unit-specific network models, and therefore, it will be important for NextEra to provide this data to NECEC Transmission in a timely fashion.[45]

Pursuant to Schedule 25 to the ISO-NE OATT, NextEra Seabrook is classified as the owner of an Affected System[46] and, in its capacity as the owner of the Affected System, NextEra Seabrook is an Affected Party.[47]  The SIS concluded that the Seabrook Breaker Replacement may be necessary due to a potentially over-duted circuit breaker that would have a small risk of developing a short circuit issue in the event that both of NextEra Seabrook's backup emergency diesel generators run at the same time, which as Mr. Dickinson explains is an overly conservative and unrealistic assumption (as both would, as a practical matter, never be operated simultaneously).[48]  The SIS's detection of a potential short circuit issue at Seabrook Station was surely not a surprise to NextEra, as NextEra knew about the short circuit problems a decade ago.[49]  Instead of addressing the issue since then, NextEra made certain modeling changes to the

---

[45]    *Id.* at PP 54, 56, 87.

[46]    "Affected System shall mean *any* electric system that is within the Control Area, including, but not limited to, *generator owned transmission facilities*, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection."  ISO-NE OATT, Schedule 25, Section 1 (emphasis added).

[47]    "Affected Party shall mean the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process." *Id.*

[48]    Dickinson Aff. at PP 51-52.

[49]    *See ISO New England, Inc.*, Docket Nos. RT04-2-000 et al., Motion for Leave to Answer and Answer of New Hampshire Transmission, LLC, Exhibit C (filed May 15, 2015), Email from ISO-NE to Steve Garwood (dated November 3, 2010), attached hereto as Exhibit B ("One of the 345kV solution options is to construct a new 345kV line from Seabrook to Ward Hill which would directly impact FPL transmission.  Because of this we are requesting that you or a representative of FPL participate in the study effort. This representation can be at either the 'working group', 'steering group', or both. A couple of the specific concern[s] we have are at the ***short circuit impact at Seabrook station*** and the cost of interconnecting to the Seabrook 345kV station.") (emphasis added).  The fact that NextEra affiliate New Hampshire Transmission, LLC attached this email to a FERC filing nearly five years after the email was sent is evidence that it found the email significant and was fully aware of its contents.

14

breaker's capability that virtually assured that any new project in the region would over-duty the circuit breaker and require that the Seabrook Breaker be replaced at the interconnecting party's cost and expense.[50] At the very least, this strategy ensured that NextEra would not need to pay for maintenance on its facilities, and perhaps, NextEra could also delay any potential interconnections that could impose negative pressure on power prices in ISO-NE.[51]

On April 8, 2020, ISO-NE held an SIS results meeting among the Interconnection Customer, the Interconnecting Transmission Owner, and Affected Parties. At this meeting, NECEC Transmission raised questions regarding the draft results of the SIS where ISO-NE relied on a power system model supplied by NextEra.[52] NextEra was not prepared to address NECEC Transmission's questions regarding the technical integrity of its power system model during that meeting or regarding the questionable results that it produced.[53] Over the next month, NextEra expressed a preference to undertake the Seabrook Breaker Replacement during a planned refueling outage of Seabrook Station. Seabrook Station's next two refueling outages are tentatively scheduled for autumn of 2021 and spring of 2023.[54] To meet the NECEC Project's in-service date, NECEC Transmission has repeatedly notified and reminded NextEra of the importance of completing the Seabrook Breaker Replacement during the Planned 2021 Outage (if required), rather than delaying it until 2023. On August 19, 2020, NextEra informed NECEC Transmission that NextEra is refusing to even try to conduct the Seabrook Breaker Replacement

---

[50]    Dickinson Aff. at P 52.

[51]    *Id.* at P 84.

[52]    *Id.* at P 58.

[53]    *Id.*

[54]    *Id.* at PP 59, 61.

during the Planned 2021 Outage.[55]  NextEra stated that more than one year is insufficient time to

conduct the pre-construction engineering work and order equipment for the Planned 2021 Outage

and, citing its own internal policies and procedures (without further explanation), that NextEra

would not be able to conduct the actual construction within the Planned 2021 Outage window.[56]

NextEra claims the Seabrook Breaker Replacement could take 40 days, even though Avangrid,

based on its experience with breaker replacements, believes that this work would take

approximately one week, but no more than two weeks.[57]

On May 15, 2020, NextEra sent NECEC Transmission a draft Affected System

Agreement for the Seabrook Breaker Replacement, and NextEra substantially modified that

original agreement with further material changes on June 18, 2020, and August 19, 2020.

NextEra's proposed language includes unusual non-conforming provisions that are not present in

either the Commission's *pro-forma* interconnection agreement or ISO-NE's form of

interconnection agreement included in the ISO-NE OATT.  One of these provisions would hold

NECEC Transmission liable for all economic Losses, which NextEra defined as all lost profits,

lost market revenues, inclusive of any ISO-NE penalties, that NextEra and the other joint owners

of Seabrook Station would incur if NextEra is unable to complete the Seabrook Breaker

Replacement during a planned outage, even if such failure to complete was due to NextEra's

---

[55]    *Id*. at P 80.

[56]    NECEC Transmission requested that NextEra provide an explanation for its refusal to conduct construction during the Planned 2021 Outage, but for months NextEra did not share any written justification or further explanation for its determination.  *Id.* at P 80.

[57]    *Id*. at PP 64-65.

own actions or inactions.[58]  A separate provision would limit the standard of Good Utility

Practice to mean, for the purposes of the agreement, only good utility practice as understood in

the "U.S. nuclear industry," rather than the electric utility industry more generally.[59]  Another

provision would require NECEC Transmission to pay for NextEra's costs to litigate the Affected

System Agreement before the Commission.[60]  NECEC Transmission conveyed to NextEra that it

would not agree to these non-conforming liability and legal fee terms, nor would it agree to

arbitrarily limit Good Utility Practice to the U.S. nuclear industry.[61]

On July 31, 2020, NECEC Transmission requested that NextEra file the Affected System

Agreement with the Commission unexecuted to allow the Commission to determine what terms

and conditions are just and reasonable.[62]  NECEC Transmission made that request so that

NextEra could begin the engineering and design study and analysis for the Seabrook Breaker

Replacement without further delay.  Now, over two months later, NextEra has still not filed the

Affected System Agreement.  It has not communicated to NECEC Transmission a justification or

explanation for failing to do so.  It instead filed a Petition for Declaratory Order seeking a

Commission determination relieving it of the obligation to file the Affected System Agreement

or to construct the Seabrook Breaker Replacement, further evidence of its intent to delay.

NextEra has refused to commence any engineering and design work related to the Seabrook

---

[58]  *Id.* at PP 63-66.  For clarity, NECEC Transmission is willing to pay for the costs of the Seabrook Breaker Replacement itself.  It is not willing, nor is it obligated, to pay for consequential damages, whether they be caused by NextEra Seabrook or otherwise.

[59]  *Id.* at P 73.

[60]  *Id.* at P 80.

[61]  *Id.* at P 75.

[62]  *Id.* at P 78.

17

**JA100**

Breaker Replacement, even at Avangrid's cost and expense.[63]  In the meantime, NECEC

Transmission expects to execute a *pro forma* Schedule 25 ETU-Interconnection Agreement with

CMP and ISO-NE in October 2020.

      NextEra has indicated that after the Planned 2021 Outage for Seabrook Station, it does

not intend to invoke another planned refueling outage until spring 2023.[64]  Waiting almost three

years for a circuit breaker replacement is unreasonable and would inhibit Avangrid's ability to

interconnect and energize the NECEC Project in time for its targeted in-service date.[65]

Furthermore, NextEra informed Avangrid that it is now seeking to shorten its spring 2023

refueling outage[66] in what can only be an attempt to make it more difficult to fit the construction

of the Seabrook Breaker Replacement into that later outage window.

      On October 5, 2020, NextEra sent a "white paper"[67] to NECEC Transmission.  That same

day, NextEra submitted a Petition for Declaratory Order with the Commission based on the

Seabrook Breaker White Paper.[68]  The Seabrook Breaker White Paper purported to explain

---

[63]    *Id.* at P 83.

[64]    *Id.* at P 61.

[65]    *Id.*

[66]    *Id.* at P 81.

[67]    Seabrook Main Generator Breaker Upgrade Evaluation ("Seabrook Breaker White Paper"), attached hereto as Exhibit C.

[68]    *NextEra Energy Seabrook, LLC*, Docket No. EL21-3-000, Petition for Declaratory Order ("NextEra Seabrook Petition" or "Petition for Declaratory Order"), Attachment C (filed October 5, 2020).  NECEC Transmission will address the specific arguments made by NextEra Seabrook in that petition in that docket.  Needless to say, the filing of the petition shows that NextEra has taken its obstruction to the next level.  And NextEra, clearly aware of the bad optics of its refusal to fulfill its obligation to perform upgrades necessary for the interconnection of the NECEC Project when coupled with NextEra's historical scorched-earth opposition to the same project, attempts to distance the arguments it makes in the petition from the fact that it does not want the NECEC Project to move forward.  *See, e.g.*, NextEra Seabrook Petition at 8 n.18 (arguing, unpersuasively, that while "NextEra Resources and its subsidiaries that operate or are developing

18

**JA101**

NextEra's refusal to take steps toward installing the Seabrook Breaker Replacement based upon self-serving explanations and internal policies. NextEra attached the Seabrook Breaker White Paper to its Petition for Declaratory Order filed with the Commission just a few hours after the Seabrook Breaker White Paper was shared with NECEC Transmission. The Petition for Declaratory Order did not request acceptance or approval of the unexecuted Affected System Agreement under Section 205 of the FPA (as Avangrid had long requested), and it conveniently omitted the actual terms and conditions of the Affected System Agreement, again reflective of NextEra's effort to delay the NECEC Project.[69]

It appears that interference with the NECEC Project interconnection is being directed by NextEra executives at the highest levels of its organization. As Mr. Dickinson describes in his Affidavit, certain NextEra executives have reached out to Avangrid's executives a number of times over the past two months in an apparent attempt to broker a deal to reduce NextEra's opposition to the NECEC Project.[70] It is well known by NextEra's executives that NextEra Seabrook is an Affected Party in the interconnection process of the NECEC Project. The NextEra executives have offered to reduce NextEra's opposition to the NECEC Project in exchange for a power purchase agreement ("PPA") between Avangrid and NextEra for the purchase of power from the Seabrook Station. Evidencing this offer, on Thursday, September 24, 2020, Avangrid received a proposed term sheet for a PPA from NextEra Seabrook that is substantially above market, which NextEra explained (telephonically) would be in exchange for

---

projects in the states of Massachusetts and Maine have been actively involved in litigation and other efforts concerning the NECEC Elective Upgrade," "[t]his Petition is unrelated").

[69]     For clarity, Avangrid has attached a draft agreement containing Avangrid's preferred terms for the Affected System Agreement as Exhibit D to the Complaint.

[70]     Dickinson Aff. at P 90. As the affidavit shows, the price proposed by NextEra for the PPA is above the average LMP for the 2016-2020 period, even by several different measures that account for capacity market prices as well as energy market prices.

19

**JA102**

NextEra's removal of its opposition to the NECEC Project.[71]  It is no coincidence that the PPA was offered from NextEra Seabrook, which is the party that is currently an Affected Party that is interfering with the NECEC Project interconnection, in an apparent *quid pro quo*.

## II.    COMMUNICATIONS

The persons to whom correspondence, pleadings, and other materials regarding this proceeding should be addressed and whose names are to be placed on the Commission's official service list on behalf of Avangrid are designated as follows:[72]

R. Scott Mahoney
Noelle Kinsch
Nicholas J. Cicale
Avangrid Service Company
180 Marsh Hill Road
Orange, CT 06477
Tel: (203) 499-2996
Scott.Mahoney@avangrid.com
Noelle.Kinsch@avangrid.com
Nicholas.Cicale@uinet.com

David L. Schwartz
James B. Blackburn
Richard H. Griffin
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
david.schwartz@lw.com
james.blackburn@lw.com
richard.griffin@lw.com

*Counsel for Avangrid, Inc. and NECEC Transmission LLC*

## III.    COMPLAINT

NextEra has long sought to prevent the development and completion of the NECEC Project because it may reduce wholesale market prices in ISO-NE.[73]  Now that nearly all of NextEra's numerous challenges have failed, NextEra's latest effort involves exploiting NextEra Seabrook's status as an Affected Party in order to block, delay or add unreasonable costs to the

---

[71]    *Id.*  The proposed term sheet is attached as Exhibit E to this Complaint.

[72]    To the extent necessary, Complainants respectfully request waiver of Section 385.203(b)(3) of the Commission's regulations in order to permit the designation of such persons for service in this proceeding.

[73]    *See* Section I.B., *supra*.

interconnection of the NECEC Project to the Administered Transmission System.  NextEra Seabrook has taken unreasonable positions geared toward interfering with the NECEC Project's interconnection process, which appears to be at the direction of its parent company's officers. Using the status of a generation company that is potentially an Affected Party to block, delay or unreasonably increase the costs of the NECEC Project violates a fundamental tenet of this Commission's mandate under the FPA – namely, to ensure that interconnection customers are able to obtain open access.  The Commission's regulations and the ISO-NE OATT prohibit transmission owners (including Affected Systems and Affected Parties) from interfering with interconnection requests.  Allowing a competitor to block access to the Administered Transmission System in New England, if permitted, would make a mockery of the Commission's open access regulations and policies, which the Commission should not permit.

Accordingly, NextEra cannot be allowed to use the alleged need for a new circuit breaker at Seabrook Station and/or a study to determine torsional interaction at the Yarmouth units to block, delay or unreasonably increase the costs of the NECEC Project's interconnection.  As set forth herein, the Commission should expeditiously (i) order NextEra to comply with its interconnection obligations as Affected Parties and/or Affected Systems under the ISO-NE OATT; (ii) direct NextEra to cease and desist all attempts to block, delay or unreasonably increase the costs associated with the interconnection of the NECEC Project to the Administered Transmission System; (iii) determine that NextEra's refusal to file the Affected System Agreement unexecuted is unjust and unreasonable and direct NextEra to file the Affected System Agreement within 10 days of the Commission's order, including any justification for any deviations from the ISO-NE *pro forma* terms and conditions with respect to the issues discussed herein; (iv) temporarily revoke NextEra's blanket waiver under Part 358 of the Commission's

21

**JA104**

regulations (with a permanent revocation pending the outcome of the fact-finding discussed

below); and (v) initiate an investigation and require NextEra to preserve and provide documents

related to the interconnection of the NECEC Project.

    **A.**    **NextEra Is Bound By FERC's Open Access Requirements And The Requirements Of The ISO-NE OATT To Act In Good Faith To Facilitate Interconnections.**

            *1.*    *The Commission's fundamental open access legal principles, which serve as foundational tenets of the Commission's regulatory oversight, apply to NextEra Seabrook as an Affected Party that must construct facilities to accommodate an interconnection.*

    There is no question that open access is one of the most important requirements in the

FPA, and is essential to ensure that incumbent market participants cannot prevent market entry

by new participants. The Commission has emphasized the fundamental importance of

interconnection as "a critical component of open access transmission service."[74] The

Commission has repeatedly reaffirmed the importance of open access to bring generation to the

market.[75]

    Just like transmission owners, Affected Systems and Affected Parties have open access

transmission and interconnection obligations under the FPA[76] and the Commission's regulations

---

[74]    Order No. 2003 at P 12.

[75]    *Open Access and Priority Rights on Interconnection Customer's Interconnection Facilities*, Order No. 807, 150 FERC ¶ 61,211 at P 7 (2015) ("Order No. 807"), *order denying reh'g and granting clarification*, 153 FERC ¶ 61,047 (2015) ("Order No. 807-A") (explaining that in Order No. 888, the Commission "established non-discriminatory open access to electric transmission service as the foundation necessary to develop competitive bulk power markets in the United States"); *id.* at P 8 (explaining the establishment in Order No. 889 of the Standards of Conduct to "prevent transmission providers from" discriminating "in favor of their marketing affiliates"); *id.* at P 9 (describing Order No. 2003's finding that "interconnection service plays a crucial role in bringing generation into the market to meet the growing needs of electricity customers and competitive electricity markets").

[76]    *See Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220 at P 47 (2015) (finding that the interconnection customers of an affected system operator and the

and open access decisions.[77]  The Commission has found that Affected Parties are integral to the

interconnection process and has required Affected Parties to provide more transparency in their

process of identifying necessary upgrades in order to make sure that they do not unduly delay or

derail projects seeking to interconnect.[78]

   Accordingly, these interconnection obligations apply to NextEra as an Affected Party

with respect to the Seabrook Breaker Replacement and associated generator owned transmission

facilities that may need modification in conjunction with the interconnection of the NECEC

---

interconnection customers of a directly-connected transmission owner are similarly situated, and that the comparability principle requires similarly situated customers to be treated comparably in the transmission planning context), *order on reh'g,* 153 FERC ¶ 61,352 (2015), *order on reh'g,* 156 FERC ¶ 61,099 (2016), *vacated and remanded, Ameren Servs. Co. v. FERC,* 880 F.3d 571 (D.C. Cir. 2018), *order on remand, Midcontinent Indep. Sys. Operator, Inc.,* 164 FERC ¶ 61,158 at P 34 (2018) (noting that the Court in *Ameren* did not overturn the Commission's determination that the interconnection customer of an affected system operator and the interconnection customer of a directly-connected transmission owner are similarly situated customers to be treated comparably in the transmission planning context and affirming that the same funding options should be available to all interconnection customers regardless of whether their network upgrades are governed pursuant to the *pro forma* interconnection agreement terms or a *pro forma* affected system agreement), *order on compliance and addressing arguments raised on reh'g,* 172 FERC ¶ 61,248 (2020); *see also South Carolina Elec. & Gas Co.,* 143 FERC ¶ 61,058 at P 48 (2013) ("The comparability principle requires public utility transmission providers ... to develop a transmission system plan that meets the specific service requests of their transmission customers and otherwise treats similarly-situated customers ... comparably in transmission system planning."), *order on reh'g,* 147 FERC ¶ 61,126 (2014); *see also PJM Interconnection, L.L.C.,* 129 FERC ¶ 61,161 at P 63 (2009).

[77]  *See Nevada Power Co.,* 97 FERC ¶ 61,227 (2001), *reh'g denied,* 99 FERC ¶ 61,347 (2002); *Am. Elec. Power Serv. Corp.* 102 FERC ¶ 61,336 (2003) (finding an interconnection customer's pending request to interconnect and obtain open access to the transmission system cannot be "held hostage" to the obstacles faced in seeking cooperation of an affected system to construct upgrades).

[78]  "[T]he lack of transparency in the Affected Systems coordination processes among MISO, SPP, and PJM has caused EDF, and other interconnection customers in MISO, SPP, and PJM harm due to uncertainty over how MISO, SPP, and PJM are evaluating the impact of interconnection requests on Affected Systems…. This lack of transparency in the current Affected Systems coordination process between MISO, SPP, and PJM has the potential to hinder the timely development of new resources and thereby to stifle competition in the wholesale markets, resulting in rates that are not just and reasonable or are unduly discriminatory or preferential." *EDF Renewable Energy, Inc.,* 168 FERC ¶ 61,173 at P 20 (2019), *reh'g denied and clarification granted,* 171 FERC ¶ 61,071 (2020).

23

**JA106**

Project to ISO-NE's Administered Transmission System.  Ignoring the application of these principles to an Affected Party (*i.e.*, NextEra's request for special exemption treatment from the Commission's open access requirements) would cascade into a reversal of decades of open access regulation.

### 2. The ISO-NE OATT obligates NextEra to accommodate an interconnection request and act in good faith.

NextEra, as a condition of its participation in ISO-NE, has agreed to be bound by the rules of the ISO-NE Tariff, a FERC filed rate schedule.[79]  The ISO-NE OATT provides that, "[p]rior to executing an ETU IA, an Interconnection Customer may request, in order to advance the implementation of its interconnection, and the Interconnecting Transmission Owner and any Affected Party *shall offer* the Interconnection Customer, an E&P Agreement that authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection."[80] As is clear from the language of the ISO-NE OATT, as well as obligations under the Commission's open access regulations, an Affected Party is *required* to offer the Interconnection Customer such an agreement—the provision does not allow for the Affected Party to refuse to provide for an agreement for a requested interconnection.

---

[79]  ISO-NE Market Participant Agreement, Section 3.2 ("The Market Participant accepts service under the Tariff as a participant in the New England Markets.  Market Participant agrees to be bound by the terms of the ISO New England Operating Documents and to make timely payment of all amounts due under the ISO New England Operating Documents."); *id.* Section 3.4 ("The Market Participant shall direct, physically operate, repair and maintain all metering and interconnection equipment under its control and all Assets providing services through the New England Transmission System (a) consistent with New England Transmission System reliability; (b) in accordance with … all applicable provisions of the ISO New England Operating Documents….").  The ISO New England Operating Documents are "the Tariff and the ISO New England Operating Procedures."  ISO-NE Tariff, Section I.2.2.

[80]  ISO-NE OATT, Schedule 25, Section 9 (emphasis added).

Moreover, NextEra is obligated to negotiate in good faith concerning a schedule for the construction of the upgrades required to interconnect the NECEC Project. In particular, Section 12.1 of Schedule 25 to the ISO-NE OATT provides that: "The Interconnection Customer, Interconnecting Transmission Owner and any other Affected Party shall negotiate in good faith concerning a schedule for the construction of the Interconnecting Transmission Owner's Interconnection Facilities and the Network Upgrades."[81] The principle behind this provision could not be more clear: Affected Parties are simply not allowed to use their status to block or delay interconnections when their cooperation is required to construct upgrades that are necessary for the interconnection to move forward.

## B. The Actions and Inactions of NextEra Violate Interconnection Obligations.

NextEra, by refusing to agree to reasonable terms or a reasonable timeframe for the construction of the Seabrook Breaker Replacement required by ISO-NE, has been violating the Commission's open-access requirements and the ISO-NE OATT's requirements.[82] NextEra, as an Affected Party, is required to act in good faith and use Reasonable Efforts to schedule and construct the Seabrook Breaker Replacement identified by ISO-NE in conjunction with the interconnection of the NECEC Project within a reasonable timeframe.

---

[81]    ISO-NE OATT, Schedule 25, Section 12.1; *see also id.* at Section 3.2.2.1 ("[T]he Interconnecting Transmission Owner and other Affected Parties as appropriate must construct the Network Upgrades needed to interconnect a controllable Merchant Transmission Facility or Other Transmission Facility External ETU under the NC Interconnection Standard.").

[82]    In addition to the delays associated with the Seabrook Breaker Replacement, NextEra has also delayed the execution of the SSTI Study Agreements, which are necessary for the sharing of data with NECEC Transmission that NECEC Transmission needs to complete the SSTI Study. Dickinson Aff. at PP 85-87. While the SSTI Study Agreements have now been executed, NECEC Transmission is concerned that NextEra may be motivated to further delay the sharing of information to take place pursuant to those agreements.

### 1. NextEra has refused to agree to a reasonable time for pre-construction efforts.

NextEra has refused to agree to a specific timeline or milestones for scheduling and completing the Seabrook Breaker Replacement, claiming the over one-year period until the Planned 2021 Outage (and perhaps even the 2.5 years until the Planned 2023 Outage) would not be sufficient time to accommodate the pre-construction work that needs to be done.[83] NextEra did not provide any evidence or analyses to support this refusal until a few hours before filing its Petition for Declaratory Order, and that so-called evidence is self-serving and simply not credible.[84] It is Avangrid's belief, based on its transmission operations and planning experience, that NextEra Seabrook has more than enough time to perform engineering and pre-construction work, and to order the necessary equipment prior to the Planned 2021 Outage.[85]

In the Seabrook Breaker White Paper, NextEra refers to internal milestones[86] that supposedly require that all modifications need to be locked down 22 months prior to a planned outage, without indicating whether there have ever been modifications to these milestones to allow for modifications to be constructed within thirteen months. Consistent with NextEra's efforts to interfere with the NECEC Project's interconnection, NextEra appears to have converted aspirational corporate goals with respect to nuclear planned outages into imaginary

---

[83]    Dickinson Aff. at P 80.

[84]    *Id.* at P 83.

[85]    *Id.* at P 65.

[86]    The Seabrook Breaker White Paper seems to suggest that the timelines for the milestones it lists are aspirational, rather than mandatory: it points out that it "is important to note that the milestones and related schedule is based on the Nuclear Fleet's refueling outage and the timing by which the milestones must be met will vary based on the complexity and scope of non-refueling related outage activities." Seabrook Breaker White Paper at 9. NextEra does not explain how it deals with requests to modify the requested work scope within the 22 month-period, which undoubtedly occurs from time-to-time.

26

**JA109**

intransient regulatory mandates.  Because of NextEra's consistent historic opposition to the NECEC Project, and the apparent role of NextEra's executives in directing these efforts, the statements of NextEra's witnesses citing NextEra's internal policies as a basis for its inability to accommodate the interconnection lack credibility.

NextEra states "which material and components are needed will not be known until design is complete."[87]  But in a classic Catch-22, NextEra has also refused to conduct the study that would determine the design, even though NextEra was aware that the Seabrook Breaker Replacement would be necessary as early as April 8, 2020 when ISO-NE held its SIS results meeting, and representatives of NECEC Transmission's planning team had emphasized to NextEra the importance of constructing the Seabrook Breaker Replacement as soon as possible in their meeting as early as May 6, 2020.[88]  Moreover, NextEra does not provide a reason why design cannot be conducted *now* and finished in time to begin ordering the materials and components that have the longer lead times, particularly where NECEC Transmission has agreed to pay for the cost of the study.

NextEra's statement that its staff is "resource loaded to plan the current scope for the 2021 Outage"[89] is not believable, given the size and scope of the NextEra organization.  NextEra surely can find personnel that can work on the pre-construction activities for the Seabrook Breaker Replacement.

---

[87]     *Id.* at 1.

[88]     Thorn Aff. at PP 58, 61.  After that May 6, 2020 meeting, instead of sending NECEC Transmission a proposed agreement encompassing the scope of engineering and a design study, as NECEC Transmission was expecting, NextEra sent the draft Affected System Agreement with the unreasonable terms that sparked this litigation.  *Id.* at P 63.

[89]     Seabrook Breaker White Paper at 1.

27

**JA110**

NextEra also resorts to technical jargon without substantive support when it states the breaker replacement involves the kind of high consequence, low probability, station operational and project risks that could affect the viability of the Seabrook Station, pursuant to the recommendations of the Institute of Nuclear Power Operations ("INPO") Event Report ("IER"), and that this requires additional time and attention.[90]  These are no more than efforts to delay the interconnection process for the benefit of NextEra's generation.  NextEra's filing of a Petition for Declaratory Order rather than an unexecuted Affected System Agreement is emblematic of a corporate strategy to delay NECEC Transmission's interconnection requests, and to refuse to accommodate upgrades that may be required for open access.

As noted above, NextEra is obligated to negotiate in good faith and use Reasonable Efforts to set and maintain a schedule for construction of upgrades required to allow for the interconnection of the NECEC Project.[91]  Its unreasonable refusal and consistent attempts to delay reflect a failure to act in good faith and an attempt to delay, derail, and/or increase the costs of the NECEC Project.  Such actions and inactions are in violation of the Commission's open-access requirements as well as NextEra Seabrook's obligation under the ISO-NE OATT to schedule and construct upgrades identified by ISO-NE as necessary for an External ETU to interconnect to the Administered Transmission System.[92]

---

[90]    *Id.*

[91]    ISO-NE OATT, Schedule 25, Section 12.1.

[92]    It violates Section 3.2.1.1 (because it is refusing to construct the upgrade), Section 9 (because it is refusing to enter into an E&P agreement "that authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection") and Section 12.1 (because it is not negotiating in good faith concerning a schedule for the construction of the upgrades) of Schedule 25 to the ISO-NE OATT.

28

2.    **NextEra has refused to perform preconstruction prior to and construction work within a planned outage window even though the construction work should only last 7-14 days at most, well within the outage window.**

Even though Avangrid has proposed a reasonable time for NextEra Seabrook to construct the Seabrook Breaker Replacement—during a planned refueling outage in the autumn of 2021—NextEra Seabrook has refused to try to complete construction during that time, claiming the window of time is not long enough to accommodate the work that needs to be done.[93] After refusing to provide any evidence or analyses to support this refusal for months, NextEra sent NECEC Transmission the Seabrook Breaker White Paper hours before filing a Petition for Declaratory Order.[94] In that document, NextEra contends that work on the Seabrook Breaker Replacement cannot take place because internal policies supposedly require the design phase to begin at least 22 months prior to the start of the Planned 2021 Outage.[95]

This position was first conveyed to Avangrid on October 5, 2020,[96] after NextEra squandered six months demanding lost opportunity costs that it has not shown it would incur, instead of commencing the timely engineering and design for the Seabrook Breaker Replacement it is required to perform. Rather than act in good faith and use Reasonable Efforts during a seventeen month period to complete the necessary preconstruction activities prior to the onset of the Planned 2021 Outage, NextEra has done nothing over the past six months except, as has now become clear, delay and prepare its Petition for Declaratory Order. Still, NextEra retains an ample eleven-month period to accomplish this work. However, NextEra would have the

---

[93]    Dickinson Aff. at P 80.

[94]    *Id*.

[95]    Seabrook Breaker White Paper at 9.

[96]    Dickinson Aff. at P 80.

Commission believe that its conduct is reasonable and that a twenty-two month period of preconstruction and project staging is necessary, but only if NECEC Transmission agrees to compensate NextEra for lost opportunity costs, even though NextEra will not incur any such costs during the preconstruction period. NextEra's requests for lost opportunity costs have nothing to do with preconstruction and its concern over lost revenues could be rendered moot depending on the results of the engineering and design study it refuses to perform.

Moreover, Avangrid is also confident, based on its transmission operations and planning experience, that NextEra Seabrook has more than enough time to perform the actual construction work during the Planned 2021 Outage.[97] The work required to construct the Seabrook Breaker Replacement should last a week, and no more than two weeks, which would be well within the Planned 2021 Outage window.[98] NextEra Seabrook's refusal violates NextEra's obligations under the Commission's open access requirements, as well as its obligations under the ISO-NE OATT to construct generator owned transmission upgrades identified by ISO-NE as necessary for an External ETU to interconnect to the Administered Transmission System.[99] The Petition for Declaratory Order estimates that the additional time needed to complete construction beyond a planned outage period would be 10 days – coincidentally, 10 total days is within the 7-14 day period of time for construction estimated by the Avangrid engineers.

---

[97]    *Id*. at P 65.

[98]    *Id*.

[99]    It violates Section 3.2.2.1 (because it is refusing to construct the upgrade), Section 9 (because it is refusing to enter into an E&P agreement "that authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection") and Section 12.1 (because it is not negotiating in good faith concerning a schedule for the construction of the upgrades) of Schedule 25 of the ISO-NE OATT.

30

**JA113**

**3.    NextEra has taken the unreasonable position that Avangrid should compensate NextEra for all indirect and consequential damages, including lost revenues.**

In negotiating the Affected System Agreement, NextEra has taken the unreasonable position that in order for it to construct the upgrades that the ISO-NE OATT requires it to construct, Avangrid must first agree to reimburse NextEra for all indirect and consequential damages that may result from the construction of the Seabrook Breaker Replacement, including lost revenues accruing if Seabrook Station remains in an outage state beyond a planned refueling outage window due to NextEra's inability to complete construction of the Seabrook Breaker Replacement within the planned outage critical path.  The ISO-NE OATT does not provide for such recovery, Commission precedent favors the use of *pro forma* terms in an Affected System Agreement in order for such terms to be found just and reasonable,[100] and NextEra has not demonstrated through any study or analysis that it requires an extended outage to complete construction of the Seabrook Breaker Replacement.

Moreover, the Commission has not regularly permitted such recovery.  For example, in Order No. 2003, the Commission explained that a transmission owner is not permitted to "allocate interconnection-related outage costs to the Interconnection Customer," even though the Commission recognized that "the Transmission Provider and the owners of other generators may incur costs as a result of having to take a transmission line out of service in order to complete an

---

[100]    *Duke Elec. Transmission*, 113 FERC ¶ 61,139 at P 17 (2005) (ordering Duke to include revisions to the Affected System Agreement to conform its provisions to the corresponding provisions in the *pro forma* LGIA or otherwise explain why the proposed language is just and reasonable); *see also Connecticut Light and Power Co.*, Letter Order, Docket No. ER19-590-000 (Feb. 1, 2019) (accepting The Connecticut Light and Power Company ("CL&P") and Cricket Valley Energy Center LLC's ("Cricket Valley") related facilities agreement where CL&P agreed to construct Affected System upgrades to accommodate interconnection of Cricket Valley under *pro forma* terms, including but not limited to, that no party would be liable to the other for consequential damages).

31

**JA114**

interconnection," including "generator shut-down and restart costs, redispatch and purchased power costs, lost opportunity costs on sales not made, costs of power to compensate for additional line losses, and possibly other costs…."[101]  While the Commission recognized that such costs may arise, it declined to permit those costs to be recovered from the Interconnection Customer because proposals to do so were vague, left "too much discretion" to the transmission provider, and did not "provide for adequate regulatory oversight by the Commission."[102]  The ISO-NE OATT also reflects the Commission's decision here in expressly stating that with respect to generator interconnection, "[t]here shall be no payment under this OATT of lost opportunity costs to Generator Owners for generating units that are dispatched down or dispatched off."[103]

### 4.    NextEra is insisting upon the unreasonable condition that Avangrid pay for NextEra's legal costs.

NextEra has taken the unreasonable position that Avangrid must agree to pay all of NextEra's legal costs arising from NextEra's filing of an unexecuted Affected System Agreement and litigating any protest regarding disputed non-conforming terms at the Commission.[104]  Just as the ISO-NE OATT does not allow for the recovery of consequential damages from an Interconnection Customer by an Affected Party, it similarly does not allow for an Affected Party to demand an Interconnection Customer pay the Affected Party's legal fees in a dispute with the Interconnection Customer.[105]  Nor does Commission precedent provide this

---

[101]    Order No. 2003 at P 714.

[102]    *Id.*

[103]    ISO-NE OATT, Section II.47.4.

[104]    Dickinson Aff. at P 81.

[105]    ISO-NE OATT, Schedule 25, Section 9; ISO-NE OATT, Section II.47.4.

relief.[106]  It simply does not make sense to allow an Affected Party that has an obligation to

reasonably accommodate interconnections to delay the filing of an Affected System Agreement

unless the Interconnection Customer funds the Affected Party's efforts to fight the

Interconnection Customer.  Yet that is the position that NextEra has taken in these negotiations,

and the Commission should accordingly prohibit NextEra's obstructionist behavior.

### 5.    *NextEra has refused to file the unexecuted Affected System Agreement.*

During negotiations, the parties long ago reached an impasse with respect to the Affected

System Agreement, and NECEC Transmission has repeatedly requested that NextEra file the

Affected System Agreement with the Commission unexecuted pursuant to FPA Section 205 so

that the Commission could sort out the parties' disagreement over terms and conditions.[107]

NextEra is well aware of its obligations as an Affected Party to make such a filing.[108]  As Section

9 of Schedule 25 to the ISO-NE OATT requires an Affected Party to offer an E&P Agreement[109]

to a requesting Interconnection Customer, the Affected Party is required to file an unexecuted

E&P Agreement offered in accordance with Schedule 25 pursuant to FPA Section 205(c) and

§ 35.1(g) of the Commission's Regulations if the customer has requested the Affected Party to

---

[106]    Order No. 2003 at P 714.

[107]    Dickinson Aff. at PP 77-79.

[108]    *See* 16 U.S.C. § 824d(c) (requiring every public utility to file contracts which relate to services); *see also* 18 C.F.R. § 35.1(g) (requiring that a public utility file all unexecuted agreements under which service will commence at the request of the customer).

[109]    *See* ISO-NE OATT, Schedule 25, Section 9 ("[A]n Interconnection Customer may request, in order to advance the implementation of its interconnection, and the Interconnecting Transmission Owner and any Affected Party *shall offer* the Interconnection Customer, an E&P Agreement that authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection.") (emphasis added).

commence immediate work under it. NECEC Transmission has repeatedly made that request[110] and NextEra has simply refused to follow the Commission's requirements, unless NECEC Transmission agrees to NextEra's unreasonable terms and conditions, which are precisely the terms and conditions that would be for this Commission to determine following the filing of an unexecuted agreement.

This is hardly new ground. Affected Systems in New England have filed unexecuted agreements when they cannot agree to terms and conditions.[111] NextEra's actions are delaying the interconnection process. NextEra's refusal to make this filing has left Avangrid no choice other than to submit this Complaint along with a request that the Commission order NextEra to file the unexecuted agreement promptly.

> **6.    *NextEra executives appear to have directed its affiliates to interfere with the NECEC Project's interconnection.***

NextEra has long opposed the NECEC Project because of the downward pressure it would arguably exert on the profitability of Seabrook Station. Based upon the actions and willful inactions of NextEra, it is clear that it is trying to take advantage of NextEra Seabrook's status as an Affected Party to delay, prevent, or increase the costs of the NECEC Project's interconnection. As detailed above, it appears that NextEra has directed NextEra Seabrook to interfere with the scheduling and construction of the Seabrook Breaker Replacement in a manner that is not permitted by the ISO-NE OATT, the FPA or Commission regulations and precedent.

---

[110]    Dickinson Aff. at PP 76-78.

[111]    *Boston Edison Company*, 91 FERC ¶ 61,187 (2000); *see also New England Power Company*, 101 FERC ¶ 61,183 (2002) (where Lake Road sought to interconnect generation with The Connecticut Light and Power Company and ISO-NE determined upgrades to the adjacent Affected System were necessary, and where Lake Road and the New England Power Company ("NEP") could not reach an agreement on the terms of the construction of those upgrades, NEP filed an unexecuted agreement with the Commission).

This is evidenced by the abrupt change in policies of NextEra Seabrook following the rejection of NextEra's arguments regarding the referendum before the Maine Law Court less than one week prior to NECEC Transmission's receipt of the August 19th NextEra Revisions, as well as the communications by NextEra's executives to offer to reduce its opposition to the NECEC Project in exchange for a substantially above-market PPA from Seabrook Station (received from NextEra on Thursday, September 24, 2020), notwithstanding the legal and regulatory obligations NextEra Seabrook has to use good faith to accommodate the interconnection of the NECEC Project.[112]

C.    **NextEra's Obstruction Requires Commission Action and Relief**

The Commission can issue an expedited initial order in this proceeding without completing any fact-finding.  The initial order requested would include the following:

*1.    The Commission should order NextEra to cease all efforts to interfere with the interconnection of the NECEC Project and direct it to act reasonably and in good faith to accommodate the interconnection, consistent with the Commission's open-access requirements and the ISO-NE OATT.*

NextEra is engaged in a coordinated series of actions intended to interfere with the interconnection of the NECEC Project in order to favor its affiliated generators.  In order to maintain the integrity of the Commission's open access regulations, which apply equally to interconnections as they do to transmission, the Commission should expeditiously order NextEra to comply with the Commission's open-access principles and the ISO-NE OATT, act in good faith and use Reasonable Efforts[113] with respect to the schedule and construction of the Seabrook

---

[112]    Dickinson Aff. at P 90.

[113]    *See* ISO-NE OATT, Schedule 25, Section 1 ("**Reasonable Efforts** shall mean, with respect to an action required to be attempted or taken by a Party under the Elective Transmission Upgrade Interconnection Agreement, efforts that are timely and consistent with Good Utility Practice and

Breaker Replacement. The Commission should not permit NextEra to further delay

interconnection efforts and should require that NextEra comply with its regulatory and tariff

obligations to act reasonably to accommodate the interconnection of the NECEC Project. The

Commission should order NextEra to cease all efforts to interfere unlawfully with the

interconnection of the NECEC Project, and to act in good faith and to use Reasonable Efforts to

accommodate the interconnection. In doing so, the Commission should ensure that such an order

would apply to any remaining obligations that NextEra has with respect to the Yarmouth units

pursuant to the SSTI Study Agreements, including the timely provision of data necessary to

complete the SSTI Study, in light of the previous unexplained 6-month delay in NextEra's

execution of the SSTI Study Agreements. Fact-finding is not essential for this action because

such a directive would simply be consistent with applicable law.

### 2.    *The Commission should order NextEra to file the Affected System Agreement on an expedited basis.*

Because NextEra Seabrook has not acted reasonably with respect to the negotiation of the

Affected System Agreement and has refused to file it in an unexecuted fashion, the Commission

should determine that NextEra's failure to do so was unjust, unreasonable and unduly

discriminatory and preferential. In order to avoid the task of having to determine what

---

are otherwise substantially equivalent to those a Party would use to protect its own interests."); *see also id.*, Section 12.2.2 ("Upon such request, the Interconnecting Transmission Owner or appropriate Affected Party will use Reasonable Efforts to advance the construction of such Network Upgrades to accommodate such request; provided that the Interconnection Customer commits to pay the Interconnecting Transmission Owner or appropriate Affected Party; (i) any associated expediting costs and (ii) the cost of such Network Upgrades."); *id.*, Section 12.2.3 ("Upon such request, the Interconnecting Transmission Owner or appropriate Affected Party will use Reasonable Efforts to advance the construction of such Network Upgrades to accommodate such request; provided that the Interconnection Customer commits to pay the Interconnecting Transmission Owner or appropriate Affected Party any associated expediting costs."). The Commission should not allow Affected Parties to prevent interconnections simply because it is in the commercial interests of their merchant functions to do so. That cannot be deemed to be acting in a reasonable manner.

provisions are reasonable and what provisions are not of an agreement that is not yet before the Commission, Avangrid requests that the Commission order NextEra to file the Affected System Agreement unexecuted within ten days following the issuance of the Commission's preliminary order in this proceeding. Fact-finding is not essential for this action because such a directive would simply be consistent with applicable law.

### 3. The Commission should temporarily revoke NextEra Seabrook's Blanket Waiver under Part 358 of its Regulations.

Order No. 807 provides a blanket waiver of the Commission's Rule 358 Standards of Conduct for any transmission owner that would be subject to such requirements "solely because it owns, controls, or operates Interconnection Customer's Interconnection Facilities, in whole or in part" in cases where "the entity that owns, operates, or controls such facilities … sells electric energy…."[114] These standards of conduct include general non-discrimination requirements,[115] the requirements to have separation of employees that are engaged in transmission functions from those engaged in marketing functions,[116] preventing transmission function employees from conveying confidential transmission operating information to marketing function employees,[117] certain related transparency requirements, including the requirement to post and record certain information exchanges between transmission function and marketing function employees,[118] and implementation requirements, including written compliance procedures and compliance

---

[114]    18 C.F.R. § 35.28(d)(2).

[115]    *Id.* §§ 358.2, 358.4.

[116]    *Id.* §§ 358.2, 358.5.

[117]    *Id.* §§ 358.2, 358.6.

[118]    *Id.* §§ 358.2, 358.7.

training.[119]  The Commission's stated intent of providing this blanket waiver to generators with Interconnection Customer's Interconnection Facilities ("ICIF") is not that the principles are unimportant, but that the "usually limited and discrete nature of ICIF and ICIF's dedicated interconnection purpose means that such facilities do not typically present the concerns about discriminatory conduct that the Commission's OATT, OASIS, and Standards of Conduct requirements were intended to address."[120]  In fact, the Commission made it clear that it was "only waiving the OATT requirements in circumstances where there is an alternative for third parties to seek not unduly discriminatory access."[121]

That is clearly not the case here, as NextEra is abusing this waiver by using its NextEra Seabrook ICIF to discriminate against the NECEC Project by declining to work in good faith and to use Reasonable Efforts for the precise purpose of interfering with the interconnection of the NECEC Project rather than to schedule and construct the Seabrook Breaker Replacement that is required.  Here, it appears that NextEra Seabrook's transmission function employees have conveyed information about scheduled outages and operations relating to NextEra Seabrook's ICIF to other NextEra and NextEra Seabrook employees involved in the merchant function, including NextEra's executives and other non-conduit employees.  Following receipt of this confidential transmission information, it appears that NextEra has directed these NextEra Seabrook employees to alter their transmission planning and operational decisions in order to impair NECEC Transmission's ability to interconnect the NECEC Project to ISO-NE's Administered Transmission System.  Accordingly, NextEra Seabrook is using its position as an

---

[119]     *Id*. §§ 358.2, 358.8.

[120]     Order No. 807 at P 55.

[121]     *Id.* at P 58.

owner and operator of ICIF transmission facilities to unduly discriminate against the interconnection of a new transmission line that would compete with NextEra's generation in ISO-NE.

While Order No. 807 conferred a conditional blanket waiver of the standards of conduct in 18 C.F.R. Part 358 for owners of ICIF in certain circumstances, the Commission made clear that this waiver should not provide permanent protection for an ICIF owner using its ICIF to discriminate against others seeking to interconnect in favor of the ICIF owner's own generation resources.[122] The Commission's regulations specify that "[t]he waivers referenced in this paragraph (d)(2) . . . may be revoked by the Commission if the Commission determines that it is in the public interest to do so."[123] Given the evidence of NextEra's abuse of the protections granted to ICIF owners by Order No. 807, Avangrid respectfully requests that the Commission temporarily revoke the blanket waiver of the Standards of Conduct for NextEra Seabrook's ICIF and order that NextEra Seabrook comply with the Standards of Conduct until such time as the Commission is able to fully evaluate the factual issues underlying this Complaint. Any reluctance to do so will undoubtedly result in continued and unjustified delays of the interconnection of the NECEC Project as a result of the interference of NextEra's efforts to protect the revenue stream for the Seabrook Station – which is inherently a merchant function.

Accordingly, the Commission should immediately order NextEra to cease violating the standard of conduct that prevents transmission owners from discriminating against competitors

---

[122] Order No. 807 at P 168 (explaining that "entities may file a complaint under section 206" in the event that "discrimination is occurring"); *id.* at P 101 (explaining that the blanket waiver "could be revoked in a Commission order if the Commission determines that it is in the public interest to do so").

[123] 18 C.F.R. § 35.28(d)(2)(i).

in favor if its own affiliated transmission,[124] and stop the coordination and exchange of confidential information between transmission function employees and marketing function employees.[125]

This requested relief does not require that the Commission complete any of its fact-finding.  Rather, all the Commission needs to determine in order to temporarily revoke the waiver is that there is a potential for NextEra to favor its merchant function over its transmission function and/or discriminate against NECEC Transmission.  The result of the fact-finding can help to determine whether that waiver should be reinstated or permanently revoked, and whether other Commission actions are merited.

### D.    The Commission Should Direct NextEra To Preserve And Provide Documents And Should Initiate An Investigation.

Given the egregious conduct displayed by NextEra as detailed in Sections III.B.1-6, *supra*, Avangrid requests that the Commission order NextEra to preserve all documents pertaining to its conduct in relation to the Seabrook Breaker Replacement.[126]  Avangrid also requests that NextEra provide all documents related to Avangrid's interconnection of the NECEC Project, as those are likely to include emails and other correspondence further

---

[124]    *Id.* § 358.4(c) ("A transmission provider may not, through its tariffs or otherwise, give undue preference to any person in matters relating to the sale or purchase of transmission service (including, but not limited to, issues of price, curtailments, scheduling, priority, ancillary services, or balancing).").

[125]    *Id.* § 358.5(a) (requiring that "a transmission provider's transmission function employees must function independently of its marketing function employees"); *id.* § 358.5(b)(1) ("A transmission provider is prohibited from permitting its marketing function employees to … Have access to the system control center or similar facilities used for transmission operations that differs in any way from the access available to other transmission customers."); *see also id.* § 358.6(a) ("from using anyone as a conduit for the disclosure of non-public transmission function information to its marketing function employees.").

[126]    This request also applies to the delay in executing the SSTI Study Agreements necessary for NECEC Transmission to complete the SSTI Study.

evidencing intent to interfere with the interconnection, including direction by NextEra's executives. Avangrid also requests that the Commission initiate an investigation into NextEra's conduct, given the indications that there may be violations of open access obligations that are crucial to the proper functioning of FERC jurisdictional transmission facilities and the modern wholesale power markets overseen by the Commission.

While such an investigation by FERC Office of Enforcement and discovery in this proceeding may be time consuming, it should not delay the issuance of a preliminary order as discussed herein.

## IV. REQUESTED RELIEF

Avangrid and NECEC Transmission respectfully request that the Commission expeditiously (i) order NextEra to comply with its interconnection obligations as Affected Parties and/or Affected Systems under the ISO-NE OATT; (ii) direct NextEra to cease and desist all attempts to block, delay or unreasonably increase the costs associated with the interconnection of the NECEC Project to the Administered Transmission System; (iii) determine that NextEra's refusal to file the Affected System Agreement unexecuted is unjust and unreasonable and direct NextEra to file the Affected System Agreement within 10 days of the Commission's order, including any justification for any deviations from the ISO-NE *pro forma* terms and conditions with respect to the issues discussed herein; (iv) temporarily revoke NextEra's blanket waiver under Part 358 of the Commission's regulations (with a permanent revocation pending the outcome of the fact-finding discussed below); and (v) initiate an investigation and require NextEra to preserve and provide documents related to the interconnection of the NECEC Project. At the conclusion of the Commission's investigation, it should grant further relief to Avangrid and NECEC Transmission as it deems appropriate.

41

## V.  RULE 206 REQUIREMENTS

### A.  Rule 206(b)(1):  Action or Inaction Alleged To Violate Statutory Standards or Regulatory Requirements

NextEra (1) has failed to negotiate an Affected System Agreement in good faith; (2) is willfully delaying the filing of an unexecuted Affected System Agreement and the work necessary to complete the Seabrook Breaker Replacement to accommodate the NECEC Project's interconnection to ISO-NE's Administered Transmission System; (3) is denying open access to the NECEC Project in violation of Order No. 888 and the ISO-NE OATT; (4) is violating interconnection rules and procedures in contravention of Order Nos. 2003 and 845 and the ISO-NE OATT; and (5) is violating Part 358 of the Commission's Regulations related to standards of conduct.

### B.  Rule 206(b)(2):  Legal Bases for Complaint

Legal bases for the complaint include, but are not limited to, violation of the Commission's (i) open access rules, (ii) interconnection rules and procedures, and (iii) the standards of conduct.

### C.  Rules 206(b)(3) and 206(b)(4):  Issues Presented as They Relate to the Complainant and Quantification of Financial Impact on Complainant

The estimated capital cost of the NECEC Project, which will be paid entirely by HQUS and the Massachusetts EDCs, is approximately $950 million.[127]  NECEC Transmission estimates and expects to incur additional unplanned and significant incremental legal and engineering costs associated with mitigation of the harmful delay and willful obstruction NextEra has caused and seems further intent on continuing to cause by not fulfilling its obligations to construct upgrades

---

[127]    Dickinson Aff. at P 10.

identified by ISO-NE that are necessary to grant the NECEC Project open access to the Administered Transmission System.[128]

### D.    Rule 206(b)(5):  Nonfinancial Impacts on Complainant

NextEra's actions and inactions could also place unnecessary regulatory and contractual risk to the NECEC Project, as amendments to the project's transmission service agreements and power purchase agreements could become necessary to accommodate a later NECEC Project in-service date, and the risk and outcome could increase and worsen if NextEra's willful and wanton misconduct is permitted to continue.[129]

### E.    Rule 206(b)(6):  Related Proceedings

 NextEra has filed a Petition for Declaratory Order on October 5, 2020, but this Complaint is not dependent upon the outcome in that other proceeding, and that proceeding is nothing more than another example of NextEra's effort to delay.  NextEra and its affiliates have refused to file an unexecuted Affected System Agreement or to begin the work necessary to engineer, design, plan, procure, and construct the Seabrook Breaker Replacement.  Due to this willful and wanton misconduct, there is no other forum through which Avangrid and NECEC Transmission can obtain their requested relief.

### F.    Rule 206(b)(7):  Specific Relief Requested

See section IV above.

### G.    Rule 206(b)(8):  Documents that Support the Complaint

The Affidavit of Thorn Dickinson is attached to this Complaint as Exhibit A.  An email from ISO-NE to Steve Garwood dated November 3, 2010 is attached to this Complaint as

---

[128]    *Id*. at P 89.

[129]    *Id*.

Exhibit B.  A copy of the Seabrook Breaker White Paper is attached to this Complaint as Exhibit C.  A draft agreement containing Avangrid's preferred terms for the Affected System Agreement is attached to this Complaint as Exhibit D.  The PPA term sheet proposed by NextEra is attached to this Complaint as Exhibit E.

### H.      Rule 206(b)(9):  Dispute Resolution

Complainants do not believe such an approach would be an effective or appropriate manner in which to resolve this dispute.  Complainants similarly do not believe that alternative dispute resolution under the Commission's supervision or the ISO-NE Tariff-based dispute resolution mechanisms could successfully resolve the issues raised in the Complaint.

### I.      Rule 206(b)(10):  Form Of Notice

Included as Attachment 1 to this Complaint is a form of notice suitable for publication in the Federal Register.

### J.      Rule 206(c):  Service On Respondent

Complainants certify that copies of this Complaint were served by email on the contacts for NextEra, NextEra Seabrook, FPL Energy Wyman LLC, and FPL Energy Wyman IV LLC, as listed on the Commission's list of Corporate Officials:

Joseph Kelliher
Executive Vice President
Federal Regulatory Affairs
NextEra Energy Resources, LLC
801 Pennsylvania Ave., N.W.
Suite 220
Washington, DC 20004
Telephone: 202-347-7082
Fax: 202-347-7076
Email: joseph_kelliher@nexteraenergy.com

Mitch Ross
Vice President & General Counsel, Nuclear

NextEra Energy Resources, LLC
700 Universe Blvd.
Juno Beach, FL 33408-0420
Telephone: 561-691-7126
Fax:  561-691-7135
Email: mitch.ross@fpl.com

## VI.    REQUEST FOR FAST TRACK PROCESSING

Avangrid respectfully requests fast track processing of this complaint[130] and a shortened answer period of 14 days.[131]  Fast track relief is requested and appropriate because NextEra requires as much time as possible to complete all preconstruction activities necessary to ensure it may construct the Seabrook Breaker Replacement during the Planned 2021 Outage. Commission action is needed as soon as possible to ensure NECEC Transmission is able to interconnect the NECEC Project to ISO-NE's Administered Transmission System on time for its contractual in-service date.  Expedited action also would limit the need for NECEC Transmission having to amend Commission jurisdictional agreements regarding the NECEC Project.  It is essential the Commission take expedited action to grant the relief Avangrid has requested herein and direct NextEra to immediately commence engineering, design, planning and procurement activities that are necessary for NextEra to construct the generator owned transmission upgrades during Seabrook Station's Planned 2021 Outage.

---

[130]    *See* 18 C.F.R. § 385.206(b)(11).

[131]    *See* 18 C.F.R. § 385.206(h)(3) (allowing the Commission to shorten the period for answers, interventions, and comments to a complaint based on "an assessment of the need for expedition").

45

**JA128**

## VII.    CONCLUSION

WHEREFORE, for the foregoing reasons, NECEC Transmission and Avangrid request that the Commission grant, on a fast-track basis, the relief requested herein with the earliest possible refund effective date.

Respectfully submitted,

/s/ *Nicholas J. Cicale*                              /s/ *David L. Schwartz*
Nicholas J. Cicale                                    David L. Schwartz
Attorney                                              James B. Blackburn
Avangrid Service Company                              Richard H. Griffin
180 Marsh Hill Road                                   Latham & Watkins LLP
Orange, CT 06477                                      555 Eleventh Street, NW
                                                      Suite 1000
                                                      Washington, DC 20004

*Counsel for Avangrid, Inc. and NECEC Transmission LLC*

Dated:  October 13, 2020

46

**JA129**

# EXHIBIT A

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
| Complainants | ) | |
| | ) | Docket No. EL21-___-000 |
| v. | ) | |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC, and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
| Respondents | ) | |

**AFFIDAVIT OF THORN C. DICKINSON FOR AVANGRID, INC. AND**
**NECEC TRANSMISSION LLC**

I, Thorn C. Dickinson, being duly sworn, depose and say as follows:

I.      **QUALIFICATIONS AND INTRODUCTION**

1.      This affidavit is being made on behalf of Avangrid, Inc. ("Avangrid") and

NECEC Transmission LLC ("NECEC Transmission").  The statements made herein are true and

correct to the best of my knowledge and belief, and I adopt them as my sworn testimony in this

proceeding.

2.      I, Thorn C. Dickinson, am President and CEO of NECEC Transmission, and Vice

President of Business Development at Avangrid Networks, Inc. ("Avangrid Networks"), the

parent company of NECEC Transmission.  In this position, I have primary responsibility for the

oversight of all development, permitting, planning, interconnection, and construction efforts

related to the New England Clean Energy Connect transmission project ("NECEC Project") and

to create and support business development and growth initiatives for Avangrid Networks and its

affiliates.  I have held this position since 2011.

JA131

3.       I joined New York State Electric & Gas Corporation ("NYSEG") in 1988 and held the following engineering and regulatory positions: Field Engineer (1988-1991), Staff Engineer – Planning and Procurement (1991-1994), and Coordinator – Cost Support and Pricing (1994 – 1997).  In 1997, I joined the parent of NYSEG, Energy East, which later became Iberdrola USA and is now Avangrid Networks, and held the following regulatory and management positions prior to being promoted to my current position: Manager – Investor Relations (1997 – 2002) and Director – Risk Management (2002 – 2011).

4.       I graduated from Union College in 1988 with a Bachelor of Science in electrical engineering.  I also hold a Master's in Business Administration from Syracuse University (2001).

5.       In my current position, I have served as Development Sponsor within Avangrid Networks for the NECEC Project since 2013.  In this role, I have been the lead executive responsible for all aspects of developing the NECEC Project including preparing Central Maine Power Company's ("CMP") winning bid in the Massachusetts Request for Proposals for Long-Term Contracts for Clean Energy Projects issued by the Massachusetts Electric Distribution Companies ("Massachusetts EDCs")[1] and the Massachusetts Department of Energy Resources ("MA DOER") dated March 31, 2017 (hereinafter the "RFP"), negotiating the transmission service agreements ("TSAs") between CMP, the Massachusetts EDCs, and H.Q. Energy Services (U.S.) Inc. ("HQUS"), a U.S. based affiliate of Hydro-Québec ("HQ"), and obtaining all state and federal regulatory approvals needed for the NECEC Project, including approval of the TSAs by the Federal Energy Regulatory Commission ("Commission").

---

[1] The Massachusetts EDCs consist of: Fitchburg Gas & Electric Light Company d/b/a Unitil ("Unitil"); Massachusetts Electric Company d/b/a National Grid and Nantucket Electric Company d/b/a National Grid (collectively, "National Grid"); and NSTAR Electric Company d/b/a Eversource Energy ("Eversource").

6.     Additionally, as President of NECEC Transmission, I am responsible for a robust staff of transmission planners, electrical engineers, project managers, and regulatory accountants. In this capacity, I have supervised and directed my transmission planning team in its negotiations with the Interconnecting Transmission Owner, ISO-NE, and Affected Parties, including NextEra Energy Resources, LLC ("NextEra") and its affiliates, for the purpose of successful and timely interconnection of the NECEC Project to ISO-NE's Administered Transmission System. Therefore, I am relying on other Avangrid employees who work directly with me and under my supervision on the NECEC Project for some of the information provided in this affidavit.

**B.     Purpose of Affidavit**

7.     The purpose of this affidavit is to describe (i) the NECEC Project, (ii) NextEra's continuous opposition to the NECEC Project, (iii) interconnection of the NECEC Project, and (iv) negotiation with NextEra and its generation affiliates as Affected Parties.

**II.     NECEC TRANSMISSION PROJECT**

**A.     Project Scope**

8.     The NECEC Project is a high voltage direct current ("HVDC") External Elective Transmission Upgrade ("External ETU") capable of delivering 1,200 MW of electricity from Québec to the New England Control Area.[2]  The NECEC Project transmission facilities consist in their entirety of:

> a.     Approximately 145.3 miles of $\pm$320 kV overhead HVDC transmission lines that will run between the Maine-Québec border and a new HVDC converter station approximately 1.6 miles from the existing Larrabee Road Substation in Lewiston, Maine;

---

[2] The New England Control Area means the New England Control Areas as set forth in the ISO New England Inc. ("ISO-NE") Transmission, Markets and Services Tariff ("Tariff"). Section II of the Tariff is ISO-NE's Open Access Transmission Tariff ("ISO-NE OATT"). All of Maine, including CMP's service territory, is part of the New England Control Area, except for that portion of Northern and Eastern Maine served by the Northern Maine Independent Service Administrator.

b. A new HVDC converter station at the southern end of the line; and

c. Certain upgrades to the existing high-voltage alternating current ("HVAC") New England Transmission System necessary to permit the interconnection of the NECEC Project to the Administered Transmission System at the existing Larrabee Road Substation under the requirements of Section I.3.9 and the Capacity Capability Interconnection Standard ("CCIS") of the Tariff.

9. The NECEC Project will interconnect at the U.S.-Canadian border with a HVDC transmission line to be constructed, owned, operated, and maintained in Québec by Hydro-Québec TransEnergie ("HQT"), a division of HQ.  NECEC Transmission is the developer of the United States portion of these transmission facilities, which are comprised of the transmission line that runs from the Québec-Maine border to the Lewiston area and all transmission upgrades on the U.S. side of the border.  The NECEC Project will cross the Québec-Maine border in Beattie Township, in the northwest corner of Maine.  The NECEC Project has a targeted in-service date of May 31, 2023.

10. The cost of constructing and operating the NECEC Project is estimated to be $950 million and will be borne by customers of the Massachusetts EDCs and by HQUS.  Because the power will be injected into the Administered Transmission System within the State of Maine, significant benefits will accrue to Maine electricity customers for at least 20 years.  The NECEC Project will also enhance bulk electric system reliability and fuel security within Maine and throughout the ISO-NE region.  Additionally, by displacing fossil fuel generation in the region, the NECEC Project will reduce greenhouse gas ("GHG") emissions, and will provide substantial benefits to the Maine economy through the creation of more than 1,600 jobs and increasing revenues to municipalities from property taxes.

11.     In addition to the transmission facilities that make up the NECEC Project in Maine, ISO-NE has preliminarily determined that the following upgrades to Affected Systems in New Hampshire may be required:

a.     Eversource

- Upgrade both segments of Eversource's 115 kV B112 line (Beebe River – F190 Tap – White Lake) to increase the summer LTE thermal rating to at least 147 MVA.

b.     NextEra Energy Seabrook, LLC ("NextEra Seabrook")

- Uprate or replace the 24.5 kV circuit breaker (the "Seabrook Breaker") at the Seabrook Nuclear Generating Station ("Seabrook Station").

12.     CMP's application to transfer the NECEC Project (including its real estate interests in certain NECEC-related property, its NECEC-related permits, and various third-party agreements) to NECEC Transmission, which will develop, construct, operate, own, and maintain the NECEC Project, is pending MPUC approval.

## III.    BACKGROUND

### A.    Massachusetts Request for Proposals for Long-Term Contracts for Clean Energy Projects

13.     In 2008, the General Court of the Commonwealth of Massachusetts enacted the Global Warming Solutions Act ("GWSA"), which established a comprehensive approach to address climate change, including a framework for reducing GHG emissions across the Massachusetts economy over a period of 40 years.[3]  Specifically, the GWSA, which amended the General Laws of Massachusetts to include a new chapter entitled "The Climate Protection and Green Economy Act," instituted GHG emissions reduction mandates that require Massachusetts to achieve reductions of between 10 percent and 25 percent below statewide 1990 GHG emission

---

[3] 2008 MASS. ACTS Ch. 298.

levels by 2020 and 80 percent below statewide Massachusetts 1990 GHG emission levels by 2050.[4]

14.     In a continued effort to stabilize New England's electricity prices while meeting the Massachusetts GWSA targets, the Massachusetts General Court passed An Act to Promote Energy Diversity in 2016 (the "Energy Diversity Act").[5]  In part, the Energy Diversity Act amended Chapter 169 of the Acts of 2008 (the "Green Communities Act") and directed, among other things, the Massachusetts EDCs to jointly and competitively solicit proposals for and to enter into cost-effective long-term contracts for Clean Energy Generation and/or Renewable Energy Certificates ("RECs") associated with Clean Energy Generation in an annual amount of 9,450,000 MWh, provided that such long-term contracts shall be subject to approval by the Massachusetts Department of Public Utilities ("MA DPU").[6]

15.     Additionally, the Energy Diversity Act directed the MA DPU to promulgate regulations that would require associated transmission costs to be incorporated into any Clean Energy Generation proposal.  If transmission costs are included in a proposal and the MA DPU finds that recovery of those costs is in the public interest, the MA DPU may authorize or require the relevant parties to seek recovery of such transmission costs through federal transmission rates, consistent with the policies and tariffs of the Commission.[7]  The Energy Diversity Act also mandates that the MA DPU regulations require proposals for clean energy resources to meet the following criteria:

---

[4] MASS GEN. Laws Ch. 21N, Section 3(a – d).

[5] 2016 MASS. ACTS Ch. 188.

[6] 2008 MASS. ACTS Ch. 169 § 83D(a).

[7] 2008 MASS. ACTS Ch. 169 § 83D(d).

- Provide enhanced electricity reliability within Massachusetts;

- Contribute to reducing winter electricity price spikes;

- Be demonstrably cost effective to electric ratepayers in Massachusetts over the term of the contract(s) taking into consideration potential economic and environmental benefits to ratepayers;

- Avoid line loss and mitigate transmission costs to the extent possible and ensure that transmission cost overruns, if any, are not borne by ratepayers;

- Allow long-term contracts for clean energy generation resources to be paired with energy storage systems;

- Guarantee energy delivery in winter months;

- Adequately demonstrate project viability in a commercially reasonable timeframe; and

- Where feasible, create and foster employment and economic development in Massachusetts.[8]

16.    On March 31, 2017, the Massachusetts EDCs, in coordination with the MA DOER, issued the RFP seeking proposals for Clean Energy Generation and/or RECs and associated transmission to enter into contracts of 15 to 20 years in duration with the Massachusetts EDCs to meet the statutorily required annual procurement of 9,450,000 MWh. Under the terms of the RFP and the Energy Diversity Act, winning bids will recover supply costs from the Massachusetts EDCs through long-term Power Purchase Agreements ("PPAs") and, as applicable, transmission related costs from the Massachusetts EDCs through Commission-approved TSAs.

---

[8] *Id.*

17.    On July 27, 2017, CMP, HQ, through Hydro Renewable Energy Inc., a special purpose entity created by HQ for the purposes of the NECEC Project, and a third party wind generation developer submitted two joint bids offering two different configurations of clean energy deliverable by the NECEC Project.

18.    The first bid (referred to as the "Hydro+Wind Solution" bid) was for a minimum of 8,500,000 MWh (and up to 9,400,000 MWh at the discretion of the Massachusetts EDCs) of energy and environmental attributes, including RECs, from a combination of Incremental Hydroelectric Generation, as defined in the RFP, owned and operated by HQ and a new wind electric generation facility to be constructed in Québec.

19.    The second bid (referred to as the "100% Hydro Solution" bid) is for a minimum of 8,500,000 MWh (and up to 9,400,000 MWh at the discretion of the Massachusetts EDCs) of energy and environmental attributes sourced exclusively from 1,090 MW of Incremental Hydroelectric Generation owned and operated by HQ.  As described below, the Massachusetts EDCs ultimately selected this bid.

20.    As part of the joint bids, CMP offered 1,090 MW transmission service out of the total 1,200 MW of transmission capacity created by the NECEC Project in order to deliver the energy offered in each of the joint bids to the New England Control Area at the existing Larrabee Road Substation in Lewiston, Maine.

21.    To further support the NECEC Project and to make the joint bids more competitive, HQ also agreed to purchase transmission rights for the remaining 110 MW of transmission capacity on the NECEC Project to use on a merchant basis, some of which has recently been secured by the State of Maine in a separate PPA.

22.      Numerous other generation and transmission developers, including affiliates of NextEra Energy, also submitted bids in response to the RFP.

23.      On February 14, 2018, the Massachusetts EDCs, in coordination with the MA DOER, selected the NECEC Project 100% Hydro Solution bid as the conditional winner of the RFP and commenced negotiations with CMP and HQ for definitive long-term PPAs and TSAs.

24.      On June 13, 2018, the Massachusetts EDCs, HQ, through its existing U.S. based affiliate HQUS, and CMP successfully completed the negotiations of the definitive PPAs and TSAs for the NECEC Project 100% Hydro Solution bid and executed those contracts.

**B.      Massachusetts Review of the Power Purchase Agreements Associated with the Participant Funded Arrangement Supporting the NECEC Project and NextEra's Vehement Opposition to Their Approval**

25.      On July 23, 2018, each of the Massachusetts EDCs filed separate petitions with the MA DPU, pursuant to Section 83D and 220 Code Mass. Regs. §§ 24.00 (2017), for approval of individual PPAs for the purchase of hydroelectric generation and associated environmental attributes from HQUS that would be deliverable by the NECEC Project.

26.      NextEra petitioned to intervene in all three MA DPU dockets and opposed regulatory approval of the PPAs in each instance.

27.      On June 25, 2019, the MA DPU issued an order approving the PPAs concluding that each PPA required HQUS to sell, and the appropriate Massachusetts EDC to purchase, firm energy derived solely from hydroelectric generation, as required under Section 83D.

28.      NextEra appealed the MA DPU order and the matter was referred to the Massachusetts Supreme Judicial Court on January 27, 2020 to be heard *en banc*.

29.      On September 3, 2020, the court affirmed the MA DPU's order approving the PPAs, concluding that the MA DPU reasonably and realistically interpreted the PPAs' firm

service requirement, upholding the MA DPU's conclusions that the PPAs guarantee electricity generated solely from hydroelectric generation, that the New England Power Pool GIS tracking system is an adequate means to ensure required accounting, and that the MA DPU's rulings were supported by substantial evidence and sufficient rationale. The court did not find any merit to the arguments raised by NextEra on appeal.

**C.     CMP's Request for Approval of a Certificate of Public Convenience and Necessity to Construct the NECEC Project**

30.     On September 27, 2017, CMP filed a Petition for a Certificate of Public Convenience and Necessity ("CPCN Proceeding") at the Maine Public Utilities Commission ("MPUC") for authorization to construct the NECEC Project.

31.     The MPUC conducted a 19-month review, in which 31 parties participated, that involved thousands of pages of pre-filed testimony and supporting materials, written discovery, technical conferences, six days of evidentiary hearings, and three public witness hearings. NextEra was an active party throughout the CPCN Proceeding, submitting witness testimony and legal briefs, and making oral argument in firm opposition to CMP's request.

32.     The MPUC weighed the benefits and costs of the NECEC Project to the ratepayers and residents of the State of Maine.[9] The MPUC concluded that the NECEC Project is in the public interest and, therefore, there is a public need for the project.[10] It found that the NECEC Project would result in "substantial benefits to Maine electricity customers" by reducing energy prices; "enhance system reliability and fuel security within Maine"; "provide environmental benefits by displacing fossil fuel generation" as well as "greenhouse gas (GHG)

---

[9] 35-A M.R.S. § 3132.

[10] *Central Maine Power Company*, order granting certificate of public convenience and necessity and approving stipulation, Maine Public Utilities Commission, A.30, ¶ 22, Docket No. 2017-00232 (May 3, 2019) ("CPCN Order").

production"; and produce "substantial macroeconomic benefits" through investment, employment, and taxes.[11]  The MPUC found that these benefits outweighed any adverse effects.[12]  Accordingly, on May 3, 2019, the MPUC issued CMP the CPCN to construct the NECEC Project.[13]

33.    NextEra appealed the CPCN Order arguing, among other things, that the MPUC improperly found that the NECEC Project was in the public interest and there was a public need for the project.  However, the Maine Supreme Judicial Court disagreed and affirmed the MPUC's grant of the CPCN, holding that the MPUC had reasonably interpreted the public need standard and appropriately found the public need standard to be satisfied.[14]

**D.    The Citizen's Initiative - State of Maine Voter Referendum**

34.    After the MPUC granted CMP a CPCN to construct the NECEC Project and the Maine Supreme Judicial Court affirmed the MPUC's CPCN Order, opponents of the NECEC Project, including NextEra and shadow organizations, many of whom were likely funded by NextEra, gathered signatures between October 2019 and February 2020 for a citizens' initiative titled "Resolve, To Reject the New England Clean Energy Connect Transmission Project" ("Citizens' Initiative") that if passed would revoke the NECEC Project's CPCN.

35.    Article IV, Part 3 § 18 of the Maine Constitution provides that citizens "may propose to the Legislature for its consideration any bill, resolve or resolution, including bills to amend or repeal emergency legislation but not an amendment of the State Constitution, by written petition addressed to the Legislature ... and filed in the office of the Secretary of State."

---

[11] *Id*. at A.30-31, ¶¶ 23-25.

[12] *Id*. at A.31, ¶ 26.

[13] *Id*. ¶ 27.

[14] *NextEra Energy Res., LLC v. Me. Pub. Utils, Comm'n*, 2020 ME 34, 227 A.3d 1117.

The Maine Constitution further provides that a citizens' initiative requires a number of citizen signatures that is "not less than 10% of the total vote for Governor cast in the last gubernatorial election preceding the filing" of the citizens' initiative.

36.     The Citizens' Initiative, as written, sought to have the MPUC amend the CPCN Order to find that (a) the construction and operation of the NECEC Project is not in the public interest and (b) there is not a public need for the NECEC Project.

37.     The Citizens' Initiative, if successful, was intended to have the effect of retroactively reversing the CPCN Order, even though the CPCN Order is final and has been affirmed by the Maine Supreme Judicial Court.

38.     The State of Maine's Secretary of State presented the proposed initiative to the Legislature in a communication dated March 16, 2020.  On May 12, 2020, the Maine Supreme Judicial Court affirmed the Secretary's verification of the Citizens' Initiative's signatures. Avangrid Networks then filed a verified complaint naming the Secretary and seeking a declaratory judgment that the Citizens' Initiative (i) exceeds the scope of the legislative powers reserved to the people; (ii) usurps the power of the executive and judicial branches; and (iii) is illegal as a special law that singles out one corporation to be exempt from the generally applicable law.  Avangrid Networks also sought injunctive relief preventing the Secretary from including the initiative on the November 3, 2020 ballot.

39.     NextEra filed a motion to intervene, which the court granted.  NextEra openly supported the Citizens' Initiative, arguing that Avangrid Networks' complaint should be dismissed.

40.     On August 13, 2020, the Maine Supreme Judicial Court ruled in favor of Avangrid Networks, remanding the action to the Maine Superior Court to enter a declaratory

judgment that the Citizens' Initiative fails to meet the constitutional requirements for inclusion on the November ballot because it exceeds the scope of the legislative powers granted to the people in the State of Maine Constitution.[15]

### E.     Organizations Supporting the Citizens' Initiative and their Ties to NextEra

41.     At my direction, a research team compiled data and investigated certain organizations that helped coordinate grassroots efforts in support of the Citizens' Initiative.

42.     We first looked into an organization known as "Stop the Corridor."  Stop the Corridor appears to be an assumed name adopted by Clean Energy for ME, LLC.  We believe that Stop the Corridor is drawing significant funding from NextEra and that it has then used this money to support opposition activities like the Citizens' Initiative.

43.     Stop the Corridor operates a website and describes itself as "a coalition of concerned citizens and organizations."  It lists a post office box address located in Westbrook, Maine, but indicates no other staff, board of directors or executive committee.  The website was regularly running Twitter and Facebook updates encouraging visitors to sign the petition supporting the Citizens' Initiative and providing relevant contact information to those who could assist visitors with signing the petition and locations where it could be signed.

44.     Another organization that we believe to be funded by or affiliated with NextEra is known as "Say No to NECEC."  Pineau Policy Associates, a lobbying firm in the State of Maine, was paid nearly $30,000 by Say No to NECEC to lobby on bills at the Maine Legislature that could adversely impact the NECEC Project, but the firm does not list Say No to NECEC as a client on its website – instead, it lists NextEra's principal subsidiary, the Florida Power & Light Company ("FPL") as its client, despite not being registered to lobby on FPL's behalf.  This

---

[15] *Avangrid Networks, Inc., et al. v. Secretary of State et al.*, 2020 ME ___, ME Sup. Jud. Ct. (Aug. 13, 2020).

indicates to us that Pineau Policy Associates, in an attempt to bolster its credentials and attract future business, listed the true source of the funds it received to lobby – FPL – as their client, rather than Say No to NECEC, the group on whose behalf they purportedly lobbied.  Say No to NECEC has joined forces with Mainers for Local Power (an organization also involved in the Citizens' Initiative) and former Maine State Senator Thomas Saviello, who has recently submitted yet another citizens' initiative targeted at halting the NECEC Project.  According to Mainers for Local Power's third quarter filing with the Maine Commission on Governmental Ethics and Elections Practices, NextEra has contributed thousands of dollars' worth of legal work to Mainers for Local Power in its work on the second citizens' initiative.

45.    We are also aware of an organization referring to itself as "No CMP Corridor." No CMP Corridor is a Maine Political Action Committee that has sought to build a resistance front opposed to the NECEC Project and has also led grassroots coordination activities related to the Citizens' Initiative.  We believe that NextEra helped coordinate and potentially helped fund upwards of $50,000 to compensate staff, recruit volunteers, pay for campaign coordination, and retain legal counsel in these efforts.  Interestingly, the same legal counsel was used by similar shadow organizations aligned with NextEra in its opposition to Eversource's Northern Pass transmission project in New Hampshire a couple years earlier.

## IV.    INTERCONNECTION OF THE NECEC TRANSMISSION PROJECT

### A.    Interconnection of an External Elective Transmission Upgrade to ISO-NE's Administered Transmission System

46.    Under the ISO-NE OATT, the NECEC Project is classified as an External ETU because once constructed, it will serve as a participant funded $\pm$320 kV electric transmission line interconnecting the New England Control Area to the Hydro-Québec TransEnergie control area at the Maine-Québec border.

47.    External ETUs may interconnect to the Administered Transmission System in accordance with the interconnection procedures set forth in Schedule 25 to the ISO-NE OATT. On April 18, 2017, CMP submitted a request to ISO-NE to interconnect the NECEC Project and was assigned Queue Position No. 639.

48.    On June 30, 2017, ISO-NE and CMP each duly executed an Interconnection System Impact Study Agreement under which ISO-NE would commence an Interconnection System Impact Study ("SIS") to assess the impact of the NECEC Project to the Administered Transmission System, and any Affected Systems.

49.    An SIS includes several sub-analyses including a (i) steady state analysis; (ii) stability analysis; (iii) short circuit analysis; (iv) sub-synchronous torsional interaction screening study ("SSTI"); (v) PSCAD study; and (vi) inter-regional stability assessment.

**B.    The NECEC Project System Impact Study Results**

50.    On March 12, 2020, RLC Engineering on behalf of ISO-NE completed the SIS and issued a draft SIS Report identifying (1) the Network Upgrades NECEC Transmission would be responsible for on CMP's transmission system; (2) the Affected System Upgrades NECEC Transmission would be responsible for on Eversource's transmission system; (3) that the Seabrook Breaker, located at the Seabrook Station in southeastern New Hampshire, may need to be uprated or replaced ("Seabrook Breaker Replacement"); and (4) a potential risk of SSTI on the equipment of three affected generators (two of which are affiliates of NextEra) requiring a detailed SSTI study ("SSTI Study") to determine if any action is required to mitigate the risk of SSTI on the affected generating units.

51.     The SIS short circuit analysis[16] determined that the NECEC Project theoretically could cause an adverse impact on the 24.5 kV Seabrook Breaker if the NECEC Project were in service and if both of the Seabrook Station's emergency diesel generators were operating simultaneously.  Specifically, in that case, the symmetrical short circuit current that the Seabrook Breaker can experience increases by 2,510 ampere (1.2%) and slightly exceeds its 165,000 ampere symmetrical interrupting capability.  This observation with the NECEC Project modeled in-service drives the need for the Seabrook Breaker to be uprated or replaced.  Without the NECEC Project modeled in-service, the Seabrook Breaker is at 99.6% of its symmetrical short circuit current capability, i.e., it is already nearly at its ampere symmetrical interrupting capability.

52.     For the short circuit analysis, RLC Engineering and ISO-NE relied on a NextEra Letter dated November 17, 2016, to model both of Seabrook Station's emergency diesel generators in simultaneous operation while all other generation on the New England system is also in simultaneous operation.  Operation of both emergency diesel generators at the same time while the affected circuit breaker is closed is overly conservative and inconsistent with actual emergency operation or a realistic operations scenario.  When only one emergency diesel generator is operating, the Seabrook Breaker would not exceed its ampere symmetrical interrupting capability.  Prior to 2016, NextEra's ASPEN model included only one emergency diesel generator running with the other turned off.  The pre-2016 model included more reasonable assumptions because there is no realistic operations scenario where both emergency diesel generators at Seabrook Station would be in simultaneous operation otherwise.  But for the

---

[16] A short circuit analysis is a transformer test conducted by placing a few percent of rated voltage on the voltage side while the low voltage winding is shortened. By measuring the voltage, current, and input power, it is possible to calculate the equivalent winding impedance for the transformer equivalent circuit.

simultaneous operation of both emergency diesel generators when the NECEC Project is modeled in-service, the Seabrook Breaker would not exceed its rating and require an uprate or replacement.  Moreover, after an adjustment to the power system model, the over-dutied Seabrook Breaker was declared barely below its short circuit current capability.  Although I disagree with the result produced by NextEra's new model, the Seabrook Breaker's nearly overloaded short circuit condition has been a concern of ISO-NE's for years.  NextEra was made aware of its potential (1) by ISO-NE and the Greater Boston working group in 2010; and (2) again in the system impact study results of Eversource's Northern Pass transmission project in 2013.  NextEra never acted on this information to replace the circuit breaker.

53.    Other observations made in the SIS were identified during the SSTI[17] screening study. This screening study was completed to identify units and AC network conditions that may have the potential risk of interactions with the controls of the NECEC Project and would warrant further investigation. The study calculated Unit Interaction Factors ("UIF") between the NECEC Project converter terminal at the Merrill Road Substation and the several electric generating units in the vicinity of the NECEC Project. The SIS set the UIF threshold at 0.1, and set forth that there is a potential risk of SSTI if the UIF is greater than 0.1.

54.    The results of the SSTI screening study indicate that there is a potential risk of torsional interaction at FPL Energy Wyman LLC's ("Wyman") unit 3 and FPL Energy Wyman IV LLC's ("Wyman 4")[18] unit 4 (collectively "the Yarmouth units").  According to the SSTI screening results, UIF is above 0.1 for numerous line-outage conditions at Yarmouth unit 4. The

---

[17] Turbine-generators can be subject to electrical environments that react with turbine-generator shafts to produce resonance (torsional vibrations) at shaft natural frequencies.  These vibrations cause cumulative fatigue damage when they exceed material fatigue limits and result in reduced component life of parts such as shafts, buckets (blades), retaining rings, and rotors.  In some cases, adverse interactions have led to growing oscillations and shaft damage, including twisted couplings and broken shafts.

[18] Wyman and Wyman IV are wholly owned subsidiaries of NextEra Energy Resources.

screening results for Yarmouth unit 3 showed that the UIF is above 0.1 for only one line-outage condition.

55.     The assumptions used by ISO-NE and RLC Engineering to perform the initial SSTI screening study mainly comprised of a quantitative analysis to determine roughly which generation units may exceed an UIF of 0.1.  Since three generation units failed this initial screening study, ISO-NE requested that NECEC Transmission perform a more detailed SSTI analysis using each generator-specific network model for the failed units and run a time series analysis between the Merrill Road Substation converter to the specific generation units to determine if there is any torsional interaction or resonance effect on the generation equipment.

56.     To perform this SSTI analysis, the owners of the generation units, namely NextEra and Calpine, must provide NECEC Transmission with data regarding their unit-specific network models so that NECEC Transmission may run a more detailed analysis to determine whether any torsional interaction mitigation is needed.  Mitigation, if necessary, could include an appropriate modification or tuning of the converter at the Merrill Road Substation.

**C.     Interconnection of the NECEC Project – Coordination and Negotiation with Affected Party NextEra Energy**

57.     For the purposes of interconnection, Seabrook Station and the Yarmouth units are Affected Systems under Schedule 25 to the ISO-NE OATT.[19]  NextEra's generation company affiliates, on behalf of these electric generating facilities, are each what is referred to as an Affected Party[20] due to the interconnection of the NECEC Project.

58.     On April 8, 2020, ISO-NE held an SIS results meeting to help initiate coordination between NECEC Transmission, CMP, and Affected Parties (Eversource, NextEra,

---

[19] § 1 of Schedule 25 to the ISO-NE OATT.

[20] *Id.*

and Calpine) ("April Meeting").  At the April Meeting, NECEC Transmission had an

opportunity to raise questions regarding the draft SIS results.  NextEra was not prepared to

address NECEC Transmission's questions regarding the technical integrity of NextEra's recently

revised power system model used in the SIS (i.e., a network model showing both emergency

diesel generators operating simultaneously) and the flawed results that it helped produce when

used in the SIS's short circuit analysis.

59.    On May 1, 2020, NextEra responded to several of NECEC Transmission's

questions that had gone unanswered at the April Meeting, including NextEra's position that the

Seabrook Breaker Replacement construction would need to occur when Seabrook Station

commences a planned refueling outage and that the next planned refueling outage was tentatively

scheduled for the autumn of 2021.

60.    Despite NECEC Transmission's concerns regarding NextEra's questionable

revisions to its power system model and the changes in the short circuit results observed in the

SIS report due to its use, NECEC Transmission opted to notify ISO-NE that, if ultimately

required, NECEC Transmission would be willing to accept the SIS results (including the

questionable assumption that both emergency diesel generators would operate simultaneously)

on May 5, 2020, to avoid unwanted and potentially harmful delay to the timely interconnection

of the NECEC Project.

61.    On May 6, 2020, representatives of NECEC Transmission's planning team had a

meeting with eight employees of NextEra to preliminarily discuss the terms and scope of the

Seabrook Breaker Replacement and the SSTI Study for the Yarmouth units.  At that meeting,

NextEra made it known that it is its preference that construction of the Seabrook Breaker

Replacement occur only during a planned refueling outage of Seabrook Station and that the next

scheduled refueling outage would occur during the autumn of 2021. Refueling outages at

Seabrook Station, on average, take place in eighteen month intervals. Due to the NECEC

Project's scheduled in-service date, representatives of NECEC Transmission emphasized the

criticality of the timing of construction of the Seabrook Breaker Replacement and notified

NextEra that construction of the Seabrook Breaker Replacement would best be accomplished

during Seabrook Station's planned autumn 2021 refueling outage. Noting that the next planned

refueling outage would not occur until the spring of 2023, construction during any planned

refueling outage period subsequent to the autumn of 2021 would potentially prevent, delay, or

disrupt timely interconnection and electrification of the NECEC Project beyond its targeted in-

service date of May 31, 2023. Waiting close to three years for NextEra to commence and

complete construction of the Seabrook Breaker Replacement would not be reasonable.

Representatives of NECEC Transmission and NextEra agreed to bifurcate the contractual

arrangements for the Seabrook Breaker Replacement into (i) a separate E&P study agreement,

which would be negotiated and executed first; and (ii) a construction agreement that would be

agreed upon once the parties had the results of the engineering and design study. This proposal

would allow NextEra to begin evaluating the scope, schedule and cost of the Seabrook Breaker

Replacement without unduly delaying NextEra's ability to perform construction during the

autumn 2021 outage.

i.    **Seabrook Station Breaker Replacement**

62.    On May 15, 2020, NextEra issued NECEC Transmission a draft E&P agreement

("Draft Agreement") for the Seabrook Breaker Replacement, which proposed to include

extensive language regarding liability, loss, and economic damages, that does not conform to the

ISO-NE OATT's *pro forma* agreement in Schedule 25. The *pro forma* language of Article 18.2

of the ETU – Interconnection Agreement ("ETU-IA") in Schedule 25 to the ISO-NE OATT

absolves parties to an ETU-IA from consequential damages, stating: "in no event shall a Party be

liable under any provision of this ETU IA for any losses, damages, costs or expenses for any

special, indirect, incidental, consequential, or punitive damages, including but not limited to loss

of profit or revenue, loss of the use of equipment, cost of capital, cost of temporary equipment or

services, whether based in whole or in part in contract, in tort, including negligence, strict

liability, or any other theory of liability; provided, however, that damages for which a Party may

be liable to the other Party under another agreement will not be considered to be special, indirect,

or consequential damages hereunder."

     63.    This Draft Agreement was supposed to contemplate the terms surrounding

engineering, design and procurement only, and therefore, it was disappointing to receive a Draft

Agreement with material non-conforming terms that proposed to place significant additional

liability risk on NECEC Transmission.  NextEra also indicated that heightened liability terms

needed to be agreed to by NECEC Transmission in order for NextEra to execute an agreement to

commence work on the E&P portion of the Seabrook Breaker Replacement, making the

assumption of these costs a precondition to NextEra's agreement to perform E&P services.

     64.    NextEra explained to NECEC Transmission that the construction period for the

Seabrook Breaker Replacement could continue beyond the planned refueling outage, and if that

were to occur, NextEra could lose ISO-NE wholesale market revenues and be vulnerable to ISO-

NE Pay-for-Performance penalties.  NextEra stated that in its belief (without providing evidence

or further explanation), construction of the Seabrook Breaker Replacement could extend for up

to a period of forty days.

65.     NECEC Transmission had its own operations personnel look into the plausible time period for construction of the Seabrook Breaker Replacement and believes that this work, if ultimately required, would take approximately one week, but no more than two weeks.

66.     NextEra has complete and unfettered control over the timing, activity, effort and progress regarding construction of the Seabrook Breaker Replacement.  NECEC Transmission informed NextEra that any action or inaction of NextEra that leads to its failure in accomplishing construction of the Seabrook Breaker Replacement during the confines of a planned refueling outage of Seabrook Station is solely within NextEra's reasonable control; and therefore, NECEC Transmission should not be held responsible for NextEra's potential lost revenues or ISO-NE penalties if NextEra fails to complete construction during the planned refueling outage.

67.     On May 22, 2020, NECEC Transmission responded to NextEra, sending proposed revisions to the Draft Agreement requesting *pro forma* liability terms and a reasonable milestone schedule regarding the commencement and completion of the E&P services.

68.     On June 2, 2020, NextEra returned counter revisions to the Draft Agreement to NECEC Transmission rejecting NECEC Transmission's proposal to use *pro forma* terms for liability.  NextEra also refused to agree to reasonable milestones or a construction sequencing schedule.  Furthermore, NextEra requested that NECEC Transmission acknowledge that it may not be possible for NextEra to commence construction of the Seabrook Breaker Replacement in time for the autumn 2021 refueling outage.  These proposed revisions were sent to NECEC Transmission at 7:00 pm on the evening prior to NECEC Transmission's and NextEra's scheduled negotiations.

69.     On the afternoon of June 3, 2020, NECEC Transmission postponed the meeting to continue negotiations so that it could have sufficient time to review NextEra's June 2nd draft and provide meaningful feedback.

70.     On June 8, 2020, NECEC Transmission reached out to NextEra to reschedule further negotiations and agreed to meet again on June 12, 2020.

71.     On June 10, 2020, two days in advance of the next meeting, NECEC Transmission provided NextEra with additional revisions to the Draft Agreement to consider.

72.     On June 12, 2020, representatives of NECEC Transmission and NextEra convened to negotiate the Draft Agreement.  At that meeting, NECEC Transmission reaffirmed its position that NextEra should undertake construction of the Seabrook Breaker Replacement during the autumn 2021 planned refueling outage of Seabrook Station.  NECEC Transmission also requested that each of the parties be held to the *pro forma* Good Utility Practice standard under the Draft Agreement in NextEra's completion of the Seabrook Breaker Replacement. NECEC Transmission further reminded NextEra that NECEC Transmission refuses to include an economic damages clause, which would be triggered if NextEra, through its own action or inaction, is unable or unwilling to complete timely construction of the Seabrook Breaker Replacement during the autumn 2021 planned refueling outage.

73.     On June 18, 2020, NextEra sent another round of proposed revisions to the Draft Agreement for NECEC Transmission's consideration, which included a proposal to limit the standard of Good Utility Practice to mean good utility practice in the "U.S. nuclear industry" rather than to encompass the "electric utility industry" more generally, which does not conform to the ISO-NE *pro forma* agreement.  At this stage in the negotiations it was clear that NextEra

had no intentions of limiting the scope of the Draft Agreement to E&P services, but that the scope of the agreement was to comprise of E&P and construction.

74.     On June 29, 2020, NECEC Transmission contacted NextEra to schedule a brief negotiation to take place on June 30, 2020.  At the June 30, 2020 negotiation, NECEC Transmission inquired of NextEra whether it would reconsider the form of the Draft Agreement as was intended initially – NECEC Transmission proposed that the parties bifurcate the transaction between an E&P agreement, which would follow reasonable and near *pro forma* terms, and separately negotiate a construction agreement once NextEra provides the results of the engineering and design study.  NextEra agreed that it would take that proposal back to discuss internally.

75.     On July 1, 2020, NECEC Transmission reached out to NextEra to schedule another meeting.  On the morning of July 9, 2020, NECEC Transmission provided another round of proposed revisions to the Draft Agreement for NextEra's consideration.  The parties met later that afternoon to walk through those revisions.  At the meeting, NECEC Transmission reiterated that it would not agree to non-conforming terms regarding liability nor would it agree to NextEra's proposal to arbitrarily limit Good Utility Practice to the U.S. nuclear industry.

76.     At the July 9, 2020 meeting, NECEC Transmission asked NextEra to file the agreement unexecuted at the Commission, and while the agreement is pending Commission acceptance, commence the engineering and design study necessary to arriving at a solution for the Seabrook Breaker Replacement.  Representatives of NextEra responded that, in all likelihood, the company would be open to following that path, but had a preference toward the parties reaching mutual agreement on all terms under the Draft Agreement prior to commencing work.  NECEC Transmission again refused to accept NextEra's proposal regarding liability.

77.     On July 22, 2020, the parties discussed the current state of the Draft Agreement after exchanging another round of proposed revisions.  On and after that meeting, NECEC Transmission agreed, at the repeated request of NextEra, to consider whether it wished to continue negotiating the liability terms of the agreement further or if it would be its preference to have the agreement filed at the Commission unexecuted so as to eliminate any further delay due to the obvious impasse in negotiations.  NECEC Transmission indicated that it would, out of courtesy, discuss internally whether further negotiations between the parties made sense, but that its strong position was that NextEra should prepare an unexecuted agreement for filing at the Commission and to commence immediate engineering on the Seabrook Breaker Replacement.

78.     On July 31, 2020, NECEC Transmission indicated to NextEra that it no longer wished to negotiate and reiterated its request for NextEra to file the agreement unexecuted so that the Commission could make the final decision regarding the terms associated with liability and Good Utility Practice and so NextEra could commence immediate work under the agreement.  NextEra ignored NECEC Transmission's request and again requested to understand NECEC Transmission's position with regard to losses and liability a bit better, which NECEC Transmission again conveyed.  NECEC Transmission reiterated to NextEra that the provisions of the Draft Agreement should conform to the *pro forma* terms that are found in Article 18.2 of the ETU-IA in Schedule 25 to the ISO-NE OATT, and if they did not, it requested that NextEra file the Draft Agreement unexecuted with the Commission so that NextEra may commence immediate E&P work under the Draft Agreement.

79.     NECEC Transmission and NextEra were scheduled to negotiate again on August 4, 2020, but NextEra requested to reschedule the meeting due to the looming threat of Hurricane Isaias.  On August 10, 2020, NECEC Transmission reached out to NextEra to reschedule the

meeting, hoping to firm up an agreement on all open items, notwithstanding the disputed liability and Good Utility Practice provisions, and to determine the timing and process NextEra would follow in filing the Draft Agreement unexecuted at the Commission and commence jurisdictional services thereunder.  However, NextEra responded to NECEC Transmission that it was still reviewing the Draft Agreement with its management and that it would get back to NECEC Transmission on when it was able to meet next.

80.    On August 14, 2020, after the passage of Hurricane Isaias, NECEC Transmission contacted NextEra to schedule a meeting to resolve remaining issues. The parties agreed to meet on August 19, 2020.  However, rather than resolving remaining issues, NextEra used this meeting to add significant new issues that NextEra had not previously raised, which NextEra sent to Avangrid that same day ("August 19th NextEra Revisions").  Among those new revisions, NextEra demanded that NECEC Transmission reimburse NextEra for all costs associated with filing and litigating the Draft Agreement unexecuted at the Commission, and informed NECEC Transmission that NextEra will not commence the planning, permitting, and procurement of the necessary materials for the Seabrook Breaker Replacement unless and until the Commission accepts the Draft Agreement for filing.  Additionally, NextEra refused to attempt to commence construction of the Seabrook Breaker Replacement in time for its planned autumn 2021 refueling outage, which NextEra stated was based on its own "internal policies and procedures," without indicating what those policies and procedures were.  NECEC Transmission stated that these provisions were unreasonable, and emphasized that NextEra has more than sufficient time to design, engineer, plan, and procure all equipment that is needed to commence construction of the Seabrook Breaker Replacement in time for the planned autumn 2021 refueling outage.  NECEC Transmission requested that NextEra provide a letter or email justifying its determination that it

could not commence construction in time for the planned autumn 2021 refueling outage, but for months, NextEra did not provide any written justification or any further explanation for its determination.[21]

81.    The August 19th NextEra Revisions also included newly added language reflecting that NextEra is seeking to shorten the duration of Seabrook Station's planned spring 2023 refueling outage.  NECEC Transmission asked why NextEra is seeking to shorten the outage period, as NextEra knows that it may be necessary to construct the Seabrook Breaker Replacement during an upcoming planned refueling outage.  To date, NextEra has not responded to NECEC Transmission's inquiry, nor has NextEra provided any further feedback on the Draft Agreement.  NECEC Transmission has also repeatedly requested that NextEra file the Draft Agreement unexecuted with the Commission and commence E&P services, but NextEra has not done so.  Because it is apparent that NextEra is seeking to prevent or delay the interconnection of the NECEC Project, it has become clear that the shortening of the 2023 refueling outage is intended to make it even more difficult for the Seabrook Breaker Replacement to fit within the 2023 refueling outage period.

82.    The August 19th NextEra Revisions marked a significant turning point in the negotiations of the Draft Agreement and reflected a signal that no further progress would be made, a signal confirmed by NextEra's filing of the Petition for Declaratory Order on October 5th.  The August 19th NextEra Revisions were proposed by NextEra six days after the Maine Supreme Judicial Court's opinion on August 13, 2020 finding the Citizens' Initiative to overturn the NECEC Project's CPCN unconstitutional.

---

[21] On October 5, 2020, NextEra sent to NECEC Transmission a white paper purporting to explain its justification. Hours later, NextEra attached that white paper to a Petition for Declaratory Order filed with the Commission seeking to relieve itself of the obligation to construct the Seabrook Breaker Replacement without its preferred contractual terms.

83.      The August 19th NextEra Revisions were not conducive to productive negotiations between the parties, and NextEra's behavior does not appear to have been in good faith.  Since August 19th, NECEC Transmission has not received any additional feedback from NextEra on the Draft Agreement (other than a white paper that was attached to NextEra's Petition for Declaratory Order later that day), nor has NextEra filed the Draft Agreement unexecuted for Commission review or commenced E&P services despite numerous requests by NECEC Transmission that it do so for months.  Since this time, NextEra has not shown any signs of willingness that it will commence engineering and design related to the Seabrook Breaker Replacement, even at NECEC Transmission's cost and expense.  NextEra's conduct is thus currently preventing the NECEC Project from obtaining open access to the Administered Transmission System in ISO-NE and would prevent the NECEC Project from meeting its targeted in-service date of May 31, 2023.

84.      The parties have long been at an impasse, and NextEra appears to be purposefully preventing the timely interconnection of the NECEC Project.  NextEra appears to be using the Seabrook Breaker's questionable condition to protect Seabrook Station's profitability by preventing or delaying the NECEC Project from obtaining open access to the New England Control Area.

### ii.      The Yarmouth Units SSTI Studies

85.      Regarding NextEra's Yarmouth units, the parties exchanged a series of drafts of SSTI Agreements, which are supposed to facilitate NECEC Transmission's ability to perform an in depth study and determine whether there is any sign of torsional interaction between the Merrill Road Substation converter component of the NECEC Project and the Yarmouth units.

86.    NextEra finally executed the SSTI Agreements and sent them to NECEC Transmission the morning of October 13, 2020.  The negotiation process started in April 2020 but lasted nearly six months as a result of NextEra's repeated delays, despite the fact that no material terms were disputed.  NECEC Transmission requires information from NextEra so that it may engage in the SSTI Study and analyze whether it needs to employ any SSTI mitigation measures at the Merrill Road Substation converter.

87.    ISO-NE is requiring that NECEC Transmission perform this study, and NECEC Transmission is concerned that, given NextEra's delay in executing the SSTI Agreements, NextEra may seek to delay NECEC Transmission's ability to complete the SSTI Study by failing to timely provide the necessary data regarding the Yarmouth units that is needed to complete the SSTI Study.  It is a precondition to the NECEC Project's interconnection that this SSTI Study is completed and that NECEC Transmission employ SSTI mitigation measures if the study results warrant such.

88.    Any further delay in NextEra's cooperation under the SSTI Study Agreements has the potential to delay the timely interconnection of the NECEC Project.

**D.    Financial and Non-Financial Adverse Impact to Avangrid, NECEC Transmission and the NECEC Project Caused by NextEra's Behavior**

89.    Avangrid estimates and expects to incur significant unplanned and incremental legal and engineering costs associated with its mitigation of the harmful delay NextEra has caused the NECEC Project to date.  NextEra's actions and inactions could also create unnecessary regulatory and contractual risk to the NECEC Project, as amendments to the project's TSAs and PPAs could become necessary to accommodate a later NECEC Project in-service date.  Further amendments to the TSAs would require the consent of the Massachusetts EDCs and this Commission's review and approval.  These and other adverse impacts to the

NECEC Project caused by NextEra are continuing and are expected to continue if NextEra is allowed to engage in further dilatory conduct.

**V.     NEXTERA PROPOSAL FOR A COMMERCIAL TRANSACTION IN EXCHANGE FOR HALTING ITS OPPOSITION TO THE NECEC PROJECT**

90.     Since August, NextEra's executives have repeatedly reached out to Avangrid's leadership team offering to reduce NextEra's opposition to the NECEC Project in exchange for a PPA for Avangrid to purchase power from Seabrook Station.  Over the last two months, NextEra executives have contacted Avangrid's executives, and engaged in a series of telephone calls in which NextEra executives discussed NextEra's proposal that Avangrid execute an above market PPA in exchange for NextEra's agreement to withdraw from further efforts to oppose the NECEC Project.  Last month, Avangrid received a proposed term sheet setting forth proposed terms for a PPA, which is attached as Exhibit E to the Complaint.  Under the terms of this PPA, NextEra Seabrook would sell 350 MW (28% of Seabrook Station's Qualified Capacity of 1,250 MW) to Avangrid for fifteen years at a rate that is substantially above clearing prices in ISO-NE's wholesale markets. The following table shows recent figures for average LMP in the New Hampshire load zone.  As the table shows, the price offered under the PPA term sheet, $43.71/MWh the first year to increase at a rate of 2% per year, is significantly above market.

|  | Day-Ahead | Real-Time |
|---|---|---|
| 2016-2020 Average LMP | $32.60 | $31.98 |
| with Capacity @ Most Recent Clearing Price | $35.40 | $34.77 |
| with Capacity @ 5-Year Average Clearing Price | $38.96 | $38.34 |
| with Capacity @ 5-Year High Clearing Price | $42.43 | $41.81 |

NextEra's executives are aware of NextEra Seabrook's status as an Affected Party with respect to the NECEC Project's interconnection process, and NextEra Seabrook's agreement to discontinue its opposition to the NECEC Project appeared to be based upon, or at least include, NextEra Seabrook's willingness to accommodate the NECEC Project's interconnection.

## V.    SUMMARY AND CONCLUSION

91.     Contrary to NextEra's continuous opposition, the NECEC Project is great for Mainers and for New England as a whole because it will be primarily constructed along existing rights-of-way, produce thousands of jobs and opportunities for local businesses in Maine and New England, and will reduce the cost of electric power in the ISO-NE Control Area. Additionally, it will deliver firm, clean, renewable power to load centers that would not otherwise have access to such energy.

92.     My affidavit demonstrates the facts that underlie the Complaint.  If NextEra is allowed to continue to act unreasonably and in bad faith, the NECEC Project is unlikely to meet its targeted in-service date, which would be costly for Avangrid and NECEC Transmission, and bad for the environment, the State of Maine and the Commonwealth of Massachusetts.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
| Complainants | ) | |
| | ) | Docket No. EL21-___-000 |
| v. | ) | |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC, and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
| Respondents | ) | |

I, Thorn C. Dickinson, President and CEO of NECEC Transmission LLC, and Vice President of Business Development at Avangrid Networks, Inc., verify, state, and affirm that the foregoing testimony is true and correct to the best of my knowledge and belief.

Thorn C. Dickinson
President and CEO
NECEC Transmission LLC

Subscribed and sworn (or affirmed) before me by Thorn C. Dickinson, President and CEO of NECEC Transmission LLC,
on this ___*13th*___ day of *October*, 2020.

Notary Public

Seal

ERICKA M. CONNOR
Notary Public-Maine
My Commission Expires
April 05, 2026

**JA162**

# EXHIBIT C

**Seabrook Main Generator Breaker Upgrade Evaluation**

**Executive Summary**

NextEra Energy Resources' Seabrook Station received a request to upgrade the main generator output breaker to support proposed changes to the connected 345 KV transmission system. Specifically, the project would entail replacing the existing Delle-Alsthom air blast circuit breaker with an upgraded, but not yet identified, breaker (**Breaker Project**). A team comprised of senior engineering, outage, and construction personnel was asked to evaluate the feasibility of, and timeline required for, implementing the Breaker Project for the next scheduled refueling outage, scheduled for the fall of 2021 (**2021 Outage**).

The main generator output breaker is located on a platform inside the north wall of the Turbine Generator Building inside the protected area boundary of Seabrook Station. The three pole breaker is approximately 20 feet long by 15 feet wide. The existing breaker and supporting cabinets occupy approximately 700 square feet on the Turbine Generation Building's mezzanine deck, with combined equipment weight exceeding 32,000 pounds. The Breaker Project would involve, among other things, removal of existing equipment, and the design, procurement, installation, and testing of a replacement breaker and supporting auxiliary equipment.

This evaluation determined that it is not possible to implement the Breaker Project during the 2021 Outage due to:

- *Size and complexity of the Breaker Project.* NextEra's processes and procedures for work at its nuclear power plants outline robust milestones and associated activities that must be observed prior to outage implementation to ensure the safety and reliability of such projects. Several of the significant design and engineering milestones have already passed for the planning for the 2021 Outage.
- *Long-lead Delivery Times.* Which material and components are needed will not be known until design is complete. The delivery times for the type of material and components used for Breaker Projects typically have long lead times. The breaker is not available off the shelf and will have to be built by the manufacturer. Before an order can be placed a specification for the breaker must be produced.
- *Impact on available resources.* The station staff and associated project managers are currently resource loaded to plan the current scope for the 2021 Outage.
- *Required critical reviews.* NextEra follows the recommendations of the Institute of Nuclear Power Operations (INPO) Event Report (IER) 14-20, *Integrated Risk – Healthy Technical Conscience* that prescribes additional actions for high consequence, low probability, station operational and project risks that could affect the viability of the facility (i.e., enterprise risk), such as the Breaker Project.

For compliance with internal processes and procedures for projects of a magnitude similar to the Breaker Project, the Breaker Project cannot be completed during the 2021 Outage.

## A - Main Generator Breaker

**Function**

The transmission grid connections that provide offsite power to Seabrook Station consist of three 345-kV transmission lines. These three lines terminate at separate terminating structures. From the terminating structures each circuit is routed in a metal-enclosed, SF6 gas-insulated bus to a common switching station.

Under normal plant operating conditions, the main generator supplies electrical power from the station main generator to the electrical grid via isolated phase bus duct (i) to the utility grid through the generator step-up transformers (**GSU**) and unit auxiliary transformers (**UAT**) and (ii) to the plant through the UAT ((See Figure 1). The main generator is connected to the GSU and the UAT through a generator circuit breaker. One of the two ways auxiliary power needed for plant startup and during shutdown may be taken from the 345-kV system is back-fed to the onsite distribution system through the GSU and UAT when the generator circuit breaker is open (See Figure 2). This provides power for all the loads supporting engineered safety features and other functions.

**JA165**

USCA Case #23-1094     Document #2024393     Filed: 10/30/2023     Page 171 of 403

Figure 1 - 345kV One Line Diagram



**JA166**

Figure 2 – On-line and Back-feed Operation



## Main Generator Breaker Details

The equipment that requires replacement as part of the Breaker Project is located on the mezzanine level on a platform inside the north wall of the Turbine Generator Building. The three-pole breaker is approximately 20 feet long by 15 feet wide. The existing breaker and supporting cabinets occupy approximately 700 square feet, with combined equipment weight exceeding 32,000 pounds. The Breaker Project would involve, among other things, removal of existing equipment and the design, procurement, installation, and testing of a replacement breaker and supporting auxiliary equipment. The project for the replacement of such large components must prevent interfering with, or causing damage to, equipment in the surrounding area. See Figure 3.

**Figure 3: Breaker Mezzanine Layout**



A generator circuit breaker, rated at 25 kV, 35-kA rated continuous current, 165-kA rated short circuit current, is provided between the main generator and the connections to the GSU and UAT. This circuit breaker consists of three single pole units mounted in line with, and forming part of, the isolated phase bus duct.

The high current-carrying capacity generator circuit breaker is an air blast type using high pressure air to operate the breaker, as an arc-extinguishing medium, and as a cooling medium. The generator circuit breaker is an adaptation of an extra-high voltage air blast circuit breaker design modified for installation in isolated phase bus duct. The use of forced air cooling of the conductors provides the required current-carrying capability to support the reliability of performance of the generator circuit breaker.

The generator circuit breaker is a large, complex piece of equipment. Additional information is provided below to illustrate the scale of the project. Figure 4 provides a schematic representation of the generator circuit breaker, while figure 5 shows the general arrangement drawing. Figure 6 shows a picture from the top of the generator circuit breaker.

**JA168**

Figure 4 - Generator Circuit Breaker Schematic Representation



Figure 5 - Generator Circuit Breaker General Arrangement Drawing



Figure 6 – Generator Circuit Breaker (picture taken from top)



Two major ancillary systems also require replacement as part of the Breaker Project: the Control Cabinet and Interlock and the Compressed Air System. When the generator is online, operational control of this generator circuit breaker is from the main control room. However, when the generator is offline, breaker testing can be performed locally from the three-pole control cabinet located adjacent to the breakers. The compressed air system is comprised of two high-pressure compressors and air receivers. The air receivers have sufficient storage capacity for five close-open operations. A forced air cooling system is provided for each circuit breaker pole consisting of an air-to-air heat exchanger with redundant fans and circulators mounted on top of the main interruption chamber.

## B – Project Planning

### Outage Milestones

Installation of the generator output breaker can only be accomplished when Seabrook Station is not on line. In preparation for a refueling outage, the station engages in an in-depth planning process to facilitate orchestrating the numerous outage activities, including refueling of the reactor, required plant maintenance, and modifications or replacement of equipment. NextEra has established a series of milestones intended to ensure that outage projects, such as the Breaker Project, are engineered, procured, and installed in a safe and reliable manner and that outages are implemented safely and predictably.

Page | 8

NextEra Nuclear Fleet Procedure OM-AA-101-1013, "Fleet Outage Milestones" establishes the Nuclear Fleet standard for managing outage milestones. Each milestone requires a carefully laid out plan prior to commencing work that considers the resources required to complete the actions, the minimum schedule upon which those actions must be completed, competing priorities or other constraints that may challenge the ability to complete the required actions, and how the actions will be monitored to ensure that the plan remains on track. It is important to note that the milestones and related schedule is based on the Nuclear Fleet's typical refueling outage and the timing by which the milestones must be met will vary based on the complexity and scope of non-refueling related outage activities.

The procedure outlines 47 milestones for each major outage activity. Broadly, once the modification is issued, there are a number of required activities including work package preparation, review and field walk-down of work packages, determination of required craft and support resources, equipment clearance preparation, develop and issue operating and maintenance procedure changes, award of implementation contracts, development of contingency plans, and development and review of an integrated outage schedule. However, for the purpose of this discussion, the following four key milestones necessary for engineering design and scope development, equipment and service procurement, work package preparation and equipment availability have been assessed to determine if implementation of the Breaker Project is viable during the 2021 Outage:

| Milestone Title | Milestone Due | Additional Information |
|---|---|---|
| **MS01: Design Change Scope Freeze** | 22 months prior to start of outage | Identify and freeze the Design Change Scope for major and minor modifications. This allows sufficient time to perform the engineering and analysis required to implement the modification. Activities required once the scope is determined include bidding and issuing contracts for engineering for equipment specification, vendor engineering, supporting calculations, and development of the modification package to implement the modification. Additionally, normal practice is to perform detailed walk-downs in the outage prior to the outage at which the Breaker Project will be implemented to ensure all interconnections and interferences are understood. |
| **MS08: Order Long Lead and Critical Materials and Services** | Approximately 12 months prior to start of outage | All orders for long lead materials and critical procurement services required to support the outage including contingencies are placed with vendors, which include estimated delivery dates that support the outage. The breaker is not available off the shelf and will have to be built by the manufacturer. |

| | | |
|---|---|---|
| **MS09: Issue Modifications** | 12 months prior to start of outage | All approved design change packages, and specific field verification and validation packages have been issued to the respective discipline planner for work package preparation. |
| **MS32: Planned Parts Onsite and Ready for Use** | 1 month prior to start of outage | All long Lead materials are on-site and available for issue or are tracked by the materials exception list. |

The first milestone due date for MS01 for the 2021 Outage has already passed. Although as of October 1, 2020, we are slightly more than a year away from the start of the 2021 Outage, it is not feasible to finalize the scope, complete the design, and order the material to support meeting the MS08 and MS09 milestones.

## Institute of Nuclear Power Operations Commitments

INPO is a member-governed organization that sets industry-wide performance objectives, criteria, and guidelines for nuclear power plant operations that are intended to promote "operational excellence" and nuclear safety and to improve the sharing of operational experience between nuclear power plants. Membership is comprised of most U.S. nuclear power plant owners and operators and other nuclear entities. Failure to follow INPO guidance can result in additional inspections and a sliding scale of peer intervention.

The evaluation of the Breaker Project indicates it would have enterprise risk, which would add to the duration and level of preparation needed. In addition to the normal planning process, NextEra follows the recommendations of INPO Event Report (IER) 14-20, *Integrated Risk – Healthy Technical Conscience*. This report cited concerns that engineering and technical errors – both within utilities and by outside vendors – were contributing to consequential events throughout the industry. The report focused attention on high consequence, low probability, station operational and project risks that could affect the viability of the unit, such as the Breaker Project. As a result of this Event Report, NextEra and the other U.S. nuclear operators adopted a series of actions to ensure technical rigor is maintained and the risk of the modification is understood and mitigated. These actions include detailed risk assessment and mitigation, and executive reviews of various aspects of such projects, including engineering and technical details, vendor oversight, and critical implementation steps.

Page | 10

**JA173**

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
|     Complainants, | ) | |
| | ) | **Docket No. EL21-6-000** |
|     v. | ) | |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC, and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
|     Respondents | ) | |

## NEXTERA ANSWER TO
## COMPLAINT OF NECEC TRANSMISSION LLC AND AVANGRID, INC.

November 2, 2020

**JA174**

# TABLE OF CONTENTS

I.    Introduction ....................................................................................................... 2

II.   Communications ............................................................................................... 8

III.  Answer ............................................................................................................. 8

   A.   The Complaint should be dismissed because its legal claims are duplicative of the Petition ......................................................................................................... 8

   B.   The Complaint should be denied as a matter of a law ................................... 9

      1.   The Generation Breaker is a generation facility, not a transmission facility ............ 10

      2.   Seabrook is in compliance with Commission regulations .......................................... 13

        a.   The Generation Breaker is not subject to open access requirements ..................... 13

        b.   The Tariff does not require Seabrook to enter into a facilities agreement ............. 21

        c.   Seabrook did not refuse to file an unexecuted Engineering and Procurement ("E&P") Agreement .......................................................................................... 26

      3.   This case is not about "damages" – it is about ratemaking, and recovery of opportunity costs that are a legitimate and verifiable cost of providing the requested service 28

      4.   Legal fees are appropriate in this cost of service setting ........................................... 36

      5.   Complainants now appear to concede that a contractual limitation on liability is appropriate ........................................................................................................ 38

      6.   "Good Utility Practice" should be measured by the standards of the nuclear industry 39

      7.   Independent analysis verifies that the Outage cannot take place in 2021 ................. 41

      8.   Seabrook did not change modeling assumptions to affect the replacement of the Generation Breaker ........................................................................................... 44

   C.   Each form of relief requested by Complainants is either moot, unnecessary, or otherwise unjustified ....................................................................................... 46

      1.   An order requiring "Compliance" is unnecessary due to the Petition and the fact that Seabrook is already in full compliance with applicable requirements ................................. 47

      2.   Complainants request for a "cease and desist" order is unjustified .......................... 47

        a.   NextEra is entitled to exercise its First Amendment rights ..................................... 47

        b.   Seabrook is not blocking, delaying, or unreasonably increasing the costs associated with the interconnection of the NECEC Elective Upgrade ............................................. 50

      3.   There is no need for an order requiring that Seabrook file an agreement because this issue will be resolved by the Petition proceeding .................................................. 53

      4.   The request to revoke waiver of the Standards of Conduct makes no sense ............. 53

      5.   A FERC Office of Enforcement investigation is unjustified and unnecessary and NextEra is already preserving documents ............................................................ 56

i

**JA175**

IV.    Conclusion ........................................................................................................ 60

**JA176**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
|     Complainants, | ) | |
| | ) | Docket No. EL21-6-000 |
|       v. | ) | |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC, and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
|     Respondents | ) | |

## NEXTERA ANSWER TO
## COMPLAINT OF NECEC TRANSMISSION LLC AND AVANGRID, INC.

Pursuant to Sections 206(f) and 213 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (the "Commission" or "FERC"),[1] NextEra Energy Resources, LLC ("NextEra Resources"), NextEra Energy Seabrook, LLC ("Seabrook"), FPL Energy Wyman LLC ("FPLE Wyman"), and FPL Energy Wyman IV LLC ("FPLE Wyman IV") (collectively, "NextEra"), respectfully submit the following Answer in response to the Complaint and Request for Shortened Answer Period and for Fast Track Processing ("Complaint") of NECEC Transmission LLC ("NECEC") and Avangrid, Inc. ("Avangrid") (collectively, "Complainants") filed in the above-captioned docket on October 13, 2020.  As NextEra demonstrates herein, the Complaint should be dismissed as duplicative or denied with prejudice.

---

[1]  18 C.F.R. §§ 385.206, 213 (2020).

NextEra notes at the outset that Complainants have not numbered the paragraphs in their Complaint.  This makes responding to each factual allegation difficult and, therefore, to the extent a particular factual allegation is not admitted or denied below, NextEra denies such allegations.

## I.    Introduction

The Complaint should be dismissed because it is baseless and wastefully duplicates the litigation already underway in Docket No. EL21-3-000.  In that proceeding, Seabrook asked the Commission, through a Petition for a Declaratory Order (the "Petition") to resolve a short list of contractual issues in dispute between Complainants and Seabrook with respect to an otherwise completed facilities agreement[2] for the replacement of a 24.5 kV generator breaker and ancillary equipment ("Generation Breaker"), as well as two major ancillary systems,[3] at Seabrook Station.  Review of the Complaint and the Petition confirms that Complainants share Seabrook's view of the nature (if not the merits) of the contractual issues in dispute.[4]  The fastest path to resolution of the agreed issues in dispute is therefore the Petition proceeding where those issues are already under adjudication.  All that this proceeding can add is delay, and a waste of resources.

To be sure, Complainants cast aspersions and false allegations against Seabrook and its affiliates in an effort to color the outcome of the contractual dispute.  They make a variety of allegations to the effect that Seabrook is delaying the Generation Breaker project to benefit its market position.  Aside from allegations about Seabrook asserting its contractual rights and

---

[2]    Schedule 25 of the ISO New England Inc.'s ("ISO-NE") Transmission, Markets and Services Tariff ("Tariff"), governs Elective Transmission Upgrades like the New England Clean Energy Connect project ("NECEC Elective Upgrade").  Schedule 25 includes the undefined term "facilities agreement;" it does not include the term "Affected System Agreement," the term used throughout the Complaint.  NextEra infers from the Complaint that Complainants mean a facilities agreement, and NextEra therefore uses the Tariff term herein.

[3]    As explained in the Petition, the Generation Breaker replacement project also will require upgrades to the Control Cabinet and Interlock and the Compressed Air System.  *See* Petition at 15, n.2, Attachment A at 3.

[4]    *Compare* Petition at 24-26 (identifying and seeking resolution of contractual dispute over recovery of opportunity costs) to Complaint at 31-32 (same); Petition at 27 (identifying and seeking resolution of contractual dispute over recovery of legal fees) to Complaint at 32-33 (same).

2

**JA178**

legitimate business concerns, the chief allegation is that Seabrook's explanation that it cannot perform the Generation Breaker replacement during its October 2021 refueling outage ("2021 Outage") is fabricated. Complainants' accusations are meritless: because Complainants' lawyers, unsupported by any testimony of a nuclear industry expert, have questioned the veracity of Seabrook's Site Vice President, Seabrook has retained an independent expert, Lawrence Weber, who testifies under oath, based on a lifetime of service in the nuclear industry, that "executing the Project during the October 2021 outage would create a high potential of an event that causes personal injury and property damage that delays the timely return of the plant to service."[5]

Moreover, it is entirely unclear why this Complaint was filed. NECEC has itself elected to push back the in-service date of its NECEC Elective Upgrade until May 31, 2023 – after the *next* planned refueling outage at Seabrook, in the spring of 2023 ("2023 Outage").[6] As explained in the attached Supplemental Affidavit of Joshua Marcum, on a September 29, 2020 call with Seabrook, Complainants shared that, based on their project team having recently taken a hard look at all of the activities needed to achieve commercial operations, Avangrid had made the decision to push back the in-service date of the NECEC Elective Upgrade to May 31, 2023.[7] The purpose of the manifestly unnecessary Complaint appears to be to deflect blame and cast NextEra and Seabrook as scapegoats for Avangrid's setbacks, as Avangrid recently announced to its investors

---

[5]    *See* Affidavit of Lawrence Weber at 7 ("Weber Affidavit").

[6]    Complaint, Attachment A at PP 9, 61.

[7]    *See* Supplemental Affidavit of Joshua Marcum at 5-6 ("Marcum Supplemental Affidavit"). Complainants also shared that they had discussed the delayed in-service date with ISO-NE. Beyond the statement regarding the in-service date in the Complaint, NextEra is unaware of a public announcement concerning the delayed in-service date.

that NECEC's newly announced construction start date has been pushed to Q4 2020 *or after approval is received from the U.S. Army Corps of Engineers* (the "Corps").[8]

That approval now appears subject to further delay. After instituting this proceeding, a complaint was filed in the United States District Court, District of Maine on October 27, 2020, alleging that the Corps failed to comply with the National Environmental Policy Act ("NEPA").[9] As the Commission is well aware, recent cases like these alleging violations of NEPA and other environmental-related laws have significantly delayed the construction and proposed in-service dates of multiple infrastructure projects.

The active opposition of these environmental advocacy groups undercuts Complainants' effort to seize the moral high ground by arguing that NECEC is a "green" project.  The environmental groups argue that the NECEC Elective Upgrade's "stated purpose is to fulfill long-term contracts for 'clean energy' projects with the State of Massachusetts.  However, the Corps was presented with substantial evidence undermining the claimed greenhouse gas ("GHG") emissions benefits of the [NECEC Elective Upgrade].  The reduction in GHG emissions at a regional level is the primary rationale for the [NECEC Elective Upgrade] but neither [Central Maine Power Company] [("]CMP["]) nor the Corps has conclusively demonstrated such reductions."[10]

NextEra makes no apology for its legal petitioning activity – including in Maine and Massachusetts legal and regulatory proceedings as well as lobbying efforts – which are protected

---

[8]   Avangrid, Inc., Transcript, Q3 2020 Earnings Call, at p. 3 (Oct. 21, 2020), https://s24.q4cdn.com/489945429/files/doc_financials/2020/q3/Bloomberg-AGR-2020-3Q-Earnings-Transcript-Final.pdf.

[9]   *See Sierra Club, Natural Resources Council of Maine, and Appalachian Mountain Club v. U.S. Army Corp of Engineers*, Complaint for Declaratory and Injunctive Relief, Civil No. ____(U.S. Dist. Ct. of Maine) (filed Oct. 27, 2020).

[10]   *Id.*at P 5.

4

**JA180**

by the First Amendment. The Commission has never regulated First Amendment rights or adjudicated whether state lobbying efforts are allowable. Complainants contend that because the outcome of a delay at Seabrook could have an effect similar to a win for NextEra in its state petitioning activity, Seabrook must be delaying the Generation Breaker replacement for reasons other than resolving its legitimate contractual disputes. This alarmist rhetoric breaks down for four reasons. First, the timing of the Generation Breaker replacement has now been independently verified by a nuclear industry expert. Second, as explained in the attached Supplemental Affidavit of Mr. Marcum, the timing and substance of back and forth contract negotiation demonstrates that the negotiation was in good faith, and the Petition was needed to resolve a limited number of issues remaining in dispute. That is exactly the purpose of such Petitions.[11] Third, neither the outage timing nor the time spent in legitimate negotiation and dispute resolution will have the delaying effect claimed by Complainants: NECEC decided to push back the in-service date for the NECEC Elective Upgrade for other reasons. Finally, Complainants offer no basis for their assertion that NextEra and Seabrook crossed the line from *lawful* petitioning activity into some form of *unlawful* activity merely because it could achieve the same goal.

Complainants themselves seem to concede that their allegations of supposed misdeeds by NextEra are no more than attempts to color the outcome. Despite presenting a 30-page affidavit and other documents, Complainants claim that the Complaint can be resolved without factual determinations. That is an unusual juxtaposition, and it suggests that Complainants understand that their "factual" allegations of delay are empty, and should have no bearing on the merits here. In any event, Seabrook demonstrates, through the attached supplemental affidavit of Mr. Marcum,

---

[11] *See* 18 C.F.R. § 385.207(a)(2) (permitting petitions for a "declaratory order . . . to . . . terminate a controversy or remove uncertainty").

that there was no delay by Seabrook, because consensual, substantial negotiation of the facilities agreement continued until shortly before Labor Day, when NECEC's last counteroffer was received. And, Complainants' witness has no personal knowledge of any of the negotiations he claims to testify about – he has not participated in any of these discussions. The bottom line is that there was no delay on Seabrook's part. Seabrook has repeatedly explained to NECEC that its concerns are based on nuclear safety in planning the Generation Breaker replacement and its interest in fairly receiving compensation for all costs, including opportunity costs, that Seabrook incurs solely in connection with the Generation Breaker replacement for NECEC's benefit.

Complainants' chief arguments are that Seabrook has violated open access requirements, interconnection requirements, and Tariff provisions. Seabrook strongly denies each and every allegation that it acted unlawfully. Indeed, the requirements cited by Complainants apply to transmission facilities, not generation facilities. As the FPA plainly states, transmission facilities are those used for "transmission of electric energy in interstate commerce."[12] The Generation Breaker, as explained in the attached Supplemental Affidavit of Eric McCartney, is located within Turbine Generator Building at Seabrook Station. It is not even an interconnection customer interconnection facility ("ICIF"), because Seabrook's ICIF do not include the Generation Breaker.[13] Open access or interconnection requirements only apply to a generator to the extent that the generator owns ICIF to which a customer seeks to connect, and NECEC is not seeking to interconnect to Seabrook's very limited ICIF. Likewise, the key Tariff provisions relied on by Complainants apply to transmission service, not components of generating plants. Accordingly,

---

[12]    16 U.S.C. § 824(a) (2018).

[13]    *See* Standard Large Generator Interconnection Agreement By and Among ISO New England Inc. and NextEra Seabrook, LLC and New Hampshire Transmission, LLC ("Seabrook IA") at 10-11 and Appendix A.

6

**JA182**

the unstated yet foundational factual premise of just about every legal argument in the Complaint is plain wrong.

Rather than confront this inconvenient fact, Complainants say nothing about whether the Generation Breaker is a transmission facility, and argue instead that facts are not necessary here. Seabrook's rights cannot be so easily side-stepped. Even if Complainants are given their wish, and the Commission applies a summary-judgment type standard without specific factual findings, the Complaint still must be denied, because under that scenario the Commission must assume that the Generation Breaker is not a transmission facility.[14]

While the fact that the Generation Breaker is not a transmission facility undercuts virtually all of Complainants' legal arguments, it is not the only inconvenient fact for them. Seabrook's Petition included an affidavit explaining why the Generation Breaker replacement project cannot be conducted during the 2021 Outage at Seabrook.[15] Complainants offered no testimony from anyone professing to understand nuclear plant outages. Nevertheless, given Complainants' allegations, NextEra herein presents the affidavit of Mr. Weber, the former Chief Nuclear Officer of American Electric Power Company ("AEP"), who independently verifies that conclusion. Seabrook's Petition also included an affidavit explaining how actual costs (including opportunity costs) could be tracked and charged through a formula.[16] Complainants offer no contrary evidence. And the Petition included evidence on potential outage-related fuel cost savings. Again, Complainants offer no contrary evidence. In the end, this is a ratemaking dispute and nothing more. The Complaint is long on angry rhetoric, and short on actionable information. For the

---

[14] *See Transcontinental Gas Pipe Line Co.*, 141 FERC ¶ 63,013 at P 9 (2012) ("summary disposition is appropriate when . . . there are no material facts in dispute, or . . . the facts presented by the party opposing summary judgment have been accepted in reaching the decision.") (citations omitted).

[15] *See* Prepared Petition Affidavit of Eric McCartney at 4-7 ("McCartney Petition Affidavit").

[16] *See* Prepared Petition Affidavit of Joshua Marcum at 8-11 ("Marcum Petition Affidavit").

7

**JA183**

reasons explained below, if the Complaint is not dismissed as duplicative, it should be denied, with prejudice, as a matter of law.

## II.    Communications

Seabrook requests that all notices, correspondence, and other communications concerning this filing be directed to the following persons:[17]

Joel D. Newton                        Noel Symons
Senior FERC Counsel                   Todd Mullins
NextEra Energy Resources, LLC         Colin Francis
801 Pennsylvania Avenue, NW           Mary-Kaitlin Rigney
Suite 220                             McGuireWoods LLP
Washington, DC 20004                  2001 K Street, NW, Suite 400
(202) 347-7126                        Washington, DC 20006
joel.newton@nee.com                   (202) 857-2929
                                      nsymons@mcguirewoods.com
                                      tmullins@mcguirewoods.com
                                      cfrancis@mcguirewoods.com
                                      mrigney@mcguirewoods.com

## III.    Answer

### A.    The Complaint should be dismissed because its legal claims are duplicative of the Petition

Once again, to level set: the few contractual issues that remain in dispute between Seabrook and NECEC are before the Commission in the Petition. Complainants agree that those are the contractual issues in dispute. The Complaint therefore improperly and unnecessarily duplicates the Petition. Complainants exacerbate this problem by arguing the same points placed at issue by the Petition without actually addressing the arguments that Seabrook made on those points. Because of that failure, the Complaint makes no forward progress, and is purely a wasteful second path. The Commission regularly dismisses complaints that are "duplicative and unnecessary, and

---

[17]    NextEra respectfully requests waiver of the Commission's regulations, to the extent necessary, to permit more than two persons to be placed on the service list for this proceeding.

waste the resources of the Commission and the parties,"[18] and should do so here.  The parties and the Commission should focus on the merits of the limited contractual dispute, which are squarely presented in the Petition.

### B.    The Complaint should be denied as a matter of a law

In addition to needless duplication, the Complaint misses the mark legally. Despite presenting additional factual materials such as affidavits and documents, Complainants claim that no fact finding is necessary for the relief they seek.  While certainly no fact finding is necessary to dispose of the Complaint, we rebut factual allegations that falsely seek to unjustly impugn the good name of NextEra's companies and employees, which we do not take lightly. For the reasons presented in the Petition and here, if the Complaint is not dismissed as duplicative, it should be denied as a matter of law, with prejudice.

As Seabrook said in the Petition, it will enter into a facilities agreement with NECEC so long as it is justly compensated and its rights are protected.  Seabrook's opposition to the Complaint is further protection of those same rights, and does not undercut Seabrook's willingness to enter into a facilities agreement with NECEC on just and reasonable terms.

---

[18]    *See Tesoro Refining & Mktg. Co. v. SFPP, L.P.*, 137 FERC ¶ 61,154 at P 11 (2011) (dismissing a complaint as duplicative because the complainant already had an open proceeding addressing the same subject as the instant complaint proceeding); *Texaco Refining & Mktg. Inc. v. SFPP*, 75 FERC ¶ 61,292, at 61,938-39 (1996) (dismissing complaints because there was already an ongoing Commission investigation into the issues presented in the complaints and "setting them for hearing in a separate proceeding would be duplicative and unnecessary, and a waste of the resources of the Commission and the parties"); *see, e.g.*, *People of the State of Cal. v. Powerex Corp.*, 135 FERC ¶ 61,178 at P 71 (2011) (dismissing complaint and refusing to open a new proceeding when the complaint was based on issues that were already before the Commission in a separate proceeding); *La. Pub. Serv. Comm'n v. Entergy Corp.*, 124 FERC ¶ 61,010 at P 27 (2008) (dismissing complaint, in part, because certain issues presented in the complaint were already before the Commission in a separate proceeding); *Williams Entergy Servs., LLC v. Mid-Am. Pipeline Co.*, 116 FERC ¶ 61,175 at P 23 (2006) (dismissing complaint, in part, because the complaint challenged tariffs that were already under review in a separate proceeding and the complainant was a party to the proceeding); *Californians for Renewable Energy, Inc. v. British Columbia Hydro & Power Auth.*, 98 FERC ¶ 61,085, at 61,253 (2002) (dismissing complaint because the subject of the complaint was the subject of ongoing proceedings before the Commission).

9

1.    **The Generation Breaker is a generation facility, not a transmission facility**

Many of Complainants' legal arguments rely on the unstated and frankly absurd assumption that the Seabrook Generation Breaker is a transmission facility. As we will show, the Generation Breaker is correctly classified as a generation facility. It serves a generation function and is housed in the nuclear station itself. It is not even an interconnection facility, much less a transmission facility. The purpose of the Generation Breaker is to connect the generator to offsite power and to protect the generator from faults on the transmission system. When the Generation Breaker is tripped, back-feed power flows from the switchyard through the generator step-up transformers to the station buses via the unit aux transformers, thus providing an immediate access circuit from the preferred power supply (offsite source) to the onsite distribution system, providing power for all loads including all the engineering safety feature loads. Indeed, when it actuates it is keeping energy *out*, not facilitating its transmission. There is no third party load behind the breaker, nor could there be. So the Generation Breaker is not a facility for the provision of transmission service, and is not subject to open access or any related requirement for transmission. As the FPA provides, a jurisdictional transmission facility is one that is used for the "transmission of electric energy in interstate commerce."[19] The Generation Breaker does not transmit electric energy in interstate commerce.[20] Complainants – who have the burden of proof in this proceeding – have done nothing to show otherwise, no doubt for the simple reason that there was no way to make this square peg round. The fact that almost all of Complainants' arguments rest on the idea

---

[19]    16 U.S.C. § 824(a).

[20]    The only facility related to Seabrook that is involved in transmission is the switchyard, and the switchyard is owned and operated by a separate affiliate, as discussed further below.

that the Generation Breaker is a transmission facility illustrates that the entire Complaint is baseless.

A documentary review confirms that the Generation Breaker is part of the generating facility. Not only is it not a transmission facility, it is not even an ICIF. This is made clear in the Seabrook IA. The Seabrook IA defines "Generating Facility" as "Interconnection Customer's device for the production of electricity identified in the Interconnection Request, but shall not include the Interconnection Customer's Interconnection Facilities."[21] In other words, per the Seabrook IA, if a piece of equipment at Seabrook is not an interconnection facility, it is a generation facility. And, indeed, the Seabrook IA makes clear that the Generation Breaker is not an interconnection facility

The Seabrook IA defines "Interconnection Customer's Interconnection Facilities" as all facilities and equipment, as identified in Appendix A of the Standard Large Generator Interconnection Agreement, that are located between the Generating Facility and the Point of Change of Ownership, including any modification, addition, or upgrades to such facilities and equipment necessary to physically and electrically interconnect the Generating Facility to the Administered Transmission System. Interconnection Customer's Interconnection Facilities are sole use facilities."[22] As Mr. McCartney explains in his Supplemental Affidavit, the Generation Breaker is inside the Generator Turbine Building, and is not "between the Generating Facility and the Point of Change of Ownership."[23] Appendix A to the Seabrook IA specifies the interconnection facilities and ICIF. There is good reason that the Generation Breaker is not

---

[21] Seabrook IA at 10.

[22] *Id.* at 11.

[23] *See* Prepared Supplemental Affidavit of Eric McCartney at 2-3 ("McCartney Supplemental Affidavit").

mentioned in Appendix A; as Mr. McCartney highlights, the ICIF terminates at the external wall of the Generator Turbine Building.[24] Thus, consistent with Order No. 807, which limits ICIF to those facilities listed in a large generator interconnection agreement as ICIF,[25] the Generation Breaker is expressly not ICIF; it is part of the Generating Facility.

To the extent Complainants meant to imply that a Generation Breaker within Seabrook Station, while not actually a transmission facility, should be treated as such, because the Generation Breaker replacement project has been deemed necessary for Complainants to pursue the NECEC Elective Upgrade, such an approach would upend cornerstones of Commission regulation, starting with the statutory grant of authority. The FPA provides that the Commission has jurisdiction over "facilities [used for] transmission," but not, with certain exceptions, "over facilities used for the generation of electric energy."[26] Seabrook therefore is regulated by the Commission with respect to its power sales and the physical interconnection to, and transmission over, its ICIF, none of which is relevant here.

Erasing the lines between generation and transmission would have other broad implications. For example, the Commission's unbundling requirements require separate charges for transmission and generation.[27] And the Commission's Standards of Conduct permit employees who operate generation to be classified as marketing function employees who must, consequently,

---

[24] *Id.* at 3.

[25] *See Open Access & Priority Rights on Interconnection Customer's Interconnection Facilities*, Order No. 807, 150 FERC ¶ 61,211 at P 113 (2015), *order denying reh'g and granting clarification*, 153 FERC ¶ 61,047 (2015).

[26] 16 U.S.C. § 824(b)(1) (2018).

[27] *See Promoting Wholesale Competition Through Open-Access Non-Discriminatory Transmission Servs. by Utilities; Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting ,Utils.*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 61,238 (1996) (stating that functional unbundling means, in part, separate rates for generation, transmission, and ancillary services), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

be barred from non-public access about transmission facilities.[28]  So Complainants' implicit claim that lines between generation and transmission do not exist would require reworking of significant portions of the regulatory scheme, and would need to start with Congress.

To be sure, companies that own generation facilities may also own transmission facilities. That is what vertically-integrated utilities do, for example.  And Commission precedent establishes that generators must make their ICIF available to someone else that wants to use them to interconnect or transmit electricity.  But NECEC is not seeking to interconnect with Seabrook's ICIF, or transmit electricity over Seabrook's ICIF.  It is asking Seabrook to interrupt its operations, lose revenues, and undertake an otherwise unnecessary generation breaker replacement that carries *enterprise risk* to Seabrook,[29] all so that *NECEC* can interconnect an Elective Transmission Upgrade about 100 miles away in Lewiston, Maine.

Finally, the underlying notion of the Complaint – that Seabrook knowingly violated open access requirements, and interconnection requirements, among other things – not only supposes that the Commission would accept the novel idea that generators are really transmission facilities, but further supposes that Seabrook acted wrongly, because it should have known that its generation facility was actually a transmission facility.  All of this, as explained immediately below, ignores the Commission's regulations, not to mention common sense.

### 2.    Seabrook is in compliance with Commission regulations

#### a.    The Generation Breaker is not subject to open access requirements

Complainants claim that Seabrook is using its position as an Affected Party to delay or block the NECEC Elective Upgrade in contravention of Seabrook's obligations under Order No.

---

[28]    *See* 18 C.F.R. §§ 358.2, 358.5, and 358.6.

[29]    *See* McCartney Petition Affidavit at 6; White Paper at 1.

888, Order No. 2003, and Order No. 845, as well as the Tariff.  Without citation to the FPA, any Commission order, or Tariff provisions, they allege that Seabrook, as an Affected Party under the Tariff is bound by the Commission's open access requirements.

Seabrook is willing to enter into a facilities agreement with NECEC on just and reasonable terms and conditions, as outlined in the Petition.  But open access requirements are not a basis for ordering Seabrook to do so.  The Generation Breaker is not transmission.  As Mr. McCartney explains and discussed above, it is part of the generating facility.   By rule, open access requirements expressly apply only to transmission facilities:

> Every public utility that owns, controls, or operates facilities *used for the transmission of electric energy in interstate commerce* must have on file with the Commission an open access transmission tariff of general applicability for transmission services, including ancillary services, **over such facilities**.[30]

So the Commission's regulations are limited and provide that open access requirements do not apply to generating facilities, including the Generation Breaker.

Seabrook does own extremely limited ICIF,[31] but those facilities are not at issue here: NECEC does not seek interconnection or transmission service over the ICIF owned by Seabrook. The mere fact that Seabrook owns ICIF does not make every facility it owns subject to open access. As the regulation expressly says, ownership of transmission facilities triggers the open access rule, but only for open access "over such facilities."

Moreover, even if Seabrook's limited ICIF facilities were somehow at issue here, the Commission in Order No. 807 amended its regulations to grant generators owning ICIF waiver from the open access transmission tariff requirements.[32]  This includes Seabrook.

---

[30]    18 C.F.R. § 35.28(c)(1) (emphases added).

[31]    *See* McCartney Supplemental Affidavit at 4.

[32]    *See* Order No. 807, 150 FERC ¶ 61,211 at P 1 (codified at 18 C.F.R. § 35.28(d)(2)).

Although Complainants cite FPA Section 210[33] in the very first sentence of the Complaint, a request for interconnection under this section of the FPA is absent both in the Complaint and any prior record.  This is unsurprising.  NECEC is a transmitting utility, and is not an "electric utility" as defined in FPA Section 3(22), Federal power marketing agency, qualifying cogenerator, or qualifying small producer.  Congress therefore provided the Commission with no statutory authority under FPA Section 210 even if NECEC were to seek the "physical connection" of the NECEC Elective Upgrade to Seabrook's discreet ICIF, which of course is not the case here.

In any event, the Complaint's entire discussion of open access and interconnection requirements is misdirection: the Generation Breaker is not ICIF, it does not transmit electric energy in interstate commerce, and it is not a transmission facility. So even if Seabrook did *not* have a waiver under Order No. 807, and was subject to open access requirements with respect to its extremely limited ICIF, that would be irrelevant here.  While there are public utility transmission owners who also own generation, and own transmission subject to open access requirements, such as ICIF, Complainants have not identified a single case where the Commission used its open access rules to order such a utility to replace a generation component within a generating plant.

Complainants also claim that the comparability principle supports their position that generation owning Affected Parties have open access transmission and interconnection obligations under the FPA.[34]  They cite to *Otter Tail Power Co. v. Midcontinent Independent System Operator,*

---

[33]    16 U.S.C. § 824i.

[34]    Complaint at 22-24.

*Inc.*,[35] *South Carolina Electric & Gas Co.*,[36] and *PJM Interconnection, L.L.C.*[37] to support this argument. Complainants' reliance on these cases is misplaced. None of them come close to the facts here, or hold that a generator must modify its generation plant in aid of transmission service provided by someone else. Like the open access principle it supports, comparability pertains to comparable provision of transmission service.

The central issue in *Otter Tail* was whether Otter Tail Power Company ("Otter Tail"), a *transmission-owner* affected party, should be treated comparably to other *transmission providers* in Midcontinent Independent Transmission System Operator, Inc. ("MISO"), and allowed to self-fund network upgrades on its system that were required for the interconnection of a facility to a different transmission system. Otter Tail's primary argument was that the comparability principle required affected system operators be treated similarly to directly-connected transmission owners and, as such, that Otter Tail should be permitted to self-fund upgrades to its system, because directly-connected transmission owners could do so.[38] The Commission agreed in relevant part.[39]

*Otter Tail* is inapposite. First, the dispute at issue in *Otter Tail* was whether a transmission owning affected party could fund network upgrades (i.e., transmission facilities) the same way that directly connected transmission owners could. The Commission's treatment of a transmission-

---

[35] *See Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220 (2015) ("*Otter Tail*"), *order on reh'g*, 153 FERC ¶ 61,352 (2015), *order on reh'g*, 156 FERC ¶ 61,099 (2016), *vacated and remanded*, *Ameren Servs. Co. v. FERC*, 880 F.3d 571 (D.C. Cir. 2018), *order on remand*, *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158 (2018), *order on compliance and addressing arguments raised on reh'g*, 172 FERC ¶ 61,248 (2020).

[36] *See S. Carolina Elec. & Gas Co.*, 143 FERC ¶ 61,058 at P 48 (2013) ("*SCE&G*").

[37] *See PJM Interconnection, L.L.C.*, 129 FERC ¶ 61,161 at P 63 (2009) ("*PJM*").

[38] Specifically, Otter Tail argued in its complaint that "MISO's Open Access Transmission, Energy and Operating Reserve Markets Tariff (Tariff) is unjust and unreasonable to the extent that the pro forma [Facilities Construction Agreement] contained therein does not permit an affected system operator the same right to elect to provide the initial funding for network upgrades that is given to directly-connected transmission owners under MISO's pro forma Generator Interconnection Agreement." *Otter Tail*, 151 FERC ¶ 61,220 at P 2.

[39] *Otter Tail*, 151 FERC ¶ 61,220 at P 47.

16

**JA192**

owner affected party in connection with construction of transmission facilities has no bearing on how a generation-owner affected party should be treated because the Commission's open access principles only apply to transmission facilities owned by transmission-owner Affected Parties. Second, it was Otter Tail, as the affected party, that was seeking comparable treatment. No one was trying to impose an obligation on an affected party. Third, the dispute in *Otter Tail* concerned MISO's tariff, under which the parties were required to enter into a facilities agreement. The MISO tariff also contained a *pro forma* facilities agreement. As explained in Section IV.B.2.b, the Tariff does not require Seabrook to enter into a facilities agreement. Moreover, the Tariff does not contain a *pro forma* facilities agreement.

*SCE&G* and *PJM* also do not support Complainants' position that the comparability principle dictates that generation owning Affected Parties have open access and interconnection obligations. In *SCE&G*, the Commission held that a public utility transmission provider's regional transmission planning filing required under Order No. 1000 did not comply with the comparability principle.[40] In *PJM*, the Commission held that treating merchant transmission facilities and transmission zones comparably in allocating transmission upgrade costs was not unduly discriminatory or preferential.[41] Neither *SCE&G* nor *PJM* are relevant. Local and regional transmission planning and cost allocation requirements of Order No. 1000 are irrelevant to the dispute between the Complainants and Seabrook, which does not involve planning of Seabrook transmission, or allocation of Seabrook transmission costs.

Finally, putting aside the fact that these cases do not apply here, Complainants' proposition makes no sense. Comparability is, as the name suggests, a comparative exercise. It requires that

---

[40]    *SCE&G*, 143 FERC ¶ 61,058 at P 48.

[41]    *PJM*, 129 FERC ¶ 61,161 at P 63.

17

**JA193**

similarly situated customers be treated comparably.  So even supposing that the principle applied to a generation breaker replacement, it would merely require that all service provided by Seabrook to third parties in replacing generation breakers be comparable.  Put differently, generation would need to act comparably to generation.  What complainants want to do is turn comparability on its head, and say that a generator should behave comparably to a transmission provider.  Complainants offer no basis in logic, law, or policy for this proposed rewrite of the regulatory rulebook.

In addition to comparability principles, Complainants also assert that the Generation Breaker replacement project is subject to open access and interconnection obligations under the Commission's open access decisions.[42]  Complainants cite to *Nevada Power Co.*[43] and *American Electric Power Service Corp.*[44] to support their position.   It almost seems as though Complainants liked the "hostage" language in these cases, and looked no further, because what these cases actually stand for is the proposition that generators – like Seabrook – cannot be forced, as a condition of interconnection, to construct upgrades on affected systems.

The interconnection agreement provision at issue in *Nevada Power* permitted the transmission provider to defer construction on the generation owner's interconnection facilities if the generation owner could not accomplish upgrades on other affected systems in a timely manner.[45]  The Commission held that the transmission provider could not require the generation owner, as a condition of interconnection, to accept responsibility for upgrades on the systems of

---

[42]  Complaint at 22-23.

[43]  *See Nev. Power Co.*, 97 FERC ¶ 61,227 (2001) ("*Nevada Power*"), *reh'g denied*, 99 FERC ¶ 61,347 (2002) ("*Nevada Power II*").

[44]  *See Am. Elec. Power Serv. Corp.*, 102 FERC ¶ 61,336 (2003) ("*AEPSC*").

[45]  *Nevada Power*, 97 FERC ¶ 61,227, at 62,035.

other transmission providers.[46]    On rehearing, the Commission explained that this provision essentially allowed the immediate interconnecting utility to hold the generator "hostage" for all affected system upgrades.[47]

The Commission reached the same conclusion in *AEPSC*.  In *AEPSC*, a third-party transmission provider protested an interconnection agreement between a generation owner and the interconnecting transmission provider, to which the third-party transmission provider was also interconnected.  The third-party transmission provider argued that the interconnection could harm reliability and unfairly impose costs on its transmission system.  The third-party transmission provider attempted to distinguish *Nevada Power* and *Nevada Power II* on the grounds that the transmission systems at issue in its case were neither distant nor remote, and were in fact located adjacent to one another.  The Commission held that those factors do not distinguish the interconnection agreement at issue from the interconnection agreement in *Nevada Power* and *Nevada Power II* and, therefore, accepted the interconnection agreement for filing.[48]

Seabrook is not holding Complainants' interconnection "hostage."  NECEC has not requested interconnection service from Seabrook, but instead is interconnecting about 100 miles away.  *Nevada Power* and *AEPSC* stand for the proposition that Seabrook cannot be compelled, as a condition of interconnection, to replace the Generation Breaker.  These cases therefore support NextEra's position.

---

[46]  *Id.* at 62,036.

[47]  *Nevada Power II*, 99 FERC ¶ 61,347, at 62,494.

[48]  *AEPSC*, 102 FERC ¶ 61,336 at PP 14-15.

Complainants further claim that the Commission has placed open access obligations on Affected Parties in order to ensure that they do not derail projects seeking to interconnect.[49] Complainants cite to *EDF Renewable Energy, Inc.*[50] to support this argument.  EDF Renewable Energy, Inc. ("EDF") filed a complaint against MISO, Southwest Power Pool, Inc. ("SPP"), and PJM Interconnection, L.L.C. ("PJM") arguing that while their tariffs and joint operating agreements already obligated each regional transmission organization ("RTO") to coordinate with the others on an affected system basis when a generator interconnection request in the host RTO has impacts on an affected system RTO, the tariffs and joint operating agreements were not sufficiently detailed regarding the coordination.  The Commission granted the complaint, in part, and held that the MISO, SPP, and PJM tariffs and joint operating agreements were unjust and unreasonable because they lacked transparency regarding the affected systems coordination processes among the RTOs.[51]

Accordingly, *EDF* does not support the Complainants' argument that Seabrook has open access obligations for its Generation Breaker, for two reasons.  First, the tariffs and joint operating agreements in question already obligated each RTO to coordinate with the others on an affected system basis.  *EDF* addressed whether the tariffs in question were adequately transparent in how they assessed affected parties, not whether open access requirements could be used to impose construction obligations on generators.  Second, if *EDF* has any relevance at all here, it shows that Complainants chose the wrong target for their ire: in substance, the Complaint faults Seabrook for the fact that the Tariff has no requirement for generators to enter into facilities agreements.  If Complainants really wished to remedy that, rather than pursue a vendetta against NextEra, the

---

[49]   Complaint at 23.

[50]   168 FERC ¶ 61,173 (2019) ("*EDF*"), *reh'g denied and clarification granted*, 171 FERC ¶ 61,071 (2020).

[51]   *EDF*, 168 FERC ¶ 61,173 at P 20.

right course of action would have been to file a complaint against the Tariff. That would have allowed the Commission to consider holistically not only whether there should be such a requirement, but also, if so, how the generator would be assured of fair treatment, for example through opportunity cost pricing, and appropriate limitations on liability.

b.    **The Tariff does not require Seabrook to enter into a facilities agreement**

Complainants claim that Seabrook is obligated as an Affected Party to enter into an "Affected System Agreement."[52]    That leaves the Commission and others to guess at Complainants' meaning. Complainants' claim that capitalized terms used but not defined in the Complaint are intended to have the meaning set forth in the Tariff, the Second Restated New England Power Pool Agreement, and the Participants Agreement.[53]    But "Affected System Agreement" is not defined in the Complaint, the Tariff, the Second Restated New England Power Pool Agreement, or the Participants Agreement. Therefore, Complainants' use of the term "Affected System Agreement" is misleading and improper. NextEra infers that this undefined term refers to the facilities agreement under negotiation between Seabrook and NECEC, because Complainants attached their version of that agreement to their Complaint as Exhibit D. However, if Complainants really meant something different, NextEra reserves its right to respond when the secret meaning of the term is revealed.

As established in the Petition, Seabrook is willing, though not obligated, to enter into a facilities agreement to undertake the Generation Breaker replacement provided that the terms

---

52    Complaint at 33-34.

53    *Id.* at 2 n. 5.

include, among other things, that Seabrook and the Joint Owners[54] recover all costs incurred but for the Generation Breaker replacement necessitated solely by the NECEC Elective Upgrade. Complainants' position, however, is based on an incorrect reading of the Tariff. Because the Complainants do not rebut and instead put this at issue again in the Complaint, we repeat the Petition's explanation of the Tariff here, and note that the Complaint fails even to attempt to rebut the explanation.

Under the Tariff, participant-funded transmission lines are defined as Elective Transmission Upgrades.[55] Elective Transmission Upgrades are voluntary transmission upgrades funded by an entity that has agreed to pay for all of the costs of the upgrade. Elective Transmission Upgrades are not identified through ISO-NE's Regional System Plan ("RSP") as being necessary for reliability or economic purposes.[56]

---

[54] Seabrook holds an 88.23% ownership interest in Seabrook Station. The remaining 11.77% of Seabrook Station is owned by the Massachusetts Municipal Wholesale Electric Company, ("MMWEC"), with an approximate 11.59% interest; Taunton Municipal Lighting Plant ("Taunton"), with an approximate 0.10% interest; and Hudson Light & Power Department ("Hudson," together, with MMWEC and Taunton, the "Joint Owners"), with an approximate 0.08% interest. Seabrook manages the Seabrook Station pursuant to its authority under the Agreement for Joint Ownership, Construction and Operation of New Hampshire Nuclear Units, dated May 1, 1973 (as amended from time to time), and the Managing Agent Operating Agreement dated June 29, 1992 (as amended).

[55] *See* OATT, Schedule 25, at § 1. Specifically, ETUs are defined as:

"a new Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is interconnecting to the Administered Transmission System, or an upgrade to an existing Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is part of or interconnected to the Administered Transmission System for which the Interconnection Customer has agreed to pay all of the costs of said Elective Transmission Upgrade and of any additions or modifications to the Administered Transmission System that are required to accommodate the Elective Transmission Upgrade."

*Id.*

[56] The RSP is a comprehensive planning report on system needs and the resource and transmission facilities needed to maintain the reliability of ISO-NE's power system, while also accounting for market efficiencies and economic and environmental considerations. *See id.*, Attachment K, at § 3.1.

Section II.47.5 of the Tariff contains provisions that provide for the study, regional review, and ISO-NE approval of Elective Transmission Upgrades.[57]  Schedule 25 of the Tariff governs the interconnection of Elective Transmission Upgrades.[58]  After an interconnection request is submitted, ISO-NE assigns a queue position and studies the request to determine whether there will be a "significant adverse effect" upon the "stability, reliability or operating characteristics" of the system.[59]  If ISO-NE determines that this standard is met for the Elective Transmission Upgrade, the proponent of the Elective Transmission Upgrade is not permitted to proceed with its plan unless it "takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect."[60]

When the adverse impact is on an "Affected System,"[61] which can include a generator, the Elective Transmission Upgrade proponent cannot build the upgrade unless it enters into a "facilities agreement" with the Affected Party[62] (the owner of the Affected System) to remediate the problem on the Affected System.[63]  Specifically, the *pro forma* Elective Transmission Upgrade Interconnection Agreement ("Elective Transmission Upgrade IA") in Schedule 25 of the Tariff,

---

[57]  *See id.*, at § II.47.5.

[58]  *See id.*, at Schedule 25.

[59]  *See* Tariff, at § I.3.9.

[60]  *Id.*, at § I.3.10.

[61]  The Tariff defines an "Affected System" as "any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection."  *See* OATT, Schedule 25, at § 1.

[62]  The Tariff defines an "Affected Party," as "the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process."  *Id.*

[63]  *See id.*, Schedule 25, Appendix 6, at Article 11.4.4.

23

**JA199**

which is entered into among the Interconnection Customer,[64] Interconnecting Transmission Owner,[65] and ISO-NE, instructs the Interconnection Customer to "enter into separate related *facilities agreements* to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection" of the Elective Transmission Upgrade.[66]

There are no rules for facilities agreements of this nature. The Tariff does not define "facilities agreement," provide a form of such an agreement, or offer any guidance as to what it must contain, other than the above-quoted language that it must "address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection" of the Elective Transmission Upgrade.[67] The Tariff also does not purport to require an Affected Party, whose Affected System is a generator, to enter into a facilities agreement, or any agreement for the construction of a generation upgrade to accommodate an Elective Transmission Upgrade. The "facilities agreement" requirement with respect to generators is found only in the Elective Transmission Upgrade IA, to which the Affected Party is not a party.[68]

Complainants claim that Seabrook is violating Section 3.2.1.1 and Section 12.1 of Schedule 25 of the Tariff by not entering into a facilities agreement.[69] Both provisions are inapposite. They

---

[64] An Elective Transmission Upgrade "Interconnection Customer" is defined as "any entity, including a transmission owner or its Affiliates or subsidiaries, that interconnects or proposes to interconnect" its Elective Transmission Upgrade with the Administered Transmission System under Schedule 25 of the OATT. *See id.*, Schedule 25, at § 1.

[65] An "Interconnecting Transmission Owner" is a Participating Transmission Owner, Merchant Transmission Owner, or Other Transmission Owner that "owns, leases or otherwise possesses an interest in the portion of the Administered Transmission System at the Point of Interconnection" and is a party to the Elective Transmission Upgrade IA. *Id.*

[66] *See id.*, Schedule 25, Appendix 6, at Article 11.4.4 (emphasis added).

[67] *See id.*

[68] *See id.*, Schedule 25, Appendix 6, at Article 1 (providing that a "Party" to the Elective Transmission Upgrade IA includes the Interconnection Customer, ISO-NE, and the Interconnecting Transmission Owner).

[69] Complaint at 28 n. 92.

24

**JA200**

apply to *Network Upgrades* of an Affected Party identified by ISO-NE as necessary for an Elective Transmission Upgrade to interconnect to the ISO-NE transmission system, and the Generation Breaker replacement is not a Network Upgrade.

Section 3.2.1.1 of the Tariff requires Affected Parties to construct Network Upgrades needed to interconnect Elective Transmission Upgrades.[70] Section 12.1 of the Tariff provides that "[t]he Interconnection Customer, Interconnecting Transmission Owner and any other Affected Party shall negotiate in good faith concerning a schedule for the construction of the Interconnecting Transmission Owner's Interconnection Facilities and the Network Upgrades."[71] Affected Systems also must use reasonable efforts in some circumstances to advance construction timetables for "the completion of Network Upgrades."[72] The Tariff defines "Network Upgrades" as "the additions, modifications, and upgrades to the New England Transmission System required at or beyond the Point of Interconnection to accommodate the interconnection of the Elective Transmission Upgrade to the Administered Transmission System."[73] The "New England Transmission System," in turn, is "the system of transmission facilities . . . within the New England Control Area under the ISO's operational jurisdiction."[74] In this case, Seabrook's Point of Interconnection is the Seabrook Substation owned by NHT. While the Seabrook Substation is under ISO-NE operational jurisdiction, neither Seabrook's ICIF nor the Generation Breaker provide network service. The

---

[70] Tariff, Schedule 25, at § 3.2.1.1.

[71] *Id.*, Schedule 25, at § 12.1.

[72] *Id.*, Schedule 25, at § 12.2.2.

[73] *Id.*, Schedule 25, at § 1. In the case of Seabrook, the Point of Interconnection is the Seabrook Substation owned by New Hampshire Transmission, LLC. The Seabrook Substation essentially abuts Seabrook Station, with approximately twenty (20) feet between the Seabrook Substation and the nuclear facility.

[74] *Id.*, § I.2.2.

upgrade to the Generation Breaker, therefore, is not a Network Upgrade. Seabrook thus does not have an obligation to upgrade the Generation Breaker under the terms of the Tariff.

### c. Seabrook did not refuse to file an unexecuted Engineering and Procurement ("E&P") Agreement

Complainants argue that Seabrook has refused to file an unexecuted E&P Agreement.[75] Complainants assert that Section 9 of Schedule 25 of the Tariff requires an Affected Party to offer an E&P Agreement to a requesting Interconnection Customer, and that the Affected Party is required to file an unexecuted E&P Agreement if the Interconnection Customer requests the Affected Party to commence immediate work under the E&P Agreement.[76]  Seabrook does not dispute that the Tariff requires an Affected Party to enter into an E&P Agreement if requested by the Interconnection Customer.  However, Complainants have not requested that Seabrook enter into an E&P Agreement.  Rather, as detailed in the Petition, the agreement currently under negotiation is a facilities agreement.  As shown by Exhibit D to the Complaint, Complainants' preferred version of the contract in dispute is clearly labelled as "Facilities Agreement for Affected System Project."[77]  In other words, this argument is a rather obvious attempt at misdirection.[78]

---

[75]  Complaint at 33.

[76]  *Id.* at 33-34.

[77]  Since Complainants ask the Commission to not make any findings in this proceeding, and instead to require NextEra to file an unexecuted facilities agreement on a later date in a new Section 205 proceeding, NextEra sees no reason to address Exhibit D.

[78]  Complainants, for example, assert that they asked for the facilities agreement, not an E&P Agreement, be filed on an unexecuted basis on July 31, 2020 – though this date proceeds by almost a full month Seabrook's receipt of Avangrid's final counterproposal. *See* Marcum Supplemental Affidavit at 4-5, 7-8.

26

Under the Tariff, E&P Agreements and facilities agreements are distinct agreements with distinct purposes.[79] An E&P Agreement is to be entered into at the option of the Interconnection Customer, and does not obligate an Affected Party to subsequently execute a facilities agreement.[80] An E&P Agreement only authorizes the engineering and procurement of long lead-time items necessary for the interconnection of an Elective Transmission Upgrade.[81] Negotiations among the parties, in contrast, have been more encompassing. As Mr. Marcum explains, on May 15, 2020, Seabrook sent a draft Agreement for Engineering and Construction for Affected System Project to Complaints, which provided for a "detailed engineering study, and following agreement with NECEC to continue the project, the procurement of material and construction" of the Generation Breaker replacement project.[82] Numerous drafts were exchanged and discussed over the next several months, with the name of the agreement ultimately being changed to Facilities Agreement for Engineering and Construction of Affected System Project to reflect the term used in Schedule 25 of the ISO-NE Tariff. In a further bit of circular misdirection, Complainants also do not ask the Commission to issue an order directing that an E&P Agreement be entered; rather, the prayer for relief focuses on the filing of an unexecuted facilities agreement – or more specifically, an "Affected System Agreement," whatever that is.

---

[79] *See* OATT, Schedule 25, Appendix 6, at Article 11.4.4 (providing for an Interconnection Customer to "enter into separate related facilities agreements to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection" of the Elective Transmission Upgrade); *id.*, Schedule 25, at § 9 (providing that an Interconnection Customer may request and "the Interconnecting Transmission Owner and any Affected Party shall offer the Interconnection Customer, an E&P Agreement that authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection").

[80] *Id.*, Schedule 25, at § 9.

[81] *Id.*

[82] Marcum Supplemental Affidavit at 3.

Complainants allege that it is common practice in New England for Affected Systems to filed unexecuted agreements when they cannot agree to the terms and conditions.[83]  Complainants point to the unexecuted agreements filed in *Boston Edison Co.*[84] and *New England Power Co.*[85] as evidence.  The unexecuted agreements at issue in *Boston Edison* and *NEPCO*, however, were under the New England Power Pool tariff and addressed upgrades to transmission facilities. Whatever the obligations those transmission owners may have had with respect to upgrading transmission facilities, the cases have no bearing on whether the Tariff requires Seabrook to file an unexecuted facilities agreement.

If Complainants now desire to enter into an E&P Agreement, Seabrook will do so, recognizing that an E&P Agreement will not address the facilities agreement contractual issues in dispute (as Complainants recognize[86]) or obligate Seabrook to enter into a facilities agreement, but instead only provide for long lead-time engineering and procurement.  It also will not change Seabrook's inability to undertake the Generation Breaker replacement project during the 2021 Outage.

3.    **This case is not about "damages" – it is about ratemaking, and recovery of opportunity costs that are a legitimate and verifiable cost of providing the requested service**

Complainants contend that Seabrook is unreasonably requesting that the Complainants reimburse Seabrook for all "indirect and consequential damages that may result from the construction of the Seabrook Breaker replacement," including lost revenues, before Seabrook

---

[83]    Complaint at 34.

[84]    *See Bos. Edison Co.*, 91 FERC ¶ 61,187 (2000) ("*Boston Edison*").

[85]    *See New England Power Co.*, 101 FERC ¶ 61,183 (2002) ("*NEPCO*").

[86]    *See* Complaint at 30 ("NextEra's requests for lost opportunity costs have nothing to do with preconstruction . . .").

upgrades the Generation Breaker.[87]    Complainants confuse the issues by misrepresenting Seabrook's request as a request for damages, as if the Petition were a suit for breach of contract, rather than a request to resolve a dispute about recovery of costs of providing the service that NECEC requests.  As Seabrook explains in the Petition, its request to recover opportunity costs is both appropriate and consistent with Commission precedent.  Nothing in the Complaint changes this, or attempts to refute it.  Accordingly, we once again repeat the explanation provided in the Petition.

Opportunity costs are, among other things, "the revenues lost or costs incurred because a utility must reduce its own off-system purchases or sales in order to overcome a constraint on the grid."[88]  Opportunity costs therefore include, in this case, lost profits, lost revenues, and forgone Pay for Performance ("PFP") bonuses through the Forward Capacity Market.[89]  All of these are "revenues lost" due to the "reduc[tion in] sales" that Seabrook must make to accommodate the NECEC Elective Upgrade.

The Tariff's limitations provision is a limitation on damages for breach of contract, not a limitation on ratemaking.  There are provisions of the Tariff that permit charging of opportunity

---

[87]  Complaint at 31.

[88]  *See Ne. Utils. Serv. Co.*, Opinion No. 364-A, 58 FERC ¶ 61,070, at 61,201 (1992) ("*NU I*"), *reh'g denied*, Opinion No. 364-B, 59 FERC ¶ 61,042 (1992), *order on reh'g*, 59 FERC ¶ 61,089 (1992), *aff'd in relevant part*, *Ne. Utils. Serv. Co. v. FERC*, 993 F.2d 937 (1st Cir. 1993) ("*NU v. FERC*"); *see also Pa. Elec. Co.*, 58 FERC ¶ 61,278, at 61,871 (1992) ("*Penelec I*") (explaining that in the context of transmission, opportunity costs are incurred "when the utility accommodates a third party's request for transmission service (*i.e.,* wheeling request) and thereby foregoes an opportunity to reduce its own costs, to the economic detriment of the utility's native load customers"), *reh'g denied*, 60 FERC ¶ 61,034 (1992) ("*Penelec II*"), *aff'd*, *Pa. Elec. Co. v. FERC*, 11 F.3d 207 (D.C. Cir. 1993).

[89]  *See PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,030 at P 19 (2004) (stating that "[a] formula purporting to provide opportunity cost compensation should be designed such that the formula as nearly as possible results in full opportunity cost (i.e., lost profits) compensation"); *RockGen Energy, LLC*, 100 FERC ¶ 61,261 at P 18 (2002) (approving recovery of "any amounts necessary to keep [the generator] whole with respect to costs or penalties incurred or revenues lost" in providing service).

costs.[90] Such charges would not be possible if the limitations provision served to limit the recovery of opportunity costs incurred in providing a service.

The Commission has long authorized recovery of opportunity costs for generators who are forced to back down output in a variety of RTO market contexts.[91] Commission precedent also supports recovery of opportunity costs in cost-of-service contexts.[92] Specifically, the Commission has held that "opportunity costs can be a valid basis for rates."[93] This is particularly true where denying recovery of opportunity costs would result in a confiscatory rate, as is the case here.[94] The fact that the opportunity costs at issue here will be recovered through a service agreement is irrelevant.[95]

---

[90]   For example, resources providing reactive power voltage support service under Schedule 2 of the OATT may be paid "Lost Opportunity Costs." See OATT, Schedule 2, at § II.A.

[91]   *See, e.g.*, *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,282 at P 17 (2016) (explaining that in PJM, generators providing reactive service are eligible to recover "lost opportunity cost credits" in order to ensure that they are adequately compensated for any lost revenues resulting from PJM's dispatch instructions); *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 at P 2 (2008) (explaining that under the MISO tariff, generators providing reactive service are eligible to recover opportunity costs associated with reducing the MW output of the generator below rated capability to produce additional reactive power), *aff'd in relevant part and vacating in part*, *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (D.C. Cir. 2011); *N.Y. Indep. Sys. Operator, Inc.*, 91 FERC ¶ 61,218 at 61,801-02 (2000) ("*NYISO*") (noting that in New York Independent System Operator, Inc. ("NYISO,"), suppliers of spinning and non-spinning reserves are compensated for their lost opportunity costs), *reh'g denied*, 97 FERC ¶ 61,155 (2001), *reh'g denied*, 99 FERC ¶ 61,125 (2002), *remanded on other grounds sub nom.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003), *order on remand*, 110 FERC ¶ 61,244 (2005), *order on reh'g*, 113 FERC ¶ 61,155 (2005).

[92]   *See, e.g.*, *Ameren Energy Mktg. Co.*, 117 FERC ¶ 61,334 at PP 15-16 (2006) ("*Ameren*") (approving proposal to include, as a component of cost based rates, lost opportunity costs related to ancillary services but setting the matter for hearing to determine the appropriate mechanism to calculate such costs); *NU I*, 58 FERC ¶ 61,070, at 61,203 (concluding that opportunity cost pricing is appropriate for firm transmission service); *Penelec*, 58 FERC ¶ 61,278, at 61,873-74 (holding that Penelec may recover opportunity costs to the extent of holding its native load customers harmless as a result of providing third-party transmission service); *New England Power Co.*, 65 FERC ¶ 61,153, at 61,757 (1993) (approving a utility's proposal to charge all transmission customers a pro rata share of average system costs, including average system opportunity costs).

[93]   *See Ameren*, 117 FERC ¶ 61,334 at P 16.

[94]   *See ISO New England, Inc.*, 120 FERC ¶ 61,087 at P 52 (2007) (recognizing that requiring an existing generating resource to offer capacity at a price less than its net risk-adjusted going forward and opportunity costs raises the possibility of confiscatory ratemaking).

[95]   *See Entergy Ark., Inc.*, 143 FERC ¶ 61,299 at P 74 (2013) (finding that the service agreements at issue appropriately compensated Entergy Arkansas's opportunity costs from lost revenues that it would otherwise have realized).

Revenues foregone to accommodate the NECEC Elective Upgrade "are an important part of Seabrook's bottom line," because Seabrook needs such revenues to cover its costs.[96]  Seabrook and the Joint Owners will incur opportunity costs in the form of: (1) lost revenues and profits from foregone power sales of the output of Seabrook Station to perform the NECEC Elective Upgrade; and (2) potential lost PFP bonus, as a result of not generating power to accommodate the NECEC Elective Upgrade.[97]  Although impossible to accurately project at this time, had an outage to replace the Generation Breaker occurred during the last Seabrook refueling outage in April 2020, Seabrook estimates that it and the Joint Owners would collectively have lost about $560,000 in lost profits and revenues for each day the outage was extended beyond the original scheduled of the planned refueling outage.[98]  In other words, to the extent a Generation Breaker replacement project causes an extended outage, these lost opportunity costs would not be incurred but for the NECEC Elective Upgrade.  Seabrook and the Joint Owners should therefore be made whole for their opportunity costs of not being able to participate in the energy market for the time it is executing a project to support an elective upgrade for a third party.

It is appropriate for Seabrook and the Joint Owners to recover any lost PFP bonus incurred as a result of the extended outage.  Seabrook and the Joint Owners would have likely earned a bonus payment of approximately $0.75 million for each hour if Seabrook Station was online operating at full power during a capacity scarcity condition in 2020.[99]  Lost PFP bonus payment costs should be borne by Complainants because, but for the replacement of the Generation Breaker

---

[96]    Marcum Petition Affidavit at 6.

[97]    *See id.* at 3-4.

[98]    *See id.* at 5-6.  Because no scarcity events occurred in the 10 days following the April 2020 refueling outage, no PFP bonus payments are included in the estimate of lost opportunity costs herein.

[99]    *Id.*

31

**JA207**

conducted solely at Complainants' request for their benefit, Seabrook Station would be online during those days, and would likely earn a PFP bonus payment.[100] Granting Seabrook's request is consistent with Commission precedent and policy and will ensure that Seabrook and the Joint Owners are fully compensated for their services. As discussed by Mr. Marcum, any PFP penalties or other costs incurred by Seabrook as a result of an extended outage likewise should be reimbursed by NECEC.[101]

Complainants' arguments to the contrary are built on false premises. Their fundamental argument is that they are entitled to force Seabrook to provide a service without reimbursing Seabrook for the legitimate costs of providing that service. This is a recipe for a confiscatory rate and must be rejected. Their insistence that Seabrook is requesting that Complainants provide for all indirect and consequential damages, before Seabrook upgrades the Generation Breaker,[102] is simply untrue; Seabrook is seeking its costs of providing service, not damages for breach of contract. This is a ratemaking dispute, not a breach of contract action.

Complainants assert that the "ISO-NE OATT does not provide for [recovery of lost revenues because] Commission precedent favors the use of *pro forma* terms in [a facilities agreement] in order for such terms to be found just and reasonable, and NextEra has not demonstrated through any study or analysis that it requires an extended outage to complete construction of the Seabrook Breaker replacement."[103] This is a non-sequitur. Commission precedent and the Tariff are different things. And of course Seabrook has not demonstrated that an extended outage is *required* to replace the Generation Breaker; Seabrook's contention is that

---

[100]  *Id.*

[101]  *Id.* at 7-8.

[102]  Complaint at 31.

[103]  *Id.*

32

**JA208**

such an extension *may be* required and, if it is, Seabrook should reasonably be compensated for revenues it loses as a result. Complainants are, once again, confusing the issues.

As an initial matter, the ISO-NE Tariff, as discussed above, does not include a *pro forma* facilities agreement; the terms and conditions of such agreements are intended to be negotiated by parties on a case-by-case basis. Complainants nonetheless cite to *Duke Electric Transmission*[104] in supposed support of this argument, claiming that it supports the proposition that *pro forma* terms are preferred in a facilities agreement. But hat case is plainly distinguishable from the present situation. In *Duke*, the affected system agreement was between a transmission-owner affected party and an electric cooperative that was interconnecting new generating facilities to a neighboring transmission system. Therefore, modeling the affected system agreement off of the *pro forma* Large Generator Interconnection Agreement and treating Duke as a transmission owner thereunder made sense in that context. In contrast, it makes no sense to treat Seabrook, a generator, as a transmission owner here. Generators have opportunity costs when they do not run, and those costs must be recognized.

Further, Complainants fail to point out that in Order No. 845, the Commission declined to take action related to affected systems, explaining that in April 2018 Commission staff convened a technical conference in Docket No. AD18-8-000 to explore, among other things, issues related to the coordination of affected systems.[105] The Commission has not since adopted any generally applicable rules.

---

[104] *Duke Elec. Transmission*, 113 FERC ¶ 61,139 at P 17 (2005) ("*Duke*").

[105] *Reform of Generator Interconnection Procedures & Agreements*, Order No. 845, 163 FERC ¶ 61,043 at P 341. (2018) ("Order No. 845").

Complainants also state that in Order No. 2003 the Commission denied recovery of a transmission provider's interconnection-related outage costs in part because the proposed methods of recovery were vague, left "too much discretion" to the transmission provider, and did not "provide for adequate regulatory oversight by the Commission."[106]  However, Complainants fail to acknowledge that Seabrook's proposed formula rate template filed with the Petition – and now included in this docket as well[107] – already cures these concerns.  To be sure, Complainants' witness, Thorn Dickinson, asserts that in an August 19, 2020 counterproposal, NextEra sought NECEC's acknowledgment that Seabrook was seeking to shorten the duration of Seabrook Station's planned 2023 Outage, and that NextEra had yet to provide an explanation for this proposal.[108]  But this assertion merely highlights the fact that Mr. Dickinson was not present for *any* negotiations.  It is true that NextEra's nuclear fleet "continuously seeks to optimize and shorten the schedules for its refueling outages in order to minimize the time during which its generators are offline."[109]  But as Mr. Marcum explains, in a conference call with NECEC on September 4, 2020, Seabrook conceded that that any ongoing effort to shorten the outage schedule beyond the one currently proposed would make it difficult to calculate lost opportunity costs and agreed to delete the provision.[110]  Had there been a disagreement on this point, Seabrook would have included this dispute in its Petition.

---

[106] Standardization of Generator Interconnection Agreements & Procedures, Order No. 2003, 104 FERC ¶ 61,103 at P 714. (2003) ("Order No. 2003").

[107] *See* Marcum Petition Affidavit at 8-11.

[108] Dickinson Affidavit at ¶ 81.

[109] *See* Marcum Supplemental Affidavit at 8.

[110] *Id.* at 5.

Additionally, the Commission's other reasons for denying interconnection-related outage cost recovery in Order No. 2003 were because "outages of transmission and generation facilities for maintenance and other purposes are a routine part of electric system operations and, in fairness, these costs also should be considered a normal part of doing business."[111]  An extended outage of a nuclear facility caused to make a substantial generator breaker modification that carries enterprise risk[112] in order to accommodate someone else's Elective Transmission Upgrade is hardly an ordinary part of doing business or a routine part of operation.

Moreover, there is a substantial difference between the secondary effect of transmission system outages discussed in Order No. 2003, and the direct effect on Seabrook of requesting that Seabrook undergo an outage to replace its Generation Breaker.  Seabrook will be providing a service, and under the FPA, it must be fully compensated for providing that service.  A generator that undergoes an outage as a consequence of an outage on the interconnected transmission system is not providing a service; it is suffering consequential damages.  One scenario has nothing to do with the other.

Finally, even if the dollars at issue were damages, rather than a normal cost of providing the service, there is no bar to recovery here.  Seabrook will not be a party to NECEC's interconnection agreement, and so is not bound by its damages limitation.  Seabrook instead will

---

[111]  Order No. 2003 at P 715.

[112]  *See* McCartney Petition Affidavit at 6; White Paper at 1.

enter into a separate facilities agreement, and such a separate agreement is not required to contain a bar on the recovery of consequential damages.[113]

### 4.    Legal fees are appropriate in this cost of service setting

Complainants argue that Seabrook's request for recovery of legal fees is "obstructionist" and contrary to the Tariff and Commission precedent.[114]    Complainants' argument fails to acknowledge that the instant dispute concerns services that will be provided on a cost-of-service basis.  As such, Seabrook's proposed recovery of legal fees is appropriate.  Seabrook has already placed this issue squarely before the Commission in the Petition, but once again is forced to repeat its unrebutted argument.

The Commission's longstanding precedent is that regulated utilities "are entitled to recover their reasonably incurred rate litigation costs" as a legitimate cost of rendering public utility service.[115]  The general rule is that "[r]ate case expenses should be collected in the rates that result from the proceedings in connection with which they were incurred."[116]  Courts have taken "a somewhat broad view of which litigation costs entities regulated under rate-of-return ratemaking should be permitted to recover."[117]

---

[113]  Order No. 2003, 104 FERC ¶ 61,103 at P 906 (stating that parties "remain liable for . . . any damages for which a Party may be liable to the other Party under another agreement"); *see also S. Cal. Edison Co.*, 151 FERC ¶ 61,273 at PP 24-26 (2015) (holding that the ban on recovery of lost profits and revenues for breach of the LGIA "does not shield an LGIA party from damages properly awarded by a court for a breach of a separate agreement between the parties").

[114]  Complaint at 32-33.

[115]  *See Potomac-Appalachian Transmission Highline, LLC*, Opinion No. 554, are at P 135 (2017), *order on reh'g*, Opinion No. 554-A, 170 FERC ¶ 61,050 (2020).

[116]  *Pub. Serv. Co. of N.M.*, Opinion No. 133, 17 FERC ¶ 61,123, at 61,251 (1981) (citing *Ala.-Tenn. Nat. Gas Co.*, 11 FPC 75, 82-83 (1952) and *Sierra Pac. Power Co.*, 53 FPC 1795, 1805 (1975)), *order on reh'g*, Opinion No. 133-A, 18 FERC ¶ 61,036 (1982), *order on reh'g*, Opinion No. 133-B, 21 FERC ¶ 61,215 (1982), *aff'd in relevant part*, *Pub. Serv. Co. of N.M.* v. FERC, 832 F.2d 1201 (10th Cir. 1987).

[117]  *See BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1296 (D.C. Cir. 2004).

The services requested here by NECEC will be provided on a cost-of-service basis. Therefore, the legal costs incurred by Seabrook in advocating and defending its rights to collect the cost of service for Seabrook Station are equivalent to costs incurred in ratemaking proceedings.[118] These include costs of both internal and external counsel incurred to negotiate the agreement with Complainants; costs to bring the Petition and the legal costs associated with any other action needed to resolve rate disputes; costs to prepare contracts to procure and install the Generation Breaker; and costs to defend any challenge related to the work. As such, it would be contrary to general ratemaking principles and public policy to deny Seabrook recovery of the legal costs incurred to accommodate the NECEC Elective Upgrade.

Further, even though the Tariff does not address the scope of a facilities agreement, the Tariff does permit the recovery of legal fees. For example, transmission providers in ISO-NE are permitted to collect legal costs booked to Account 928 as part of the revenue requirements

---

[118] *See SFPP, L.P.*, Opinion No. 435-A, 91 FERC ¶ 61,135, at 61,512 (2000) ("Litigation related to the pipeline's cost of service and the structure of its tariff are part of its normal, ongoing operations, and such costs are recoverable as part of the pipeline's cost of service."), *aff'd in relevant part and vacated in part*, *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263 (D.C. Cir. 2004).

37

**JA213**

collected under the Tariff.[119]  Such charges would not be possible if Complainants' reading of the law were correct.  Moreover, Complainants' reliance on Section 9 of Schedule 25 and Section II.47.4 of the Tariff to support their position is unavailing.  Neither governs recovery of legal costs in facilities agreements.

### 5.    Complainants now appear to concede that a contractual limitation on liability is appropriate

Complainants previously have argued that Seabrook is inappropriately requesting that they reimburse Seabrook for all indirect and consequential damages that may result from upgrading the Generation Breaker,[120] and previously sought to have the provision removed from the facilities agreement.  As explained in Mr. Marcum's Supplemental Affidavit, NECEC in its August 27, 2020 counterproposal stated that because Seabrook could not undertake the Generation Breaker replacement in the 2021 outage, it objected to a provision in the draft agreement preventing Seabrook from being liable for consequential damages and lost profits (e.g., delay damages) to

---

[119]  The revenue requirements for the transmission-owning utilities in ISO-NE are determined through a formula rate set forth in Attachment F to the OATT. See OATT, at Attachment F. The formula rate provides that the revenue requirement for each transmission owner shall include Transmission Related Administrative and General ("A&G") Expenses. *Id.* "Transmission Related A&G Expenses" equals the sum of the transmission owner's (1) A&G expenses, multiplied by the Transmission Wages and Salaries Allocation Factor, (2) Property Insurance multiplied by the Transmission Plant Allocation Factor, and (3) Expenses included in Account 928 (excluding Merger-Related Costs included in Account 928) related to FERC Assessments multiplied by Plant Allocation Factor, plus any other Federal and State transmission related expenses or assessments, plus specific transmission related expenses included in Account 930.1 plus Transmission Merger-Related Costs. *Id.*, Attachment F Implementation Rule, at § II.H. Therefore, the formula rate includes expenses included in Account 928. Account 928 (Regulatory Commission Expenses) includes "all expenses . . . incurred by the utility in connection with formal cases before regulatory commissions, or other regulatory bodies, or cases in which such a body is a party." 18 C.F.R. pt. 101, Account 928 (2020). Expenses recorded in Account 928 include "[s]alaries, fees, retainers, and expenses of counsel, solicitors, attorneys, accountants, engineers, clerks, attendants, witnesses, and others engaged in the prosecution of, or defense against petitions or complaints presented to regulatory bodies." *Id.*; *see also Ameren Ill. Co.*, 170 FERC ¶ 61,267 at P 71 (2020) ("[E]xpenses associated with responding to and defense against formal challenges and expenses incurred in connection with other formal cases before a regulatory body would fall within the instructions of Account 928, and those expenses should therefore be recorded to Account 928.").

[120]  Complaint at 31.

NECEC.[121]  Now, Complainants position has apparently evolved based on its proposed facilities agreement (Exhibit D to the Complaint), which contains such a provision.  Assuming that Complainants take the same position in the Petition proceeding, that will narrow the few contractual issues remaining in dispute between Seabrook and NECEC even further.

6.    **"Good Utility Practice" should be measured by the standards of the nuclear industry**

Complainants take issue with the fact that Seabrook, a nuclear generator, believes that "Good Utility Practice" should be defined in terms of the practices of the nuclear power industry.[122] They claim that Seabrook's proposed definition of term is arbitrarily limiting[123] and argue instead for a standard applicable to the "'electric utility industry' more generally."[124]  Again, this issue was fully joined in the Petition, and again, we are forced to repeat our unrebutted argument.

Complainants' desired definition of "Good Utility Practice" disregards important safety protocols for nuclear power plants and, therefore, should not be adopted in any facilities agreement to upgrade the Generation Breaker, which is housed inside the power block of a nuclear generating station.  In the case of a nuclear refueling outage and the Generation Breaker replacement, relying on the standards and practices of the electric industry as a whole is misplaced.

Regardless, Seabrook has already placed this issue squarely before the Commission in the Petition.  There, Mr. McCartney explained that Seabrook Station remains subject to Nuclear Regulatory Commission ("NRC") requirements and Institute of Nuclear Power Operations

---

[121]   Marcum Supplemental Affidavit at 5; *see* Exhibit 3 (the August 27, 2020 counterproposal).

[122]   *See* Complaint at 17.

[123]   *Id.* at 17.

[124]   Dickinson Affidavit at P 73.

39

("INPO") guidelines and, as such, the Generation Breaker replacement project itself should not be subject to an inapplicable standard.[125]  Given Complainants' objection to use of a term as it relates to the nuclear industry, Seabrook is concerned that Complainants intend to use an inapplicable standard to attempt to argue that any extended outage was overlong or otherwise improperly conducted, even if all work in the outage was done in accordance with the actually applicable nuclear industry standards.

The Commission should reject Complainants' attempts to dismiss important safety protocols for a nuclear power plant, which have been in place for years and are standard for the industry, which simply highlight their lack of nuclear energy expertise.  Seabrook's performance of the Generation Breaker replacement should be evaluated solely by reference to the standards used to conduct that replacement.  As Mr. McCartney explains, replacing a generation breaker at a nuclear plant is not like replacing a generation breaker at a fossil plant.[126]  Indeed, this very replacement will be subject to after-the-fact review by INPO, using INPO's guidance.[127]  And, NextEra's internal nuclear fleet procedures were developed to implement that guidance.  Mr. Weber, an independent expert with a long history in the nuclear industry, validates Seabrook's reliance on INPO guidance and rebuts Complainants' critique of NextEra's reliance on supposedly "aspirational" goals.[128]  Given this context, Seabrook's unwillingness to enter into a contract that uses an inapplicable standard to evaluate its performance is reasonable.

---

[125]  *See* McCartney Petition Affidavit at 8; *Essential Reliability Servs. & the Evolving Bulk-Power Sys.—Primary Frequency Response*, Order No. 842, 162 FERC ¶ 61,128 at P 202 (2018) (exempting nuclear generating facilities from certain interconnection requirements "due to the[ir] unique regulatory and technical requirements"), *order on clarification and reh'g*, 164 FERC ¶ 61,135 (2018).

[126]  *See* McCartney Petition Affidavit at 7.

[127]  *Id.*

[128]  *See* Weber Affidavit at 4-7.

The Commission should reject Complainants denigration of NextEra's procedures adopted to implement INPO guidance as nothing more than "aspirational corporate goals."[129]  As the Commission has recognized, "[a]ll U.S. utilities that operate commercial nuclear power plants are members of the INPO."[130]  Further, the Commission has acknowledged that INPO's "mission" as a technical organization "is to promote the highest levels of safety and reliability, [and] it performs this function not to supplant the regulatory role of the NRC, but to provide the means whereby the industry itself can, acting collectively, make its nuclear operations safer."[131]  It would be an error to dismiss NextEra's procedures adopted to implement INPO guidance on the ground that Complainants, supported by no nuclear energy expertise, casually disagree with the very guidance adopted by the nuclear industry as a whole for the purpose of ensuring safe and reliable operations.

## 7.      Independent analysis verifies that the Outage cannot take place in 2021

Complainants allege that NextEra has refused to agree to a specific timeline or milestones for scheduling and completing the Seabrook Breaker.[132]  According to Complainants, NextEra's evidence and analysis regarding the potential timing for completing the Breaker Project "is self-serving and simply not credible."[133]  Complainants state that it is Avangrid's "belief" based on "its 'transmission operations and planning experience,' that Seabrook has more than enough time to perform engineering and pre-construction work, and to order the necessary equipment prior to the

---

[129]  Complaint at 26.

[130]  *See Rules Concerning Certification of the Electric Reliability Organization; and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*, Docket No. RM05-30-000 at P 73 (2005).

[131]  *Enforcement of Stats., Orders, Rules, & Regulations*, 132 FERC ¶ 61,216 at P 91 (2010).

[132]  Complaint at 26.

[133]  *Id.*

[p]lanned 2021 Outage."[134]   Avangrid asserts that the work required to construct the Seabrook Breaker replacement should last a week, and no more than two weeks, which would be well within the planned 2021 Outage window.[135]

Complainants do not support their "belief" with any nuclear power plant equipment replacement "experience" because they do not have any.  Given the Complainants' baseless implication that NextEra's witness on the timing of the Generation Breaker replacement project, Mr. McCartney, is not credible, NextEra has consulted with an outside expert with unquestionable credentials.  Specifically, NextEra has attached to this Answer the affidavit of Mr. Weber, a retired utility executive who has held nearly every operational position within the U.S. nuclear power industry – from an entry-level position to the Chief Nuclear Officer of AEP.  Mr. Weber has led dozens of refueling and maintenance outages in his 38-year career, and led and participated in several nuclear plant performance assessments in the U.S. and abroad.

In 2013, Mr. Weber was named "Nuclear Professional of the Year" by the North American Information System on Occupational Exposure.  This was because of "his involvement in the U.S. nuclear industry's response to the accident at the Fukushima plant in Japan, and for several significant accomplishments at USA member Cook Nuclear Plant associated with radiation protection and exposure reduction."[136]  And when he retired in 2016, The College of Engineering at the University of Illinois at Champaign-Urbana announced a brand new addition to its

---

[134]  *Id.* (citing Dickinson Affidavit at P 63).

[135]  Complaint at 30.

[136]  *See* Bill Schalk, *Cook Plant's Weber Named 2013 Nuclear Professional of the Year*, Utilities Service Alliance, (Jan. 21, 2014), https://www.usainc.org/cook-plants-weber-named-2013-nuclear-professional-of-the-year/.

Department of Nuclear, Plasma and Radiological Engineering: the Larry Weber Center of Nuclear Safety Excellence.[137]

The affidavit of Mr. Weber documents an independent feasibility review he performed of the proposed replacement of the Seabrook Generation Breaker during the next scheduled refueling and maintenance outage in October of 2021.[138]  Mr. Weber concludes that a two-week time period for completion of the Generation Breaker replacement is simply not realistic.  He reasons that replacement of the Generation Breaker is "extremely complicated" for a number of reasons, including that:

> the Project will be executed inside the power block of a nuclear power plant with significantly higher standards and requirements in all aspects of engineering, work control, security, and operations when compared with the requirements that would apply to work in an open-air substation. There are tight physical clearances involved in an indoor project, which as explained in the White Paper occupies approximately 700 square feet on the Turbine Generation Building's mezzanine deck, and therefore lifting and rigging an approximately 32,000-pound breaker becomes extremely complicated.  For these and many other reasons this Project has many more complications, increased risk, and reduced margin for error, which significantly increases the complexity of planning and execution for the Project.[139]

Mr. Weber states also that replacement of the Generation Breaker will be subject to stringent performance standards imposed by the NRC and promulgated by INPO.  He explains that these standards were developed in response to actual nuclear industry events where owners experienced severe difficultly in the execution of major outage projects.  Therefore, compliance with these standards is a both a legitimate concern and crucial for the safe operation of the Seabrook Station.  As Mr. Weber concludes: "it is my view that executing the Project during the October 2021 outage would create a high potential of an event that causes personal injury and property damage that

---

[137] https://aepretirees.com/2016/01/27/weber-honored-for-his-lifetime-efforts-in-nuclear-safety-excellence/

[138] Weber Affidavit at 1.

[139] *Id.* at 4.

delays the timely return of the plant to service."[140]  In sum, Avangrid's baseless projection should be rejected, as replacing the Generation Breaker located inside Seabrook Station has little in common with replacing a breaker in an open substation of a fossil plant.

### 8.    Seabrook did not change modeling assumptions to affect the replacement of the Generation Breaker

Complainants assert that the replacement of the Generation Breaker is only required due to unreasonable assumptions.  According to Mr. Dickinson, the ASPEN model used prior to 2016 included only one emergency diesel generator running with the other turned off.  However, the RLC Engineering model relied upon by ISO-NE in modeling the NECEC Elective Upgrade models both of Seabrook Station's emergency diesel generators in simultaneous operation.  According to Mr. Dickinson, this assumption is unreasonable because "there is no realistic operations scenario where both emergency diesel generators at Seabrook Station would be in simultaneous operation otherwise."[141]  Mr. Dickinson concludes that "[b]ut for the simultaneous of both emergency diesel generators when the NECEC Project is modeled in-service, the Seabrook Breaker would not exceed its rating and require and uprate or replacement."[142]

As Seabrook explained to Avangrid in a May 7, 2020 response, the modeling of simultaneous operation of both emergency diesel generators is required by NRC regulations.  10 C.F.R. § 50, App. A, GDC 17 ("GDC 17") requires, in relevant part, that: "[e]lectric power from the transmission network to the onsite electric distributions system shall be supplied by two physically independent circuits."[143]  As Mr. McCartney explains, as a reasonable and conservative

---

[140]  *Id.* at 7.

[141]  Dickinson Affidavit at P 52.

[142]  *Id.*

[143]  10 C.F.R. § 50, App. A, GDC 17 (2020).

44

**JA220**

assumption to ensure compliance with GDC 17, Seabrook Station's design basis, as documented in Seabrook Calculation 9763-3-ED-00-01-F, considers both emergency diesel generators connected to the station buses in the determination of the station contribution of short circuit fault currents to the Generation Breaker.[144]  The need for inclusion of both emergency diesel generators being connected to the station buses arises, as follows.  Should a fault occurs between the generator and the Generation Breaker, the Generation Breaker opens to "clear" the fault, and preserve the first offsite circuit from the Unit Auxiliary Transformers.[145]  However, if the magnitude of the fault current exceeds the Generation Breaker's rating and prevents the Generation Breaker from opening, the "back up" breaker protection circuits actuate and trip open switchyard breakers 11 and 12.[146]  This results in a loss of one path (first circuit) of offsite power from the switchyard, leaving only the path from the Reserve Auxiliary Transformers ("RATs") available for offsite power.  Should power also not be available from the RATs, this would result in a loss of offsite power to the station emergency buses.[147]  Seabrook Station's emergency diesel generators would then start and connect to power the emergency buses and associated nuclear safety equipment.[148]  Mr. McCartney also noted that the need for modelling actuation of both emergency diesel generators can also be demonstrated by the recent experience of NextEra Seabrook's affiliate, NextEra Energy Duane Arnold, LLC ("DAEC").[149]  DAEC's nuclear power plant lost offsite power on both trains during a Derecho storm in August 2020.[150]  Both of DAEC's

---

[144] *See* McCartney Supplemental Affidavit at 4.

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] *Id.*

[149] *Id.* at 5.

[150] *Id.*

emergency diesel generators started and safely provided power to operate the power the emergency buses and associated nuclear safety equipment.[151]

Seabrook Station has not changed its modeling assumptions. Seabrook Station sought to have the ISO-NE approach amended, when the ISO-NE calculations failed to align with the expected results from Seabrook Station's modelling.[152] Prior to 2016, none of the studies performed by ISO-NE identified the modeling error, most likely because the projects were small in comparison to the Northern Pass project which brought the error to light.[153]

### C. Each form of relief requested by Complainants is either moot, unnecessary, or otherwise unjustified

Complainants request that the Commission issue an initial order on an expedited basis, and then, following further fact-finding, issue a subsequent order on the remaining issues. They request that in the initial order the Commission:

1. Order NextEra to comply with its interconnection obligations as Affected Parties and/or Affected Systems under the Tariff;
2. Direct NextEra to "cease and desist" all attempts to "block, delay or unreasonably increase the costs" associated with the interconnection of the NECEC Elective Upgrade;
3. Determine that NextEra's refusal to file the "Affected System Agreement" unexecuted is unjust and unreasonable and direct NextEra to file said document within 10 days of the Commission's order, including any justification for any deviations from the Tariff pro forma terms and conditions;
4. Temporarily revoke NextEra's blanket waiver under Part 358 of the Commission's regulations pertaining to Standards of Conduct; and
5. Initiate an enforcement investigation *and* discovery and require NextEra to preserve and provide documents related to the interconnection of the NECEC Elective Upgrade.

None of these requested forms of relief are necessary or justified. The Commission should deny each of Complainants' requests for the following reasons.

---

[151]  *Id.*

[152]  *Id.* at 4.

[153]  *Id.* at 4-5.

46

**JA222**

1.    **An order requiring "Compliance" is unnecessary due to the Petition and the fact that Seabrook is already in full compliance with applicable requirements**

Complainants request that the Commission issue an order requiring Seabrook to comply with its interconnection obligations as an Affected Party and/or Affected System under the Tariff. This request is entirely unnecessary because Seabrook is already in full compliance with its interconnection requirements and all Tariff requirements, as discussed above. Further, the issues raised in the Complaint on the limited number of contractual provisions actually in dispute are already before the Commission in Seabrook's Petition. If the Petition is granted, a compliance order is unnecessary. If Seabrook is wrong about the issues it has asked the Commission to address in the Petition, it will of course govern itself accordingly.

2.    **Complainants request for a "cease and desist" order is unjustified**

Complainants ask that the Commission direct NextEra to "cease and desist all attempts to block, delay or unreasonably increase the costs associated with the interconnection of the NECEC Project to the ISO-NE Administered Transmission System."[154] There is no justification for such an order. To the contrary, NextEra has negotiated with the Complainants in good faith, and Seabrook filed the Petition in an effort to resolve the outstanding issues between the parties.

a.    **NextEra is entitled to exercise its First Amendment rights**

Complainants mostly point to NextEra's opposition to the NECEC Elective Upgrade in other jurisdictions to support its claim that NextEra has directed Seabrook to interfere with the NECEC Elective Upgrade's interconnection.[155] NextEra's exercise of its legal, petitioning, and free speech rights in other jurisdictions is an improper basis for ordering Seabrook to refrain from

---

[154] Complaint at 41.

[155] *Id.* at 34.

doing anything, especially given Seabrook's good faith filing of the Petition and bringing the few actual contractual disputes between the parties to the Commission for resolution. If the purpose of the request is to ask the Commission to somehow enjoin any further exercise of NextEra's First Amendment rights to petition or to exercise freedom of speech in opposing the NECEC project, Complainants offer no legal basis for such a prior restraint.

The First Amendment guarantees the right to "petition the Government for a redress of grievances."[156] For example, under the *Noerr-Pennington* doctrine, which construes the First Amendment right to petition in the context of antitrust law, petitioning activity is immune from liability regardless of intent or purpose.[157] The First Amendment petitioning immunity adopted in *Noerr-Pennington* extends to all branches of government: legislative, executive (including administrative), and judicial.[158] Although originally developed in the antitrust context, the courts have applied the *Noerr-Pennington* immunity doctrine to a wide variety of claims impacting the First Amendment right to petition.[159] Importantly, First Amendment protections

---

[156] U.S. CONST. amend. I.

[157] *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

[158] *See Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

[159] *See Or. Nat. Res. Council v. Mohla*, 944 F.2d 531, 533-34 (9th Cir. 1991) ("*Oregon*") (stating that *Noerr-Pennington* protection has been expanded "to preclude claims other than those brought under the antitrust laws"); *Video Int'l ,Prod., Inc. v. Warner-Amex Cable Comms., Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) (stating that "[a]lthough the *Noerr-Pennington* doctrine initially arose in the antitrust field, other circuits have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws"); *see, e.g.*, *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003) (explaining that "although originally developed in the antitrust context, the [*Noerr-Pennington*] doctrine has now universally been applied to business torts"); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128-29 (3d Cir. 1999) (applying *Noerr-Pennington* to provide immunity from tortious interference and unfair competition claims); *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 299 (6th Cir. 1992) (applying *Noerr-Pennington* to a cause of action arising under a federal civil rights law); *Oregon*, 944 F.2d at 533-34 (applying *Noerr-Pennington* immunity to abuse of process and interference with business relations claims); *Hufsmith v. Weaver*, 817 F.2d 455, 458-59 (8th Cir. 1987) (holding that *Noerr-Pennington* doctrine immunizes tortious interference with business claims); *Havoco of ,Am., Ltd. v. Hollobow*, 702 F.2d 643, 649 (7th Cir. 1983) (applying *Noerr-Pennington* to claims of tortious interference with business relationships).

48

**JA224**

extend not only to direct corporate speech but also to contributions to other organizations for the purpose of facilitating speech.[160]

NextEra's efforts against the NECEC Elective Upgrade are not secret. The simple fact is that that opposition has nothing to do with the limited set of contractual issues presently before the Commission, which is primarily about who pays for certain costs associated with the NECEC Elective Upgrade. As Seabrook explained in its Petition, NextEra and its subsidiaries that operate or are developing projects in the states of Massachusetts and Maine have been actively involved in litigation and other efforts concerning the NECEC Elective Upgrade. In Maine, for example, the NextEra's subsidiaries litigated before the Maine Public Utilities Commission and Department of Environmental Protection and in Maine's appellate courts that the NECEC Elective Upgrade did not comport with Maine's renewable generation and transmission siting statutes. In Massachusetts, the NextEra subsidiaries litigated before the Department of Public Utilities and the Supreme Judicial Court that the power purchase agreements with Hydro Quebec for hydroelectric energy generation were inconsistent with the statutory mandates of Massachusetts renewable solicitation.

Seabrook made clear that its Petition is unrelated to these efforts.

Complainants allege that NextEra has operated through "shadow organizations" in an attempt to frustrate and prevent development and construction of the NECEC Elective Upgrade.[161] However, NextEra's exercise of free speech in supporting any such group is not a basis for concluding that Seabrook acted wrongfully in the separate matter of the facilities agreement. The

---

[160] *See Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (holding that a ban on corporate-funded independent expenditures violated the First Amendment because it was a ban on speech).

[161] Complaint at 10. NextEra does not believe that Complainants' unsupported innuendo deigns a response, though NextEra denies the scope of activities alleged by Complainants to have been undertaken by NextEra.

suggestion that NextEra would undertake unlawful activity merely because such activity could compliment lawful activity is entirely unfounded.

> **b.  Seabrook is not blocking, delaying, or unreasonably increasing the costs associated with the interconnection of the NECEC Elective Upgrade**

Complainants also claim that Seabrook is exploiting its status as an Affected Party in order to block, delay, or unreasonably increase the costs associated with the interconnection of the NECEC Elective Upgrade.[162]  Complainants allege that Seabrook has known for decades that the Generation Breaker would eventually need to be upgraded, yet has not remedied the issue.[163] Further, Complaints assert that FPLE Wyman and FPLE Wyman IV delayed the execution of the agreements needed to study the sub-synchronous torsional interaction ("SSTI") between the NECEC Elective Upgrade and Yarmouth units 3 and 4 ("SSTI Study Agreements").[164]

This claim is baseless.  Seabrook's Petition demonstrates that it is attempting to resolve the outstanding disputes between the parties, not block the NECEC Elective Upgrade's access to the ISO-NE transmission system.  Moreover, in recent discussions, *Complainants* repeatedly *accused* NextEra of seeking to tie the settlement of issues in other jurisdictions to terms and conditions for completing the Generation Breaker replacement project.  NextEra emphatically denied this was the case.

As explained in Seabrook's Petition, Complainants and Seabrook agree that Complainants should pay the equipment engineering, procurement, removal, and installation costs that will be incurred to replace the Generation Breaker.  However, after good faith negotiations, the parties

---

[162]  *Id.* at 20-21.

[163]  *Id.* at 14-15.

[164]  *Id.* at 13, 25 n. 82.  NECEC entered into the SSTI Study Agreements with Wyman and Wyman IV to facilitate the sharing of data to be used in the SSTI study.

have been unable to resolve certain issues.  As Mr. Marcum explains, the negotiation has been a two way street, involving give and take from both parties.[165]  There is nothing obstructionist about this.  Contrary to Complainants' assertions otherwise, Seabrook filed the Petition in an effort to resolve the outstanding issues between the parties.  Seabrook did not file the Petition to delay the interconnection of the NECEC Elective Upgrade.  Nor has Seabrook in fact delayed the NECEC Elective Upgrade:  Complainants have themselves revised the in-service date for the NECEC Elective Upgrade until May 31, 2023 – that is, *after* Seabrook's planned 2023 outage.[166]  Additionally, Seabrook has made clear that it is not refusing to enter into a facilities agreement to replace the Generation Breaker, but rather that in doing so, it would insist on being made whole and having limits to its liabilities, as is its fundamental right under the FPA.  While the Complaint includes a great deal of hand-waving, there is little substance – highlighted by Complainants' request that the Commission make no factual findings.

Relatedly, Complainants contend that Seabrook "knew" the Generation Breaker would have to be upgraded from past studies and yet did nothing.  This, of course, ignores that the only reason Seabrook now has to replace the Generation Breaker is due to Complainants.  Knowing that something may need to be replaced if there is a further interconnection happens all the time, including to Complainants.  Take CMP, for example, a utility owned by Avangrid.  A system impact study may show that transmission lines will be overloaded with the interconnection of a new generator.  But if that generator as a result of costs chooses not to go forward, there is no requirement for CMP to replace its transmission lines when there is no reliability need but for the

---

[165]  *See* Marcum Supplemental Affidavit at 7.

[166]  Complaint at 4; Dickinson Affidavit at PP 4, 61.  As explained in the Petition, subject to the completion of an engineering study that may affect the timing of the Generation Breaker replacement upgrade, Seabrook could seek to complete the upgrade during the 2023 Outage.

interconnection of a new hypothetical generator.  Complainants seem to think a generator breaker used solely to serve a nuclear generation facility should be treated differently in this respect, but they provide no rationale for why this should be the case.  There was simply no reason or plan to upgrade the Generation Breaker until Complainants made it a necessity.  Accordingly, Complainants' assertions that Seabrook is using its status as an Affected Party to derail the interconnection of the NECEC Elective Upgrade are false and misleading.

Complainants also claim that, in addition to delaying the Generation Breaker replacement, FPLE Wyman and FPLE Wyman IV unreasonably delayed the execution of the SSTI Study Agreements.[167]  Specifically, Complainants claim that despite the fact that no material terms were disputed, FPLE Wyman and FPLE Wyman IV delayed the execution of the SSTI Study Agreements for six months.[168]  As Mr. Marcum explains, during negotiations, Complainants made it clear that there was no rush to complete the agreement because it was not part of NECEC's "critical path."[169]  This may be because NECEC is only required by the agreements to complete the study by August 31, 2021, almost two years before the NECEC in-service date.  Complainants acknowledge that FPLE Wyman and FPLE Wyman IV executed the SSTI Study Agreements on October 13, 2020, but state that they are concerned that FPLE Wyman and FPLE Wyman IV may be motivated to further delay the sharing of information needed to complete the SSTI study,[170] and the timely interconnection of the NECEC Elective Upgrade.[171]  Although FPLE Wyman and FPLE Wyman IV intend to provide any requested information for the study, neither SSTI Agreement has

---

[167]  Complaint at 13, 25 n. 82.

[168]  *Id.* at 13; Dickinson Affidavit at P 86.

[169]  Marcum Supplemental Affidavit at 8.

[170]  Complaint at 25 n. 82.

[171]  Dickinson Affidavit at P 88.

any provision requiring (or even asking) them to do so, as NECEC is certainly aware that such information also can be provided by ISO-NE. This is a bizarrely speculative accusation to make in a filing occurring after FPLE Wyman and FPLE Wyman IV delivered the executed SSTI Study Agreements.

### 3. There is no need for an order requiring that Seabrook file an agreement because this issue will be resolved by the Petition proceeding

Complainants ask the Commission to order Seabrook to "file the Affected System Agreement within 10 days of the Commission's order, including any justification for any deviations from the ISO-NE pro forma terms and conditions."[172] Complainants have advanced no valid legal theory for such an order, as discussed above. But in any event, there is no need for such an order. Seabrook has already put the contractual issues in dispute before the Commission in the Petition. Those issues should be resolved in that proceeding.

### 4. The request to revoke waiver of the Standards of Conduct makes no sense

Turning again to the false premise that the Generation Breaker is ICIF, Complainants ask the Commission to temporarily revoke NextEra's waiver of the Standards of Conduct because "NextEra is abusing this waiver by using its Seabrook ICIF to discriminate against the NECEC Project by declining to work in good faith and to use Reasonable Efforts for the precise purpose of interfering with the interconnection of the NECEC Project rather than to schedule and construct the Seabrook Breaker replacement that is required."[173] Complainants also speculate that:

> Seabrook's transmission function employees have conveyed information about scheduled outages and operations relating to Seabrook's ICIF to other NextEra and Seabrook employees involved in the merchant function, including NextEra's executives and other non-conduit employees. Following receipt of this confidential

---

[172] Complaint at 2.

[173] *Id.* at 2, 37-40.

53

transmission information, it appears that NextEra has directed these Seabrook employees to alter their transmission planning and operational decisions in order to impair NECEC Transmission's ability to interconnect the NECEC Project to ISO-NE's Administered Transmission System.[174]

This argument is so far wide off the mark it is difficult to know how to make enough sense of it to be able to respond. It posits that a generator breaker in the middle of a nuclear power plant is a transmission facility, and that as a result, employees tasked with marketing the output of the generation facility cannot be told when they will not be able to sell that output, because telling them would "reveal" that a portion of the generation plant would not be functioning. That makes no sense, proceeds from the same false "the Generation Breaker is transmission" premise, and has nothing to do with the way the Standards of Conduct actually operate.

Seabrook and its affiliates follow the Standards of Conduct in operating Seabrook. NHT, Seabrook's affiliate, owns a single transmission asset, the Seabrook Substation, and provides wholesale transmission service to Seabrook through a Local Network Service Tariff on file with the Commission.[175] ISO-NE has operational control of the regional transmission facilities associated with the Seabrook Substation, which interconnects Seabrook and three 345 kV transmission lines, including one of the major North-South wholesale transmission interfaces in New England, that are part of the ISO-NE transmission system.[176] NHT's transmission facilities are fully subject to the Standards of Conduct[177] – so NHT is not subject to any "waiver" that can be to revoked. Seabrook employees that perform transmission functions for NHT are designated as transmission function employees under the Standards of Conduct, while other Seabrook

---

[174] *Id.* at 38.

[175] New Hampshire Transmission, LLC, FERC Electric Tariff No. 3.

[176] *See* ISO New England Inc., FERC Electric Tariff No. 3, Schedule 21 NHT, Original Sheet No. 4200.

[177] *See* https://www.oasis.oati.com/NHT/NHTdocs/SOC_Written_Procedure_-_NHT_05-07-17.pdf.

employees that provide neither a transmission nor marketing function are classified as "shared" and are subject to the no-conduit rule.  These employees cannot share any transmission information with marketing function employees.  Annual training is in place to ensure that no information is improperly shared.

The Generation Breaker is a generator component, and information about its operation is not transmission information.[178]  The Standards of Conduct are not intended to prohibit market function employees from having information about maintenance being performed on the generating plant that they control.[179]

For avoidance of doubt, and because Complaints' claims falsely posit abuses related to Seabrook's ICIF, we reiterate that the Generation Breaker is not ICIF.  The Seabrook IA lists all of the (very limited) ICIF that Seabrook owns, and the Generation Breaker is not one of them.  As explained in the attached supplemental affidavit of Mr. McCartney, the Generation Breaker is behind the ICIF:  the ICIF is between the exterior wall of the Turbine Generator Building and the point of change of ownership with NHT at the Seabrook Substation.  The Generation Breaker is

---

[178]  Under the Standards of Conduct, "transmission function information" means information relating to transmission functions. 18 C.F.R. § 358.3(j) (2020).  "Transmission functions" involve "planning, directing, organizing or carrying out of day-to-day transmission operations, including the granting and denying of transmission service requests." *Id.* § 358.3(h). Examples include coordinating the physical flows of power, balancing load with energy or capacity, and imposing transmission load relief.  *See Standards of Conduct for Transmission Providers*, Order No. 717, 125 FERC ¶ 61,064 at P 122 (2008) ("Order No. 717"), *order on reh'g and clarification*, Order No. 717-A, 129 FERC ¶ 61,043 ("Order No. 717-A"), *order on reh'g and clarification*, Order No. 717-B, 129 FERC ¶ 61,123 (2009), *order on reh'g and clarification*, Order No. 717-C, 131 FERC ¶ 61,045 (2010), *order on reh'g and clarification*, Order No. 717-D, 135 FERC ¶ 61,017 (2011) (codified at 18 C.F.R. pt. 358).

[179]  *See, e.g.*, *Allegheny Power Serv. Corp.*, 84 FERC ¶ 61,131, at 61,724 (1998) (permitting merchant function employees access to data concerning alarms and alarm summaries, co-gen setpoints and limits, capability reports on generation units, system frequency, hourly load data, similar day load forecasts, and automatic generator control information because the data was generation-related and necessary for generation dispatch, which was performed by the marketing function employees); *see also* Order No. 717-A, 129 FERC ¶ 61,043 at P 131 (stating that "[t]o the extent that information concerning a company's own generation, load, and generation dispatch is not 'transmission function information' as defined in § 358.3(j), then this information may be provided to marketing function employees").

located *inside* Turbine Generator Building, and thus is part of the generating plant.[180]  This is confirmed by the White Paper, which fully describes that the Generation Breaker is housed in the generating facility and performs a generation, not transmission, function.

FERC Order No. 807 waived OATT, OASIS, and Standards of Conduct requirements for generators, like Seabrook, that own only ICIF.  Under 18 C.F.R. § 35.28(d)(2)(ii), third parties seeking service on ICIF may follow the procedures of FPA sections 210, 211 and 212.  FPA Section 210 addresses the "physical connection" of facilities,[181] and as discussed above is not relevant here.  Section 211 states that an entity may apply to the Commission for an order requiring a "transmitting utility to provide transmission service."[182]  This is not relevant here either, as the Complaint was not filed under Section 211, and NECEC is not seeking transmission service over Seabrook's ICIF.  Section 212 discusses orders issued under Section 211, and the rates for "wholesale transmission services."  Again, none of this is relevant here.

Because there has been no "third party request" to use the ICIF, the request to revoke the ICIF waiver is without foundation.  In short, Seabrook is not "using its Seabrook ICIF to discriminate against the NECEC Project" because Seabrook's ICIF and the NECEC Elective Upgrade have nothing to do with one another.

> ### 5.    A FERC Office of Enforcement investigation is unjustified and unnecessary and NextEra is already preserving documents

Complainants request that the Commission initiate a FERC Office of Enforcement investigation and require NextEra to preserve and provide all documents related to the

---

[180]  McCartney Supplemental Affidavit at 3-4.

[181]  16 U.S.C. § 824i (2018).

[182]  16 U.S.C. § 824j(a).

interconnection of the NECEC Elective Upgrade.[183]  Complainants assert that a FERC Office of Enforcement investigation is warranted seemingly because there are indications that Seabrook may be violating its open access obligations.[184]   A FERC Office of Enforcement investigation is unjustified and unnecessary.  First, if Seabrook succeeds on its Petition, there will be nothing to investigate.  As described in detail in above, Seabrook does not have any open access, interconnection, or Tariff obligations to NECEC.[185]  Even if Seabrook and Complainants disagree on contractual terms to be included in a facilities agreement, certainly Seabrook has negotiated in good faith. It is almost as if Complainants' want to the Office of Enforcement to become the regulator of what utilities advocate in contract negotiations and state policy matters.   Second, Complainants cite to no precedent supporting a FERC Office of Enforcement investigation under these circumstances.  Complainants point to no instance where the Commission rewarded a party that came to the Commission, in good faith, seeking permission for its stance in a rate controversy through a petition for a declaratory order with a *referral to the FERC Office of Enforcement.*  For good reason, Seabrook should not be penalized for asserting its legal position and then seeking Commission permission in good faith. This would be an extremely poor message to the regulated community about the wisdom of seeking declaratory relief from the Commission.

Seabrook approached its negotiations with the Complainants responsibly and in good faith, and filed the Petition in an attempt to keep the transaction moving forward.  Complainants claim that NextEra has reached out to Complainants several times to attempt to broker a deal to reduce

---

[183]  Complaint at 40-41.

[184]  *Id.* at 41.

[185]  With the one Tariff exception discussed above of entering into an E&P Agreement for the procurement of long lead-time items – an agreement which Complainants do not seek in this proceeding.

57

**JA233**

NextEra's opposition to the NECEC Elective Upgrade.[186]  While that opposition was in Maine and Massachusetts, Complainants nevertheless claim that the offer was intended to "interfer[e] with the NECEC Project interconnection, in an apparent quid pro quo."[187]  This is nothing more than unsupported innuendo.  Complainants' witness on this very issue, Mr. Dickinson, did not actually participate in any of the meetings he describes in his affidavit.[188]   As discussed above, Complainants on a recent call – likely while preparing their Complaint – repeatedly accused NextEra of seeking to tie the settlement of issues in other jurisdictions to terms and conditions for completing the Generation Breaker replacement project.  And, NextEra emphatically denied doing so each time.

Further, the outage timing considerations critiqued by Complainants' counsel, who are not nuclear experts, are reasoned applications of longstanding rules for the safe and reliable operation of NextEra's nuclear fleet. These timing considerations have now been fully validated by an independent witness, Mr. Weber.[189]

While there is actually nothing to refer to the FERC Office of Enforcement, the Commission's ruling on the legal issues will moot any perceived investigative need – either NextEra is right in which case there is nothing to investigate or NextEra is wrong (in good faith) and Seabrook will govern itself in accordingly.  Resolution of disputes is what petitions for declaratory orders are for, and NextEra's choice to avail itself of the Commission's declaratory

---

[186]  Complaint at 19-20.

[187]  *Id.* at 20.

[188]  *See* Marcum Supplemental Affidavit at 7.

[189]  *See* Weber Affidavit at 4-7.

order process is consistent with enforcement safe harbors that insulate actions specifically directed by the Commission.[190]

Additionally, Complainants cite to no precedent wherein the Commission referred a dispute to the FERC Office of Enforcement over what are essentially rate issues. Matters investigated by the FERC Office of Enforcement usually involve some claim of misbehavior, which is not present in the Complaint.[191] The only supposed misbehavior claimed by Complainants, other than assertion of NextEra's legal rights or lack of obligations under the Tariff, concerns conduct that is immune under NextEra's First Amendment petitioning rights as explained in above. Every entity engaged in advocacy advocates for its own interests. If such advocacy became the basis for FERC Office of Enforcement investigations, two things would happen. First, there would be many investigations. Second, to prevent such investigations, advocacy would cease. That is exactly why the First Amendment exists. The core issues addressed in the Complaint and the Petition are Tariff and rate interpretational issues and should therefore be resolved by the Commission as a matter of law.

Complainants' request for an order requiring document preservation is unsupported, but more fundamentally, unnecessary. Although Seabrook has not acted egregiously such that an

---

[190] *See Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047 at P 67 (2006) (explaining that "if a market participant undertakes an action or transaction that is explicitly contemplated in Commission-approved rules and regulations" the market participant is entitled to a safe harbor presumption of compliance), *order denying reh'g*, 114 FERC ¶ 61,300 (2006).

[191] *See, e.g.*, *Ariz. Pub. Serv. Co.*, 156 FERC ¶ 61,006 at P 32 (2016) (referring to the Office of Enforcement the matter of the utility's failure to timely file a jurisdictional agreement because it was not the first instance in which the utility failed to timely file), *order denying reh'g*, 161 FERC ¶ 61,022 (2017); *DeSoto Cty. Generating Co.*, 151 FERC ¶ 61,009 at P 14 (2015) (referring to the Office of Enforcement the matter of the resource owner possibly receiving payments for reactive power service while its facility was incapable of providing such service); *Am. Transmission Co.*, 153 FERC ¶ 61,006 at P 7 n. 12 (2015) (referring to the Office of Enforcement the matter of the utility's failure to obtain prior Commission authorization for acquiring transmission facilities because there were twenty-two unfiled agreements that were between sixteen months and eight years late); *FC Landfill Energy, LLC*, 133 FERC ¶ 61,041 at P 33 (2010) (referring to the Office of Enforcement the matter of a market-based rate applicant's failure to file an application for market-based rates before making market-based rate sales because its affiliates had previously been notified on numerous occasions about the importance of making timely filings).

investigation would be needed, NextEra has already issued a litigation hold in light of the instant proceedings, and will maintain it until these matters are concluded.  We trust that Complainants, having instituted this litigation, have done so as well.

## IV.     Conclusion

For the reasons stated above, NextEra requests that the Commission dismiss the Complaint as duplicative, or deny the Complaint on the merits, with prejudice.

Respectfully submitted,

*/s/ Joel D. Newton*                     */s/ Noel Symons*
Joel D. Newton                          Noel Symons
NextEra Energy Resources, LLC           Todd Mullins
801 Pennsylvania Avenue, NW             Colin Francis
Suite 220                               Mary-Kaitlin Rigney
Washington, DC 20004                    McGuireWoods LLP
(202) 347-7126                          2001 K Street, NW, Suite 400
joel.newton@nee.com                     Washington, DC 20006
                                        (202) 857-2929
                                        nsymons@mcguirewoods.com
                                        tmullins@mcguirewoods.com

*Counsel to Respondents*

Dated:  November 2, 2020

60

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this 2nd day of November 2020, caused to be served a copy of the foregoing upon all parties on the service list in these proceedings in accordance with the requirements of Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010 (2020).

Respectfully submitted,

*/s/ Maha Saad*
Maha Saad
McGuireWoods LLP
2001 K Street, NW, Suite 400
Washington, DC 20006
(202) 828-2807
msaad@mcguirewoods.com

# Exhibit No. 1

# Prepared Supplemental Affidavit
of Joshua Marcum

**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. EL21-6-000 |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC,  and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
| Respondents. | ) | |

**PREPARED SUPPLEMENTAL AFFIDAVIT OF JOSHUA MARCUM
ON BEHALF OF NEXTERA**

**I.      Introduction**

My name is Joshua Marcum.  My business address is 700 Universe Boulevard, Juno

Beach, Florida 33408.  I am the Regional Business Director responsible for Seabrook Station for

NextEra Energy Resources, LLC ("NextEra").  I have been employed by NextEra since 2015,

and I have served in my current position since 2018.  My responsibilities include managing the

business aspects of Seabrook Station including marketing of power sales, oversight of operating

and capital expenditures, and nuclear decommissioning trust management through the utilization

of resources across a matrixed organization.  In addition, my responsibilities include managing

the business aspects of FPL Energy Wyman LLC ("FPLE Wyman"), which wholly owns

Yarmouth 3, and FPL Energy Wyman IV LLC ("FPLE Wyman IV"), which owns 91.1912% of

Yarmouth 4.

The primary purpose of my affidavit is to describe the negotiations between NextEra

Energy Seabrook, LLC ("Seabrook"), Avangrid, Inc. ("Avangrid") and NECEC Transmission

LLC ("NECEC," and together with Avangrid, "Complainants") for the replacement of the

Seabrook Station 24.5 kV generator circuit breaker ("Breaker Project"). As demonstrated herein,

Seabrook has been negotiating with Complainants in good faith, and Complainants' statements

to the contrary are not based in fact.

Also, I previously submitted an affidavit in Docket No. EL21-3-000, a Petition for

Declaratory Order ("Petition") proceeding addressing the same contractual issues placed in

dispute by the complaint here in Docket No EL21-6-000 ("Complaint"). I am resubmitting that

affidavit here, which is why I refer to this new affidavit as my "supplemental" affidavit. My

prior affidavit is attached to this supplemental affidavit as Exhibit No. 2.

## II.    History of Negotiations

On April 8, 2020, ISO New England Inc. ("ISO-NE") held a system impact study ("SIS")

results meeting. During the meeting, ISO-NE representatives described the results of the SIS,

which concluded that the Seabrook Station generator circuit breaker would need to be

uprated/replaced as a result of the interconnection of the NECEC Elective Transmission Upgrade

project. Subsequently, Complainants sent Seabrook questions on April 17, 2020. Seabrook

responded to these questions on May 1 and May 7, 2020.

On May 7, 2020, I participated in a meeting with representatives of Complainants to

discuss the Breaker Project, including the need for an agreement to cover the replacement of the

generator circuit breaker. During this call and as documented in meeting minutes emailed by

Complainants on May 10, 2020, Seabrook informed Complainants that it had already taken

concrete steps toward determining the scope of the Breaker Project, including reaching out to

vendors to determine what types of technology were available for the Breaker Project. Further,

Seabrook personnel relayed that they had already heard back from one vendor – ABB – and that

it was possible that the newer ABB breaker technology would not fit into the existing bus

position, and that the protection and control systems might have to be reevaluated. Additionally, Seabrook personnel stressed that Seabrook believed that the Breaker Project was a large and complex project that would require approximately 18-24 months to complete – likely beyond the next outage which was scheduled for fall 2021. In other words, Seabrook has been up front with Complainants from the beginning of discussions that the Breaker Project would be highly complex and would require a long lead time. In addition, throughout the negotiations, Seabrook also has noted that the length of a projected extended outage associated with completing the Breaker Project would remain uncertain until a detailed engineering study had been completed.

Following this meeting, Seabrook and Complainants began negotiating and exchanging drafts of the terms of a draft Agreement for Engineering and Construction for Affected System Project ("E&C Agreement"). Seabrook first sent a draft contract to Complainants on May 15, 2020. The draft contract provided for the aforementioned detailed engineering study, and following agreement with NECEC to continue the project, the procurement of material and construction of the Breaker Project. Subsequently, Seabrook and Complainants exchanged and discussed numerous drafts over the next several months, in line with the following timing:

- Complainants returned comments on the draft E&C Agreement on May 22, 2020.

- Seabrook returned a marked-up version to Complainants on June 2, 2020. Importantly, in this version Seabrook indicated and sought acknowledgement by Complainants that it may not be possible to complete the Breaker Project prior to completion of the refueling outage scheduled for October 2021 ("2021 Outage"). This acknowledgement remained in every draft version issued by Seabrook, until Seabrook definitively determined that the Breaker Project could not be completed in the 2021 Outage.

- Complainants requested to postpone a call that had been previously scheduled for June 3, 2020, and Seabrook agreed to reschedule the call to June 12, 2020.

- On June 10, 2020, Complainants returned a markup of the draft E&C Agreement to Seabrook.

- Seabrook and Complainants discussed the draft on June 12, 2020, on the rescheduled call.

- On June 18, 2020, Seabrook sent a revised draft to Complainants reflecting edits discussed on the June 12 call.

- A few hours prior to a scheduled call with Seabrook on July 9, Complainants returned a copy of the draft agreement with further edits.  Complainants sent another revised draft to Seabrook on July 10, 2020.

- Seabrook issued revisions to the draft agreement on July 21, 2020.

- Complainants returned a copy of the draft agreement with further edits and comments on July 22, 2020.  In his July 22, 2020, emailed revisions of the E&C Agreement to me (and Seabrook counsel), counsel for Avangrid stated:

  Josh and Joel –

  Please see attached some minor proposed revisions from Avangrid that we discussed during our call this afternoon.  I will discuss the concept of Losses internally to determine whether there is an appetite to continue working through that impasse or not.  As you aware, it is critical to Avangrid, that engineering work commence as soon as possible.

  Thank you again for your strong efforts on this.

  Best,
  Nick

- On July 31, Seabrook and Complainants had a call during which Complainants stated their desire to get the engineering work started.  The parties discussed different

approaches with respect to the E&C Agreement.  However, nothing definitive was determined at the meeting.

- On August 19, 2020, Seabrook sent Complainants a revised agreement, which reflected Seabrook's definitive determination that the Breaker Project could not be completed during the 2021 Outage.  Additionally, in this draft, Seabrook corrected the title of the agreement to Facilities Agreement to reflect the fact that Schedule 25 of the ISO-NE tariff uses the term "facilities agreement" in describing the agreement between an Affected Party and an Elective Transmission Upgrade owner.

- Complainants returned significant comments to the revised draft agreement on August 27, 2020, including a comment stating that because Seabrook could not undertake the generator circuit breaker replacement in the 2021 Outage, Complainants now objected to a provision in the draft agreement preventing Seabrook from being liable for consequential damages and lost profits to NECEC (for example, delay damages).  A copy of Complainants' August 27, 2020 version of the draft agreement is attached to my supplemental affidavit as Exhibit No. 3.

- On September 4, 2020, Seabrook counsel and Avangrid counsel had a call to better understand Complainants' position on Seabrook potentially being liable for consequential damages and lost profits to NECEC.  Seabrook was surprised and particularly concerned about NECEC's position that it would seek delay damages because since May 7, 2020, Seabrook had clearly explained to Complainants multiple times that it was unlikely that the Breaker Project could be completed in the 2021 Outage; likewise, draft agreements since June 2, 2020, had included an express acknowledgement by Complainants that it may not be possible to complete the Breaker Project prior to completion of the 2021

Outage.  Also, on this call Seabrook counsel agreed to strike language in the draft

Facilities Agreement that indicated Seabrook was seeking to shorten the duration of

Seabrook Station's refueling outage planned for the spring of 2023 ("2023 Outage"),

conceding that the provision could make it difficult to calculate lost profits – that is,

opportunity costs – during an extended outage.  Although counsel for Avangrid suggested

that he hoped to continue discussions the following week, it was becoming ever more

apparent that the parties likely were at an impasse with respect to the remaining open

contractual disputes.

- On September 29, 2020, Seabrook and Complainants had a phone call.  During the call,
  Complainants shared that, based on their project team having recently taken a hard look
  at all of the activities that NECEC needed to complete in order to achieve commercial
  operations, NECEC had made the decision to push back the NECEC project in-service
  date to May 31, 2023, and would be making a public announcement indicating this
  schedule change later in October 2020.  NECEC also stated that they had informed ISO-
  NE of the delay.  With the exception of the new in-service date provided in the
  Complaint, I am not aware that a public announcement of this development was made.  In
  addition, during the September 29 call, we discussed the status of the FPLE Wyman and
  FPLE Wyman IV SSTI Study Agreements in an attempt to finalize these agreements.

On October 5, 2020, Seabrook filed the Petition with the Federal Energy Regulatory

Commission in an effort to seek resolution of the outstanding disputed issues relating to the

Facilities Agreement.  This occurred a little more than two months after (as noted above) counsel

for Complainant thanked us "again" for our "strong efforts" on the contract negotiations.

**III.        Seabrook has negotiated in good faith and NECEC did not deem the SSTI Agreements part of its "critical path"**

I have reviewed the Affidavit of Thorn Dickinson attached to the Complaint ("Dickinson Affidavit"), in which Mr. Dickinson describes in his view of the negotiations described above. With the exception of the call between counsel on September 4, 2020, I was directly involved in each step of the negotiations described above (and in the Dickinson Affidavit), and can say that Mr. Dickinson was not a part of any of the discussions – telephonic, email, or otherwise. Perhaps this is why several of Mr. Dickinson's assertions do not reflect the context of the actual conversations.

As shown above, Seabrook has made its positions on scheduling the outage for the Breaker Project clear since early May 2020, and has been working diligently and in good faith to come to an understanding with Complainants.  While it is true that some of Seabrook's positions have evolved over the course of the negotiating process, the same is true of Complainants.  This was a natural part of the give-and-take negotiating process where both sides attempted to resolve numerous complicated issues over a relatively short time frame.  With negotiations faltering, Seabrook prepared and ultimately filed the Petition with the Federal Energy Regulatory Commission so that a resolution of the issues can be reached and the Breaker Project can move forward without unreasonably trampling on Seabrook's rights.  Contrary to Mr. Dickinson's intimations to the contrary, the negotiation has been a two-way street, involving give and take from both parties, and the duration of the negotiations is attributable to that mutual give and take.

Mr. Dickinson also faults Seabrook for not filing an unexecuted Facilities Agreement by July 31, 2020, stating that: "NECEC Transmission indicated to NextEra that it no longer wished to negotiate and reiterated its request for NextEra to file the agreement unexecuted."  Dickinson Affidavit at P 78.  But this makes little sense, as evidenced by the fact that Complainants sent

Seabrook its last comments on the Facilities Agreement on August 27, 2020, confirming that two-way negotiations regarding the Facilities Agreement were still ongoing almost a month beyond the date cited by Mr. Dickinson.  Also, it is clear that as late as July 22, 2020, Complainants found that Seabrook was negotiating in good faith, as Complainant's lawyer thanked me and Seabrook counsel for our "strong efforts" on the matter.

Mr. Dickinson also criticizes Seabrook for, in mid-August 2020, including language in the draft Facilities Agreement that Seabrook is seeking to shorten the duration of Seabrook Station's planned 2023 Outage.  Dickson Affidavit at P 81.  He wrongly states, based on nothing but his own speculation, that Seabrook is doing so with the "inten[t] to make it even more difficult for the Seabrook Breaker Replacement to fit within the 2023 refueling outage period."  This is simply not true.  NextEra's nuclear fleet, including Seabrook, continuously seeks to optimize and shorten the schedules for its refueling outages in order to minimize the time during which its generators are offline.  In any event, as detailed above, Seabrook's counsel has already agreed to delete the provision, though Mr. Dickinson does not acknowledge this fact in his affidavit.  Given this agreement, we do not understand Mr. Dickinson's expectation that Seabrook would provide an explanation for the provision.  The fact that Seabrook did not raise this provision as a disputed issue in its Petition underscores that it was not in dispute at the time Seabrook filed the Petition.

Finally, Mr. Dickinson makes other misleading claims, including that NextEra unreasonably delayed the execution by FPLE Wyman and FPLE Wyman IV of the SSTI Study Agreements.  Dickinson Affidavit at PP 85-87.  But during negotiations, Complainants made it clear in an email that there was no rush to complete these agreements because, in the words of the person negotiating for NECEC, he did not "believe that [the work] is in our critical path."

**Exhibit No. 1**
**Docket No. EL21-6-000**
**Page 9 of 9**

NECEC's viewpoint is confirmed in the executed SSTI Study Agreements, which specify that the date by which NECEC expects to complete a revised SSTI study is as late as August 31, 2021 – almost two years before the in-service date of the NECEC Elective Transmission Upgrade.

Complainants also speculate that FPLE Wyman and FPLE Wyman IV could delay the SSTI study by not sharing information with NECEC "pursuant to those agreements" (Complaint at note 82; Dickinson Affidavit at P 87), yet nothing in the executed agreements require FPLE Wyman or FPLE Wyman IV to provide information to NECEC. While in discussions FPLE Wyman and FPLE Wyman IV have stated their intent to voluntarily provide data to NECEC, it is my understanding that any required data also is readily available from ISO-NE.

This concludes my supplemental affidavit.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746 (2012), I state under penalty of perjury that the foregoing testimony is true and correct to the best of my knowledge, information, and belief.

Executed this 2nd day of November, 2020.


Joshua Marcum
_____

Joshua Marcum
Regional Business Director
NextEra Energy Resources, LLC

# Exhibit No. 2

# Prepared Affidavit of Joshua Marcum Attachment B to Petition for Declaratory Order Filed in Docket No. EL21-3-000

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

NextEra Energy Seabrook, LLC           )           Docket No. EL21-___-000

PREPARED AFFIDAVIT OF JOSHUA MARCUM
ON BEHALF OF
NEXTERA ENERGY SEABROOK, LLC

I.     **Introduction**

My name is Joshua Marcum.  My business address is 700 Universe Boulevard, Juno

Beach, Florida 33408. I am the Regional Business Director responsible for Seabrook Station for

NextEra Energy Resources, LLC ("NextEra").  I have been employed by NextEra since 2015,

and I have served in my current position since 2018.  My responsibilities include managing the

business aspects of Seabrook Station including marketing of power sales, oversight of operating

and capital expenditures, and nuclear decommissioning trust management through the utilization

of resources across a matrixed organization.

The purpose of my affidavit is to describe the formula rate ("Formula Rate Template")

for calculating NextEra Energy Seabrook, LLC's ("Seabrook") and the Joint Owners' (defined

further below) recovery of direct costs and opportunity costs from NECEC Transmission, LLC

("NECEC") for replacing the 24.5 kV generator circuit breaker ("Gen Breaker") at Seabrook

Station to accommodate NECEC's New England Clean Energy Connect project ("NECEC

Project").  Seabrook is authorized to represent the interests of the Joint Owners in this

proceeding in its capacity as agent pursuant to its authority under the Agreement for Joint

Ownership, Construction and Operation of New Hampshire Nuclear Units, dated May 1, 1973

(as amended), and the Managing Agent Operating Agreement dated June 29, 1992 (as amended).

The first part of my affidavit explains why it is appropriate for Seabrook and the Joint

Owners to use the Formula Rate Template to recover lost profits from NECEC.  In the second

part of my affidavit, I describe how the Formula Rate Template operates to calculate direct costs

and opportunity costs, and I demonstrate that it produces a reasonable result.

## II.    Support for use of the Formula Rate Template

My understanding is that the Gen Breaker removal and replacement ("Breaker Project")

could occur during a refueling outage ("Breaker Project Outage") after being adequately

engineered and planned at Seabrook Station.  I also understand from the affidavit of Eric

McCartney that it is impossible to know how long the Breaker Project could extend a Breaker

Project Outage, but that the current best estimate is about 10 days.  This will impose significant

costs on Seabrook and the Joint Owners, including opportunity costs that occur because

Seabrook Station will be offline for a period of time when it would not otherwise be offline, and

will lose the opportunity to make sales, and the profits from those sales, during that period.

Seabrook is a wholly-owned subsidiary of NextEra, and holds an approximate 88.23%

ownership interest in Seabrook Station.  The remaining 11.77% ownership interest is held by a

number of municipalities and municipal utilities:  Massachusetts Municipal Wholesale Electric

Company ("MMWEC"), Taunton Municipal Lighting Plant ("Taunton"), and Hudson Light &

Power Department ("Hudson" and together with MMWEC and Taunton, the "Joint Owners").

The calculation of the economic harm due to an extended outage requires evaluation of

several categories: (1) lost revenue of the Joint Owners; (2) Seabrook's lost revenues from unit-

contingent power purchase agreement ("PPA") sales; (3) Seabrook's lost revenues from day-

ahead sales in the ISO New England, Inc. ("ISO-NE") market; (4) potential Pay for Performance

("PFP") penalties, as provided for in the ISO-NE Forward Capacity Market rules, and lost PFP

bonus payments; (5) other costs incurred by Seabrook in furtherance of the Breaker Project for

the benefit of NECEC; and (6) a potential reduction in fuel costs, which could in part offset the

lost revenues. The first three economic harms together with a component of the fourth (lost PFP

bonus payments), as adjusted by any fuel cost savings, are opportunity costs. The other costs are

incurred costs, and include potential PFP penalties, incremental labor, electricity expenses, and

legal costs.

Opportunity Costs

In this case, Seabrook and the Joint Owners will incur opportunity costs if they forego

sales of output of Seabrook to do the work to accommodate the NECEC Elective Upgrade, and

so lose revenues or profits as described below.

NextEra schedules the output of Seabrook Station on behalf of Seabrook and the Joint

Owners. As described in the testimony of Eric McCartney, Seabrook Station typically operates

24 hours a day, 7 days a week by virtue of being an approximately 1,250 MW baseload nuclear

generator. Seabrook Station virtually always runs because it is bid in the day-ahead market as a

"must-run" unit, and thus receives the resulting clearing price. In other words, unless there is an

outage, Seabrook Station is always selected and committed in the day-ahead energy market.

The first category of lost revenue concerns the Joint Owners and their approximate 147

MW (nameplate) interest in Seabrook Station. I have conferred with the Joint Owners, and it is

my understanding that each of the Joint Owners rely on their ownership interests from the output

of Seabrook Station as a physical hedge to the power they purchase to serve their load. Under

ordinary operation, when the output of Seabrook Station is sold at the locational marginal price

("LMP") at the Seabrook node (ISO-NE node 555), the owners use the revenues from their share to offset purchase power costs at LMP in the load zones where they are located.

The second category of lost revenue is from Seabrook's PPA sales. From time to time, Seabrook enters into PPAs with unaffiliated third parties, which specify the price at which a customer will pay Seabrook to purchase power from Seabrook Station. Currently, Seabrook has entered into seven (7) unit-contingent PPAs representing about 303.5 MW (or 24.3% of 1,250 MW). Additional PPAs may be entered into prior to the Breaker Project Outage. Seabrook would lose the associated revenue from these PPA sales for each hour that the Breaker Project Outage is extended due to the Breaker Project incurred at NECEC's request.

Third, the remainder of the output of the Seabrook Station that does not serve PPAs or the Joint Owners' load is sold for Seabrook into the market at the day-ahead energy market LMP. Seabrook thus would forgo all revenues and profits from these sales during an extended outage caused by the replacement of the Gen Breaker. Note that the calculation of this revenue impact for Seabrook in the Formula Rate Template is identical to that used to calculate the revenue impact to the Joint Owners as detailed above, with the only difference being the volume of nameplate capacity to use in the calculation.

The final category of opportunity costs is lost PFP bonus payments. If a capacity scarcity condition were to occur during any days that a Breaker Project Outage is extended solely due to the Breaker Project, Seabrook and the Joint Owners would likely have earned a PFP bonus payment for each hour under the PFP design if Seabrook Station was online operating at full power during a capacity scarcity condition. The foregone PFP bonus amount would be determined in accordance with the Forward Capacity Market rules. On the flip side, an additional cost of an extended outage is a PFP penalty. If a capacity scarcity condition were to

occur during any days that the Breaker Project Outage is extended solely due to the Breaker Project, the foregone PFP bonus amount would be calculated as the product of (1) the PFP penalty rate, (2) the duration of the capacity scarcity condition, and (3) the number determined by subtracting the product of Seabrook Station's Capacity Supply Obligation ("CSO") and the actual balancing ratio from Seabrook Station's nameplate capacity of 1250 MW.

Because opportunity costs are a result of foregone output, it is also appropriate to consider, and net out, any cost savings that may accrue to Seabrook and the Joint Owners if an outage is extended to accommodate NECEC.  In discussing this potential with plant operators and others within the NextEra organization, there appears to be only one quantifiable potential benefit from a brief extended outage resulting from the Breaker Project: potential nuclear fuel savings.  As described in the affidavit of Ruben Rodriguez, fuel costs for Seabrook Station, like other nuclear plants, are not variable.  Fuel must be acquired far in advance, and if there is fuel left unused at the time of a refueling outage, it is discarded when new fuel assemblies are swapped for existing fuel assemblies.  Accordingly, the only time that there is a savings in fuel costs is if a decision is made not to procure a certain amount of nuclear fuel to accommodate a planned outage.  In the absence of such an adjustment, there are no cost savings associated with an outage extension.

<u>Estimate of Opportunity Costs from Lost Power Sales</u>

As discussed below, it is not possible to accurately project opportunity costs at this time. In order to give an idea of the order of magnitude of the potential lost profits of Seabrook and the Joint Owners, for illustrative purposes only, I looked at the actual energy prices for the 10 days following the April 2020 refueling outage as well as the actual PPA contract prices during this period.  Based on this, had this outage been extended, Seabrook and the Joint Owners would

have foregone about $560,000 a day, every day, from energy sales, inclusive of PPA sales. While I do not know what LMPs will be at the time the Breaker Project will be undertaken, $560,000 per day in foregone revenue from lost energy sales is representative of the order of magnitude of the problem had a Breaker Project Outage extension occurred in 2020.[1]  This shows that the dispute over recovery of opportunity costs in this case is not trivial – based on historic prices and reasonable assumptions, I would expect total opportunity costs for a 10-day outage extension to be in the neighborhood of $5.6 million.

Those foregone revenues are an important part of Seabrook's bottom line and to the customers served by the Joint Owners.  In the case of Seabrook, because it sells the Seabrook Station output at market and does not receive cost-of-service recovery, it must cover its costs through market-based sales.  Nuclear plants are not inexpensive or simple to run.  For example, Seabrook directly employs over 400 people at Seabrook Station.  The revenue Seabrook earns in the energy markets is necessary to properly maintain and run Seabrook Station in compliance with Nuclear Regulatory Commission regulations and guidance from the Institute of Nuclear Power Operations.  Seabrook should not have to lose out on significant needed revenues to accommodate a project from which it receives no benefit.  Conversely, NECEC should not have to pay for foregone revenues on outage days that do not occur.  Because the total amount of opportunity costs (if any) will be based on variables not currently known, below I propose a formula for the recovery of actual opportunity costs and other costs from NECEC on an after-the-fact basis.  My understanding is that if the Commission approves the formula, it would be included in a facilities agreement with NECEC addressing the Breaker Project.

---

[1]    The Joint Owners portion of foregone revenue is approximately $60,000 per day, with the remainder being Seabrook's foregone revenues.

Other Costs

Another category of potential costs that Seabrook should not be forced to incur are ISO-NE PFP penalties.  PFP is a design feature of the Forward Capacity Market that provides incentives for resources that perform during capacity-scarcity conditions and penalizes those that do not perform.  A capacity-scarcity condition occurs when one or more of the three reserve requirements is deficient and the reserve-constraint penalty factor ("RCPF") is setting the real-time reserve price.  A capacity scarcity condition can occur in one or more five-minute pricing intervals.  Seabrook Station, like all generators with a CSO, is subject to PFP penalties when the generator is unavailable due to outage during a critical time of power supply shortages.  ISO-NE assesses a generator with PFP penalties when its actual energy production over the duration of a capacity scarcity condition is less than the product of its CSO and a balancing ratio, which is a number calculated by ISO-NE on an after-the-fact basis and is a function of system load during the capacity scarcity condition.  The resulting energy production shortfall is then multiplied by the prevailing PFP penalty rate to determine the actual PFP penalties that a generator is assessed.  The PFP penalty rate in effect for the April 2020 refueling outage was $2,000/MWh, and will increase over time.[2]  Again, for illustrative purposes, since Seabrook Station's CSO was 1,251.35 MW at that time, it could have incurred a PFP penalty of approximately $1.75 million for each hour of a capacity scarcity condition (assuming a balancing ratio of 70%) that it was offline.  Seabrook and the Joint Owners should not be responsible for paying any PFP penalties that may be incurred during the days that the Breaker Project Outage is extended solely due to the Breaker Project.  These costs should instead be borne by NECEC, because but for the

---

[2]    The PFP penalty rate increases to $3,500/MWh starting June 1, 2021 and increases to $5,455/MWh starting June 1, 2024.  The PFP penalty rates after June 1, 2025 have not been finalized.

Breaker Project conducted solely at NECEC's request for its benefit, Seabrook Station would be online during those days, and would not incur any PFP penalties.

Incremental labor costs (including, but not limited to, overtime) and electricity expenses due to an outage extension needed to accommodate NECEC, as well as legal costs associated solely with the Breaker Project, also should be borne by NECEC, for the same reason as opportunity costs, i.e., Seabrook would not incur them but for its accommodation of NECEC's elective project.

### III.    Description of the Formula Rate Template methodology

The opportunity costs described above are impossible to calculate at this time. This is true for a number of reasons, not least of which are that: (1) it is not knowable whether, and for how long, the Breaker Project will extend a Breaker Project Outage; (2) the LMPs during any extension of a Breaker Project Outage are not knowable today; and (3) it is unknown whether Seabrook will incur any PFP penalties during the time that a Breaker Project Outage is extended solely due to the Breaker Project. What is known is that Seabrook runs 24 hours a day, 7 days a week unless there is an outage, and that the general measure of opportunity costs will be any lost revenues minus any associated fuel cost savings, and that additional costs that should be included are legal costs, incremental labor and electricity costs associated solely with the Breaker Project, plus any PFP penalties incurred during the extended outage days attributable to the Breaker Project. In other words, the categories and ranges of risks and costs can be identified today, but the precise costs cannot be known until a Breaker Project Outage occurs.

Therefore, the most reasonable way to accommodate NECEC's request that Seabrook perform the Breaker Project for NECEC's sole benefit is to implement a Formula Rate Template to calculate the opportunity costs and PFP penalties that Seabrook will incur for each day that the

Breaker Project extends the Breaker Project Outage.  This approach fairly balances the interests

of Seabrook and NECEC by ensuring that NECEC will reimburse Seabrook for the actual costs –

no more, no less – that Seabrook would not incur but for replacing the Gen Breaker for

NECEC's sole benefit.

 For the portion of Seabrook Station's output that is not under contract at specified prices

via PPAs, the actual day-ahead energy market clearing price is the most appropriate measure of

the opportunity cost of the foregone power sales.

 Other costs will be determined after the fact on an as-incurred basis.  I note here that the

Formula Rate Template does not include engineering, procurement or construction costs that

NECEC has agreed to pay, which will be subject to different terms and conditions in a facilities

agreement.

 Set forth below is a formula rate template that I propose be adopted for the categories of

costs addressed in this affidavit.

- **NECEC Payment Amount = Foregone Revenue + PFP Penalties + Legal Fees + Incremental Labor + Incremental Electricity – Fuel Savings**, where

  **Foregone Revenue = Foregone Market Revenue + Foregone PPA Revenue + Foregone PFP Bonus**,

  **Foregone Market Revenue = Nameplate Capacity** x **Merchant Percentage** x **Average Actual Day-Ahead Clearing Price**[3] **During Outage Extension** x **Outage Extension**,

  **Foregone PPA Revenue = Nameplate Capacity** x **PPA Percentage** x **Weighted Average Stated PPA Price During Outage Extension** x **Outage Extension**,

  **Foregone PFP Bonus** means the amount of payment that Seabrook and the Joint Owners would have received as a bonus from ISO-NE for performing during a capacity scarcity condition but did not receive due to the fact that Seabrook Station could not perform because it was offline owing to an Outage Extension,

---

[3]  At Seabrook Node (ISO-NE Node 555).

**PFP Penalties** means any actual amounts charged to Seabrook and the Joint Owners (or otherwise used to offset revenue) by ISO-NE for not performing during a capacity scarcity condition that occurs during an Outage Extension,

**Legal Fees** means all legal costs incurred by Seabrook and the Joint Owners in advocating or defending their rights to collect the cost of service for Seabrook Station, including but not limited to costs of both internal and external counsel incurred to negotiate the agreement with NECEC; costs to bring this action and any other action needed to resolve rate disputes; costs to prepare contracts to procure and install the Gen Breaker; and costs to defend any challenge related to the work,

**Incremental Labor** means direct salary and overtime costs incurred by Seabrook and the Joint Owners during the time by which an outage is extended for purposes of accommodating the Breaker Project, only to the extent by which such costs are not otherwise addressed in any agreement with NECEC,

**Incremental Electricity** means costs reflected on an electricity invoice during the time by which an outage is extended for purposes of accommodating the Breaker Project, only to the extent by which such costs are not otherwise addressed in any agreement with NECEC,

**Fuel Savings** means cost savings determined in accordance with the affidavit of Ruben Rodriguez,

**Nameplate Capacity** = 1250 MW,

**Merchant Percentage** (includes Joint Owners) = the amount of Seabrook output sold into the market at Day-Ahead LMP, which currently is 94.1% and will be, as of this writing, 75.7% starting 1/1/2022,[4]

**PPA Percentage** = the amount of Seabrook's output sold bilaterally at a negotiated price, which currently is 5.9% and will be, as of this writing, 24.3% starting 1/1/2022,

**Outage Extension** means the number of hours that an outage is extended for purposes of accommodating the Breaker Project.

---

[4]    The Merchant Percentage and PPA Percentage will be adjusted to reflect the actual PPAs in effect during the Breaker Project Outage.

<u>Illustrative Example Application of Template</u>
<u>for assumed 10-day extension to the April 2020 outage</u>

I have calculated an illustrative example of the application of my proposed formula rate template, using the following actual values from the 2020 outage as well as certain hypothetical values:[5]

**Average Actual Day-Ahead Clearing Price During Outage Extension** = for 2020 outage, $16.90/MWh[6]

**Weighted Average Stated PPA Price During Outage Extension** = for 2020 outage, $46.99/MWh

**Foregone PFP Bonus** = $0

**PFP Penalties** = $0

**Legal Fees** = $200,000

**Incremental Labor** = $50,000

**Incremental Electricity** = $100,000

**Fuel Savings** = $1,000,000

**Foregone Market Revenue** = 1250 MW x 94.1% x $16.90/MWh x 10 days x 24 hours/day = $4,770,870

**Foregone PPA Revenue** = 1250 MW x 5.9% x $46.99/MWh x 10 days x 24 hours/day = $831,723

**NECEC Payment Amount** = $4,770,870 + $831,723 + $0 + $0 + $200,000 + $50,000 + $100,000 - $1,000,000 = $4,952,593

---

[5]  Energy market and PPA prices are actual based on 2020 and not hypothetical values, including the use of the PPA Percentage applicable in 2020.

[6]  Averages will be prorated to the actual extension.

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746 (2012), I state under penalty of perjury that the foregoing

testimony is true and correct to the best of my knowledge, information, and belief.

Executed this 5th day of October, 2020.

_____

Joshua Marcum
Regional Business Director
NextEra Energy Resources, LLC

# Exhibit No. 5

# Prepared Affidavit of Eric McCartney Attachment A to Petition for Declaratory Order Filed in Docket No. EL21-3-000

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

NextEra Energy Seabrook, LLC          )          Docket No. EL21-___-000

PREPARED AFFIDAVIT OF ERIC MCCARTNEY
ON BEHALF OF
NEXTERA ENERGY SEABROOK, LLC

I.    **Introduction**

My name is Eric McCartney.  My business address is 626 Lafayette Road, Seabrook, NH 03874.  I am the Site Vice President for Seabrook Station.  I have been employed by NextEra Energy, Inc. ("NextEra") since 2011, and have served in my current position at NextEra Energy Seabrook, LLC ("Seabrook") as the most senior executive on site at Seabrook Station since 2015.

The purpose of my affidavit is to explain what upgrading the 24.5 kV generator circuit breaker ("Gen Breaker") at the Seabrook Station to accommodate NECEC Transmission, LLC's ("NECEC") New England Clean Energy Connect project ("NECEC Project") would involve.  More specifically, I describe how replacing and upgrading the Gen Breaker to support proposed changes to the connected 345 KV transmission system would entail replacing the existing Gen Breaker with an upgraded, but not yet identified, breaker ("Breaker Project").  I explain why this will likely require more time than what is provided during a typical nuclear power plant refueling outage ("Breaker Project Outage") and why installation of the upgraded Gen Breaker cannot occur during Seabrook Station's next refueling outage in October 2021 ("2021 Outage").

In addition, I am sponsoring as Attachment D a white paper prepared under my supervision by senior engineering, outage, and construction personnel that evaluates upgrading the Gen Breaker to accommodate the NECEC project.  The individuals produced such paper in consultation

with me and I am in agreement with its content.

## II.    Affidavit

### A.    Seabrook

Seabrook has approximately an 88.23% ownership interest in Seabrook Station, a nuclear power plant located in Seabrook, New Hampshire.  Seabrook Station is located within the control area operated by ISO New England Inc. ("ISO-NE") and sells into the ISO-NE market.  Seabrook Station serves approximately 4.4% of the peak load in ISO-NE, and as much as 12.5% of the load in off-peak times.  Among those served are Seabrook Station's joint owners, the Massachusetts Municipal Wholesale Electric Company, ("MMWEC"),[1] with an approximate 11.59% interest; Taunton Municipal Lighting Plant, with an approximate 0.10% interest; and Hudson Light & Power Department with an approximate 0.08% interest.

### B.    The Gen Breaker and the Breaker Project

Seabrook Station is connected to the transmission grid by three 345-kV transmission lines. These lines terminate at separate terminating structures.[2]  From the terminating structures, each circuit is routed to a common switching station. Under normal plant operating conditions, the main generator supplies electrical power from the station main generator to the electrical grid via isolated phase bus duct (i) to the utility grid through the generator step-up transformers ("GSU") and unit auxiliary transformers ("UAT") and (ii) to the plant through the UAT.[3]  The main generator is connected to the GSU and the UAT through the Gen Breaker.  One of the ways

---

[1]    The participants of MMWEC include 28 Massachusetts municipal utilities based in the communities of Ashburnham, Boylston, Braintree, Danvers, Georgetown, Groton, Hingham, Holden, Holyoke, Hudson, Hull, Ipswich, Littleton, Mansfield, Marblehead, Middleborough, Middleton, North Attleborough, Paxton, Peabody, Reading, Shrewsbury, South Hadley, Sterling, Templeton, Wakefield, West Boylston and Westfield.  The Pascoag (Rhode Island) Utility District also is a MMWEC participant.

[2]    Attachment D at 2.

[3]    *Id.* at 3.

auxiliary power needed for plant startup and during shutdown may be taken from the 345-kV system is back-fed to the onsite distribution system through the GSU and UAT when the Gen Breaker is open.[4]  This provides power for all the loads supporting engineered safety features and other functions.

The existing Gen Breaker is a large, complex piece of equipment; it is approximately 20 feet long by 15 feet wide, occupies approximately 700 square feet, and weighs over 32,000 pounds.[5]  It is rated at 25 kV, 35-kA rated continuous current and 165-kA rated short circuit current.  The Gen Breaker consists of three single pole units mounted in line with, and forming part of, the isolated phase bus duct.  It is operated using high-pressure air as an arc-extinguishing medium and as a cooling medium.  It is an adaptation of an extra-high voltage air blast circuit breaker design modified for installation in isolated phase bus duct.  The use of forced air cooling of the conductors provides the required current-carrying capability to support the reliability of performance of the Gen Breaker.[6]

Not only would the Breaker Project involve the removal and replacement of the Gen Breaker, it would also require that two major ancillary systems be replaced, the Control Cabinet and Interlock and the Compressed Air System.  The Control Cabinet and Interlock are important because, when the generator is online, operational control of Gen Breaker is from the main control room. However, when the generator is offline, breaker testing can be performed locally from the Control Cabinet located adjacent to the breakers.[7]  The Compressed Air System is comprised of

---

[4]    *Id.*

[5]    *Id.*

[6]    *Id.* at 4.

[7]    *Id.* at 5.

two high-pressure compressors and air receivers. The air receivers have sufficient storage capacity for five close-open operations. A forced air cooling system is provided for each circuit breaker pole consisting of an air-to-air heat exchanger with redundant fans and circulators mounted on top of the main interruption chamber.[8]

### C.    Replacing the Gen Breaker cannot be done during the 2021 Outage

Seabrook Station cannot be operated while the Gen Breaker is being replaced.  Therefore, removing and replacing the Gen Breaker and associated systems can only be accomplished during a refueling outage.  Nuclear power plants typically refuel every 18 to 24 months, often during the fall and spring when electricity demand is lower.  During a refueling outage, nuclear power plants typically schedule facility upgrades, repairs, and other maintenance work while the plant is offline. The next refueling outage for Seabrook Station is planned for October 2021.  After that, the next planned outage for Seabrook Station is April 2023.

In preparation for a refueling outage, Seabrook engages in an in-depth planning process to facilitate the orchestration of the numerous outage activities, including refueling of the reactor, required plant maintenance, and modifications to, or replacement of, equipment.  To this end, the NextEra nuclear fleet has established a series of milestones intended to ensure that outage projects, such as the Breaker Project, are engineered, procured, and installed in a safe and reliable manner and that outages are implemented safely and predictably.

Specifically, Procedure OM-AA-101-1013, "Fleet Outage Milestones" establishes the Nuclear Fleet standard for managing outage milestones.  Each milestone requires a carefully laid out plan prior to commencing work that considers the resources required to complete the actions, the schedule upon which those actions must be completed, competing priorities or other constraints

---

[8]    *Id.* at 5.

that may challenge the ability to complete the required actions, and how the actions will be monitored to ensure that the plan remains on track.  Procedure OM-AA-101-1013 "Fleet Outage Milestones" outlines 47 milestones for each major outage planning activity ("Milestones").  In particular, four key Milestones are necessary to determine if implementation of the Breaker Project is viable during the 2021 Outage: MS01 "Change Scope Freeze"; MS08 "Order Long Lead and Critical Materials and Services"; MS09 "Issue Modifications;" and MS32 "Planned Parts Onsite and Ready for Use."

The purpose of key Milestone MS01 is to identify and freeze the Design Change Scope for major and minor modifications, which allows sufficient time to perform the engineering and analysis required to implement the modification.  Activities required under MS01 include bidding and issuing contracts for engineering for equipment specifications, vendor engineering, supporting calculations, and development of the modification package to implement the modification.  Additionally, the normal practice is to perform detailed walk-downs in the outage prior to the outage at which the Breaker Project will be implemented to ensure all interconnections and interferences are understood.  The minimum deadline for MS01 is 22 months before the outage.  In the case of the 2021 Outage, the best-case deadline would have been in December 2019, a date that has already passed.

Key Milestone MS08 is necessary because all orders for long lead materials and critical procurement services required to support the outage including contingencies are placed with vendors, which include estimated delivery dates that support the outage.  The replacement Gen Breaker is not available off the shelf.  Once engineering design is completed and the contract negotiated, the Gen Breaker will have to be built by the manufacturer.  An estimate of the manufacturing time will not be known with any degree of certainty until after an engineering study

is completed.  As a result, it is not feasible to finalize the scope, complete the design, and order the material to support meeting the MS08 Milestone for the 2021 Outage, which is only 12 months away.

Similarly, key Milestone MS09 requires all approved design change packages, and specific field verification and validation packages to have been issued to the respective discipline planner for work package preparation within 12 months of the planned outage.  Given that even the precursor work necessary to complete this Milestone is incomplete, it is not feasible to meet MS09 for the 2021 Outage by October 2020.

In addition, key Milestone MS032 requires that all long lead materials are on-site and available for issue or are tracked by the materials exception list at least one month before the outage.  The timing issues with MS01, MS08, and MS09 make it infeasible for the deadline for MS032 to be met for the 2021 Outage.

Finally, the evaluation of the Breaker Project indicates it would have enterprise risk, which would add to the duration and level of preparation needed.  In addition to the normal planning process, NextEra follows the recommendations of Institute of Nuclear Plant Operations ("INPO")[9] Event Report ("IER") 14-20, *Integrated Risk – Healthy Technical Conscience*.  This report cited concerns that engineering and technical errors – both within utilities and by outside vendors – were contributing to consequential events throughout the nuclear power industry.  Seabrook is committed to implement the recommendations from INPO Event Report IER 14-20 through its INPO membership.  The report focused attention on high consequence, low probability station

---

[9]    INPO is a member-governed organization that sets industry-wide performance objectives, criteria, and guidelines for nuclear power plant operations that are intended to promote "operational excellence" and nuclear safety and to improve the sharing of operational experience between nuclear power plants.  Membership is comprised of most U.S. nuclear power plant owners and operators and other nuclear entities.  Failure to follow INPO guidance can result in additional inspections and a sliding scale of peer intervention.

operational and project risks that could affect the viability of the unit, such as the Breaker Project.

As a result of this Event Report, NextEra and other INPO members adopted a series of actions to

ensure technical rigor is maintained and the risk of the modification is understood and mitigated.

These actions include detailed risk assessment and mitigation, and executive reviews of various

aspects of such projects, including engineering and technical details, vendor oversight, and critical

implementation steps.  Replacing a generation breaker at a nuclear plant is not like replacing a

generation breaker at a fossil plant.  Indeed, the Breaker Project will be subject to after-the-fact

review by INPO, using INPO's standards set out in INPO Event Report IER 14-20.

Based on projects of a magnitude similar to the Breaker Project, the preliminary project

planning and installation estimate for the Breaker Project is longer than the 12 months' period until

the start of the 2021 Outage, meaning it is not possible for the Breaker Project to be completed

during the 2021 Outage.  Additionally, given that the engineering study has yet to be undertaken

and all of the planning and evaluation work that must be done pursuant to the NextEra process,

there is no guarantee that the Gen Breaker project could be executed in the 2023 Outage.

### D.    Replacing the Gen Breaker will almost certainly extend the Breaker Project Outage by days, if not weeks

Seabrook Station typically runs 24 hours a day, 7 days a week by virtue of being a baseload

nuclear generator.  In addition, taking a nuclear unit offline and returning it to service is a complex

task not lightly undertaken.  For these reasons, whenever possible, and consistent with industry

practice, work on Seabrook Station is planned and executed during refueling outages.  This makes

refueling outages incredibly complex and time consuming, which is exacerbated by the fact that

nuclear plants are the most regulated infrastructure in the country, subject to both the regulations

of the Nuclear Regulatory Commission ("NRC") and other agencies, and the guidelines of INPO.

The length of time for each refueling outage depends on the scope of work that is to be completed during that outage.  Refueling outages typically take about three-and-a-half weeks.  However, Seabrook estimates that, based in part on a general understanding of the numerous activities needed to install and test the replacement Gen Breaker, replacement of the Gen Breaker is likely to take longer than this amount of time.  Current estimates are that the Breaker Project Outage will need to be extended by at least 10 days solely to complete the Breaker Project.  This is because replacing the Gen Breaker is a complex and difficult project and all work must be measured and done methodically, to maintain compliance with NRC regulations. In particular, without an operating Gen Breaker in place during the outage, Seabrook Station must transition to and from a reliable alternative source of off-site power during shutdown conditions to power the systems that provide forced cooling to the reactor core and to the spent fuel pool.  Having an alternative power source also allows required maintenance to be conducted on other power sources during shutdown operations.  It is possible that the Gen Breaker replacement will be even more complex than currently contemplated if the removal and replacement of such a system exposes further complexities that are not foreseeable at this time or even during the project's planning stage.

Accordingly, replacement of the Gen Breaker may require Seabrook Station to remain off-line for a period when it would not otherwise be off-line, but for the work required to accommodate the Breaker Project.  The work to replace the Gen Breaker will begin concurrently with the start of refueling and other work done during the Breaker Project Outage, subject of course to any limitation imposed by NRC requirements, INPO guidance, and good utility practice.

In sum, while it is likely that the Breaker Project will extend the Breaker Project Outage, the exact length of time to complete the project is unknowable.  Preliminary analyses indicate that the Breaker Project will extend the outage by approximately 10 days, but this is just an estimate.

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746 (2012), I state under penalty of perjury that the foregoing

testimony is true and correct to the best of my knowledge, information, and belief.

Executed this ___5th___ day of October, 2020.


_____
Eric McCartney
Site Vice President
NextEra Energy Seabrook, LLC

# Exhibit No. 6

# Standard Large Generator Interconnection Agreement By and Among ISO New England Inc. and NextEra Energy Seabrook, LLC and New Hampshire Transmission, LLC

Exhibit No. 6
Docket No. EL21-6-000
ISO New England Inc.                                    Original Service Agreement No. LGIA-ISONE/NHT-12-01
ISO New England Inc. Transmission, Markets and Services Tariff, 0.0.0          Page 1 of 116
Open Access Transmission Tariff
Schedule 22 – Large Generator Interconnection Agreement

**STANDARD LARGE GENERATOR INTERCONNECTION AGREEMENT**

**BY AND AMONG**

**ISO NEW ENGLAND INC.**

**AND**

**NEXTERA ENERGY SEABROOK, LLC**

**AND**

**NEW HAMPSHIRE TRANSMISSION, LLC**

**Contains Critical Energy Infrastructure Information – Do not Release**

Issued by:   Raymond W. Hepper                                    Effective Date:  April 3, 2012
             Vice President and General Counsel
Issued on:   March 15, 2012

# APPENDIX 6

## LARGE GENERATOR INTERCONNECTION AGREEMENT

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Article 1 | Definitions | |
| Article 2 | Effective Date, Term and Termination | |
| Article 3 | Regulatory Filings | |
| Article 4 | Scope of Service | |
| Article 5 | Interconnection Facilities Engineering, Procurement, and Construction | |
| Article 6 | Testing and Inspection | |
| Article 7 | Metering | |
| Article 8 | Communications | |
| Article 9 | Operations | |
| Article 10 | Maintenance | |
| Article 11 | Performance Obligation | |
| Article 12 | Invoice | |
| Article 13 | Emergencies | |
| Article 14 | Regulatory Requirements and Governing Law | |
| Article 15 | Notices | |
| Article 16 | Force Majeure | |
| Article 17 | Default | |
| Article 18 | Indemnity, Consequential Damages and Insurance | |
| Article 19 | Assignment | |
| Article 20 | Severability | |
| Article 21 | Comparability | |
| Article 22 | Confidentiality | |
| Article 23 | Environmental Releases | |
| Article 24 | Information Requirements | |
| Article 25 | Information Access and Audit Rights | |
| Article 26 | Subcontractors | |
| Article 27 | Disputes | |

Article 28      Representations, Warranties and Covenants

Article 29      Omitted

Article 30      Miscellaneous

## THIS STANDARD LARGE GENERATOR INTERCONNECTION AGREEMENT

("Agreement") is made and entered into this _3rd___ day of __April_____ 2012, by and between NextEra Energy Seabrook, LLC, a limited liability company organized and existing under the laws of the State of Delaware ("Interconnection Customer" with a Large Generating Facility), ISO New England Inc., a non-stock corporation organized and existing under the laws of the State of Delaware ("System Operator"), and New Hampshire Transmission, LLC, a company organized and existing under the laws of the State of Delaware ("Interconnecting Transmission Owner").  Under this Agreement the Interconnection Customer, System Operator, and Interconnecting Transmission Owner each may be referred to as a "Party" or collectively as the "Parties."

## RECITALS

**WHEREAS,** System Operator is the central dispatching agency provided for under the Transmission Operating Agreement ("TOA") which has responsibility for the operation of the New England Control Area from the System Operator control center and the administration of the Tariff; and

**WHEREAS**, Interconnecting Transmission Owner is the owner or possessor of an interest in the Administered Transmission System; and

**WHEREAS**, Interconnection Customer intends to own, lease and/or control and operate the Generating Facility identified as a Large Generating Facility in Appendix C to this Agreement; and

**WHEREAS,** System Operator, Interconnection Customer and Interconnecting Transmission Owner have agreed to enter into this Agreement for the purpose of interconnecting the Large Generating Facility to the Administered Transmission System.

**NOW, THEREFORE,** in consideration of and subject to the mutual covenants contained herein, it is agreed:

When used in this Standard Large Generator Interconnection Agreement, terms with initial capitalization that are not defined in Article 1 shall have the meanings specified in the Article in which they are used.

## ARTICLE 1.  DEFINITIONS

The definitions contained in this Article 1 and those definitions embedded in an Article of this Agreement are intended to apply in the context of the generator interconnection process provided for in Schedule 22 (and its appendices).  To the extent that the definitions herein are different than those contained in Sections I.2.2 of the Tariff, the definitions provided below shall control only for purposes of generator interconnections under  Schedule 22.  Capitalized terms in Schedule 22 that are not defined in this Section 1 shall have the meanings specified in Sections I.2.2 of the Tariff.

**Administered Transmission System** shall mean the PTF, the Non-PTF, and distribution facilities that are subject to the Tariff.

**Adverse System Impact** shall mean any significant negative effects on the stability, reliability or operating characteristics of the electric system.

**Affected System** shall mean any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection.

**Affected Party or Parties** shall mean the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process.

**Affiliate** shall mean, with respect to a corporation, partnership or other entity, each such other corporation, partnership or other entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such corporation, partnership or other entity.

**Applicable Laws and Regulations** shall mean all duly promulgated applicable federal, state and local laws, regulations, rules, ordinances, codes, decrees, judgments, directives, or judicial or administrative orders, permits and other duly authorized actions of any Governmental Authority.

**Applicable Reliability Council** shall mean the reliability council applicable to the New England Transmission System.

5

**Applicable Reliability Standards** shall mean the requirements and guidelines of NERC, the NPCC and the New England Control Area, including publicly available local reliability requirements of Interconnecting Transmission Owners or other Affected Parties.

**At-Risk Expenditure** shall mean money expended for the development of the Generating Facility that cannot be recouped if the Interconnection Customer were to withdraw the Interconnection Request for the Generating Facility. At-Risk Expenditure may include, but is not limited to, money expended on: (i) costs of federal, state, local, regional and town permits, (ii) Site Control, (iii) site-specific design and surveys, (iv) construction activities, and (v) non-refundable deposits for major equipment components. For purposes of this definition, At-Risk Expenditure shall not include costs associated with the Interconnection Studies.

**Base Cases** shall have the meaning specified in Section 2.3 of the Large Generator Interconnection Procedures ("LGIP").

**Base Case Data** shall mean the base case power flow, short circuit, and stability data bases used for the Interconnection Studies by the System Operator, Interconnection Customer, Interconnecting Transmission Owner, or any Affected Party as deemed appropriate by the System Operator in accordance with applicable codes of conduct and confidentiality requirements.

**Breach** shall mean the failure of a Party to perform or observe any material term or condition of the Standard Large Generator Interconnection Agreement.

**Breaching Party** shall mean a Party that is in Breach of the Standard Large Generator Interconnection Agreement.

**Calendar Day** shall mean any day including Saturday, Sunday or a Federal Holiday.

**Capacity Capability Interconnection Standard ("CC Interconnection Standard")** shall mean the criteria required to permit the Interconnection Customer to interconnect in a manner that avoids any significant adverse effect on the reliability, stability, and operability of the New England Transmission System, including protecting against the degradation of transfer capability for interfaces affected by the Generating Facility, and in a manner that ensures intra-zonal deliverability by avoidance of the redispatch of other Capacity Network Resources, as detailed in the ISO New England Planning Procedures.

6

**JA279**

**Capacity Network Resource ("CNR")** shall mean that portion of a Generating Facility that is interconnected to the Administered Transmission System under the Capacity Capability Interconnection Standard.

**Capacity Network Resource Capability ("CNR Capability")** shall mean: (i) in the case of a Generating Facility that is a New Generating Capacity Resource pursuant to Section III.13.1 of the Tariff or an Existing Generating Capacity Resource that is increasing its capability pursuant to Section III.13.1.2.2.5 of the Tariff, the highest megawatt amount of the Capacity Supply Obligation obtained by the Generating Facility in accordance with Section III.13 of the Tariff, and, if applicable, as specified in a filing by the System Operator with the Commission in accordance with Section III.13.8.2 of the Tariff, or (ii) in the case of a Generating Facility that meets the criteria under Section 5.2.3 of this LGIP, the total megawatt amount determined pursuant to the hierarchy established in Section 5.2.3. CNR Capability shall not exceed the maximum net megawatt electrical output of the Generating Facility at the Point of Interconnection at an ambient temperature at or above 90 F. degrees for Summer and at or above 20 degrees F. for Winter. Where the Generating Facility includes multiple production devices, the CNR Capability shall not exceed the aggregate maximum net megawatt electrical output of the Generating Facility at the Point of Interconnection at an ambient temperature at or above 90 degrees F. for Summer and at or above 20 degrees F. for Winter.

**Capacity Network Resource Group Study ("CNR Group Study")** shall mean the study performed by the System Operator under Section III.13.1.1.2.3 of the Tariff to determine which resources qualify to participate in a Forward Capacity Auction.

**Capacity Network Resource Interconnection Service ("CNR Interconnection Service")** shall mean the Interconnection Service selected by the Interconnection Customer to interconnect its Large Generating Facility with the Administered Transmission System in accordance with the Capacity Capability Interconnection Standard. An Interconnection Customer's CNR Interconnection Service shall be for the megawatt amount of CNR Capability. CNR Interconnection Service does not in and of itself convey transmission service.

**Clustering** shall mean the process whereby a group of Interconnection Requests is studied together for the purpose of conducting the Interconnection System Impact Study.

**JA280**

**Commercial Operation** shall mean the status of a Generating Facility that has commenced generating electricity for sale, excluding electricity generated during Trial Operation.

**Commercial Operation Date** of a unit shall mean the date on which the Generating Facility commences Commercial Operation as agreed to by the Parties pursuant to Appendix E to the Standard Large Generator Interconnection Agreement.

**Conditional Qualified New Generating Capacity Resource** shall be as defined in Section III.13.1.1.2.3(f) of the Tariff.

**Confidential Information** shall mean any confidential, proprietary or trade secret information of a plan, specification, pattern, procedure, design, device, list, concept, policy or compilation relating to the present or planned business of a Party, which is designated as confidential by the Party supplying the information, whether conveyed orally, electronically, in writing, through inspection, or otherwise. Confidential Information shall include, but not be limited to, information that is confidential pursuant to the ISO New England Information Policy.

**Cost of New Entry ("CONE")** shall be as determined in Section III.13.2.4 of the Tariff.

**Default** shall mean the failure of a Breaching Party to cure its Breach in accordance with Article 17 of the Standard Large Generator Interconnection Agreement.

**Dispute Resolution** shall mean the procedure for resolution of a dispute between the Parties in which they will first attempt to resolve the dispute on an informal basis.

**Distribution System** shall mean the Interconnecting Transmission Owner's facilities and equipment used to transmit electricity to ultimate usage points such as homes and industries directly from nearby generators or from interchanges with higher voltage transmission networks which transport bulk power over longer distances.  The voltage levels at which distribution systems operate differ among areas.

**Distribution Upgrades** shall mean the additions, modifications, and upgrades to Interconnecting Transmission Owner's Distribution System at or beyond the Point of Interconnection to facilitate interconnection of the Generating Facility and render the transmission service necessary to effect

Interconnection Customer's wholesale sale of electricity in interstate commerce.  Distribution Upgrades do not include Interconnection Facilities.

**Effective Date** shall mean the date on which the Standard Large Generator Interconnection Agreement becomes effective upon execution by the Parties subject to acceptance by the Commission or if filed unexecuted, upon the date specified by the Commission.

**Emergency Condition** shall mean a condition or situation: (1) that in the judgment of the Party making the claim is likely to endanger life or property; or (2) that, in the case of the Interconnecting Transmission Owner, is likely (as determined in a non-discriminatory manner) to cause a material adverse effect on the security of, or damage to the New England Transmission System, Interconnecting Transmission Owner's Interconnection Facilities or any Affected System to which the New England Transmission System is directly connected; or (3) that, in the case of Interconnection Customer, is likely (as determined in a non-discriminatory manner) to cause a material adverse effect on the security of, or damage to, the Generating Facility or Interconnection Customer's Interconnection Facilities.  System restoration and black start shall be considered Emergency Conditions; provided that Interconnection Customer is not obligated by the Standard Large Generator Interconnection Agreement to possess black start capability.

**Engineering & Procurement ("E&P") Agreement** shall mean an agreement that authorizes the Interconnection Customer, Interconnecting Transmission Owner and any other Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection in order to advance the implementation of the Interconnection Request.

**Environmental Law** shall mean Applicable Laws or Regulations relating to pollution or protection of the environment or natural resources.

**Federal Power Act** shall mean the Federal Power Act, as amended, 16 U.S.C. §§ 791a *et seq.*

**Force Majeure** shall mean any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, breakage or accident to machinery or equipment, any order, regulation or restriction imposed by governmental, military or lawfully established civilian authorities, or any other cause beyond a Party's control.  A Force Majeure event does not include acts of negligence or intentional wrongdoing by the Party claiming Force Majeure.

9

**Generating Facility** shall mean Interconnection Customer's device for the production of electricity identified in the Interconnection Request, but shall not include the Interconnection Customer's Interconnection Facilities.

**Good Utility Practice** shall mean any of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition.  Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the region.

**Governmental Authority** shall mean any federal, state, local or other governmental regulatory or administrative agency, court, commission, department, board, or other governmental subdivision, legislature, rulemaking board, tribunal, or other governmental authority having jurisdiction over the Parties, their respective facilities, or the respective services they provide, and exercising or entitled to exercise any administrative, executive, police, or taxing authority or power; provided, however, that such term does not include the System Operator, Interconnection Customer, Interconnecting Transmission Owner, or any Affiliate thereof.

**Hazardous Substances** shall mean any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "radioactive substances," "contaminants," "pollutants," "toxic pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law, or any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any applicable Environmental Law.

**Initial Synchronization Date** shall mean the date upon which the Generating Facility is initially synchronized and upon which Trial Operation begins.

**In-Service Date** shall mean the date upon which the Interconnection Customer reasonably expects it will be ready to begin use of the Interconnecting Transmission Owner's Interconnection Facilities to obtain back feed power.

10

**JA283**

**Interconnecting Transmission Owner** shall mean a Transmission Owner that owns, leases or otherwise possesses an interest in the portion of the Administered Transmission System at the Point of Interconnection and shall be a Party to the Standard Large Generator Interconnection Agreement. The term Interconnecting Transmission Owner shall not be read to include the System Operator.

**Interconnecting Transmission Owner's Interconnection Facilities** shall mean all facilities and equipment owned, controlled, or operated by Interconnecting Transmission Owner from the Point of Change of Ownership to the Point of Interconnection as identified in Appendix A to the Standard Large Generator Interconnection Agreement, including any modifications, additions or upgrades to such facilities and equipment.  Interconnecting Transmission Owner's Interconnection Facilities are sole use facilities and shall not include Distribution Upgrades, Stand Alone Network Upgrades or Network Upgrades.

**Interconnection Customer** shall mean any entity, including a transmission owner or its Affiliates or subsidiaries, that proposes to interconnect its Generating Facility with the Administered Transmission System.

**Interconnection Customer's Interconnection Facilities** shall mean all facilities and equipment, as identified in Appendix A of the Standard Large Generator Interconnection Agreement, that are located between the Generating Facility and the Point of Change of Ownership, including any modification, addition, or upgrades to such facilities and equipment necessary to physically and electrically interconnect the Generating Facility to the Administered Transmission System. Interconnection Customer's Interconnection Facilities are sole use facilities.

**Interconnection Facilities** shall mean the Interconnecting Transmission Owner's Interconnection Facilities and the Interconnection Customer's Interconnection Facilities.  Collectively, Interconnection Facilities include all facilities and equipment between the Generating Facility and the Point of Interconnection, including any modification, additions or upgrades that are necessary to physically and electrically interconnect the Generating Facility to the Administered Transmission System. Interconnection Facilities are sole use facilities and shall not include Distribution Upgrades, Stand Alone Network Upgrades or Network Upgrades.

**JA284**

**Interconnection Facilities Study** shall mean a study conducted by the System Operator, Interconnecting Transmission Owner, or a third party consultant for the Interconnection Customer to determine a list of facilities (including Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades as identified in the Interconnection System Impact Study), the cost of those facilities, and the time required to interconnect the Generating Facility with the Administered Transmission System. The scope of the study is defined in Section 8 of the Standard Large Generator Interconnection Procedures.

**Interconnection Facilities Study Agreement** shall mean the form of agreement contained in Appendix 4 of the Standard Large Generator Interconnection Procedures for conducting the Interconnection Facilities Study.

**Interconnection Feasibility Study** shall mean a preliminary evaluation of the system impact and cost of interconnecting the Generating Facility to the Administered Transmission System, the scope of which is described in Section 6 of the Standard Large Generator Interconnection Procedures. The Interconnection Customer has the option to request either that the Interconnection Feasibility Study be completed as a separate and distinct study, or as part of the Interconnection System Impact Study. If the Interconnection Customer requests that the Interconnection Feasibility Study be completed as part of the Interconnection System Impact Study, Section 6 shall be performed as the first step of the Interconnection System Impact Study, and shall be regarded as part of the Interconnection System Impact Study. When the requirements of Section 6 are performed as part of the Interconnection System Impact Study, the Interconnection Customer shall be responsible only for the deposit requirements of the Interconnection System Impact Study, and there shall be only one final report, which will include the results of both Section 6 and Section 7.

**Interconnection Feasibility Study Agreement** shall mean the form of agreement contained in Appendix 2 of the Standard Large Generator Interconnection Procedures for conducting the Interconnection Feasibility Study.

**Interconnection Request** (a) shall mean an Interconnection Customer's request, in the form of Appendix 1 to the Standard Large Generator Interconnection Procedures, in accordance with the Tariff, to: (i) interconnect a new Generating Facility to the Administered Transmission System as either a CNR or a NR; (ii) increase the energy capability or capacity capability of an existing Generating Facility; (iii) make a Material Modification to the design or operating characteristics of an existing Generating Facility,

including its Interconnection Facilities, that is interconnected with the Administered Transmission System; (iv) commence participation in the wholesale markets by an existing Generating Facility that is interconnected with the Administered Transmission System; or (v) change from NR Interconnection Service to CNR Interconnection Service.  Interconnection Request shall not include: (i) a retail customer interconnecting a new Generating Facility that will produce electric energy to be consumed only on the retail customer's site; (ii) a request to interconnect a new Generating Facility to a distribution facility that is subject to the Tariff if the Generating Facility will not be used to make wholesale sales of electricity in interstate commerce;  or (iii) a request to interconnect a Qualifying Facility (as defined by the Public Utility Regulatory Policies Act, as amended by the Energy Policy Act of 2005 and the regulations thereto), where the Qualifying Facility's owner intent is to sell 100% of the Qualifying Facility's output to its interconnected electric utility.

**Interconnection Service** shall mean the service provided by System Operator and the Interconnecting Transmission Owner, associated with interconnecting the Interconnection Customer's Generating Facility to the Administered Transmission System and enabling the receipt of electric energy capability and/or capacity capability from the Generating Facility at the Point of Interconnection, pursuant to the terms of the Standard Large Generator Interconnection Agreement and, if applicable, the Tariff.

**Interconnection Study** shall mean any of the following studies: the Interconnection Feasibility Study, the Interconnection System Impact Study, and the Interconnection Facilities Study described in the Standard Large Generator Interconnection Procedures.  Interconnection Study shall not include a CNR Group Study.

**Interconnection System Impact Study** shall mean an engineering study that evaluates the impact of the proposed interconnection on the safety and reliability of the Administered Transmission System and any other Affected System.  The study shall identify and detail the system impacts that would result if the Generating Facility were interconnected without project modifications or system modifications, focusing on Adverse System Impacts, or to study potential impacts, including but not limited to those identified in the Scoping Meeting as described in the Standard Large Generator Interconnection Procedures.  If the Interconnection Customer requests that the Interconnection Feasibility Study be completed as part of the Interconnection System Impact Study, Section 6 shall be performed as the first step of the Interconnection System Impact Study, and shall be regarded as part of the Interconnection System Impact Study.  When the requirements of Section 6 are performed as part of the Interconnection System Impact Study, the Interconnection Customer shall be responsible only for the

deposit requirements of the Interconnection System Impact Study, and there shall be only one final report, which will include the results of both Section 6 and Section 7.

**Interconnection System Impact Study Agreement** shall mean the form of agreement contained in Appendix 3 of the Standard Large Generator Interconnection Procedures for conducting the Interconnection System Impact Study.

**IRS** shall mean the Internal Revenue Service.

**Large Generating Facility** shall mean a Generating Facility having a maximum gross capability at or above zero degrees F. of more than 20 MW.

**Long Lead Time Generating Facility ("Long Lead Facility")** shall mean a Generating Facility with an Interconnection Request for CNR Interconnection Service that has, as applicable, elected or requested long lead time treatment and met the eligibility criteria and requirements specified in Section 3.2.3 of the LGIP.

**Loss** shall mean any and all losses relating to injury to or death of any person or damage to property, demand, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from another Party's performance, or non-performance of its obligations under the Standard Large Generator Interconnection Agreement on behalf of the Indemnifying Party, except in cases of gross negligence or intentional wrongdoing by the Indemnifying Party.

**Major Permits shall be as defined in Section III.13.1.1.2.2.2(a) of the Tariff.**

**Material Modification** shall mean (i) except as expressly provided in Section 4.4.1, those modifications to the Interconnection Request, including any of the technical data provided by the Interconnection Customer in Attachment A to the Interconnection Request or to the interconnection configuration, requested by the Interconnection Customer that either require significant additional study of the same Interconnection Request and could substantially change the interconnection design, or have a material impact on the cost or timing of any Interconnection Studies or upgrades associated with an Interconnection Request with a later queue priority date; (ii) a change to the design or operating characteristics of an existing Generating Facility, including its Interconnection Facilities, that is

14

**JA287**

interconnected with the Administered Transmission System that may have a significant adverse effect on the reliability or operating characteristics of the New England Transmission System; (iii) a delay to the Commercial Operation Date, In-Service Date, or Initial Synchronization Date of greater than three (3) years where the reason for delay is unrelated to construction schedules or permitting which delay is beyond the Interconnection Customer's control; or (iv) except as provided in Section 3.2.3.4 of the LGIP, a withdrawal of a request for Long Lead Facility treatment; or (v) except as provided in Section 3.2.3.6 of the LGIP, an election to participate in an earlier Forward Capacity Auction than originally anticipated.

**Metering Equipment** shall mean all metering equipment installed or to be installed at the Generating Facility pursuant to the Standard Large Generator Interconnection Agreement at the metering points, including but not limited to instrument transformers, MWh-meters, data acquisition equipment, transducers, remote terminal unit, communications equipment, phone lines, and fiber optics.

**NERC** shall mean the North American Electric Reliability Council or its successor organization.

**Network Capability Interconnection Standard ("NC Interconnection Standard")** shall mean the criteria required to permit the Interconnection Customer to interconnect in a manner that avoids any significant adverse effect on the reliability, stability, and operability of the New England Transmission System, including protecting against the degradation of transfer capability for interfaces affected by the Generating Facility, and in a manner that avoids the redispatch of other Network Resources, as detailed in the ISO New England Planning Procedures.

**Network Resource ("NR")** shall mean the portion of a Generating Facility that is interconnected to the Administered Transmission System under the Network Capability Interconnection Standard.

**Network Resource Capability ("NR Capability")** shall mean the maximum gross and net megawatt electrical output of the Generating Facility at the Point of Interconnection at an ambient temperature at or above 50 degrees F. for Summer and at or above 0 degrees F. for Winter.  Where the Generating Facility includes multiple energy production devices, the NR Capability shall be the aggregate maximum gross and net megawatt electrical output of the Generating Facility at the Point of Interconnection at an ambient temperature at or above 50 degrees F. for Summer and at or above 0 degrees F. for Winter.  NR Capability shall be equal to or greater than the CNR Capability.  In the case of a Generating Facility that meets the criteria under Section 5.2.4 of this LGIP, the NR Capability shall equal the total megawatt amount determined pursuant to Section 5.2.4.

**JA288**

**Network Resource Interconnection Service ("NR Interconnection Service")** shall mean the Interconnection Service selected by the Interconnection Customer to interconnect its Generating Facility to the Administered Transmission System in accordance with the Network Capability Interconnection Standard. An Interconnection Customer's NR Interconnection Service shall be solely for the megawatt amount of the NR Capability. NR Interconnection Service in and of itself does not convey transmission service.

**Network Upgrades** shall mean the additions, modifications, and upgrades to the New England Transmission System required at or beyond the Point of Interconnection to accommodate the interconnection of the Large Generating Facility to the Administered Transmission System.

**Notice of Dispute** shall mean a written notice of a dispute or claim that arises out of or in connection with the Standard Large Generator Interconnection Agreement or its performance.

**Optional Interconnection Study** shall mean a sensitivity analysis based on assumptions specified by the Interconnection Customer in the Optional Interconnection Study Agreement.

**Optional Interconnection Study Agreement** shall mean the form of agreement contained in Appendix 5 of the Standard Large Generator Interconnection Procedures for conducting the Optional Interconnection Study.

**Party** or **Parties** shall mean the System Operator, Interconnection Customer and Interconnecting Transmission Owner or any combination of the above.

**Point of Change of Ownership** shall mean the point, as set forth in Appendix A to the Standard Large Generator Interconnection Agreement, where the Interconnection Customer's Interconnection Facilities connect to Interconnecting Transmission Owner's Interconnection Facilities.

**Point of Interconnection** shall mean the point, as set forth in Appendix A to the Standard Large Generator Interconnection Agreement, where the Interconnection Facilities connect to the Administered Transmission System.

**Queue Position** shall mean the order of a valid request in the New England Control Area, relative to all other pending requests in the New England Control Area, that is established based upon the date and

16

time of receipt of such request by the System Operator.  Requests are comprised of Interconnection Requests, requests for Elective Transmission Upgrades, requests for transmission service and notification of requests for interconnection to other electric systems, as notified by the other electric systems, that impact the Administered Transmission System.  For purposes of this LGIA, references to a "higher-queued" Interconnection Request shall mean one that has been received by the System Operator (and placed in queue order) earlier than another Interconnection Request, which is referred to as "lower-queued."

  **Reasonable Efforts** shall mean, with respect to an action required to be attempted or taken by a Party under the Standard Large Generator Interconnection Agreement, efforts that are timely and consistent with Good Utility Practice and are otherwise substantially equivalent to those a Party would use to protect its own interests.

  **Scoping Meeting** shall mean the meeting between representatives of the System Operator, Interconnection Customer, Interconnecting Transmission Owner, or any Affected Party as deemed appropriate by the System Operator in accordance with applicable codes of conduct and confidentiality requirements, conducted for the purpose of discussing alternative interconnection options, to exchange information including any transmission data and earlier study evaluations that would be reasonably expected to impact such interconnection options, to analyze such information, and to determine the potential feasible Points of Interconnection.

  **Site Control** shall mean documentation reasonably demonstrating: (a) that  the Interconnection Customer is the owner in fee simple of the real property for which new interconnection is sought; (b) that the Interconnection Customer holds a valid written leasehold interest in the real property for which new interconnection is sought; (c) that the Interconnection Customer holds a valid written option to purchase or leasehold property for which new interconnection is sought; (d) that the Interconnection Customer holds a duly executed written contract to purchase or leasehold the real property for which new interconnection is sought; or (e) that the Interconnection Customer has filed applications for required permits to site on federal or state property.

  **Stand Alone Network Upgrades** shall mean Network Upgrades that an Interconnection Customer may construct without affecting day-to-day operations of the New England Transmission System during their construction.  The System Operator, Interconnection Customer, Interconnecting Transmission Owner, and any Affected Party as deemed appropriate by System Operator in accordance

17

with applicable codes of conduct and confidentiality requirements, must agree as to what constitutes Stand Alone Network Upgrades and identify them in Appendix A to the Standard Large Generator Interconnection Agreement.

**Standard Large Generator Interconnection Agreement ("LGIA")** shall mean the form of interconnection agreement applicable to an Interconnection Request pertaining to a Large Generating Facility, that is included in this Schedule 22 to the Tariff.

**Standard Large Generator Interconnection Procedures ("LGIP")** shall mean the interconnection procedures applicable to an Interconnection Request pertaining to a Large Generating Facility that are included in this Schedule 22 to the Tariff.

**System Operator** shall mean ISO New England Inc. or a successor organization.

**System Protection Facilities** shall mean the equipment, including necessary signal protection communications equipment, required to protect (1) the New England Transmission System from faults or other electrical disturbances occurring at the Generating Facility and (2) the Generating Facility from faults or other electrical system disturbances occurring on the New England Transmission System or on other delivery systems or other generating systems to which the New England Transmission System is directly connected.

**Trial Operation** shall mean the period during which Interconnection Customer is engaged in on-site test operations and commissioning of the Generating Facility prior to Commercial Operation.

## ARTICLE 2.  EFFECTIVE DATE, TERM AND TERMINATION

2.1     **Effective Date**.  This LGIA shall become effective upon execution by the Parties subject to acceptance by the Commission (if applicable), or if filed unexecuted, upon the date specified by the Commission. System Operator and Interconnecting Transmission Owner, shall promptly and jointly file this LGIA with the Commission upon execution in accordance with Section 11.3 of the LGIP and Article 3.1, if required.

2.2    **Term of Agreement.**  This LGIA, subject to the provisions of Article 2.3, and by mutual agreement of the Parties, shall remain in effect for a period of <u>eighteen (18)</u> years (until March 15, 2030) from the Effective Date and shall be automatically renewed for each successive one-year period thereafter.

2.3    **Termination Procedures.**

2.3.1    **Written Notice.**  This LGIA may be terminated by the Interconnection Customer, subject to continuing obligations of this LGIA and the Tariff, after giving the System Operator and Interconnecting Transmission Owner ninety (90) Calendar Days advance written notice, or by System Operator or Interconnecting Transmission Owner notifying the Commission after a Generating Facility retires pursuant to the Tariff, provided that if an Interconnection Customer exercises its right to terminate on ninety (90) Calendar Days, any reconnection would be treated as a new interconnection request; or this LGIA may be terminated by Interconnecting Transmission Owner or System Operator by notifying the Commission after the Generating Facility permanently ceases Commercial Operation.

2.3.2    **Default.**  Each Party may terminate this LGIA in accordance with Article 17. Notwithstanding Articles 2.3.1 and 2.3.2, no termination shall become effective until the Parties have complied with all Applicable Laws and Regulations applicable to such termination, including the filing, if applicable, with the Commission of a notice of termination of this LGIA, which notice has been accepted for filing by the Commission. Termination of the LGIA shall not supersede or alter any requirements for deactivation or retirement of a generating unit under  ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

2.4    **Termination Costs.**  If a Party elects to terminate this Agreement pursuant to Article 2.3 above, each Party shall pay all costs incurred (including any cancellation costs relating to orders or contracts for Interconnection Facilities and equipment) or charges assessed by the other Party(ies), as of the date of such Party's(ies') receipt of such notice of termination, that are the responsibility of such Party(ies) under this LGIA.  In the event of termination by a Party, all Parties shall use commercially Reasonable Efforts to mitigate the costs, damages and charges arising as a consequence of termination.  Upon termination of this LGIA, unless otherwise ordered or approved by the Commission:

2.4.1    With respect to any portion of the Interconnecting Transmission Owner's Interconnection Facilities, Network Upgrades, or Distribution Upgrades to the extent covered by this agreement, that have not yet been constructed or installed, the Interconnecting Transmission Owner shall to the extent possible and with Interconnection Customer's authorization cancel any pending orders of, or return, any materials or equipment for, or contracts for construction of, such facilities; provided that in the event Interconnection Customer elects not to authorize such cancellation, Interconnection Customer shall assume all payment obligations with respect to such materials, equipment, and contracts, and the Interconnecting Transmission Owner shall deliver such material and equipment, and, if necessary, and to the extent possible, assign such contracts, to Interconnection Customer as soon as practicable, at Interconnection Customer's expense.  To the extent that Interconnection Customer has already paid Interconnecting Transmission Owner for any or all such costs of materials or equipment not taken by Interconnection Customer, either (i) in the case of overpayment, Interconnecting Transmission Owner shall promptly refund such amounts to Interconnection Customer, less any costs, including penalties incurred by the Interconnecting Transmission Owner to cancel any pending orders of or return such materials, equipment, or contracts, or (ii) in the case of underpayment, Interconnection Customer shall promptly pay such amounts still due plus any costs, including penalties incurred by Interconnecting Transmission Owner to cancel any pending orders of or return such materials, equipment, or contracts.
If an Interconnection Customer terminates this LGIA, it shall be responsible for all costs incurred in association with that Interconnection Customer's interconnection, including any cancellation costs relating to orders or contracts for Interconnection Facilities and equipment, and other expenses including any Network Upgrades for which the Interconnecting Transmission Owner has incurred expenses and has not been reimbursed by the Interconnection Customer.

2.4.2    Interconnecting Transmission Owner may, at its option, retain any portion of such materials, equipment, or facilities that Interconnection Customer chooses not to accept delivery of, in which case Interconnecting Transmission Owner shall be responsible for all costs associated with procuring such materials, equipment, or facilities.

**JA293**

2.4.3    With respect to any portion of the Interconnection Facilities, and any other facilities already installed or constructed pursuant to the terms of this LGIA, Interconnection Customer shall be responsible for all costs associated with the removal, relocation or other disposition or retirement of such materials, equipment, or facilities.

2.5    **Disconnection.**  Upon termination of this LGIA, Interconnection Service shall terminate and, the Parties will take all appropriate steps to disconnect the Large Generating Facility from the Interconnecting Transmission Owner's Interconnection Facilities. All costs required to effectuate such disconnection shall be borne by the terminating Party, unless such termination resulted from a non-terminating Party's Default of this LGIA or such non-terminating Party otherwise is responsible for these costs under this LGIA.

2.6    **Survival.**  This LGIA shall continue in effect after termination to the extent necessary to provide for final billings and payments and for costs incurred hereunder, including billings and payments pursuant to this LGIA; to permit the determination and enforcement of liability and indemnification obligations arising from acts or events that occurred while this LGIA was in effect; and to permit each Party to have access to the lands of the other Party(ies) pursuant to this LGIA or other applicable agreements, to disconnect, remove or salvage its own facilities and equipment.

## ARTICLE 3.  REGULATORY FILINGS

3.1    **Filing**.  The System Operator and Interconnecting Transmission Owner shall jointly file this LGIA (and any amendment hereto) with the appropriate Governmental Authority, if required, in accordance with Section 11.3 of the LGIP.  Interconnection Customer may request that any information so provided be subject to the confidentiality provisions of Article 22.  If the Interconnection Customer has executed this LGIA, or any amendment thereto, the Interconnection Customer shall reasonably cooperate with the System Operator and Interconnecting Transmission Owner with respect to such filing and to provide any information reasonably requested by the System Operator and/or the Interconnecting Transmission Owner needed to comply with applicable regulatory requirements.

## ARTICLE 4.  SCOPE OF SERVICE

4.1      **Interconnection Product Options.**  Interconnection Customer has selected the following (checked) type(s) of Interconnection Service:

Check:  ___   NR for NR Interconnection Service (NR Capability Only)

　　　　 _X_   CNR for CNR Interconnection Service (CNR Capability and NR Capability)

**4.1.1      Capacity Network Resource Interconnection Service (CNR Interconnection Service).**

> **4.1.1.1   The Product**.  The System Operator and Interconnecting Transmission Owner must conduct the necessary studies and the Interconnecting Transmission Owner and Affected Parties must construct the Network Upgrades needed to interconnect the Large Generating Facility in a manner comparable to that in which all other Capacity Network Resources are interconnected under the CNR Interconnection Standard.  CNR Interconnection Service allows the Interconnection Customer's Large Generating Facility to be designated as a Capacity Network Resource, to participate in the New England Markets, in accordance with Market Rule 1, Section III of the Tariff, up to the net CNR Capability, or as otherwise provided in Market Rule 1, Section III of the Tariff, on the same basis as all other existing Capacity Network Resources, and to be studied as a Capacity Network Resource on the assumption that such a designation will occur.

**4.1.2  Network Resource Interconnection Service (NR Interconnection Service).**

> **4.1.2.1   The Product**.  The System Operator and Interconnecting Transmission Owner must conduct the necessary studies and Interconnecting Transmission Owner and Affected Parties must construct the Network Upgrades needed to interconnect the Large Generating Facility in a manner comparable to that in which all other Network Resources are interconnected under the NC Interconnection Standard.

22

**JA295**

NC Interconnection Service allows the Interconnection Customer's Large Generating Facility to participate in the New England Markets, in accordance with Market Rule 1, Section III of the Tariff, up to the gross and net NR Capability or as otherwise provided in Market Rule l, Section III of the Tariff. Notwithstanding the above, the portion of a Large Generating Facility that has been designated as a Network Resource interconnected under the NC Interconnection Standard cannot be a capacity resource under Section III.13 of the Tariff, unless pursuant to a new Interconnection Request for CNR Interconnection Service.

**4.2**    **Provision of Service**.  System Operator and Interconnecting Transmission Owner shall provide Interconnection Service for the Large Generating Facility at the Point of Interconnection.

**4.3**    **Performance Standards**.  Each Party shall perform all of its obligations under this LGIA in accordance with Applicable Laws and Regulations, the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and Good Utility Practice, and to the extent a Party is required or prevented or limited in taking any action by such requirements and standards, such Party shall not be deemed to be in Breach of this LGIA for its compliance therewith.  If such Party is the Interconnecting Transmission Owner, then that Party shall amend the LGIA and System Operator, in conjunction with the Interconnecting Transmission Owner, shall submit the amendment to the Commission for approval.

**4.4**    **No Transmission Delivery Service**.  The execution of this LGIA does not constitute a request for, nor the provision of, any service except for Interconnection Service, including, but not limited to, transmission delivery service, local delivery service, distribution service, capacity service, energy service, or Ancillary Services under any applicable tariff, and does not convey any right to deliver electricity to any specific customer or Point of Delivery.

**4.5**    **Transmission Delivery Service Implications**.  CNR Interconnection Service and NR Interconnection Service allow the Interconnection Customer's Large Generating Facility to be designated by any Network Customer under the Tariff on the New England Transmission System as a Capacity Network Resource or Network Resource, up to the net CNR Capability or NR Capability, respectively, on the same basis as all other existing Capacity Network Resources and Network Resources interconnected to the New England

Transmission System, and to be studied as a Capacity Network Resource or a Network Resource on the assumption that such a designation will occur. Although CNR Interconnection Service and NR Interconnection Service do not convey a reservation of transmission service, any Network Customer can utilize its network service under the Tariff to obtain delivery of capability from the Interconnection Customer's Large Generating Facility in the same manner as it accesses Capacity Network Resources and Network Resources. A Large Generating Facility receiving CNR Interconnection Service or NR Interconnection Service may also be used to provide Ancillary Services, in accordance with the Tariff and Market Rule 1, after technical studies and/or periodic analyses are performed with respect to the Large Generating Facility's ability to provide any applicable Ancillary Services, provided that such studies and analyses have been or would be required in connection with the provision of such Ancillary Services by any existing Capacity Network Resource or Network Resource. However, if an Interconnection Customer's Large Generating Facility has not been designated as a Capacity Network Resource or as a Network Resource by any load, it cannot be required to provide Ancillary Services except to the extent such requirements extend to all Generating Facilities that are similarly situated.

CNR Interconnection Service and NR Interconnection Service do not necessarily provide the Interconnection Customer with the capability to physically deliver the output of its Large Generating Facility to any particular load on the New England Transmission System without incurring congestion costs. In the event of transmission constraints on the New England Transmission System, the Interconnection Customer's Large Generating Facility shall be subject to the applicable congestion management procedures for the New England Transmission System in the same manner as other Capacity Network Resources or Network Resources.

There is no requirement either at the time of study or interconnection, or at any point in the future, that the Interconnection Customer's Large Generating Facility be designated as a Capacity Network Resource or as a Network Resource by a Network Service Customer under the Tariff or that the Interconnection Customer identify a specific buyer (or sink). To the extent a Network Customer does designate the Large Generating Facility as either a Capacity Network Resource or a Network Resource, it must do so pursuant to the Tariff.

24

Once an Interconnection Customer satisfies the requirements for obtaining CNR Interconnection Service or NR Interconnection Service, as long as the Large Generating Facility has not been deemed to be retired, any future transmission service request for delivery from the Large Generating Facility on the New England Transmission System of any amount of capacity capability and/or energy capability will not require that any additional studies be performed or that any further upgrades associated with such Large Generating Facility be undertaken, regardless of whether or not such Large Generating Facility is ever designated by a Network Customer as a Capacity Network Resource or Network Resource, and regardless of changes in ownership of the Large Generating Facility.  To the extent the Interconnection Customer enters into an arrangement for long-term transmission service for deliveries from the Large Generating Facility outside the New England Transmission System, or if the unit has been deemed to be retired, such request may require additional studies and upgrades in order for Interconnecting Transmission Owner to grant such request.

**4.6    Interconnection Customer Provided Services.**  The services provided by Interconnection Customer under this LGIA are set forth in Article 9.6 and Article 13.4. Interconnection Customer shall be paid for such services in accordance with Article 11.6.

## ARTICLE 5.  INTERCONNECTION FACILITIES ENGINEERING, PROCUREMENT, AND CONSTRUCTION

5.1     **Options**.  Unless otherwise mutually agreed to between the Parties, Interconnection Customer shall specify the In-Service Date, Initial Synchronization Date, and Commercial Operation Date as specified in the Interconnection Request or as subsequently revised pursuant to Section 4.4 of the LGIP; and select either Standard Option or Alternate Option set forth below for completion of the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades as set forth in Appendix A, and such dates and selected option shall be set forth in Appendix B (Milestones).  In accordance with Section 8 of the LGIP and unless otherwise mutually agreed, the Alternate Option is not an available option if the Interconnection Customer waived the Interconnection Facilities Study.

5.1.1     **Standard Option**.  The Interconnecting Transmission Owner shall design, procure, and construct the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades, using Reasonable Efforts to complete the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades by the dates set forth in Appendix B (Milestones).  The Interconnecting Transmission Owner shall not be required to undertake any action which is inconsistent with its standard safety practices, its material and equipment specifications, its design criteria and construction procedures, its labor agreements, and Applicable Laws and Regulations.  In the event the Interconnecting Transmission Owner reasonably expects that it will not be able to complete the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades by the specified dates, the Interconnecting Transmission Owner shall promptly provide written notice to the Interconnection Customer and shall undertake Reasonable Efforts to meet the earliest dates thereafter.

5.1.2     **Alternate Option**.  If the dates designated by Interconnection Customer are acceptable to Interconnecting Transmission Owner, the Interconnecting Transmission Owner shall so notify Interconnection Customer within thirty (30) Calendar Days, and shall assume responsibility for the design, procurement and construction of the Interconnecting Transmission Owner's Interconnection Facilities by the designated dates.
If Interconnecting Transmission Owner subsequently fails to complete Interconnecting Transmission Owner's Interconnection Facilities by the In-Service Date, to the extent

necessary to provide back feed power; or fails to complete Network Upgrades by the Initial Synchronization Date to the extent necessary to allow for Trial Operation at full power output, unless other arrangements are made by the Parties for such Trial Operation; or fails to complete the Network Upgrades by the Commercial Operation Date, as such dates are reflected in Appendix B (Milestones); Interconnecting Transmission Owner shall pay Interconnection Customer liquidated damages in accordance with Article 5.3, Liquidated Damages, provided, however, the dates designated by Interconnection Customer shall be extended day for day for each day that the applicable System Operator refuses to grant clearances to install equipment.

5.1.3    **Option to Build**.  If the dates designated by Interconnection Customer are not acceptable to Interconnecting Transmission Owner, the Interconnecting Transmission Owner shall so notify the Interconnection Customer within thirty (30) Calendar Days, and unless the Parties agree otherwise, Interconnection Customer shall have the option to assume responsibility for the design, procurement and construction of Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades on the dates specified in Article 5.1.2.  The System Operator, Interconnecting Transmission Owner, Interconnection Customer, and any Affected Party as deemed appropriate by System Operator in accordance with applicable codes of conduct and confidentiality requirements must agree as to what constitutes Stand Alone Network Upgrades and identify such Stand Alone Network Upgrades in Appendix A to the LGIA. Except for Stand Alone Network Upgrades, Interconnection Customer shall have no right to construct Network Upgrades under this option.

5.1.4    **Negotiated Option**.  If the Interconnection Customer elects not to exercise its option under Article 5.1.3 (Option to Build), Interconnection Customer shall so notify Interconnecting Transmission Owner within thirty (30) Calendar Days, and the Parties shall in good faith attempt to negotiate terms and conditions (including revision of the specified dates and liquidated damages, the provision of incentives or the procurement and construction of a portion of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades by Interconnection Customer) pursuant to which Interconnecting Transmission Owner is responsible for the design, procurement and construction of the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades.  If the Parties are unable to reach

agreement on such terms and conditions, Interconnecting Transmission Owner shall assume responsibility for the design, procurement and construction of the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades pursuant to 5.1.1 (Standard Option).

5.2    **General Conditions Applicable to Option to Build.**  If Interconnection Customer assumes responsibility for the design, procurement and construction of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades,

(1)    the Interconnection Customer shall engineer, procure equipment, and construct the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades (or portions thereof) using Good Utility Practice and using standards and specifications provided in advance by the Interconnecting Transmission Owner;

(2)    Interconnection Customer's engineering, procurement and construction of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades shall comply with all requirements of law to which Interconnecting Transmission Owner would be subject in the engineering, procurement or construction of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades;

(3)    Interconnecting Transmission Owner shall review and approve the engineering design, equipment acceptance tests, and the construction of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades;

(4)    prior to commencement of construction, Interconnection Customer shall provide to Interconnecting Transmission Owner a schedule for construction of the Interconnecting Transmission Owner's  Interconnection Facilities and Stand Alone Network Upgrades, and shall promptly respond to requests for information from Interconnecting Transmission Owner;

(5)    at any time during construction, Interconnecting Transmission Owner shall have the right to gain unrestricted access to the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades and to conduct inspections of the same;

**JA301**

(6)        at any time during construction, should any phase of the engineering, equipment procurement, or construction of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades not meet the standards and specifications provided by Interconnecting Transmission Owner, the Interconnection Customer shall be obligated to remedy deficiencies in that portion of the Interconnecting Transmission Owner's  Interconnection Facilities and Stand Alone Network Upgrades;

(7)        the Interconnection Customer shall indemnify the Interconnecting Transmission Owner for claims arising from the Interconnection Customer's construction of Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades under the terms and procedures applicable to Article 18.1 (Indemnity);

(8)        the Interconnection Customer shall transfer control of Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades to the Interconnecting Transmission Owner;

(9)        Unless Parties otherwise agree, Interconnection Customer shall transfer ownership of Interconnecting Transmission Owner's Interconnection Facilities and Stand-Alone Network Upgrades to Interconnecting Transmission Owner;

(10)      Interconnecting Transmission Owner shall approve and accept for operation and maintenance the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades to the extent engineered, procured, and constructed in accordance with this Article 5.2; and

(11)      Interconnection Customer shall deliver to Interconnecting Transmission Owner "as built" drawings, information, and any other documents that are reasonably required by Interconnecting Transmission Owner to assure that the Interconnection Facilities and Stand-Alone Network Upgrades are built to the standards and specifications required by Interconnecting Transmission Owner.

**5.3**    **Liquidated Damages**.  The actual damages to the Interconnection Customer, in the event the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades are not completed by the dates designated by the Interconnection Customer and accepted by the

Interconnecting Transmission Owner pursuant to subparagraphs 5.1.2 or 5.1.4, above, may include Interconnection Customer's fixed operation and maintenance costs and lost opportunity costs. Such actual damages are uncertain and impossible to determine at this time. Because of such uncertainty, any liquidated damages paid by the Interconnecting Transmission Owner to the Interconnection Customer in the event that Interconnecting Transmission Owner does not complete any portion of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades by the applicable dates, shall be an amount equal to ½ of 1 percent per day of the actual cost of the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades, in the aggregate, for which Interconnecting Transmission Owner has assumed responsibility to design, procure and construct.

However, in no event shall the total liquidated damages exceed 20 percent of the actual cost of the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades for which the Interconnecting Transmission Owner has assumed responsibility to design, procure, and construct. The foregoing payments will be made by the Interconnecting Transmission Owner to the Interconnection Customer as just compensation for the damages caused to the Interconnection Customer, which actual damages are uncertain and impossible to determine at this time, and as reasonable liquidated damages, but not as a penalty or a method to secure performance of this LGIA. Liquidated damages, when the Parties agree to them, are the exclusive remedy for the Interconnecting Transmission Owner's failure to meet its schedule.

No liquidated damages shall be paid to Interconnection Customer if: (1) Interconnection Customer is not ready to commence use of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades to take the delivery of power for the Large Generating Facility's Trial Operation or to export power from the Large Generating Facility on the specified dates, unless the Interconnection Customer would have been able to commence use of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades to take the delivery of power for Large Generating Facility's Trial Operation or to export power from the Large Generating Facility, but for Interconnecting Transmission Owner's delay; (2) the Interconnecting Transmission Owner's failure to meet the specified dates is the result of the action or inaction of the Interconnection Customer or any other Interconnection Customer who has entered into an LGIA with the Interconnecting Transmission Owner or any cause beyond Interconnecting Transmission Owner's reasonable control or reasonable ability to cure, including, but not limited to, actions by the System Operator that cause delays and/or delays in licensing,

permitting or consents where the Interconnecting Transmission Owner has pursued such licenses, permits or consents in good faith; (3) the Interconnection Customer has assumed responsibility for the design, procurement and construction of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades; or (4) the Parties have otherwise agreed.

**5.4**    **Power System Stabilizers**.  If a Power System Stabilizer is required to be installed on the Large Generating Facility for the purpose of maintaining system stability, the Interconnection Customer shall procure, install, maintain and operate Power System Stabilizers in accordance with the guidelines and procedures established by the System Operator and Interconnecting Transmission Owner, and consistent with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  The System Operator and Interconnecting Transmission Owner reserve the right to reasonably establish minimum acceptable settings for any installed Power System Stabilizers, subject to the design and operating limitations of the Large Generating Facility.  If the Large Generating Facility's Power System Stabilizers are removed from service or not capable of automatic operation, the Interconnection Customer shall immediately notify the System Operator and Interconnecting Transmission Owner, or their designated representative. The requirements of this paragraph shall not apply to non-synchronous power production equipment.

**5.5**    **Equipment Procurement**.  If responsibility for construction of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades is to be borne by the Interconnecting Transmission Owner, then the Interconnecting Transmission Owner shall commence design of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades and procure necessary equipment as soon as practicable after all of the following conditions are satisfied, unless the Parties otherwise agree in writing:

**5.5.1**    The Interconnecting Transmission Owner has completed the Facilities Study pursuant to the Facilities Study Agreement;

**5.5.2**    The Interconnecting Transmission Owner has received written authorization to proceed with design and procurement from the Interconnection Customer by the date specified in Appendix B (Milestones); and

**5.5.3**    The Interconnection Customer has provided security to the Interconnecting Transmission Owner in accordance with Article 11.5 by the dates specified in Appendix B (Milestones).

**5.6**    **Construction Commencement**.  The Interconnecting Transmission Owner shall commence construction of the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades for which it is responsible as soon as practicable after the following additional conditions are satisfied:

**5.6.1**    Approval of the appropriate Governmental Authority has been obtained for any facilities requiring regulatory approval;

**5.6.2**    Necessary real property rights and rights-of-way have been obtained, to the extent required for the construction of a discrete aspect of the Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades;

**5.6.3**    The Interconnecting Transmission Owner has received written authorization to proceed with construction from the Interconnection Customer by the date specified in Appendix B (Milestones); and

**5.6.4**    The Interconnection Customer has provided security to Interconnecting Transmission Owner in accordance with Article 11.5 by the dates specified in Appendix B (Milestones).

**5.7**    **Work Progress**.  The Interconnection Customer and the Interconnecting Transmission Owner shall keep each Party informed, by written quarterly progress reports, as to the progress of their respective design, procurement and construction efforts in order to meet the dates specified in Appendix B (Milestones).  Any Party may also, at any other time, request a written progress report from the other Parties. If, at any time, the Interconnection Customer determines that the completion of the Interconnecting Transmission Owner's Interconnection Facilities will not be required until after the specified In-Service Date, the Interconnection Customer, upon the System Operator's approval that the change in the In-Service Date will not constitute a Material Modification pursuant to Section 4.4 of the LGIP, will provide written notice to the

32

**JA305**

Interconnecting Transmission Owner of such later date upon which the completion of the Interconnecting Transmission Owner's Interconnection Facilities will be required.

5.8     **Information Exchange**.  As soon as reasonably practicable after the Effective Date, the Parties shall exchange information regarding the design and compatibility of the Parties' Interconnection Facilities and compatibility of the Interconnection Facilities with the New England Transmission System, and shall work diligently and in good faith to make any necessary design changes.

5.9     **Limited Operation**.  If any of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades are not reasonably expected to be completed prior to the Commercial Operation Date of the Large Generating Facility, System Operator and the Interconnecting Transmission Owner shall, upon the request and at the expense of Interconnection Customer, perform operating studies on a timely basis to determine the extent to which the Large Generating Facility and the Interconnection Customer's Interconnection Facilities may operate prior to the completion of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades consistent with Applicable Laws and Regulations, Applicable Reliability Standards, Good Utility Practice, and this LGIA.  System Operator and Interconnecting Transmission Owner shall permit Interconnection Customer to operate the Large Generating Facility and the Interconnection Customer Interconnection Facilities in accordance with the results of such studies.

5.10     **Interconnection Customer's Interconnection Facilities ("ICIF")**.  Interconnection Customer shall, at its expense, design, procure, construct, own and install the ICIF, as set forth in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades).

5.10.1     **Large Generating Facility Specifications**.  Interconnection Customer shall submit initial specifications for the ICIF, including System Protection Facilities, to Interconnecting Transmission Owner at least one hundred eighty (180) Calendar Days prior to the Initial Synchronization Date; and final specifications for review and comment at least ninety (90) Calendar Days prior to the Initial Synchronization Date. Interconnecting Transmission Owner shall review such specifications to ensure that the ICIF are compatible with the technical specifications, operational control, and safety requirements of the Interconnecting Transmission Owner and comment on such

specifications within thirty (30) Calendar Days of Interconnection Customer's submission. All specifications provided hereunder shall be deemed confidential.

**5.10.2** **Interconnecting Transmission Owner's Review**. Interconnecting Transmission Owner's review of Interconnection Customer's final specifications shall not be construed as confirming, endorsing, or providing a warranty as to the design, fitness, safety, durability or reliability of the Large Generating Facility, or the ICIF. Interconnection Customer shall make such changes to the ICIF as may reasonably be required by Interconnecting Transmission Owner, in accordance with Good Utility Practice, to ensure that the ICIF are compatible with the technical specifications, operational control, and safety requirements of the Interconnecting Transmission Owner.

**5.10.3** **ICIF Construction**. The ICIF shall be designed and constructed in accordance with Good Utility Practice. Within one hundred twenty (120) Calendar Days after the Commercial Operation Date, unless the Parties agree on another mutually acceptable deadline, the Interconnection Customer shall deliver to the Interconnecting Transmission Owner "as-built" drawings, information and documents for the ICIF, such as: a one-line diagram, a site plan showing the Large Generating Facility and the ICIF, plan and elevation drawings showing the layout of the ICIF, a relay functional diagram, relaying AC and DC schematic wiring diagrams and relay settings for all facilities associated with the Interconnection Customer's step-up transformers, the facilities connecting the Large Generating Facility to the step-up transformers and the ICIF, and the impedances (determined by factory tests) for the associated step-up transformers and the Large Generating Facilities. The Interconnection Customer shall provide Interconnecting Transmission Owner specifications for the excitation system, automatic voltage regulator, Large Generating Facility control and protection settings, transformer tap settings, and communications, if applicable.

**5.11** **Interconnecting Transmission Owner's Interconnection Facilities Construction**. The Interconnecting Transmission Owner's Interconnection Facilities shall be designed and constructed in accordance with Good Utility Practice. Upon request, within one hundred twenty (120) Calendar Days after the Commercial Operation Date, unless the Parties agree on another mutually acceptable deadline, the Interconnecting Transmission Owner shall deliver to the Interconnection Customer the following "as-built" drawings, information and documents for the

Interconnecting Transmission Owner's Interconnection Facilities. The appropriate drawings and relay diagrams shall be included in Appendix A of the LGIA.

The System Operator will obtain operational control of the Interconnecting Transmission Owner's Interconnection Facilities and Stand Alone Network Upgrades upon completion of such facilities pursuant to the TOA.

5.12    **Access Rights**. Upon reasonable notice and supervision by a Party, and subject to any required or necessary regulatory approvals, a Party ("Granting Party") shall furnish at the incremental cost to another Party ("Access Party") any rights of use, licenses, rights of way and easements with respect to lands owned or controlled by the Granting Party, its agents if allowed under the applicable agency agreement, that are necessary to enable the Access Party solely to obtain ingress and egress to construct, operate, maintain, repair, test (or witness testing), inspect, replace or remove facilities and equipment to: (i) interconnect the Large Generating Facility with the Administered Transmission System; (ii) operate and maintain the Large Generating Facility, the Interconnection Facilities and the New England Transmission System; and (iii) disconnect or remove the Access Party's facilities and equipment upon termination of this LGIA. In exercising such licenses, rights of way and easements, the Access Party shall not unreasonably disrupt or interfere with normal operation of the Granting Party's business and shall adhere to the safety rules and procedures established in advance, as may be changed from time to time, by the Granting Party and provided to the Access Party.

5.13    **Lands of Other Property Owners**. If any part of the Interconnecting Transmission Owner's Interconnection Facilities and/or Network Upgrades is to be installed on property owned by persons other than Interconnection Customer or Interconnecting Transmission Owner, the Interconnecting Transmission Owner shall at Interconnection Customer's expense use Reasonable Efforts, including use of its eminent domain authority, and to the extent consistent with state law, to procure from such persons any rights of use, licenses, rights of way and easements that are necessary to construct, operate, maintain, test, inspect, replace or remove the Interconnecting Transmission Owner's Interconnection Facilities and/or Network Upgrades upon such property. Notwithstanding the foregoing, the Interconnecting Transmission Owner shall not be obligated to exercise eminent domain authority in a manner inconsistent with Applicable Laws and Regulations or when an Interconnection Customer is authorized under Applicable Laws and Regulations to exercise eminent domain on its own behalf.

5.14    **Permits.** System Operator, Interconnecting Transmission Owner and Interconnection Customer shall cooperate with each other in good faith in obtaining all permits, licenses, and authorizations that are necessary to accomplish the interconnection in compliance with Applicable Laws and Regulations.  With respect to this paragraph, Interconnecting Transmission Owner shall provide permitting assistance to the Interconnection Customer comparable to that provided to the Interconnecting Transmission Owner's own, or an Affiliate's generation.

5.15    **Early Construction of Base Case Facilities.**  Interconnection Customer may request Interconnecting Transmission Owner to construct, and Interconnecting Transmission Owner shall construct, using Reasonable Efforts to accommodate Interconnection Customer's In-Service Date, all or any portion of any Network Upgrades required for Interconnection Customer to be interconnected to the Administered Transmission  System, which are included in the Base Case of the Facilities Study for the Interconnection Customer, and which also are required to be constructed for another Interconnection Customer, but where such construction is not scheduled to be completed in time to achieve Interconnection Customer's In-Service Date.  The Interconnection Customer shall reimburse the Interconnecting Transmission Owner for all costs incurred related to early construction to the extent such costs are not recovered from other Interconnection Customers included in the base case.

5.16    **Suspension.**  Interconnection Customer reserves the right, upon written notice to Interconnecting Transmission Owner and System Operator, to suspend at any time all work by Interconnecting Transmission Owner associated with the construction and installation of Interconnecting Transmission Owner's Interconnection Facilities and/or Network Upgrades required under this LGIA with the condition that the New England Transmission System  shall be left in a safe and reliable condition in accordance with Good Utility Practice and the System Operator's and Interconnecting Transmission Owner's safety and reliability criteria.  In such event, Interconnection Customer shall be responsible for all reasonable and necessary costs which Interconnecting Transmission Owner (i) has incurred pursuant to this LGIA prior to the suspension and (ii) incurs in suspending such work, including any costs incurred to perform such work as may be necessary to ensure the safety of persons and property and the integrity of the New England Transmission System during such suspension and, if applicable, any costs incurred in connection with the cancellation or suspension of material, equipment and labor contracts which Interconnecting Transmission Owner cannot reasonably avoid; provided, however, that

prior to canceling or suspending any such material, equipment or labor contract, Interconnecting Transmission Owner shall obtain Interconnection Customer's authorization to do so. Interconnecting Transmission Owner shall invoice Interconnection Customer for such costs pursuant to Article 12 and shall use due diligence to minimize its costs. In the event Interconnection Customer suspends work by Interconnecting Transmission Owner required under this LGIA pursuant to this Article 5.16, and has not requested Interconnecting Transmission Owner to recommence the work required under this LGIA on or before the expiration of three (3) years following commencement of such suspension, this LGIA shall be deemed terminated. The three-year period shall begin on the date the suspension is requested, or the date of the written notice to Interconnecting Transmission Owner and System Operator, if no effective date is specified. The three-year period shall in no way result in an extension of the In-Service Date, the Initial Synchronization Date or the Commercial Operation Date that exceeds seven (7) years from the date of the Interconnection Request; otherwise, this LGIA shall be deemed terminated.

**5.17    Taxes.**

    **5.17.1    Payments Not Taxable.** The Parties intend that all payments or property transfers made by any Party for the installation of the Interconnecting Transmission Owner's Interconnection Facilities and the Network Upgrades shall be non-taxable, either as contributions to capital, or as an advance, in accordance with the Internal Revenue Code and any applicable state income tax laws and shall not be taxable as contributions in aid of construction or otherwise under the Internal Revenue Code and any applicable state income tax laws.

    **5.17.2    Representations and Covenants.** In accordance with IRS Notice 2001-82 and IRS Notice 88-129, Interconnection Customer represents and covenants that (i) ownership of the electricity generated at the Large Generating Facility will pass to another party prior to the transmission of the electricity on the New England Transmission System, (ii) for income tax purposes, the amount of any payments and the cost of any property transferred to the Interconnecting Transmission Owner for the Interconnecting Transmission Owner's Interconnection Facilities will be capitalized by Interconnection Customer as an intangible asset and recovered using the straight-line method over a useful life of twenty (20) years, and (iii) any portion of the Interconnecting Transmission Owner's Interconnection Facilities that is a "dual-use intertie," within the meaning of IRS

Notice 88-129, is reasonably expected to carry only a de minimis amount of electricity in the direction of the Large Generating Facility. For this purpose, "de minimis amount" means no more than 5 percent of the total power flows in both directions, calculated in accordance with the "5 percent test" set forth in IRS Notice 88-129. This is not intended to be an exclusive list of the relevant conditions that must be met to conform to IRS requirements for non-taxable treatment.

At Interconnecting Transmission Owner's request, Interconnection Customer shall provide Interconnecting Transmission Owner with a report from an independent engineer confirming its representation in clause (iii), above. Interconnecting Transmission Owner represents and covenants that the cost of the Interconnecting Transmission Owner's Interconnection Facilities paid for by Interconnection Customer will have no net effect on the base upon which rates are determined.

**5.17.3    Indemnification for the Cost Consequences of Current Tax Liability Imposed Upon Interconnecting Transmission Owner.**  Notwithstanding Article 5.17.1, Interconnection Customer shall protect, indemnify and hold harmless Interconnecting Transmission Owner from the cost consequences of any current tax liability imposed against Interconnecting Transmission Owner as the result of payments or property transfers made by Interconnection Customer to Interconnecting Transmission Owner under this LGIA, as well as any interest and penalties, other than interest and penalties attributable to any delay caused by Interconnecting Transmission Owner.

The Interconnecting Transmission Owner shall not include a gross-up for the cost consequences of any current tax liability in the amounts it charges Interconnection Customer under this LGIA unless (i) Interconnecting Transmission Owner has determined, in good faith, that the payments or property transfers made by Interconnection Customer to Interconnecting Transmission Owner should be reported as income subject to taxation or (ii) any Governmental Authority directs Interconnecting Transmission Owner to report payments or property as income subject to taxation; provided, however, that Interconnecting Transmission Owner may require Interconnection Customer to provide security, in a form reasonably acceptable to Interconnecting Transmission Owner (such as a parental guarantee or a letter of credit), in an amount equal to the cost consequences of any current tax liability under this Article

5.17. Interconnection Customer shall reimburse Interconnecting Transmission Owner for such costs on a fully grossed-up basis, in accordance with Article 5.17.4, within thirty (30) Calendar Days of receiving written notification from Interconnecting Transmission Owner of the amount due, including detail about how the amount was calculated.

The indemnification obligation shall terminate at the earlier of (1) the expiration of the ten year testing period, and the applicable statute of limitation, as it may be extended by the Interconnecting Transmission Owner upon request of the IRS, to keep these years open for audit or adjustment, or (2) the occurrence of a subsequent taxable event and the payment of any related indemnification obligations as contemplated by this Article 5.17.

**5.17.4**  **Tax Gross-Up Amount.**  Interconnection Customer's liability for the cost consequences of any current tax liability under this Article 5.17 shall be calculated on a fully grossed-up basis.  Except as may otherwise be agreed to by the parties, this means that Interconnection Customer will pay  Interconnecting Transmission Owner, in addition to the amount paid for the Interconnection Facilities and Network Upgrades, an amount equal to (1) the current taxes imposed on Interconnecting Transmission Owner ("Current Taxes") on the excess of (a) the gross income realized by Interconnecting Transmission Owner as a result of payments or property transfers made by Interconnection Customer to Interconnecting Transmission Owner under this LGIA (without regard to any payments under this Article 5.17) (the "Gross Income Amount") over (b) the present value of future tax deductions for depreciation that will be available as a result of such payments or property transfers (the "Present Value Depreciation Amount"), plus (2) an additional amount sufficient to permit the Interconnecting Transmission Owner to receive and retain, after the payment of all Current Taxes, an amount equal to the net amount described in clause (1).For this purpose, (i) Current Taxes shall be computed based on Interconnecting Transmission Owner composite federal and state tax rates at the time the payments or property transfers are received and Interconnecting Transmission Owner will be treated as being subject to tax at the highest marginal rates in effect at that time (the "Current Tax Rate"), and (ii) the Present Value Depreciation Amount shall be computed by discounting Interconnecting Transmission Owner's anticipated tax depreciation deductions as a result of such payments or property transfers by Interconnecting Transmission Owner current weighted average cost of capital.  Thus, the formula for calculating Interconnection Customer's liability to Transmission Owner pursuant to this

Article 5.17.4 can be expressed as follows: (Current Tax Rate x (Gross Income Amount – Present Value of Tax Depreciation))/(1-Current Tax Rate). Interconnection Customer's estimated tax liability in the event taxes are imposed shall be stated in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades).

**5.17.5    Private Letter Ruling or Change or Clarification of Law**.  At Interconnection Customer's request and expense, Interconnecting Transmission Owner shall file with the IRS a request for a private letter ruling as to whether any property transferred or sums paid, or to be paid, by Interconnection Customer to Interconnecting Transmission Owner under this LGIA are subject to federal income taxation.  Interconnection Customer will prepare the initial draft of the request for a private letter ruling, and will certify under penalties of perjury that all facts represented in such request are true and accurate to the best of Interconnection Customer's knowledge.  Interconnecting Transmission Owner and Interconnection Customer shall cooperate in good faith with respect to the submission of such request.

Interconnecting Transmission Owner shall keep Interconnection Customer fully informed of the status of such request for a private letter ruling and shall execute either a privacy act waiver or a limited power of attorney, in a form acceptable to the IRS, that authorizes Interconnection Customer to participate in all discussions with the IRS regarding such request for a private letter ruling.  Interconnecting Transmission Owner shall allow Interconnection Customer to attend all meetings with IRS officials about the request and shall permit Interconnection Customer to prepare the initial drafts of any follow-up letters in connection with the request.

**5.17.6    Subsequent Taxable Events**.  If, within ten (10) years from the date on which the relevant Interconnecting Transmission Owner's Interconnection Facilities are placed in service, (i) Interconnection Customer Breaches the covenant contained in Article 5.17.2, (ii) a "disqualification event" occurs within the meaning of IRS Notice 88-129, or (iii) this LGIA terminates and Interconnecting Transmission Owner retains ownership of the Interconnection Facilities and Network Upgrades, the Interconnection Customer shall pay a tax gross-up for the cost consequences of any current tax liability imposed on Interconnecting Transmission Owner, calculated using the methodology described in Article 5.17.4 and in accordance with IRS Notice 90-60.

**5.17.7  Contests**.  In the event any Governmental Authority determines that Interconnecting Transmission Owner's receipt of payments or property constitutes income that is subject to taxation, Interconnecting Transmission Owner shall notify Interconnection Customer, in writing, within thirty (30) Calendar Days of receiving notification of such determination by a Governmental Authority.  Upon the timely written request by Interconnection Customer and at Interconnection Customer's sole expense, Interconnecting Transmission Owner may appeal, protest, seek abatement of, or otherwise oppose such determination.  Upon Interconnection Customer's written request and sole expense, Interconnecting Transmission Owner may file a claim for refund with respect to any taxes paid under this Article 5.17, whether or not it has received such a determination.  Interconnecting Transmission Owner reserves the right to make all decisions with regard to the prosecution of such appeal, protest, abatement or other contest, including the selection of counsel and compromise or settlement of the claim, but Interconnecting Transmission Owner shall keep Interconnection Customer informed, shall consider in good faith suggestions from Interconnection Customer about the conduct of the contest, and shall reasonably permit Interconnection Customer or an Interconnection Customer representative to attend contest proceedings.

Interconnection Customer shall pay to Interconnecting Transmission Owner on a periodic basis, as invoiced by Interconnecting Transmission Owner, documented reasonable costs of prosecuting such appeal, protest, abatement or other contest.  At any time during the contest, Interconnecting Transmission Owner may agree to a settlement either with Interconnection Customer's consent or after obtaining written advice from nationally - recognized tax counsel, selected by Interconnecting Transmission Owner, but reasonably acceptable to Interconnection Customer, that the proposed settlement represents a reasonable settlement given the hazards of litigation.  Interconnection Customer's obligation shall be based on the amount of the settlement agreed to by Interconnection Customer, or if a higher amount, so much of the settlement that is supported by the written advice from nationally recognized tax counsel selected under the terms of the preceding sentence.  The settlement amount shall be calculated on a fully grossed-up basis to cover any related cost consequences of the current tax liability. Any settlement without Interconnection Customer's consent or such written advice will relieve Interconnection Customer from any obligation to indemnify Interconnecting Transmission Owner for the tax at issue in the contest.

41

**JA314**

**5.17.8    Refund.**  In the event that (a) a private letter ruling is issued to Interconnecting Transmission Owner which holds that any amount paid or the value of any property transferred by Interconnection Customer to Interconnecting Transmission Owner under the terms of this LGIA is not subject to federal income taxation, (b) any legislative change or administrative announcement, notice, ruling or other determination makes it reasonably clear to Interconnecting Transmission Owner in good faith that any amount paid or the value of any property transferred by Interconnection Customer to Interconnecting Transmission Owner under the terms of this LGIA is not taxable to Interconnecting Transmission Owner, (c) any abatement, appeal, protest, or other contest results in a determination that any payments or transfers made by Interconnection Customer to Interconnecting Transmission Owner are not subject to federal income tax, or (d) if Interconnecting Transmission Owner receives a refund from any taxing authority for any overpayment of tax attributable to any payment or property transfer made by Interconnection Customer to Interconnecting Transmission Owner pursuant to this LGIA, Interconnecting Transmission Owner shall promptly refund to Interconnection Customer the following:

> (i)    any payment made by Interconnection Customer under this Article 5.17 for taxes that is attributable to the amount determined to be non-taxable, together with interest thereon,

> (ii)    interest on any amounts paid by Interconnection Customer to Interconnecting Transmission Owner for such taxes which Interconnecting Transmission Owner did not submit to the taxing authority, interest calculated in accordance with the methodology set forth in the Commission's regulations at 18 CFR §35.19a(a)(2)(iii) from the date payment was made by Interconnection Customer to the date Interconnecting Transmission Owner refunds such payment to Interconnection Customer, and

> (iii)    with respect to any such taxes paid by Interconnecting Transmission Owner, any refund or credit Interconnecting Transmission Owner receives or to which it may be entitled from any Governmental Authority, interest (or that portion thereof attributable to the payment described in clause (i), above) owed to

the Interconnecting Transmission Owner for such overpayment of taxes (including any reduction in interest otherwise payable by Interconnecting Transmission Owner to any Governmental Authority resulting from an offset or credit); provided, however, that Interconnecting Transmission Owner will remit such amount promptly to Interconnection Customer only after and to the extent that Interconnecting Transmission Owner has received a tax refund, credit or offset from any Governmental Authority for any applicable overpayment of income tax related to the Interconnecting Transmission Owner's Interconnection Facilities.

The intent of this provision is to leave parties, to the extent practicable, in the event that no taxes are due with respect to any payment for Interconnection Facilities and Network Upgrades hereunder, in the same position they would have been in had no such tax payments been made.

**5.17.9    Taxes Other Than Income Taxes.**  Upon the timely request by Interconnection Customer, and at Interconnection Customer's sole expense, Interconnecting Transmission Owner shall appeal, protest, seek abatement of, or otherwise contest any tax (other than federal or state income tax) asserted or assessed against Interconnecting Transmission Owner for which Interconnection Customer may be required to reimburse Interconnecting Transmission Owner under the terms of this LGIA.  Interconnection Customer shall pay to Interconnecting Transmission Owner on a periodic basis, as invoiced by Interconnecting Transmission Owner, Interconnecting Transmission Owner's documented reasonable costs of prosecuting such appeal, protest, abatement, or other contest.  Interconnection Customer and Interconnecting Transmission Owner shall cooperate in good faith with respect to any such contest.  Unless the payment of such taxes is a prerequisite to an appeal or abatement or cannot be deferred, no amount shall be payable by Interconnection Customer to Interconnecting Transmission Owner for such taxes until they are assessed by a final, non-appealable order by any court or agency of competent jurisdiction.  In the event that a tax payment is withheld and ultimately due and payable after appeal, Interconnection Customer will be responsible for all taxes, interest and penalties, other than penalties attributable to any delay caused by Interconnecting Transmission Owner.

**JA316**

5.18    **Tax Status**.  Each Party shall cooperate with the others to maintain the other Party's(ies') tax status.  Nothing in this LGIA is intended to adversely affect any Interconnecting Transmission Owner's tax-exempt status with respect to the issuance of bonds including, but not limited to, Local Furnishing Bonds.

5.19    **Modification**.

5.19.1    **General.**  Either Interconnection Customer or Interconnecting Transmission Owner may undertake modifications to its facilities.  If a Party plans to undertake a modification that reasonably may be expected to affect the other Party's facilities, the facilities of any Affected Parties, or the New England Transmission System, that Party shall provide to the other Parties and any Affected Party: (i) sufficient information regarding such modification so that the other Party(ies) may evaluate the potential impact of such modification prior to commencement of the work; and (ii) such information as may be required by the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  Such information shall be deemed to be confidential hereunder and shall include information concerning the timing of such modifications and whether such modifications are expected to interrupt the flow of electricity from the Large Generating Facility.  The Party desiring to perform such work shall provide the relevant drawings, plans, and specifications to the other Party(ies) at least ninety (90) Calendar Days in advance of the commencement of the work or such shorter period upon which the Parties may agree, which agreement shall not unreasonably be withheld, conditioned or delayed.  Notwithstanding the foregoing, no party shall be obligated to proceed with a modification that would constitute a Material Modification or an Interconnection Request under the LGIP, except as provided under and pursuant to the LGIP.

In the case of Large Generating Facility modifications that do not require Interconnection Customer to submit an Interconnection Request, Interconnecting Transmission Owner shall provide, within thirty (30) Calendar Days (or such other time as the Parties may agree), an estimate of any additional modifications to the New England Transmission System, Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades necessitated by such Interconnection Customer modification and a good faith estimate of the costs thereof.

5.19.2  **Standards.**  Any additions, modifications, or replacements made to a Party's facilities shall be designed, constructed and operated in accordance with this LGIA and Good Utility Practice.

5.19.3  **Modification Costs.**  Interconnection Customer shall not be directly assigned for the costs of any additions, modifications, or replacements that Interconnecting Transmission Owner makes to the Interconnecting Transmission Owner's Interconnection Facilities or the New England Transmission System to facilitate the interconnection of a third party to the Interconnecting Transmission Owner's Interconnection Facilities or the New England Transmission System, or to provide transmission service to a third party under the Tariff, except as provided for under the Tariff or any other applicable tariff.  Interconnection Customer shall be responsible for the costs of any additions, modifications, or replacements to the Interconnection Customer Interconnection Facilities that may be necessary to maintain or upgrade such Interconnection Customer Interconnection Facilities consistent with Applicable Laws and Regulations, Applicable Reliability Standards or Good Utility Practice.

## ARTICLE 6.  TESTING AND INSPECTION

6.1     **Pre-Commercial Operation Date Testing and Modifications.**  Prior to the Commercial Operation Date, the Interconnecting Transmission Owner shall test Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades and Interconnection Customer shall test the Large Generating Facility and the Interconnection Customer's Interconnection Facilities to ensure their safe and reliable operation.  Similar testing may be required after initial operation. Each Party shall make any modifications to its facilities that are found to be necessary as a result of such testing.  Interconnection Customer shall bear the cost of all such testing and modifications.  Interconnection Customer shall generate test energy at the Large Generating Facility only if it has arranged for the delivery of such test energy.

6.2     **Post-Commercial Operation Date Testing and Modifications.**  Each Interconnection Customer and Interconnecting Transmission Owner shall at its own expense perform routine inspection and testing of its facilities and equipment in accordance with ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, as may be necessary to

ensure the continued interconnection of the Large Generating Facility to the Administered
Transmission System in a safe and reliable manner.  The Interconnection Customer and
Interconnecting Transmission Owner each shall have the right, upon advance written notice, to
require reasonable additional testing of the other Party's(ies') facilities, at the requesting Party's
expense, as may be in accordance with the ISO New England Operating Documents, Applicable
Reliability Standards, or successor documents.  The System Operator shall also have the right to
require reasonable additional testing of the other Party's (ies') facilities in accordance with the
ISO New England Operating Documents, Applicable Reliability Standards, or successor
documents.

6.3     **Right to Observe Testing.**  Each Party shall notify the System Operator and other Party(ies) in
advance of its performance of tests of its Interconnection Facilities.  The other Party(ies) has the
right, at its own expense, to observe such testing.

6.4     **Right to Inspect.**  Each Party shall have the right, but shall have no obligation to: (i) observe the
other Party's(ies') tests and/or inspection of any of its System Protection Facilities and other
protective equipment, including Power System Stabilizers; (ii) review the settings of the other
Party's(ies') System Protection Facilities and other protective equipment; and (iii) review the
other Party's(ies') maintenance records relative to the Interconnection Facilities, the System
Protection Facilities and other protective equipment.  Each Party may exercise these rights from
time to time as it deems necessary upon reasonable notice to the other Parties. The exercise or
non-exercise by a Party of any such rights shall not be construed as an endorsement or
confirmation of any element or condition of the Interconnection Facilities or the System
Protection Facilities or other protective equipment or the operation thereof, or as a warranty as to
the fitness, safety, desirability, or reliability of same.  Any information that a Party obtains
through the exercise of any of its rights under this Article 6.4 shall be governed by Article 22.

### ARTICLE 7.  METERING

7.1     **General.**  Each Party shall comply with the ISO New England Operating Documents, Applicable
Reliability Standards, or successor documents, regarding metering.  Interconnection Customer
shall bear all reasonable documented costs associated with the purchase, installation, operation,
testing and maintenance of the Metering Equipment.  Unless the System Operator otherwise
agrees, the Interconnection Customer shall be responsible for installing and maintaining

compatible metering and communications equipment to accurately account for the capacity and energy being transmitted under this Tariff and to communicate the information to the System Operator. Unless otherwise agreed, such equipment shall remain the property of the Interconnecting Transmission Owner.

7.2     **Check Meters.** Interconnection Customer, at its option and expense, may install and operate, on its premises and on its side of the Point of Interconnection, one or more check meters to check Interconnecting Transmission Owner's meters. Such check meters shall be for check purposes only and shall not be used for the measurement of power flows for purposes of this LGIA, except as provided in Article 7.4 below. The check meters shall be subject at all reasonable times to inspection and examination by Interconnecting Transmission Owner or its designee. The installation, operation and maintenance thereof shall be performed entirely by Interconnection Customer in accordance with Good Utility Practice.

7.3     **Standards.** Interconnecting Transmission Owner shall install, calibrate, and test revenue quality Metering Equipment in accordance with applicable ANSI standards and the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

7.4     **Testing of Metering Equipment.** Interconnecting Transmission Owner shall inspect and test all Interconnecting Transmission Owner-owned Metering Equipment upon installation and thereafter as specified in the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents. Interconnecting Transmission Owner shall give reasonable notice of the time when any inspection or test shall take place, and Interconnection Customer may have representatives present at the test or inspection. If at any time Metering Equipment is found to be inaccurate or defective, it shall be adjusted, repaired or replaced at Interconnection Customer's expense, in order to provide accurate metering. If Metering Equipment fails to register, or if the measurement made by Metering Equipment during a test varies by more than the values specified within ISO New England Operating Documents, or successor documents, from the measurement made by the standard meter used in the test, the Interconnecting Transmission Owner shall adjust the measurements, in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

7.5     **Metering Data.** At Interconnection Customer's expense, metered data shall be telemetered to one or more locations designated by System Operator and Interconnecting Transmission Owner.

**JA320**

The hourly integrated metering, established in accordance with ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, used to transmit Megawatt hour ("MWh") per hour data by electronic means and the Watt-hour meters equipped with kilowatt-hour ("kwh") or MWh registers to be read at month's end shall be the official measurement of the amount of energy delivered from the Large Generating Facility to the Point of Interconnection. Instantaneous metering is required for all Generators in accordance with ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

## ARTICLE 8.  COMMUNICATIONS

8.1     **Interconnection Customer Obligations.** Interconnection Customer shall maintain satisfactory operating communications with the System Operator and Interconnecting Transmission Owner in accordance with applicable provisions of ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

8.2     **Remote Terminal Unit.** Prior to the Initial Synchronization Date of the Large Generating Facility, a Remote Terminal Unit, or equivalent data collection and transfer equipment acceptable to the Parties, shall be installed by Interconnection Customer or Interconnecting Transmission Owner at Interconnection Customer's expense, to gather accumulated and instantaneous data to be telemetered to the location(s) designated by System Operator and Interconnecting Transmission Owner through use of a dedicated point-to-point data circuit(s). The communication protocol for the data circuit(s) shall be specified by System Operator and Interconnecting Transmission Owner. All information required by the ISO New England Operating Documents, or successor documents, must be telemetered directly to the location(s) specified by System Operator and Interconnecting Transmission Owner.
Each Party will promptly advise the other Party(ies) if it detects or otherwise learns of any metering, telemetry or communications equipment errors or malfunctions that require the attention and/or correction by the other Party(ies). The Party owning such equipment shall correct such error or malfunction as soon as reasonably feasible.

8.3     **No Annexation.** Any and all equipment placed on the premises of a Party shall be and remain the property of the Party providing such equipment regardless of the mode and manner of annexation or attachment to real property, unless otherwise mutually agreed by the Parties.

48

**JA321**

## ARTICLE 9.  OPERATIONS

**9.1**     **General.**  Each Party shall comply with applicable provisions of ISO New England Operating Documents, Reliability Standards, or successor documents, regarding operations.  Each Party shall provide to the other Party(ies) all information that may reasonably be required by the other Party(ies) to comply with Applicable Laws and Regulations and Applicable Reliability Standards.

**9.2**     **Control Area Notification.**  Before Initial Synchronization Date, the Interconnection Customer shall notify the System Operator and Interconnecting Transmission Owner in writing in accordance with ISO New England Operating Documents, Reliability Standards, or successor documents.  If the Interconnection Customer elects to have the Large Generating Facility dispatched and operated from a remote Control Area other than the Control Area in which the Large Generating Facility is physically located, and if permitted to do so by the relevant transmission tariffs and ISO New England Operating Documents, Reliability Standards, or successor documents, all necessary arrangements, including but not limited to those set forth in Article 7 and Article 8 of this LGIA, and remote Control Area generator interchange agreements, if applicable, and the appropriate measures under such agreements, shall be executed and implemented prior to the placement of the Large Generating Facility in the other Control Area for dispatch and operations.

**9.3**     **Interconnecting Transmission Owner and System Operator Obligations.**  Interconnecting Transmission Owner and System Operator shall cause the Interconnecting Transmission Owner's Interconnection Facilities to be operated, maintained and controlled in a safe and reliable manner and in accordance with this LGIA and ISO New England Operating Documents, Reliability Standards, or successor documents.  Interconnecting Transmission Owner or System Operator may provide operating instructions to Interconnection Customer consistent with this LGIA, ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and Interconnecting Transmission Owner's and System Operator's operating protocols and procedures as they may change from time to time.  Interconnecting Transmission Owner and System Operator will consider changes to their operating protocols and procedures proposed by Interconnection Customer.

**9.4**     **Interconnection Customer Obligations.**  Interconnection Customer shall at its own expense operate, maintain and control the Large Generating Facility and the Interconnection Customer

Interconnection Facilities in a safe and reliable manner and in accordance with this LGIA and ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**9.5     Start-Up and Synchronization.**  The Interconnection Customer is responsible for the proper start-up and synchronization of the Large Generating Facility to the New England Transmission System in accordance with ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**9.6     Reactive Power.**

**9.6.1     Power Factor Design Criteria.**  Interconnection Customer shall design the Large Generating Facility to maintain a composite power delivery at continuous rated power output at the Point of Interconnection at a power factor within the range of 0.95 leading to 0.95 lagging, unless the System Operator or Interconnecting Transmission Owner has established different requirements that apply to all generators in the Control Area on a comparable basis and in accordance with ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  The requirements of this paragraph shall not apply to wind generators.

**9.6.2     Voltage Schedules.**  Once the Interconnection Customer has synchronized the Large Generating Facility to the New England Transmission System, Interconnection Customer shall operate the Large Generating Facility at the direction of System Operator and Interconnecting Transmission Owner in accordance with applicable provisions of the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, regarding voltage and provide voltage schedules in accordance with such requirements.

**9.6.2.1     Voltage Regulators.**  The Interconnection Customer must keep and maintain a voltage regulator on all generating units comprising a Generator in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  All interconnected generators that have, or are required to have, automatic voltage regulation shall normally operate the Large Generating Facility with its voltage regulators in automatic operation.

50

**JA323**

It is the responsibility of the Interconnection Customer to maintain the voltage regulator in good operating condition and promptly report to the System Operator and Interconnecting Transmission Owner any problems that could cause interference with its proper operation.

**9.6.2.2  Governor Control.**  The Interconnection Customer is obligated to provide and maintain a functioning governor on all Generating Facilities in accordance with applicable provisions of the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**9.6.2.3  System Protection.**  The Interconnection Customer shall install and maintain protection systems in accordance with applicable provisions of the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, regarding system protection.

**9.6.3  Payment for Reactive Power.**

Interconnection Customers shall be compensated for Reactive Power service in accordance with Schedule 2 of the Section II of the Tariff.

**9.7  Outages and Interruptions.**

**9.7.1  Outages.**

**9.7.1.1  Outage Authority and Coordination.**  The System Operator shall have the authority to coordinate facility outages in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents. Each Party may in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, in coordination with the other Party(ies), remove from service any of its respective Interconnection Facilities or Network Upgrades that may impact the other Party's(ies') facilities as necessary to perform maintenance or testing or to install or replace equipment, subject to the oversight of System Operator in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

9.7.1.2 **Outage Schedules.**  Outage scheduling, and any related compensation, shall be in accordance with the applicable provisions of the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

9.7.2 **Interruption of Service.**  In accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, the System Operator or Interconnecting Transmission Owner may require Interconnection Customer to interrupt or reduce deliveries of electricity if such delivery of electricity could adversely affect System Operator's or Interconnecting Transmission Owner's ability to perform such activities as are necessary to safely and reliably operate and maintain the New England Transmission System.

9.7.3 **Under-Frequency and Over Frequency Conditions.**  Interconnection Customer shall implement under-frequency and over-frequency relay set points for the Large Generating Facility as required by the applicable provisions of ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  Large Generating Facility response to frequency deviations of pre-determined magnitudes, both under-frequency and over-frequency deviations, shall be studied and coordinated with System Operator and Interconnecting Transmission Owner in accordance with ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

9.7.4 **System Protection and Other Control Requirements.**

9.7.4.1 **System Protection Facilities.**  Interconnection Customer shall, at its expense, install, operate and maintain System Protection Facilities as a part of the Large Generating Facility or the Interconnection Customer Interconnection Facilities in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  Interconnecting Transmission Owner shall install at Interconnection Customer's expense, in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, any System Protection Facilities that may be required on the Interconnecting Transmission Owner Interconnection Facilities or the New

**JA325**

England Transmission System as a result of the interconnection of the Large Generating Facility and the Interconnection Customer Interconnection Facilities.

**9.7.4.2** Each Party's protection facilities shall be designed and coordinated with other systems in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**9.7.4.3** Each Party shall be responsible for protection of its facilities consistent with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**9.7.4.4** Each Party's protective relay design shall allow for tests required in Article 6.

**9.7.4.5** Each Party will test, operate and maintain System Protection Facilities in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**9.7.5** **Requirements for Protection.** In accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and compliance with Good Utility Practice , Interconnection Customer shall provide, install, own, and maintain relays, circuit breakers and all other devices necessary to remove any fault contribution of the Large Generating Facility to any short circuit occurring on the New England Transmission System not otherwise isolated by Interconnecting Transmission Owner's equipment, such that the removal of the fault contribution shall be coordinated with the protective requirements of the New England Transmission System. Such protective equipment shall include, without limitation, a disconnecting device or switch with load-interrupting capability located between the Large Generating Facility and the New England Transmission System at a site selected upon mutual agreement (not to be unreasonably withheld, conditioned or delayed) of the Parties. Interconnection Customer shall be responsible for protection of the Large Generating Facility and Interconnection Customer's other equipment from such conditions as negative sequence currents, over- or under-frequency, sudden load rejection, over- or under-voltage, and generator loss-of-field. Interconnection Customer shall be solely responsible to disconnect the Large

Generating Facility and Interconnection Customer's other equipment if conditions on the New England Transmission System could adversely affect the Large Generating Facility.

**9.7.6    Power Quality.**  A Party's facilities shall not cause excessive voltage flicker nor introduce excessive distortion to the sinusoidal voltage or current waves as defined by ANSI Standard C84.1-1989, in accordance with IEEE Standard 519, or any applicable superseding electric industry standard.

**9.8    Switching and Tagging Rules.**  Each Party shall provide the other Party(ies) with a copy of its switching and tagging rules that are applicable to the other Party's activities. Such switching and tagging rules shall be developed on a non-discriminatory basis.  The Parties shall comply with applicable switching and tagging rules, as amended from time to time, in obtaining clearances for work or for switching operations on equipment.

**9.9    Use of Interconnection Facilities by Third Parties.**

**9.9.1    Purpose of Interconnection Facilities.**  Except as may be required by Applicable Laws and Regulations, or as otherwise agreed to among the Parties, the Interconnection Facilities shall be constructed for the sole purpose of interconnecting the Large Generating Facility to the Administered Transmission System and shall be used for no other purpose.

**9.9.2    Third Party Users.**  If required by Applicable Laws and Regulations or if the Parties mutually agree, such agreement not to be unreasonably withheld, to allow one or more third parties to use the Interconnecting Transmission Owner's Interconnection Facilities, or any part thereof, Interconnection Customer will be entitled to compensation for the capital expenses it incurred in connection with the Interconnection Facilities based upon the pro rata use of the Interconnection Facilities by Interconnecting Transmission Owner, all third party users, and Interconnection Customer, in accordance with Applicable Laws and Regulations or upon some other mutually agreed-upon methodology.  In addition, cost responsibility for ongoing costs, including operation and maintenance costs associated with the Interconnection Facilities, will be allocated between Interconnection Customer and any third party users based upon the pro rata use of the Interconnection Facilities by Interconnecting Transmission Owner, all third party users, and

Interconnection Customer, in accordance with Applicable Laws and Regulations or upon some other mutually agreed-upon methodology. If the issue of such compensation or allocation cannot be resolved through such negotiations, it shall be submitted to the Commission for resolution.

**9.10    Disturbance Analysis Data Exchange.**  The Parties will cooperate with one another in the analysis of disturbances to either the Large Generating Facility or the New England Transmission System by gathering and providing access to any information relating to any disturbance, including information from oscillography, protective relay targets, breaker operations and sequence of events records, and any disturbance information required by the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

## ARTICLE 10.  MAINTENANCE

**10.1    Interconnecting Transmission Owner and Customer Obligations.**  Interconnecting Transmission Owner and Interconnection Customer shall each maintain that portion of its respective facilities that are part of the New England Transmission System and the Interconnecting Transmission Owner's Interconnection Facilities in a safe and reliable manner and in accordance with the applicable provisions of the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**10.2    Operating and Maintenance Expenses.**  Subject to the provisions herein addressing the use of facilities by others, and except for operations and maintenance expenses associated with modifications made for providing interconnection or transmission service to a third party and such third party pays for such expenses, Interconnection Customer shall be responsible for all reasonable expenses including overheads, associated with: (1) owning, operating, maintaining, repairing, and replacing Interconnection Customer Interconnection Facilities; and (2) operation, maintenance, repair and replacement of Interconnecting Transmission Owner's Interconnection Facilities, Stand Alone Network Upgrades, Network Upgrades and Distribution Upgrades.

## ARTICLE 11.  PERFORMANCE OBLIGATION

**11.1    Interconnection Customer Interconnection Facilities.**  Interconnection Customer shall design, procure, construct, install, own and/or control the Interconnection Customer Interconnection

Facilities described in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades) at its sole expense.

**11.2**    **Interconnecting Transmission Owner's Interconnection Facilities.**  Interconnecting Transmission Owner shall design, procure, construct, install, own and/or control the Interconnecting Transmission Owner's Interconnection Facilities described in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades) at the sole expense of the Interconnection Customer.

**11.3**    **Network Upgrades and Distribution Upgrades.**  Interconnecting Transmission Owner shall design, procure, construct, install, and own the Network Upgrades, and to the extent provided by Article 5.1,  Stand Alone Network Upgrades, and Distribution Upgrades described in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades).  The Interconnection Customer shall be responsible for all costs related to Distribution Upgrades.  Unless the Interconnecting Transmission Owner elects to fund the capital for the Network Upgrades, they shall be solely funded by the Interconnection Customer.

**11.4**    **Cost Allocation; Compensation; Rights; Affected Systems**

   **11.4.1**  **Cost Allocation.**  Cost allocation of Generator Interconnection Related Upgrades shall be in accordance with Schedule 11 of Section II of the Tariff.

   **11.4.2**  **Compensation.**  Any compensation due to the Interconnection Customer for increases in transfer capability to the PTF resulting from its Generator Interconnection Related Upgrade shall be determined in accordance with Sections II and III of the Tariff.

   **11.4.3**  **Rights.**  Notwithstanding any other provision of this LGIA, nothing herein shall be construed as relinquishing or foreclosing any rights, including but not limited to firm transmission rights, capacity rights, transmission congestion rights, or transmission credits, that the Interconnection Customer shall be entitled to, now or in the future, under any other agreement or tariff as a result of, or otherwise associated with, the transmission capacity, if any, created by the Network Upgrades.

**11.4.4   Special Provisions for Affected Systems.**  The Interconnection Customer shall enter into separate related facilities agreements to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection of the Interconnection Customer's Generating Facility.

**11.5   Provision of Security.**  At least thirty (30) Calendar Days prior to the commencement of the procurement, installation, or construction of a discrete portion of an Interconnecting Transmission Owner's Interconnection Facilities, Network Upgrades, or Distribution Upgrades, Interconnection Customer shall provide Interconnecting Transmission Owner a guarantee, a surety bond, letter of credit or other form of security that is reasonably acceptable to Interconnecting Transmission Owner in accordance with Section 7 of Schedule 11 of the Tariff.  In addition:

**11.5.1**   The guarantee must be made by an entity that meets the creditworthiness requirements of Interconnecting Transmission Owner, and contain terms and conditions that guarantee payment of any amount that may be due from Interconnection Customer, up to an agreed-to maximum amount.

**11.5.2**   The letter of credit must be issued by a financial institution  reasonably acceptable to Interconnecting Transmission Owner and must specify a reasonable expiration date.

**11.5.3**   The surety bond must be issued by an insurer reasonably acceptable to Interconnecting Transmission Owner and must specify a reasonable expiration date.

**11.6   Interconnection Customer Compensation.**  If System Operator or Interconnecting Transmission Owner requests or directs Interconnection Customer to provide a service pursuant to Articles 9.6.3 (Payment for Reactive Power), or 13.4.1 of this LGIA, Interconnection Customer shall be compensated pursuant to the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**11.6.1   Interconnection Customer Compensation for Actions During Emergency Condition.**  Interconnection Customer shall be compensated for its provision of real and reactive power and other Emergency Condition services that Interconnection Customer provides to support the New England Transmission System during an Emergency Condition in

**JA330**

accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

## ARTICLE 12.  INVOICE

12.1    **General.**  Each Party shall submit to the other Party(ies), on a monthly basis, invoices of amounts due for the preceding month.  Each invoice shall state the month to which the invoice applies and fully describe the services and equipment provided.  The Parties may discharge mutual debts and payment obligations due and owing to each other on the same date through netting, in which case all amounts a Party owes to the other Party(ies) under this LGIA, including interest payments or credits, shall be netted so that only the net amount remaining due shall be paid by the owing Party.

12.2    **Final Invoice.**  Within six months after completion of the construction of the Interconnecting Transmission Owner's Interconnection Facilities and the Network Upgrades, Interconnecting Transmission Owner shall provide an invoice of the final cost of the construction of the Interconnecting Transmission Owner's Interconnection Facilities and the Network Upgrades and shall set forth such costs in sufficient detail to enable Interconnection Customer to compare the actual costs with the estimates and to ascertain deviations, if any, from the cost estimates. Interconnecting Transmission Owner shall refund to Interconnection Customer any amount by which the actual payment by Interconnection Customer for estimated costs exceeds the actual costs of construction within thirty (30) Calendar Days of the issuance of such final construction invoice.  Interconnection Customer shall pay to Interconnecting Transmission Owner any amount by which the actual payment by Interconnection Customer for estimated costs falls short of the actual costs of construction within thirty (30) Calendar Days of the issuance of such final construction invoice.

12.3    **Payment.**  Invoices shall be rendered to the paying Party at the address specified in Appendix F. The Party receiving the invoice shall pay the invoice within thirty (30) Calendar Days of receipt. All payments shall be made in immediately available funds payable to the other Party, or by wire transfer to a bank named and account designated by the invoicing Party.  Payment of invoices by any Party will not constitute a waiver of any rights or claims the other Party(ies) may have under this LGIA.

**JA331**

12.4  **Disputes.**  In the event of a billing dispute between Interconnecting Transmission Owner and Interconnection Customer, Interconnecting Transmission Owner shall continue to provide Interconnection Service under this LGIA as long as Interconnection Customer: (i) continues to make all payments not in dispute; and (ii) pays to Interconnecting Transmission Owner or into an independent escrow account the portion of the invoice in dispute, pending resolution of such dispute.  If Interconnection Customer fails to meet these two requirements for continuation of service, then Interconnecting Transmission Owner may provide notice to Interconnection Customer of a Default pursuant to Article 17.  Within thirty (30) Calendar Days after the resolution of the dispute, the Party that owes money to the other Party shall pay the amount due with interest calculated in accord with the methodology set forth in the Commission's Regulations at 18 CFR § 35.19a(a)(2)(iii).

## ARTICLE 13.  EMERGENCIES

13.1  **Obligations.**  Each Party shall comply with the Emergency Condition procedures of the System Operator in accordance with the applicable provisions of the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

13.2  **Notice.**  Interconnecting Transmission Owner or  System Operator as applicable shall notify Interconnection Customer and System Operator or Interconnecting Transmission Owner as applicable, promptly when it becomes aware of an Emergency Condition that affects the Interconnecting Transmission Owner's Interconnection Facilities or the New England Transmission System that may reasonably be expected to affect Interconnection Customer's operation of the Large Generating Facility or the Interconnection Customer's Interconnection Facilities.  Interconnection Customer shall notify Interconnecting Transmission Owner and System Operator promptly when it becomes aware of an Emergency Condition that affects the Large Generating Facility or the Interconnection Customer Interconnection Facilities that may reasonably be expected to affect the New England Transmission System or the Interconnecting Transmission Owner's Interconnection Facilities.  To the extent information is known, the notification shall describe the Emergency Condition, the extent of the damage or deficiency, the expected effect on the operation of Interconnection Customer's or Interconnecting Transmission Owner's facilities and operations, its anticipated duration and the corrective action taken and/or to be taken.  The initial notice shall be followed as soon as practicable with written notice.

13.3    **Immediate Action.**  Unless, in Interconnection Customer's reasonable judgment, immediate action is required, Interconnection Customer shall obtain the consent of Interconnecting Transmission Owner and System Operator, such consent to not be unreasonably withheld, prior to performing any manual switching operations at the Large Generating Facility or the Interconnection Customer Interconnection Facilities in response to an Emergency Condition either declared by the Interconnecting Transmission Owner or the System Operator or otherwise regarding the New England Transmission System.

13.4    **System Operator's and Interconnecting Transmission Owner's Authority.**

13.4.1    **General.**  System Operator or Interconnecting Transmission Owner may take whatever actions or inactions with regard to the New England Transmission System or the Interconnecting Transmission Owner's Interconnection Facilities it deems necessary during an Emergency Condition in order to (i) preserve public health and safety, (ii) preserve the reliability of the New England Transmission System or Interconnecting Transmission Owner's Interconnection Facilities, (iii) limit or prevent damage, and (iv) expedite restoration of service.

System Operator and Interconnecting Transmission Owner shall use Reasonable Efforts to minimize the effect of such actions or inactions on the Large Generating Facility or the Interconnection Customer Interconnection Facilities.  System Operator and Interconnecting Transmission Owner may, on the basis of technical considerations, require the Large Generating Facility to mitigate an Emergency Condition by taking actions necessary and limited in scope to remedy the Emergency Condition, including, but not limited to, directing Interconnection Customer to shut-down, start-up, increase or decrease the real or reactive power output of the Large Generating Facility; implementing a reduction or disconnection pursuant to Article 13.4.2; directing the Interconnection Customer to assist with black start (if available) or restoration efforts; or altering the outage schedules of the Large Generating Facility and the Interconnection Customer Interconnection Facilities. Interconnection Customer shall comply with all of System Operator's and Interconnecting Transmission Owner's operating instructions concerning Large Generating Facility real power and reactive power output within the manufacturer's design limitations of the Large Generating Facility's equipment that is in

60

**JA333**

service and physically available for operation at the time, in compliance with Applicable Laws and Regulations.

**13.4.2   Reduction and Disconnection.**  System Operator and Interconnecting Transmission Owner may reduce Interconnection Service or disconnect the Large Generating Facility or the Interconnection Customer Interconnection Facilities when such reduction or disconnection is necessary in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  These rights are separate and distinct from any right of curtailment of the System Operator and Interconnecting Transmission Owner pursuant to the Tariff.  When the System Operator and Interconnecting Transmission Owner can schedule the reduction or disconnection in advance, System Operator and Interconnecting Transmission Owner shall notify Interconnection Customer of the reasons, timing and expected duration of the reduction or disconnection.  System Operator and Interconnecting Transmission Owner shall coordinate with the Interconnection Customer in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents to schedule the reduction or disconnection during periods of least impact to the Interconnection Customer and the System Operator and Interconnecting Transmission Owner.  Any reduction or disconnection shall continue only for so long as reasonably necessary in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.  The Parties shall cooperate with each other to restore the Large Generating Facility, the Interconnection Facilities, and the New England Transmission System to their normal operating state as soon as practicable in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

**13.5**   **Interconnection Customer Authority.**  In accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents and the LGIA and the LGIP, the Interconnection Customer may take whatever actions or inactions with regard to the Large Generating Facility or the Interconnection Customer's Interconnection Facilities during an Emergency Condition in order to (i) preserve public health and safety, (ii) preserve the reliability of the Large Generating Facility or the Interconnection Customer's Interconnection Facilities, (iii) limit or prevent damage, and (iv) expedite restoration of service.  Interconnection Customer shall use Reasonable Efforts to minimize the effect of such actions or inactions on the New England

Transmission System and the Interconnecting Transmission Owner's Interconnection Facilities. System Operator and Interconnecting Transmission Owner shall use Reasonable Efforts to assist Interconnection Customer in such actions.

13.6     **Limited Liability.**  Except as otherwise provided in Article 11.6.1 of this LGIA, a Party shall not be liable to another Party for any action it takes in responding to an Emergency Condition so long as such action is made in good faith and in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents.

### ARTICLE 14.  REGULATORY REQUIREMENTS AND GOVERNING LAW

14.1     **Regulatory Requirements.**  Each Party's obligations under this LGIA shall be subject to its receipt of any required approval or certificate from one or more Governmental Authorities in the form and substance satisfactory to the applying Party, or the Party making any required filings with, or providing notice to, such Governmental Authorities, and the expiration of any time period associated therewith.  Each Party shall in good faith seek and use its Reasonable Efforts to obtain such other approvals.  Nothing in this LGIA shall require Interconnection Customer to take any action that could result in its inability to obtain, or its loss of, status or exemption under the Federal Power Act or the Public Utility Holding Company Act of 1935, as amended.  To the extent that a condition arises that could result in Interconnection Customer's inability to obtain, or its loss of, status or exemption under the Federal Power Act, the Public Utility Holding Company Act of 1935, as amended, or the Public Utility Regulatory Policies Act of 1978, the Parties shall engage in good faith negotiations to address the condition so that such result will not occur and so that the Interconnection Agreement can be performed.

14.2     **Governing Law.**

14.2.1     The validity, interpretation and performance of this LGIA and each of its provisions shall be governed by the laws of the state where the Point of Interconnection is located, without regard to its conflicts of law principles.

14.2.2     This LGIA is subject to all Applicable Laws and Regulations.

**14.2.3** Each Party expressly reserves the right to seek changes in, appeal, or otherwise contest any laws, orders, rules, or regulations of a Governmental Authority.

### ARTICLE 15.  NOTICES

**15.1**  **General.**  Unless otherwise provided in this LGIA, any notice, demand or request required or permitted to be given by a Party to another Party and any instrument required or permitted to be tendered or delivered by a Party in writing to another Party shall be effective when delivered and may be so given, tendered or delivered, by recognized national courier, or by depositing the same with the United States Postal Service with postage prepaid, for delivery by certified or registered mail, addressed to the Party, or personally delivered to the Party, at the address set out in Appendix F (Addresses for Delivery of Notices and Billings).
A Party may change the notice information in this LGIA by giving five (5) Business Days written notice prior to the effective date of the change.

**15.2**  **Billings and Payments.**  Billings and payments shall be sent to the addresses set out in Appendix F.

**15.3**  **Alternative Forms of Notice.**  Any notice or request required or permitted to be given by a Party to another Party and not required by this Agreement to be given in writing may be so given by telephone, facsimile or email to the telephone numbers and email addresses set out in Appendix F.

**15.4**  **Operations and Maintenance Notice.**  Each Party shall notify the other Party(ies) in writing of the identity of the person(s) that it designates as the point(s) of contact with respect to the implementation of Articles 9 and 10.

### ARTICLE 16.  FORCE MAJEURE

**16.1**  **Force Majeure.**

**16.1.1**  Economic hardship is not considered a Force Majeure event.

16.1.2    A Party shall not be considered to be in Default with respect to any obligation hereunder (including obligations under Article 4), other than the obligation to pay money when due, if prevented from fulfilling such obligation by Force Majeure.  A Party unable to fulfill any obligation hereunder (other than an obligation to pay money when due) by reason of Force Majeure shall give notice and the full particulars of such Force Majeure to the other Party(ies) in writing or by telephone as soon as reasonably possible after the occurrence of the cause relied upon.  Telephone notices given pursuant to this Article shall be confirmed in writing as soon as reasonably possible and shall specifically state full particulars of the Force Majeure, the time and date when the Force Majeure occurred and when the Force Majeure is reasonably expected to cease.  The Party affected shall exercise due diligence to remove such disability with reasonable dispatch, but shall not be required to accede or agree to any provision not satisfactory to it in order to settle and terminate a strike or other labor disturbance.

## ARTICLE 17.  DEFAULT

**17.1    Default.**

17.1.1    **General.**  No Breach shall exist where such failure to discharge an obligation (other than the payment of money) is the result of Force Majeure as defined in this LGIA or the result of an act or omission of the other Party(ies).  Upon a Breach, the non-Breaching Party shall give written notice of such Breach to the breaching Party.  Except as provided in Article 17.1.2, the Breaching Party shall have thirty (30) Calendar Days from receipt of the Breach notice within which to cure such Breach; provided however, if such Breach is not capable of cure within thirty (30) Calendar Days, the Breaching Party shall commence such cure within thirty (30) Calendar Days after notice and continuously and diligently complete such cure within ninety (90) Calendar Days from receipt of the Breach notice; and, if cured within such time, the Breach specified in such notice shall cease to exist.

17.1.2    **Right to Terminate.**  If a Breach is not cured as provided in this Article, or if a Breach is not capable of being cured within the period provided for herein, the non-breaching Party(ies) shall have the right to terminate this LGIA by written notice at any time until

**JA337**

cure occurs, and be relieved of any further obligation hereunder and, whether or not those Parties terminate this LGIA, to recover from the Breaching Party all amounts due hereunder, plus all other damages and remedies to which they are entitled at law or in equity. The provisions of this Article will survive termination of this LGIA.

### ARTICLE 18.  INDEMNITY, CONSEQUENTIAL DAMAGES AND INSURANCE

Notwithstanding any other provision of this Agreement, the liability, indemnification and insurance provisions of the Transmission Operating Agreement ("TOA") or other applicable operating agreements shall apply to the relationship between the System Operator and the Interconnection Transmission Owner and the liability, indemnification and insurance provisions of the Tariff apply to the relationship between the System Operator and the Interconnection Customer and between the Interconnecting Transmission Owner and the Interconnection Customer.

18.1  **Indemnity.**  Each Party shall at all times indemnify, defend, and save the other Party(ies) harmless from any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demand, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from the other Party's(ies') action or inactions of their obligations under this LGIA on behalf of the Indemnifying Party, except in cases of gross negligence or intentional wrongdoing by an indemnified Party.

18.1.1  **Indemnified Person.**  If an Indemnified Person is entitled to indemnification under this Article 18 as a result of a claim by a third party, and the Indemnifying Party fails, after notice and reasonable opportunity to proceed under Article 18.1, to assume the defense of such claim, such Indemnified Person may at the expense of the Indemnifying Party contest, settle or consent to the entry of any judgment with respect to, or pay in full, such claim.

18.1.2  **Indemnifying Party.**  If an Indemnifying Party is obligated to indemnify and hold any Indemnified Person harmless under this Article 18, the amount owing to the Indemnified

Person shall be the amount of such Indemnified Person's actual Loss, net of any insurance or other recovery.

**18.1.3   Indemnity Procedures.**  Promptly after receipt by an Indemnified Person of any claim or notice of the commencement of any action or administrative or legal proceeding or investigation as to which the indemnity provided for in Article 18.1 may apply, the Indemnified Person shall notify the Indemnifying Party of such fact.  Any failure of or delay in such notification shall not affect a Party's indemnification obligation unless such failure or delay is materially prejudicial to the Indemnifying Party.

The Indemnifying Party shall have the right to assume the defense thereof with counsel designated by such Indemnifying Party and reasonably satisfactory to the Indemnified Person.  If the defendants in any such action include one or more Indemnified Persons and the Indemnifying Party and if the Indemnified Person reasonably concludes that there may be legal defenses available to it and/or other Indemnified Persons which are different from or additional to those available to the Indemnifying Party, the Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on its own behalf.  In such instances, the Indemnifying Party shall only be required to pay the fees and expenses of one additional attorney to represent an Indemnified Person or Indemnified Persons having such differing or additional legal defenses.

The Indemnified Person shall be entitled, at its expense, to participate in any such action, suit or proceeding, the defense of which has been assumed by the Indemnifying Party. Notwithstanding the foregoing, the Indemnifying Party (i) shall not be entitled to assume and control the defense of any such action, suit or proceedings if and to the extent that, in the opinion of the Indemnified Person and its counsel, such action, suit or proceeding involves the potential imposition of criminal liability on the Indemnified Person, or there exists a conflict or adversity of interest between the Indemnified Person and the Indemnifying Party, in which event the Indemnifying Party shall pay the reasonable expenses of the Indemnified Person, and (ii) shall not settle or consent to the entry of any judgment in any action, suit or proceeding without the consent of the Indemnified Person, which shall not be reasonably withheld, conditioned or delayed.

**18.2**     **Consequential Damages.**  Other than the Liquidated Damages heretofore described, in no event shall a Party be liable under any provision of this LGIA for any losses, damages, costs or expenses for any special, indirect, incidental, consequential, or punitive damages, including but not limited to loss of profit or revenue, loss of the use of equipment, cost of capital, cost of temporary equipment or services, whether based in whole or in part in contract, in tort, including negligence, strict liability, or any other theory of liability; provided, however, that damages for which a Party may be liable to the other Party under another agreement will not be considered to be special, indirect, incidental, or consequential damages hereunder.

**18.3**     **Insurance.**  The Interconnecting Transmission Owner and the Interconnection Customer shall, at their own expense, maintain in force throughout the period of this LGIA, and until released by the other Party(ies), the following minimum insurance coverages, with insurers authorized to do business in the state where the Point of Interconnection is located:

    **18.3.1**   Employers' Liability and Workers' Compensation Insurance providing statutory benefits in accordance with the laws and regulations of the state in which the Point of Interconnection is located.

    **18.3.2**   Commercial General Liability Insurance including premises and operations, personal injury, broad form property damage, broad form blanket contractual liability coverage (including coverage for the contractual indemnification) products and completed operations coverage, coverage for explosion, collapse and underground hazards, independent contractors coverage, coverage for pollution to the extent normally available and punitive damages to the extent normally available and a cross liability endorsement, with minimum limits of One Million Dollars ($1,000,000) per occurrence/One Million Dollars ($1,000,000) aggregate combined single limit for personal injury, bodily injury, including death, and property damage.

    **18.3.3**   Comprehensive Automobile Liability Insurance for coverage of owned and non-owned and hired vehicles, trailers or semi-trailers designed for travel on public roads, with a minimum, combined single limit of One Million Dollars ($1,000,000) per occurrence for bodily injury, including death, and property damage.

18.3.4    Excess Public Liability Insurance over and above the Employers' Liability Commercial General Liability and Comprehensive Automobile Liability Insurance coverage, with a minimum combined single limit of Twenty Million Dollars ($20,000,000) per occurrence/Twenty Million Dollars ($20,000,000) aggregate.

18.3.5    The Commercial General Liability Insurance, Comprehensive Automobile Insurance and Excess Public Liability Insurance policies shall name the other Party(ies), its parent, associated and Affiliate companies and their respective directors, officers, agents, servants and employees ("Other Party Group") as additional insured.  All policies shall contain provisions whereby the insurers waive all rights of subrogation in accordance with the provisions of this LGIA against the Other Party Group and provide thirty (30) Calendar Days advance written notice to the Other Party Group prior to anniversary date of cancellation or any material change in coverage or condition.

18.3.6    The Commercial General Liability Insurance, Comprehensive Automobile Liability Insurance and Excess Public Liability Insurance policies shall contain provisions that specify that the policies are primary and shall apply to such extent without consideration for other policies separately carried and shall state that each insured is provided coverage as though a separate policy had been issued to each, except the insurer's liability shall not be increased beyond the amount for which the insurer would have been liable had only one insured been covered.  Each Party shall be responsible for its respective deductibles or retentions.

18.3.7    The Commercial General Liability Insurance, Comprehensive Automobile Liability Insurance and Excess Public Liability Insurance policies, if written on a Claims First Made Basis, shall be maintained in full force and effect for two (2) years after termination of this LGIA, which coverage may be in the form of tail coverage or extended reporting period coverage if agreed by the Parties.

18.3.8    The requirements contained herein as to the types and limits of all insurance to be maintained by the Parties are not intended to and shall not in any manner, limit or qualify the liabilities and obligations assumed by the Parties under this LGIA.

18.3.9    Within ten (10) days following execution of this LGIA, and as soon as practicable after the end of each fiscal year or at the renewal of the insurance policy and in any event within ninety (90) days thereafter, each Party shall provide certification of all insurance required in this LGIA, executed by each insurer or by an authorized representative of each insurer.

18.3.10    Notwithstanding the foregoing, each Party may self-insure to meet the minimum insurance requirements of Articles 18.3.2 through 18.3.8 to the extent it maintains a self-insurance program, provided that such Party's senior secured debt is rated at investment grade, or better, by Standard & Poor's and that its self-insurance program meets the minimum insurance requirements of Articles 18.3.2 through 18.3.8.  For any period of time that a Party's senior secured  debt is unrated by Standard & Poor's or is rated at less than investment grade by Standard & Poor's, such Party shall comply with the insurance requirements applicable to it under Articles 18.3.2 through 18.3.9.  In the event that a Party is permitted to self-insure pursuant to this Article, it shall notify the other Party(ies) that it meets the requirements to self-insure and that its self-insurance program meets the minimum insurance requirements in a manner consistent with that specified in Article 18.3.9.

18.3.11    The Parties agree to report to each other in writing as soon as practical all accidents or occurrences resulting in injuries to any person, including death, and any property damage arising out of this LGIA.

## ARTICLE 19.  ASSIGNMENT

19.1    **Assignment.**  This LGIA may be assigned by any Party only with the written consent of the other Parties; provided that the Parties may assign this LGIA without the consent of the other Parties to any Affiliate of the assigning Party with an equal or greater credit rating and with the legal authority and operational ability to satisfy the obligations of the assigning Party under this LGIA; and provided further that the Interconnection Customer shall have the right to assign this LGIA, without the consent of the Interconnecting Transmission Owner or System Operator, for collateral security purposes to aid in providing financing for the Large Generating Facility, provided that the Interconnection Customer will promptly notify the Interconnecting Transmission Owner and System Operator of any such assignment.  Any financing arrangement entered into by the

69

Interconnection Customer pursuant to this Article will provide that prior to or upon the exercise of the secured party's, trustee's or mortgagee's assignment rights pursuant to said arrangement, the secured creditor, the trustee or mortgagee will notify the Interconnecting Transmission Owner and System Operator of the date and particulars of any such exercise of assignment right(s), including providing the Interconnecting Transmission Owner with proof that it meets the requirements of Articles 11.5 and 18.3. Any attempted assignment that violates this Article is void and ineffective. Any assignment under this LGIA shall not relieve a Party of its obligations, nor shall a Party's obligations be enlarged, in whole or in part, by reason thereof. Where required, consent to assignment will not be unreasonably withheld, conditioned or delayed.

## ARTICLE 20.  SEVERABILITY

20.1    **Severability.**  If any provision in this LGIA is finally determined to be invalid, void or unenforceable by any court or other Governmental Authority having jurisdiction, such determination shall not invalidate, void or make unenforceable any other provision, agreement or covenant of this LGIA; provided that if the Interconnection Customer (or any third party, but only if such third party is not acting at the direction of the Interconnecting Transmission Owner) seeks and obtains such a final determination with respect to any provision of the Alternate Option (Article 5.1.2), or the Negotiated Option (Article 5.1.4), then none of these provisions shall thereafter have any force or effect and the Parties' rights and obligations shall be governed solely by the Standard Option (Article 5.1.1).

## ARTICLE 21.  COMPARABILITY

21.1    **Comparability.**  The Parties will comply with all applicable comparability and code of conduct laws, rules and regulations, as amended from time to time.

## ARTICLE 22.  CONFIDENTIALITY

22.1    **Confidentiality.**  Confidential Information shall include, without limitation, all information governed by the  ISO New England Information Policy, all information obtained from third parties under confidentiality agreements, all information relating to a Party's technology, research

and development, business affairs, and pricing, and any information supplied by a Party to another prior to the execution of this LGIA.

Information is Confidential Information only if it is clearly designated or marked in writing as confidential on the face of the document, or, if the information is conveyed orally or by inspection, if the Party providing the information orally informs the Party receiving the information that the information is confidential.

If requested by a Party, the other Party(ies) shall provide, in writing, the basis for asserting that the information referred to in this Article warrants confidential treatment, and the requesting Party may disclose such writing to the appropriate Governmental Authority.  Each Party shall be responsible for the costs associated with affording confidential treatment to its information.

**22.1.1   Term.**  During the term of this LGIA, and for a period of three (3) years after the expiration or termination of this LGIA, except as otherwise provided in this Article 22, each Party shall hold in confidence and shall not disclose to any person Confidential Information.

**22.1.2   Scope.**  Confidential Information shall not include information that the receiving Party can demonstrate: (1) is generally available to the public other than as a result of a disclosure by the receiving Party; (2) was in the lawful possession of the receiving Party on a non-confidential basis before receiving it from the disclosing Party; (3) was supplied to the receiving Party without restriction by a third party, who, to the knowledge of the receiving Party after due inquiry, was under no obligation to the disclosing Party to keep such information confidential; (4) was independently developed by the receiving Party without reference to Confidential Information of the disclosing Party; (5) is, or becomes, publicly known, through no wrongful act or omission of the receiving Party or Breach of this LGIA; or (6) is required, in accordance with Article 22.1.7 of the LGIA, Order of Disclosure, to be disclosed by any Governmental Authority or is otherwise required to be disclosed by law or subpoena, or is necessary in any legal proceeding establishing rights and obligations under this LGIA. Information designated as Confidential Information will no longer be deemed confidential if the Party that designated the information as confidential notifies the other Party(ies) that it no longer is confidential.

71

**JA344**

**22.1.3    Release of Confidential Information.**  A Party shall not release or disclose Confidential Information to any other person, except to its Affiliates (limited by the Standards of Conduct requirements), subcontractors, employees, consultants, or to parties who may be or are considering providing financing to or equity participation with Interconnection Customer, or to potential purchasers or assignees of Interconnection Customer, on a need-to-know basis in connection with this LGIA, unless such person has first been advised of the confidentiality provisions of this Article 22 and has agreed to comply with such provisions.  Notwithstanding the foregoing, a Party providing Confidential Information to any person shall remain primarily responsible for any release of Confidential Information in contravention of this Article 22.

**22.1.4    Rights.**  Each Party retains all rights, title, and interest in the Confidential Information that each Party discloses to the other Party(ies).  The disclosure by each Party to the other Party(ies) of Confidential Information shall not be deemed a waiver by a Party or any other person or entity of the right to protect the Confidential Information from public disclosure.

**22.1.5    No Warranties.**  By providing Confidential Information, a Party does not make any warranties or representations as to its accuracy or completeness.  In addition, by supplying Confidential Information, a Party does not obligate itself to provide any particular information or Confidential Information to the other Party(ies) nor to enter into any further agreements or proceed with any other relationship or joint venture.

**22.1.6    Standard of Care.**  Each Party shall use at least the same standard of care to protect Confidential Information it receives as it uses to protect its own Confidential Information from unauthorized disclosure, publication or dissemination.  Each Party may use Confidential Information solely to fulfill its obligations to the other Party(ies) under this LGIA or its regulatory requirements.

**22.1.7    Order of Disclosure.**  If a court or a Government Authority or entity with the right, power, and apparent authority to do so requests or requires a Party, by subpoena, oral deposition, interrogatories, requests for production of documents, administrative order, or otherwise, to disclose Confidential Information, that Party shall provide the other Party(ies) with prompt notice of such request(s) or requirement(s) so that the other

**JA345**

Party(ies) may seek an appropriate protective order or waive compliance with the terms of this LGIA. Notwithstanding the absence of a protective order or waiver, the Party may disclose such Confidential Information which, in the opinion of its counsel, the Party is legally compelled to disclose. Each Party will use Reasonable Efforts to obtain reliable assurance that confidential treatment will be accorded any Confidential Information so furnished.

**22.1.8  Termination of Agreement.**  Upon termination of this LGIA for any reason, each Party shall, within ten (10) Calendar Days of receipt of a written request from the other Party(ies), use Reasonable Efforts to destroy, erase, or delete (with such destruction, erasure, and deletion certified in writing to the other Party(ies)) or return to the other Party(ies), without retaining copies thereof, any and all written or electronic Confidential Information received from the other Party(ies).

**22.1.9  Remedies.**  The Parties agree that monetary damages would be inadequate to compensate a Party for the other Party's(ies') Breach of its obligations under this Article 22. Each Party accordingly agrees that the other Party(ies) shall be entitled to equitable relief, by way of injunction or otherwise, if the first Party Breaches or threatens to Breach its obligations under this Article 22, which equitable relief shall be granted without bond or proof of damages, and the receiving Parties shall not plead in defense that there would be an adequate remedy at law. Such remedy shall not be deemed an exclusive remedy for the Breach of this Article 22, but shall be in addition to all other remedies available at law or in equity. The Parties further acknowledge and agree that the covenants contained herein are necessary for the protection of legitimate business interests and are reasonable in scope. No Party, however, shall be liable for indirect, incidental, or consequential or punitive damages of any nature or kind resulting from or arising in connection with this Article 22.

**22.1.10  Disclosure to the Commission, its Staff, or a State.**  Notwithstanding anything in this Article 22 to the contrary, and pursuant to 18 CFR. section 1b.20, if the Commission or its staff, during the course of an investigation or otherwise, requests information from one of the Parties that is otherwise required to be maintained in confidence pursuant to this LGIA, the Party shall provide the requested information to the Commission or its staff, within the time provided for in the request for information. In providing the

information to the Commission or its staff, the Party must, consistent with 18 CFR section 388.112, request that the information be treated as confidential and non-public by the Commission and its staff and that the information be withheld from public disclosure.  Parties are prohibited from notifying the other Party(ies) to this LGIA prior to the release of the Confidential Information to the Commission or its staff.  The Party shall notify the other Party(ies) to the LGIA when it is notified by the Commission or its staff that a request to release Confidential Information has been received by the Commission, at which time any of the Parties may respond before such information would be made public, pursuant to 18 CFR section 388.112.  Requests from a state regulatory body conducting a confidential investigation shall be treated in a similar manner if consistent with the applicable state rules and regulations.

22.1.11    Subject to the exception in Article 22.1.10, any information that a Party claims is competitively sensitive, commercial or financial information under this LGIA ("Confidential Information") shall not be disclosed by the other Party(ies) to any person not employed or retained by the other Party(ies), except to the extent disclosure is (i) required by law; (ii) reasonably deemed by the disclosing Party to be required to be disclosed in connection with a dispute between or among the Parties, or the defense of litigation or dispute; (iii) otherwise permitted by consent of the other Party(ies), such consent not to be unreasonably withheld; or (iv) necessary to fulfill its obligations under this LGIA or as a transmission service provider or a Control Area operator including disclosing the Confidential Information to an RTO or ISO or to a regional or national reliability organization.  The Party asserting confidentiality shall notify the other Party(ies) in writing of the information it claims is confidential.  Prior to any disclosures of the other Parties' Confidential Information under this subparagraph, or if any third party or Governmental Authority makes any request or demand for any of the information described in this subparagraph, the disclosing Party agrees to promptly notify the other Party(ies) in writing and agrees to assert confidentiality and cooperate with the other Party(ies) in seeking to protect the Confidential Information from public disclosure by confidentiality agreement, protective order or other reasonable measures.

### ARTICLE 23.  ENVIRONMENTAL RELEASES

23.1    Each Party shall notify the other Party(ies), first orally and then in writing, of the release of any Hazardous Substances, any asbestos or lead abatement activities, or any type of remediation activities related to the Large Generating Facility or the Interconnection Facilities, each of which may reasonably be expected to affect the other Party(ies).  The notifying Party shall: (i) provide the notice as soon as practicable, provided such Party makes a good faith effort to provide the notice no later than twenty-four (24) hours after such Party becomes aware of the occurrence; and (ii) promptly furnish to the other Party(ies) copies of any publicly available reports filed with any Governmental Authorities addressing such events.

## ARTICLE 24.  INFORMATION REQUIREMENTS

24.1    **Information Acquisition.**  Subject to any applicable confidentiality restrictions, including, but not limited to, codes of conduct, each Party shall submit specific information regarding the electrical characteristics of their respective facilities to each other as described below and in accordance with Applicable Reliability Standards.

24.2    **Information Submission by System Operator and Interconnecting Transmission Owner.**  The initial information submission by System Operator and Interconnecting Transmission Owner shall occur no later than one hundred eighty (180) Calendar Days prior to Trial Operation and shall include information necessary to allow the Interconnection Customer to select equipment and meet any system protection and stability requirements, unless otherwise mutually agreed to by the Parties.  On a monthly basis Interconnecting Transmission Owner shall provide Interconnection Customer a status report on the construction and installation of Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades, including, but not limited to, the following information: (1) progress to date; (2) a description of the activities since the last report; (3) a description of the action items for the next period; and (4) the delivery status of equipment ordered.

24.3    **Updated Information Submission by Interconnection Customer.**  The updated information submission by the Interconnection Customer, including manufacturer information, shall occur no later than one hundred eighty (180) Calendar Days prior to the Trial Operation.  Interconnection Customer shall submit a completed copy of the Large Generating Facility data requirements contained in Appendix 1 to the LGIP.  It shall also include any additional information provided to

75

Interconnecting Transmission Owner and System Operator for the Interconnection Feasibility Study, Interconnection System Impact Study and Interconnection Facilities Study.  Information in this submission shall be the most current Large Generating Facility design or expected performance data.  Information submitted for stability models shall be compatible with Interconnecting Transmission Owner and System Operator standard models.  If there is no compatible model, the Interconnection Customer will work with a consultant mutually agreed to by the Parties to develop and supply a standard model and associated information.

If the Interconnection Customer's data is materially different from what was originally provided to Interconnecting Transmission Owner pursuant to the Interconnection Study Agreement between Interconnecting Transmission Owner and Interconnection Customer, then the System Operator will conduct appropriate studies to determine the impact on the New England Transmission System based on the actual data submitted pursuant to this Article 24.3.  The Interconnection Customer shall not begin Trial Operation until such studies are completed.

**24.4    Information Supplementation.**  Prior to the Operation Date, the Parties shall supplement their information submissions described above in this Article 24 with any and all "as-built" Large Generating Facility information or "as-tested" performance information that differs from the initial submissions or, alternatively, written confirmation that no such differences exist. The Interconnection Customer shall conduct tests on the Large Generating Facility as required by Good Utility Practice such as an open circuit "step voltage" test on the Large Generating Facility to verify proper operation of the Large Generating Facility's automatic voltage regulator.

Unless otherwise agreed, the test conditions shall include: (1) Large Generating Facility at synchronous speed; (2) automatic voltage regulator on and in voltage control mode; and (3) a five percent change in Large Generating Facility terminal voltage initiated by a change in the voltage regulators reference voltage.  Interconnection Customer shall provide validated test recordings showing the responses of Large Generating Facility terminal and field voltages.  In the event that direct recordings of these voltages is impractical, recordings of other voltages or currents that mirror the response of the Large Generating Facility's terminal or field voltage are acceptable if information necessary to translate these alternate quantities to actual Large Generating Facility terminal or field voltages is provided.  Large Generating Facility testing shall be conducted and results provided to the Interconnecting Transmission Owner for each individual generating unit in a station.

**JA349**

Subsequent to the Operation Date, the Interconnection Customer shall provide Interconnecting Transmission Owner and System Operator any information changes due to equipment replacement, repair, or adjustment.  Interconnecting Transmission Owner shall provide the Interconnection Customer any information changes due to equipment replacement, repair or adjustment in the directly connected substation or any adjacent Interconnecting Transmission Owner-owned substation that may affect the Interconnection Customer's Interconnection Facilities equipment ratings, protection or operating requirements.  The Parties shall provide such information no later than thirty (30) Calendar Days after the date of the equipment replacement, repair or adjustment.

### ARTICLE 25.  INFORMATION ACCESS AND AUDIT RIGHTS

25.1    **Information Access.**  Each Party (the "disclosing Party") shall make available to the other Parties information that is in the possession of the disclosing Party and is necessary in order for the other Party(ies) to:  (i) verify the costs incurred by the disclosing Party for which the other Party(ies) are responsible under this LGIA; and (ii) carry out its obligations and responsibilities under this LGIA.  The Parties shall not use such information for purposes other than those set forth in this Article 25.1 and to enforce their rights under this LGIA.

25.2    **Reporting of Non-Force Majeure Events.**  Each Party (the "notifying Party") shall notify the other Party(ies) when the notifying Party becomes aware of its inability to comply with the provisions of this LGIA for a reason other than a Force Majeure event.  The Parties agree to cooperate with each other and provide necessary information regarding such inability to comply, including the date, duration, reason for the inability to comply, and corrective actions taken or planned to be taken with respect to such inability to comply.  Notwithstanding the foregoing, notification, cooperation or information provided under this Article shall not entitle the Party receiving such notification to allege a cause for anticipatory breach of this LGIA.

25.3    **Audit Rights.**  Subject to the requirements of confidentiality under Article 22 of this LGIA, each Party shall have the right, during normal business hours, and upon prior reasonable notice to the other Party(ies), to audit at its own expense the other Party's(ies') accounts and records pertaining to a Party's performance or a Party's satisfaction of obligations under this LGIA.  Such audit rights shall include audits of the other Party's(ies') costs, calculation of invoiced amounts, the

efforts to allocate responsibility for the provision of reactive support to the New England Transmission System, the efforts to allocate responsibility for interruption or reduction of generation on the New England Transmission System, and each Party's actions in an Emergency Condition.  Any audit authorized by this Article shall be performed at the offices where such accounts and records are maintained and shall be limited to those portions of such accounts and records that relate to each Party's performance and satisfaction of obligations under this LGIA. Each Party shall keep such accounts and records for a period equivalent to the audit rights periods described in Article 25.4.

**25.4**  **Audit Rights Periods.**

    **25.4.1**  **Audit Rights Period for Construction-Related Accounts and Records.**  Accounts and records related to the design, engineering, procurement, and construction of Interconnecting Transmission Owner's Interconnection Facilities and Network Upgrades shall be subject to audit for a period of twenty-four (24) months following Interconnecting Transmission Owner's issuance of a final invoice in accordance with Article 12.2.

    **25.4.2**  **Audit Rights Period for All Other Accounts and Records.**  Accounts and records related to a Party's performance or satisfaction of all obligations under this LGIA other than those described in Article 25.4.1 shall be subject to audit as follows:  (i) for an audit relating to cost obligations, the applicable audit rights period shall be twenty-four (24) months after the auditing Party's receipt of an invoice giving rise to such cost obligations; and (ii) for an audit relating to all other obligations, the applicable audit rights period shall be twenty-four (24) months after the event for which the audit is sought.

**25.5**  **Audit Results.**  If an audit by a Party determines that an overpayment or an underpayment has occurred, a notice of such overpayment or underpayment shall be given to the other Party(ies) together with those records from the audit which support such determination.

## ARTICLE 26.  SUBCONTRACTORS

**26.1**  **General.**  Nothing in this LGIA shall prevent a Party from utilizing the services of any subcontractor as it deems appropriate to perform its obligations under this LGIA; provided,

however, that each Party shall require its subcontractors to comply with all applicable terms and conditions of this LGIA in providing such services and each Party shall remain primarily liable to the other Party(ies) for the performance of such subcontractor.

26.2   **Responsibility of Principal.**   The creation of any subcontract relationship shall not relieve the hiring Party of any of its obligations under this LGIA.  The hiring Party shall be fully responsible to the other Party(ies) for the acts or omissions of any subcontractor the hiring Party hires as if no subcontract had been made; provided, however, that in no event shall the Interconnecting Transmission Owner be liable for the actions or inactions of the Interconnection Customer or its subcontractors with respect to obligations of the Interconnection Customer under Article 5 of this LGIA.  Any applicable obligation imposed by this LGIA upon the hiring Party shall be equally binding upon, and shall be construed as having application to, any subcontractor of such Party.

26.3   **No Limitation by Insurance.**   The obligations under this Article 26 will not be limited in any way by any limitation of subcontractor's insurance.

**ARTICLE 27.  DISPUTES**

27.1   **Submission.**   In the event a Party has a dispute, or asserts a claim, that arises out of or in connection with this LGIA or its performance, such Party (the "disputing Party") shall provide the other Party(ies) with written notice of the dispute or claim ("Notice of Dispute").  Such dispute or claim shall be referred to a designated senior representative of each Party for resolution on an informal basis as promptly as practicable after receipt of the Notice of Dispute by the other Party(ies).  In the event the designated representatives are unable to resolve the claim or dispute through unassisted or assisted negotiations within thirty (30) Calendar Days of the other Party's(ies') receipt of the Notice of Dispute, such claim or dispute may, upon mutual agreement of the Parties, be submitted to arbitration and resolved in accordance with the arbitration procedures set forth below.  In the event the Parties do not agree to submit such claim or dispute to arbitration, each Party may exercise whatever rights and remedies it may have in equity or at law consistent with the terms of this LGIA.

27.2   **External Arbitration Procedures.**   Any arbitration initiated under this LGIA shall be conducted before a single neutral arbitrator appointed by the Parties.  If the Parties fail to agree upon a single arbitrator within ten (10) Calendar Days of the submission of the dispute to arbitration, each Party

79

**JA352**

shall choose one arbitrator who shall sit on a three-member arbitration panel. The arbitrator so chosen by the System Operator shall chair the arbitration panel. In either case, the arbitrators shall be knowledgeable in electric utility matters, including electric transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any party to the arbitration (except prior arbitration). The arbitrator(s) shall provide each of the Parties an opportunity to be heard and, except as otherwise provided herein, shall conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("Arbitration Rules") and any applicable Commission regulations or RTO rules; provided, however, in the event of a conflict between the Arbitration Rules and the terms of this Article 27, the terms of this Article 27 shall prevail

27.3    **Arbitration Decisions.**  Unless otherwise agreed by the Parties, the arbitrator(s) shall render a decision within ninety (90) Calendar Days of appointment and shall notify the Parties in writing of such decision and the reasons therefore. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this LGIA and shall have no power to modify or change any provision of this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards set forth in the Federal Arbitration Act or the Administrative Dispute Resolution Act. The final decision of the arbitrator must also be filed with the Commission if it affects jurisdictional rates, terms and conditions of service, Interconnection Facilities, or Network Upgrades.

27.4    **Costs.**  Each Party shall be responsible for its own costs incurred during the arbitration process and for the following costs, if applicable:  (1) the cost of the arbitrator chosen by the Party to sit on the three member panel; or (2) a pro rata share of the cost of a single arbitrator chosen by the Parties.

### ARTICLE 28.  REPRESENTATIONS, WARRANTIES AND COVENANTS

28.1    **General.**  Each Party makes the following representations, warranties and covenants:

28.1.1    **Good Standing.**  Such Party is duly organized, validly existing and in good standing under the laws of the state in which it is organized, formed, or incorporated, as

applicable; that it is qualified to do business in the state or states in which the Large Generating Facility, Interconnection Facilities and Network Upgrades owned by such Party, as applicable, are located; and that it has the corporate power and authority to own its properties, to carry on its business as now being conducted and to enter into this LGIA and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this LGIA.

28.1.2  **Authority.**  Such Party has the right, power and authority to enter into this LGIA, to become a Party hereto and to perform its obligations hereunder.  This LGIA is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

28.1.3  **No Conflict.**  The execution, delivery and performance of this LGIA does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of such Party, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon such Party or any of its assets.

28.1.4  **Consent and Approval.**  Such Party has sought or obtained, or, in accordance with this LGIA will seek or obtain, each consent, approval, authorization, order, or acceptance by any Governmental Authority in connection with the execution, delivery and performance of this LGIA, and it will provide to any Governmental Authority notice of any actions under this LGIA that are required by Applicable Laws and Regulations.

**ARTICLE 29.  [OMITTED]**

**ARTICLE 30.  MISCELLANEOUS**

30.1  **Binding Effect.**  This LGIA and the rights and obligations hereof shall be binding upon and shall inure to the benefit of the successors and assigns of the Parties hereto.

81

30.2   **Conflicts.**  In the event of a conflict between the body of this LGIA and any attachment, appendices or exhibits hereto, the terms and provisions of the body of this LGIA shall prevail and be deemed the final intent of the Parties.

30.3   **Rules of Interpretation.**  This LGIA, unless a clear contrary intention appears, shall be construed and interpreted as follows:  (1) the singular number includes the plural number and vice versa;  (2) reference to any person includes such person's successors and assigns but, in the case of a Party, only if such successors and assigns are permitted by this LGIA, and reference to a person in a particular capacity excludes such person in any other capacity or individually; (3) reference to any agreement (including this LGIA), document, instrument or tariff means such agreement, document, instrument, or tariff as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof; (4) reference to any Applicable Laws and Regulations means such Applicable Laws and Regulations as amended, modified, codified, or reenacted, in whole or in part, and in effect from time to time, including, if applicable, rules and regulations promulgated thereunder; (5) unless expressly stated otherwise, reference to any Article, Section or Appendix means such Article of this LGIA or such Appendix to this LGIA, or such Section to the LGIP or such Appendix to the LGIP, as the case may be; (6) "hereunder", "hereof", "herein", "hereto" and words of similar import shall be deemed references to this LGIA as a whole and not to any particular Article or other provision hereof or thereof; (7) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; and (8) relative to the determination of any period of time, "from" means "from and including", "to" means "to but excluding" and "through" means "through and including".

30.4   **Entire Agreement.**  Except for the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, this LGIA, including all Appendices and Schedules attached hereto, constitutes the entire agreement between the Parties with reference to the subject matter hereof, and supersedes all prior and contemporaneous understandings or agreements, oral or written, between the Parties with respect to the subject matter of this LGIA. Except for the ISO New England Operating Documents, Applicable Reliability Standards, any applicable tariffs, related facilities agreements, or successor documents, there are no other agreements, representations, warranties, or covenants which constitute any part of the consideration for, or any condition to, any Party's compliance with its obligations under this LGIA.

30.5    **No Third Party Beneficiaries.**  This LGIA is not intended to and does not create rights, remedies, or benefits of any character whatsoever in favor of any persons, corporations, associations, or entities other than the Parties, and the obligations herein assumed are solely for the use and benefit of the Parties, their successors in interest and, where permitted, their assigns.

30.6    **Waiver.**  The failure of a Party to this LGIA to insist, on any occasion, upon strict performance of any provision of this LGIA will not be considered a waiver of any obligation, right, or duty of, or imposed upon, such Party.

Any waiver at any time by a Party of its rights with respect to this LGIA shall not be deemed a continuing waiver or a waiver with respect to any other failure to comply with any other obligation, right, or duty of this LGIA.  Termination or Default of this LGIA for any reason by the Interconnection Customer shall not constitute a waiver of the Interconnection Customer's legal rights to obtain an interconnection from the Interconnecting Transmission Owner.  Any waiver of this LGIA shall, if requested, be provided in writing.

30.7    **Headings.**  The descriptive headings of the various Articles of this LGIA have been inserted for convenience of reference only and are of no significance in the interpretation or construction of this LGIA.

30.8    **Multiple Counterparts.**  This LGIA may be executed in two or more counterparts, each of which is deemed an original but all constitute one and the same instrument.

30.9    **Amendment.**  The Parties may by mutual agreement amend this LGIA by a written instrument duly executed by the Parties.

30.10   **Modification by the Parties.**  The Parties may by mutual agreement amend the Appendices to this LGIA by a written instrument duly executed by all of the Parties.  Such amendment shall become effective and a part of this LGIA upon satisfaction of all Applicable Laws and Regulations.

**30.11    Reservation of Rights.**  Consistent with Section 11.3 of the LGIP, Interconnecting Transmission Owner and System Operator shall have the right to make unilateral filings with the Commission to modify this LGIA with respect to any rates, terms and conditions, charges, classifications of service, rule or regulation under section 205 or any other applicable provision of the Federal Power Act and the Commission's rules and regulations thereunder, and Interconnection Customer shall have the right to make a unilateral filing with the Commission to modify this LGIA pursuant to section 206 or any other applicable provision of the Federal Power Act and the Commission's rules and regulations thereunder; provided that each Party shall have the right to protest any such filing by the other Parties and to participate fully in any proceeding before the Commission in which such modifications may be considered. In the event of disagreement on terms and conditions of the LGIA related to the costs of upgrades to such Interconnecting Transmission Owner's transmission facilities, the anticipated schedule for the construction of such upgrades, any financial obligations of Interconnecting Transmission Owner, and any provisions related to physical impacts of the interconnection on Interconnecting Transmission Owner's transmission facilities or other assets, then the standard applicable under Section 205 of the Federal Power Act shall apply only to Interconnecting Transmission Owner's position on such terms and conditions. Nothing in this LGIA shall limit the rights of the Parties or of the Commission under sections 205 or 206 of the Federal Power Act and the Commission's rules and regulations thereunder, except to the extent that the Parties otherwise mutually agree as provided herein.

**30.12    No Partnership.**  This LGIA shall not be interpreted or construed to create an association, joint venture, agency relationship, or partnership between the Parties or to impose any partnership obligation or partnership liability upon any Party.  No Party shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other Parties.

**JA357**

**IN WITNESS WHEREOF**, the Parties have executed this LGIA in triplicate originals, each of which shall constitute and be an original effective Agreement between the Parties.

**ISO New England Inc. (System Operator)**

By: _[signature]_

Title: _Vice President, System Planning_

Date: _March 16, 2012_

**New Hampshire Transmission, LLC (Interconnecting Transmission Owner)**

By:

Title:

Date:

**NextEra Energy Seabrook, LLC (Interconnection Customer]**

By:

Title:

Date:

**JA358**

**IN WITNESS WHEREOF**, the Parties have executed this LGIA in triplicate originals, each of which shall constitute and be an original effective Agreement between the Parties.


**ISO New England Inc. (System Operator)**

By:

Title:

Date:


**New Hampshire Transmission, LLC (Interconnecting Transmission Owner)**

By:

Title: President

Date: 04/03/2012


**NextEra Energy Seabrook, LLC (Interconnection Customer]**

By:

Title:

Date:

85

      **IN WITNESS WHEREOF**, the Parties have executed this LGIA in triplicate originals, each of which shall constitute and be an original effective Agreement between the Parties.


**ISO New England Inc. (System Operator)**

By:

Title:

Date:


**New Hampshire Transmission, LLC (Interconnecting Transmission Owner)**

By:

Title:

Date:


**NextEra Energy Seabrook, LLC (Interconnection Customer]**

By:

Title: *Vice President*

Date: *4/2/12*

**JA360**

**APPENDICES TO LGIA**

Appendix A    Interconnection Facilities, Network Upgrades and Distribution Upgrades

Appendix B    Milestones

Appendix C    Interconnection Details

Appendix D    Security Arrangements Details

Appendix E    Commercial Operation Date

Appendix F    Addresses for Delivery of Notices and Billings

Appendix G    Interconnection Requirements for a Wind Generating Plant

## APPENDIX A TO LGIA

### Interconnection Facilities, Network Upgrades and Distribution Upgrades

1. **Interconnection Facilities**:

   a. **Point of Interconnection and Point of Change of Ownership**. The Point of Interconnection shall be the point at which the 345 kV conductors from the generator step-up transformers (GSUs) connect to the 345 kV bus between Breaker NEW 11 and Breaker 12. The Point of Change of Ownership shall be the point at the disconnect link on the low side of the GSUs. Ownership also changes at the points at the disconnect links on the high side of each reserve auxiliary transformer (RAT).

   These points are designated "PCO" in Appendix A, Figure 1, which drawing is attached hereto and made part hereof.

   b. **Interconnection Customer's Interconnection Facilities (including metering equipment)**. The Interconnection Customer has constructed and owns all low voltage conductors and buswork from the Large Generating Facility to the disconnect links at the low voltage side of the GSUs. Furthermore, pursuant to prior asset transfers of existing equipment, the Interconnection Customer owns all the revenue metering and related equipment. See Appendix A, Figure 1.

   c. **Interconnecting Transmission Owner's Interconnection Facilities (including metering equipment)**. The Interconnecting Transmission Owner owns the 345 kV switchyard adjacent to the Large Generating Facility, as well as the 345 kV equipment between said switchyard to and including the GSUs. Furthermore, the Interconnecting Transmission Owner owns the 345 kV conductors and ancillary equipment between the 345 kV switchyard and the points where ownership changes at the disconnect links on the high side of each RAT. The Interconnecting Transmission Owner does not own the metering equipment. See Appendix A, Figure 1.

2. **Network Upgrades**:

   a. **Stand-Alone Network Upgrades**. None

   b. **Other Network Upgrades**. None

87

**JA362**

3.    **Distribution Upgrades**.  None

4.    **Affected System Upgrades**.  None

5.    **Contingency Upgrades List**:

    a.    **Long Lead Facility-Related Upgrades**.  The Interconnection Customer's Large Generating Facility is associated with a Long Lead Facility, in accordance with Section 3.2.3 of the LGIP.  Pursuant to Section 4.1 of the LGIP, the Interconnection Customer shall be responsible for the following upgrades in the event that the Long Lead Facility achieves Commercial Operation and obtains a Capacity Supply Obligation in accordance with Section III.13.1 of the Tariff:

    None

    If the Interconnection Customer fails to cause these upgrades to be in-service prior to the commencement of the Long Lead Facility's Capacity Commitment Period, the Interconnection Customer shall be deemed to be in Breach of this LGIA in accordance with Article 17.1, and the System Operator will initiate all necessary steps to terminate this LGIA, in accordance with Article 2.3.

    b.    **Other Contingency Upgrades**.  None

6.    **Post-Forward Capacity Auction Re-study Upgrade Obligations**.  None

**Appendix A**
**Figure 1**
**Contains Critical Energy Infrastructure**

**FIGURE REMOVED**

**WITH FIGURE REMOVED –**

**Document Does Not Contain Critical Energy Infrastructure**

# APPENDIX B TO LGIA

## Milestones[1]

1. **Selected Option Pursuant to Article 5.1:** The Options described in Article 5.1 are not applicable because the Interconnection Facilities and Network Upgrades are pre-existing.

2. **Milestones for all Large Generating Facilities:** The description and entries listed in the following table establish the required Milestones in accordance with the provisions of the LGIP and this LGIA.

| Item No. | Milestone Description | Responsible Party | Date | LGIP/LGIA Reference |
|---|---|---|---|---|
| 1 | Provide evidence of continued Site Control to System Operator, or $250,000 non-refundable deposit to Interconnecting Transmission Owner | Interconnection Customer | Complete | § 11.3 of LGIP |
| 2 | Provide evidence of one or more milestones specified in § 11.3 of LGIP | Interconnection Customer | Complete | § 11.3 of LGIP |
| 3A | Commit to a schedule for payment of upgrades | Interconnection Customer | Not Applicable – no upgrades | § 11.3 of LGIP |
| 3B | Provide either (1) evidence of Major Permits or (2)refundable deposit to Interconnection Transmission Owner | Interconnection Customer | Not Applicable – no upgrades | § 11.3 of LGIP |
| 4 | Provide certificate of | Interconnection | Within 10 days of | § 18.3.9 of LGIA |

---

[1] Some of the Milestones set out in this Appendix B are not applicable because they relate to the Interconnection Customer's Interconnection Requests for the increase in output and the activation of the power system stabilizer for an existing Large Generating Facility, as described further in Appendix C of this Agreement.

| | | | |
|---|---|---|---|
| | insurance | Customer and Interconnecting Transmission Owner | execution of LGIA | |
| 5 | Provide siting approval for Generating Facility and Interconnection Facilities to Interconnecting Transmission Owner | Interconnection Customer | Not Applicable – existing unit | § 7.5 of LGIP |
| 6 | Provide written authorization to Interconnecting Transmission Owner to proceed with design, equipment procurement and construction | Interconnection Customer | Not Applicable – no upgrades | § 5.5.2 and § 5.6.3 of LGIA |
| 7 | Engineering of Interconnection Facilities approved by Interconnecting Transmission Owner | Interconnection Customer to provide to Interconnecting Transmission Owner; Interconnecting Transmission Owner to complete approval | Not Applicable – no upgrades | § 7.5 of LGIP |
| 8 | Provision of Security to Interconnecting Transmission Owner pursuant to Section 11.5 of LGIA | Interconnection Customer | Not Required | §§ 5.5.3 and 5.6.4 of LGIA |
| 9 | Provision of Security to Interconnecting Transmission Owner | Interconnection Customer | Not Required | § 5.17.3 of LGIA |

91

| | pursuant to Section 5.17.3 of LGIA | | | |
|---|---|---|---|---|
| 10 | Ordering of long lead time material for Interconnection Facilities and Network Upgrades | Interconnection Customer | Not Applicable – no upgrades | § 7.5 of LGIP |
| 11A | Provide initial design and specification for Interconnection Customer's Interconnection Facilities to Interconnecting Transmission Owner | Interconnection Customer | Not Applicable – no upgrades | § 5.10.1 of LGIA |
| 11B | Provide comments on initial design and specification for Interconnection Customer's Interconnection Facilities | Interconnecting Transmission Owner | Not Applicable – no upgrades | § 5.10.1 of LGIA |
| 12A | Provide final design and specification for Interconnection Customer's Interconnection Facilities to Interconnecting Transmission Owner | Interconnection Customer | Not Applicable – no upgrades | § 5.10.1 of LGIA |
| 12B | Provide comments on final design and specification for Interconnection Customer's Interconnection Facilities to Interconnecting Transmission Owner | Interconnecting Transmission Owner | Not Applicable – no upgrades | § 5.10.1 of LGIA |
| 13 | Deliver to Transmission Owner "as built" drawings, information and documents regarding Interconnection Customer's Interconnection | Interconnection Customer | Not Applicable – no upgrades | § 5.10.3 of LGIA |

| | Facilities | | | |
|---|---|---|---|---|
| 14 | Provide protective relay settings to Interconnecting Transmission Owner for coordination and verification | Interconnection Customer | Not Applicable – no relay changes planned. | §§ 5.10.1 of LGIA |
| 15 | Commencement of construction Interconnection Facilities | Interconnecting Transmission Owner | Not Applicable – no upgrades | § 5.6 of LGIA |
| 16 | Deliver to Interconnection Customer "as built" drawings, information and documents regarding Interconnecting Transmission Owner's Interconnection Facilities | Interconnecting Transmission Owner | Not Applicable – no upgrades | § 5.11 of LGIA |
| 17 | Provide Interconnection Customer final cost invoices | Interconnecting Transmission Owner | Not Applicable – no upgrades | § 12.2 of LGIA |
| 18 | In Service Date | Interconnection Customer | Completed | § 3.3.1 and 4.4.5 of LGIP, § 5.1 of LGIA |
| 19 | Initial Synchronization Dates: a. PSS b. Turbine Upgrade Phase 1 c. Turbine Upgrade Phase 2 | Interconnection Customer | a. 5/29/09[2] b.1/21/10 c. 5/30/11 | § 3.3.1, 4.4.4, 4.4.5, and 7.5 of LGIP |
| 20 | Commercial Operation Dates: a. PSS b. Turbine Upgrade Phase 1 | Interconnection Customer | a. Upon execution of this LGIA b. Upon execution of this LGIA. | § 3.3.1, 4.4.4, 4.4.5, and 7.5 of LGIP |

---

[2]  The ISO approved temporary activation of the PSS through March 2011 in a Section I.3.9 approval letter dated May 28, 2009.  The permanent Section I.3.9 approval was received July 14, 2011.

| | | | | |
|---|---|---|---|---|
| | c. Turbine Upgrade Phase 2 | | c. Upon execution of this LGIA. | |
| 21 | Submit updated information to System Operator and Interconnecting Transmission Owner | Interconnection Customer | See Milestone 22 | § 24.3 of LGIA |
| 22 | Submit supplemental and updated information to System Operator and Interconnecting Transmission Owner | Interconnection Customer | Complete | § 24.4 of LGIA |
| 23 | Provide quarterly written progress reports | Interconnection Customer and Interconnecting Transmission Owner | First report due 15 days after the end of the quarter that includes the date for Milestone 6. Reports continue quarterly thereafter.[3] | § 5.7 of LGIA |

3. **Milestones Applicable Solely for CNR Interconnection Service and Long Lead Facility Treatment.** In addition to the Milestones above, the following Milestones apply to Interconnection Customers requesting CNR Interconnection Service and/or Long Lead Facility Treatment:

| Item No. | Milestone Description | Responsible Party | Date | LGIP/LGIA Reference |
|---|---|---|---|---|
| 1 | If Long Lead Facility, all dates by which Critical Path Schedule upgrades will be submitted to System Operator (end date | Interconnection Customer | Not Applicable | § 3.2.3 of LGIP |

---

[3] Milestone 23 does not apply to this agreement because Milestone 6 is "Not Applicable."

94

| | | | |
|---|---|---|---|
| | for New Capacity Show of Interest Submission) | | | |
| 2 | If Long Lead Facility, dates by which Long Lead Facility Deposits will be provided to System Operator (each deadline for which New Generating Capacity Resource would be required to provide financial assurance under § III.13.1.9 of the Tariff) | Interconnection Customer | Not Applicable | § 2.3 of LGIP |
| 3 | If Long Lead Facility, Capacity Commitment Period (not to exceed the Commercial Operation Date) | Interconnection Customer | Not Applicable | § 1 and 3.2 of LGIP |
| 4 | Submit necessary requests for participation in the Forward Capacity Auction associated with the Generating Facility's requested Commercial Operation Date, in accordance with Section III.13 of the Tariff | Interconnection Customer | Not Applicable | § 3.2.1.3 of LGIP |
| 5 | Participate in a CNR Group Study | Interconnection Customer | Not Applicable | § 3.2.1.3 of LGIP |
| 6 | Qualify and receive a Capacity Supply Obligation in accordance with Section III.13 of the Tariff | Interconnection Customer | Not Applicable | § 3.2.1.3 of LGIP |
| 7 | Complete a re-study of the applicable Interconnection Study to determine the cost responsibility for facilities and upgrades necessary to accommodate the Interconnection Request based on the results of the Forward Capacity Auction or Reconfiguration Auction or bilateral transaction through which the Interconnection Customer received a | System Operator | Not Applicable | § 3.2.1.3 of LGIP |

| | Capacity Supply Obligation | | | |
|---|---|---|---|---|

**APPENDIX C TO LGIA**

**Interconnection Details**

1.  **Description of Interconnection**:

Interconnection Customer's Large Generating Facility is comprised of a single nuclear unit located in Seabrook, New Hampshire.  Interconnection Customer's Large Generating Facility will be rated at 1309.275 MW gross and 1257.275 MW net upon the Effective Date of this Agreement.

Prior to the Effective Date of this Agreement, the Large Generating Facility was interconnected to the Administered Transmission System pursuant to the Interconnection and Operating Agreement dated June 25, 2003 ("I&O Agreement") by and between Florida Power & Light Company and FPL Energy Seabrook, LLC.  On June 1, 2010, Florida Power & Light Company transferred its interests in the Seabrook 345 kV Switchyard to a new affiliate, New Hampshire Transmission, LLC.  On April 19, 2009, FPL Energy Seabrook, LLC, was renamed NextEra Energy Seabrook, LLC. On October 28, 2008, Interconnection Customer submitted an Interconnection Request to increase the capacity output of the Large Generating Facility by approximately 13 MW from 1296.275 MW gross and 1244.275 MW net to 1309.275 MW gross and 1257.275 MW  net through the installation  of new design last stage buckets and diaphragms on low pressure rotors A, B, and C.  Subsequently, on May 12, 2009, Interconnection Customer submitted another Interconnection Request to activate the existing power system stabilizer. These Interconnection Requests required a new three-party *pro forma* Standard Large Generator Interconnection Agreement as set forth in Schedule 22 to Section II of the Tariff.  Accordingly, the Parties have agreed to enter into this Agreement, and Interconnection Customer and Interconnecting Transmission Owner have agreed to terminate the I&O Agreement to become effective concurrent with the Effective Date of this Agreement.

**JA372**

The Large Generating Facility shall receive:

Network Resource Interconnection Service for the NR Capability: See below.

Capacity Network Resource Interconnection Service for: (a)(i) the NR Capability at a level not to exceed 1309.275 MW gross and 1257.275 MW net for both Summer and Winter; and (ii) the CNR Capability 1257.275 MW net for Summer and 1257.275 MW net for Winter, which shall not exceed 1257.275 MW net for Summer and Winter. The CNR Capability shall be the highest amount of the Capacity Supply Obligation obtained by the Generating Facility in accordance with Section III.13 of the Tariff and, if applicable, as specified in filings by the System Operator with the Commission pursuant to Section III.13 of the Tariff.

**2.      Detailed Description of Generating Facility and Generator Step-Up Transformer, if applicable**:

**JA373**

| Generator Data | |
|---|---|
| Number of Generators | 1 |
| Manufacturer | GE |
| Model | 180X560 |
| Designation of Generator(s) | ISO Asset ID 555 |
| Excitation System Manufacturer | GE |
| Excitation System Model | EX2100 |
| Voltage Regulator Manufacturer | GE |
| Voltage Regulator Model | EX2100 |

| Generator Ratings | |
|---|---|
| Greatest Unit Gross and Net MW Output at Ambient Temperature at or above 90 Degrees F | 1309.275 / 1257.275 |
| Greatest Unit Gross and Net MW Output at Ambient Temperature at or above 50 Degrees F | 1309.275 / 1257.275 |
| Greatest Unit Gross and Net MW Output at Ambient Temperature at or above 20 Degrees F | 1309.275 / 1257.275 |
| Greatest Unit Gross and Net MW Output at Ambient Temperature at or above zero Degrees F | 1309.275 / 1257.275 |
| Station Service Load For Each Unit | 52 MW / 32.52 MVAR |
| Overexcited Reactive Power at Greatest Unit Gross MW Output | 420 MVAR |
| Underexcited Reactive Power at Greatest Unit Gross MW Output | -55 MVAR (UEL limited) |

| Generator Short Circuit and Stability Data | |
|---|---|
| Generator MVA rating | 1373.1 |
| Generator AC Resistance | R1= 0.0047 |
| Subtransient Reactance (saturated) | 0.288 |
| Subtransient Reactance (unsaturated) | 0.349 |
| Transient Reactance (saturated) | 0.415 |
| Negative sequence reactance | 0.288 saturated, 0.349 unsaturated |

99

JA374

| Transformer Data | |
|---|---|
| Number of units | 3, single phase |
| Self Cooled Rating | 410 MVA FOA (55°C) |
| Maximum Rating | 460 MVA FOA (65°C) |
| Winding Connection (LV/LV/HV) | Delta/Wye |
| Fixed Taps | 5, in 0.025 pu increments |
| Z1 primary to secondary at self cooled rating | 10% |
| Positive Sequence X/R ratio primary to secondary | 62.2 |
| Z0 primary to secondary at self cooled rating | 10% |

**3.    Other Description of Interconnection Plan and Facilities**:

See Appendix C-1.  Interconnecting Transmission Owner and Interconnection Customer have determined that it is necessary to preserve certain nuclear-related requirements of the I&O Agreement given the fact that the Large Generating Facility is a nuclear generating facility.  In the event of any conflict between the body of the Agreement, as defined in the preamble thereto, and Appendix C-1 between Interconnecting Transmission Owner and Interconnection Customer, the terms and provisions of the body of the Agreement shall prevail.

APPENDIX C-1

A.    **NRC MAINTENANCE RULE AND NRC REQUIREMENTS & COMMITMENTS.**

I.    **NRC Maintenance Rule and NRC Commitments and Requirements**

(a)     Subject to Sections A.II and A.III of this Appendix C.1,  Interconnection Customer and Interconnecting Transmission Owner agree to cooperate with each other so to permit the Interconnection Customer to comply with the requirements of the United States Nuclear Regulatory Commission, or any successor commission, agency or officer ("NRC") rules and regulations set forth in 10 C.F.R. § 50.65, as amended from time to time ("NRC Maintenance Rule") and all the requirements, obligations, duties and commitments required to be followed and honored by Interconnection Customer pursuant to (a) the Atomic Energy Act of 1954, (b) the regulations of the NRC, (c) the NRC Facility Operating License and Materials License on the basis of which Interconnection Customer is authorized to own, possess and operate Seabrook Station and its associated nuclear materials (i.e., the Large Generating Facility) ("NRC Licenses") and (d) all other laws, regulations, licenses and commitments to which Interconnection Customer is or may become subject from time to time as an NRC licensee for the Large Generating Facility, as each may be amended from time to time ("NRC Requirements & Commitments").

In furtherance of Interconnection Customer's obligation to comply with the NRC Maintenance Rule and NRC Requirements & Commitments, Interconnecting Transmission Owner agrees that Interconnection Customer has the authority, control and obligation (i) to identify all facilities, equipment and functions covered under the NRC Maintenance Rule and NRC Requirements & Commitments, regardless of ownership, and provide such information to Interconnecting Transmission Owner and System Operator; (ii) in cooperation with Interconnecting Transmission Owner and the System Operator, to establish or approve availability and reliability performance criteria and improvement goals for all such facilities, equipment and functions, regardless of ownership, to permit Interconnection Customer to comply with the NRC Maintenance Rule and NRC Requirements & Commitments; and (iii) in cooperation with Interconnecting Transmission Owner and System Operator, to  approve all improvements, maintenance, inspections, monitoring, operational procedures or any other activity directly affecting those facilities, equipment and functions subject to and governed by the NRC Maintenance Rule and NRC Requirements & Commitments, regardless of ownership.

(b)    To the extent that Interconnecting Transmission Owner becomes aware of any failure of any Interconnecting Transmission Owner equipment or function within the scope of the NRC Maintenance Rule and NRC Requirements and Commitments, Interconnecting Transmission Owner shall provide prompt notice thereof to the Interconnection Customer.

**II.    Interconnection Customer Equipment Governed by NRC Maintenance Rule and NRC Requirements & Commitments** The equipment owned or controlled by Interconnecting Transmission Owner under this Agreement that is necessary to fulfill those functions covered by the NRC Maintenance Rule and NRC Requirements & Commitments for the maintenance, inspection and testing of those items is any and all equipment in the 345 kV Substation that was transferred to Interconnecting Transmission Owner on June 1, 2010 ("Closing") pursuant to the FERC Order issued in Docket EC10-58. The list of the equipment that is necessary to fulfill those functions covered by the NRC Maintenance Rule and NRC Requirements & Commitments shall be maintained by the Interconnecting Transmission Owner.  If the Interconnection Customer and the Interconnecting Transmission Owner agree that additional equipment in the 345 kV Substation that was not identified at the time of Closing should have been included among those items, then the Interconnection Customer and Interconnecting Transmission Owner may, by their mutual agreement, add such equipment to the list of that which is necessary to fulfill those functions covered by the NRC Maintenance Rule and NRC Requirements & Commitments, provided, however, that (1) all maintenance, inspection and testing costs associated with such new equipment and all costs associated with any changes to the schedule for maintenance, inspection and testing of such items shall be borne exclusively by Interconnection Customer; and (2) no such new equipment or changes to the schedule for maintenance, inspection and testing of such items shall adversely affect the 345 kV Substation except as otherwise required pursuant to Applicable Laws and Regulations, ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and Good Utility Practice.

**III.    Amendments or Modifications to Interconnecting Transmission Owner's Obligations.**  Following the execution of this Agreement, any additional costs or expenses incurred by Interconnecting Transmission Owner as a result of Interconnection Customer's request to Interconnecting Transmission Owner for additional or different action with respect to any equipment described in (a) Sections A.I or A.II. of this Appendix C-1 or any other provision of this Agreement or (b) arising from Interconnection Customer's compliance with any amendment or modification to or any change in

interpretation of the NRC Maintenance Rule or NRC Requirements & Commitments, shall be borne exclusively by Interconnection Customer.

  **IV.**   <u>**Analysis.**</u>   As required by the NRC Maintenance Rule, Interconnection Customer, at its discretion and with Interconnecting Transmission Owner's cooperation, will conduct risk assessments as required when maintenance is performed on equipment within the scope of the NRC Maintenance Rule, and shall perform an analysis of a failure of any equipment or function subject to the NRC Maintenance Rule. Interconnecting Transmission Owner shall cooperate with Interconnection Customer and promptly provide Interconnection Customer with all information under Interconnecting Transmission Owner's control necessary for Interconnection Customer to: (1) perform the monitoring of structures, systems and components subject to applicable NRC Requirements and Commitments; (2) determine whether the failure was a functional failure; (3) determine whether the failure, if a functional failure, was maintenance preventable; (4) conduct root cause analyses of those failures as Interconnection Customer deems appropriate; and (5) implement corrective actions determined to be necessary in Interconnection Customer's discretion.

  **V.**   <u>**Testing.**</u>   At Interconnection Customer's request, Interconnecting Transmission Owner will arrange for independent testing of any failed Interconnecting Transmission Owner equipment under its ownership or control that is subject to the NRC Maintenance Rule. Interconnection Customer will bear the expense of all such independent testing requested by Interconnection Customer.

  **VI.**   <u>**Performance Improvement Plan.**</u>   Interconnection Customer shall analyze data supplied by Interconnecting Transmission Owner concerning a failure of an Interconnecting Transmission Owner facility, equipment or function subject to the NRC Maintenance Rule and shall notify Interconnecting Transmission Owner if a performance improvement plan is required in accordance with the NRC Maintenance Rule. Interconnection Customer and Interconnecting Transmission Owner will cooperate to develop and implement any such performance improvement plan.

  **VII.**   <u>**Records.**</u>   For the term of this Agreement, Interconnecting Transmission Owner shall maintain complete and accurate records concerning all preventative and corrective maintenance activities performed by Interconnecting Transmission Owner on all facilities, equipment and functions subject to the NRC Maintenance Rule.

## B.    ADDITIONAL REQUIREMENTS RELATED TO THE LARGE GENERATING FACILITY

I.    **Maintenance Scheduling.**  In addition to the requirements of Articles 9.7, 13.2 and 13.4 of this Agreement, Interconnecting Transmission Owner shall consult with Interconnection Customer regarding the timing of scheduled maintenance of the 345 kV Substation, which might reasonably be expected to affect the Large Generating Facility. Interconnecting Transmission Owner shall, to the extent practicable, schedule any testing, shutdown or withdrawal of the 345 kV Substation to coincide with scheduled outages for the Large Generating Facility. If Interconnection Customer desires Interconnecting Transmission Owner to perform maintenance to coincide with a scheduled outage of the Large Generating Facility, Interconnecting Transmission Owner shall notify Interconnection Customer as promptly as practicable of the reasons for, the time scheduled for the outage to take place, and the expected duration of the outage.  Interconnecting Transmission Owner shall comply with ISO New England Governing Documents and Applicable Reliability Standards, or successor documents, and Good Utility Practice.

II.    **Modification to the 345 kV Substation, Protection and Control Systems, and Communications Equipment.**    Unless otherwise provided under the Agreement, the Interconnecting Transmission Owner shall make no functional changes or modifications to the protection or control equipment, or the communications equipment that supports critical systems, including but not limited to relaying equipment and SCADA Equipment, in the 345 kV Substation without prior notice, review, and acceptance from the Interconnection Customer based on compliance with, among other things, security access and its nuclear design control process, which acceptance should not be unreasonably withheld.  In addition to the requirements set out in Article 5.19 of the Agreement, the entity desiring to perform any such changes or modifications shall provide drawings, plans and specifications to the other entity at least ninety (90) days prior to the anticipated commencement of any such work or such shorter period upon which the entities may agree, which agreement shall not be unreasonably conditioned or delayed.  All costs associated with any such changes or modifications shall be borne by the entity that proposes such changes or modifications.  The activities described in this Section B.II of Appendix C-1 may be performed by third parties acceptable to Interconnection Customer and the Interconnecting Transmission Owner.  Note that such changes may also require a new Interconnection Request under the LGIP if found to be Material Modification and also may be subject to the study and approval process pursuant to Section I.3.9 of the Tariff.

III.  **Other Modifications.**  In addition to Article 5.19 of this Agreement and notwithstanding the provisions of Sections B.I and B.II of this Appendix C-1, in the event Interconnecting Transmission Owner or Interconnection Customer make a modification or functional change to its own facilities that is not required by Applicable Laws and Regulations or Governmental Authority, and thereby makes it necessary for the other entity to make a modification or functional change to its own facilities that is required in accordance with Good Utility Practice, the entity making the modification or functional change not required by Law or Governmental Authority shall bear the cost of the modification or functional change to the other entity's facilities required in accordance with Good Utility Practice.

IV.  **Defects, Deficiencies and Lack of Scheduled Testing or Maintenance.**  If Interconnecting Transmission Owner or Interconnection Customer becomes aware of any condition with respect to the other entity's facilities or equipment that might reasonably affect the observing entity's facilities or equipment, the observing entity shall provide prompt verbal notice of such condition to the other entity followed by written notice thereof within two (2) Business Days of such verbal notice, and the notified entity shall make corrections, if any, necessitated by Good Utility Practice.  The entity recognizing the problem may take such actions as may be reasonable and necessary to prevent, avoid or mitigate any hazard that poses an Emergency; and the entity owning the equipment or facilities shall remain fully liable for its failure to inspect, maintain or repair its facilities or equipment, and the observing entity shall have no liability whatsoever for failure to give timely notice or take corrective action under this Section.  Interconnection Customer shall immediately notify the applicable Local Control Center and Interconnecting Transmission Owner of any observed fires, break-ins or threats to the 345 kV Substation.

### APPENDIX D TO LGIA

### Security Arrangements Details

Infrastructure security of the New England Transmission System equipment and operations and control hardware and software is essential to ensure day-to-day New England Transmission System reliability and operational security.  The Commission will expect System Operator, Interconnecting Transmission Owners, market participants, and Interconnection Customers interconnected to the New England Transmission System to comply with the recommendations offered by the President's Critical Infrastructure Protection Board and, eventually, best practice recommendations from the electric reliability authority.  All public utilities will be expected to meet basic standards for system infrastructure and operational security, including physical, operational, and cyber-security practices.

## APPENDIX E TO LGIA

### Commercial Operation Date

This Appendix E is a part of the LGIA between System Operator, Interconnecting Transmission Owner and Interconnection Customer.

[*Date*]

New Hampshire Transmission, LLC

700 Universe Boulevard

Juno Beach, FL 33408

Generator Interconnections

Transmission Planning Department

ISO New England Inc.

One Sullivan Road

Holyoke, MA 01040-2841

Re:      Seabrook Nuclear Large Generating Facility

Dear [*Name*]:

On [*Date*] NextEra Energy Seabrook, LLC has completed Trial Operation of Unit No. 1.  This letter confirms that NextEra Energy Seabrook, LLC commenced commercial operation of Unit No. 1 at the Large Generating Facility, effective as of [*Date plus one day*].

Thank you.

[*Signature*]

[*Interconnection Customer Representative*]

## APPENDIX F TO LGIA

**Addresses for Delivery of Notices and Billings Notices**:

System Operator:

> Generator Interconnections
>
> Transmission Planning Department
>
> ISO New England Inc.
>
> One Sullivan Road
>
> Holyoke, MA 01040-2841

> With copy to:
>
> Billing Department
>
> ISO New England Inc.
>
> One Sullivan Road
>
> Holyoke, MA 01040-2841

Interconnecting Transmission Owner:

> Business Manager
>
> New Hampshire Transmission, LLC
>
> 700 Universe Boulevard
>
> Juno Beach, FL 33408

Interconnection Customer:

> Business Manager
>
> NextEra Energy Seabrook, LLC
>
> 700 Universe Boulevard; Mailstop FEJ/JB
>
> Juno Beach, FL 33408

> Vice President
>
> NextEra Energy Seabrook, LLC
>
> 626 Lafayette Road
>
> Seabrook, NH 03874

**Billings and Payments**:

System Operator:

        Generator Interconnections

        Transmission Planning Department

        ISO New England Inc.

        One Sullivan Road

        Holyoke, MA 01040-2841

        With copy to:

        Billing Department

        ISO New England Inc.

        One Sullivan Road

        Holyoke, MA 01040-2841

Interconnecting Transmission Owner:

        Business Manager

        New Hampshire Transmission, LLC

        700 Universe Boulevard

        Juno Beach, FL 33408

Interconnection Customer:

        Business Manager

        NextEra Energy Seabrook, LLC

        700 Universe Boulevard; Mailstop FEJ/JB

        Juno Beach, FL 33408

**Alternative Forms of Delivery of Notices (telephone, facsimile or email)**:

System Operator:

        Facsimile:  (413) 540-4203

        E-mail:   geninterconn@iso-ne.com

With copy to:

Facsimile: (413) 535-4024

E-mail:   billingdept@iso-ne.com

Interconnecting Transmission Owner:

Cheryl.dietrich@nexteraenergy.com

Office: 561-691-7222

Fax: 561-691-2328

Matt.valle@nexteraenergy.com

Office:  561-694-4223

Fax: 561-691-2328

Interconnection Customer:

E-mail:   NextEraEnergy-BusinessManagement-Seabrook@nexteraenergy.com

Office: 561-304-5920

Facsimile:  561-304-5161

With copy to:

E-mail:   NextEraEnergy-BusinessManagement-TransmissionServices-ISONE@nexteraenergy.com

Office: 561-691-2927

Facsimile:  561-304-5161

**DUNS Numbers:**

Interconnection Customer:          **121346998**

Interconnecting Transmission Owner: **831322677**

**APPENDIX G TO LGIA**

**Interconnection Requirements For A Wind Generating Plant**

Appendix G sets forth requirements and provisions specific to a wind generating plant.  All other requirements of this LGIA continue to apply to wind generating plant interconnections.

**A.      Technical Standards Applicable to a Wind Generating Plant**

**i.      Low Voltage Ride-Through (LVRT) Capability**

A wind generating plant shall be able to remain online during voltage disturbances up to the time periods and associated voltage levels set forth in the standard below. The LVRT standard provides for a transition period standard and a post-transition period standard.

**Transition Period LVRT Standard**

The transition period standard applies to wind generating plants subject to FERC Order 661 that have either: (i) interconnection agreements signed and filed with the Commission, filed with the Commission in unexecuted form, or filed with the Commission as non-conforming agreements between January 1, 2006 and December 31, 2006, with a scheduled in-service date no later than December 31, 2007, or (ii) wind generating turbines subject to a wind turbine procurement contract executed prior to December 31, 2005, for delivery through 2007.

1.      Wind generating plants are required to remain in-service during three-phase faults with normal clearing (which is a time period of approximately 4 – 9 cycles) and single line to ground faults with delayed clearing, and subsequent post-fault voltage recovery to prefault voltage unless clearing the fault effectively disconnects the generator from the system.  The clearing time requirement for a three-phase fault will be specific to the wind generating plant substation location, as determined by and documented by the System Operator and Interconnecting Transmission Owner.  The maximum clearing time the wind generating plant shall be required to withstand for a three-phase fault shall be 9 cycles at a voltage as low as 0.15 p.u., as measured at the high side of the wind generating plant step-up transformer (i.e. the transformer that steps the voltage up to the transmission interconnection voltage or "GSU"), after which, if the fault remains

111

**JA386**

following the location-specific normal clearing time for three-phase faults, the wind generating plant may disconnect from the transmission system.

2.      This requirement does not apply to faults that would occur between the wind generator terminals and the high side of the GSU or to faults that would result in a voltage lower than 0.15 per unit on the high side of the GSU serving the facility.

3.      Wind generating plants may be tripped after the fault period if this action is intended as part of a special protection system.

4.      Wind generating plants may meet the LVRT requirements of this standard by the performance of the generators or by installing additional equipment (e.g., Static VAr Compensator, etc.) within the wind generating plant or by a combination of generator performance and additional equipment.

5.      Existing individual wind generator units that are, or have been, interconnected to the network at the same location at the effective date of the Appendix G LVRT.  Standard are exempt from meeting the Appendix G LVRT Standard for the remaining life of the existing generation equipment. Existing individual wind generator units that are replaced are required to meet the Appendix G LVRT Standard.

**Post-transition Period LVRT Standard**

All wind generating plants subject to FERC Order No. 661 and not covered by the transition period described above must meet the following requirements:

1.      Wind generating plants are required to remain in-service during three-phase faults with normal clearing (which is a time period of approximately 4 – 9 cycles) and single line to ground faults with delayed clearing, and subsequent post-fault voltage recovery to prefault voltage unless clearing the fault effectively disconnects the generator from the system.  The clearing time requirement for a three-phase fault will be specific to the wind generating plant substation location, as determined by and documented by the System Operator and Interconnecting Transmission Owner.  The maximum clearing time the wind generating plant shall be required to withstand for a three-phase fault shall be 9 cycles after which, if the fault remains following the location-specific normal clearing

time for three-phase faults, the wind generating plant may disconnect from the transmission system. A wind generating plant shall remain interconnected during such a fault on the transmission system for a voltage level as low as zero volts, as measured at the high voltage side of the wind GSU.

2.      This requirement does not apply to faults that would occur between the wind generator terminals and the high side of the GSU.

3.      Wind generating plants may be tripped after the fault period if this action is intended as part of a special protection system.

4.      Wind generating plants may meet the LVRT requirements of this standard by the performance of the generators or by installing additional equipment (e.g., Static VAr Compensator) within the wind generating plant or by a combination of generator performance and additional equipment.

5.      Existing individual wind generator units that are, or have been, interconnected to the network at the same location at the effective date of the Appendix G LVRT Standard are exempt from meeting the Appendix G LVRT Standard for the remaining life of the existing generation equipment. Existing individual wind generator units that are replaced are required to meet the Appendix G LVRT Standard.

**ii.      Power Factor Design Criteria (Reactive Power)**

A wind generating plant shall maintain a power factor within the range of 0.95 leading to 0.95 lagging, measured at the Point of Interconnection as defined in this LGIA, if the Interconnection System Impact Study shows that such a requirement is necessary to ensure safety or reliability. The power factor range standard can be met by using, for example, power electronics designed to supply this level of reactive capability (taking into account any limitations due to voltage level, real power output, etc.) or fixed and switched capacitors if agreed to by the System Operator and Interconnecting Transmission Owner, or a combination of the two. The Interconnection Customer shall not disable power factor equipment while the wind generating plant is in operation. Wind generating plants shall also be able to provide sufficient dynamic voltage support in lieu of the power system stabilizer and automatic voltage regulation at the generator excitation system if the Interconnection System Impact Study shows this to be required for system safety or reliability.

**JA388**

### iii.    Supervisory Control and Data Acquisition (SCADA) Capability

The wind generating plant shall provide SCADA capability to transmit data and receive instructions from the System Operator and Local Control Center to protect system reliability.  The System Operator, Interconnecting Transmission Owner and the wind generating plant Interconnection Customer shall determine what SCADA information is essential for the proposed wind generating plant, taking into account the size of the plant and its characteristics, location, and importance in maintaining generation resource adequacy and transmission system reliability in its area.

**JA389**

# Exhibit No. 7

# Prepared Affidavit of Lawrence Weber

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. EL21-6-000 |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC,  and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
| Respondents. | ) | |

PREPARED AFFIDAVIT OF LAWRENCE WEBER
ON BEHALF OF NEXTERA

My name is Lawrence Weber.  My address is 5343 Ridge Road, Stevensville, MI 49127.

I am a retired utility executive having spent 38 years in the U.S. commercial nuclear power

industry.  In my career I held nearly every operational position within the U.S. nuclear power

industry – from an entry level position to the Chief Nuclear Officer of a major U.S. utility.

From 1998 to 2015 I held the following positions while employed by American Electric

Power Company ("AEP") at the D.C. Cook nuclear plant:  Operations Manager, Performance

Improvement Director, Work Controls Manager, Assistant Plant Manager, Plant Manager,

Director of Plant Engineering, Site Vice President, and ultimately Chief Nuclear Officer.  Before

joining AEP I held Reactor Operator and Senior Reactor Operating licenses from the U.S.

Nuclear Regulatory Commission ("NRC").  I served as Senior Reactor Operator at the

Braidwood Nuclear Plant, a Control Room Supervisor at the WNP-2 and Marble Hill nuclear

plants, and as a Reactor Operator, auxiliary operator, and health physics technician at the Point

Beach nuclear plant.  I have a Bachelor of Science Degree in Business Management from the University of St. Francis and I served in the U.S. Navy from June of 1968 to July of 1972.  I have never worked as an employee of NextEra Energy, Inc. or any of its subsidiaries.

As Plant Manager of D.C. Cook, the plant achieved unprecedented performance improvement as recognized by the Institute of Nuclear Power Operations ("INPO"), the nuclear power industry's oversight group that promotes the highest levels of safety and excellence in the operation of nuclear power plants.  I have led dozens of refueling and maintenance outages in my 38-year career.  As the Site Vice President at D.C. Cook, I led a 15-month recovery from the largest turbine failure in nuclear power history, and oversaw a $1.16 billion life extension project that secured an additional 20 years of operational authority from the NRC.  In my career I led and participated in several nuclear plant performance assessments in the U.S and abroad.  The D.C. Cook plant, and other nuclear plants where I have worked, include a Westinghouse-designed Pressurized Water Reactor ("PWR") and associated balance of plant components, including in the case of D.C. Cook Unit 1 GE-manufactured steam turbine generators with associated breakers, that are of a similar design and configuration to the Seabrook Station PWR and GE turbine generators and associated breakers.

The purpose of my affidavit is to document an independent feasibility review that I was asked to perform by NextEra Energy Resources, LLC ("NextEra") of the proposed generator breaker replacement project (the "Project") by NextEra Energy Seabrook, LLC ("Seabrook") at Seabrook Station during the next scheduled refueling and maintenance outage in October of 2021 ("2021 Outage").

In conducting my review, I reviewed the following information that was provided to me by NextEra:

- o  Complaint filed by NECEC Transmission, LLC ("NECEC") and Avangrid, Inc. ("Avangrid") (Avangrid and NECEC together, "Complainants") with the Federal Energy Regulatory Commission ("FERC") in Docket No. EL21-6-000;

- o  Affidavit of Thorn C. Dickinson;

- o  Letter from Andrew Kniska to Steve Garwood on the Greater Boston Energy Study;

- o  Draft Facilities Agreement for the Project

- o  Petition for Declaratory Order filed by NextEra Energy Seabrook, LLC filed in Docket No. EL21-3-000 ("Petition");

- o  Affidavit of Eric McCartney filed in Docket No. EL21-3-000, which includes the Seabrook White Paper for Generator Breaker replacement ("White Paper") and documents referenced therein;

- o  Affidavit of Joshua Marcum filed in Docket No. EL21-3-000; and

- o  Affidavit of Ruben Rodriguez filed in Docket No EL21-3-000.

Based on my review of this material and based on my experience in the nuclear industry, the following are my conclusions:

Complainants assert in the Complaint that the Project could be accomplished in no more than two weeks. The Project is extremely complicated. The scope of the Project is described in the White Paper. In addition to replacing the Generator Breaker, the Project also includes replacing the control system and the high-pressure air system. Even if the Project was conducted in an open switchyard, operations with which Avangrid may be more familiar given that it does not operate nuclear plants, I do not believe that a two-week time period for completion is realistic.

Rather than an open switchyard, the Project will be executed inside the power block of a

nuclear power plant with significantly higher standards and requirements in all aspects of

engineering, work control, security, and operations when compared with the requirements that

would apply to work in an open-air substation. There are tight physical clearances involved in an

indoor project, which as explained in the White Paper occupies approximately 700 square feet on

the Turbine Generation Building's mezzanine deck, and therefore lifting and rigging an

approximately 32,000-pound breaker becomes extremely complicated.  For these and many other

reasons this Project has many more complications, increased risk, and reduced margin for error,

which significantly increases the complexity of planning and execution for the Project.

The U.S. Nuclear Industry operates pursuant to stringent performance standards.  Many

requirements and standards are imposed by NRC regulatory requirements, and performance

standards and expectations have been established by INPO.  Even though INPO is not a

regulator, compliance with INPO standards is the industry standard for all nuclear plants in the

United States.   One of the INPO standards is IER 14-20, "Integrated Risk—Healthy Technical

Conscience."  This document was developed following actual nuclear industry events where

owners experienced severe difficultly in the execution of major projects.  I will mention four

events involving complicated projects at nuclear power plants that are similar to the Project:

1.  During a refueling outage at the D.C. Cook nuclear power plant, maintenance and
    construction crews dropped a 30-ton load near the reactor vessel due to poor rigging
    practices.  This load drop extended the planned outage by a week.

2.  During a major construction project to install a main generator at the Braidwood
    nuclear plant, contract electricians left grounds installed on the iso-phase bus duct and
    the metering cabinets of the main generator.  During energization of the generator the

cabinets were totally destroyed and delayed the completion of the installation by two months.

3. At the D.C. Cook nuclear power plant, there was a catastrophic turbine generator failure due to a design flaw in the main turbine. The turbine failure destroyed the high pressure turbine, three low pressure turbines, the main generator, and support structures. The recovery from this event took fifteen months and cost the plant owner several hundred million dollars.

4. During a main generator replacement at the Arkansas Nuclear One nuclear power plant, construction crews dropped a 500-ton generator due to poorly designed rigging equipment. The accident resulted in one fatality and several injuries. The generator fell through the floor and destroyed several pieces of safety related equipment. This event delayed the plant's return to service by several months.

INPO IER 14-20 established a detailed process for planning major projects at nuclear power plants to minimize the probability and consequences of a problem during project execution. This process incorporates a number of critical milestones in project planning.

- There is typically a scope freeze milestone that requires identified projects 24 months prior to the commencement of the outage. The due date for this milestone has long passed for the October 2021 outage.

- There is a milestone to have the design engineering complete within 12 months of the outage, so the manufacturer has the specifications to build the products. This milestone has also passed for the October 2021 outage.

Other critical milestones that cannot be met for this Project:

- Planning the work packages for the removal of the old generation breaker and the installation of the new generation breaker and support equipment;

- Developing the lifting and rigging processes for moving heavy equipment;

- Evaluation of floor loading during the project;

- Developing the electrical and mechanical isolations to protect equipment and personnel;

- Developing training for operations and maintenance personnel and contractors;

- Developing post installation testing procedures.

The Generator Breaker will also require significant testing and verifications after installation and before it can be placed in operation. This testing must be rigorous and thorough. There is industry experience at a fossil power plant where a main generator breaker was closed onto the bus, out of phase and caused significant damage because the synch meter was wired incorrectly. In that case testing was not done to verify that the maintenance was performed correctly.

In its White Paper and Petition, Seabrook expresses its view that the Project cannot be completed in the 2021 Outage and may add up to 10 days to a scheduled refueling and maintenance outage. I agree with both conclusions, though a 10-day extension beyond Seabrook's planned approximate three and a half week scheduled refueling outage may be a conservative estimate, as there is a significant potential to exceed the 10-day projected extension.

There are significant risks of engineering errors, planning errors, and execution errors that would need to be addressed and corrected during the implementation of the Project. These types of in-process adjustments are always very time consuming and difficult to correct. Based on the time frame and the amount of significant work, engineering, and planning that needs to be

done to execute the Project, it is my view that executing the Project during the 2021 Outage

would create a high potential of an event that causes personal injury and property damage that

delays the timely return of the plant to service.

      I have reviewed the White Paper regarding the Project.  Based on my experience, I

believe the White Paper demonstrates that Seabrook is taking a reasonable approach to project

execution and will meet all safety, execution, and quality standards applicable to the execution of

major projects at nuclear power plants.  The documents referenced and approach documented in

the White Paper have much more significance in the nuclear power industry than mere

"aspirational goals" as mischaracterized by Complainants.  Compliance with the INPO guidance

(IER-14-20) – which is committed to by every U.S. nuclear plant owner, is essential to ensuring

that nuclear plant management prudently plans major and complex work tasks in a manner that

minimizes the probability and consequences of a problem with project execution.

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing

testimony is true and correct to the best of my knowledge, information, and belief.

Executed this 2nd day of November, 2020.

Lawrence J. Weber