ORAL ARGUMENT NOT YET SCHEDULED

Nos. 23-1094 and 23-1215 (consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

───────────────────────────

NEXTERA ENERGY RESOURCES, LLC AND
NEXTERA ENERGY SEABROOK, LLC,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

───────────────────────────

On Petitions for Review

───────────────────────────

**JOINT APPENDIX
VOLUME II OF II
(PAGES JA399 – JA738)**

───────────────────────────

Richard P. Bress
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Intervenors NECEC
Transmission LLC and Avangrid, Inc.*

Matthew R. Christiansen
General Counsel
Federal Energy Regulatory
Commission
Washington, DC 20426

John N. Estes III
JENNER & BLOCK LLP
1099 New York Ave, NW Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Petitioners NextEra
Energy Resources, LLC
and NextEra Energy Seabrook, LLC*

# INDEX

# VOLUME I

Certified Index to the Record .................................................................................. JA1

*NextEra Energy Seabrook, LLC*, Docket No. EL21-3-000, Petition for Declaratory Order of NextEra Energy Seabrook, LLC (filed Oct. 5, 2020) ("Petition for Declaratory Order"), R.1 ............................................................. JA19

    Attachment B - Prepared Affidavit of Joshua Marcum ............................ JA60

    Attachment D - Seabrook Main Generator Breaker Upgrade Evaluation ................................................................................................. JA73

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Complaint and Request for Shortened Answer Period and for Fast Track Processing of NECEC Transmission LLC and Avangrid, Inc. (filed Oct. 13, 2020) ("Avangrid Complaint"), R.4 ............................................ JA84

    Exhibit A - Affidavit of Thorn C. Dickinson ......................................... JA130

    Exhibit C - Seabrook Main Generator Breaker Upgrade Evaluation ..... JA163

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, NextEra Answer to Complaint of NECEC Transmission LLC and Avangrid, Inc. (filed Nov. 2, 2020) ("NextEra Answer to Complaint"), R.26 ............................................................................................................. JA174

    Exhibit 1 - Prepared Supplemental Affidavit of Joshua Marcum .......... JA238

    Exhibit 2 - Prepared Affidavit of Joshua Marcum ................................ JA249

    Exhibit 5 - Prepared Affidavit of Eric McCartney ................................ JA262

    Exhibit 6 - Standard Large Generator Interconnection Agreement by and Among ISO New England Inc. and NextEra Energy Seabrook, LLC and New Hampshire Transmission, LLC ("Seabrook LGIA") .... JA273

    Exhibit 7 - Prepared Affidavit of Lawrence Weber ............................... JA390

# VOLUME II

*NextEra Energy Seabrook, LLC*, Docket No. EL21-3-000, Protest of NECEC Transmission LLC and Avangrid, Inc. (filed Nov. 4, 2020), R.30 .... JA399

*NextEra Energy Seabrook, LLC*, Docket No. EL21-3-000, Answer and Motion for Leave to Answer of NextEra Energy Seabrook, LLC (filed Nov. 19, 2020) ("NextEra Answer to Protest"), R.33, Page 20 ............................... JA423

    Exhibit 3 - Prepared Affidavit of Lawrence Weber .............................. JA425

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC and Avangrid, Inc. (filed Mar. 26, 2021) ("Avangrid Amended Complaint"), R.37 ........................................................ JA434

    Exhibit D - Affidavit of Mark McBurnett .............................................. JA451

    Exhibit E - Affidavit of Glen Palmer ..................................................... JA460

    Exhibit F - Affidavit of Tracy Rolstad ................................................... JA468

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, NextEra Answer to Amended Complaint of NECEC Transmission LLC and Avangrid, Inc. (filed Apr. 15, 2021) ("NextEra Answer to Amended Complaint"), R.38, Pages 1-7 ........................................ JA477

    Exhibit 1 - Prepared Second Supplemental Affidavit of Eric McCartney, Pages 2-7 ............................................................................ JA484

    Exhibit 3 - Siemens PTI Report, Pages 1-3 .......................................... JA493

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-000 & EL21-6-000, Letter of ISO New England Inc. (filed May 6, 2021) ("ISO-NE Letter"), R.40 .................................................................................................................. JA497

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket Nos. EL21-6-000 & EL21-94-000, Order Establishing Additional Briefing and Instituting Section 206 Proceeding, 176 FERC ¶ 61,148 (Sept. 7, 2021) ("Briefing Order"), R.44 ................................................................................... JA500

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Motion to Lodge of NECEC Transmission LLC and Avangrid, Inc. (filed Sept. 20, 2021) ("Motion to Lodge"), R.46 ................... JA517

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Brief of ISO New England Inc. (filed Oct. 7, 2021) ("ISO-NE Brief"), R.53 ................................................................................................ JA522

*NECEC Transmission LLC v. NextEra Energy Resources, LLC*, Docket No. EL21-6-000, Comments of Massachusetts Attorney General (filed Oct. 7, 2021), R.59 ................................................................................................ JA545

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-000 & EL21-6-000, Motion to Lodge of NextEra Energy Seabrook, LLC (filed Nov. 17, 2021) ("NextEra Motion to Lodge NRC Letter"), R.68 ............................................ JA547

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-000 & EL21-6-000, Order Denying Complaint in Part, Granting Complaint in Part, and Dismissing Petition for Declaratory Order, 182 FERC ¶ 61,044 (Feb. 1, 2023) ("Initial Order"), R.76 ........................................................................... JA575

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-0001 & EL21-6-001, Request for Rehearing of NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC (filed Mar. 3, 2023) ("Request for Rehearing"), R.77 ........................................................................................ JA627

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-001 & EL21-6-001, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,001 (Apr. 3, 2023) ("Rehearing Order"), R.81 .............................................................................................. JA683

*NextEra Energy Seabrook, LLC*, Docket Nos. EL21-3-001, EL21-6-001 & EL21-94-000, Order Addressing Arguments Raised on Rehearing and Terminating Section 206 Proceeding, 183 FERC ¶ 61,196 (June 15, 2023) ("Modification Order"), R.84 ......................................................................... JA684

ISO New England Inc. Transmission, Markets and Services Tariff ................ JA714

  § I.2.2 (Definitions for "Asset"; "Good Utility Practice"; and "ISO New England Operating Documents") .................................................... JA717

  § I.3.2 ........................................................................................................ JA722

§ I.3.10 ................................................................................................ JA724

§ II.47.4 .............................................................................................. JA725

Schedule 25 (§ 1 (Definition for "Affected System"); § 7.3; § 9; App'x 6, § 11.4.4) ................................................................. JA728

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |
|---|---|---|
| NextEra Energy Seabrook, LLC | ) ) ) | Docket No. EL21-3-000 |

**PROTEST OF**
**NECEC TRANSMISSION LLC AND AVANGRID, INC.**

Pursuant to Rule 211 of the Rules of Practice and Procedure of the Federal Energy

Regulatory Commission ("FERC" or the "Commission"),[1] NECEC Transmission LLC ("NECEC

Transmission") and Avangrid, Inc. (together with NECEC Transmission, "Avangrid") hereby

submit this protest ("Protest") to the Petition for Declaratory Order ("Petition") filed by NextEra

Energy Seabrook, LLC ("NextEra Seabrook") in the above-referenced docket.[2]  For the reasons

described below, the Commission should decline to consider the Petition, which is merely an

attempt to distract from the true issues underlying the dispute between Avangrid and NextEra

Energy Resources, LLC ("NextEra Energy Resources" and, in conjunction with NextEra

Seabrook, "NextEra"), as outlined in the complaint filed by Avangrid in Docket No. EL21-6.[3]

The issues raised in the Complaint—that NextEra is exploiting the need for Avangrid to rely on

NextEra to construct a circuit breaker (the "Seabrook Breaker") replacement (the "Seabrook

Breaker Replacement") at NextEra Seabrook's Seabrook Station and has indicated that it will

continue to delay and possibly jeopardize the viability of the New England Clean Energy

Connect transmission project ("NECEC Project") unless Avangrid agrees to pay NextEra a large

---

[1]     18 C.F.R. § 385.211 (2020).

[2]     Avangrid filed a doc-less motion to intervene in this proceeding on October 29, 2020.

[3]     Complaint and Request for Shortened Answer Period and for Fast Track Processing of NECEC
Transmission LLC and Avangrid, Inc., Docket No. EL21-6 (filed Oct. 13, 2020) (the
"Complaint").

and unknowable sum of money, *i.e.,* a plain and simple violation of open access principles and the ISO New England Inc. ("ISO-NE") Tariff ("ISO-NE Tariff")—are pressing. Avangrid seeks expeditious resolution of the Complaint, while NextEra has taken a "go slow" approach with its Petition. A quick resolution of the issues raised in the Complaint, followed by the Commission's resolution of the terms and conditions under an agreement between NextEra Seabrook and NECEC Transmission (the "Affected System Agreement"), will remove any need to further address the issues raised in the Petition in this docket.[4] Accordingly, Avangrid respectfully requests that the Commission focus its attention regarding this dispute on the Complaint and ignore the Petition, which is a purely dilatory maneuver from NextEra that seeks to distract from the issues raised in the Complaint.

## I.      BACKGROUND AND SUMMARY

The NECEC Project is a proposed 320 kV overhead HVDC transmission line, approximately 145 miles in length, from the Québec-Maine border to a new converter station in Lewiston, Maine, and a new 1.6 mile 345 kV AC transmission line from the new converter station to the existing Larrabee Road Substation and certain required upgrades, which will enable the delivery of up to 1,200 megawatts of hydroelectric energy from Québec to New England for a period of at least 20 years under Commission-jurisdictional transmission contracts. NextEra

---

[4]     On November 2, 2020, NextEra filed an answer to the Complaint. NextEra Answer to Complaint of NECEC Transmission LLC and Avangrid, Inc., Docket No. EL21-6 (filed Nov. 2, 2020) ("Answer"). Consistent with NextEra's strategy to delay further the NECEC interconnection process, NextEra advocates against acting on an expedited basis in the Complaint proceeding and, instead, asks the Commission to focus on a Petition that has no requested timeframe for Commission action. The Complaint is the critical path precisely because time is of the essence for Avangrid with respect to the interconnection of the NECEC Project, particularly because NextEra alleges that it need not undertake the Seabrook Breaker Replacement at all, and that, regardless of its obligations, NextEra may not be able to undertake the Seabrook Breaker Replacement in either of its next two planned outages.

has opposed the NECEC Project at every turn.[5]  As relevant here, and as more fully described in

the Complaint,[6] a draft System Impact Study completed in March 2020 ("SIS") determined that

the Seabrook Breaker may need to be uprated or replaced.[7]  Rather than negotiate in good faith

regarding the Affected System Agreement, under which the Seabrook Breaker Replacement

could be conducted in a timely fashion and at Avangrid's expense, NextEra used the Seabrook

Breaker Replacement as an opportunity to unlawfully delay the construction of the NECEC

Project.  The Petition is a continuation of NextEra's efforts to delay and interfere with the

NECEC Project's interconnection process.  NextEra seeks a Commission ruling that it need not

accommodate the interconnection, which is clearly contrary to law.  NextEra also asks to have

NECEC Transmission held liable for all potential economic losses, including all lost profits, lost

market revenues, inclusive of any ISO-NE penalties, that NextEra and the other joint owners of

Seabrook Station would incur if NextEra is unable to complete the Seabrook Breaker

Replacement during a planned outage, even if such failure to complete were due to NextEra's

own actions or inactions.  NextEra itself effectively concedes that this position is inconsistent

with Commission precedent.

　　　　The Commission need not act on the Petition at this time.  Avangrid respectfully asks that

the Commission first act swiftly to resolve Avangrid's Complaint, which is urgent.  As requested

in the Complaint, the Commission should direct NextEra to file an unexecuted Affected System

Agreement with the Commission for review under Section 205 of the FPA, or perhaps more

---

[5]     Additional background regarding NextEra's historic and continued opposition to the NECEC
        Project can be found in the Complaint at 7-12.

[6]     Complaint at 12-20.

[7]     Under the terms of the ISO-NE Tariff, the Seabrook Breaker is an Affected System, and NextEra
        Seabrook is an Affected Party.

expeditiously, order the parties to enter into the Affected System Agreement, which Avangrid has attached to its Complaint, under Section 206 of the FPA. The resolution of the Complaint and the Commission's review of the Affected System Agreement will address all of the issues set forth by NextEra in its Petition. Conversely, focusing on the Petition rather than the Complaint as NextEra requests would ignore the need for expedition and would exclude important facts and issues relevant to the dispute between Avangrid and NextEra, which NextEra conveniently omitted from the Petition.[8]

### A.    The Commission Should Focus on the Complaint, Which Would Obviate the Need for a Ruling on the Petition.

The Petition, first and foremost, is simply NextEra's latest delay tactic and a distraction from the primary issues raised in Avangrid's Complaint. As thoroughly detailed in the Complaint, NextEra has sought to interfere with Avangrid's efforts to interconnect the NECEC Project to the ISO-NE Administered Transmission System by refusing to file the Affected System Agreement unexecuted with the Commission or take any meaningful steps toward constructing the Seabrook Breaker Replacement.

After months of delay, NextEra has now filed this Petition to buy more time, as opposed to simply moving forward with the necessary studies, scheduling the necessary milestones and ordering the necessary equipment. The Commission should recognize this dilatory tactic for what it is and first address the Complaint, granting Avangrid the relief it seeks on an expedited

---

[8]    For example, the Petition fails to include the Affected System Agreement itself, which NextEra attaches to its answer to the Complaint. Furthermore, nowhere in the Petition or the Answer does NextEra mention that its executives offered to Avangrid executives a power purchase agreement to have an Avangrid subsidiary purchase energy and capacity from the Seabrook Station at a substantially above-market price in exchange for NextEra agreeing to drop its fervid opposition to the NECEC Project.

basis because time is of the essence for the NECEC Project.  The Commission may then decline to act on the Petition because the issues underlying NextEra's requested declarations will have already been resolved in conjunction with the Commission's review of the Complaint and the Affected System Agreement.

Moreover, as detailed in the Complaint, NextEra's delay and refusal to accommodate the NECEC Project is driven by NextEra's intent to benefit its merchant function.[9]  By delaying its competitor's access to the market, NextEra seeks to preserve its own market position.[10]  This is a textbook violation of the Commission's core open access principles and the Federal Power Act.[11]

For these reasons, the Commission should focus on the most pressing issues set forth in the Complaint.  The Petition is a distraction, and the Commission need not issue an order on the Petition, as all of the issues raised therein can be addressed in conjunction with the Complaint and the Commission's review of the Affected System Agreement after NextEra files that agreement with the Commission unexecuted.

### B.    If the Commission Considers the Petition on the Merits, the Petition Must Be Rejected.

NextEra's proposed declarations cannot be accepted.  First, most striking is NextEra's requested declaration that would relieve it of *any obligation* to construct the Seabrook Breaker Replacement.  Specifically, NextEra argues that the ISO-NE Tariff "does not require it to enter

---

[9]     Complaint at 37-40.

[10]    NextEra acknowledges that it has long opposed the NECEC Project, yet it insists that its refusal to work together with NECEC Transmission to construct the Seabrook Breaker Replacement is unrelated.  Petition at 8 n.18.  This is difficult to believe.

[11]    In its Answer in the Complaint proceeding, NextEra has taken the remarkable position that it is not bound by open access rules with respect to the Seabrook Breaker.  Answer at 13-15.  This is a key component of this dispute, which underlies the need for the Commission to address the Complaint on an expedited basis.

into a facilities agreement to replace the Generation Breaker to accommodate the NECEC Elective Upgrade."[12]  This is a strained, illogical, and plainly incorrect reading of the ISO-NE Tariff, and interpreting the ISO-NE Tariff in this manner would run contrary to the Commission's open access requirements.

Second, NextEra also seeks a declaration that it is entitled to indirect and consequential costs, *including lost opportunity costs*, resulting from its construction of the Seabrook Breaker Replacement.[13]  In an effort to convince the Commission that indirect and consequential costs and legal fees are ordinary forms of recovery for this situation, NextEra pretends NECEC Transmission's interconnection request is actually a NextEra cost-of-service rate filing.  But the law on cost-of-service ratemaking is simply irrelevant to this interconnection issue and the cases cited by NextEra are all inapposite.  Furthermore, NextEra's position that indirect and consequential damages should be permitted is belied by NextEra's concession (discussed below) that the Commission does not permit indirect and consequential damages in the interconnection context for either party.

Third, NextEra seeks a declaration that Good Utility Practice should be interpreted, for the purposes of the Affected System Agreement only, in a manner specific to the nuclear power industry.[14]  There is no reason to depart from the standard definition of Good Utility Practice, and the Commission should accordingly decline NextEra's invitation to do so.  Moreover, once NextEra is ordered to file the Affected System Agreement unexecuted, or the Commission orders the parties to enter into the Affected System Agreement that Avangrid has attached to its

---

[12]    Petition at 37.

[13]    *Id.* at 21-33.

[14]    *Id.* at 33-35.

**JA404**

Complaint under Section 206 of the FPA, this issue will be resolved in that proceeding and therefore it need not be addressed here.

Finally, NextEra also seeks a declaration that NextEra Seabrook will not be liable for consequential damages under an Affected System Agreement with NECEC Transmission.[15]  This request is irrelevant and was put forward to create confusion and delay.  Avangrid agrees that neither party is permitted to charge the other for indirect or consequential damages or costs.

## II.    NEXTERA'S PROPOSED DECLARATION THAT IT IS NOT OBLIGATED TO REPLACE THE SEABROOK BREAKER IS CONTRARY TO LAW

NextEra argues that even though ISO-NE has determined that NextEra Seabrook is an Affected Party under the ISO-NE Tariff and therefore must replace the Seabrook Breaker, NextEra may simply decline to do so because "the [ISO-NE] Tariff does not require Seabrook to replace the Generation Breaker"[16] or to "enter into a facilities agreement to replace the Generation Breaker."[17]  NextEra apparently believes it has been granted veto power over whether NECEC Transmission may interconnect to the ISO-NE Administered Transmission System.  But this reading of the ISO-NE Tariff is plainly incorrect.

NextEra arrives at this radical interpretation of the ISO-NE Tariff through a provision of the *pro forma* ETU Interconnection Agreement among the Interconnecting Customer, ISO-NE, and the transmission owner, which states:  "The Interconnection Customer shall enter into separate related facilities agreements to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection of the Interconnection Customer's Elective

---

[15]     *Id.* at 35-36.

[16]     *Id.* at 31.

[17]     *Id.* at 37.

7

**JA405**

Transmission Upgrade."[18]  NextEra infers from the absence of specific language in the *pro forma*

Interconnection Agreement requiring the Affected System to enter into such an agreement that,

while an ETU interconnection customer is obligated to enter into facilities agreements with

Affected Parties, Affected Parties have no obligations to enter into agreements with the ETU

interconnection customer.[19]  Accordingly, NextEra claims that "[t]here are no rules for facilities

agreements of this nature."[20]  This is not a plausible reading of the ISO-NE Tariff.

As explained in the Complaint,[21] Schedule 25 is clear that "[p]rior to executing an ETU

[Interconnection Agreement], an Interconnection Customer may request, in order to advance the

implementation of its interconnection," an "E&P Agreement that authorizes the Interconnecting

Transmission Owner and any Affected Party to begin engineering and procurement of long lead-

time items necessary for the establishment of the interconnection."[22]  Upon that request, an

Affected Party "*shall offer* the Interconnection Customer" that E&P Agreement.[23]  This

provision applies to NextEra as an Affected Party.  Of course, by refusing to offer such an E&P

Agreement to Avangrid unless Avangrid agrees to unprecedented and unreasonable terms—*i.e.*,

effectively insuring NextEra for an unknown but potentially large amount of opportunity costs

---

[18]    ISO-NE OATT, Schedule 25, Appendix 6, § 11.4.4.

[19]    Petition at 12-13.  The entire basis for NextEra's argument for this alternative declaration is contained in Section III.B of the Petition.  Petition at 37 ("This declaration is warranted because, as explained in Section III.B above, only NECEC has an obligation under the [ISO-NE] Tariff to enter into a facilities agreement.").

[20]    Petition at 12.

[21]    Complaint at 24.

[22]    ISO-NE OATT, Schedule 25, Section 9.

[23]    *Id.*

**JA406**

that are completely outside the control of Avangrid—NextEra has been and remains in violation of this provision.

What is more, the existence of this provision is further evidence that NextEra's interpretation is not correct. It would be nonsensical for NextEra Seabrook, as an Affected Party, to be required to offer an E&P Agreement for the engineering and procurement of long lead-time items "necessary for the establishment of the interconnection" and then allowed to refuse to enter into an agreement to construct the same upgrades contemplated by the E&P Agreement. NextEra cannot reconcile this provision with its strained argument based on language in the *pro forma* ETU interconnection agreement.

NextEra's argument is built upon a provision in the *pro forma* ETU interconnection agreement,[24] but that *pro forma* agreement is an agreement to be entered into among ISO-NE, the Interconnection Customer, and the Interconnecting Transmission Owner—not an Affected Party. The silence in the *pro forma* agreement with respect to the Affected Party's obligations is to be expected because the Affected Party would not be a party to that agreement.

It is incomprehensible that the ISO-NE Tariff would impose a unilateral obligation on the Interconnection Customer to enter into an agreement with an Affected Party for upgrades, while leaving the Affected Party free to decline to execute such an Affected Party agreement. It would not make sense for ISO-NE to require an interconnection customer to take an action that is dependent on the action of an Affected Party, while at the same time permitting the Affected

---

[24]    It is also strange that this argument relies entirely on a *pro forma* agreement, given that NextEra has argued that it may alter the terms of the *pro forma* agreement by insisting on including unreasonable terms in the Affected System Agreement requiring Avangrid to pay for any indirect and consequential costs, including lost opportunity costs, stemming from delays caused by NextEra.

Party to stand by and do nothing.  Such an interpretation of the ISO-NE Tariff would not only permit but *encourage* violations of fundamental open access principles.  The open access obligation is placed on transmission owners precisely to ensure that interconnection customers have access to the grid.  Here, NextEra is in the position of being an owner of transmission facilities that may need to be upgraded.  Allowing such an Affected Party to stand in the way of an interconnection undermines open access and runs counter to decades of Commission regulations and orders.[25]  Construing the ISO-NE Tariff in this manner would allow an Affected

---

[25] *Open Access and Priority Rights on Interconnection Customer's Interconnection Facilities*, Order No. 807, 150 FERC ¶ 61,211 at P 7 (2015) ("Order No. 807"), *order denying reh'g and granting clarification*, 153 FERC ¶ 61,047 (2015) ("Order No. 807-A") (explaining that in Order No. 888, the Commission "established non-discriminatory open access to electric transmission service as the foundation necessary to develop competitive bulk power markets in the United States"); *id.* at P 8 (explaining the establishment in Order No. 889 of the Standards of Conduct to "prevent transmission providers from" discriminating "in favor of their marketing affiliates"); *id.* at P 9 (describing Order No. 2003's finding that "interconnection service plays a crucial role in bringing generation into the market to meet the growing needs of electricity customers and competitive electricity markets"); *see also Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220 at P 47 (2015) (finding that the interconnection customers of an affected system operator and the interconnection customers of a directly-connected transmission owner are similarly situated, and that the comparability principle requires similarly situated customers to be treated comparably in the transmission planning context), *order on reh'g*, 153 FERC ¶ 61,352 (2015), *order on reh'g*, 156 FERC ¶ 61,099 (2016), *vacated and remanded*, *Ameren Servs. Co. v. FERC*, 880 F.3d 571 (D.C. Cir. 2018), *order on remand*, *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158 at P 34 (2018) (noting that the Court in *Ameren* did not overturn the Commission's determination that the interconnection customer of an affected system operator and the interconnection customer of a directly-connected transmission owner are similarly situated customers to be treated comparably in the transmission planning context and affirming that the same funding options should be available to all interconnection customers regardless of whether their network upgrades are governed pursuant to the *pro forma* interconnection agreement terms or a *pro forma* affected system agreement), *order on compliance and addressing arguments raised on reh'g*, 172 FERC ¶ 61,248 (2020); *see also South Carolina Elec. & Gas Co.*, 143 FERC ¶ 61,058 at P 48 (2013) ("The comparability principle requires public utility transmission providers ... to develop a transmission system plan that meets the specific service requests of their transmission customers and otherwise treats similarly-situated customers ... comparably in transmission system planning."), *order on reh'g*, 147 FERC ¶ 61,126 (2014); *see also PJM Interconnection, L.L.C.*, 129 FERC ¶ 61,161 at P 63 (2009); *Am. Elec. Power Serv. Corp.* 102 FERC ¶ 61,336 (2003) (finding an interconnection customer's pending request to interconnect and obtain open access to the transmission system cannot be "held hostage" to the obstacles faced in seeking cooperation of an affected system to construct upgrades).

Party to delay, and potentially kill, any projects it opposes for its own commercial reasons.  It would permit generators and other existing owners of transmission-related facilities as a tool to freely discriminate against the interconnection of competitors.  This is a clear violation of the Federal Power Act, and would also be inconsistent with other provisions of the ISO-NE Tariff,[26] which specifies that ETU interconnection service is a right, not a privilege that may be freely taken away by an Affected Party.[27]

While NextEra does offer a half-hearted statement that "Seabrook is not saying that it would not enter into such a facilities agreement to replace the Generation Breaker,"[28] this hedge is particularly meaningless when viewed in the context of the facts:  NextEra has opposed the NECEC Project at every juncture, it has refused to file the Affected System Agreement after repeated requests, and it now asks that the Commission declare that it does not need to enter into the Affected System Agreement at all.

## III.     NEXTERA'S ARGUMENTS THAT NEXTERA SEABROOK MUST BE REIMBURSED FOR ALL INDIRECT AND CONSEQUENTIAL COSTS, INCLUDING OPPORTUNITY COSTS AND LEGAL COSTS, ARE NOT SUPPORTED BY FACTS OR LAW

NextEra claims it is not obligated to upgrade the Seabrook Breaker "at a loss" and that Avangrid is obligated to reimburse Seabrook for any and all indirect and consequential costs that may stem from the construction of the Seabrook Breaker Replacement, including opportunity

---

[26]     *See* Complaint at 22-24.

[27]     ISO-NE OATT, Schedule 25, Section 3.2 ("Interconnection Service for all Elective Transmission Upgrades is the *right* to interconnect the Interconnection Customer's Elective Transmission Upgrade to the Administered Transmission System at the Point of Interconnection pursuant to the terms of the Elective Transmission Upgrade Interconnection Agreement and, if applicable, the Tariff.") (emphasis added).

[28]     Petition at 8.

costs.  NextEra's arguments regarding "fundamental ratemaking principles" and Commission policy are seriously flawed.

NextEra attempts to support the contention that it is entitled to recovery of all indirect and consequential costs by pretending that it has submitted a rate filing to obtain a return of and on its investment in facilities needed to provide service to a customer.  NextEra uses this fiction to argue that (1) it should be allowed to recover indirect and consequential damages, including opportunity costs[29] and legal costs;[30] (2) to find otherwise would constitute a confiscatory rate;[31] and (3) "principles" of cost causation support its argument.[32]  But none of these arguments has any merit in the interconnection context.

### A.    NextEra Is Not Entitled to Indirect or Consequential Damages, Including Opportunity Costs or Legal Costs.

FERC cases that allow for the inclusion in rates of indirect and consequential costs, including lost opportunity costs and legal costs, in order to provide service on a cost-of-service basis are inapplicable because none relate to upgrades built for and at the expense of an interconnection customer.  NextEra is not providing the type of service that allows it to obtain a return of and on its investment.  Rather, there is no investment that NextEra is making in order to provide such a service.  To the contrary, Avangrid simply seeks to interconnect the NECEC Project, and if upgrades are required, including on NextEra's transmission facilities, then NECEC Transmission would reimburse NextEra for those direct costs.

---

[29]    *Id.* at 24-26.

[30]    *Id.* at 27.

[31]    *Id.* at 21-22.

[32]    *Id.* at 22-24.

12

**JA410**

Indeed, the Commission has squarely rejected previous attempts by transmission owners to allocate consequential costs resulting from upgrades necessary for interconnection, including "lost opportunity costs on sales not made,"[33] and the ISO-NE Tariff also expressly prohibits the payment of "lost opportunity costs to Generator Owners for generating units that are dispatched down or dispatched off."[34]  Even NextEra Seabrook's own interconnection agreement, which NextEra attached to its Answer in the Complaint proceeding, contains the pro forma language prohibiting the collection of "any losses, damages, costs or expenses for any special, indirect, incidental, consequential, or punitive damages, including but not limited to loss of profit or revenue" from the other party under the interconnection agreement.[35]  The NECEC Project is simply seeking to include the same language in the Affected System Agreement that benefits NextEra Seabrook in its own interconnection agreement.

NextEra concedes that the Commission does not permit recovery of indirect or consequential damages[36] when it asks that the Commission find that the limitation on indirect and consequential damages should be bilateral.  Avangrid agrees, which disposes of this request in its entirety.

---

[33]    Complaint at 32 (quoting Order No. 2003); *see also Southern California Edison Co.*, 151 FERC ¶ 61,273 at P 25 (2015) (confirming that "the ban on recovery of lost profits or revenues in Article 18.2 of the LGIA includes lost profits or revenues from foregone power sales, consistent with the discussion of this provision in Order No. 2003").

[34]    *Id.* (quoting ISO-NE Tariff, Section II.47.4).

[35]    Answer, Exhibit 6, Standard Large Generator Interconnection Agreement By and Among ISO New England Inc. and NextEra Energy Seabrook, LLC and New Hampshire Transmission, LLC, ("Seabrook LGIA"), Section 18.2.

[36]    Petition at 35-36.

13

**JA411**

In particular, NextEra cites Order No. 2003's express limitation on consequential damages[37] and the recent *AEP v. PJM* case, in which the Commission denied the portion of AEP's complaint seeking to impose indirect and consequential damages on the Interconnection Customer.[38]  The specific language of this decision cited by NextEra precludes NextEra from seeking consequential costs from the NECEC Project.

To be clear, Avangrid will reimburse NextEra for any *__direct__* costs associated with the Seabrook Breaker Upgrade, as set forth in the *pro forma* agreement.

### 1.    *NextEra Is Not Entitled to Opportunity Costs.*

NextEra specifically contends that it is entitled to opportunity costs because opportunity costs can, in some cases, be recovered through ratemaking.[39]  NextEra claims that it should "be made whole for [the] opportunity costs of not being able to participate in the energy market for the time it is executing a project to support an . . . upgrade . . ."[40]  NextEra cites to "recovery of opportunity costs for generators who are forced to back down output in a variety of [RTO]

---

[37]    *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 at P 906 (2003).

[38]    *Am. Elec. Power Serv. Corp. v. PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,121 at P 62 (2019) ("AEPSC's proposal would remove the limitation on damages as to the interconnection customer's liability under the Option to Build. This proposal is inconsistent with Order No. 2003, which limits damages in order to protect 'either Party from liability for any special, indirect, incidental, consequential, or punitive damages, including profit or revenue.'  The Commission found that this provision should be bilateral in order to 'offer greater certainty to Transmission Providers and Interconnection Customers.'  AEPSC's proposal, however, would require the interconnection customer, and only the interconnection customer, to be liable for certain damages.") (quoting Order No. 2003 at P 906).

[39]    Petition at 24-26.

[40]    *Id.* at 26.

market contexts."[41]  But the cited contexts—reactive power service[42] and the provision of spinning and non-spinning reserves[43]—involve the generator receiving a return of and on its investment to provide such service.  Similarly, NextEra points to precedent that "supports recovery of opportunity costs in cost of service contexts."[44]  None of this applies to the reimbursement of the costs to construct facilities to accommodate an interconnection.[45]  NextEra has not cited to any interconnection cases to support its novel theory that a party building system upgrades as a result of interconnection of a new source of generation is entitled to receive costs resulting from forgone sales.

### 2.    *NextEra Is Not Entitled to Legal Costs.*

NextEra also contends that it is entitled to legal costs because such costs are recoverable in cost-of-service ratemaking.[46]  According to NextEra, the "Commission's longstanding precedent is that regulated utilities 'are entitled to recover their reasonably incurred rate litigation costs' as a legitimate cost of rendering public utility service."[47]  Once again, NextEra relies upon inapposite cost-of-service cases where a utility receives a return of and on its investment in conjunction with its provision of service.[48]  NextEra's expenses to construct the Seabrook

---

[41]    Petition at 24-25.

[42]    The reactive power cases cited make little sense in this context for the additional reason that NextEra's Seabrook Station is a consumer, not a producer of reactive power.

[43]    Petition at 25 n.79. Nor does Seabrook provide any of these services.

[44]    *Id.* at 25.

[45]    *See Southern California Edison Co.*, 151 FERC ¶ 61,273 at P 25 (2015) (confirming that "the ban on recovery of lost profits or revenues in Article 18.2 of the LGIA includes lost profits or revenues from foregone power sales, consistent with the discussion of this provision in Order No. 2003").

[46]    Petition at 27.

[47]    *Id.*

[48]    *Id.* at nn. 89-92; *see also id.* at nn. 91-92 (citing pipeline cases).

15

**JA413**

Breaker Replacement are not investment to provide such service. Rather, the cost to construct the upgrades is merely reimbursable pursuant to the Commission's interconnection upgrade precedent. NextEra does not identify any precedent where a party has been awarded legal fees associated with litigating over interconnection.

## B.    NextEra's Confiscatory Rates And Cost Causation Arguments Are Irrelevant.

NextEra's arguments about confiscatory rates and cost causation are all irrelevant. All of the cases cited in support of these arguments relate to circumstances where FERC determines that a utility is entitled to a return of and on its investment in conjunction with its provision of service.[49] Yet again, the cases cited by NextEra are inapplicable—all are from the context of allocating *rates* among customers.[50]

Similarly, NextEra is not entitled to recover indirect and consequential costs as a result of the Commission's "principles of cost causation."[51] The precedent cited by NextEra stands for the proposition that the principles of cost causation apply only to *direct* costs, not to additional speculative indirect and consequential costs, as requested by NextEra. Avangrid has already agreed to pay for all *direct costs* associated with upgrading the Seabrook Breaker. No case cited by NextEra stands for the proposition that speculative indirect and consequential costs and lost profits should be borne by the party that might benefit.

---

[49]    *Id.* at nn. 70-71.

[50]    *See, e.g.*, Petition at 22 (arguing that *rates* must allocate costs in a manner consistent with causation of those costs); *id.* n. 70 (citing *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009) ("*ICC v. FERC*") for the proposition that "rates must allocate costs in a manner that is at least 'roughly commensurate' with causation of those costs"); *ICC v. FERC*, 576 F.3d at 476 ("All approved *rates* must reflect to some degree the costs actually caused by the *customer* who must pay them.") (quoting *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)) (internal brackets omitted) (emphasis added).

[51]    Petition at 22-24.

16

**JA414**

Additionally, while cost causation principles do not apply here, NextEra ignores that these costs were *caused by NextEra* and not the NECEC Project. The vast majority of the short circuit issue is caused by NextEra's own generation facilities, and—regardless of the interconnection of the NECEC Project—the Seabrook Breaker is very close to being overdutied. And, as more fully set forth in the Complaint,[52] the assumptions regarding the Seabrook Breaker being overdutied are questionable at best—running both back-up emergency diesel generators and at full load. In truth, the cost allocation associated with the portion of the short circuit issue attributable to NECEC is *de minimis* and therefore, cost causation is of little use to NextEra. In fact, if cost causation principles were applied here, NextEra would be responsible for the vast majority of the *direct* costs of the Seabrook Breaker Replacement in addition to its full responsibility for any indirect costs.

### C.     A "Formula Rate" Is Entirely Inappropriate Here.

In keeping with the misconception underlying all of NextEra's arguments that it should be entitled to cost-of-service ratemaking for constructing an upgrade identified as necessary to preserve the integrity of ISO-NE's Administered Transmission System, NextEra has also proposed a "formula rate" to calculate the opportunity costs it seeks to be reimbursed for.[53] The formula rate proposed is inappropriate and should not be considered.[54] The use of a *formula rate* for the *absence of sales* of capacity and energy is unprecedented and makes no sense. There is

---

[52]     *See* Complaint, Dickinson Aff. at PP 51-52.

[53]     Petition at 28-31.

[54]     While the formula rate need not be considered in detail because the entire concept should be rejected out of hand, inclusion of potential lost PFP bonus payments is emblematic of NextEra's approach to this entire negotiation—it appears to be nothing more than a delay tactic with little basis in reality.

17

**JA415**

no sale of energy or capacity to Avangrid, nor is there transmission service being provided.  A formula rate is simply inapplicable.  The only issue is the cost allocation of interconnection-related costs, and the only question is which costs are reimbursable.

## IV.    GOOD UTILITY PRACTICE SHOULD BE GIVEN ITS ORDINARY MEANING

NextEra seeks a declaration that Good Utility Practice as used in the Affected System Agreement should not mean what it ordinarily means—Good Utility Practice in the broader electric utility industry—but rather that it should be given a special definition that only applies to the standards of the nuclear industry.[55]  NextEra provides no compelling justification for altering this longstanding industry definition.

The Good Utility Practice standard and definition has always applied in ISO-NE and around the country in a uniform fashion applicable to all parties, and there is no reason to carve out special rules for one segment of the industry.  No change here is necessary.  Good Utility Practice applies to the owners and operators of all generation and transmission facilities, regardless of whether the facilities relate to a nuclear power plant.  Despite NextEra's claims to the contrary, this standard definition applies to NextEra Seabrook, as shown by its own interconnection agreement, which employs the standard definition of Good Utility Practice that applies to the electric industry as a whole and does not apply a special standard to NextEra Seabrook.[56]

---

[55]    Petition at 33-34.

[56]    Seabrook LGIA, Article I (defining "Good Utility Practice" in reference to "the electric industry" as a whole).

## V.    NEXTERA SEEKS IMMUNITY FOR CONSEQUENTIAL DAMAGES WHILE ATTEMPTING TO IMPOSE CONSEQUENTIAL COSTS ON AVANGRID

NextEra also seeks a declaration that NextEra Seabrook will not be liable for consequential damages under an Affected System Agreement with NECEC Transmission. NextEra states that limitations on forcing another party to bear consequential damages must be "bilateral."[57]  Avangrid agrees with this bilateral principle—NextEra should not be liable to Avangrid for consequential damages, and Avangrid should not be liable to NextEra for consequential costs.[58]

## VI.    NEXTERA MAKES A SERIES OF DUBIOUS AND UNSUPPORTED FACTUAL CLAIMS

In addition to the lack of legal merit in all of NextEra's proposed declarations, many of the factual assertions on which these legal claims are based lack support and are questionable at best.  There is thus even more reason for the Commission to focus its attention on the Complaint and ignore the Petition, or, if the Commission does consider the Petition on the merits, to deny it.

### A.    NextEra Claims That It Cannot Construct the Seabrook Breaker Replacement in Fall 2021.

NextEra states that it cannot construct the Seabrook Breaker Replacement during a planned refueling outage of its Seabrook Station scheduled for the autumn of 2021 (the "Planned 2021 Outage"),[59] but it has not provided anything other than conclusory statements in support of

---

[57]    Petition at 36 n. 125.

[58]    NextEra attempts to differentiate between the two but can only do so by incorrectly relying—as it does throughout the Petition—on the fiction that it is entitled to a cost-of-service rate for constructing the Seabrook Breaker Replacement.  *See* Petition at 35-36.

[59]    Petition at 4 ("Due to the complexity and scope of the Generation Breaker replacement project, Seabrook's operations team has concluded that the lead time necessary to prepare for such a major undertaking dictates that the replacement cannot occur during Seabrook Station's next refueling outage in October 2021.").

that position. NextEra argues that it cannot fit the Seabrook Breaker Replacement into the Planned 2021 Outage because doing so would not comply with its own internal standards of having all of the work identified and frozen 22 months in advance.[60] NextEra suggests that these internal policies are inflexible, but it does not explain why. It is inconceivable that NextEra has never modified any of its work inside of its 22-month internal timetable. It is NECEC Transmission's strong suspicion that this is another example of discriminatory treatment, representing an ability to accommodate modifications when convenient and beneficial to NextEra but not to third-party requesters (and especially competitors), even when NextEra is required by law to use reasonable efforts and good faith to try to accommodate such requests. Avangrid's experts have concluded that the engineering and planning for this work would not be complex and that the actual construction could occur within a 1-2 week period, which is significantly shorter than the Planned 2021 Outage.[61]

NextEra further claims that its purported inability to construct the Seabrook Breaker Replacement during the Fall 2021 Outage is also caused by the replacement's "enterprise risk, which would add to the duration and level of preparation needed."[62] It does not support this with any explanation or state why this is significant. NextEra states that "replacing a generation breaker at a nuclear plant is not like replacing a generation breaker at a fossil plant."[63] In support of this assertion, NextEra quotes its attached Affidavit, which states, without further elaboration: "Replacing a generation breaker at a nuclear plant is not like replacing a generation breaker at a

---

[60]    McCartney Aff. at 4-7; Seabrook Breaker White Paper at 9.

[61]    *See* Complaint, Dickinson Aff. at PP 64-66.

[62]    Petition at 6.

[63]    *Id.* at 34.

fossil plant."[64]  Neither the complaint nor the McCartney affidavit explains how it is different, or, more importantly, why any such difference matters.[65]

### B.     NextEra Suggests That It Could Not Build the Seabrook Breaker Replacement During Its 2023 Planned Outage or Any Other Planned Outage.

As further evidence of its total resistance to accommodating the Seabrook Breaker Replacement, NextEra claims that it is not even sure whether it could complete the Seabrook Breaker Replacement during the 2023 outage.  Specifically, NextEra states that "given that the engineering study has yet to be undertaken and all of the planning and evaluation work that must be done pursuant to the NextEra process, there is no guarantee that the Gen Breaker project could be executed in the 2023 Outage."[66]  Here, NextEra attempts to benefit from its *own* refusal to conduct a study to determine the detailed requirements for construction of the Seabrook Breaker and the resulting continued uncertainty about exactly how long that construction will take.[67]  To date NextEra has *refused* to do any such "engineering study."  Yet it seeks to use this fact to force Avangrid to agree to potentially vast liability.  NextEra cannot use its own improper obstruction of the NECEC Project interconnection process to benefit itself here.

---

[64]     McCartney Aff. at 7.

[65]     Both affidavit and Petition also state iterations of this sentence:  "Indeed, the Breaker Project will be subject to after-the-fact review by INPO, using INPO's standards set out in INPO Event Report IER 14-20."  McCartney Aff. at 7; Petition at 34 ("Indeed, this very replacement will be subject to after-the-fact review by INPO, using INPO's standards.").  But what about the INPO standards makes the Seabrook Breaker Replacement different from the replacement of a circuit breaker at any other power plant, and why will any such difference require that it take longer?  NextEra provides no answer.

[66]     Petition at 7.

[67]     "The following refueling outage is scheduled in April 2023.  However, the actual date for the execution of the work cannot be known until after an engineering study of the project is completed, at which point the appropriate outage for conducting the Generation Breaker replacement will be identified ('Generation Breaker Replacement Outage')."  Petition at 4.

21

**JA419**

In fact, NextEra goes even further—it assumes, *no matter when a given planned outage is or for how long it is planned*, that the Seabrook Breaker Replacement would extend any outage by about 10 days.[68]  NextEra appears to be suggesting that it would not begin the work until the outage is over and after completing all other planned work (whether affected by the Seabrook Breaker Replacement or not).  This position again indicates NextEra is interested only in delay and the imposition of substantial additional (and unnecessary) costs on the NECEC Project.

### C.    NextEra Makes Additional Dubious Claims.

There is evidence to suggest that the breaker issue has existed for many years, and Seabrook may have violated Good Utility Practice by failing to replace it before now.  This suggests that the claim that "replacement of the Generation Breaker would not be required but for the NECEC Elective Upgrade"[69] is exaggerated.

Additionally, NextEra seems to suggest that the NECEC Project is somehow inappropriate because it could have a significant adverse effect upon an Affected System.[70]  But this is not true; the SIS was conducted and certain upgrades were identified by ISO-NE to ensure that the NECEC Project will not have any such adverse effect.

---

[68]    "Seabrook currently estimates that replacing the Generation Breaker will extend a Generation Breaker Replacement Outage by 10 days."  Petition at 4.  NextEra defines this term it coined, Generation Breaker Replacement Outage, as "the appropriate outage for conducting the Generation Breaker replacement."  Petition at 4.  In other words, NextEra has decided that its construction of the Seabrook Breaker Replacement will take 10 days no matter when the outage is or how long it lasts.  NextEra's assumption, accompanied by the complete lack of explanation for its estimate, makes clear that NextEra is attempting to extend the amount of time that it seeks to force Avangrid to pay for all of its costs, including lost energy sales, by as long as possible, and that NextEra will refuse to begin construction of the Seabrook Breaker Replacement during a planned outage (which also undercuts its insistence that the Seabrook Breaker Replacement must take place during a planned outage in the first place).

[69]    Petition at 3.

[70]    *Id.* at 10 ("ISO-NE's Tariff prohibits construction of Elective Transmission Upgrades if they will have a significant adverse effect upon an Affected System").

22

## VII. CONCLUSION

WHEREFORE, for the foregoing reasons, NECEC Transmission LLC and Avangrid, Inc. request that the Commission decline to address the requests in, or alternatively deny, the Petition.

Respectfully submitted,

*/s/ Nicholas J. Cicale*
Nicholas J. Cicale
Attorney
Avangrid Service Company
180 Marsh Hill Road
Orange, CT 06477

*/s/ David L. Schwartz*
David L. Schwartz
James B. Blackburn
Richard H. Griffin
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Avangrid, Inc. and NECEC Transmission LLC*

Dated:  November 4, 2020

**JA421**

**<u>Certificate of Service</u>**

I hereby certify that I have this day served the foregoing document upon each person designated on the official service lists compiled by the Secretary of the Commission in these proceedings.

Dated at Washington, DC this 4th day of November, 2020.

*/s/ Richard H. Griffin*
Richard H. Griffin
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

**NextEra Energy Seabrook, LLC**          )          **Docket No. EL21-3-000**

## ANSWER AND MOTION FOR LEAVE TO ANSWER OF
## NEXTERA ENERGY SEABROOK, LLC

NECEC Transmission LLC and Avangrid, Inc. ("NECEC") ask the Federal Energy Regulatory Commission ("FERC" or "Commission") to *expedite* resolution of the limited contractual dispute *already* before the Commission by *deferring* that resolution to a proceeding that has *not begun*.[1]  NECEC claims to want the contractual dispute with Seabrook resolved, but says this proceeding is not the right one to resolve the dispute.[2]  Instead, NECEC asks the Commission to resolve NECEC's complaint filed against Seabrook in Docket No. EL21-6-000.[3] But review of NECEC's Complaint shows that NECEC asks the Commission to order Seabrook to initiate yet a third proceeding to resolve those same issues.[4]

---

[1]  Pursuant to Rules 212 and 213 of the Commission's Rules of Practice and Procedure, 18 C.F.R. §§ 385.212 and 385.213 (2020), NextEra Energy Seabrook, LLC ("Seabrook") hereby moves for leave to answer the protest filed by NECEC on November 4, 2020, in the above-captioned proceeding ("Protest").  The Protest was filed in response to Seabrook's October 5, 2020 Petition for Declaratory Order filed in this docket ("Petition").  The Commission's regulations prohibit an answer to a protest unless otherwise ordered by decisional authority.  *Id.* § 385.213(a)(2).  However, the Commission may accept an answer to a protest for good cause shown.  Because this Answer ensures a complete record, contributes to an understanding of the issues, and will assist the Commission in its decision-making process, good cause exists to grant Seabrook's motion for leave to answer.  *See, e.g.*, *PJM Interconnection, L.L.C.*, 158 FERC ¶ 61,133 at P 12 (2017) (accepting answers to protests of compliance filing because they provided information that assisted in the Commission's decision-making process); *KO Transmission Co.*, 156 FERC ¶ 61,147 at n. 5 (2016) (accepting answer to protest because it provided a better understanding of the issues and ensured a complete record).

[2]  Protest at 4-5.

[3]  *NECEC Transmission LLC*, Complaint and Request for Shortened Answer Period and for Fast Track Processing, Docket No. EL21-6-000 (Oct. 13, 2020) ("Complaint").

[4]  *See* Protest at 3-4 (requesting that the Commission require Seabrook to file an unexecuted agreement with the Commission for review under Section 205 of the Federal Power Act ("FPA")).

*Finally*, NECEC's position concerning the removal of a provision limiting indirect and consequential damages remains uncertain. As explained in Mr. Marcum's Supplemental Affidavit, NECEC in its August 27, 2020 counterproposal stated that because Seabrook could not undertake the Generation Breaker replacement in the 2021 Outage, it objected to a provision in the draft agreement preventing Seabrook from being liable for consequential damages and lost profits (e.g., delay damages) to NECEC.[78]  In the Protest, while never addressing the apparent evolution of its position, NECEC asserts that Seabrook's requested declaration "is irrelevant and was put forward to create confusion and delay,"[79] and it suggests that "neither party [be] permitted to charge the other for indirect or consequential damages or costs."[80]  Given NECEC's continued tying of its position on this issue to Seabrook's request for opportunity cost recovery, Seabrook cannot reasonably conclude that the consequential damages issue is now resolved. Costs and damages are not the same thing, as explained above. The Commission should still grant the requested declaration on consequential damages to avoid any confusion that may result from NECEC's continued conflation of the issues.

In sum, for the reasons set forth in the Petition, as well as this Answer and the attached exhibits,[81] Seabrook respectfully reiterates its request that the Commission grant the relief requested in the Petition.

---

[78]  *See* Marcum Supplemental Affidavit at 5; *see* NECEC Draft Facilities Agreement.

[79]  Protest at 7.

[80]  *Id*.

[81]  As discussed above, Seabrook is submitting the following exhibits, each of which was also submitted in Docket No EL21-6-000: Exhibit No. 1, Supplemental Marcum Affidavit; Exhibit No. 2, Supplemental McCartney Affidavit; Exhibit No. 3, Weber Affidavit; Exhibit No. 4, NECEC Draft Facilities Agreement; and Exhibit No. 5, Seabrook IA.

20

**JA424**

**Exhibit No. 3**

**Prepared Affidavit of Lawrence Weber
Exhibit No. 7 to NextEra Answer to Complaint
Filed in Docket No. EL21-6-000**

**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. EL21-6-000 |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC,  and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
| Respondents. | ) | |

**PREPARED AFFIDAVIT OF LAWRENCE WEBER
ON BEHALF OF NEXTERA**

My name is Lawrence Weber.  My address is 5343 Ridge Road, Stevensville, MI 49127.

I am a retired utility executive having spent 38 years in the U.S. commercial nuclear power

industry.  In my career I held nearly every operational position within the U.S. nuclear power

industry – from an entry level position to the Chief Nuclear Officer of a major U.S. utility.

From 1998 to 2015 I held the following positions while employed by American Electric

Power Company ("AEP") at the D.C. Cook nuclear plant:  Operations Manager, Performance

Improvement Director, Work Controls Manager, Assistant Plant Manager, Plant Manager,

Director of Plant Engineering, Site Vice President, and ultimately Chief Nuclear Officer.  Before

joining AEP I held Reactor Operator and Senior Reactor Operating licenses from the U.S.

Nuclear Regulatory Commission ("NRC").  I served as Senior Reactor Operator at the

Braidwood Nuclear Plant, a Control Room Supervisor at the WNP-2 and Marble Hill nuclear

plants, and as a Reactor Operator, auxiliary operator, and health physics technician at the Point

Beach nuclear plant.  I have a Bachelor of Science Degree in Business Management from the University of St. Francis and I served in the U.S. Navy from June of 1968 to July of 1972.  I have never worked as an employee of NextEra Energy, Inc. or any of its subsidiaries.

As Plant Manager of D.C. Cook, the plant achieved unprecedented performance improvement as recognized by the Institute of Nuclear Power Operations ("INPO"), the nuclear power industry's oversight group that promotes the highest levels of safety and excellence in the operation of nuclear power plants.  I have led dozens of refueling and maintenance outages in my 38-year career.  As the Site Vice President at D.C. Cook, I led a 15-month recovery from the largest turbine failure in nuclear power history, and oversaw a $1.16 billion life extension project that secured an additional 20 years of operational authority from the NRC.  In my career I led and participated in several nuclear plant performance assessments in the U.S and abroad.  The D.C. Cook plant, and other nuclear plants where I have worked, include a Westinghouse-designed Pressurized Water Reactor ("PWR") and associated balance of plant components, including in the case of D.C. Cook Unit 1 GE-manufactured steam turbine generators with associated breakers, that are of a similar design and configuration to the Seabrook Station PWR and GE turbine generators and associated breakers.

The purpose of my affidavit is to document an independent feasibility review that I was asked to perform by NextEra Energy Resources, LLC ("NextEra") of the proposed generator breaker replacement project (the "Project") by NextEra Energy Seabrook, LLC ("Seabrook") at Seabrook Station during the next scheduled refueling and maintenance outage in October of 2021 ("2021 Outage").

In conducting my review, I reviewed the following information that was provided to me by NextEra:

- o Complaint filed by NECEC Transmission, LLC ("NECEC") and Avangrid, Inc. ("Avangrid") (Avangrid and NECEC together, "Complainants") with the Federal Energy Regulatory Commission ("FERC") in Docket No. EL21-6-000;

- o Affidavit of Thorn C. Dickinson;

- o Letter from Andrew Kniska to Steve Garwood on the Greater Boston Energy Study;

- o Draft Facilities Agreement for the Project

- o Petition for Declaratory Order filed by NextEra Energy Seabrook, LLC filed in Docket No. EL21-3-000 ("Petition");

- o Affidavit of Eric McCartney filed in Docket No. EL21-3-000, which includes the Seabrook White Paper for Generator Breaker replacement ("White Paper") and documents referenced therein;

- o Affidavit of Joshua Marcum filed in Docket No. EL21-3-000; and

- o Affidavit of Ruben Rodriguez filed in Docket No EL21-3-000.

Based on my review of this material and based on my experience in the nuclear industry, the following are my conclusions:

Complainants assert in the Complaint that the Project could be accomplished in no more than two weeks. The Project is extremely complicated. The scope of the Project is described in the White Paper. In addition to replacing the Generator Breaker, the Project also includes replacing the control system and the high-pressure air system. Even if the Project was conducted in an open switchyard, operations with which Avangrid may be more familiar given that it does not operate nuclear plants, I do not believe that a two-week time period for completion is realistic.

Rather than an open switchyard, the Project will be executed inside the power block of a nuclear power plant with significantly higher standards and requirements in all aspects of engineering, work control, security, and operations when compared with the requirements that would apply to work in an open-air substation. There are tight physical clearances involved in an indoor project, which as explained in the White Paper occupies approximately 700 square feet on the Turbine Generation Building's mezzanine deck, and therefore lifting and rigging an approximately 32,000-pound breaker becomes extremely complicated.  For these and many other reasons this Project has many more complications, increased risk, and reduced margin for error, which significantly increases the complexity of planning and execution for the Project.

The U.S. Nuclear Industry operates pursuant to stringent performance standards.  Many requirements and standards are imposed by NRC regulatory requirements, and performance standards and expectations have been established by INPO.  Even though INPO is not a regulator, compliance with INPO standards is the industry standard for all nuclear plants in the United States.   One of the INPO standards is IER 14-20, "Integrated Risk—Healthy Technical Conscience."  This document was developed following actual nuclear industry events where owners experienced severe difficultly in the execution of major projects.  I will mention four events involving complicated projects at nuclear power plants that are similar to the Project:

1. During a refueling outage at the D.C. Cook nuclear power plant, maintenance and construction crews dropped a 30-ton load near the reactor vessel due to poor rigging practices.  This load drop extended the planned outage by a week.

2. During a major construction project to install a main generator at the Braidwood nuclear plant, contract electricians left grounds installed on the iso-phase bus duct and the metering cabinets of the main generator.  During energization of the generator the

cabinets were totally destroyed and delayed the completion of the installation by two months.

3. At the D.C. Cook nuclear power plant, there was a catastrophic turbine generator failure due to a design flaw in the main turbine. The turbine failure destroyed the high pressure turbine, three low pressure turbines, the main generator, and support structures. The recovery from this event took fifteen months and cost the plant owner several hundred million dollars.

4. During a main generator replacement at the Arkansas Nuclear One nuclear power plant, construction crews dropped a 500-ton generator due to poorly designed rigging equipment. The accident resulted in one fatality and several injuries. The generator fell through the floor and destroyed several pieces of safety related equipment. This event delayed the plant's return to service by several months.

INPO IER 14-20 established a detailed process for planning major projects at nuclear power plants to minimize the probability and consequences of a problem during project execution. This process incorporates a number of critical milestones in project planning.

- There is typically a scope freeze milestone that requires identified projects 24 months prior to the commencement of the outage. The due date for this milestone has long passed for the October 2021 outage.

- There is a milestone to have the design engineering complete within 12 months of the outage, so the manufacturer has the specifications to build the products. This milestone has also passed for the October 2021 outage.

Other critical milestones that cannot be met for this Project:

- Planning the work packages for the removal of the old generation breaker and the installation of the new generation breaker and support equipment;

- Developing the lifting and rigging processes for moving heavy equipment;

- Evaluation of floor loading during the project;

- Developing the electrical and mechanical isolations to protect equipment and personnel;

- Developing training for operations and maintenance personnel and contractors;

- Developing post installation testing procedures.

The Generator Breaker will also require significant testing and verifications after installation and before it can be placed in operation. This testing must be rigorous and thorough. There is industry experience at a fossil power plant where a main generator breaker was closed onto the bus, out of phase and caused significant damage because the synch meter was wired incorrectly. In that case testing was not done to verify that the maintenance was performed correctly.

In its White Paper and Petition, Seabrook expresses its view that the Project cannot be completed in the 2021 Outage and may add up to 10 days to a scheduled refueling and maintenance outage. I agree with both conclusions, though a 10-day extension beyond Seabrook's planned approximate three and a half week scheduled refueling outage may be a conservative estimate, as there is a significant potential to exceed the 10-day projected extension.

There are significant risks of engineering errors, planning errors, and execution errors that would need to be addressed and corrected during the implementation of the Project. These types of in-process adjustments are always very time consuming and difficult to correct. Based on the time frame and the amount of significant work, engineering, and planning that needs to be

done to execute the Project, it is my view that executing the Project during the 2021 Outage would create a high potential of an event that causes personal injury and property damage that delays the timely return of the plant to service.

I have reviewed the White Paper regarding the Project. Based on my experience, I believe the White Paper demonstrates that Seabrook is taking a reasonable approach to project execution and will meet all safety, execution, and quality standards applicable to the execution of major projects at nuclear power plants. The documents referenced and approach documented in the White Paper have much more significance in the nuclear power industry than mere "aspirational goals" as mischaracterized by Complainants. Compliance with the INPO guidance (IER-14-20) – which is committed to by every U.S. nuclear plant owner, is essential to ensuring that nuclear plant management prudently plans major and complex work tasks in a manner that minimizes the probability and consequences of a problem with project execution.

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing testimony is true and correct to the best of my knowledge, information, and belief.

Executed this 2nd day of November, 2020.

Lawrence J. Weber

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| NECEC Transmission LLC and Avangrid, Inc., | ) ) ) | Docket No. EL21-6-000 |
|  Complainants | ) ) |  |
| v. | ) ) |  |
| NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC, | ) ) ) |  |
|  Respondents | ) ) ) |  |

**AMENDED COMPLAINT AND REQUEST FOR EXPEDITED RELIEF OF**
**<u>NECEC TRANSMISSION LLC AND AVANGRID, INC.</u>**

NECEC Transmission LLC ("NECEC Transmission") and Avangrid, Inc. (together with NECEC Transmission, "Avangrid") respectfully submit this amendment to the complaint ("Complaint") filed in the above-captioned proceeding ("Amended Complaint"). There is no question that NextEra Energy Resources, LLC ("NextEra Energy Resources") and its affiliate, NextEra Energy Seabrook, LLC ("Seabrook" and, together with NextEra Energy Resources, "NextEra") are not permitted to interfere with the interconnection of NECEC Transmission's New England Clean Energy Connect transmission project ("NECEC Project"). However, NextEra has thus far successfully blocked the NECEC Project from moving forward with its interconnection by utilizing a variety of delay tactics based upon its position as an Affected System. Since the Complaint was filed on October 13, 2020, NextEra has refused to move forward with the development of certain upgrades, which has continued to obstruct the NECEC Project. Now, aspects of the relief originally requested in the Complaint are no longer feasible

within the timeline previously sought.  To reflect these changed circumstances, Avangrid submits this Amended Complaint.

Avangrid continues to seek expeditious Commission action to order NextEra to remove the barriers it has erected that have thus far successfully prevented the NECEC Project from interconnecting a transmission line that would enable the delivery of up to 1,200 megawatts ("MW") of clean hydroelectric energy from Québec to New England for a period of at least 20 years.  As set forth below in Sections III and IV, *infra*, it is feasible for NextEra to construct the facility the NECEC Project requires to interconnect prior to its 2023 in-service date, but to do so NextEra must begin preliminary engineering and design work now.  NextEra has made clear it will not take any action unless required to do so, and Avangrid respectfully requests that the Commission exercise its authority to require NextEra to accommodate the interconnection by initiating engineering and design work now and constructing the upgrades during its 2023 planned outage.  Because the necessary work from NextEra must begin soon, Avangrid respectfully requests expedited relief, and an order directing NextEra to cease obstructing the interconnection of the NECEC Project within six weeks, by May 7, 2021.

## I.    BACKGROUND

As set forth in the Complaint, ISO New England Inc. ("ISO-NE") identified that the generator breaker at NextEra's Seabrook Station in southeastern New Hampshire (the "Seabrook Breaker") must be replaced (the "Seabrook Breaker Replacement") in order for the NECEC Project to interconnect to the ISO-NE Administered Transmission System.[1]  NextEra, which has vociferously opposed the NECEC Project, has used the Seabrook Breaker Replacement as an

---

[1]    Complaint at 13.

opportunity to delay and attempt to derail the NECEC Project.  NextEra has accomplished this delay by refusing to construct the Seabrook Breaker Replacement (or even *begin* the preliminary engineering and scoping studies that must precede the construction) unless the Commission requires NextEra to do so.  As explained in the Complaint, if the Seabrook Breaker must be replaced, NextEra is in the unique position of being able to either enable or prevent such a replacement from occurring in a reasonable and timely fashion.[2]  Where, as here, it may be commercially beneficial to NextEra to prevent or delay such replacement, it is incumbent upon the Commission to act to ensure that NextEra's commercial interests are not allowed to stand in the way of the Commission's open access mandate, in accordance with the Federal Power Act ("FPA") and the Commission's own regulations.  NextEra's dilatory actions reflect an attempt to extract a benefit from its position as the owner of equipment that, unchecked, would allow NextEra to impede a competitor's interconnection to the Administered Transmission System in violation of the Commission's fundamental open access rules and precedent.[3]

NextEra insisted that the Seabrook Breaker Replacement must be constructed during a planned outage at Seabrook Station, with only two planned outages between now and the NECEC Project's planned in-service date.  NextEra became aware of the need for the Seabrook Breaker Replacement in April 2020, when ISO-NE held a System Impact Study ("SIS") results meeting attended by representatives of NextEra.[4]  Yet despite receipt of this information, and NextEra's insistence that the Seabrook Breaker Replacement could only be constructed during a

---

[2]     Affidavit of Thorn Dickinson, attached to the Complaint as Exhibit A ("Dickinson Aff.), at P 66 ("NextEra has complete and unfettered control over the timing, activity, effort and progress regarding construction of the Seabrook Breaker Replacement.").

[3]     Complaint at 12.

[4]     Complaint at 15.

planned outage, NextEra has not begun any apparent preparations necessary for constructing the Seabrook Breaker Replacement during its planned outage in Fall 2021 ("2021 Outage").

In the Complaint, Avangrid sought relief in the form of an order directing NextEra to take the steps necessary to construct the Seabrook Breaker Replacement during the 2021 Outage and respectfully requested expedited action within 60 days.[5]  More than five months have passed since Avangrid filed the Complaint, and NextEra has done nothing to accommodate Avangrid's reasonable requests to begin engineering and scoping work.  As a result of NextEra's delay strategies, it is no longer realistic for NECEC Transmission to expect that the Seabrook Breaker Replacement will occur during the 2021 Outage.  NextEra's strategy of delay, documented in the Complaint, has succeeded in delaying the Seabrook Breaker Replacement to its Spring 2023 planned outage ("2023 Outage"), and if allowed to continue, threatens to delay the project further.  NECEC Transmission needs the Commission to intercede to ensure that NextEra cooperates and fits the Seabrook Breaker Replacement into its 2023 Outage.  However, in order to make that a reality, NextEra would need to begin engineering and design of the Seabrook Breaker Replacement now.  Thus far, NextEra has made no apparent efforts to accommodate the inclusion of the Seabrook Breaker Replacement into the 2023 Outage.[6]

Avangrid now has serious concerns about whether NextEra will make any reasonable efforts to complete the Seabrook Breaker Replacement in the 2023 Outage prior to the Avangrid

---

[5]    Complaint at 5.

[6]    NextEra has refused to begin the engineering and study process unless Avangrid accedes to its demand that Avangrid agree to exposure to potentially unlimited liability stemming from, among other things, forgone revenues from energy sales that Seabrook does not make. Dickinson Aff. at P 63 ("NextEra also indicated that heightened liability terms needed to be agreed to by NECEC Transmission in order for NextEra to execute an agreement to commence work on the E&P portion of the Seabrook Breaker Replacement, making the assumption of these costs a precondition to NextEra's agreement to perform E&P services.").

4

**JA437**

Project's 2023 in-service date.  NextEra's intransigence, coupled with its insistence on nonbinding and arbitrary long lead times, mean that if NextEra does not start work very soon, we may hear arguments from NextEra that it may not think it has sufficient time to prepare for and complete the Seabrook Breaker Replacement during the 2023 Outage (which is more than two years away).  Accordingly, for the NECEC Project to successfully interconnect, Avangrid needs Commission action to compel NextEra to comply with its legal obligation not to interfere with the NECEC Project's interconnection.  Given these developing facts, Avangrid respectfully submits this Amended Complaint.

## II.    AMENDED COMPLAINT

Because construction of the Seabrook Breaker Replacement during the 2021 Outage is no longer feasible, Avangrid hereby submits this Amended Complaint pursuant to Rule 215 of the Commission's Rules of Practice and Procedure.[7]  The amendment is necessary to reflect changed circumstances and focus the proceeding on the necessity of construction of the Seabrook Breaker Replacement during the 2023 Outage.  Accordingly, Avangrid requests that the Commission take all steps necessary to prohibit NextEra from continuing to block the NECEC Project to benefit NextEra's commercial interests in violation of the ISO-NE Open Access Transmission Tariff ("ISO-NE OATT") and the Commission's open access rules and precedent, including requiring NextEra to enter into the attached modified Affected System Agreement that would cover design, engineering, procurement and construction of the Seabrook Breaker Replacement.[8]

---

[7]     18 C.F.R. § 385.215 (2020).

[8]     *See* Facilities Agreement for Affected System Project ("Updated Affected System Agreement"), attached as Exhibit A hereto.  Avangrid is also removing FPL Energy Wyman LLC and FPL Energy Wyman IV LLC as respondents because no Commission relief is needed with respect to those entities any longer.

5

**JA438**

### III.   CONSTRUCTION OF THE SEABROOK BREAKER REPLACEMENT IS FEASIBLE DURING THE 2023 OUTAGE IF NEXTERA BEGINS PREPARATION IMMEDIATELY, BUT NEXTERA WILL NOT TAKE THE REQUIRED STEPS TO DO SO WITHOUT AN ORDER FROM THE COMMISSION.

#### A.   NextEra has time to plan for, design, and construct the Seabrook Breaker Replacement during the 2023 Outage—based on NextEra's own internal procedures—so long as it begins doing so immediately.

The NECEC Project's in-service date is scheduled for Spring 2023.  Because ISO-NE currently believes that the Seabrook Breaker Replacement must be constructed as a precondition to interconnection, the NECEC Project's in-service date could be threatened if the Commission does not intercede and direct NextEra to commence immediate work on the Seabrook Breaker Replacement, which NextEra has continuously and willfully delayed and refused to perform. Seabrook has planned outages approximately once every eighteen months.[9]  Accordingly, because construction of the Seabrook Breaker Replacement during the 2021 Outage is no longer feasible, the Seabrook Breaker now *must* be replaced during the 2023 Outage for the NECEC Project to meet its in-service date—the next planned outage would not occur until more than a year *after* that in-service date.

Currently, there is more than sufficient time for NextEra to plan for and complete the Seabrook Breaker Replacement during the 2023 Outage, and it should be able to complete that work without needing to extend the outage.  As outlined in the attached affidavits of Mark McBurnett and Glen Palmer, and based on NextEra's own internal procedures as represented to the Commission in this proceeding, there is ample time to conduct all of the planning and

---

[9]   Affidavit of Eric McCartney, attached as Exhibit No. 5 to NextEra Answer, at 6, Docket No. EL21-6-000 (filed Nov. 2, 2020) ("McCartney Aff.").

engineering work necessary for construction to proceed during the 2023 Outage.[10]  Moreover, as explained in the Palmer Affidavit, it will be feasible for NextEra to construct the Seabrook Breaker Replacement during the 2023 Outage without having to incur an extension to the planned outage period.  It is estimated that construction can be accomplished in approximately 23 days.[11]  NextEra has stated that its outages are typically three and a half weeks,[12] which amounts to 24 or 25 days, a window large enough to accommodate the estimated 23 days required for testing and construction.

### B.     NextEra has made it clear it will not act unless the Commission orders it to do so.

Despite the urgency created by NextEra's insistence on a nearly 2-year lead time, coupled with its refusal to move this process forward in any meaningful way, NextEra has made it clear that it will not act unless the Commission orders it to do so.  While NextEra's deliberate resistance is unlawful and unreasonable, it is not difficult to explain based upon NextEra's commercial interests.  NextEra has made no secret of its opposition to the NECEC Project.[13]  It has also consistently, ever since it first became aware that the NECEC Project would require NextEra to construct the Seabrook Breaker Replacement, dragged its feet.  NextEra is likely motivated to prevent or substantially delay the NECEC Project from bringing low-cost clean

---

[10]     *See* Affidavit of Mark McBurnett, attached hereto as Exhibit D ("McBurnett Aff.") at 3:20-4:7; Affidavit of Glen Palmer, attached hereto as Exhibit E ("Palmer Aff."), at 6:1-6:5.

[11]     Palmer Aff. at 6:1-6:3.

[12]     NextEra Answer at 51 n.166 (stating that "Seabrook could seek to complete the upgrade during the 2023 Outage"); *see also* McCartney Aff. at 8 ("Refueling outages typically take about three-and-a-half weeks.").

[13]     Complaint at 34-35; *see also id.* at 18 n.68.

7

**JA440**

hydroelectric power into New England.  It is clear that NextEra will not voluntarily move forward with the Seabrook Breaker Replacement.

In addition to insisting that the Seabrook Breaker Replacement take place only during a limited window that occurs once every eighteen months, NextEra continues to insist that it cannot construct the Seabrook Breaker Replacement unless it has 24 months of lead time.[14]  And yet, simultaneously, NextEra has refused to begin the necessary engineering and scoping processes without first securing a patently unreasonable commitment from NECEC Transmission exposing NECEC Transmission to potentially limitless liability that is contrary to Commission precedent[15] for a process over which NECEC Transmission has no control.[16]

Moreover, NextEra's insistence that the Seabrook Breaker Replacement is necessary only because of the NECEC Project is suspect.  As explained in the attached affidavit of Tracy Rolstad, the tiny amount of headroom (the remaining safety margin between the maximum breaker operating condition and its design capability) in the Seabrook Breaker is a result of two separate paper-only "upgrades" commissioned by NextEra in 2009 and 2016.[17]  In fact, the Seabrook Breaker has so little design margin to spare that NextEra should have already replaced the Seabrook Breaker if NextEra were abiding by Good Utility Practice.[18]  Accordingly, NECEC Transmission's offer to pay for the Seabrook Breaker Replacement is an elegant solution to

---

[14]    *See* Affidavit of Lawrence Weber, at 5, attached as Exhibit No. 7 to NextEra Answer to Complaint (Nov. 2, 2020) (stating that "[t]here is typically a scope freeze milestone that requires identified projects *24 months prior to* the commencement of the outage") (emphasis added).

[15]    *Southern California Edison Co.*, 151 FERC ¶ 61,273 at P 25 (2015) (confirming that "the ban on recovery of lost profits or revenues in Article 18.2 of the LGIA includes lost profits or revenues from foregone power sales, consistent with the discussion of this provision in Order No. 2003").

[16]    *See, e.g.*, Complaint at 16, 31.

[17]    Affidavit of Tracy Rolstad, attached hereto as Exhibit F ("Rolstad Aff."), at 3:17-4:17.

[18]    *Id.* at 7:9-10.

8

**JA441**

NextEra's failure to maintain its own equipment and continuing to operate it in a non-compliant and obsolescent state.[19]

Despite the benefits flowing to NextEra from NECEC Transmission's willingness to pay for construction of the Seabrook Breaker Replacement, NextEra has indicated it will not construct the Seabrook Breaker Replacement without a mandate from the Commission. NextEra's lack of action prevents the NECEC Project from moving forward and thereby accomplishes the goal NextEra has sought in multiple fora—preventing or substantially delaying the NECEC Project from interconnecting with ISO-NE.  Accordingly, NECEC Transmission seeks an order from the Commission directing NextEra to enter into the Affected System Agreement and begin the process of engineering and procurement in preparation for constructing the Seabrook Breaker Replacement during its 2023 Outage.  Furthermore, to the extent that NextEra alleges that planning and engineering assessment cannot occur while the Seabrook Station is in operation, the Commission should also direct NextEra to use the 2021 Outage to enable the appropriate expert or vendor to perform any such planning and engineering assessment.

---

[19]     McBurnett Aff. at 7:5-10. ("[T]he Seabrook Breaker has very little margin and may not be capable of performing its design function, which could reflect a concern that the station design is not in compliance with GDC 17.  As such the NECEC Project represents a good opportunity for NextEra to replace the Seabrook Breaker to preclude a potential plant regulatory issue and ensure compliance with the NRC GDC 17 criteria.").

9

**JA442**

## IV.    THE COMMISSION CAN AND MUST GRANT THE NECESSARY RELIEF TO AVANGRID EXPEDITIOUSLY.

### A.    The Commission has the authority to order NextEra to stop blocking the interconnection of the NECEC Project.

As explained in the Complaint and subsequent briefing, the Commission has the authority to direct NextEra to cease its anticompetitive behavior.  Interconnection is a "critical component of open access transmission service."[20]  Open access is essential to the functioning of a truly competitive market.[21]  An incumbent's use of its position to block a competitor from entering a market by preventing the competitor's interconnection to the transmission system is antithetical to open access.  When such behavior occurs, the Commission can, and does, intervene to stop it.  An Affected System or Affected Party, as Seabrook is here, is not able to evade these rules simply because the would-be competitor does not interconnect directly to a transmission line owned by Seabrook.[22]

---

[20]    Complaint at 22 (quoting *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103, at P 12 (2003) ("Order No. 2003"), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007)).

[21]    Complaint at 22 n.75; *Open Access and Priority Rights on Interconnection Customer's Interconnection Facilities*, Order No. 807, 150 FERC ¶ 61,211 at P 7 (2015) ("Order No. 807"), *order denying reh'g and granting clarification*, 153 FERC ¶ 61,047 (2015) ("Order No. 807-A") (explaining that in Order No. 888, the Commission "established non-discriminatory open access to electric transmission service as the foundation necessary to develop competitive bulk power markets in the United States"); *id.* at P 8 (explaining the establishment in Order No. 889 of the Standards of Conduct to "prevent transmission providers from" discriminating "in favor of their marketing affiliates"); *id.* at P 9 (describing Order No. 2003's finding that "interconnection service plays a crucial role in bringing generation into the market to meet the growing needs of electricity customers and competitive electricity markets").

[22]    Complaint at 22-24; Avangrid Answer at 14-18; *Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220 at P 47 (2015) (finding that the interconnection customers of an affected system operator and the interconnection customers of a directly-connected transmission owner are similarly situated, and that the comparability principle requires similarly situated customers to be treated comparably in the transmission planning context), *order on reh'g,* 153 FERC ¶ 61,352 (2015), *order on reh'g*, 156 FERC ¶ 61,099 (2016), *vacated and*

10

**JA443**

In addition to violating the Commission's open access regulations and precedent,

NextEra is also violating the ISO-NE OATT, which provides the Commission with another

source of authority to put an end to NextEra's anticompetitive behavior.  The ISO-NE OATT

requires that an Affected Party under these circumstances, upon the request of the

interconnection customer, "*shall offer* the Interconnection Customer, an E&P Agreement that

authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering

and procurement of long lead-time items necessary for the establishment of the

interconnection."[23]  While NextEra has conceded it is subject to this obligation,[24] it has yet to

begin engineering and procurement for the Seabrook Breaker Replacement.  Moreover, NextEra

has taken the position that while it is obligated to enter into an agreement to engineer and

procure the facilities and materials necessary for the Seabrook Breaker Replacement, it has no

obligation to follow through and actually build the Seabrook Breaker Replacement, a strained

interpretation of the ISO-NE OATT that would render the requirement meaningless.[25]  In other

---

*remanded*, *Ameren Servs. Co. v. FERC*, 880 F.3d 571 (D.C. Cir. 2018), *order on remand*, *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158 at P 34 (2018) (noting that the Court in *Ameren* did not overturn the Commission's determination that the interconnection customer of an affected system operator and the interconnection customer of a directly-connected transmission owner are similarly situated customers to be treated comparably in the transmission planning context), *order on compliance and addressing arguments raised on reh'g*, 172 FERC ¶ 61,248 (2020); *Nevada Power Co.*, 97 FERC ¶ 61,227 (2001), *reh'g denied*, 99 FERC ¶ 61,347 (2002); *Am. Elec. Power Serv. Corp.* 102 FERC ¶ 61,336 (2003) (finding an interconnection customer's pending request to interconnect and obtain open access to the transmission system cannot be "held hostage" to the obstacles faced in seeking cooperation of an affected system to construct upgrades).

[23]    Complaint at 24 (quoting Schedule 25 to the ISO-NE OATT, § 9 (emphasis added)).

[24]    NextEra Answer at 26 ("Seabrook does not dispute that the Tariff requires an Affected Party to enter into an E&P Agreement if requested by the Interconnection Customer.").

[25]    NextEra Answer at 26-27; Avangrid Answer at 11.  What is more, NextEra has continued to refuse to enter into an E&P agreement despite its recognition of its obligation to do so.  Avangrid Answer at 11 ("As recounted in the Complaint and accompanying Dickinson Affidavit, Avangrid did request such an agreement, but NextEra insisted on including its unreasonable terms requiring

11

**JA444**

words, NextEra has taken the position that it may block the interconnection of a competitor with impunity by refusing to construct a facility that is necessary for the competitor to interconnect and for which the competitor has agreed to pay.  This is no different from a Transmission Owner anticompetitively refusing to implement a network upgrade necessary for a generator to interconnect.  The Commission has the authority to prevent this misconduct pursuant to its open access regulations, Commission precedent and the ISO-NE OATT, and may further address this misconduct with its investigative authority.

**B.     The Commission should order NextEra to immediately commence planning and engineering that is necessary for construction of the Seabrook Breaker Replacement during the 2023 Outage.**

In light of the immediate relief that Avangrid requires, at a minimum, the Commission should order NextEra to begin planning and engineering for the Seabrook Breaker Replacement immediately, so that NextEra cannot claim that its internal procedures prevent it from moving forward.[26]  This is the most pressing step.  Should the Commission require more time to consider the facts and legal arguments raised in this proceeding, it can issue supplemental orders accordingly.

**C.     The Commission should order additional relief requiring NextEra to take reasonable steps to complete the Seabrook Breaker Replacement.**

In addition to an order paving the way for construction to take place during the 2023 Outage by requiring NextEra to begin engineering and planning now, the Commission should order NextEra to take the other steps necessary for constructing the Seabrook Breaker Replacement.  To the extent that NextEra claims that planning and engineering assessment must

---

Avangrid to pay for lost opportunity costs and other consequential costs.") (citing Complaint at 27 n.88; Dickinson Aff. at PP 61-63).

[26]     *See* Schedule 25 to the ISO-NE OATT, § 9.

be conducted when Seabrook Station is not operating, NextEra should be required to use the 2021 Outage to enable the appropriate expert or vendor to perform any such planning and engineering assessment.  Avangrid respectfully requests that the Commission issue the following relief, as modified from the relief requested in the Complaint:  (i) order NextEra to comply with its interconnection obligations as an Affected Party and/or Affected System under the ISO-NE OATT; (ii) direct NextEra to cease and desist all attempts to block, delay or unreasonably increase the costs associated with the interconnection of the NECEC Project to the Administered Transmission System; (iii) require the adoption of the attached Affected System Agreement;[27] and (iv) temporarily revoke NextEra's blanket waiver under Part 358 of the Commission's regulations (with a permanent revocation pending the outcome of further fact-finding).  The Commission may also choose to initiate an investigation and require NextEra to preserve and provide documents related to the interconnection of the NECEC Project.[28]

To make the Commission's task as easy as possible with respect to the above step (iii), Avangrid attaches hereto the latest draft of the Affected System Agreement that was proposed by

---

[27]    Avangrid had previously requested that the Commission order NextEra to file the Affected System Agreement unexecuted.  Complaint at 41.  Now that the Affected System Agreement is already before the Commission in this proceeding, Avangrid requests that the Commission exercise its power under FPA section 206 to order NextEra to execute the Updated Affected System Agreement attached as Exhibit A to this Amended Complaint, which contains reasonable terms.

[28]    While Avangrid suggested to the Commission a potentially efficient path for awarding the most pressing relief first, *see* Avangrid Answer at 7-8, given the changed circumstances, this path is not necessary, although the Commission of course possesses the authority to prioritize the pieces of relief that are most urgent as it sees fit.  As explained herein, the most urgent next step is for NextEra to begin engineering and scoping necessary for construction of the Seabrook Breaker Replacement immediately, given its nearly two-year self-imposed lead time for beginning such work.

NextEra and has proposed a minimal number of reasonable revisions.[29]  As explained more fully in the Supplemental Affidavit of Thorn Dickinson, the Updated Affected System Agreement includes updates to certain provisions to reflect the necessity of constructing the Seabrook Breaker Replacement during the 2023 Outage; removes the objectionable language from NextEra that would have made Avangrid liable for all costs, including lost profits and penalties resulting from an extended outage; extends the agreement to cover all of the Seabrook Breaker Replacement, including planning and construction (whereas the NextEra draft would have covered only design and engineering); and provides for milestones to be met along the way.[30]

> ### D.    The Commission should not be fooled by NextEra's alarmist rhetoric.

NextEra may continue to seek to stymie Commission action on this Amended Complaint by raising nuclear safety concerns that have no merit.  As explained in the McBurnett Affidavit, NextEra can safely construct the Seabrook Breaker Replacement and, in preparation for that construction, can conduct all of the necessary preliminary engineering and planning in between now and the 2023 Outage while also using the 2021 Outage for any pre-construction planning that cannot be done while Seabrook Station is in operation.[31]  The Seabrook Breaker Replacement is "not an unusual or exotic project," it is "in an area of the plant with minimal conflicts with other outage work," its location is "not in a radiation-controlled area," and "neither

---

[29]    *See* Updated Affected System Agreement.  Avangrid has attached the Updated Affected System Agreement as Exhibit A and a redline of the Updated Affected System Agreement against the draft that Avangrid proposed in August 2020 as Exhibit B to this Amended Complaint.

[30]    *See* Supplemental Affidavit of Thorn Dickinson, attached hereto as Exhibit C ("Supplemental Dickinson Aff."), at PP 7-22.

[31]    McBurnett Affidavit at 3:10-4:13.

the generator breaker nor the work necessary for the installation are particularly unique to nuclear power and not practically different from any other steam electric plant."[32]

## V.    CONCLUSION

NextEra has used the need for the Seabrook Breaker Replacement to delay the NECEC Project potentially indefinitely.  NextEra has made no secret of its strident opposition to the NECEC Project, and it has become clear that delaying the Seabrook Breaker Replacement has become yet another front in the crusade to prevent the interconnection of a transmission line that would bring 1,200 MW of renewable power to New England.  Failing to take prompt action would reward NextEra for anticompetitive behavior and incentivize other market participants to do the same in the future.

Avangrid respectfully requests that the Commission grant the relief requested in the Complaint, as modified by this Amended Complaint.  No action by the Commission would inevitably lead to continued delay to the sole benefit of NextEra.  It would also send other market participants who might be incentivized to use their market position as leverage to benefit their own commercial activities a loud and clear message that there are no consequences for such actions.  This would be antithetical to the Commission's expressed commitment to open access and competitive markets.  Accordingly, Avangrid respectfully requests that the Commission grant the relief requested herein no later than May 7, 2021.

---

[32]    *Id.* at 3:11-3:18.

15

Respectfully submitted,


/s/ Nicholas J. Cicale                           /s/ David L. Schwartz
Nicholas J. Cicale                               David L. Schwartz
Attorney                                         James B. Blackburn
Avangrid Service Company                         Richard H. Griffin
180 Marsh Hill Road                              Latham & Watkins LLP
Orange, CT 06477                                 555 Eleventh Street, NW
                                                 Suite 1000
                                                 Washington, DC 20004

*Counsel for Avangrid, Inc. and NECEC Transmission LLC*


Dated:  March 26, 2021

16

**JA449**

**<u>Certificate of Service</u>**

I hereby certify that I have this day served the foregoing document upon each person

designated on the official service lists compiled by the Secretary of the Commission in these

proceedings.

Dated at Washington, DC this 26th day of March, 2021.


*/s/ Richard H. Griffin*
Richard H. Griffin
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

**JA450**

# EXHIBIT
# D

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | |
|---|---|
| NECEC Transmission LLC and Avangrid, Inc., <br>                  Complainants <br><br> v. <br><br> NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC, <br>                  Respondents | Docket No. EL21-6-000 |

**AFFIDAVIT OF MARK MCBURNETT FOR AVANGRID, INC. AND NECEC TRANSMISSION LLC**

I, Mark McBurnett, being duly sworn, depose and say as follows:

1  My name is Mark McBurnett.  I am an independent consultant and hold a Bachelor of Science

2  Degree and a Master of Engineering Degree in Nuclear Engineering.  I am a licensed Professional

3  Engineer in the state of Texas.  Currently, I have been engaged by Avangrid to provide expert

4  testimony regarding the replacement of the generator circuit breaker at Seabrook nuclear station.

5  I have 40+ years of professional experience in Nuclear Regulatory Commission ("NRC")

6  regulations and nuclear plant operations and have held leadership and executive positions in the

7  nuclear power industry including nuclear plant licensing, oversight, and outage management.  I

8  worked in the initial licensing of the Tennessee Valley Authority's Sequoyah nuclear station and

9  afterward spent 25 years at the South Texas Project, which consists of two 1,350 MW electric

10  nuclear units located 90 miles south of Houston Texas, through construction, licensing, startup,

11  and operation.  During 1993 and 1994, I spent one year with the Institute of Nuclear Power

12  Operations in Atlanta performing oversight of nuclear plant operation and outages.  In 2007, I

**JA452**

1    began working on the development of new reactors for construction at the South Texas Project site

2    and in 2012 became Chief Executive Officer of Nuclear Innovation North America, the

3    development company for the new plants.  Engineering, procurement, and construction contracts

4    were signed, the units were licensed, and later cancelled due to market conditions.

5    **1.    Nuclear Operators have processes and procedures in place, that if invoked, allow for**

6    **flexibility and controlled deviation from self-prescribed outage planning milestones.**

7    **a.   Explain industry standards / common practices that support this position.**

8    Nuclear power stations maintain comprehensive procedures and guidance documents that

9    govern planning, preparation and conduct of outages with the goals of ensuring safety and

10    balancing cost and duration consistent with corporate goals.  Operators of nuclear power

11    stations typically manage outages with large logic-tied critical-path-based networks which

12    may include tens of thousands of individual activities.  These activities are sequenced and

13    logically tied to ensure required equipment remains operable and work is completed safely,

14    efficiently, and effectively.  The procedures and guidance documents typically establish a

15    scope freeze milestone for outage preparation and planning to ensure that the scope is

16    solidified early so that a preliminary framework for the schedule can be set to allow

17    required engineering, design, and procurement to proceed to support the outage.  This

18    milestone is typically about 2 years prior to the outage.

19    The scope freeze locks down the list of activities to be performed in an outage so the

20    planning process can proceed and effectively focuses the plant organization on a finite list.

21    At scope freeze it is necessary to have some high level technical information to help

22    estimate the duration of work to be performed, identify associated constraints or conflicts

23    with other work, and have sufficient knowledge of the required engineering, design, and

2

**JA453**

1   procurement to be confident that remaining work can be completed within the post-scope

2   freeze outage planning schedule.   The time required for specifying, procuring, and

3   fabricating long lead items must be considered.

4   Plant operational needs and other events can justify the need for deviations from outage

5   planning milestones.  For example, scope additions after the freeze must be considered for

6   items of particular importance.  In cases where deviations are needed, contingency plans

7   and additional oversight may be applied to compensate for the schedule deviation.

8   **b. Explain actions NextEra could take in light of these practices to ensure the Seabrook**

9   **Breaker is replaced during the April 2023 refueling outage.**

10   The replacement of the generator circuit breaker at Seabrook Station (Seabrook Breaker

11   Replacement) is not an unusual or exotic project.  It is in an area of the plant where

12   replacement work would pose minimal conflicts with other outage work, and with the

13   station offsite power source shifted to the Reserve Auxiliary Transformers (RATs), work

14   on the Seabrook Breaker Replacement would have minimal restraints on normal outage

15   activities.  The work location is not in a radiation-controlled area and neither the generator

16   breaker nor the work necessary for the installation are particularly unique to nuclear power

17   stations and not practically different from construction work on any other steam electric

18   plant. Sufficient details are available from electric power industry experience to determine

19   a reasonable estimate for the time required for the actual work as well as pre-outage

20   engineering, design, procurement, and fabrication.  For instance, I understand that during

21   the consultation with a well-known breaker vendor discussed in Glen Palmer's affidavit, it

22   was learned that this vendor could complete construction of the Seabrook Breaker

23   Replacement within approximately 23 days. *See* Palmer Aff. at page 6, line 2. It is my

3

**JA454**

1    understanding that completion of construction of the Seabrook Breaker Replacement

2    within 23 days would fall within NextEra Energy Resources, LLC's ("NextEra") planned

3    outage period for Seabrook Station in April 2023. This vendor has significant

4    contemporary experience in the design, engineering, and installation of generator circuit

5    breakers and can manufacture an uprated generator breaker to NextEra's specifications for

6    Seabrook Station, engineer, help plan, and construct the Seabrook Breaker Replacement

7    safely and within the planned April 2023 Refueling Outage period.

8    The Seabrook Breaker Replacement should be added to the outage planning scope for the

9    April 2023 Refueling Outage prior to the scope freeze (June 2021) so that the necessary

10   engineering can be completed to design and procure the Seabrook Breaker and associated

11   support equipment. In parallel with these activities, NextEra should be addressing the

12   issues identified in INPO IER 14-20 to ensure the work is completed safely, efficiently,

13   and effectively.

14   **2. NextEra has sufficient time to complete engineering, procurement, and construction of**

15   **the Seabrook Breaker Replacement during the April 2023 Refueling Outage in a manner**

16   **that is safe and complies with INPO IER 14-20.**

17   **a. So long as NextEra observes Good Utility Practice and employs practices ensuring**

18   **the safe removal of the Seabrook Breaker and safe installation of the Seabrook**

19   **Breaker Replacement, NextEra will be able to complete the Seabrook Breaker**

20   **Replacement during the April 2023 Refueling Outage without running, the risk of, or**

21   **creating an event that causes, personal injury and/or property damage that delays the**

22   **timely return of the plant to service.**

4

**JA455**

1   Based on review of Seabrook Station's electrical design as described in the station Updated

2   Final Safety Analysis Report and Technical Specifications,[1] once the station loads are

3   shifted to the Reserve Auxiliary Transformers, the NRC General Design Criteria (GDC)

4   17 requirements are satisfied, and work on the Seabrook Breaker can proceed in parallel

5   with the other outage activities.  While a generator breaker is not replaced very often during

6   a nuclear station's useful life, the work comprising its replacement is not unusual or exotic.

7   The work location is not in a radiation-controlled area and neither the generator breaker

8   nor the work necessary for the installation are particularly unique to nuclear power and not

9   practically different from a fossil plant.  There is no reason this work cannot be completed

10  safely while observing Good Utility Practice and INPO IER 14-20, which will ensure

11  prevention of (1) injuries, (2) equipment damage, and (3) outage extension.

12  **3.  NextEra's assumptions regarding NRC General Design Criteria 17 are wrong.**

13  **a.  Explain what NRC General Design Criteria 17 are, what they require, and how they**

14  **may apply to Seabrook Station.**

15  The NRC GDCs are delineated in Appendix A of 10 C.F.R. 50 and establish the first-

16  principle design criteria for light water reactors.  NRC regulation related to light water

17  reactors and light water reactor design evolves from these first principles. GDC 17 is for

18  Electric Power Systems and in part requires two independent sources of offsite power.

---

[1] NextEra Energy Seabrook, LLC, Updated Final Safety Analysis Report, Nuclear Regulatory Commission Agencywide Documents Access and Management System ("ADAMS") accession number ML16176A255 ("Seabrook UFSAR"); Nuclear Regulatory Commission, NextEra Seabrook, LLC Renewed Facility Operating License, ADAMS accession number ML053130320 ("Seabrook RFOL").

5

**JA456**

1    Seabrook Station's licensing basis as documented in the Updated Final Safety Analysis

2    Report[2] describes how the design complies with GDC 17, and Seabrook Station's Renewed

3    Facility Operating License Appendix A, Plant Technical Specifications,[3] set the minimum

4    conditions for the offsite and onsite power sources during shutdown and refueling periods

5    as: "One circuit between the offsite transmission network and the onsite Class 1E

6    Distribution System and One Diesel generator." (Class 1E is regulatory nomenclature for

7    safety related electrical equipment).

8    Seabrook Station has two offsite sources to the station electrical loads including the safety

9    buses.

10   1. Switchyard via the generator step up transformer to the two Unit Auxiliary

11      Transformers (UAT) via the isophase bus. During a plant trip/shutdown, the opening

12      generator circuit breaker allows the UATs to power all station loads including the safety

13      busses from the switchyard with no interruption.

14   2. Switchyard via two RATs to the station loads including the safety busses.

15   Power supplied through the RATs is not affected by the work on the Seabrook Breaker;

16   therefore, the GDC 17 requirements are satisfied in the outage as specified in the operating

17   license.

18   **b. Explain concern regarding existing Generator Circuit Breaker compliance with GDC**

19      **17.**

---

[2] Seabrook UFSAR.

[3] Seabrook RFOL.

6

**JA457**

1    Compliance with GDC 17 is predicated on the reliability of the generator breaker to open

2    during conditions as it is intended and designed, including to allow uninterrupted power to

3    the Auxiliary Transformers and plant loads from the grid.  Failure of the generator breaker

4    to open when required will cause switchyard breakers to open, interrupting power to the

5    UATs and plant loads.  As discussed in Tracy Rolstad's affidavit, the Seabrook Breaker

6    has very little margin and may not be capable of performing its design function, which

7    could reflect a concern that the station design is not in compliance with GDC 17.  As such

8    the NECEC Project represents a good opportunity for NextEra to replace the Seabrook

9    Breaker to preclude a potential plant regulatory issue and ensure compliance with the NRC

10   GDC 17 criteria.

11

12

13

7

**JA458**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| NECEC Transmission LLC and<br>Avangrid, Inc.,<br>　　　　　　Complainants<br><br>　　　v.<br><br>NextEra Energy Resources, LLC and<br>NextEra Energy Seabrook, LLC,<br>　　　　　　Respondents | )<br>)<br>)<br>)<br>)　　Docket No. EL21-6-000<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF MARK MCBURNETT

I, Mark McBurnett, being duly sworn, depose and state that the contents of the foregoing Affidavit are true, correct, accurate and complete to the best of my knowledge, information and belief.

Mark McBurnett[1]

---

[1] Pursuant to the Commission's Supplemental Notice Waiving Regulations issued on January 22, 2021, in Docket No. AD20-11-000, the signed verification accompanying this affidavit has not been notarized.

# EXHIBIT E

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| NECEC Transmission LLC and Avangrid, Inc., | ) ) ) | |
| Complainants | ) ) | |
| | ) | Docket No. EL21-6-000 |
| v. | ) ) | |
| NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC, | ) ) ) | |
| Respondents | ) ) ) | |

**AFFIDAVIT OF GLEN PALMER FOR AVANGRID, INC. AND**
**NECEC TRANSMISSION LLC**

I, Glen Palmer, being duly sworn, depose and say as follows:

1    My name is Glen Palmer.  My address is 7 Caswell Drive, Greenland, NH 03840.  I am

2    an Executive Consultant with Pegasus-Global Holdings, Inc. (Pegasus-Global) with extensive

3    experience in analysis of corporate project management approaches, project estimate

4    validation, planning and scheduling auditing, earned value auditing, change control program

5    evaluations, project controls' procedure writing, and training of client personnel in project

6    controls' tools. I have over 40 years of experience with all aspects of managing engineering

7    and construction of large and complex energy and power projects, including over 35 years of

8    experience with actively planning, coordinating and managing various aspects of project

9    controls' functions on lump sum EPC projects.  My experience includes analysis and assistance

10   in resolution of disputes, including expert testimony on power, commercial,

11   infrastructure/transportation, and process projects, globally.  I was assigned to the construction

12   of the Seabrook Station from 1978 to 1986 while with United Engineers & Constructors, Inc. I

1

**JA461**

1    started out as a member of the cost control department where my main duty was tracking pipe

2    installation for the plant. After a couple of years, I was transferred to a detailed scheduling

3    group where I prepared level IV schedules for the containment critical paths. After several

4    years in that capacity, I was chosen to work on United Engineers' lump sum contracts.

5    Seabrook's owner at the time, Public Service Company of New Hampshire, was going through

6    financial difficulties and asked United Engineers to finish five buildings (Waste Processing

7    Building, Diesel Generator Building, Control Building, Fuel Storage Building, and Cooling

8    Tower) on a lump sum basis. Initially, I was charged to walk down each building, marking up

9    drawings and estimating the completion effort. Later I prepared the detailed schedules to

10   complete the work for each building. I also assisted in concrete placement supervision during

11   this time.  After completing the lump sum work, I was asked to supervise the containment

12   insulation work and worked in this capacity until I left the project in 1986.

13       My dispute resolution expertise in the construction industry includes schedule delay

14   analyses, productivity analyses, cumulative impact analyses, project management evaluations,

15   damage calculations and scope change management analyses on most types of power plants

16   including nuclear, combined cycle, simple cycle, coal, and geothermal. I am a certified

17   Planning & Scheduling Professional (PSP) and have an extensive background in all methods of

18   time impact analyses, including the Window Analysis. I am also a Certified Forensic Claims

19   Consultant (CFCC), one of less than 100 certified CFCCs worldwide. I have an extensive

20   background in productivity impact analyses, including the Measured Mile. I have been an

21   expert witness on several dispute resolution cases, testifying in depositions, mediations,

22   arbitrations and in court before juries.

2

**JA462**

1    The purpose of my affidavit is to document an independent review of the documentation

2    submitted in Docket No. EL21-6-000 before the Federal Energy Regulatory Commission to

3    assess whether or not NextEra Energy Resources, LLC's ("NextEra") planning procedures and

4    protocols as referenced within the filings, as well as the guidelines stated in INPO IER 14-20,

5    Integrated Risk – Healthy Technical Conscience could be adhered to if NextEra commits to

6    replacing the generator circuit breaker at Seabrook Station (the "Seabrook Breaker") during the

7    facility's April 2023 Refueling Outage (the "Seabrook Breaker Replacement").

8    As part of NECEC Transmission LLC ("NECEC Transmission") and Avangrid, Inc.'s

9    project to develop a 1,200 MW HVDC transmission line to import clean hydro power from

10    Québec into Maine ("NECEC Project"), a System Impact Study ("SIS") was performed for

11    ISO New England Inc. by RLC Engineering.  This study indicates that prior to the NECEC

12    Project, the Seabrook Breaker was operating at 99.6% of its capability, and with the NECEC

13    Project in service, the Seabrook Breaker would operate at 101.2% of its capability.[1]  The

14    Seabrook Breaker's presumed 10% design margin had been utilized by NextEra during

15    Seabrook Station's prior power uprates without being replaced.[2]  Further uprate was not

16    possible, so the Seabrook Breaker must be replaced.

17    In order to confirm my opinions regarding this work, I benchmarked the milestones

18    provided in NextEra's filings in this proceeding with the experience of a leading provider of

19    turnkey generator circuit breakers in large thermal and nuclear facilities, to ensure my

20    interpretations and the schedule as stated by NextEra were, in fact, achievable.

---

[1] SIS at 66.

[2] Rolstad Affidavit at 4:20-5:2.

1    I focused my evaluation of whether this work could be planned and executed in time for

2    the April 2023 Refueling Outage. In doing so, I relied on the information received from a

3    breaker vendor, whose opinion was that there was adequate time to engineer, procure and

4    replace the Seabrook Breaker during the April 2023 Refueling Outage. The information

5    received from the breaker vendor was reviewed with the Pegasus team and confirmed my

6    opinion that this work is completely achievable based on the information that is known today.

7    The Pegasus team review also took into account the NextEra milestones referenced in its

8    filings in this proceeding as well as the NextEra internal procedures. These milestones were

9    reviewed in conjunction with the efforts and timeframes required to properly scope, engineer,

10    procure, plan and schedule, and execute the Seabrook Breaker Replacement between now and

11    the end of the April 2023 Refueling Outage. This review concluded that it is possible for

12    NextEra to complete this work within its own requirements, as long as it begins work

13    promptly.  However, even if NextEra delays making the basic decision to place the Seabrook

14    Breaker Replacement on the outage planning list, that should not preclude NextEra from

15    moving forward in the course of the next two to three months.  NextEra can make up for lost

16    time so long as a turnkey vendor is engaged before the October 2021 Refueling Outage. I have

17    reviewed the milestones proposed by NECEC Transmission attached as Exhibit B to the

18    proposed Updated Affected System Agreement, and I agree that these milestones are

19    reasonable.

20    Step one of this process calls for NextEra to add the Seabrook Breaker Replacement to its

21    outage plan. Under NextEra's procedures as described by NextEra in this proceeding, NextEra

22    decides what will be involved in a refueling outage two years in advance. Under NextEra's

1    step two, NextEra will apply a "scope freeze" for the April 2023 Refueling Outage by the end

2    of May 2021 (approximate date), which is 22 months prior to the refueling outage.

3        Once the first two steps are complete, NextEra will start the Seabrook Breaker

4    Replacement process, which leads into the vendor purchase order and the engineering and

5    procurement activities. NextEra's procedures state that all purchase orders for long lead

6    equipment, critical materials and services should be placed approximately 12 months prior to

7    an outage.

8        Also 12 months prior to an outage, NextEra's procedures state that all approved design

9    change packages will be issued, verified, and validated and given to the respective discipline

10   planner for work package preparation.

11       Finally, pursuant to NextEra's procedures, all planned parts will be onsite and ready for

12   use one month prior to the refueling outage.

13       The vendor who advised Pegasus in this review is an industry leader in manufacturing

14   and supplying generator breakers to the nuclear industry and is experienced in replacing

15   generator breakers as a turnkey service at nuclear facilities. The Pegasus team held a

16   benchmarking discussion with the vendor to discuss their experience and capabilities in

17   performing this work. During that discussion we learned that they have performed similar work

18   on multiple occasions successfully. They are currently involved in the replacement of a

19   generator breaker at a separate nuclear facility. They achieve success in this work by using

20   dedicated teams of trained personnel who are authorized to work within nuclear facilities.

21   Although the Seabrook Breaker Replacement would be a first for Seabrook Station, it would

22   not be for the vendor that Pegasus reviewed this work with, and by using an outside team there

23   would be very little impact on Seabrook's refueling outage resources.

1    The vendor provided scheduling information and indicated that NextEra could perform

2    the Seabrook Breaker Replacement in approximately 23 days, which I understand is within

3    Seabrook Station's planned outage period for April 2023. Execution would require proper

4    planning, which means that they may want to perform a site survey during the October 2021

5    Refueling Outage. They would also need to have an agreement for engineering, design,

6    manufacturing, logistics and outage execution finalized by the end of September 2021. If

7    NextEra observes Good Utility Practice, meeting or beating these milestones is reasonable.

8    The Pegasus evaluation illustrates that the replacement work is achievable while

9    meeting NextEra's processes and procedures. Breaker vendors that are experienced in

10   replacing generator breakers at nuclear facilities have a demonstrated track record and

11   expertise, giving their estimate a firm grounding in experience and in-depth knowledge.  While

12   it is possible for NextEra to meet all of its internal steps if it acts in a timely manner, the use of

13   experienced turnkey vendors for the Seabrook Breaker Replacement provides flexibility to

14   NextEra, and a minor setback at the beginning of their process would not require replacement

15   to be delayed even further.

6

**JA466**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | |
|---|---|
| NECEC Transmission LLC and ) | |
| Avangrid, Inc., ) | |
|          Complainants ) | |
| ) | Docket No. EL21-6-000 |
|    v. ) | |
| ) | |
| NextEra Energy Resources, LLC and ) | |
| NextEra Energy Seabrook, LLC, ) | |
|          Respondents ) | |
| ) | |
| ) | |

**AFFIDAVIT OF GLEN PALMER**

    I, Glen Palmer, being duly sworn, depose and state that the contents of the foregoing Affidavit are true, correct, accurate and complete to the best of my knowledge, information and belief.

_____
Glen Palmer[1]

---

[1]    Pursuant to the Commission's Supplemental Notice Waiving Regulations issued on January 22, 2021, in Docket No. AD20-11-000, the signed verification accompanying this informational report has not been notarized.

# EXHIBIT F

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| NECEC Transmission LLC and Avangrid, Inc., Complainants<br><br>v.<br><br>NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC, Respondents | Docket No. EL21-6-000 |

**AFFIDAVIT OF TRACY ROLSTAD FOR AVANGRID, INC. AND NECEC TRANSMISSION LLC**

I, Tracy Rolstad, being duly sworn, depose and say as follows:

1   My name is Tracy Rolstad.  I am employed as a Technical Director by Power Systems

2   Consultants, Inc, Suite 300, 4010 Lake Washington Blvd, Kirkland, WA 98033.  I have been

3   retained as an Executive Consultant to Pegasus-Global Holdings, Inc. (Pegasus-Global) and have

4   more than 30 years of experience in power plant operations, transmission system planning and

5   operations planning.  I provide clients strategic guidance in power system planning, modeling,

6   and compliance with the NERC Reliability standards.  I have held numerous leadership positions

7   in the Western Electricity Coordinating Council (WECC), and currently serve as Chair of the

8   System Review Subcommittee.  My subject matter expertise is in transmission planning and

9   compliance with NERC Reliability standards.

10   I served as a Chief Petty Officer (Nuclear) for the Submarine Service in the United States

11   Navy, from 1980-2003 and then moved on to become a Senior Analyst at the Joint Warfare

12   Analysis Center for six years.  I then became a Senior Electrical Engineer at the Bonneville

1    Power Administration and then a Principal Planning Engineer at Utility System Efficiencies.

2    Starting in 2008, I was a Senior Power System Consultant for Avista Utilities until 2019. My

3    present employment is as the Technical Director for Power Networks (North America) for Power

4    Systems Consultants, Inc. Additionally, I serve as the Chair of the Western Electricity

5    Coordinating Council System Review Subcommittee (WECC SRS). The WECC Short Circuit

6    Modeling Work Group reports to WECC SRS on short circuit modeling activities within the

7    WECC footprint.

8        The purpose of my affidavit is to document an independent review of the documentation

9    submitted in Docket No. EL21-6-000 before the Federal Energy Regulatory Commission to

10   assess the history of the generator circuit breaker at Seabrook Station ("Seabrook Breaker") and

11   whether or not it requires replacement.  It does need to be replaced and has needed replacement

12   for some time.  It is my opinion that the existing Seabrook Breaker may represent an

13   unacceptable condition under NERC's Transmission Reliability Planning Standard, TPL-001-5

14   and could be a risk to the grid and to the plant itself.[1] In a March 30, 2009 advisory report,

15   NERC stated that "[p]rotection system component failures may render a protective scheme

16   inoperative, which could result in N-1 transmission system contingencies evolving into more

17   severe or even extreme events."[2]

18       The continued operation of the Seabrook Breaker in its current condition is contrary to

19   Good Utility Practice.

---

[1] NERC, Transmission System Planning Performance Requirements, TPL-001-5,
https://www.nerc.com/pa/Stand/Reliability%20Standards/TPL-001-5.pdf.

[2] NERC, Industry Advisory, Protection System Single Point of Failure, at 2 (Mar. 30, 2009),
https://www.nerc.com/pa/rrm/bpsa/Alerts%20DL/2009%20Advisories/A-2009-03-30-01.pdf.

1    Seabrook Station was placed in service in August of 1990 and is serviced with three

2    345kV lines, which are called Seabrook – Scobie Pond (Line 363), Seabrook – Newington

3    (Timber Swamp, Line 369), and Seabrook – West Amesbury (Tewksbury Ward Hill, Line 394).

4    Seabrook Station is connected to the grid via the generator step up transformer.  On the

5    primary side (low voltage) of the transformer, a generator breaker is installed between the

6    transformer and the generator.

7    The existing Seabrook Breaker is an air blast type and is obsolescent technology.  The

8    original rating of the Seabrook Breaker was 150 kA for fault interrupting duty.  Subsequent to

9    commissioning, the owners of Seabrook Station requested and received from the Nuclear

10   Regulatory Commission ("NRC") approvals for power uprates.  In 2004, the "Stretch Power

11   Uprate" increased thermal and electrical output of Seabrook Station from 3411 MWt to 3587

12   MWt (plus 5.2%) and from 1295 MWe to 1318 Mwe (plus 23 MWe, or 1.8%).  This increase in

13   MW output causes an increase in sub-transient reactance, reducing short circuit contribution

14   from the generator from 5877 Amps to 5672 Amps, or 3.5%.  The Stretch Power Uprate report

15   (LAR 04-03) states that the uprate "will not have a significant adverse effect on the reliability or

16   operating characteristics of the station or on the offsite electrical system."[3]

17   An engineering exercise performed by General Electric (GE) in 2004 (GE Phase 2 Final

18   Report Rev 5) established that the Seabrook Breaker had a nominal margin of 0.35% short circuit

19   capability.  In April 2009, the breaker was "upgraded" from 150 kA to 160 kA via an Areva

20   technical letter, and then in May 2016 the breaker was again "upgraded" via a GE technical letter

21   to 165kA.[4]  This was achieved not through physical modifications but was in effect an erosion of

---

[3] Seabrook Station Stretch Power Uprate Report, LAR 04-03, § 8.4.16.7, https://www.nrc.gov/docs/ML0408/ML040860307.pdf.

[4] Siemens PTI Report number:  R031-16, at 2 (Oct. 26, 2016).

1    the design margin of circuit breaker that was imbedded into the original design.  In other words,

2    Seabrook twice "upgraded" the interrupting capability of the Seabrook Breaker on "paper"

3    without actually uprating the breaker physically or mechanically at all. In effect, this paper

4    exercise increased the available breaker capability solely on the basis of changes in assumptions

5    rather than in mechanical modifications.  These "upgrades" allowed Seabrook to exceed the

6    original factory limitation on the generator breaker by up to 15 kA.  Doing so allowed Seabrook

7    Station to significantly increase the short circuit capability borne by the generator breaker

8    without having to arrange for the uprate or replacement of the Seabrook Breaker.

9        Siemens was retained by NextEra Energy Resources, LLC ("NextEra") to perform a

10   review of the short circuit duty of the Seabrook Breaker in 2016.[5]  For modeling Case 4 in Table

11   1 of the Siemens Report, the highest three phase fault current for the original ISO-NE cases

12   indicates that the maximum capability of the Seabrook Breaker is 164,414.5 Amps (for 2021

13   TPL-001-4 compliance work).[6]  This represents 99.65% of the rated capacity of 165,000 Amps.

14   Because there is effectively no additional interrupting capability on the Seabrook Breaker to

15   accommodate any further short circuit current, Seabrook Station's current condition guarantees

16   that any additional short circuit current will exceed the Seabrook Breaker's interrupting

17   capability.

18        Continued operation under these conditions represents a risk to the grid and to Seabrook

19   Station itself.  The Seabrook Breaker has needed replacement, both before and regardless of the

20   interconnection of the NECEC Project.  The presumed original 10% design margin (the 15 kA

21   increase from 150 kA to 165 kA represents 10% of the original 150 kA rating) has been eroded

---

[5] *Id* at 1.

[6] *Id.* at 33.

1   through changes in the electrical system that serves Seabrook Station and nonphysical breaker

2   "uprates."

3        Good Utility Practice requires that the generator breaker fault current be mitigated via

4   fault reduction schemes or breaker replacement.  The Salt River Project ("SRP"), a government

5   owned utility in Arizona, shows an analogous example of Good Utility Practice in regards to the

6   operation and planning of circuit breakers: "SRP requires that a short-circuit issue shall be

7   mitigated when the calculated fault duty exceeds 95% of breaker's rating or if the calculated

8   fault duty exceeds the substation bus work mechanical strength load limits.  The selection of

9   95% of breaker rating incorporates a 2% margin of error for equipment (per Apparatus

10   Engineering) as well as an additional 3% margin for uncertainty in Aspen Modeling parameters

11   (per Transmission Planning Strategy and Development)."[7]

12        NextEra's own Lone Star Transmission, LLC affiliate requires 20% breaker interrupting

13   duty margin for a generator to interconnect to the grid.[8]

14        As a matter of comparison, the Palo Verde Nuclear Generating Station project located in

15   Arizona conducted a short circuit analysis that revealed that the fault current interrupting duty of

16   the breakers at Palo Verde could be within 90% of the fault current interrupting duty under

17   certain circumstances.  To resolve this issue, the Palo Verde owners aggressively pursued a 12-

18   ohm series reactor (i.e. series inductor) installation at Palo Verde to mitigate the fault duty to

---

[7] Salt River Project, Guidelines for Electric System Planning (Transmission, Sub transmission, Distribution), at 14, https://www.oasis.oati.com/woa/docs/SRP/SRPdocs/2018_Guidelines_for_Electric_System_Planning_FINAL_10-30-2019.pdf.

[8] LST-FAC-001-PRO Facility_Interconnection_Requirements, 2.1.4 Breaker Duty and Surge Protection, at 5, https://www.lonestartransmission.com/pdf/Lone-Star-Transmission-Facility-Connection-Requirements-.pdf.

1    levels below the 63 kA fault current interrupting capability.[9] Additionally, SRP, the transmission

2    provider to Palo Verde, has in place a 2018 Ten Year Plan,[10] which indicates that SRP plans to

3    add additional fault current limiting series reactors at Palo Verde to increase the series reactor

4    size from 12 ohms to 18 ohms for SRP in order to accommodate the fault current increases over

5    time that occur with the addition of other generation resources and changes to the grid.

6          Further, NextEra has repeatedly emphasized in this proceeding the importance of

7    following the guidance of INPO IER 14-20 in replacing the Seabrook Breaker.[11]  INPO IER 14-

8    20 explains that the root cause of the serious incidents discussed can be traced to "Technical

9    conscience – the personal obligation leaders and individuals internalize and exercise to ensure

10   plant operation, maintenance and engineering activities are conducted in a manner that ***upholds***

11   ***plant design requirements and preserves operating, design, and safety margins*** – was found to

12   be lacking at all levels."[12]  INPO IER 14-20 found that erosion of design margin, lack of risk

13   assessments and lack of testing contributed to the significant incidents examined.[13]

14         Here, the owners of Seabrook Station have twice solicited and obtained calculations to

15   "uprate" the existing Seabrook Breaker while simultaneously eroding the margin in fault current

16   interrupting capability that was imbedded in the original design. A further item of concern is

17   whether the Seabrook substation has adequate mechanical strength to withstand the mechanical

18   forces that might be caused by an increase in fault current.

---

[9] Salt River Project, 2016 Annual Progress Report to WECC, at 2 (2016), https://www.wecc.biz/Reliability/2016-APR-SRP.pdf.

[10] SRP Ten Year Transmission Plan 2018-2027, at 5 (2018), http://www.oasis.oati.com/SRP/SRPdocs/SRP_2018_Ten_Year_Transmission_Plan_Final_v4.pdf.

[11] INPO IER 14-20, Integrated Risk – Healthy Technical Conscience, at 2 (April 29, 2014).

[12] *Id.* at 2 (April 29, 2014) (emphasis added).

[13] *Id.* at 6-9.

1       In the event of failure of the Seabrook Breaker, the 345kV breakers in the switchyard

2   would trip to isolate Seabrook Station and the generator excitation breaker would trip, resulting

3   in a reactor scram and loss of power to the auxiliary transformers, one of the two sources of

4   offsite power required by GDC 17.  The inability of the Seabrook Breaker to perform its

5   intended function may not follow NRC GDC 17, which is also described in the Affidavit of

6   Mark McBurnett.

7       Continued operation under current conditions presents a risk that the Seabrook Breaker

8   may be commanded to operate in an over-dutied situation and that the continued operation of

9   such in its current condition may not be prudent.  Good Utility Practice requires that NextEra

10   should have replaced the Seabrook Breaker long ago. NextEra now has the opportunity to have

11   the Seabrook Breaker Replacement funded by an Interconnection Customer.  However, NextEra

12   does not seem in tune with the reliability requirements of Seabrook Station, but instead seems

13   focused on using the Seabrook Breaker Replacement as a way to prevent or delay the

14   interconnection of the NECEC Project to the ISO New England Inc. wholesale markets.  NextEra

15   is not following Good Utility Practice.  It is maintaining obsolescent equipment to prevent

16   competition from entering the markets. Seabrook Station is not in compliance with NRC GDC

17   17 and should be directed to replace the Seabrook Breaker immediately.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | |
| Complainants | ) | |
| | ) | Docket No. EL21-6-000 |
| v. | ) | |
| | ) | |
| NextEra Energy Resources, LLC and | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| Respondents | ) | |
| | ) | |
| | ) | |

**AFFIDAVIT OF TRACY ROLSTAD**

I, Tracy Rolstad, being duly sworn, depose and state that the contents of the foregoing Affidavit are true, correct, accurate and complete to the best of my knowledge, information and belief.

_/s/ Tracy Rolstad_
Tracy Rolstad[1]

---

[1] Pursuant to the Commission's Supplemental Notice Waiving Regulations issued on January 22, 2021, in Docket No. AD20-11-000, the signed verification accompanying this affidavit has not been notarized.

**JA476**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | |
|---|---|
| NECEC Transmission LLC and )<br>Avangrid, Inc., )<br>    Complainants, )<br> )<br>      v. )<br> )<br>NextEra Energy Resources, LLC, and )<br>NextEra Energy Seabrook, LLC, )<br>    Respondents )<br> )<br> ) | **Docket No. EL21-6-000** |

**NEXTERA ANSWER TO AMENDED COMPLAINT**
**OF NECEC TRANSMISSION LLC AND AVANGRID, INC.**

Pursuant to Sections 206(f) and 213 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (the "Commission" or "FERC"),[1] NextEra Energy Resources, LLC ("NextEra Resources") and NextEra Energy Seabrook, LLC ("Seabrook") (collectively, "NextEra") respectfully submit the following Answer in response to the Amended Complaint[2] of NECEC Transmission LLC ("NECEC") and Avangrid, Inc. ("Avangrid") (collectively, "Complainants") filed in the above-captioned docket on March 26, 2021.  As NextEra demonstrates here, the Amended Complaint should be dismissed as compounding the duplicative nature of the already-duplicative initial complaint,[3] or denied with prejudice.

---

[1]   18 C.F.R. §§ 385.206, 213 (2020).

[2]   *See NECEC Transmission LLC v. NextEra Energy Res., LLC*, Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC and Avangrid, Inc., Docket No. EL21-6-000 (Mar. 26, 2021) ("Amended Complaint").

[3]   *See NECEC Transmission LLC v. NextEra Energy Res., LLC*, Complaint and Request for Shortened Answer Period and For Fast Track Processing of NECEC and Avangrid, Docket No. EL21-6-000 (Oct. 13, 2020) ("Complaint").

1

**JA477**

The Petition for Declaratory Order filed by Seabrook remains the best path to prompt resolution of the contractual issues identified there.[4]  While Complainants seek an expeditious decision in *this* proceeding, this is the *fourth* pleading filed by Complainants *outside* the proceeding where the contractual disputes were submitted for resolution.  And the Amended Complaint adds nothing of value in evaluating the issues before the Commission in *either* proceeding, except that it eliminates two NextEra defendants, which required only one sentence.[5]

The Amended Complaint does not cite a single new case or make any new legal arguments in support of the requested relief.  It continues to fail to distinguish the legal precedent cited by NextEra on the contractual provisions that are agreed to be in dispute, and for the first time proposes substantive new contractual provisions that have never before been shared with Seabrook.  It attaches new affidavits that are irrelevant.  And the factual allegation most often repeated in support of the Amended Complaint – that NextEra supposedly refuses to enter into an E&P agreement – verges on the absurd given Complainants' prior rejection, *in a pleading filed with the Commission*, of NextEra's offers to do just that.  To recap:

> ➤ Seabrook twice offered, in pleadings filed with the Commission, to enter into an E&P agreement.[6]

---

[4]    *See NextEra Energy Seabrook, LLC*, Petition for Declaratory Order at 21-37, Docket No. EL21-3-000 (Oct. 5, 2020) ("Petition for Declaratory Order") (detailing the contractual issues in dispute).

[5]    *See* Amended Complaint at 5 n.8 ("Avangrid is also removing FPL Energy Wyman LLC and FPL Energy Wyman IV LLC as respondents because no Commission relief is needed with respect to those entities any longer.").

[6]    *See NECEC Transmission LLC v. NextEra Res., LLC*, NextEra Answer to Complaint at 2, 8-9, 28, 53, Docket No. EL21-6-000 (Nov. 2, 2020) ("NextEra Answer to Complaint") ("If Complainants now desire to enter into an E&P Agreement, Seabrook will do so, recognizing that an E&P Agreement will not address the facilities agreement contractual issues in dispute (as Complainants recognize) or obligate Seabrook to enter into a facilities agreement, but instead only provide for long lead-time engineering and procurement."); *NextEra Energy Seabrook, LLC*, Answer and Motion for Leave to Answer of Seabrook at 2, 10, Docket No. EL21-3-000 (Nov. 19, 2020) ("Seabrook Answer to NECEC Protest") ("Seabrook is willing to enter into an E&P Agreement, if that is what NECEC now wants.").

2

**JA478**

➢ Complainants disdainfully declared Seabrook's offer to be "meaningless."[7]

➢ In the subsequent four months, Complainants have not retracted their rejection of Seabrook's offers, or otherwise requested any discussion of an E&P agreement.[8]

➢ Nonetheless, the Amended Complaint says, six times, that Seabrook refuses to negotiate an E&P agreement or start the engineering process.[9]

So a central allegation of the Amended Complaint is indisputably false. Nonetheless, for the avoidance of doubt, Seabrook renews its offer to negotiate an E&P agreement, though the contractual disputes raised in the Petition for Declaratory Order must still be resolved.

Perhaps most strangely of all, the Amended Complaint continues Complainants' self-contradictory practice of claiming to want expedition while actually obstructing expedition by creating unnecessary and unhelpful new process. Again, to recap procedurally how we reached this point:

➢ Last spring and summer, Seabrook and NECEC engaged in discussions regarding the terms and conditions of a facilities agreement. After otherwise reaching consensus, negotiations on three issues reached an impasse around September 2020.[10]

---

[7]    *See NECEC Transmission LLC v. NextEra Res., LLC*, Motion for Leave to Answer and Limited Answer of NECEC and Avangrid at 6, Docket No. EL21-6-000 (Nov. 17, 2020) ("NECEC Answer") (calling an E&P agreement "meaningless" if it does not also include "an agreement for the actual construction of the Seabrook Breaker Replacement").

[8]    Complainants do not assert otherwise, nor could they.

[9]    *See* Amended Complaint at 3 (arguing that Seabrook has refused to "even *begin* the preliminary engineering and scoping studies"); *id.* at 4 (asserting that Seabrook "has done nothing to accommodate Avangrid's reasonable requests to begin engineering and scoping work"); *id.* at 4 n.6 (claiming that Seabrook "has refused to begin the engineering and study process"); *id.* at 8 (alleging that Seabrook "has refused to begin the necessary engineering and scoping processes"); *id.* at 11 (arguing that Seabrook "has yet to begin engineering and procurement for the Seabrook Breaker Replacement"); *id.* at 11 n.25 (contending that Seabrook "has continued to refuse to enter into an E&P agreement").

[10]    *See* NextEra Answer to Complaint, Exhibit No. 1, Prepared Supplemental Affidavit of Joshua Marcum at 5-6. The three issues were, in general terms, (i) whether Seabrook should be compensated for all of its costs; (ii) whether the standards of the nuclear industry should govern the definition of "good utility practice" for this nuclear facility; and (iii) whether Seabrook is entitled to a limitation on liability in providing the requested services. *See* Petition for Declaratory Order at 21-37.

➤ On October 5, 2020, Seabrook filed the Petition for Declaratory Order asking the Commission to resolve the three disputed issues.  Seabrook filed extensive evidentiary support for its positions.[11]  Seabrook "commit[ed] to work with NECEC in coordinating with third party contractors to complete the project in a timely manner."[12]  Seabrook proposed a formula to ensure that NECEC was only charged actual costs, offered to provide formula rate protocols that would allow NECEC to challenge the prudency of any costs claimed for inclusion in the formula, and made clear that Seabrook was not seeking an advance determination of prudency.[13]

➤ Rather than take the offered path to resolve the open issues, Complainants filed the Complaint on October 13, 2020.  The Complaint agreed that compensation and good utility practice (the first two issues raised in the Petition for Declaratory Order) were disputed issues, but did not ask the Commission to resolve them, and made no response to Seabrook's arguments on these agreed disputes in the Petition for Declaratory Order proceeding.  Instead, the Complaint engaged in a long, mostly rhetorical and conjectural diatribe against NextEra, and sought extreme relief, including the proposed launching of an enforcement investigation over a contract dispute.  However, in doing so Complainants said that the Commission need not enter findings of fact on these issues,[14] as any issues germane to the contractual dispute

---

[11]  In support of the Petition for Declaratory Order, Seabrook filed three affidavits and a white paper that evaluated upgrading the Generation Breaker to accommodate the NECEC project.  *See id.* at Attachments A-D.

[12]  *See id.* at 33.

[13]  *See id.* at 28-31, 37-38.

[14]  Complaint at 2 (stating that the requested first expedited order will not require any fact-finding).

4

**JA480**

could be addressed in yet a third proceeding, after Seabrook files a facilities

agreement under Section 205 of the Federal Power Act ("FPA").[15]

➢ When Complainants did respond to the Petition for Declaratory Order, they repeated

their request for more process, again asking that the Commission resolve the same

issues already in play in both the Petition for Declaratory Order and (to a lesser

extent) Complaint dockets in a new Section 205 proceeding.[16]

➢ Now, after a substantial period of time in which the Commission has been working

with the previously established records, Complainants inexplicably submitted a newly

Amended Complaint, with four affidavits that seem calculated to unjustly demean

NextEra, rather than change the substantive analysis, as discussed further below.

In short, Complainants seem to prefer to orchestrate new opportunities to engage in

mudslinging at the expense of expeditious resolution of the actual contractual issues in dispute.

Complainants further seem willing to do so without regard to the integrity of their arguments, as

shown by (among other things[17]) their claims regarding an E&P agreement, and their insistence

that NextEra is responsible for jeopardizing the in-service date of the NECEC Elective

---

[15]   *Id.*

[16]   *NextEra Energy Seabrook, LLC*, Protest of NECEC and Avangrid at 3-4, Docket No. EL21-3-000 (Nov. 4, 2020)
       ("NECEC Protest") (requesting that the Commission require Seabrook to file an unexecuted agreement with the
       Commission for review under FPA Section 205).

[17]   *Compare, e.g.*, Amended Complaint at 9 ("NextEra has indicated it will not construct the Seabrook Breaker
       Replacement without a mandate from the Commission") *with* Petition for Declaratory Order at 8 ("Seabrook's
       request here . . . is [] aimed at protecting Seabrook's rights as it proceeds with helping NECEC get its project
       built") *and* Seabrook Answer to NECEC Protest at 8 ("Nonetheless, we reiterate that Seabrook is willing to enter
       into a facilities agreement, and seeks through the Petition only to protect its rights").

5

**JA481**

Upgrade.[18]  This filing is no different.  Complainants continue to attempt to justify their extreme requests for relief with egregious factual misrepresentations, including the claim that "NextEra has thus far refused to include procurement and construction in the Affected System Agreement, insisting that procurement and construction be deferred for a *potential* subsequent agreement."[19] This patently false claim is easily debunked; Complainants attach to the Amended Complaint an "Updated Affected System Agreement" that was "created by starting with the draft of the agreement that NextEra sent to Avangrid on August 19, 2020."[20]  As Exhibit B to the Amended Complaint demonstrates, the draft NextEra sent to Avangrid on August 19, 2020, expressly provided that, "Affected Party shall use Reasonable Efforts to construct the facilities necessary to resolve the Significant Adverse Impact on the Affected System, during the limited timeframe of Affected Party's identified critical path for returning Seabrook Station to full power operation after a refueling outage . . . ."[21]  But Complainants do not let the facts get in the way of their storytelling.

Further, the claimed basis for needing an amendment is to reflect changed circumstances since the original Complaint was filed.[22]  But obviously that does not require the submission of four new affidavits.  The request for relief could have been changed, along with removal of the two NextEra defendants, with a one-page filing.  Moreover, the four new affidavits add no facts

---

[18]  *Compare* NECEC Protest at 2 n.4 (claiming that NextEra has a "strategy to delay" to the NECEC Elective Upgrade) *and* Complaint at 4 ("NextEra [] continue[s] to delay its legally required actions to accommodate interconnection of the NECEC [Elective Upgrade] beyond the NECEC [Elective Upgrade's] targeted in-service date") *with* NextEra Answer to Complaint at 3-4 (explaining that "NECEC has itself elected to push back the in-service date of its NECEC Elective Upgrade" and that NECEC is "deflect[ing] blame and cast[ing] NextEra and Seabrook as scapegoats for Avangrid's setbacks").

[19]  *See* Amended Complaint, Exhibit C, Supplemental Affidavit of Thorn C. Dickinson at P 11 ("Supplemental Dickinson Affidavit") (emphasis added).

[20]  *Id.* at P 7.

[21]  Amended Complaint, Exhibit B at P 12.

[22]  *See id.* at 2, 5.

pertinent to the Commission's consideration of the issues.  Most importantly, there is still no evidence that the Generation Breaker is a transmission facility – because it is not.  As a consequence, substantially all of the Amended Complaint's legal arguments fail, as NextEra has explained previously.[23]

Instead of bolstering Complainants' case, the new information presented in the affidavits is either immaterial or incorrect.  For example, Complainants argue that Seabrook may not need to extend an outage to complete replacement of the Generation Breaker, while increasing their estimated time of the outage to 23 days.[24]  But Seabrook has said since the beginning that it is possible that the outage will not need to be extended.[25]  To be fair to both sides, Seabrook proposed a formula rate to track actually incurred costs, and left open the potential for a prudency challenge, if Complainants believe that Seabrook is attempting to collect imprudently incurred costs.[26]  The whole point of including a formula is to avoid the difficult task of predicting what the costs will be before they are actually incurred.  Complainants' new timing evidence does not diminish that it is Seabrook's right under FPA Section 205, as the service provider, to propose the form of its rate.[27]

---

[23]  *See* NextEra Answer to Complaint at 6-7, 10-13; *NextEra Energy Seabrook, LLC*, Answer and Motion for Leave to Answer at 5-9, Docket No. EL21-3-000 (Nov. 19, 2020).

[24]  *See* Amended Complaint at Exhibit D, Affidavit of Mark McBurnett ("McBurnett Affidavit"); *id.* at Exhibit E, Affidavit of Glen Palmer ("Palmer Affidavit").

[25]  *See* Petition for Declaratory Order at 7 ("If the outage does not run past the time otherwise required to address refueling, there would be no opportunity costs associated with Generation Breaker replacement, and hence no charge for opportunity costs").

[26]  *See id.* at 28-31, 37-38.  While Seabrook offered formula rate protocols if desired by Complainants, Complainants have not accepted that offer.  *See id.*

[27]  *See NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 114 (D.C. Cir. 2017) (stating that FERC plays a "passive and reactive role" in reviewing a utility's proposed rates under Section 205 and that Section 205 "does not authorize FERC to impose a new rate scheme of its own making without the consent of the utility") (quoting *Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017)).

# Exhibit No. 1
# Prepared Second Supplemental Affidavit of Eric McCartney

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **NECEC Transmission LLC and** | ) | |
| **Avangrid, Inc.,** | ) | |
| **Complainants,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. EL21-6-000** |
| | ) | |
| **NextEra Energy Resources, LLC, and** | ) | |
| **NextEra Energy Seabrook, LLC,** | ) | |
| **Respondents.** | ) | |

**PREPARED SECOND SUPPLEMENTAL AFFIDAVIT OF ERIC MCCARTNEY
ON BEHALF OF NEXTERA**

**I.      Introduction**

My name is Eric McCartney. My business address is 626 Lafayette Road, Seabrook, NH

03874. I am the former Site Vice President for Seabrook Station, which is owned by NextEra

Energy Seabrook, LLC ("Seabrook"). Today, I am the Vice President, Nuclear for NextEra

Energy, Inc.'s nuclear generation fleet, and will be retiring from NextEra Energy, Inc. on July 1,

2021.

I previously submitted: (i) an affidavit ("Petition Affidavit") in Docket No. EL21-3-000,

a Petition for Declaratory Order ("Petition") proceeding addressing the same contractual issues

placed in dispute by the Complaint and Request for Shortened Answer Period and for Fast Track

Processing ("Complaint") of NECEC Transmission LLC ("NECEC") and Avangrid, Inc.

(together, "Complainants") in the above-referenced docket; and (ii) a supplemental affidavit

("First Supplemental Affidavit") to support NextEra's November 2, 2020 answer to the

Complaint ("Answer").  My Petition Affidavit was submitted (along with my First Supplemental

Affidavit) as an exhibit to the Answer.

**JA485**

This affidavit supplements my Petition Affidavit and First Supplemental Affidavit, responds to allegations in the March 26, 2021 Amended Complaint and Request for Expedited Relief of Complainants ("Amended Complaint"), and provides further information regarding proposed upgrades to the 24.5 kV generator circuit breaker ("Gen Breaker") at Seabrook Station to accommodate NECEC's New England Clean Energy Connect project ("NECEC Project").

More specifically, I provide further information in response to the affidavits of Mr. Mark McBurnett ("McBurnett Affidavit") and Mr. Tracy Rolstad ("Rolstad Affidavit") in support of the Amended Complaint. Contrary to their claims, the Gen Breaker is operable and in compliance with applicable regulatory requirements, codes, and standards, and is neither a threat to stability of the grid nor to Seabrook Station.

## II.    The Seabrook Breaker Replacement is a significant project for Seabrook Station

Mr. McBurnett believes the replacement of the Gen Breaker at Seabrook Station ("Seabrook Breaker Replacement") is "not an unusual or exotic project," suggesting that the work would "pose minimal conflicts with other outage work," "would have minimal restraints on normal outage activities,"[1] and is "not practically different from construction work on any other steam electric plant."[2] While Seabrook is capable of completion of such a project, describing it as neither unusual nor exotic is inappropriate. The Gen Breaker affects nuclear safety systems at Seabrook Station, may affect other outage activities, and may create enterprise risk if the

---

[1]    McBurnett Affidavit at 3:10-15, 5:5-6.

[2]    *Id.* at 3:17-18, 4:10-15.

Seabrook Breaker Replacement is unsuccessful, as previously highlighted in my Petition

Affidavit[3] and in the affidavit of Mr. Lawrence Weber.[4]

### A. Safety Risk

That the Seabrook Breaker Replacement is "not in a radiation-controlled area," as Mr.

McBurnett proffers as support for his position, should not be interpreted to mean that the project

cannot impact safety systems.[5]  Unlike non-nuclear plants, the Gen Breaker circuitry interfaces

with the plant's reactor protection systems making the Seabrook Breaker Replacement more

complex compared to similar breaker replacement projects at non-nuclear facilities.  Further,

Seabrook Station is required to maintain an offsite power source when the reactor is shut down.

This is critical to maintaining the safety of the reactor core at Seabrook Station.

### B. Execution Risk

The Seabrook Breaker Replacement will be screened for enterprise risk, and is expected

to meet the definition of enterprise risk, under Institute of Nuclear Power Operations (INPO)

Event Report (IER) 14-20, *Integrated Risk – Healthy Technical Conscience*. As explained in the

White Paper included as Attachment D to the Petition, and which has also been included in this

docket as Exhibit C to the Complaint:  "[INPO IER 14-20]  prescribes additional actions for high

consequence, low probability, station operational and project risks that could affect the viability

of the facility (i.e., enterprise risk), such as the Breaker Project."[6]  Any enterprise risk project

requires additional layers of preparation and precaution as Seabrook Station cannot return to

---

[3]     *See* Petition Affidavit at 7-8; *see also* First Supplemental Affidavit at 3-4.

[4]     *See NECEC Transmission LLC v. NextEra Res., LLC*, Docket No. EL21-6-000, NextEra Answer
        to Complaint, Exhibit No. 7 (Prepared Affidavit of Lawrence Weber) at 4-7 (Nov. 2, 2020).

[5]     McBurnett Affidavit at 3:15-16, 5:7.

[6]     Petition, Attachment D at 1; Complaint, Exhibit C at 1.

service until the project is successfully completed.  Those recommendations will be followed for

the work related to the Seabrook Breaker Replacement.  It is noteworthy that Mr. McBurnett,

notwithstanding his characterizations of the project, agrees that INPO IER 14-20 should be

followed "to ensure the work is completed safely, efficiently, and effectively."[7] Mr. McBurnett

therefore recognizes, at least implicitly, that the Seabrook Breaker Replacement is a high risk

activity.

Further, there is also additional complexity as the Seabrook Breaker Replacement is

larger in terms of replaced components and number of activities than typical modifications at

Seabrook Station.  The magnitude of required work can lead to interfaces with other activities

onsite.  As discussed in my First Supplemental Affidavit, unlike facilities where generator

breakers are outside, Seabrook Station's turbine building is a rather difficult area to work in.[8]  It

can impact outage work conducted in that building or that requires access to the turbine building,

such as the main turbine rotor maintenance and scheduled feedwater heater replacements to be

conducted during the refueling outage scheduled for the Spring of 2023 ("2023 Refueling

Outage"). Among other activities, access to the turbine building's truck bay and pathways must

be choreographed with other work being conducted in the turbine building.

III.    **It appears likely that the Seabrook Breaker Replacement must be completed in
        series with Reserve Auxiliary Transformer ("RAT") maintenance during the 2023
        Refueling Outage**

Mr. McBurnett suggests that "[b]ased on . . . Updated Final Safety Analysis Report

[("UFSAR")] and Technical Specifications, once the station loads are shifted to the [Reserve

---

[7]        McBurnett Affidavit at 4:11-13.

[8]        *See* First Supplemental Affidavit at 2.

Auxiliary Transformers ("RATs")], the [Nuclear Regulatory Commission ("NRC") General Design Criteria ("GDC")] 17 requirements are satisfied, and work on the Seabrook Breaker can proceed in parallel with the other outage activities."[9]    For clarity, the scope of work during the 2023 Refueling Outage is not yet finalized, and therefore it is not possible to determine the impact of the Seabrook Breaker Replacement on the outage's timeline.  Among other work to ensure ongoing reliability of Seabrook Station, Seabrook anticipates conducting reactor vessel head peening, which is needed to prevent future cracks on the reactor head, and may also need to conduct maintenance on the RATs.

With regard to the RATs, if required, RAT maintenance cannot be conducted in parallel with the Seabrook Breaker Replacement.  The work on the RATs and Seabrook Breaker Replacement must be done in series to comply with Seabrook's Technical Specifications (which are part of the NRC operating license for the facility) and NRC General Design Criterion 17 (10 C.F.R. pt. 50 App. A GDC 17).  At all times during an outage, at least one line of offsite power must be available to the plant.  If the RATs are undergoing maintenance, the primary line of offsite power (what nuclear operations refers to as "Train 1") must be available.  When the Gen Breaker is being replaced, the secondary line of offsite power ("Train 2") must be available.  The maintenance on the RATs, if determined necessary, is currently anticipated to require approximately 1 day of tagging and 10 days of maintenance.  Therefore, work on the Seabrook Breaker Replacement can only begin after RAT maintenance is complete.

---

[9]    McBurnett Affidavit at 5:1-5; 6:15-17.

IV.    **The existing Gen Breaker does not need to be replaced but for the NECEC Project**

    A.    **The Gen Breaker is compliant**

Mr. Rolstad argues that the Gen Breaker has needed to be replaced for some time.[10]  The Gen Breaker does not need to be replaced (absent the NECEC Project), as the Gen Breaker does not exceed its ratings.  The size and capacity of the Gen Breaker at Seabrook Station (and similar generation breakers nationwide) is determined in accordance with the American National Standards Institute ("ANSI") and Institute of Electronic and Electrical Engineers ("IEEE") standard, ANSI/IEE C37.013 *AC High Voltage Generator Circuit Breakers Rated on a Symmetrical Current Basis*.  Seabrook also committed to these standards in Seabrook Station's UFSAR, making such standard part of Seabrook Station's NRC licensing basis.  The Gen Breaker satisfies the requirement that the interrupt rating of the generator circuit breaker is greater than the maximum symmetrical short circuit current that can be expected due to a fault condition, in accordance with ANSI/IEEE C37.013.  The revised rating of the Gen Breaker was accomplished  in consultation with GE AREVA (formerly GE Grid Solutions, a joint venture between GE and Alstom Grid SAS), the Gen Breaker's original equipment manufacturer ("OEM").  The uprate to 165 kA was conducted within the OEM rules and calculations which established the revised value to 165 kA.[11]  This demonstrates that the Gen Breaker's ability to trip, which then enables an immediate access path from the station switchyard to the Unit Auxiliary Transformers ("UATs") via the second independent source of offsite power (Train 2).

---

[10]    *See* Rolstad Affidavit at 2:11-12.

[11]    *See* Exhibit No. 2 at 1.

In 2016, Siemens Power Technologies International ("Siemens PTI") performed a short circuit duty assessment for the Gen Breaker in accordance with ANSI/IEEE Std. C37.010-1999 IEEE Application Guide for AC High-Voltage Circuit Breakers Rated on a Symmetrical Current Basis using the ASPEN and ETAP software tools.  The later version, ANSI/IEEE Std. C37.013-1997 (R2008) IEEE Standard for AC High-Voltage Generator Circuit Breakers Rated on a Symmetrical Current Basis, was also consulted during the study.  The rated short circuit rating of generator circuit breaker is based on the highest rms value of the symmetrical component of the three-phase short circuit current as per ANSI/IEEE Std. C37.013-1997.[12]  The Siemens PTI report is attached as Exhibit No. 3.

The results show that the short circuit seen by the Gen Breaker based on (i) the ISO New England, Inc.'s ("ISO-NE") model as of 12/31/2015, (ii) the ISO-NE model as of 12/31/2016, and (iii) the Base Case Review for 2021 North American Electric Reliability Corporation ("NERC") TPL 001-4 Compliance Study Short Circuit Analysis are all below the 165,000 Amp short circuit duty for the Gen Breaker.[13]  The foregoing analysis was reviewed and affirmed by the OEM.[14]

### B.    The Gen Breaker is functional

Mr. Rolstad's allegation that the Gen Breaker is obsolete is misleading.[15]  The Gen Breaker is an older piece of equipment, but it functions to its intended purpose and within its maximum rating.  Seabrook inspects and maintains the Gen Breaker on an 18-month frequency.

---

[12]     *See* Exhibit No. 3 at 1.

[13]     *See id.* at 2.

[14]     *See id.* at 1.

[15]     *See* Rolstad Affidavit at 3:7.

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing

testimony is true and correct to the best of my knowledge, information, and belief. Executed this

15th day of April, 2021.


Eric McCartney

# Exhibit No. 3
# Siemens PTI Report

**SIEMENS**

Siemens Industry, Inc.
Siemens Power Technologies International
400 State Street • P.O. Box 1058
Schenectady, New York  12301-1058 USA
Tel: +1 (518) 395-5000 • Fax: +1 (518) 346-2777
www.siemens.com/power-technologies

Siemens PTI Report Number: R031-16     *REV- O*

Title:     **Review of the Seabrook Generator Circuit Breaker Short Circuit Duty Evaluation**

**Date:**     October 26, 2016

**For:**     NextEra Energy Seabrook LLC
Brad Woodland, Seabrook Station Design Engineering Supervisor

**Prepared by:** Carlos Grande-Moran, James W. Feltes, Alkesh Patel

Executive Summary

Siemens Power Technologies International, Inc. (SPTI) was contracted by NextEra Energy Seabrook, LLC (NextEra) to perform a review of the short circuit duty for the generator circuit breaker (52G) at the Seabrook power plant. This investigation included a review of the past studies, a review of the representation of the Seabrook plant equipment in the short circuit models and the performance of short circuit calculations using the updated models.

The short circuit duty assessment for the generator breaker at Seabrook was performed in accordance with ANSI/IEEE Std. C37.010-1999 *IEEE Application Guide for AC High-Voltage Circuit Breakers Rated on a Symmetrical Current Basis* using the ASPEN and ETAP software tools. ANSI/IEEE Std. C37.013-1997 (R2008) *IEEE Standard for AC High-Voltage Generator Circuit Breakers Rated on a Symmetrical Current Basis* was also consulted during the study.  The rated short circuit rating of generator circuit breaker is based on the highest rms value of the symmetrical component of the three phase short circuit current as per ANSI/IEEE Std. C37.013-1997.  Identical result is obtained using the ANSI/IEEE Std. C37.010-1999; however, the requirements demanded by the latter standard apply to only general purpose circuit breakers employed in transmission and distribution networks.  These requirements include service conditions, ratings and required capabilities, and tests.

Three discrepancies with the original OEM's plant's data were found in the Seabrook plant's ASPEN model data previously used.  An ASPEN change file will be provided to implement these changes to the Seabrook power plant representation in the ISO-NE ASPEN data base.  The data discrepancies are related to the plant's standby generation and induction motors short circuit contributions, and the impedance data for the generator and the auxiliary transformer units UAT 2A, UAT 2B, RAT 3A and RAT 3B.

*This document was prepared by Siemens Industry, Inc., Siemens Power Technologies International (Siemens PTI), solely for the benefit of the recipient named in this memorandum. Siemens PTI nor any party acting on its behalf (a) makes any warranty, expressed or implied, with respect to the use of any information or methods disclosed in this document; or (b) assumes any liability with respect to the use of any information or methods disclosed in this document.*
*Any party other than the named recipient of this memorandum, by their acceptance or use of this document, releases Siemens PTI from any liability for direct, indirect, consequential or special loss or damage whether arising in contract, warranty, express or implied, tort or otherwise, and irrespective of fault, negligence, and strict liability.*

**JA494**

The replacement of the generator step-up (GSU) transformer increased the fault currents at the generator side of generator circuit breaker 52G because the positive sequence leakage impedance of the original GSU transformer bank is about 5.4% larger than the positive sequence leakage impedance of the new GSU transformer bank when both impedances are represented in per unit on a common MVA and voltage base (or in Ohms).

With the new GSU transformer bank and the current ISO-NE model labeled "2019 MASTER ISONE CASE 20150923-7(SEABROOK_BREAKERS) _SEABROOK", the short circuit duty of the generator circuit breaker is not exceeded when the pre-fault voltage at the fault location is 25.298 kV (1.0326 pu on a 24.5 kV base) for operating scenarios using the revised Seabrook plant models. This is true for all scenarios analyzed:

1. Both the Greater Boston Solution (GBS) and Northern Pass transmission (NPT) projects excluded

2. GBS project is included but the NPT project is excluded

3. GBS is excluded but the NPT project is included

4. Both GBS and NPT included

The system contribution to the bolted 3-phase short circuit current on the generator side of the 52G breaker is 1179 A higher when both GSB and NPT projects are included than when both projects are excluded for a pre-fault voltage of 25.298 kV (1.0326 pu).

The contribution to the SC current seen by the Seabrook 52G CB is higher for the GBS project than the NPT project.

A comparison of the maximum bolted three-phase fault short circuit current for the case where both GBS and NPT projects are either excluded or included was made using the full ISO-NE ASPEN current model and the ISO-NE ASPEN revised model.  The current model refers to all ASPEN OneLiner cases prepared by ISO-NE and labeled "2019 MASTER ISONE CASE 20150923-7(SEABROOK_BREAKERS)_SEABROOK" while the ASPEN revised model refers to all cases used with the current model but with a revised short circuit model of the Seabrook power plant by Siemens PTI.

The short circuit current for the case when both projects are excluded was calculated to be 163,432.3 Amps using the current model of the plant and 161,989 Amps using the revised model of the plant. The short circuit current using the current ISO-NE model is about 1,443 Amps larger than that calculated using the revised ISO-NE model.

The short circuit current for the case when both projects are included was calculated to be 164,611.2 Amps using the current model of the plant and 163,168.4 Amps using the revised model of the plant. The short circuit current using the current ISO-NE model is also about 1,443 Amps larger than that calculated using the revised ISO-NE model.

It is thus concluded that:

- The results in Appendix E Tables 4 and 5 show that the short circuit seen by the Seabrook 52G circuit breaker based on (i) the ISO-NE model as of 12/31/2015, (ii) the ISO-NE model as of 12/31/2016, and (iii) the Base Case Review for 2021 NERC TPL 001-4 Compliance Study Short Circuit Analysis are all below the 165,000 Amp short circuit duty for the Seabrook 52G circuit breaker.  The 165,000 Arms short circuit rating issued by GE-Alstom Grid Solutions on May 31, 2016 replaces the 160,000 Arms issued by AREVA on April 2, 2009.

- The GBS and NPT projects result in an increase (1179 Amps) in the short circuit current seen by the Seabrook 52G circuit breaker using either the current or the revised ISO-NE model for the Seabrook plant. The revised generator circuit breaker rated short circuit current capability is achieved with the use of the existing 3.2 Ohm damping resistor as per technical letter issued by GE- Alstom's Grid Solutions on May 31, 2016. It should be noted that as per this technical letter no additional increase in short circuit capability is possible without a replacement of the current circuit breaker. Copy of the technical letter is provided in Appendix D.

- The short circuit current seen by the Seabrook 52G circuit breaker calculated using the current and revised ISO-NE short circuit model is higher with the GBS project in service than with NPT project in service.



May 6, 2021

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re:     *Nextera Energy Seabrook, LLC*, Petition for Declaratory Order of NextEra Energy
        Seabrook, LLC; Docket No. EL21-3-___

        *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Amended Complaint
        and Request for Expedited Relief of NECEC Transmission LLC and Avangrid,
        Inc.; Docket No. EL21-6-___

Dear Secretary Bose:

ISO New England Inc. ("ISO-NE")[1] offers this letter to express the importance of prompt resolution
of the matters before the Federal Energy Regulatory Commission ("Commission") in the above-
referenced proceedings.[2]  Based on the pleadings to date, prompt resolution is supported by the
disputing parties – NECEC Transmission LLC/Avangrid, Inc. (collectively, "Interconnection
Customer") and NextEra Energy Seabrook, LLC ("Affected Party").  While ISO-NE writes to
inform the Commission of the need for expeditious resolution of the issues, it does not take a
position on the issues presented nor the specific proceeding in which they are addressed.

These proceedings relate to certain upgrades to the generator circuit breaker at the Affected Party's
Seabrook Station ("Affected System") that are required for the safe and reliable interconnection of
Interconnection Customer's proposed Elective Transmission Upgrade, known as the New England
Clean Energy Connect (the "Project"), to the ISO-NE-administered system.  ISO-NE identified the
need for the Affected System upgrades during the Interconnection Studies performed for the Project

---

[1]Capitalized terms used but not otherwise defined in this filing letter have the meanings ascribed thereto in the
ISO's Transmission, Markets and Services Tariff ("Tariff").
[2] *See NECEC Transmission LLC v. NextEra Energy Res., LLC*, NextEra Answer to Amended Complaint of
NECEC Transmission LLC and Avangrid, Inc.; Docket No. EL21-6-000, p. 14 (Apr. 15, 2021) ("NextEra
Answer" (continuing to support promote resolution of the matters in dispute); *NECEC Transmission LLC v.
NextEra Energy Res., LLC*, Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC
and Avangrid, Inc., Docket No. EL21-6-000 (Mar. 26, 2021) ("Amended Complaint") (requesting expedited
relief).

**ISO New England Inc.**
One Sullivan Road
Holyoke, MA 01040-2841
413-535-4000
amcbride@iso-ne.com
mgonzalez@iso-ne.com

iso-ne.com
isonewswire.com
@isonewengland
iso-ne.com/isotogo
iso-ne.com/isoexpress

Kimberly D. Bose, Secretary
May 6, 2021
Page 2 of 3

pursuant to the Commission-accepted ETU Interconnection Procedures.    Specifically, the Interconnection System Impact Study for the Project showed the duty on the Seabrook Station circuit breaker within its ratings until the addition of the Project, but over its ratings after the addition of the Project, which rendered Interconnection Customer responsible for the circuit breaker upgrade. In other words, the Seabrook Station circuit breaker upgrade was not required "but for" the interconnection of the Project.  Interconnection Customer's responsibility for this Affected System upgrade is memorialized in the fully-executed Interconnection Agreement for the Project,[3] and is included as a requirement of the Project's approval under Section I.3.9 of the Tariff.

In accordance with the Interconnection Procedures and Section I.3.9 of the Tariff, the Project and its corresponding upgrades must be included in the base case of all subsequent planning studies performed under the planning processes set forth in the Tariff.  As relevant to these proceedings, the expected in-service date and the actual new equipment design for the Seabrook Station circuit breaker, as upgraded, are inputs into several subsequent interconnection and regional planning studies and therefore the information is required for those assessments. That information, however, is now pending resolution of the issues presented in these proceedings.  Therefore, prompt resolution of these proceedings is needed to allow the planning processes associated with all subsequent projects to continue to move forward.

Please feel free to contact us if you have any questions on this matter.


Very truly yours,


*Alan McBride*
_____
Alan McBride
Director, Transmission Services
  and Resource Qualification


*Monica Gonzalez*
_____
Monica Gonzalez
Assistant General Counsel –
  Operations and Planning

ISO New England Inc.
One Sullivan Road
Holyoke, MA 01040
(413) 535-4000

_____
[3] For reference, see Elective Transmission Upgrade Interconnection Agreement by and among ISO New England Inc., NECEC Transmission LLC, and Central Maine Power Company, dated November 6, 2020, and designated as Original Service Agreement No. ETUIP-ISONE/CMP-20-01 under Schedule 25 of Section II of Tariff.

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person designated on the official service lists compiled by the Secretary in these proceedings.

Dated at Holyoke, Massachusetts this 6th day of May, 2021.

*/s/ Julie Horgan*
Julie Horgan
eTariff Coordinator
ISO New England Inc.
One Sullivan Road
Holyoke, MA 01040
(413) 540-4218

176 FERC ¶ 61,148
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                        James P. Danly, Allison Clements,
                        and Mark C. Christie.

| | |
|---|---|
| NECEC Transmission LLC and Avangrid, Inc. | Docket Nos.  EL21-6-000 |
| v. | |
| NextEra Energy Resources, LLC, NextEra Energy Seabrook, LLC, FPL Energy Wyman LLC, and FPL Energy Wyman IV LLC | |
| ISO New England Inc. | EL21-94-000 (Not Consolidated) |

ORDER ESTABLISHING ADDITIONAL BRIEFING AND INSTITUTING SECTION
206 PROCEEDING

(Issued September 7, 2021)

1.     On October 13, 2020, as amended on March 26, 2021, NECEC Transmission LLC and Avangrid, Inc. (collectively, Avangrid) filed a complaint, in Docket No. EL21-6-000, pursuant to sections 206, 210 and 306 of the Federal Power Act (FPA),[1] against NextEra Energy Resources, LLC, NextEra Energy Seabrook, LLC, FPL Energy Wyman LLC, and FPL Wyman IV LLC (collectively, Seabrook) alleging that, inter alia, Seabrook has been unlawfully attempting to delay and unreasonably increase the costs of a circuit breaker replacement at Seabrook Station necessary for the interconnection of Avangrid's New England Clean Energy Connect (NECEC) transmission project (Complaint).[2]  As discussed below, we establish briefing procedures regarding issues concerning Seabrook's Large Generator Interconnection Agreement (LGIA).  We also institute a

---

[1] 16 U.S.C. §§ 824e, 824i, 825e.

[2] Seabrook filed a petition for declaratory order in Docket No. EL21-3-000 that relates to the NECEC project.  We are not addressing that petition here.

Document Accession #: 20210907-3052          Filed Date: 09/07/2021

proceeding pursuant to section 206 of the FPA in Docket No. EL21-94-000 to determine if certain provisions of ISO New England Inc.'s (ISO-NE) Transmission, Markets and Services Tariff (Tariff) are unjust and unreasonable.[3]

## I.    **Background**

2.      In 2017, the Commonwealth of Massachusetts selected Avangrid to construct the NECEC Project, a participant-funded transmission project, consisting of a proposed 320 kV overhead high voltage direct current transmission line approximately 145 miles in length, from the Quebec-Maine border to a new converter station in Lewiston, Maine, and a new 1.6 mile 345 kV alternating current transmission line from the new Lewiston, Maine converter to the existing Larrabee Road Substation.  The NECEC Project will enable the delivery of up to 1,200 MW of hydroelectric energy from Quebec to New England for at least 20 years under Commission jurisdictional transmission contracts.[4]

3.      ISO-NE's Tariff requires participant-funded transmission projects like the NECEC Project to interconnect to the transmission system as Elective Transmission Upgrades (ETU)[5] using Tariff-required interconnection procedures similar to those for generation

---

[3] 16 U.S.C. § 824e.

[4] Avangrid Complaint at 5-6; *see also Cent. Me. Power Co.*, 165 FERC ¶ 61,034 (2018) (order accepting Central Maine Power's transmission service agreements for the NECEC Project).  As a condition of the Maine Public Utilities Commission's approval of the Certificate of Public Convenience and Necessity for the NECEC Project, Central Maine Power was required to transfer the NECEC Project to a separate corporate entity, NECEC Transmission LLC.  Avangrid Complaint at 6.

[5] "Elective Transmission Upgrade" is defined as "a new Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is interconnecting to the Administered Transmission System, or an upgrade to an existing Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is part of or interconnected to the Administered Transmission System for which the Interconnection Customer has agreed to pay all of the costs of said Elective Transmission Upgrade and of any additions or modifications to the Administered Transmission System that are required to accommodate the Elective Transmission Upgrade.  An Elective Transmission Upgrade is not a Generator Interconnection Related Upgrade, a Regional Transmission Upgrade, or a Market Efficiency Transmission Upgrade."  ISO-NE, Transmission, Markets and Service Tariff, § II, Schedule 25 (Elec. Transmission Upgrade Interconnection Procedures) (5.0.0), § 1 (Schedule 25).

projects.  Schedule 25 of the ISO-NE Tariff governs the process whereby a transmission developer may submit a request to interconnect an ETU to the transmission system.[6]

4.      In 2017, an interconnection request for the NECEC Project as an ETU was submitted to ISO-NE pursuant to Schedule 25.  A system impact study was subsequently performed to assess the impact of the NECEC Project on the transmission system and any Affected Systems.[7]  Based on the system impact study, ISO-NE determined that several upgrades would be necessary to accommodate the interconnection of the NECEC Project to the ISO-NE transmission system, including, at issue in this complaint proceeding, the replacement of a circuit breaker located at the Seabrook Station, which is owned and operated by Seabrook.  Based on this finding, pursuant to Schedule 25, ISO-NE determined that Seabrook Station is an Affected System and, in its capacity as the owner of an Affected System, Seabrook is an Affected Party.[8]

## II.      Avangrid Complaint and Amended Complaint

5.      Avangrid argues that Affected Systems and Affected Parties have open access transmission and interconnection obligations under the FPA, the Commission's regulations, and open access precedent.[9]  Avangrid maintains that these open access obligations apply to Seabrook as an Affected Party with respect to the breaker replacement, but that Seabrook is attempting to block, delay, or add unreasonable costs to the interconnection of the NECEC Project.[10]  Avangrid further argues that the ISO-NE Tariff requires Seabrook to accommodate the NECEC Project's interconnection and act in good faith.[11]  Avangrid argues that Seabrook, a direct competitor of Avangrid, stands to lose significant revenues and profits as a result of the successful development of the

---

[6] *See* Schedule 25.

[7] The ISO-NE Tariff defines an "Affected System" as "any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection."  *See* Schedule 25, § 1.

[8] The ISO-NE Tariff defines an "Affected Party" as "the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process."  *Id.; see also* Avangrid Complaint at 14; ISO New England Inc., Letter at 1 (filed May 6, 2021).

[9] Avangrid Complaint at 22-23.

[10] *Id*. at 25.

[11] *Id*. at 24, 26-27, 29 (citing Schedule 25, §§ 3.2.1.1, 9, 12.1).

NECEC Project due to reduced energy and capacity revenues in the ISO-NE wholesale markets for Seabrook's existing generation resource.[12]  Avangrid requests that the Commission issue an order that:  (1) directs Seabrook to comply with its interconnection obligations as an Affected Party and/or Affected System under the Tariff; (2) directs Seabrook to cease and desist all attempts to block, delay, or unreasonably increase the costs associated with the interconnection of the NECEC Project to the transmission system; (3) determines that Seabrook's refusal to file an unexecuted facilities agreement is unjust and unreasonable and directs Seabrook to file the agreement within 10 days of the order; (4) temporarily revokes Seabrook's waiver under Part 358 of the Commission's regulations; and (5) initiates an investigation and requires Seabrook to preserve and provide documents related to the interconnection of the NECEC Project.[13]

6.     In an amended complaint filed on March 26, 2021, Avangrid contends that Seabrook has made it clear that it will not replace the breaker unless ordered to do so by the Commission.  Avangrid argues that Seabrook can safely replace the breaker, which Avangrid contends is not an unusual project and is in the area of the plant, with minimal conflicts with other outage work, but that Seabrook has refused to agree to a reasonable timeframe for preconstruction efforts to replace the breaker.[14]  Avangrid requests that the Commission direct Seabrook to begin planning and engineering studies so that the necessary work can be completed during the 2023 outage and order Seabrook to take any other steps necessary for the breaker replacement.[15]  Avangrid further contends that the breaker has so little design margin to spare that Seabrook should have already replaced the breaker, consistent with Good Utility Practice.[16]

## III.     **Notice and Responsive Pleadings**

7.     Notice of Avangrid's complaint was filed in the *Federal Register*, 85 Fed. Reg. 66,971 (Oct. 21, 2020), with interventions or protests due November 2, 2020.

---

[12] *Id*. at 12.

[13] *Id*. at 21-22.

[14] Avangrid Amended Complaint at 14; Avangrid Complaint at 26, 28-30.

[15] Avangrid Amended Complaint at 9.  Avangrid provides an unexecuted facilities agreement with its Amended Complaint, which covers engineering, procurement, and construction of the breaker replacement and requests that the Commission direct Seabrook to execute the agreement.  *Id*. at 5, 13-14, Exhibit A.

[16] *Id*. at 8.

8.      Calpine Corporation, Dominion Energy Services, Inc., Exelon Corporation, Eversource Energy Service Company, H.Q. Energy Services (U.S.) Inc., Massachusetts Attorney General Maura Healey, Massachusetts Municipal Wholesale Electric Company, New England States Committee on Electricity, NRG Power Marketing LLC, Public Citizen, Inc., and Massachusetts Department of Public Utilities (Massachusetts DPU) filed motions to intervene.  National Grid[17] filed a motion to intervene and comments.

9.      On November 2, 2020, Seabrook filed an answer to Avangrid's initial complaint. On November 17, 2020, Avangrid filed an answer to Seabrook's answer.  On November 30, 2020, Seabrook filed a supplemental answer.  On December 7, 2020, Avangrid filed a supplemental answer.

10.     Seabrook filed an answer to the amended complaint on April 15, 2021.  Avangrid filed an answer to Seabrook's answer on April 30, 2021.  On May 6, 2021, ISO-NE filed a letter taking no position on the issues addressed in the Complaint but urging expeditious Commission action.  On May 17, 2021, Avangrid filed a response to ISO-NE's letter, agreeing that the Commission should act quickly to resolve the proceeding.

11.     Seabrook contends that most of Avangrid's arguments rely on the assumption that the Seabrook breaker is a transmission facility, but to the contrary, the breaker is part of its generating facility and is not a transmission or interconnection facility.  Seabrook explains that, when the breaker is tripped, back-feed power flows from the switchyard through the generator step-up transformers to the station buses via the unit auxiliary transformers, thus providing an immediate access circuit from the preferred power supply to the onsite distribution system.  Seabrook asserts that, when the breaker actuates, it is keeping energy out, not facilitating transmission.  Seabrook adds that the breaker does not transmit energy in interstate commerce.[18]  Thus, according to Seabrook, Seabrook is not violating the Tariff because the Tariff provisions cited by Avangrid apply to Network Upgrades, which the breaker replacement is not.[19]

12.     Further, Seabrook argues that, as a generator, it is not subject to open access requirements.  Seabrook explains that generators are only subject to such requirements if they own interconnection facilities to which a customer seeks to connect, which is not the case here.[20]  Seabrook argues that treating the breaker as a transmission facility because it

_____

[17] Massachusetts Electric Company, Nantucket Electric Company, The Narragansett Electric Company, and New England Power Company.

[18] Seabrook Answer at 10.

[19] *Id*. at 24-26.

[20] *Id*. at 6.

Document Accession #: 20210907-3052     Filed Date: 09/07/2021

has been deemed necessary for Avangrid's project would upend cornerstones of Commission regulation, starting with the statutory grant of authority under the FPA.[21]

13.    In its answer to the amended complaint, Seabrook disputes that the breaker is operated unsafely or needs to be replaced absent Avangrid's interconnection.[22]  Seabrook states that the breaker is not over-dutied.  Seabrook argues that the margin cited by Avangrid's witnesses refers to the next change on the system, not the margin needed to safely operate Seabrook Station today.[23]  In response, Avangrid argues that, taking Seabrook's theory to its logical conclusion, if the breaker is not a transmission facility, then ISO-NE would not have been able to identify it as part of the required Affected System upgrades in the system impact study.  Avangrid adds that the Commission should not allow Affected Parties the opportunity to block interconnection projects they oppose for purely competitive reasons, as doing so would give existing market participants the opportunity to prevent further market entry.[24]

## IV.    **Discussion**

### A.    **Procedural Matters**

14.    Pursuant to rule Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2020), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

15.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d), we grant Massachusetts DPU's late-filed motion to intervene given its interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

16.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2020), prohibits an answer to an answer or protest unless otherwise ordered by the decisional authority.  We accept parties' answers because they provided information that assisted us in our decision-making process.

---

[21] *Id*. at 12 (citing 16 U.S.C. § 824(b)(1)).

[22] Seabrook Answer to Amended Complaint at 8-9.

[23] *Id*. at 9.

[24] Avangrid Answer at 8-10.

## B.     Substantive Matters

17.     Having considered Avangrid's Complaint and the responsive pleadings thereto, we find that additional briefing is needed to more fully develop the record to resolve issues raised in the Complaint.  While the record evidence to date suggests that the identified breaker at Seabrook Station was within its ratings until the addition of the NECEC Project but will be over its ratings after the addition of the NECEC Project,[25] Seabrook also asserts that given its location, the breaker is properly classified as part of its generating facility and therefore, ISO-NE's tariff and open access principles do not apply and it is not required to replace the breaker.[26]  Avangrid, on the other hand, asserts that the breaker should be replaced by Seabrook because it was identified by ISO-NE pursuant to Avangrid's system impact study and that, as a result, Seabrook has certain open access transmission and interconnection obligations under the FPA, and is subject to the Commission's regulations and open access precedent.[27]

18.     Parties are invited to submit briefing, including citation to all evidence in support of their arguments and opinions, on the issues listed below.  While ISO-NE did not explicitly intervene in this proceeding, on May 6, 2021, it filed a letter taking no position on the issues addressed in the Complaint but urging expeditious Commission action.  We therefore request[28] that ISO-NE file responsive briefing in

---

[25] Avangrid Complaint at 14; *see* ISO New England Inc., Letter at 1, Docket Nos. EL21-3-000 and EL21-6-000 (filed May 6, 2021).

[26] Seabrook Answer, McCartney Supplemental Aff. at 3; "[P]er the Seabrook IA, if a piece of equipment at Seabrook is not an interconnection facility, it is a generation facility. And, indeed, the Seabrook IA makes clear that the Generation Breaker is not an interconnection facility."). Seabrook Answer at 11; *see also id*. at 10,12,55.

[27] Avangrid Complaint at 21-22.

[28] *See* 16 U.S.C. § 825f (stating that "[t]he Commission may permit any person … or other entity to file with it a statement in writing under oath or otherwise, as it shall determine, as to any or all facts and circumstances concerning a matter which may be the subject of investigation"); *id.* § 825h (stating that "[t]he Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this [Act]").  *See generally PJM Interconnection, L.L.C.*, 174 FERC ¶ 61,064, at P 31 (2021).

Document Accession #: 20210907-3052     Filed Date: 09/07/2021

this docket as well on the issued listed below.  Specifically, we request briefing on the following issues:

    i.   Whether or not Seabrook's breaker is properly identified as a part of Seabrook's generating facility.

    ii.   If Seabrook's breaker is part of Seabrook's generating facility, under what authority, if any, Seabrook may be subject to the upgrade obligations imposed on Affected Parties under the ISO-NE Tariff.

    iii.   If Seabrook's breaker is part of Seabrook's generating facility, what obligations, if any, Seabrook has under its LGIA with respect to replacement of the breaker and whether or not ISO New England Operating Documents and Applicable Reliability Standards impose an obligation to replace the breaker.[29]  If Seabrook's breaker is appropriately classified as a system protection facility, what obligations Seabrook has to replace the breaker.[30]  If the Seabrook LGIA obligates Seabrook to act, please describe the scope of Seabrook's obligation under the LGIA.

    iv.   Whether there exists any solution for the interconnection of the NECEC project that may be implemented without the replacement of Seabrook's breaker.

    v.   If replacement of Seabrook's breaker is necessary for the interconnection of the NECEC project, whether there exists any interim solution for the

---

[29] We note that, pursuant to the terms of Seabrook's LGIA, Seabrook must operate, maintain, and control, at its own expense, its generating facility in a safe and reliable manner and in accordance with the LGIA, ISO New England Operating Documents, and Applicable Reliability Standards.  Seabrook Answer, Exhibit No. 6, Seabrook LGIA, § 9.4.

[30] *Id.* § 9.7.4.1 (requiring Seabrook to install, operate, and maintain System Protection Facilities in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents); *see also id.*, Art. 1 (defining System Protection Facilities as "the equipment . . . required to protect (1) the New England Transmission System from faults or other electrical disturbances occurring at the Generating Facility and (2) the Generating Facility from faults or other electrical system disturbances occurring on the New England Transmission System or on other delivery systems or other generating systems to which the New England Transmission System is directly connected").

interconnection of the NECEC project that would allow energization of the NECEC project prior to the replacement of Seabrook's breaker.[31]

Initial briefs responsive to the questions set out in paragraph 18 are due 30 days from the date of this order.  Reply briefs are due 15 days thereafter.

19.    Section 206(b) of the FPA provides that, upon the filing of a complaint, the Commission must establish a refund effective date that is no earlier than the date of the complaint and no later than five months subsequent to the date of the complaint. In such cases, in order to give maximum protection to customers, and consistent with our precedent, we have historically tended to establish the section 206 refund effective date at the earliest date allowed by section 206, and we do so here as well.[32]  That date is the date of the complaint.

## V.    <u>Show Cause Proceeding</u>

20.    This proceeding raises important issues regarding the terms of Schedule 25 of the ISO-NE Tariff that ISO-NE uses to determine what upgrades are needed to accommodate an ETU interconnection request.  As discussed below, we are concerned that Schedule 25's definition of Affected Party and Tariff section I.3.10 may be unjust and unreasonable to the extent they may allow generating facilities and their components to be identified as facilities on which adverse impacts must be remedied before an elective transmission upgrade can interconnect to the ISO-NE transmission system, even though generators are not subject to the Commission's open access transmission principles.[33]  Without a requirement to adhere to the Commission's open access

---

[31] We recognize that the status of the NECEC project's certificate may be uncertain at this time pending state action in Maine, but we nonetheless seek information concerning potential interim solutions.

[32] *See, e.g.*, *Idaho Power Co.*, 145 FERC ¶ 61,122 (2013); *Canal Electric Co.*, 46 FERC ¶ 61,153, *order on reh'g*, 47 FERC ¶ 61,275 (1989).

[33] The Commission's open access requirements apply to transmission providers and transmission owners.  *See, e.g.*, *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,635-36 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002) (explaining that Order No. 888 was issued in order to prevent discrimination by requiring all public utilities owning

Document Accession #: 20210907-3052       Filed Date: 09/07/2021

principles, upgrades could be identified on an Affected Party's system without any obligation for the Affected Party to construct the identified upgrades. We therefore institute a proceeding in Docket No. EL21-94-000 to investigate the lawfulness of Schedule 25 of the ISO-NE Tariff and Tariff section I.3.10.

21.     First, we find that Schedule 25 of the ISO-NE Tariff may be unjust and unreasonable because the definition of Affected Party is overly broad and may improperly include generating facilities. The ISO-NE Tariff defines Affected Party as "the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process."[34] In contrast, the definition of Affected Systems established by Order No. 2003, from which Affected Party is derived, refers only to transmission systems.[35] Accordingly, we preliminarily find that the definition of Affected Party should be limited to entities that own, operate, or control transmission facilities.

22.     Similarly, we preliminarily find that Tariff section I.3.10, which provides in part that interconnection customers must remedy adverse effects on the reliability of impacted facilities,[36] potentially including "the system of one or more Market Participants"[37] that is not a transmission facility, may therefore be unjust and unreasonable because it could include an entity that does not own, operate or control transmission facilities.

23.     The Affected Party definition and Tariff section I.3.10 therefore appear to allow existing generating facilities and their components to be identified as impacted facilities on which adverse impacts must be remedied before a new interconnection customer can interconnect. As above, this could create the situation where an existing generator can be

---

and/or controlling transmission facilities to offer non-discriminatory open access transmission service).

[34] Schedule 25, § I (emphasis added). The Tariff defines Affected System as "any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection." *Id.*

[35] *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103, at P 29 n.32 (2003) (stating that an Affected System "is an electric system other than the Transmission Provider's Transmission System that may be affected by the proposed interconnection"); *id*. P 118 (referring to Affected System and a neighboring transmission system as synonymous).

[36] ISO-NE, Tariff, § I.3.10.

[37] *Id*.

identified as an Affected Party, on whose system an adverse impact must be remedied under section I.3.10, but does not require the existing generator to take action with respect to that remedy, resulting in a category of required upgrades the completion of which the Tariff does not address.  Based on the foregoing, we find that Schedule 25 and Tariff section I.3.10 may be unjust and unreasonable.  Accordingly, pursuant to FPA section 206, we direct ISO-NE within 60 days of the date of this order either to: (1) show cause as to why Schedule 25 and Tariff section I.3.10 remain just and reasonable or (2) explain what changes to Schedule 25 and/or Tariff section I.3.10 it believes would remedy the identified concerns if the Commission were to determine that Schedule 25 and/or Tariff section I.3.10 has become unjust and unreasonable and proceeds to establish a replacement rate.[38]

24.    Interested entities may respond within 60 days of ISO-NE's filing made pursuant to FPA section 206, addressing either or both of:  (1) whether ISO-NE's existing Tariff remains just and reasonable and (2) if not, what changes to ISO-NE's Tariff should be implemented as a replacement rate.

25.    In cases where, as here, the Commission institutes a proceeding on its own motion under section 206, section 206(b) requires that the Commission establish a refund effective date that is no earlier than the date of publication of the notice of the Commission's initiation of its investigation in the *Federal Register*, and no later than five months after the publication date.  Consistent with our general policy of providing maximum protection to customers, we will set the refund effective date at the earliest date possible, i.e., the date of publication by the Commission of its notice of intention to initiate Docket No. EL21-94-000 in the *Federal Register*.

26.    Section 206(b) of the FPA requires that, if no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of the section 206 proceeding, the Commission shall state the reason why it has failed to render such a decision and state its best estimate as to when it reasonably expects to make such a decision.  Assuming that ISO-NE files changes to Schedule 25 and/or Tariff section I.3.10 that it believes would remedy the identified concerns within 60 days of the date of this order, we estimate that we would be able to issue our decision within approximately three months of the responsive comments.

---

[38] If ISO-NE instead prefers to propose revisions to its Tariff on the subject of this order, then it may do so pursuant to its applicable FPA section 205 filing rights.  In such a filing, ISO-NE should state explicitly that it is submitting its proposal under section 205. If ISO-NE wishes to have the Commission hold this proceeding in abeyance pending the Commission's consideration of any such FPA section 205 filing, it should submit an appropriate motion in Docket No. EL21-94-000 explaining the basis for the abeyance.

Document Accession #: 20210907-3052     Filed Date: 09/07/2021

The Commission orders:

(A) The parties are hereby invited to submit initial briefs and evidence in Docket No. EL21-6-000 regarding the questions raised for additional briefing in P 18 of the body of this order within 30 days from the date of issuance of this order.  Parties may submit reply briefs 15 days thereafter.

(B) Any interested persons who wish to submit briefs regarding the questions raised in the body of this order but who are not currently parties to Docket No. EL21-6-000 may submit notices of intervention or motions to intervene, as appropriate, within 21 days of the date of this order.  The briefing schedule described in Ordering Paragraph (A) will apply to such persons.  The Commission encourages electronic submission of interventions in lieu of paper using the "eFiling" link at http://www.ferc.gov.  Persons unable to file electronically should submit an original and three copies of the protest or intervention to the Federal Energy Regulatory Commission, 888 First Street, NE, Washington, DC 20426.

(C) ISO-NE is hereby requested to submit briefing in Docket No. EL21-6-000 as discussed in P 18 of the body of this order within 30 days from the issuance of this order.

(D) The refund effective date in Docket No. EL21-6-000 established pursuant to section 206 of the FPA shall be the date on which the complaint was filed.

(E) Pursuant to the authority contained in and subject to the jurisdiction conferred upon the Commission by section 402(a) of the Department of Energy Organization Act and by the FPA, particularly section 206 thereof, and pursuant to the Commission's Rules of Practice and Procedure and the regulations under the FPA (18 C.F.R. Chapter I), the Commission hereby institutes a proceeding in Docket No. EL21-94-000, regarding whether Schedule 25 and Tariff section I.3.10 remain just and reasonable, as discussed in the body of this order.

(F) Pursuant to FPA section 206, ISO-NE is hereby directed, within 60 days of the date of this order, either:  (1) to show cause as to why Schedule 25 and Tariff section I.3.10 remain just and reasonable or (2) to explain what changes to Schedule 25 and/or Tariff section I.3.10 it believes would remedy the identified concerns if the Commission were to determine that these Tariff provisions have in fact become unjust and unreasonable and, therefore, to proceed to establish replacement rates.

(G) Any interested person desiring to participate in Docket No. EL21-94-000 must file a notice of intervention or a motion to intervene, as appropriate, in the docket number identified in the caption of this order in accordance with Rule 214 of the Commission's Rules of Practice and Procedure, within 21 days of publication of notice in the *Federal Register* of the Commission's initiation of the section 206 proceeding.  The Commission

encourages electronic submission of interventions in lieu of paper using the "eFiling" link at http://www.ferc.gov.  Persons unable to file electronically should submit an original and three copies of the protest or intervention to the Federal Energy Regulatory Commission, 888 First Street, NE, Washington, DC 20426.

(H) Interested entities may respond within 60 days of ISO-NE's filing in Docket No. EL21-94-000, addressing either or both:  (1) whether ISO-NE's existing Tariff remains just and reasonable; and (2) if not, what changes to ISO-NE's Tariff should be implemented as a replacement rate.

(I) The Secretary shall promptly publish in the *Federal Register* a notice of the Commission's initiation of section 206 proceedings in Docket No. EL21-94-000.

(J) The refund effective date established in Docket No. EL21-94-000 pursuant to section 206(b) of the FPA will be the date of publication in the *Federal Register* of the notice discussed in Ordering Paragraph (I) above.

By the Commission.  Commissioner Danly is dissenting with a separate statement
                              attached.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| NECEC Transmission LLC | Docket Nos.    EL21-6-000 |
| Avangrid, Inc. | |
| | |
| v. | |
| | |
| NextEra Energy Resources, LLC | |
| NextEra Energy Seabrook, LLC | |
| FPL Energy Wyman LLC | |
| FPL Energy Wyman IV LLC | |
| | |
| ISO New England Inc. | EL21-94-000 |
| | (Not |
| | Consolidated) |

(Issued September 7, 2021)

DANLY, Commissioner, *dissenting*:

1.     I respectfully dissent from this order.[1]  This case concerns the development of a transmission project, a claimed priority of many on this Commission.  Rather than accommodate the requested action date, which was driven by refueling outages and procurement timelines, we have allowed the matter to languish for nearly a year and have yet to issue an order on the merits.  Such delay is unacceptable.

2.     This case involves the New England Clean Energy Connect transmission project (NECEC Project), which is a proposed 320 kV overhead high voltage direct current transmission line, approximately 145 miles in length, which will enable the delivery of up to 1,200 MW of hydroelectric power from Quebec to New England for a period of at least twenty years.[2]

3.     The NECEC Project has faced a number of problems; it has become an exemplum of the challenges faced when establishing new transmission facilities.  The proposal has

---

[1] *See NECEC Transmission LLC v. NextEra Energy Resources, LLC*, 176 FERC ¶ 61,148 (2021).

[2] The sponsors of the NECEC Project are NECEC Transmission LLC and Avangrid, Inc. (collectively, Avangrid).

faced significant local opposition and has had difficulty in obtaining and retaining the necessary state and local permits. While those problems are outside the Commission's jurisdiction, the project has another problem that we do have the power to address.

4.      In order to deliver the power transmitted by the NECEC Project to New England, it is necessary for the transmission line to be interconnected with the transmission system operated by ISO New England Inc. (ISO-NE). And before that interconnection can occur, ISO-NE is obligated to study the effects of the interconnection on its system. Any adverse effects identified by ISO-NE's study must be mitigated before the interconnection is placed in operation.

5.      ISO-NE has performed its study, and one of the effects it identified is that interconnection will require the replacement of a generation circuit breaker at the Seabrook Nuclear Station (Seabrook) owned by NextEra Energy Seabrook, LLC (NextEra Seabrook). ISO-NE identified the need to replace this circuit breaker as an upgrade to an "Affected System." Under Schedule 25 of ISO-NE's tariff, the costs of upgrades to Affected Systems must be reimbursed by Avangrid.

6.      So much is straightforward, but there are timing constraints: the circuit breaker upgrade can be installed only when Seabrook is taken out of service for refueling. The next two scheduled outages for Seabrook are October 2021 and April 2023.[3] Further, NextEra Seabrook states that the process of performing the necessary studies and procurement will take approximately twenty-two months.[4] Given the period between refueling outages and the long lead times that NextEra Seabrook has stated will be required to complete the installation, the work must begin long before a planned refueling outage in order to avoid a year-and-a-half delay.

7.      NextEra Seabrook and Avangrid began negotiations over the necessary agreements to accomplish the upgrade and soon reached an impasse on a number of issues regarding the costs Avangrid would be required to pay, non-cost terms and conditions, and NextEra Seabrook's obligation to perform the upgrade.[5] In October of 2020, NextEra Seabrook and Avangrid filed a competing petition for declaratory order and complaint.

---

[3] NextEra November 2, 2020 Answer to Complaint, Exh. No. 5, Aff. of Eric McCartney on behalf of NextEra Seabrook at 4 ("The next refueling outage for Seabrook Station is planned for October 2021. After that, the next planned outage for Seabrook Station is April 2023.").

[4] *See* Avangrid October 13, 2020 Complaint at 26 (citation omitted).

[5] *See id.* at 14-20.

8.      By that time, it was too late for NextEra Seabrook to install the generation breaker upgrade in October of 2021, yet it was still eight months until the June 2021 date by which NextEra Seabrook said it would need to begin work in order to install the upgrade during the April 2023 refueling outage.  Given this timing, Avangrid asked the Commission to rule expeditiously on its complaint.

9.      But the Commission did not rule expeditiously.  In March 2021, Avangrid amended its complaint to reflect changed circumstances and requested the Commission grant expedited relief by May 7, 2021.  And when no ruling was forthcoming in May of 2021, seven months from the date of the original complaint, ISO-NE filed a letter with the Commission.  ISO-NE explained that a ruling was important not only for the NECEC Project, but for all the other generation interconnection studies being performed by ISO-NE that depended on knowing whether and when the NECEC Project would go into service.  Accordingly, ISO-NE asserted "prompt resolution of these proceedings is needed."[6]  Shortly thereafter, Avangrid filed a similar letter stating that, "[w]hile Avangrid does not agree with all aspects of the ISO-NE Letter, Avangrid does agree with ISO-NE's request that the Commission act quickly to resolve this proceeding."[7]

10.     But, again, the Commission did not act quickly.  Instead, the Commission has waited four more months until today, *eleven months after* NextEra Seabrook filed its petition, to issue this order.  And even now, the Commission is not ruling on either NextEra Seabrook's petition or Avangrid's complaint.  Instead, we are asking for yet more briefing to address a completely different question—never raised in any of the pleadings—of whether NextEra Seabrook is obligated to complete the upgrade at its own expense under the terms of its interconnection agreement with ISO-NE.  I can see no justification for this further procedure.  The Commission invites briefing on matters that it should be able to resolve wholly on the basis of the agreements between the parties, the ISO-NE tariff, and Commission precedent.  And as if to add insult to injury, we decline to provide any explanation as to why we did not act in the eight months we had prior to the stated deadline for scheduling the upgrade during the 2023 refueling outage, or why it took eleven months for us to decide to ask for briefing on these new issues.

11.     It is not clear whether NextEra Seabrook's claim that it needs twenty-two months' advance notice establishes a real, inflexible deadline, or whether it would still have been possible to complete the upgrade during Seabrook's April 2023 refueling outage had we acted decisively today.  But it does appear that, by requesting additional briefing, including on a novel theory, the Commission has now all but guaranteed that the generation breaker upgrades will be delayed for at least a year and a half.  And it is entirely possible that the upgrade will not be installed during even the next scheduled

---

[6] ISO-NE May 6, 2021 Letter at 2.

[7] Avangrid May 17, 2021 Letter at 1.

Document Accession #: 20210907-3052    Filed Date: 09/07/2021

refueling outage if the Commission acts with anything like the sense of urgency that it has evinced to date.  While transmission development faces innumerable challenges (as the facts of this case amply demonstrate), unjustifiable Commission inaction should never be among them.

      For these reasons, I respectfully dissent.

_____

James P. Danly
Commissioner

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| NECEC Transmission LLC and | ) | Docket No. EL21-6-000 |
| Avangrid, Inc., | ) | |
|          Complainants | ) | |
|  | ) | |
|     v. | ) | |
|  | ) | |
| NextEra Energy Resources, LLC and | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
|          Respondents | ) | |
|  | ) | |

**MOTION TO LODGE OF**
**NECEC TRANSMISSION LLC AND AVANGRID, INC.**

Pursuant to Rule 212[1] of the Rules of Practice and Procedure of the Federal Energy
Regulatory Commission ("FERC" or the "Commission"),  NECEC Transmission LLC ("NECEC
Transmission") and Avangrid, Inc. (together with NECEC Transmission, "Avangrid") hereby
submit this Motion to Lodge ("Motion") to lodge a filing containing the executed engineering
and procurement agreement ("E&P Agreement") between NextEra Energy Seabrook, LLC
("NextEra") and NECEC Transmission.[2]  Avangrid is authorized to state that NextEra does not
oppose this Motion.

---

[1]     18 C.F.R. § 385.212 (2021).

[2]     Executed Engineering and Procurement Agreement and Request for Expedited Action, *NextEra Energy Seabrook, LLC*, Docket No. ER21-2719 (filed Aug. 19, 2021) ("E&P Filing").  The E&P Agreement is attached as Attachment A to the E&P Filing.

The E&P Agreement was entered into between NECEC Transmission and NextEra as a result of NECEC Transmission's desire to commence immediately the engineering and conceptual design for the replacement of the generator circuit breaker that is under the control of NextEra's Seabrook Station (the "Seabrook Breaker Replacement"), and subsequently to proceed to the procurement and detailed design phase for the project. ISO-NE has indicated that the Seabrook Breaker must be replaced before the New England Clean Energy Connect transmission project ("NECEC Project") can interconnect to the ISO-NE Administered Transmission System, as specified in the Interconnection Agreement for the NECEC Project. As Avangrid's ultimate goal is the timely construction of the Seabrook Breaker, Avangrid has entered into this agreement as a first step. Accordingly, Avangrid hereby submits this Motion to inform the Commission of the effect of the E&P Agreement on Avangrid's requested relief in this proceeding.

As explained in the E&P Agreement, the E&P Agreement is not intended to affect the ultimate relief requested by Avangrid in this proceeding.[3] However, because the E&P Agreement accomplishes a preliminary element of the relief that Avangrid had requested— NextEra Seabrook's design, engineering, and procurement activities for the Seabrook Breaker Replacement—Avangrid seeks to clarify for the Commission that, as a result of the E&P Agreement's execution, one component of the relief it has requested is no longer necessary.

---

[3]     E&P Agreement at Section 14.

Specifically, in its Complaint,[4] Avangrid had requested that the Commission direct NextEra to submit the Affected System Agreement unexecuted in a Federal Power Act ("FPA") Section 205 proceeding.[5]  Subsequently, in the Amended Complaint,[6] Avangrid amended that request and asked for the Commission to direct the parties to enter into an Affected System Agreement based on a proposed draft that Avangrid provided.[7]  That draft Affected System Agreement contained certain provisions that are now covered by the E&P Agreement—specifically, design, engineering, and procurement.  For this reason, Avangrid no longer seeks to have the Commission direct the parties to enter into an agreement that would contain design, engineering and procurement provisions that are now covered by the E&P Agreement.  However, the remainder of Avangrid's requested relief is unchanged.[8]

Wherefore, Avangrid respectfully requests that the Commission accept this Motion to Lodge.

---

[4]    Complaint and Request for Shortened Answer Period and for Fast Track Processing of NECEC Transmission LLC and Avangrid, Inc., Docket No. EL21-6-000 (filed Oct. 13, 2020) ("Complaint").

[5]    *Id.* at 2, 36-37, 41.

[6]    Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC and Avangrid, Inc., Docket No. EL21-6-000 (filed Mar. 26, 2021) ("Amended Complaint").

[7]    *Id.* at 5 (requesting that the Commission require NextEra "to enter into the attached modified Affected System Agreement that would cover design, engineering, procurement and construction of the Seabrook Breaker Replacement"); *id.* at 13.  Avangrid also requested that the Commission "order NextEra to begin planning and engineering for the Seabrook Breaker Replacement immediately," *id.* at 12, but this relief is no longer necessary given the execution of the E&P Agreement, which accomplishes that result.

[8]    Avangrid also notes that, while not a component of its relief as initially requested, as a part of the negotiations to enter into the E&P Agreement, Avangrid has agreed to proceed with NextEra's preferred definition of "Good Utility Practice."

Respectfully submitted,

/s/ David L. Schwartz
David L. Schwartz
James B. Blackburn
Richard H. Griffin
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Avangrid, Inc. and NECEC Transmission LLC*

Dated:  September 20, 2021

4

**<u>Certificate of Service</u>**

I hereby certify that I have this day cause the foregoing document to be served upon each person designated on the official service lists compiled by the Secretary of the Commission in these proceedings.

Dated at Washington, DC this 20th day of September, 2021.


*/s/ Richard H. Griffin*
Richard H. Griffin
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

5

**JA521**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc. | ) | |
| | ) | |
| v. | ) | Docket No. EL21-6-000 |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| ISO New England Inc., | ) | |
| FPL Energy Wyman LLC, and | ) | |

**BRIEF OF ISO NEW ENGLAND INC.**

Pursuant to the Federal Energy Regulatory Commission's ("Commission") September 7, 2021 *Order Establishing Additional Briefing and Instituting Section 206 Proceeding* in the above-captioned proceeding, ISO New England Inc. ("ISO-NE" or "ISO") submits this initial brief to address the questions posed by the Commission in the order.[1]

## I.    INTRODUCTION

### A.    This NECEC Complaint Proceeding

This proceeding involves a dispute between NECEC Transmission LLC ("NECEC Transmission") and NextEra Energy Seabrook, LLC ("Seabrook") regarding upgrades to a circuit breaker ("Seabrook Breaker") at the Seabrook Nuclear Generating Station ("Seabrook Station") that are required for the safe and reliable interconnection of NECEC

---

[1] *NECEC Transmission LLC, et al.*, Order Establishing Additional Briefing and Instituting Section 206 Proceeding, 176 FERC ¶ 61,148 (2021) ("September 7 Order").

**JA522**

Transmission's proposed Elective Transmission Upgrade ("ETU"),[2] known as the New England Clean Energy Connect (the "Project"), to the ISO-NE Administered Transmission System.  ISO-NE identified the Seabrook Station as an Affected System and need for the upgrades to the Seabrook Breaker during the Interconnection Studies performed for the Project pursuant to the Commission-accepted ETU Interconnection Procedures in Schedule 25 of the OATT and Affected System provisions set forth therein.[3]  No Party in this proceeding has challenged the engineering need for the Seabrook Breaker upgrades.[4]  ISO-NE, therefore, urges the Commission to take action in assisting NECEC and Seabrook resolve their dispute as it relates to the Seabrook Breaker upgrade.  To facilitate the Commission's engagement, ISO-NE offers the following background information and responses to the specific questions posed in the September 7 Order.

### B.      New England's Affected System Construct

In  2005,  the  Commission  issued  an  order[5]  accepting  the  Affected  System provisions set forth in the Interconnection Procedures in response to the New England

---

[2]  Capitalized terms used but not otherwise defined in this filing letter have the meanings ascribed thereto in the ISO's Transmission, Markets and Services Tariff ("Tariff").  Section II of the Tariff contains the Open Access Transmission Tariff ("OATT").

[3]   Schedule 25 of the OATT is based on the Large Generator Interconnection Procedures incorporated in Schedule 22 of the OATT to comply with Order No. 2003.  *ISO New England Inc.*, 151 FERC ¶ 61,024 (2015).

[4]   *See, e.g., NECEC Transmission LLC, et al.*, NextEra Answer to Complaint of NECEC Transmission LLC and Avangrid, Inc., Docket No. EL21-6-000 (Nov. 2, 2020); *see also NECEC Transmission LLC, et al.*, Complaint and Request for Shortened Answer Period and for Fast Track Processing of NECEC Transmission LLC and Avangrid, Inc., Docket No. EL21-6-000 (Oct. 13, 2020).

[5]   *New England Power Pool*, Order Accepting Compliance Filings, Denying Rehearing, and Accepting Tariff Revisions 110 FERC ¶ 61,335 (Mar. 24, 2005).  For the New England

Power Pool Participants Committee's ("NEPOOL") compliance filing for Order No. 2003.[6] In the compliance filing, NEPOOL requested that the Commission accept multiple variations for inclusion in the ISO-NE *pro forma* Large Generator Interconnection Procedures/Large Generator Interconnection Agreement that deviated from the Commission's *pro forma* Large Generator Interconnection Agreement adopted in Order No. 2003.[7] ISO-NE and NEPOOL developed the variations in accordance with "…the guidance of the Commission in Order No. 2003 that it would allow for regional flexibility in the development of modifications to the pro forma [Interconnection Procedure] and [Interconnection Agreement], especially where an independent entity, such as ISO-NE, oversees the interconnection process."[8]

The definition of Affected System, Affected Party, and other related Tariff provisions filed by NEPOOL included such variations.[9] The variations allow ISO-NE to: (1) study the effects of interconnections on Affected Systems, including generators, distribution and sub-transmission systems, and neighboring systems; and (2) direct Interconnection Customers to work with Affected Parties to effectuate upgrades on Affected Systems if a proposed interconnection presents any adverse impacts on the

---

[6] *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103, at P 826 (2003) ("Order No. 2003"), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220 (2004), *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008).

[7] *See New England Power Pool*, Order No. 2003 Compliance, Docket No. ER04-433-000, p.7 (Jan. 20, 2004) ("Compliance Filing").

[8] Compliance Filing at p. 3.

[9] *See* Compliance Filing, Volume III at p. 35 (showing redlined comparison of the definitions of Affected System and Affected Party to the Commission's pro forma definitions thereof).

Affected Party's Affected System.  Although the definition of Affected System in the ISO-NE Tariff does not explicitly list each type of system that is an Affected System, NEPOOL's Compliance Filing included a variation from the *pro forma* definition that states *any* electric system may be studied as an Affected System.[10]

These variations codified the region's longstanding practice of studying the impacts of interconnections on any Market Participant's Affected System, including generators, distribution, sub-transmission systems, and neighboring systems, and requiring upgrades on an Affected System if needed.[11]  Since the formation of ISO-NE, this practice has been an important element of maintaining reliability and the ability to dispatch generation in the highly networked and tightly integrated ISO-NE region.[12]

This approach to Affected Systems was adopted, and continues to apply, in the Interconnection Procedures for Generating Facilities.  Generators are considered Affected

---

[10]  *Id.*; *see also* ISO-NE Tariff, Schedule 25, at § 1 ("Affected System shall mean any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection.").

[11]  For example, upgrades may be needed to ensure an Affected System's equipment remains within operating limits (*e.g.*, thermal operating limits, etc.).

[12]  *See, e.g., New England Power Pool*, Answer of ISO New England Inc. to Motions to Intervene, Docket No. ER98-3853-000, p. 5 (Sept. 10, 1998) ("These [ISO-NE interconnection] studies assess both the local interconnection requirements for, and the NEPOOL-wide impacts of, the connection of a new generator.  Study of the NEPOOL-wide impacts is grounded in longstanding NEPOOL agreements and standards.  That is, the agreements among the members ("Participants") of NEPOOL have historically specified a process for reviewing the *New England-wide impacts* of the plans of the individual Participants for additions to or changes in generating and transmission facilities that might have a significant effect on the stability, reliability or operating characteristics of its system *or the system of any other Participant.  This process has been viewed as an important element of maintaining reliability and generation dispatchability in the context of a highly networked region utilizing central dispatch of generation resources.*") (Emphasis added.).

Systems in the analysis of proposed new resources, including Generating Facilities.    This process ensures that projects, whether, new, existing, or studied at an earlier (higher) Queue Position, are not adversely impacted by subsequent projects.    Moreover, this exact approach was adopted in the ETU Interconnection Procedures when they were later developed in 2015.  The approach in the ETU Interconnection Procedures was not new or expanded upon from Interconnection Procedures used for generators.

ISO-NE studies Affected Systems to ensure the safety and reliability of the tightly integrated ISO-NE system.  Neglecting to review and mitigate impacts on Affected Systems would expose electrical facilities to unsafe conditions that could result in equipment damage and personal injury or death.  In the case of the Seabrook Station, failure to upgrade the Seabrook Breaker could lead to an uninterrupted short circuit if the Seabrook Breaker is over-dutied when a fault occurs and, as a result, could lead to catastrophic equipment failure including equipment melting, catching fire, or exploding at the nuclear facility.

In addition to the obvious safety concerns and issues associated with the catastrophic failure of equipment at a nuclear plant, such a failure would also result in a significant loss of baseload generation that would need to be replaced, creating potential reliability concerns depending on system conditions.  While ISO-NE ensures it has sufficient operating reserves to remain reliable for the loss of a large resource in accordance with North American Electric Reliability Corporation ("NERC") reliability standards,[13] a

---

[13] *See, e.g.*, NERC Reliability Standards, BAL-002-3, Requirement R.1, North American Reliability Corporation, https://www.nerc.com/pa/Stand/Reliability%20Standards%20Complete%20Set/RSCompleteSet.pdf ("NERC-BAL-002-3"); *see also* Northeast Power Coordinating Council, Inc. ("NPCC")

catastrophic equipment failure resulting from the Seabrook Breaker being over-dutied would result in a long-term outage of the Seabrook Station. The long-term loss of generation from the Seabrook Station could cause reliability concerns, particularly during the cold weather in the winter months when operating reserves that are dependent on just-in-time fuel sources or limited onsite fuel storage are depleted of fuel.

Narrowing the definition of Affected System to exclude generators or other systems will not change the fact that changes to the interconnected system—whether they are changes to the transmission system, sub-transmission system, neighboring systems in Canada, etc.—affect facilities that are not defined as transmission and vice versa. Under responsible engineering practices for reliability as part of overall good utility practice, it is not acceptable to simply ignore impacts that result in equipment being exposed to conditions that would result in property damage/or and unsafe conditions for personnel.

ISO-NE's inclusion of generators as Affected Systems also aligns with Commission-approved NERC reliability standards FAC-001-3 and FAC-002-3. Under these reliability standards, ISO-NE, as a Transmission Planner, studies the impacts of proposed interconnection projects on affected systems, including generators, to ensure that no generating facility ratings are violated as a result of the interconnection.[14] This

---

Regional Reliability Reference Directory No. 5 Reserve, Northeast Power Coordinating Council, https://www.npcc.org/Standards/Directories/Directory%205%20-%20Reserve_20200116.pdf ("NPCC Directory 5"). NERC-BAL-002-3 and NPCC Directory 5 are incorporated into the ISO-NE Operating Procedures at ISO New England Operating Procedures No. 8 – Operating Reserve and Regulation, https://www.iso-ne.com/static-assets/documents/rules_proceds/operating/isone/op8/op8_rto_final.pdf.

[14] *See*, *e.g.*, NERC Reliability Standards, FAC-002-3, Requirement R1.1, North American Reliability Corporation, https://www.nerc.com/pa/Stand/Reliability%20Standards%20Complete%20Set/RSCompleteSet.pdf ("NERC-FAC-002-3") ("Each Transmission Planner and each Planning Coordinator shall study

demonstrates the importance of mitigating and remediating, as a condition of allowing a proposed interconnection project to move forward, any such project's negative reliability impacts on Affected Systems that are generators.

## II.    RESPONSES TO THE COMMISSION'S QUESTIONS IN THE SEPTEMBER 7 ORDER

### A.    Commission Question I: "Whether or not Seabrook's breaker is properly identified as a part of Seabrook's generating facility." [15]

Yes, the Seabrook Breaker is part of the Generating Facility at the Seabrook Station. Under the Seabrook LGIA,[16] equipment is part of the Generating Facility[17] if it is part of Seabrook's "…device for the production of electricity…." and not part of the

---

the reliability impact of: (i) interconnecting new generation, transmission, or electricity end-user Facilities and (ii) materially modifying existing interconnections of generation, transmission, or electricity end-user Facilities. The following shall be studied: 1.1 The reliability impact of the new interconnection, or materially modified existing interconnection, on *affected system(s)*….") (emphasis added); *see also NERC Consideration of Comments*, Response of Standard Drafting Team to Comments on Revisions to FAC-001 and FAC-002, p. 48 (With regard to FAC-002 revisions, "Some commenters preferred 'interconnected [transmission] systems' to 'affected systems.' The SDT chose to use 'affected' instead of 'interconnected' because an interconnection could impact other systems that may not be physically interconnected to the system in question. The SDT chose to eliminate 'transmission' because the studies should consider the impact on more than just the transmission system – impacts could include impacts generally on the electric system."), https://www.nerc.com/pa/Stand/FAC%20FiveYear%20Review%20Team/Comment_Report_resp onses_06122014.pdf; *see also id.* at p. 19 (With regard to FAC-001 revisions, "Some commenters preferred 'interconnected transmission system(s)' to 'affected system(s).' The SDT chose to use 'affected' instead of 'interconnected' because an interconnection could impact other systems that may not be physically interconnected to the system in question. The SDT chose to eliminate 'transmission' because the studies should consider the impact on more than just the transmission system – impacts could include impacts on the electric system more generally.").

[15]  September 7 Order at P 8.

[16]  *Standard Large Generator Interconnection Agreement by and Among ISO New England Inc. and NextEra Energy Seabrook, LLC and New Hampshire Transmission, LLC*, dated April 3, 2012, and designated as Original Service Agreement No. LGIA-ISONE/ISONE/NHT-12-01 under Schedule 25 of Section II of the Tariff. ("Seabrook LGIA").

[17]  *See* Seabrook LGIA at Article 1 ("Generating Facility shall mean Interconnection Customer's device for the production of electricity identified in the Interconnection Request, but shall not include the Interconnection Customer's Interconnection Facilities.").

7

Interconnection Customer's Interconnection Facilities,[18] which are described in Appendix A to the Seabrook LGIA.

The Seabrook Breaker is protective equipment that is part of the generator terminal (*i.e.*, a protective part of the device for the production of electricity), and not included in the description of Interconnection Customer's Interconnection Facilities.  Appendix A to the Seabrook LGIA describes the Interconnection Customer's Interconnection Facilities (including metering equipment) as follows:

> The Interconnection Customer has constructed and owns all low voltage conductors and buswork from the Large Generating Facility to the disconnect links at the low voltage side of the GSUs.  Furthermore, pursuant to prior asset transfers of existing equipment, the Interconnection Customer owns all the revenue metering and related equipment.[19]

As a result, the Seabrook Breaker is not part of the Interconnection Customer's Interconnection Facilities.

Accordingly, the Seabrook Breaker satisfies the definition of Generation Facility (*i.e.*, the breaker is part of Seabrook's "…device for the production of electricity…." and not part of the Interconnection Customer's Interconnection Facilities).

---

[18]  *See id*. ("Interconnection Customer's Interconnection Facilities shall mean all facilities and equipment, as identified in Appendix A of the Standard Large Generator Interconnection Agreement, that are located between the Generating Facility and the Point of Change of Ownership, including any modification, addition, or upgrades to such facilities and equipment necessary to physically and electrically interconnect the Generating Facility to the Administered Transmission System. Interconnection Customer's Interconnection Facilities are sole use facilities and shall not include Distribution Upgrades, Stand Alone Network Upgrades or Network Upgrades.").

[19]  Seabrook LGIA, Appendix A at § 1(b).

B.  **Commission Question II: "If Seabrook's breaker is part of Seabrook's generating facility, under what authority, if any, Seabrook may be subject to the upgrade obligations imposed on Affected Parties under the ISO-NE Tariff?"[20]**

The ISO-NE Tariff does not require Seabrook to undertake upgrades as part of the interconnection process.[21]  Rather, Schedule 25 of the ISO-NE OATT requires the Interconnection Customer to pay for and effectuate upgrades on an Affected System.[22]  In

---

[20]  September 7 Order at P 8.

[21]  As ISO-NE will explain in the filing it submits in Docket No. EL21-94 in response to the Commission's order to show cause, the ISO-NE Tariff definitions of Affected System and Affected Party are just and reasonable even though not explicitly limited to affected transmission systems because the ISO-NE Tariff does not impose an obligation an Affected System generator; but rather, requires the Interconnection Customer to work with such third parties to effect the Affected System Upgrade for a safe and reliable interconnection to the system.  With regard to the Project, NECEC Transmission agreed to its obligation to effectuate the Affected System upgrade for the Seabrook Breaker as evidenced by: (1) the fully executed Interconnection Agreement for the Project; and (2) the transmission service agreement for the Project filed with the Massachusetts Department of Public Utilities.  *See Elective Transmission Upgrade Interconnection Agreement by and among ISO New England Inc., NECEC Transmission LLC, and Central Maine Power Company*, dated November 6, 2020, and designated as Original Service Agreement No. ETUIA-ISONE/CMP-20-01 under Schedule 25 of Section II of the Tariff, Appendix A at § 4 (*Affected System Upgrades*) ("NECEC Interconnection Agreement"); *see also* Third Amendment to Transmission Service Agreement between Distribution Companies and NECEC Transmission LLC, dated August 23, 2021, Mass. Dep't of Public Utilities Docket No. D.P.U. 18-64/65/66 (Sept. 17, 2021).

[22]  *See* ISO-NE Tariff, Schedule 25 at § 11.4.4 ("Special Provisions for Affected Systems. The Interconnection Customer shall enter into separate related facilities agreements to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection of the Interconnection Customer's Elective Transmission Upgrade."); *see also* ISO-NE Tariff at § I.3.10 ("If the ISO notifies a Market Participant pursuant to Section I.3.9.1 that implementation of the Market Participant's or Transmission Owner's plan has been determined to have a significant adverse effect upon the reliability or operating characteristics of the Transmission Owner's transmission facilities, the transmission facilities of another Transmission Owner, or the system of one or more Market Participants, the Market Participant or Transmission Owner shall not proceed to implement such plan unless the Market Participant (or the Non-Market Participant on whose behalf the Market Participant has submitted its plan) or Transmission Owner takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect.").

9

other words, the obligation is on the Interconnection Customer (*i.e.*, NECEC Transmission) to work with the Affected Party (*i.e.*, Seabrook) to effectuate the upgrade.

A generator may be studied and upgraded as an Affected System under the ISO-NE Tariff.  Under Schedule 25 of the ISO-NE OATT, Affected System is defined as "*…any* electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection."[23]  Within this definition, an *electric system* is not limited to a transmission system and, therefore, may include generation.  As a result, under the ISO-NE Tariff, a generator such as Seabrook Station may be an Affected System.  Moreover, under ISO-NE Tariff, Schedule 25, Affected Party is defined as "the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process."[24]  Because Seabrook owns the Affected System, it is the Affected Party.

As discussed above, the definitions of Affected System and Affected Party intentionally deviate from the *pro forma* interconnection agreement's definition of Affected System promulgated in Order No. 2003.  The ISO-NE Tariff broadens the *pro forma* definition to include any Market Participant's Affected System, including generators, distribution and sub-transmission systems, and neighboring systems.[25]  Again, this variation codifies ISO-NE's longstanding practice and is an important element of

---

[23]  *See* ISO-NE Tariff, Schedule 25, § I (Emphasis added.).

[24]  ISO-NE Tariff, Schedule 25, § I.

[25]  *See* supra at § 1.

maintaining safety, reliability, and the ability to dispatch generation in the highly networked, tightly integrated and interconnected ISO-NE region.[26]

This approach is also consistent with Commission precedent. For example, under the Midcontinent Independent System Operator, Inc. ("MISO") Open Access Transmission Tariff ("MISO Tariff"), the definition of Affected Systems explicitly includes existing generators "…to the extent that an existing or planned (higher-queued) generator's system may need to improve, replace or upgrade its protective devices or control systems because of the presence of another generator."[27] In the order accepting the definition of Affected System, the Commission explained that MISO's proposed definition of Affected System "…merely clarifies those electric systems with which Midwest ISO must coordinate to study a proposed interconnection…."[28] The Commission went on to state, "Regarding Tenaska's concern that including existing or higher-queued generators in the definition of "Affected System" might require existing generators to pay for upgrades needed as the result of an interconnection request, we note Midwest ISO's justification for this change, which is that an existing or planned (higher-queued) generator's system may need to

---

[26] *Id.*

[27] MISO Tariff, Attachment X, § 1 ("Affected System shall mean an electric transmission or distribution system or the electric system associated with an Existing Generating Facility or of a higher queued Generating Facility, which is an electric system other than the Transmission Owner's Transmission System that is affected by the Interconnection Request. An Affected System may or may not be subject to FERC jurisdiction.").

[28] Order Accepting in Part and Rejecting in Part Compliance Filings to Order Nos. 2003 and 2003-A, Midwest Independent Transmission System Operator, Inc., 108 FERC ¶ 61,027, Docket Nos. ER04-458-000, ER04-458-001, at P 89 (July 8, 2004) ("2004 MISO Order").

11

improve, replace or upgrade its protective devices or control systems because of the presence of another generator."[29]

  **C. Commission Question III: "If Seabrook's breaker is part of Seabrook's generating facility, what obligations, if any, Seabrook has under its LGIA with respect to replacement of the breaker and whether or not ISO New England Operating Documents and Applicable Reliability Standards impose an obligation to replace the breaker? If Seabrook's breaker is appropriately classified as a system protection facility, what obligations Seabrook has to replace the breaker? If the Seabrook LGIA obligates Seabrook to act, please describe the scope of Seabrook's obligation under the LGIA?"[30]**

The Seabrook LGIA makes Seabrook responsible for protecting its facility from adverse conditions on the transmission system. Because the Seabrook Breaker is part of the Generating Facility, Article 9.7.5 of the Seabrook LGIA applies. That provision states:

**9.7.5 Requirements for Protection.** In accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and compliance with Good Utility Practice, Interconnection Customer shall provide, install, own, and maintain relays, circuit breakers and all other devices necessary to remove any fault contribution of the Large Generating Facility to any short circuit occurring on the New England Transmission System not otherwise isolated by Interconnecting Transmission Owner's equipment, such that the removal of the fault contribution shall be coordinated with the protective requirements of the New England Transmission System. Such protective equipment shall include, without limitation, a disconnecting device or switch with load-interrupting capability located between the Large Generating Facility and the New England Transmission System at a site selected upon mutual agreement (not to be unreasonably withheld, conditioned or delayed) of the Parties. Interconnection Customer shall be responsible for protection of the Large Generating Facility and Interconnection Customer's other equipment from such conditions as negative sequence currents, over- or under-frequency, sudden load rejection, over- or under-voltage, and generator loss-of-field. Interconnection Customer shall be solely responsible to disconnect the Large Generating Facility and Interconnection Customer's

---

[29] *Id.*

[30] September 7 Order at P 8.

other equipment if conditions on the New England Transmission System could adversely affect the Large Generating Facility.[31]

Under this provision, Seabrook is clearly responsible for having a breaker in place for the purpose of protecting the Seabrook Station and maintaining the breaker. The existing Seabrook Breaker served this purpose for many years, but now needs to be upgraded because of changes on the system caused by the interconnection of the Project. Article 9.7.5 does not require Seabrook to upgrade the Seabrook Breaker for the benefit of another entity's interconnection to the system. As discussed above, it is the obligation of the Interconnection Customer to work with the Affected Party to effectuate an upgrade required for the interconnection of the Interconnection Customer's project.

ISO-NE is not aware of NERC reliability standards that impose an obligation on Seabrook to upgrade the Seabrook Breaker. However, under NERC reliability standards FAC-001-3 and FAC-002-3, ISO-NE, as a Transmission Planner, is required to study the impacts on affected systems as part of its planning processes to ensure that no generator facility ratings are violated as a result of an interconnecting resource.[32] This obligation is not limited to affected transmission systems, and may include affected generators.[33]

---

[31] Seabrook LGIA at § 9.7.5.

[32] *See supra* at § 1.

[33] *See, e.g.*, NERC Reliability Standard, FAC-002-3, R1, R1.1 ("Each Transmission Planner and each Planning Coordinator shall study the reliability impact of: (i) interconnecting new generation, transmission, or electricity end-user Facilities and (ii) materially modifying existing interconnections of generation, transmission, or electricity end-user Facilities. The following shall be studied: 1.1 The reliability impact of the new interconnection, or materially modified existing interconnection, on *affected system(s)*….") (emphasis added); *see also NERC Consideration of Comments*, Response of Standard Drafting Team to Comments on Revisions to FAC-001 and FAC-002, p. 48 (With regard to FAC-002 revisions, "Some commenters preferred 'interconnected [transmission] systems' to 'affected systems.' The SDT chose to use 'affected' instead of 'interconnected' because an interconnection could impact other systems that may not be physically interconnected to the system in question. The SDT chose to eliminate 'transmission' because the

13

D.    **Commission Question IV: "Whether there exists any solution for the interconnection of the NECEC project that may be implemented without the replacement of Seabrook's breaker."**[34]

Although ISO-NE, and the interconnecting and affected transmission owners considered whether alternative upgrades elsewhere on the system might obviate the need to upgrade the Seabrook Breaker, a viable alternative was not identified as part of the Interconnection Studies performed for NECEC Transmission's Interconnection Request for the Project, designated as Queue Position No. 639.[35]

---

studies should consider the impact on more than just the transmission system – impacts could include impacts generally on the electric system."), https://www.nerc.com/pa/Stand/FAC%20FiveYear%20Review%20Team/Comment_Report_responses_06122014.pdf; *see also id*. at p. 19 (With regard to FAC-001 revisions, "Some commenters preferred 'interconnected transmission system(s)' to 'affected system(s).' The SDT chose to use 'affected' instead of 'interconnected' because an interconnection could impact other systems that may not be physically interconnected to the system in question. The SDT chose to eliminate 'transmission' because the studies should consider the impact on more than just the transmission system – impacts could include impacts on the electric system more generally.").

[34] September 7 Order at P 8.

[35]



14

ISO-NE's planning process evaluates the impact of any system change on the short circuit performance of the system. If a system change could increase the short circuit fault duty that could be experienced by a circuit breaker, then the analysis will evaluate whether the interrupting duty of the circuit breaker remains sufficient to withstand potential faults. If the breaker duty is not sufficient then, unless the breaker is upgraded, a fault would fail to be interrupted and catastrophic damage would occur. This phenomenon applies equally to transmission system and generator breakers.

In general, alternatives to upgrading over-dutied circuit breakers are very difficult to identify and almost always come with undesirable consequences. The high short circuit duty on the breaker is caused by the large current the breaker could experience if an electrical fault were to occur.[36] The large current could be lowered by increasing the impedance of the surrounding network corridor. One way to increase the impedance would be to add series reactors on the nearby transmission system. However, raising the impedance in this way would degrade the system's voltage and stability performance, which were also conditions of concern for the interconnection of the Project. Adding series reactors would likely require additional upgrades to mitigate these impacts.

Even if additional upgrades to mitigate the identified impacts were pursued, raising the impedance of this surrounding network corridor would counter the efforts that have been made over the years to support transfer capability from northern to southern New England[37] –transfer capability that will be heavily used by the Project itself. Moreover,

---

[36] The NECEC Transmission Project, and its associated upgrades, adds to the fault current that the Seabrook Breaker could experience and caused the breaker to be over its rating in the study.

[37] Raising the impedance would lower the transfer capability for the surrounding network corridor.

such a solution would only add back some headroom to the available duty on the breaker. As changes continue to occur on the system, this headroom would get used up again and the requirement to upgrade the Seabrook Breaker (and the associated cost responsibility) would be transferred to a later project.

A very large number of Interconnection Requests have been studied since the completion of the study for the Project. The Project was studied at Queue Position No. 639, where the requirement to upgrade the Seabrook Breaker was identified. ISO-NE is now studying projects with Queue Positions in the 1,100s. Effectively all of the intervening Queue Positions are for on- and off-shore wind projects, solar, and battery facilities. All of these projects will have some impact on the Seabrook Breaker, but all of those studies assumed that the Seabrook Breaker will be upgraded for interconnection of the NECEC Transmission Project. In addition, area transmission reliability solutions have assumed in their final designs that the Seabrook Breaker will be upgraded.

Given all of this, the replacement of the Seabrook Breaker is necessary for the safe and reliable interconnection of the NECEC Transmission Project to the system.

E.    **Commission Question V: "If replacement of Seabrook's breaker is necessary for the interconnection of the NECEC project, whether there exists any interim solution for the interconnection of the NECEC project that would allow energization of the NECEC project prior to the replacement of Seabrook's breaker."[38]**

In addition to exploring the alternative upgrades discussed above, ISO-NE is assessing the feasibility of extending the *pro forma* limited operation construct for the NECEC Transmission Project by exploring multiple operational alternatives to allow the

---

[38] September 7 Order at P 8.

Project to energize prior to the completion of Seabrook Breaker upgrades.  Under Article 5.9 of the NECEC Interconnection Agreement, an Interconnection Customer (in this case, NECEC Transmission) may request that ISO-NE and the Interconnecting Transmission Owner perform operational analysis "to determine the extent to which the Elective Transmission Upgrade . . . may operate prior to the completion of the Interconnecting Transmission Owner's Interconnection Facilities or Network Upgrades...."  Currently, Article 5.9 does not apply in a case where the incomplete upgrade is on Affected Systems, and extending that option to the NECEC Transmission Project will require amendments to the NECEC Interconnection Agreement that deviate from the Commission-accepted *pro forma* Elective Transmission Upgrade Interconnection Agreement in Schedule 25 and the Commission's approval of the nonconforming revisions.  However, prior to revising and filing a non-conforming amended NECEC Interconnection Agreement to apply Article 5.9 in the absence of the upgrades on Affected Systems, ISO-NE is exploring the feasibility of various operational interim solutions.

First, ISO-NE is considering the implementation of a short circuit dispatch solution. The short circuit dispatch option would only allow the Project to operate when ISO-NE's security constrained economic dispatch ("SCED") system produces dispatch solutions that result in current on the Seabrook Breaker remaining within the Seabrook Breaker's rating limits (*i.e.*, produces dispatch solutions that would *not* result in the Seabrook breaker being over-dutied).  Under this option, if the SCED solution results in the Seabrook Breaker being over-dutied, the Project would be electrically disconnected from the transmission system.

While ISO-NE has implemented interim solutions for the limited operations of Generating Facilities in the past, creating an interim solution for the Project poses unique

challenges and risks to ISO-NE's reliability and markets that must be mitigated prior to implementing.  For example, for the Project to operate prior to the completion of the Seabrook Breaker upgrade, a subset of generators would have to be disconnected from the transmission system while the Project is electrically connected to the transmission system. If the generators were required to come online for any reason (for example, if one of the generators were an Existing Capacity Resource required to provide generation due to a capacity event), the Project would have to be ramped down to zero megawatts and disconnected from the transmission system prior to connecting and ramping up the generators.  In other words, power injection from the project could not be replaced on an incremental basis.

Depending on the generators involved and system conditions, this process could take a significant amount of time (*e.g.*, hours).  Managing the thermal, voltage, and stability limits during such a long transition period would create operational challenges that would need to be resolved prior to implementing this interim solution.  Any interim solutions typically developed under limited operations can be accomplished by small incremental exchange of megawatts between the generators, which is not an option for the Project.

The short circuit dispatch option also poses challenges to the ISO-NE markets that would need to be resolved prior to the implementation of the solution.  Because NECEC Transmission does not have all of its upgrades, the Project would be the resource that is subject to limited operation.  However, as mentioned above, ISO-NE's assessments identified the potential for a scenario where the Project is on line, a capacity shortage event occurs on the system, and an Existing Capacity Resource that is required to run or otherwise face penalties under the ISO-NE Tariff, would not be able to come on line because it would

18

cause the Seabrook Breaker to be over-dutied with the Project on line.  In that case, ISO-NE would need to ramp down the Project, if it is feasible to do so, or the Existing Capacity Resource will not be able to run, in which case, it will incur penalties.  Replacing 1,200 megawatts of power injection from the Project would affect other aspects of the markets as well (*e.g.*, locational marginal prices and real-time reserve products such as Ten-Minute Non-Spinning Reserve and Thirty-Minute Operating Reserve, etc.).  ISO-NE would need to solve for these issues before extending the limited operation construct for the Project to Affected System upgrades.

Second, ISO-NE is exploring a complementary interim solution under which ISO-NE would manually reconfigure the transmission system prior to a SCED solution that causes the Seabrook Breaker to be over-dutied.  Under this procedure, one of the three major 345 kV paths between Maine and New Hampshire would be manually opened prior to the implementation of a SCED solution that causes the Seabrook breaker to be over-dutied.

Similar to the short circuit dispatch option, this interim solution results in risks to reliability and markets that would need to be mitigated prior to implementing the limited operation procedure.  For example, this action would reduce transfer capability from northern to southern New England that will be heavily used by the Project itself, as well as by other resources.  The lost generation from the decreased transfer capability would need to be replaced by other generation accessible to the load that was being served by the transfers.  This loss of transfer capability could lead to capacity deficiencies and, as a result, reliability issues.  Moreover, the decreased transfer capability could affect the markets as

well (*e.g.*, locational marginal prices and real-time reserve products such as Ten-Minute Non-Spinning Reserve and Thirty-Minute Operating Reserve, etc.).

ISO-NE will continue to evaluate limited operation approaches as it would for any new resource with delayed upgrades; however, it is important to communicate the significant challenges that must be resolved in this case prior to extending the limited operation construct for the Project to Affected System upgrades.

## III.   REQUEST FOR CONFIDENTIAL TREATMENT

Footnote 35 in Section II (D) of this brief contains information related to an Interconnection Customer's pending Interconnection Request.  The ISO requests that the Commission treat the information contained in Footnote 35 of the un-redacted version of this brief as confidential under Section 388.112(b) of the Commission's regulations. Footnote 35 contains detailed information regarding ongoing Interconnection Studies, the release of which could harm or prejudice the competitive position of Interconnection Customers.  The Commission previously acknowledged that such information should be treated as confidential. Specifically, in Order No. 2003, the Commission "emphasize[d] that the Final Rule LGIP requires the Transmission Provider, the Transmission Owner, and such entities' officers, employees, and contractors to maintain proper procedures for Confidential Information provided by an Interconnection Customer related to the Interconnection Request, the disclosure of which could harm or prejudice the Interconnection Customer or its business."[39]  The ISO is required to treat such information

---

[39] Order No. 2003 at fn. 39.

as confidential under Section 13.1 of Schedule 22 of the OATT consistent with the Commission's directive in Order No. 2003 and files it as such here.

The Commission has previously recognized that, where it has directed that certain information be held as confidential, and Section 388.112(b)(2)(1) of its rules, under which the filing of the confidential information must include a draft Protective Order or Non-Disclosure Agreement, does not apply.[40]  However, to the extent necessary, the ISO requests a waiver of the requirement to include a draft Protective Order under Section 388.112(b)(2)(1) of the Commission's regulations.  Good cause exists to grant such a waiver given the commercially sensitive nature of certain information contained in footnote 35 of the brief, and its release could harm or prejudice the Interconnection Customer or its business.

The confidential version of the brief has been marked: "CONTAINS CONFIDENTIAL INFORMATION - DO NOT RELEASE."  ISO-NE is filing one version of the report that includes the confidential information, which should not be released to the public.  A public, redacted version of this report, which does not include the confidential information, is also filed herewith.

## IV.    CONCLUSION

For the reasons described in the ISO-NE letter filed in this proceeding on May 6, 2021, ISO-NE requests the Commission promptly resolve the proceedings to allow the planning processes associated with all subsequent projects to continue to move forward.

---

[40] *See, e.g., ISO New England, Inc.*, Order Accepting Filing and Granting Waiver, 169 FERC ¶ 61,015 (2019).

Respectfully submitted,

*/s/ James M. Burlew*

James M. Burlew
Senior Regulatory Counsel
ISO New England Inc.
One Sullivan Road
Holyoke, MA  01040-2841
Telephone: (413) 540-4663
jburlew@iso-ne.com

October 7, 2021

**CERTIFICATE OF SERVICE**


I hereby certify that I have this day served the foregoing document upon each person

designated on the official service list compiled by the Secretary in this proceeding.


Dated at Holyoke, Massachusetts, this 7th day of October 2021.



/s/  Julie Horgan
Julie Horgan
eTariff Coordinator
ISO New England Inc.



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MAURA HEALEY
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

October 7, 2021
VIA ELECTRONIC FILING

The Honorable Richard Glick, Chairman
The Honorable James Danly, Commissioner
The Honorable Allison Clements, Commissioner
The Honorable Mark Christie, Commissioner

Federal Energy Regulatory Commission
888 First Street, NE
Washington, D.C. 20426

**RE: Comments on *NECEC Transmission LLC and Avangrid, Inc. v. NextEra Energy
Resources, LLC and NextEra Energy Seabrook, LLC*, Docket No. EL21-6-000**

Dear Chairman Glick and Commissioners Danly, Clements and Christie,

      Pursuant to the Commission's order of September 7, 2021 in the captioned proceeding, the
Office of the Attorney General of the Commonwealth of Massachusetts ("Massachusetts AGO")
respectfully submits these comments concerning the issues raised by this litigation and the impact on
Massachusetts of the delays in the New England Clean Energy Connect (NECEC) transmission
project.  As the Commonwealth's Ratepayer Advocate, the Massachusetts AGO is authorized by
statute to represent the interests of Massachusetts customers before state and federal courts, and
before the Commission.[1]  The Massachusetts AGO timely intervened in both this matter and the
related section 206 investigation in EL21-94.

      The NECEC Project is of vital importance to Massachusetts.  It will enable the delivery of up
to 1,200 megawatts of clean, affordable hydroelectric energy from the province of Quebec to New
England for an initial term of twenty years.  Under the Federal Power Act, states are the entities
primarily responsible for shaping the electric generation mix.[2]  In Massachusetts, we are committed

---

[1] Massachusetts General Law, c. 12 § 10; *Feeney v. Commonwealth,* 373 Mass. 359, 366 N.E.2d 1262, 1266
1977); *Secretary of Administration and Finance v. Attorney General*, 367 Mass. 154, 163, 326 N.E.2d 344, 348
(1977); Massachusetts General Law, c. 12, § 11E.
[2] 16 U.S.C. § 824(b) (2012*); Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016); *see also Pacific
Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 205 (1983)
(recognizing that issues including the "[n]eed for new power facilities, their economic feasibility, and rates and
services, are areas that have been characteristically governed by the States").

to moving towards a more diverse and cleaner energy portfolio. Our Clean Energy and Climate Plan for 2020 calls for an increase in clean energy and we have passed laws to procure this clean energy, including a large amount of hydroelectric power from Canada via the NECEC project.[3] Canadian hydro also offers New England a non-fossil fuel approach to help address regional energy concerns, including winter fuel security. Delay in acting on this significant dispute is inconsistent with the Commission's stated objective to address fuel security and support the Commonwealth's statutory requirement to reshape our electric generation mix.

Further, this dispute is a harbinger of a larger problem given the Commission's recent emphasis on facilitating regional transmission and integration of clean energy into wholesale markets. The fact that in this case a direct competitor of NECEC can thwart a major transmission project simply by refusing to negotiate and agree to commercially reasonable terms manifests a weakness in the interconnection process that must be addressed. Not only should the Commission resolve this dispute as soon as possible, but it should create a process to resolve any such future disputes expeditiously.[4] This may not be the last dispute involving the needed upgrade at Next Era's Seabrook facility, or a similar dispute involving other entities at another New England site.

The Massachusetts AGO urges the Commission not to delay decision in this case while the section 206 investigation in EL21-94 proceeds. The two matters, while related, are not coterminous, and the schedule the Commission has set in EL21-94 pushes the Commission's decision out approximately 7 months from today. Given that NECEC Transmission and Avangrid filed their complaint in October 2020, and given long construction lead times, an additional delay of seven months will significantly compromise the Spring 2023 in-service date of the NECEC project.

We appreciate the opportunity to share our views and concerns in this matter and request that the Commission consider the above comments in reaching a timely decision.

Sincerely,

*Rebecca Tepper*

Rebecca Tepper, Chief
Christina H. Belew
Assistant Attorney General
Energy and Environment Bureau
Massachusetts Office of
the Attorney General

---

[3] *See Global Warming Solutions*, G.L. c.21N, c. 30, § 61 (2008), *An Act Relative to Green Communities*, St.2008, c. 169, *An Act to Promote Energy Diversity*, St.2016, c. 188.

[4] The investigation in EL21-94 may be the appropriate docket in which to consider such a process. There will doubtless be other disputes of this nature as significant amounts of new transmission are added in furtherance of New England states' clean energy and climate goals. Ratepayers and state clean energy goals cannot afford the delays, costs or procedural uncertainty associated with such disputes.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| NextEra Energy Seabrook, LLC | ) | Docket No. EL21-3-000 |
| | ) | |
| NECEC Transmission LLC and | ) | |
| Avangrid, Inc., | ) | Docket No.  EL21-6-000 |
|     Complainants, | ) | |
| | ) | |
|       v. | ) | |
| | ) | |
| NextEra Energy Resources, LLC, | ) | |
| NextEra Energy Seabrook, LLC, | ) | |
| FPL Energy Wyman LLC, and | ) | |
| FPL Energy Wyman IV LLC, | ) | |
|     Respondents | ) | |

**MOTION TO LODGE OF NEXTERA ENERGY SEABROOK, LLC**

Pursuant to Rule 212 of the Rules of Practice and Procedure of the Federal Energy

Regulatory Commission (the "Commission" or "FERC"),[1] NextEra Energy Seabrook, LLC

("Seabrook") hereby moves to lodge a November 10, 2021 letter from a Branch Chief of the U.S.

Nuclear Regulatory Commission ("NRC Letter") and the enclosure to the NRC Letter, an NRC

Inspection Report for Seabrook Station for the time period from July 1, 2021 through September

30, 2021 ("NRC Seabrook Report").  The report directly refutes a central claim of NECEC

Transmission LLC and Avangrid, Inc. (collectively, "NECEC"), namely the incorrect claim that

Seabrook should have already replaced the Generation Breaker at issue in this proceeding.

As part of this recent inspection of Seabrook, NRC "inspectors reviewed the design of

Seabrook's main generator output breaker, specifically the fault current interrupting capability."

The inspectors reviewed Seabrook's compliance with NRC's General Design Criteria for

---

[1]     18 C.F.R. § 385.212 (2021).

1

**JA547**

Electric Power Systems (10 CFR Part 50, Appendix A, General Design Criteria (GDC) 17).[2] They "reviewed Seabrook's [Updated Final Safety Analysis Report], breaker calculations, and completed preventative maintenance work orders to determine the breaker capability and functionality," including "changes made by the original equipment manufacturer to uprate the breaker via calculations. The original rated short circuit current was 150kA and was uprated via calculation to 160kA in 2006 and then subsequently uprated via calculation to 165kA in 2016."[3]

The NRC inspectors "determined the methodology and results [of the uprates] were reasonable," and that "consistent with [American Nuclear Standards Institute/Institute of Electrical and Electronics Engineers] standards . . . , the rated short circuit current of the breaker (165kA) is greater than the maximum short circuit current (~164.6kA and 164.4kA) that can be expected due to a fault condition."[4] These conclusions of NRC inspectors were "independently validated" by "NRC headquarters technical staff in the electrical division of [the Office of] Nuclear Reactor Regulation."[5] As a result, "the inspectors have reasonable assurance that the Seabrook main generator output breaker can perform its intended function with the current margin available to the rated short circuit current capability of the breaker and that NextEra remains in compliance with GDC-17."[6]

In requesting additional briefing in this proceeding, the Commission asked "what obligations, if any, Seabrook has under its LGIA with respect to replacement of the breaker and whether or not ISO New England Operating Documents and Applicable Reliability Standards

---

[2]   NRC Seabrook Report at 9.

[3]   *Id.* at 10.

[4]   *Id.*

[5]   *Id.*

[6]   *Id.*

2

**JA548**

impose an obligation to replace the breaker."[7]  The Commission added in a footnote to this question that "pursuant to the terms of Seabrook's LGIA, Seabrook must operate, maintain, and control, at its own expense, its generating facility in a safe and reliable manner . . . ."[8]  NECEC argued in response that this meant Seabrook should already have replaced the Generation Breaker, and that the upgrades to the rating of the Generation Breaker were "paper-only."[9]  This was essentially a rehash of baseless arguments previously made by NECEC's witness Rolstad, that "[t]he continued operation of the Seabrook Breaker in its current condition is contrary to Good Utility Practice."[10]  As detailed above, NECEC's arguments are wrong.  The NRC Seabrook Report, compiled by the Federal agency charged with ensuring protection of the public health and safety in connection with the operation of commercial nuclear power plants, clearly shows that "the methodology and results [of the uprates] were reasonable," and that as a result, the Generation Breaker does in fact have the margin it needs.

In short, this independent factual analysis of a Federal agency directly refutes NECEC's allegations made in response to the Briefing Order, and corroborates the opposing evidence offered by Seabrook and ISO-NE showing that Seabrook is operating safely within its margin before NECEC, and would not exceed that margin but for the NECEC proposal.[11]  In further

[7]    *NECEC Transmission LLC v. NextEra Energy Res., LLC*, 176 FERC ¶ 61,148 at P 18 (2021) ("Briefing Order").

[8]    *Id.* at n.29 (citing Seabrook Answer, Exhibit No. 6, Seabrook LGIA, § 9.4).

[9]    NECEC Supplemental Brief at n.33 ("if NextEra were maintaining its facility in a safe and reliable manner in accordance with its obligations under the LGIA, the Seabrook Breaker already should have been replaced. The limited headroom on the Seabrook Breaker is a result of two separate paper-only 'upgrades' commissioned by NextEra in 2009 and 2016") (quoting *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC and Avangrid, Inc. at 8, Docket No. EL21-6-000 (filed Mar. 26, 2021) ("Amended Complaint") (citing *id.*, Exhibit F, Rolstad Affidavit at 3-4)).

[10]   Amended Complaint, Exhibit F, Rolstad Affidavit at 2; *see also id.* at 4 ("Continued operation under these conditions represents a risk to the grid and to Seabrook Station itself."); *id.* at 5 ("Good Utility Practice requires that the generator breaker fault current be mitigated via fault reduction scheme or breaker replacement.").

[11]   *E.g.*, ISO New England Inc., Letter at 2, Docket Nos. EL21-3-000 and EL21-6-000 (filed May 6, 2021); Seabrook Answer to Amended Complaint, Exhibit No. 1, McCartney Supplemental Affidavit at 6-9.

3

answer to the Commission's question, the NRC Seabrook Report also shows that the Generation

Breaker was being operated reliably, stating that "[n]o performance issues were identified during

the conduct of this review and inspection."[12]

Accordingly, the Commission should grant this motion to lodge the attached NRC Letter

and NRC Seabrook Report in the above-captioned proceedings.

Respectfully submitted,

*/s/ Joel D. Newton*
Joel D. Newton
Senior FERC Counsel
NextEra Energy Resources, LLC
801 Pennsylvania Avenue, NW
Suite 220
Washington, DC 20004
(202) 347-7126
joel.newton@nee.com

*/s/ Noel Symons*
Noel Symons
Colin Francis
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-2929
nsymons@mcguirewoods.com
cfrancis@mcguirewoods.com

*Counsel for NextEra Energy Seabrook, LLC*

Dated: November 17, 2021

---

[12]    NRC Seabrook Report at 10.

4

**JA550**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 17th day of November 2021, caused to be served a copy of the foregoing upon all parties on the service list in these proceedings in accordance with the requirements of Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010 (2021).

Respectfully submitted,

*/s/ Maha Saad*
Maha Saad
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 828-2807
msaad@mcguirewoods.com

# November 10, 2021 Letter re:
# Seabrook Station, Unit No. 1 – Integrated Inspection Report 05000443/2021003



**UNITED STATES**
**NUCLEAR REGULATORY COMMISSION**
REGION I
2100 RENAISSANCE BOULEVARD, SUITE 100
KING OF PRUSSIA, PENNSYLVANIA 19406-2713

November 10, 2021

Mr. Robert Coffey
Executive Vice President, Nuclear Division
  and Chief Nuclear Officer
Florida Power & Light Company
700 Universe Blvd.
Mail Stop: EX/JB
Juno Beach, FL 33408

SUBJECT:     SEABROOK STATION, UNIT NO. 1 – INTEGRATED INSPECTION REPORT
             05000443/2021003

Dear Mr. Coffey:

On September 30, 2021, the U.S. Nuclear Regulatory Commission (NRC) completed an inspection at Seabrook Station, Unit No. 1.  On November 9, 2021, the NRC inspectors discussed the results of this inspection with Mr. Brian Booth, Site Vice President and other members of your staff.  The results of this inspection are documented in the enclosed report.

Two findings of very low safety significance (Green) are documented in this report.  Two of these findings involved violations of NRC requirements.  One Severity Level IV violation without an associated finding is documented in this report.  We are treating these violations as non-cited violations (NCVs) consistent with Section 2.3.2 of the Enforcement Policy.

If you contest the violations or the significance or severity of the violations documented in this inspection report, you should provide a response within 30 days of the date of this inspection report, with the basis for your denial, to the U.S. Nuclear Regulatory Commission, ATTN: Document Control Desk, Washington, DC 20555-0001; with copies to the Regional Administrator, Region I; the Director, Office of Enforcement; and the NRC Resident Inspector at Seabrook Station, Unit No. 1.

If you disagree with a cross-cutting aspect assignment in this report, you should provide a response within 30 days of the date of this inspection report, with the basis for your disagreement, to the U.S. Nuclear Regulatory Commission, ATTN:  Document Control Desk, Washington, DC 20555-0001; with copies to the Regional Administrator, Region I; and the NRC Resident Inspector at Seabrook Station, Unit No. 1.

R. Coffey                                              2

This letter, its enclosure, and your response (if any) will be made available for public inspection and copying at http://www.nrc.gov/reading-rm/adams.html and at the NRC Public Document Room in accordance with Title 10 of the *Code of Federal Regulations* (10 CFR) 2.390, "Public Inspections, Exemptions, Requests for Withholding."

                                        Sincerely,



                                        Matt R. Young, Branch Chief
                                        Projects Branch 2
                                        Division of Operating Reactor Safety

Docket No.   05000443
License No.  NPF-86

Enclosure:
As stated

cc w/ encl:  Distribution via LISTSERV®

R. Coffey
3

SUBJECT:     SEABROOK STATION, UNIT NO. 1 – INTEGRATED INSPECTION REPORT
05000443/2021003 DATED NOVEMBER 10, 2021

<u>DISTRIBUTION</u>:
MYoung, DORS
BBickett, DORS
LCline, DORS
CNewport, DORS, SRI
TDaun, DORS, RI
ACass, DORS, AA
RWilliams, RI OEDO
RidsNrrPMSeabrook Resource
RidsNrrDorlLpl1 Resource

DOCUMENT NAME: https://usnrc.sharepoint.com/teams/DRPPB3/SB Docs/Inspection
Reports/IR 2021/2021003/SB IR2021003 Final to Workflow.docx
ADAMS ACCESSION NUMBER:  ML21314A043

| X | SUNSI Review | X | Non-Sensitive | X | Publicly Available |
|---|---|---|---|---|---|
| | | ☐ | Sensitive | ☐ | Non-Publicly Available |

| OFFICE | RI/CNewport | BBickett | MYoung | | |
|---|---|---|---|---|---|
| NAME | RI/DORS per email | RI/DORS per email | RI/DORS | | |
| DATE | 11/9/21 | 11/8/21 | 11/10/21 | | |

OFFICIAL RECORD COPY

**JA555**

**U.S. NUCLEAR REGULATORY COMMISSION**
**Inspection Report**

Docket Number:        05000443

License Number:       NPF-86

Report Number:        05000443/2021003

Enterprise Identifier:  I-2021-003-0003

Licensee:             NextEra Energy Seabrook, LLC

Facility:             Seabrook Station, Unit No. 1

Location:             Seabrook, New Hampshire

Inspection Dates:     July 01, 2021 to September 30, 2021

Inspectors:           C. Newport, Senior Resident Inspector
                      T. Daun, Resident Inspector
                      P. Cataldo, Senior Reactor Inspector
                      S. Wilson, Senior Health Physicist

Approved By:          Matt Young, Chief
                      Projects Branch 2
                      Division of Operating Reactor Safety

Enclosure

**SUMMARY**

The U.S. Nuclear Regulatory Commission (NRC) continued monitoring the licensee's performance by conducting an integrated inspection at Seabrook Station, Unit No. 1, in accordance with the Reactor Oversight Process. The Reactor Oversight Process is the NRC's program for overseeing the safe operation of commercial nuclear power reactors. Refer to https://www.nrc.gov/reactors/operating/oversight.html for more information.

**List of Findings and Violations**

| Inadequate Preventative Maintenance Contributes to Failure of 'F' Vital Inverter Static Transfer Switch | | | |
|---|---|---|---|
| Cornerstone | Significance | Cross-Cutting Aspect | Report Section |
| Mitigating Systems | Green NCV 05000443/2021003-01 Open/Closed | [H.13] - Consistent Process | 71111.19 |
| A self-revealed Green non-cited violation of Seabrook Technical Specification 6.7 "Procedures and Programs" was identified when NextEra personnel failed to implement the requirements of MA-AA-201-1000, "Preventative Maintenance and Surveillance Procedure." Specifically, adequate preventative maintenance activities were not developed and performed on the 'F' vital inverter static transfer switch, likely contributing to its failure and resultant loss of the 1F 120VAC vital bus and complex plant transient. | | | |

| Inadequate Corrective Actions Result in the Failure of the Unit 1 'B' Service Water Cooling Tower Fan | | | |
|---|---|---|---|
| Cornerstone | Significance | Cross-Cutting Aspect | Report Section |
| Mitigating Systems | Green NCV 05000443/2021003-02 Open/Closed | [H.14] - Conservative Bias | 71153 |
| A self-revealed Green non-cited violation of Title 10 of the *Code of Federal Regulations* (10 CFR) Part 50, Appendix B, Criterion XVI, "Corrective Action," was identified when NextEra personnel failed to implement adequate corrective actions following degraded oil samples for the Unit 1, 'B' emergency cooling tower fan. Specifically, a history of degraded oil conditions combined with inadequate or ineffective actions taken in response to the oil degradation led to the gearbox failure on September 17, 2021. | | | |

| Pressurizer Safety Valve Outside of Technical Specification Limits Discovered During As-Found Set Point Testing | | | |
|---|---|---|---|
| Cornerstone | Severity | Cross-Cutting Aspect | Report Section |
| Not Applicable | Severity Level IV NCV 05000443/2021003-03 Open/Closed | Not Applicable | 71153 |
| A self-revealed Severity Level IV non-cited violation of Technical Specification 3.4.2.2, "Reactor Coolant System Safety Valves" was identified when testing results of one of the three pressurizer safety valves did not meet the technical specification requirement of being within +/- 3 percent of design lift pressure. | | | |

**Additional Tracking Items**

| Type | Issue Number | Title | Report Section | Status |
|------|--------------|-------|----------------|--------|
| LER | 05000443/2021-001-00 | LER 05000443/2021-001-00 for Seabrook Station, Pressurizer Safety Valve Outside of Technical Specification Limits Discovered During As-Found Set Point Testing | 71153 | Closed |

**PLANT STATUS**

Seabrook Station began the inspection period operating at 100 percent rated thermal power and remained at or near full power for the inspection period.

**INSPECTION SCOPES**

Inspections were conducted using the appropriate portions of the inspection procedures (IPs) in effect at the beginning of the inspection unless otherwise noted.  Currently approved IPs with their attached revision histories are located on the public website at http://www.nrc.gov/reading-rm/doc-collections/insp-manual/inspection-procedure/index.html.  Samples were declared complete when the IP requirements most appropriate to the inspection activity were met consistent with Inspection Manual Chapter (IMC) 2515, "Light-Water Reactor Inspection Program - Operations Phase."  The inspectors reviewed selected procedures and records, observed activities, and interviewed personnel to assess licensee performance and compliance with Commission rules and regulations, license conditions, site procedures, and standards. Starting on March 20, 2020, in response to the National Emergency declared by the President of the United States on the public health risks of the coronavirus (COVID-19), resident and regional inspectors were directed to begin telework and to remotely access licensee information using available technology.  During this time, the resident inspectors performed periodic site visits each week, increasing the amount of time on-site as local COVID-19 conditions permitted. As part of their on-site activities, resident inspectors conducted plant status activities as described in IMC 2515, Appendix D, "Plant Status," and conducted routine reviews using IP 71152, "Problem Identification and Resolution."  The inspectors reviewed selected procedures and records; observed risk significant activities; and completed on-site portions of IPs.  In addition, resident and regional baseline inspections were evaluated to determine if all or a portion of the objectives and requirements stated in the IP could be performed remotely.  If the inspections could be performed remotely, they were conducted per the applicable IP.  In some cases, portions of an IP were completed remotely and on-site.  The inspections documented below met the objectives and requirements for completion of the IP.

**REACTOR SAFETY**

71111.01 - Adverse Weather Protection

External Flooding Sample (IP Section 03.03) (1 Sample)

    (1)    The inspectors evaluated that flood protection barriers, mitigation plans, procedures, and equipment were consistent with the licensee's design requirements and risk analysis assumptions for coping with external flooding on September 7

71111.04 - Equipment Alignment

Partial Walkdown Sample (IP Section 03.01) (4 Samples)

The inspectors evaluated system configurations during partial walkdowns of the following systems/trains:

    (1)    'A' residual heat removal after maintenance and testing on July 14
    (2)    'D' vital battery and associated direct current distribution system during 'B' vital battery service test on July 28

4

**JA559**

(3)  'A' containment building spray during 'B' containment building spray maintenance outage on August 31
(4)  'A' service water cooling tower during 'B' service water cooling tower fan failure on September 17

71111.05 - Fire Protection

Fire Area Walkdown and Inspection Sample (IP Section 03.01) (5 Samples)

The inspectors evaluated the implementation of the fire protection program by conducting a walkdown and performing a review to verify program compliance, equipment functionality, material condition, and operational readiness of the following fire areas:

(1)  Primary auxiliary building piping penetration area (PP-F-1A,B,2A,B) on August 31
(2)  Control building mechanical room (CB-F-3B-A) on September 7
(3)  Service water cooling tower Unit 1 switchgear rooms (CT-F-1C-A/CT-F-1D-A) on September 20
(4)  Service water cooling tower Unit 1 HVAC and pump room (CT-F-2B-A) on September 24
(5)  Service water cooling tower roof (CT-F-3-0) on September 24

71111.06 - Flood Protection Measures

Inspection Activities - Internal Flooding (IP Section 03.01) (1 Sample)

The inspectors evaluated internal flooding mitigation protections in the:

(1)  Fuel storage building on September 23

71111.07T - Heat Sink Performance

Heat Exchanger (Service Water Cooled) (IP Section 03.02) (2 Samples)

The inspectors evaluated heat exchanger/sink performance on the following:

(1)  'B' emergency diesel generator jacket water heat exchanger (1-DG-E-42B)
(2)  'B' primary component cooling water heat exchanger (1-CC-E-17B)

Ultimate Heat Sink (IP Section 03.04) (1 Sample)

The inspectors evaluated the performance of the following ultimate heat sink structures:

(1)  Intake transition structure, discharge transition structure, service water cooling tower, and service water pumphouse/intake

<u>71111.11Q - Licensed Operator Requalification Program and Licensed Operator Performance</u>

<u>Licensed Operator Performance in the Actual Plant/Main Control Room (IP Section 03.01) (1 Sample)</u>

(1)    The inspectors observed and evaluated licensed operator performance of the following activities in the control room:
- Loss of 120 VAC power panel PP-1F on August 22
- Valve timing, instrument calibrations, and fire panel testing on September 15

<u>Licensed Operator Requalification Training/Examinations (IP Section 03.02) (1 Sample)</u>

(1)    The inspectors observed and evaluated licensed operator requalification training conducted in the plant-reference simulator on September 9

<u>71111.12 - Maintenance Effectiveness</u>

<u>Maintenance Effectiveness (IP Section 03.01) (1 Sample)</u>

The inspectors evaluated the effectiveness of maintenance to ensure the following structures, systems, and components remain capable of performing their intended function:

(1)    Inspection of primary component cooling water isolation from residual heat removal heat exchanger valve CC-V-145 limit switch failure on August 17

<u>71111.13 - Maintenance Risk Assessments and Emergent Work Control</u>

<u>Risk Assessment and Management Sample (IP Section 03.01) (5 Samples)</u>

The inspectors evaluated the accuracy and completeness of risk assessments for the following planned and emergent work activities to ensure configuration changes and appropriate work controls were addressed:

(1)    Emergent risk during keypad replacement for inverter ED-I-11 on July 7
(2)    Elevated risk during 'B' vital battery maintenance outage on July 29
(3)    Elevated risk during 'B' emergency feedwater engineered safety features actuation system testing and switchyard work on August 3
(4)    Elevated risk during supplemental emergency power system annual maintenance on August 18
(5)    Elevated risk during maintenance on the steam supply to the emergency feedwater pump turbine (MS-395) on September 14

<u>71111.15 - Operability Determinations and Functionality Assessments</u>

<u>Operability Determination or Functionality Assessment (IP Section 03.01) (5 Samples)</u>

The inspectors evaluated the licensee's justifications and actions associated with the following operability determinations and functionality assessments:

(1)    Breaker stab failures (ARs 02364081, 02393934, 02396124) on July 1

**JA561**

(2)    Main control board annunciator for reactor trip and engineered safety features actuation system alarms (AR 02398689) on July 20
(3)    Video alarm system functionality with alarm reset delays (AR 02400569) on August 9
(4)    Unit 2 'B' service water cooling tower fan (AR 02404429) on September 22
(5)    Evaluation of the Seabrook main generator output breaker fault current interrupting capability on September 28

## 71111.18 - Plant Modifications

### Temporary Modifications and/or Permanent Modifications (IP Section 03.01 and/or 03.02) (1 Sample)

The inspectors evaluated the following temporary or permanent modifications:

(1)    Temporary repair of service water discharge piping degraded condition per ASME Code Case N-513-4 and Code Case N-789-2 on August 23

## 71111.19 - Post-Maintenance Testing

### Post-Maintenance Test Sample (IP Section 03.01) (7 Samples)

The inspectors evaluated the following post-maintenance test activities to verify system operability and functionality:

(1)    Bus 5 27B2 relay replacement on July 6
(2)    'A' residual heat removal pump bypass flow control valve RH-FCV-610 thermal overload relay replacement on July 13
(3)    'C' primary component cooling water following check valve internal inspections and maintenance on July 20
(4)    Supplemental emergency power system annual maintenance on August 18
(5)    'F' vital inverter static transfer switch failure and driver card replacement on August 22
(6)    Service water cooling tower pump discharge isolation valve SW-V-25 following repairs on August 26
(7)    Service water cooling tower fan 1-SW-FN-51B motor, drive shaft, and gearbox replacement on September 22

## 71111.22 - Surveillance Testing

The inspectors evaluated the following surveillance tests:

### Surveillance Tests (other) (IP Section 03.01) (3 Samples)

(1)    Start-up feed pump quarterly functionality surveillance on July 21
(2)    'A' vital battery 18 month service test on September 2
(3)    Containment personnel air lock door seal air flow rate test on September 29

### In-service Testing (IP Section 03.01) (1 Sample)

(1)    Emergency feedwater main steam supply valve MS-V-395 in-service stroke time testing on September 14

**RADIATION SAFETY**

71124.02 - Occupational As Low As Reasonably Achievable Planning and Controls

Radiological Work Planning (IP Section 03.01) (5 Samples)

The inspectors evaluated the licensee's radiological work planning including the following activities:

(1) Reactor vessel disassembly and reassembly as low as reasonably achievable (ALARA) package 20-01
(2) Steam generator eddy current testing and tube plugging ALARA package 20-120
(3) As low as reasonably achievable Review Board meeting minutes for ALARA package 20-01
(4) Miscellaneous and bulk work not associated with refuel outage number 20 category 2, 3 and 4 ALARA reviews 20-14 and 20-15
(5) Diving operations to repair the fuel transfer system emergency pull cable under radiation work permit number 21-0080, Revision 01

Verification of Dose Estimates and Exposure Tracking Systems (IP Section 03.02) (4 Samples)

The inspectors evaluated dose estimates and exposure tracking for the following:

(1) Refuel outage dose totals analysis
(2) Refueling operations ALARA planning package 20-07
(3) Refuel outage dose totals analysis
(4) Refueling operations post-activity ALARA outcome

Implementation of ALARA and Radiological Work Controls (IP Section 03.03) (3 Samples)

The inspectors reviewed ALARA practices and radiological work controls including the following:

(1) ALARA job in progress review for ALARA review No: 20-01: Reactor vessel disassembly and reassembly 75% complete review
(2) ALARA job in progress review for ALARA review No. 20-120: Steam generator eddy current testing and tube plugging 25% complete review
(3) ALARA job in progress review for ALARA review number 20-140: Outage scaffolding 50% complete review

**OTHER ACTIVITIES – BASELINE**

71151 - Performance Indicator Verification

The inspectors verified licensee performance indicators submittals listed below:

MS08: Heat Removal Systems (IP Section 02.07) (1 Sample)

(1) For the period July 1, 2020 through June 30, 2021

8

**JA563**

<u>MS09:  Residual Heat Removal Systems (IP Section 02.08) (1 Sample)</u>

(1)    For the period July 1, 2020 through June 30, 2021

<u>MS10:  Cooling Water Support Systems (IP Section 02.09) (1 Sample)</u>

(1)    For the period July 1, 2020 through June 30, 2021

<u>71152 - Problem Identification and Resolution</u>

<u>Annual Follow up of Selected Issues (IP Section 02.03) (1 Sample)</u>

The inspectors reviewed the licensee's implementation of its corrective action program related to the following issues:

(1)    Evaluation of the impacts of alkali-silica reaction (ASR) related bulk structural deformation of the spent fuel building on the spent fuel pool stainless steel liner

<u>71153 - Follow Up of Events and Notices of Enforcement Discretion</u>

<u>Event Follow up (IP Section 03.01) (1 Sample)</u>

(1)    The inspectors evaluated a loss of power to the 'F' 120VAC vital instrumentation bus due to the failure of the 'F' vital inverter static transfer switch and the licensee's response on August 22

<u>Event Report (IP Section 03.02) (1 Sample)</u>

The inspectors evaluated the following licensee event reports (LERs):

(1)    LER 05000443/2021-001-00, Pressurizer Safety Valve Outside of Technical Specification Limits Discovered During As-Found Setpoint Testing (ADAMS accession:  ML21140A411).  The inspectors determined that it was not reasonable to foresee or correct the cause discussed in the LER therefore no performance deficiency was identified.  The technical specification violation is dispositioned in the inspection results section of this report.

<u>Notice of Enforcement Discretion (NOED) (IP Section 03.04) (1 Sample)</u>

(1)    The inspectors evaluated the licensee's actions surrounding Notice of Enforcement Discretion EA-21-138, which can be accessed at http://www.nrc.gov/reading-rm/doc-collections/enforcement/notices/noedreactor.html, on September 23, 2021.

**INSPECTION RESULTS**

| Observation:  Evaluation of the Seabrook Main Generator Output Breaker Fault Current Interrupting Capability | 71111.15 |
|---|---|
| The inspectors reviewed the design of Seabrook's main generator output breaker, specifically the fault current interrupting capability.  The inspectors also reviewed Seabrook's compliance with 10 CFR Part 50, Appendix A, General Design Criteria (GDC) 17, Electric Power Systems.  The Seabrook main generator output breaker is non-safety related, rated at 25kV, | |

35kA rated continuous current, and 165kA rated short circuit current. During normal operating conditions, the main generator supplies electrical power to the transmission network (Grid) through the generator step-up transformers (GSU) and to the plant through the unit auxiliary transformers (UAT). The main generator is connected to the GSUs and UATs through the main generator output breaker. When the breaker is tripped (open), the UATs remain energized from the switchyard via the GSUs.

The inspectors reviewed Seabrook's UFSAR, breaker calculations, and completed preventative maintenance work orders to determine the breaker capability and functionality. The inspectors reviewed changes made by the original equipment manufacturer to uprate the breaker via calculations. The original rated short circuit current was 150kA and was uprated via calculation to 160kA in 2006 and then subsequently uprated via calculation to 165kA in 2016. Also, the inspectors reviewed a sampling of preventative maintenance work orders completed by NextEra every 18 months. The work orders included various inspections such as insertion resistor checks and leak checks. The inspectors also noted that the breaker is opened every 18 months when Seabrook enters a refueling outage. The inspectors reviewed the calculations and determined the methodology and results were reasonable to uprate the breaker to 160kA and subsequently to 165kA.

The inspectors reviewed NextEra's short circuit assessment conducted in 2016 by Siemens and ISO-NE's study conducted in 2020 by RLC Engineering, LLC, for the Seabrook breaker. The inspectors noted that the calculation used to conduct the short circuit assessment was based on ANSI/IEEE C37.010-1999, "IEEE Application Guide for AC High-Voltage Circuit Breakers Rated on a Symmetrical Current Basis," using the ASPEN and ETAP software tools. The maximum short circuit current was determined to be 164,611 amps and 164,415 amps by Siemens and RLC Engineering, LLC, respectively. The inspectors reviewed the short circuit assessments and determined the methodology and results were reasonable. As a result, consistent with ANSI/IEEE standards stated above, the rated short circuit current of the breaker (165kA) is greater than the maximum short circuit current (~164.6kA and 164.4kA) that can be expected due to a fault condition.

NRC Region I inspectors also requested an independent review of the technical aspects of the Seabrook main generator output breaker by NRC headquarters technical staff in the electrical division of Nuclear Reactor Regulation (NRR). NRR's staff review independently validated NRC Region I inspectors' technical conclusions. Specifically, the inspectors have reasonable assurance that the Seabrook main generator output breaker can perform its intended function with the current margin available to the rated short circuit current capability of the breaker and that NextEra remains in compliance with GDC-17. No performance issues were identified during the conduct of this review and inspection.

| Inadequate Preventative Maintenance Contributes to Failure of 'F' Vital Inverter Static Transfer Switch | | | |
|---|---|---|---|
| Cornerstone | Significance | Cross-Cutting Aspect | Report Section |
| Mitigating Systems | Green<br>NCV 05000443/2021003-01<br>Open/Closed | [H.13] - Consistent Process | 71111.19 |
| A self-revealed Green non-cited violation of Seabrook Technical Specification 6.7 "Procedures and Programs" was identified when NextEra personnel failed to implement the requirements of MA-AA-201-1000, "Preventative Maintenance and Surveillance Procedure." | | | |

Specifically, adequate preventative maintenance activities were not developed and performed on the 'F' vital inverter static transfer switch, likely contributing to its failure and resultant loss of the 1F 120VAC vital bus and complex plant transient.

Description:  Seabrook Station utilizes a safety related 120VAC power distribution system to provide uninterruptible power to 120VAC instrumentation and control loads essential to the operation of the plant during normal operations and postulated accident conditions.  This power is provided from six vital main distribution panels, I-EDE-PP-1A through -1F.  Each of these six main distribution panels are provided with an associated uninterrupted power supply via six vital inverters.  These inverters supply power via vital station alternating current power during normal plant operation and can provide power from the station vital batteries during a station blackout event.  The transition from vital alternating current power to vital direct current power during such an event is, in part, facilitated by a static transfer switch.  The static transfer switch can also provide an alternate maintenance supply of power without a loss of bus loads in the event of a failure of the associated inverter.

On August 22, 2021, Seabrook Station unexpectedly lost 120VAC power to vital power panel 1F.  The loss of power resulted in a series of transients throughout the plant requiring control room operators to respond to a complex plant event and carry out a series of procedurally driven actions to maintain plant stability.  Operators responded, in part, to the isolation of both trains of primary component cooling water supply to containment (providing cooling water flow to the four operating reactor coolant pumps and containment fan cooling units), a loss of automatic primary component cooling water temperature control, loss of reactor coolant system letdown flow, loss of jacket coolant and air cooler temperature control to the 'B' emergency diesel generator, as well as the loss of multiple additional control and indication capabilities.  Operators stabilized the plant and manually supplied power to the 1F power panel approximately 30 minutes after initiation of the transient.

Investigation by NextEra revealed that the loss of power to the 1F 120VAC power panel was due to a failure of the 1F vital inverter static transfer switch.  Two heat deformed resistors as well as build ups of dust and dirt were observed on the silicon controlled rectified driver card located within the static transfer switch cabinet.  Additional forensic examination determined that a voltage spike on the card likely resulted in its failure and a failure of the 1F static transfer switch to provide power to the 1F 120VAC vital bus.  The station determined that age-related degradation could have caused the voltage spike and that a routinely performed preventative maintenance activity of cleaning and inspecting the static transfer switch could have identified signs of the age-related degradation and prevented the failure.  This was documented in NextEra's maintenance rule functional failure evaluation as well as the equipment failure investigation performed as a result of the failure.

NextEra procedure ER-AA-204-2006, "Management of Critical Components and Single Point Vulnerabilities," Revision 11, states that "a single failure is unacceptable" for FID-1 components and provides guidance for establishment of a preventative maintenance strategy to prevent failures of any FID-1 component.  NextEra procedure MA-AA-201-1000, "Preventative Maintenance and Surveillance Procedure," Revision 10, provides instructions on the implementation of the Preventative Maintenance (PM) and Surveillance Program, in part, for FID-1 components.  Specifically, MA-AA-201-1000, Section 4.6 requires that a formal Preventative Maintenance Change Request (PMCR) process be followed for a PM frequency change for any component classified FID-1, which includes the 'F' vital inverter static transfer switch.  A PM task was established for the 'F' vital inverter static transfer switch to perform a visual inspection and cleaning of the transfer switch cabinet, based in part on recommendations by the vendor of the static transfer switch.  This task was initially

established with a frequency of once every two refueling outages (~36 months).  The inspectors noted that the visual inspection PM task was last performed in January 2014, approximately 7 years and 8 months prior to the failure.  Additional investigation revealed that, in 2016, as part of an initiative by NextEra to reduce the number of PMs performed on-site ("PM Optimization Project"), the frequency of the PM task was changed from once every two outages to once every three outages (~54 months) and scheduled for the OR20 outage occurring in the spring of 2020.  Prior to the OR20 outage, the PM task was descoped and reassigned to OR21, scheduled to occur in the fall of 2021.  A review by the inspectors of the PMCR form submitted for the 2016 frequency change determined that the justifications for the change were inadequate.  A single PMCR form was generated as a cover sheet for a large number of proposed PM changes as part of the PM Optimization Project.  The justification for the frequency change of the static transfer switch was contained in a single cell in a spreadsheet and did not provide an adequate technical evaluation and justification for the change as required by the PMCR process.  The inspectors also noted that NextEra on-site engineering did not certify the 120VAC system for operation for the next operating cycle at the end of the OR20 refueling outage, due in part, to the descoping of PM maintenance items such as the visual inspection for the 'F' static transfer switch.  This lack of certification was reviewed and accepted by station senior management.  The inspectors determined that a more frequent visual inspection and cleaning of the 'F' vital inverter static transfer switch could have identified and/or prevented the age-related degradation of the silicon controlled rectified card that led to the loss of power to the vital 'F' power panel.

Corrective Actions:  The licensee replaced the 'F' static transfer switch silicon controlled rectifier card, conducted a forensics analysis of the failed card, and initiated an equipment failure investigation to identify the causal factors and associated corrective actions for the event.  As part of the investigation, the licensee conducted extent of condition inspections of other similar static transfer switches as well as restored visual PM inspections of the static transfer switch to its original frequency of once every two refueling outages.  Additionally, the licensee is in the process of replacing all vital inverters and associated static transfer switches to newer models.

Corrective Action References:  AR 02401831

Performance Assessment:

Performance Deficiency:  The inspectors determined that NextEra's failure to appropriately assign and schedule PM activities for the 1F vital inverter static transfer switch was a performance deficiency within Seabrook's ability to foresee and correct.

Screening:  The inspectors determined the performance deficiency was more than minor because it was associated with the Equipment Performance attribute of the Mitigating Systems cornerstone and adversely affected the cornerstone objective to ensure the availability, reliability, and capability of systems that respond to initiating events to prevent undesirable consequences.  Specifically, the failure to perform adequate preventative maintenance activities on the 1F vital inverter static transfer switch led to the loss of 120VAC power panel 1F and subsequent plant transient.

Significance:  The inspectors assessed the significance of the finding using IMC 0609, Appendix A, "The Significance Determination Process for Findings At-Power."  The inspectors determined the finding was of very low safety significance (Green) since the failure of the 1F vital inverter static transfer switch did not cause a loss of a probabilistic risk assessment system function for greater than 24 hours.

12

**JA567**

Cross-Cutting Aspect: H.13 - Consistent Process: Individuals use a consistent, systematic approach to make decisions. Risk insights are incorporated as appropriate. Specifically, inadequate preventative maintenance activities were developed and performed on the 'F' vital inverter static transfer switch, contributing to its failure and resultant loss of the 1F 120VAC vital bus and complex plant transient.

Enforcement:

Violation: Seabrook Technical Specification 6.7 "Procedures and Programs," Section 6.7.1.a requires that written procedures shall be established, implemented, and maintained covering the applicable procedures recommended in Appendix A of Regulatory Guide 1.33, Revision 2, February 1978. Regulatory Guide 1.33, Revision 2, Section 9.b. requires, in part, that preventative maintenance schedules should be developed to specify inspection or replacement or parts that have a specific lifetime. NextEra procedure MA-AA-201-1000, "Preventative Maintenance and Surveillance Procedure," Revision 10, a safety related procedure, provides instructions on the implementation of the PM and Surveillance Program. Specifically, MA-AA-201-1000, Section 4.6 requires that a formal PMCR process be followed for a PM frequency change for any component classified "FID-1," which includes the safety related 'F' vital inverter static transfer switch. Contrary to the above, NextEra failed to follow the guidance and instructions of MA-AA-201-1000. Specifically, NextEra inappropriately changed the frequency and descoped PM activities for the FID-1 categorized 'F' vital inverter static transfer switch such that a visual inspection and cleaning had not been performed in over 7 years and 8 months at the time of failure. Because this violation is of very low safety significance (Green) and NextEra entered the issue into their corrective action program, this violation is being treated as a NCV consistent with the NRC Enforcement Policy.

Enforcement Action: This violation is being treated as a non-cited violation, consistent with Section 2.3.2 of the Enforcement Policy.

| Observation: Evaluation of the Impacts of Alkali-Silica Reaction Related Bulk Structural Deformation of the Fuel Storage Building on the Spent Fuel pool stainless steel liner | 71152 |
|---|---|

NRC inspectors performed a review of any potential impacts of observed alkali-silica reaction caused bulk structural deformation of the fuel storage building on the stainless steel spent fuel pool liner. As part of the review, the inspectors reviewed records associated with measurements of the relative movement of the spent fuel building, plans for future monitoring and remediation of the structure, detailed construction drawings of the spent fuel structure and associated cavity liner system, prints depicting the layout of the spent fuel pool cavity drain systems, procedures for sampling and monitoring of spent fuel pool leak chase sump drain collection system, and corrective action documents describing a number of conditions observed in the spent fuel building.

The inspectors reviewed the results of periodic spent fuel pool cavity leak chase monitoring as well as associated water chemistry results and determined that there did not appear to be any leakage of spent fuel pool water through the liner into the cavity system. Water samples collected from the leak chase system were consistent with groundwater penetration through the structural exterior concrete and did not contain the chemical constituents known to be present in spent fuel pool water. The inspectors also noted that a leak in the liner would be readily identifiable via an automatic spent fuel pool cavity leak chase sump alarm as well as via routine checks and samples of water in the sump.

13

**JA568**

The inspectors concluded that NextEra staff are appropriately monitoring signs of water leakage from the spent fuel liner cavity drain system in accordance with Seabrook program procedures and would be able to appropriately identify and resolve indications of leakage from the spent fuel pool liner.

Inadequate Corrective Actions Result in the Failure of the Unit 1 'B' Service Water Cooling Tower Fan

| Cornerstone | Significance | Cross-Cutting Aspect | Report Section |
|---|---|---|---|
| Mitigating Systems | Green<br>NCV 05000443/2021003-02<br>Open/Closed | [H.14] - Conservative Bias | 71153 |

A self-revealed Green non-cited violation of 10 CFR Part 50, Appendix B, Criterion XVI, "Corrective Action," was identified when NextEra personnel failed to implement adequate corrective actions following degraded oil conditions for the Unit 1, 'B' emergency cooling tower fan. Specifically, a history of degraded oil conditions combined with inadequate or ineffective actions taken in response to the oil degradation led to the gearbox failure on September 17, 2021.

Description: The service water cooling tower provides the alternate source of cooling water for the plant's primary and secondary safety related heat loads. The cooling tower consists of two independent trains, an 'A' train and a 'B' train. The 'B' train cell has two fans, a Unit 1 fan and a Unit 2 fan, designed to remove the heat load from the cooling tower basin while the tower is in operation. Both fans on the 'B' cell are required for design capacity.

NextEra's "Machinery Oil Analysis" program (ES1807.020) section 4.4.3.8 states that, following the second consecutive severity level 4 sample test result, an action request (AR) should be initiated in the corrective action program, and a work request initiated to replace the oil. Additionally, in February 2021, ES1807.020 was revised to add section 4.4.3.2 to initiate an AR for any oil analysis results that reflect severity level 4 for FID 1 or FID 2 components. The Unit 1, 'B' train fan is classified as a FID 2 component and the oil is sampled on a 6-month frequency per NextEra's predictive maintenance monitored equipment list (MA3.5, Figure 5.8). AR 02379755 was initiated in January 2021 for the second consecutive severity level 4 test result received on the Unit 1, 'B' train fan from the oil sample obtained in October 2020. As a result of high particulate and low oil viscosity from the oil analysis performed in 2019 and 2020, NextEra performed an oil change on the gearbox for the Unit 1, 'B' train fan in January 2021. The cause of the high particulate was assumed to be from the carbon steel drain port lines that run from the gearbox to outside the fan enclosure.

NRC Inspection Report 05000443/2021001 (ML21119A260) identified a non-cited violation associated with maintenance personnel not following procedural guidance when performing a scheduled gearbox oil change in January 2021 on the Unit 1, 'B' service water cooling tower fan (1-SW-FN-51B) which resulted in excessive particulate in the gearbox oil which plugged the internal lubrication spray nozzle of the gearbox. Corrective actions from the January 2021 event included cleaning and flushing the gearbox internal oil flow path and components. A management action was also initiated to revise ES1807.020 to ensure ARs are initiated after a single adverse sample for risk significant equipment.

On April 28, 2021 an oil sample was taken from the 1-SW-FN-51B gear box. The results of the analysis indicated a severity level 3 condition with high particulates. The station discussed the condition in AR 02380345 and made the determination that particulate was

14

**JA569**

likely 'hiding out' in inaccessible areas of the gearbox and that the previous flushing activities were inadequate to reduce particulates to satisfactory conditions. On July 30, 2021 oil samples were again taken from the 1-SW-FN-51B gear box and analysis results were reported back to NextEra as severity level 3 due to excessive particulate with high concentrations of black and red oxides which is indicative of thermal degradation of the fluid. The vendor also recommended determining the source of the black and red oxides as well as removal of the particulate to improve running conditions for the gearbox. The condition report was closed to a work order (WO 40779255) to flush the gearbox with a recommendation to sample the oil directly from the gearbox but the work was scheduled to be performed in a timely manner. On September 17, 2021 the 'B' cooling tower fans (1-SW-FN-51B and 2-SW-FN-51B) were started to obtain oil samples from their respective gearboxes. 40 minutes into the run, the control room received an oil pressure low alarm on the 1-SW-FN-51B and immediately secured both fans. Upon investigation, it was noted that oil had sprayed out of the pressure switch for the gearbox and the motor driveshaft had broken. The gearbox was removed and it was discovered that all the oil spray nozzles had clogged, restricting oil flow to the gearbox. The gear shaft, gears, and bearings all had signs of excessive heat.

The inspectors determined that while the station, on multiple occasions, identified adverse conditions associated with oil sample results, sufficient actions were not taken in a timely manner to address the adverse trend prior to the fan failure on September 17.

Corrective Actions: Immediate corrective actions included replacing the gearbox, drive motor, and drive shaft. The oil drain lines were also replaced with stainless steel to eliminate potential contribution to oil particulate.

Corrective Action References: ARs 02404438, 02401370, 02380345

Performance Assessment:

Performance Deficiency: The inspectors determined that NextEra's failure to implement adequate or timely corrective actions to address degraded oil conditions in the Unit 1, 'B' cooling tower fan was a performance deficiency within Seabrook's ability to foresee and correct.

Screening: The inspectors determined the performance deficiency was more than minor because it was associated with the Equipment Performance attribute of the Mitigating Systems cornerstone and adversely affected the cornerstone objective to ensure the availability, reliability, and capability of systems that respond to initiating events to prevent undesirable consequences. Specifically, the high particulate concentration in the lube oil caused the oil spray nozzles in the gearbox to clog, resulting in a loss of lubricating oil and the failure of the gearbox and drive shaft rendering the fan non-functional.

Significance: The inspectors assessed the significance of the finding using IMC 0609, Appendix A, "The Significance Determination Process for Findings At-Power." The inspectors determined that a detailed risk evaluation was required because the issue represented a loss of the probabilistic risk assessment function of one train of a multi-train technical specification system for greater than its technical specification allowed outage time.

Specifically, the risk associated with the performance deficiency was determined for the failure to implement adequate or timely corrective actions from April 28, 2021 until the 'B' cooling tower fan was restored to an operable status on September 26, 2021. The exposure

15

**JA570**

time due to the performance deficiency associated with the degraded condition was therefore assumed to be a nominal five months.

The Unit 1, 'B' service water cooling tower fan (1-SW-FN-51B) supports a mechanical draft evaporative cooling tower which serves as the ultimate heat sink for conditions where the main circulating water tunnel is unavailable. The cooling tower is designed to supply cooling water to the primary component cooling water and diesel heat exchangers. The cooling tower and all of its associated components are designed for the safe shutdown earthquake loads.

A Region I senior reactor analyst completed the detailed risk evaluation and estimated the increase in core damage frequency associated with this performance deficiency to be a nominal 1E-7/yr or of very low safety significance (Green). To perform the detailed risk evaluation, the senior reactor analyst used the Standardized Plant Analysis Risk Model, version 8.61 for Seabrook Station. The basic event, SWS-CTF-FR-1FN51B, failure of the service water cooling water tower to run, was set to TRUE. A dominant core damage sequence involved a common cause failure of the service water intake strainers, with a common cause failure of the cooling tower fans to run, and long-term failure of secondary cooling. NextEra indicated that the 1-SW-FN-51B is not credited for fire safe shutdown in their Appendix R analyses. The senior reactor analyst noted the fire risk would not be a dominant factor or have a notable contribution to the risk evaluation. A review of the dominant core damage sequences indicated that large early release frequency would not be expected to have an impact on the risk conclusion of a very low safety significant issue.

Cross-Cutting Aspect: H.14 - Conservative Bias: Individuals use decision making-practices that emphasize prudent choices over those that are simply allowable. A proposed action is determined to be safe in order to proceed, rather than unsafe in order to stop. Specifically, NextEra did not take timely action to address degraded conditions commensurate with their safety significance. The degraded lubricating oil was a known condition and actions were not taken to understand and address the condition until the fan failed due to a loss of lubricating oil.

Enforcement:

Violation: Title 10 CFR Part 50, Appendix B, Criterion XVI, "Corrective Action," requires, in part, that measures be established to ensure conditions adverse to quality, such as failures, malfunctions, deficiencies, deviations, defective material and equipment, and nonconformances are promptly identified and corrected.

Contrary to the above, from April 28, 2021 to September 26, 2021, NextEra failed to correct a condition adverse to quality. Specifically, multiple oil samples for the Unit 1, 'B' train, cooling tower fan indicated that high particulate existed in the lubricating oil but actions were taken only to confirm the adverse condition, not to correct the condition until the fan failed on September 17, 2021.

Enforcement Action: This violation is being treated as a non-cited violation, consistent with Section 2.3.2 of the Enforcement Policy.

| Pressurizer Safety Valve Outside of Technical Specification Limits Discovered During As-Found Set Point Testing | | | |
|---|---|---|---|
| Cornerstone | Severity | Cross-Cutting Aspect | Report Section |
| Not Applicable | Severity Level IV NCV 05000443/2021003-03 Open/Closed | Not Applicable | 71153 |

A self-revealed Severity Level IV non-cited violation of Technical Specification 3.4.2.2, "Reactor Coolant System Safety Valves" was identified when testing results of one of the three pressurizer safety valves did not meet the technical specification requirement of being within +/- 3 percent of design lift pressure.

Description:  As reported in LER 05000443/2021-001-00 (ML21140A411), during testing of the pressurizer safety valves performed by an off-site vendor, the as-found set point for one of the three pressurizer safety valves removed during the station's 2020 refueling outage did not meet the technical specification 3.4.2.2 requirement of being within +/- 3 percent of design lift pressure.  The subject pressurizer safety valve had an as-found set point pressure that was -4.2 percent of design lift pressure.  The pressurizer safety valve was installed in the plant from October 25, 2018 until April 01, 2020.

Although the technical specification limit was surpassed, the as-found set point remained sufficiently higher than normal transient conditions and no inadvertent valve actuation occurred during the cycle.  The contributing cause of the excessive set point pressure is attributed to set point drift.  A direct cause of the excessive set point drift was not able to be determined.

The inspectors determined that it was not reasonable to foresee the set point drift and therefore no performance deficiency was identified.

Corrective Actions:  Since the valve had already been replaced with a tested valve and not in-service at the time of the identified failure, no immediate corrective actions were required.  The planned corrective action is to replace the valve spring and perform testing of the affected valve to ensure that is suitable to be placed back in-service.

Performance Assessment:  The NRC determined this violation was not reasonably foreseeable and preventable by the licensee and therefore is not a performance deficiency.

Enforcement:  The ROP's significance determination process does not specifically consider a violation without a finding in its assessment of licensee performance.  Therefore, it is necessary to address this violation using traditional enforcement.

Severity:  The inspectors determined that the violation was a condition prohibited by technical specifications of very low safety significance (Severity Level IV) since it did not result in appreciable increase in risk because the setpoint remained significantly higher than normal transient pressures, did not inadvertently actuate during the cycle, and meets the criteria described in Enforcement Policy Section 2.3.2 for disposition as a non-cited violation.

Violation:  Technical specification 3.4.2.2, "Reactor Coolant System Safety Valves" requires all pressurizer code safety valves to be operable with a lift setting of 2485 psig +/- 3 percent while the plant is operating in modes 1, 2, or 3.  With one pressurizer code safety valve inoperable, either restore the inoperable valve to operable status within 15 minutes or be in hot standby (mode 3) within 6 hours and hot shutdown (mode 4) within the following 6 hours.

Contrary to the above, one pressurizer code safety valve became inoperable during the operating cycle between October 25, 2018 and April 1, 2020 and the plant remained in a mode of applicability.

This closes LER 05000443/2021-001-00.

Enforcement Action: This violation is being treated as a non-cited violation, consistent with Section 2.3.2 of the Enforcement Policy.

**EXIT MEETINGS AND DEBRIEFS**

The inspectors verified no proprietary information was retained or documented in this report.

- On August 12, 2021, the inspectors presented the triennial heat sink inspection results to Mr. Jeff Sobotka, Engineering Director and other members of the licensee staff.
- On September 1, 2021, the inspectors presented the occupational ALARA inspection results to Mr. Jeff Sobotka, Engineering Director and other members of the licensee staff.
- On November 9, 2021, the inspectors presented the integrated inspection results to Mr. Brian Booth, Site Vice President and other members of the licensee staff.

**DOCUMENTS REVIEWED**

| Inspection Procedure | Type | Designation | Description or Title | Revision or Date |
|---|---|---|---|---|
| 71111.07T | Corrective Action Documents | 02376063<br>02377148<br>02377189<br>02378941 | | |
| | Corrective Action Documents Resulting from Inspection | 02400603<br>02400611<br>02401369 | | |
| | Work Orders | 40481527<br>40638933<br>40651051<br>40651054 | | |

19

Document Accession #: 20230201-3035     Filed Date: 02/01/2023

182 FERC ¶ 61,044
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | |
|---|---|
| NextEra Energy Seabrook, LLC | Docket Nos.  EL21-3-000 |
| NECEC Transmission LLC and<br>Avangrid, Inc. | EL21-6-000 |
| v. | |
| NextEra Energy Resources, LLC and<br>NextEra Energy Seabrook, LLC | |

ORDER DENYING COMPLAINT IN PART, GRANTING COMPLAINT IN PART,
AND DISMISSING PETITION FOR DECLARATORY ORDER

(Issued February 1, 2023)

1.     On October 5, 2020, NextEra Energy Seabrook, LLC (Seabrook) filed a Petition
for Declaratory Order (Petition), pursuant to Rule 207(a)(2) of the Commission's Rules
of Practice and Procedure,[1] requesting that the Commission determine, *inter alia*, that
Seabrook is not required to incur a financial loss to upgrade a 24.5 kV generation circuit
breaker and ancillary equipment (breaker replacement) at Seabrook Station in relation to
NECEC Transmission LLC's (NECEC) New England Clean Energy Connect
transmission line project (NECEC Project).  On October 13, 2020, as amended on
March 26, 2021, NECEC and Avangrid, Inc. (collectively, Avangrid) filed a complaint,
pursuant to sections 206, 210 and 306 of the Federal Power Act (FPA),[2] against NextEra
Energy Resources, LLC, NextEra Energy Seabrook, LLC, FPL Energy Wyman LLC, and
FPL Wyman IV LLC[3] (collectively, Seabrook) alleging that, *inter alia*, Seabrook has

---

[1] 18 C.F.R. § 385.207(a)(2) (2021).

[2] 16 U.S.C. §§ 824e, 824i, 825e.

[3] In the Amended Complaint, Avangrid states that it removed FPL Energy Wyman
LLC and FPL Energy Wyman IV LLC as respondents because no Commission relief is
needed with respect to these entities any longer.  Avangrid Amended Complaint at 5 n.8.

USCA Case #23-1094      Document #2024393          Filed: 10/30/2023      Page 183 of 346

been unlawfully attempting to delay and unreasonably increase the costs of the breaker replacement.  On September 7, 2021, the Commission issued an order in the complaint proceeding[4] requesting additional briefing regarding, *inter alia*, whether Seabrook was required to replace the circuit breaker pursuant to the provisions of its Large Generator Interconnection Agreement (Seabrook LGIA).  As discussed below, we grant the complaint in part, deny the complaint in part, dismiss the petition for declaratory order and direct Seabrook to replace the breaker at Seabrook Nuclear Generating Station (Seabrook Station) pursuant to its obligations under the Seabrook LGIA and Good Utility Practice.

## I.  <u>Background</u>

2.      In 2017, the Commonwealth of Massachusetts selected Avangrid to construct the NECEC Project, a participant-funded transmission project, consisting of a proposed 320 kV overhead high voltage direct current transmission line approximately 145 miles in length, from the Quebec-Maine border to a new converter station in Lewiston, Maine, and a new 1.6-mile 345 kV alternating current transmission line from the new Lewiston, Maine converter to the existing Larrabee Road Substation.  The NECEC Project will enable the delivery of up to 1,200 MW of hydroelectric energy from Quebec to New England for at least 20 years under Commission jurisdictional transmission contracts.[5]

3.      The ISO-NE Tariff[6] requires participant-funded transmission projects like the NECEC Project to interconnect to the transmission system as Elective Transmission

---

[4] *NECEC Transmission LLC v. NextEra Energy Res., LLC*, 176 FERC ¶ 61,148 (2021) (Briefing Order).  The Briefing Order addressed Avangrid's complaint but not Seabrook's Petition.  The order further instituted an additional FPA section 206 proceeding in Docket No. EL21-94-000 to investigate the justness and reasonableness of the ISO New England Inc. (ISO-NE) Transmission, Markets and Services Tariff (Tariff), specifically, its possible application to generating facilities as Affected Parties charged with making upgrades in circumstances such as those presented here.  *Id.* P 20.  That additional FPA section 206 proceeding remains pending before the Commission and is not addressed here.

[5] Avangrid Complaint at 5-6; *see also Cent. Me. Power Co.*, 165 FERC ¶ 61,034 (2018) (order accepting the original Central Maine Power Company's transmission service agreements for the NECEC Project).  As a condition of the Maine Public Utilities Commission's approval of the Certificate of Public Convenience and Necessity for the NECEC Project, Central Maine Power Company was required to transfer the NECEC Project to a separate corporate entity, NECEC Transmission.  Avangrid Complaint at 6.

[6] Tariff, § II.

Upgrades (ETU)[7] using Tariff-required interconnection procedures similar to those for generation projects.  Schedule 25 of the ISO-NE Tariff governs this process whereby a transmission developer may submit a request to interconnect an ETU project to the transmission system.[8]

4.      In 2017, Central Maine Power Company, on behalf of Avangrid, submitted an ETU Schedule 25 interconnection request for the NECEC Project to ISO-NE.  ISO-NE subsequently performed a system impact study to assess the impact of the NECEC Project on the transmission system and any Affected Systems.[9]  Based on the system impact study, ISO-NE determined that several upgrades would be necessary to accommodate the interconnection of the NECEC Project to the ISO-NE transmission system, including, as pertinent in this proceeding, the replacement of the circuit breaker[10]

---

[7] "Elective Transmission Upgrade" is defined as "a new Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is interconnecting to the Administered Transmission System, or an upgrade to an existing Pool Transmission Facility, Merchant Transmission Facility or Other Transmission Facility that is part of or interconnected to the Administered Transmission System for which the Interconnection Customer has agreed to pay all of the costs of said Elective Transmission Upgrade and of any additions or modifications to the Administered Transmission System that are required to accommodate the Elective Transmission Upgrade.  An Elective Transmission Upgrade is not a Generator Interconnection Related Upgrade, a Regional Transmission Upgrade, or a Market Efficiency Transmission Upgrade." ISO-NE, Tariff, § II H, Schedule 25 (Elec. Transmission Upgrade Inter. Proc.) (5.0.0), § 1 (Schedule 25).

[8] *See* Schedule 25, § 2.

[9] The Tariff defines an "Affected System" as "any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection."  *See id.* § 1.

[10] The existing circuit breaker is approximately 20 feet long by 15 feet wide and weighs approximately 32,000 pounds.  Seabrook November 2 Answer, Ex. 5 at 3.  It is rated at 25 kV, 35-kA rated continuous current and 165-kA rated short circuit current. Seabrook has uprated the breaker from its original 150-kA to its current 165-kA short circuit current through two upratings in 2006 and 2016, to continue satisfying the symmetrical short circuit current rating.  Seabrook Answer to Amended Complaint, Ex. 1 at 6, Ex. 2.  In a 2016 study, the short circuit current of the breaker was calculated to be 164,611.2 Amps (164.6 kA).  *Id.*, Ex. 3 at 1-3.  This 2016 study also noted that "no additional increase in short circuit capability is possible without a replacement of the current circuit breaker."  *Id.* at 3.  ISO-NE has stated that a very large number of

Document Accession #: 20230201-3035     Filed Date: 02/01/2023

located at the Seabrook Station,[11] which is owned and operated by Seabrook. Specifically, Avangrid states that the system impact study showed that the breaker was operating at 99.6% of its capability prior to the NECEC project, but with the NECEC project in service, the breaker would operate at 101.2% of its capability.[12]  Based on ISO-NE's system impact study, pursuant to Schedule 25 ISO-NE determined that Seabrook Station is an Affected System and, in its capacity as the owner of an Affected System, Seabrook is an Affected Party.[13]

## II.     Avangrid Complaint – Docket No. EL21-6-000

### A.     Complaint, Amended Complaint and Briefing Order

5.      Avangrid contends that Seabrook is unlawfully interfering with the interconnection of the NECEC Project.  Avangrid states that Seabrook is attempting to use Seabrook's status as an Affected Party in order to block, delay or add unreasonable costs to the interconnection of the NECEC Project, inconsistent with the Commission's open access regulations and policies.  Avangrid argues that Seabrook, a direct competitor of Avangrid, stands to lose significant revenues and profits as a result of the successful development of the NECEC Project due to reduced energy and capacity revenues in the ISO-NE wholesale markets for Seabrook's existing generation resources.[14]

---

subsequent interconnection requests will have some impact on the circuit breaker, but all subsequent studies assumed that the breaker would have been replaced.  ISO-NE Initial Brief at 16.

[11] Seabrook Station is a 1,250 MW nuclear power plant located in Seabrook, New Hampshire.  Seabrook Station is located within the control area operated by ISO-NE and sells into the ISO-NE energy and capacity markets.  Seabrook states that during normal plant operating conditions, electrical power from Seabrook Station's main generator is supplied to the electrical grid through the breaker.  Seabrook Station is connected to the grid through a substation and three 345 kV high voltage lines.  Seabrook Petition at 3.

[12] Avangrid Amended Complaint, Ex. E at 3.

[13] Avangrid Complaint at 14; *see* ISO New England Inc., Letter at 1, Docket Nos. EL21-3-000 and EL21-6-000 (filed May 6, 2021).  The Tariff defines an "Affected Party" as "the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process." Schedule 25, § 1.

[14] Avangrid Complaint at 12.

6.      In its amended complaint, Avangrid requests that the Commission direct Seabrook to begin planning and engineering so that the necessary breaker replacement work can be completed during a planned outage at Seabrook Station in 2023 and order Seabrook to take any other steps necessary for the breaker replacement.[15]  Avangrid also provides an updated unexecuted facilities agreement,[16] which will cover engineering, procurement, and construction of the breaker replacement, and requests that the Commission direct Seabrook to execute the facilities agreement.[17]  Avangrid contends that Seabrook has made it clear that it will not replace the breaker unless ordered to do so by the Commission.  Avangrid argues that Seabrook can safely replace the breaker, which it contends is not an unusual project and is in an area of the plant with minimal conflicts with other outage work.[18]

7.      On September 7, 2021, the Commission issued the Briefing Order finding that "additional briefing is needed to more fully develop the record to resolve the issues raised in the Complaint."[19]  As discussed below, the record included Seabrook's submission of the Seabrook LGIA.

### B.      Responsive Pleadings

8.      Notice of Avangrid's complaint was filed in the *Federal Register*, 85 Fed. Reg. 66,971 (Oct. 21, 2020), with interventions or protests due November 2, 2020.  Calpine Corporation, Dominion Energy Services, Inc., Exelon Corporation, Eversource Energy Service Company, H.Q. Energy Services (U.S.) Inc., Massachusetts Attorney General Maura Healey, Massachusetts Municipal Wholesale Electric Company, New England States Committee on Electricity, NRG Power Marketing LLC, Public Citizen, Inc., and Massachusetts Department of Public Utilities (Massachusetts DPU) filed motions to intervene.  National Grid[20] filed a motion to intervene and comments.

---

[15] *Id*. at 9.  Seabrook states the parties are now working to replace the breaker during the fall 2024 outage.  Seabrook, Transmittal Letter, Docket No. ER22-2807-000, at 2 (filed Sept. 7, 2022).

[16] Avangrid also refers to the facilities agreement as an Affected Systems Agreement.  For clarity, we refer to the agreement as a facilities agreement.

[17] Avangrid Amended Complaint at 5, 13-14, Ex. A.

[18] *Id*. at 14.

[19] Briefing Order, 176 FERC ¶ 61,148 at PP 17-19.

[20] National Grid comprises Massachusetts Electric Company, Nantucket Electric Company, The Narragansett Electric Company, and New England Power Company.

Document Accession #: 20230201-3035          Filed Date: 02/01/2023

On November 2, 2020, Seabrook filed an answer to Avangrid's initial complaint.  On November 17, 2020, Avangrid filed an answer to Seabrook's answer.  On November 30, 2020, Seabrook filed a supplemental answer.  On December 7, 2020, Avangrid filed a supplemental answer.

9.      Avangrid filed an amended complaint on March 26, 2021.  Seabrook filed an answer to the amended complaint on April 15, 2021.  Avangrid filed an answer to Seabrook's answer on April 30, 2021.  On May 6, 2021, ISO-NE filed a letter taking no position on the issues addressed in the complaint but urging expeditious Commission action.  On May 17, 2021, Avangrid filed a response to ISO-NE's letter, agreeing that the Commission should act quickly to resolve the proceeding.

10.     Motions to intervene in response to the Briefing Order were filed by American Clean Power Association, Anbaric Development Partners, LLC, Connecticut Department of Power and Environmental Protection, Electric Power Supply Association, ISO-NE, and New England Power Generators Association, Inc.  Vista Corp. filed a motion to intervene out of time.

11.     Initial Briefs filed in response to the Briefing Order were filed by Avangrid, ISO-NE, New England Power Generators Association, Inc. and Electric Power Supply Association (NEPGA/EPSA), Massachusetts Attorney General Maura Healy (Massachusetts Attorney General), and Seabrook.  The Massachusetts Department of Energy Resources filed a motion for leave to file comments out of time and comments.

12.     Reply Briefs were filed by Avangrid, ISO-NE and Seabrook.  Seabrook filed for motion for leave to answer and answer.  Avangrid filed an answer to Seabrook's answer.

13.     On September 20, 2021, Avangrid and Seabrook filed motions to lodge an executed engineering and procurement agreement (E&P Agreement) between Seabrook and NECEC Transmission LLC to commence immediately the engineering and conceptual design for the replacement of the circuit breaker at issue in this case.[21]  Avangrid and Seabrook explain that the E&P Agreement will clarify that one disputed issue – the filing of an unexecuted E&P Agreement – has been resolved.[22]  On

---

[21] The Commission accepted the E&P Agreement for filing effective August 20, 2021.  *NextEra Energy Seabrook, LLC*, Docket No. ER21-2719-000 (Oct. 4, 2021) (delegated order).  On September 7, 2022, Seabrook filed an executed amended and revised E&P Agreement governing the final engineering drawings through the procurement and delivery of breaker.  The Commission also accepted the revised E&P Agreement for filing effective September 8, 2022.  *NextEra Energy Seabrook, LLC*, Docket No. ER22-2807-000 (October 24, 2022) (delegated order).

[22] Avangrid Motion to Lodge, Docket No. EL21-6-000, at 2 (Sept. 20, 2021).

November 17, 2021, Seabrook filed a motion to lodge a November 10, 2021 letter from a Branch Chief of the U.S. Nuclear Regulatory Commission (NRC Letter) and an accompanying NRC Inspection Report for Seabrook Station, for the time period from July 1, 2021, through September 30, 2021 (NRC Seabrook Report). Seabrook contends that the NRC Seabrook Report refutes Avangrid's claim that Seabrook should have already replaced the breaker at issue in this proceeding.[23]

14.     On November 29, 2021, Avangrid filed an answer to Seabrook's November 17, 2021 motion to lodge, arguing that Seabrook's motion is outside the scope of this proceeding. Avangrid argues that Seabrook's contention that the NRC Letter refutes Avangrid's arguments rests on a mischaracterization. Avangrid explains that the arguments put forth by Avangrid in these proceedings focus on Seabrook's responsibility for and control over the breaker and the fact that Seabrook has engaged in efforts to prevent or delay the Seabrook breaker replacement. Avangrid contends that nothing in the motion to lodge or the NRC Seabrook Report challenges this premise.[24]

15.     On December 9, 2022, Avangrid filed a motion to lodge an amended E&P Agreement between Avangrid and NECEC Transmission LLC.[25] Avangrid explains that the Amended E&P Agreement amends and restates the earlier E&P Agreement and allows for the delivery of the Seabrook Breaker in advance of the scheduled Fall 2024 refueling outage at Seabrook Station.[26]

## III.   Seabrook Petition - Docket No. EL21-3-000

### A.     Petition for Declaratory Order

16.     Seabrook filed a petition for declaratory order requesting that the Commission declare that: (1) Seabrook is not required to incur a financial loss to upgrade the circuit breaker; and (2) Seabrook will not be liable for consequential damages for the service it provides to Avangrid under a facilities agreement.[27] In the alternative, Seabrook requests

---

[23] Seabrook Motion to Lodge, Docket Nos. EL21-3-000 & EL21-6-000, at 1 (Nov. 17, 2021).

[24] Avangrid Answer to Seabrook Motion to Lodge at 2.

[25] Avangrid Motion to Lodge, Docket No. EL21-6-000 (Dec. 9, 2022).

[26] *Id*. at 1.

[27] An additional issue regarding whether it is appropriate to define "Good Utility Practice" for the E&P Agreement and facilities agreement to replace the breaker in terms of the practices of the nuclear power industry has been resolved by the parties and accepted by a prior Commission order. Seabrook Motion to Lodge, Docket

Document Accession #: 20230201-3035    Filed Date: 02/01/2023

USCA Case #23-1094    Document #2024393    Filed: 10/30/2023    Page 189 of 346

Docket Nos. EL21-3-000 and EL21-6-000                                    - 8 -

that the Commission declare that nothing in the Tariff requires Seabrook to enter into an agreement to replace the breaker, and, therefore, that Seabrook is entitled to bargain for appropriate terms and conditions for cost recovery and limit liability associated with providing the service. Seabrook states that it intends to enter into a facilities agreement if it is made whole and receives appropriate protections.[28]

## B.    Notice and Responsive Pleadings

17.    Notice of Seabrook's petition was filed in the *Federal Register*, 85 Fed. Reg. 64,453 (Oct. 13, 2020), with interventions and protests due on or before November 4, 2020.

18.    Calpine Corporation, Dominion Energy Services, Inc., Exelon Corporation, H.Q. Energy Services (U.S.), Inc., National Grid, New England States Committee on Electricity, NRG Power Marketing, LLC, and Public Citizen, Inc. filed motions to intervene. Massachusetts Municipal Wholesale Electric Company filed a motion to intervene and comments. Eversource Energy Service Company and NEPGA filed comments.

19.    On November 4, 2020, Avangrid filed a protest. On November 19, 2020, Seabrook filed an answer. On December 4, 2020, Avangrid filed an answer to Seabrook's answer.

20.    On September 20, 2021, Seabrook filed a motion to lodge the E&P Agreement between Seabrook and NECEC Transmission LLC.[29] Seabrook explains that the E&P Agreement will resolve two issues presented in Docket No. EL21-3-000: whether Seabrook must file an executed E&P Agreement and whether Good Utility Practice should be defined in terms of the practices of the nuclear power industry.[30]

---

No. EL21-3-000, at 2-3 (Sept. 20, 2021); *see* Avangrid Motion to Lodge, Docket No. EL21-6-000, at 3 n.8 (Sept. 20, 2021); *NextEra Energy Seabrook, LLC*, Docket No. ER21-2719-000 (Oct. 4, 2021) (delegated letter order accepting E&P Agreement).

[28] Seabrook Petition at 37.

[29] Seabrook, Motion to Lodge, Docket No. EL21-3-000, at 2 (filed Sept. 20, 2021).

[30] *Id.* at 2.

JA582

## IV.    Discussion

### A.    Procedural Matters

21.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2021), the timely, unopposed motions to intervene in Docket Nos. EL21-3-000 and EL21-6-000 serve to make the entities that filed them parties to this proceeding.[31]

22.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d), we grant Vista Corp.'s late-filed motion to intervene in Docket No. EL21-6-000 given its interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.  We also grant the Massachusetts Department of Energy Resources' motion to file comments out of time in Docket No. EL21-6-000.  Accepting comments at this stage of the proceeding will not disrupt the proceeding or place additional burdens on existing parties.

23.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2), prohibits an answer to an answer or protest unless otherwise ordered by the decisional authority.  We accept parties' answers in Docket Nos. EL21-3-000 and EL21-6-000 because they provided information that assisted us in our decision-making process.

24.    We grant Seabrook and Avangrid's September 20, 2021 motions to lodge.  Avangrid and Seabrook have demonstrated good cause for granting the motions as the information assisted us in our decision-making and ensures a complete record.  We also grant Seabrook's November 17, 2021 motion to lodge.  While we disagree with Avangrid that Seabrook's motion to lodge should be denied, we also accept Avangrid's November 29, 2021 answer thereto because both pleadings assisted us in our decision-making process.  We also grant Avangrid's December 9, 2022 motion to lodge in order to ensure a complete record.

### B.    Substantive Matters

25.    As discussed further below, we deny Avangrid's complaint in part and grant Avangrid's complaint in part to find that Seabrook is responsible for replacing the breaker, which is a component of its generating facility, pursuant to the Seabrook LGIA.  We also dismiss Seabrook's petition for declaratory order.

---

[31] Motions to intervene and answers in Docket No. EL21-6-000 were also accepted in the Briefing Order.

### 1.  <u>Seabrook's Obligation to Replace the Breaker</u>

### a.  <u>Complaint</u>

26.   Avangrid argues that Affected Systems and Affected Parties such as Seabrook have open access transmission and interconnection obligations under the FPA,[32] the Commission's regulations, and open access precedent.[33]   Avangrid argues that these interconnection obligations apply to Seabrook as an Affected Party with respect to the breaker replacement and to associated generator-owned transmission facilities that may need modification in conjunction with the interconnection of the NECEC Project. Avangrid maintains that the Commission has found that Affected Parties are required to provide transparency in their process of identifying necessary upgrades in order to make sure that they do not unduly discriminate against projects seeking to interconnect.[34]

27.   Avangrid contends that the Tariff requires Seabrook to accommodate the NECEC Project's interconnection and act in good faith, stating that Schedule 25, section 9 provides that an ETU interconnection customer may request, and the Affected Party "shall offer," an E&P Agreement that authorizes the interconnecting transmission customer and Affected Party to begin engineering and procurement of long lead-time

---

[32]   Avangrid Complaint at 22 (citing *Otter Tail Power Co. v. Midcontinent Indep. Sys. Operator, Inc*., 151 FERC ¶ 61,220, at P 47 (2015) (*Otter Tail*) (finding that the interconnection customers of an Affected System operator and the interconnection customers of a directly-connected transmission owner are similarly situated and that the comparability principle requires similarly situated customers to be treated comparably in the transmission planning context); *S. C. Elec. & Gas Co.*, 143 FERC ¶ 61,058, at P 48 (2013), *order on reh'g*, 147 FERC ¶ 61,126, *order on reh'g*, 147 FERC ¶ 61,126 (2014) (*SCG&E*) ("The comparability principle requires public utility transmission providers . . . to develop a transmission system plan that meets the specific service requests of their transmission customers and otherwise treats similarly-situated customers . . . comparably in transmission system planning."); *PJM Interconnection, L.L.C.*, 129 FERC ¶ 61,161, at P 63 (2009) (*PJM*)).

[33]   *Id*. at 23 (citing *Am. Elec. Power Serv. Corp*., 102 FERC ¶ 61,336 (2003) (*AEPSC*) (finding that an interconnection customer's pending request to interconnect cannot be "held hostage" to the obstacles faced in seeking cooperation of an Affected System to construct upgrades); *Nev. Power Co.*, 97 FERC ¶ 61,227 (*Nevada Power*), *reh'g denied*, 99 FERC ¶ 61,347 (*Nevada Power II*) (2002)).

[34]   *Id*. (citing *EDF Renewable Energy, Inc.*, 168 FERC ¶ 61,173, at P 20 (2019) (*EDF*)).

items necessary for the interconnection, which Seabrook has not done.[35]  Avangrid argues that Seabrook is also violating Schedule 25, section 3.2.1.1, which specifies that Affected Parties must construct Network Upgrades needed to interconnect an External ETU, and section 12.1, which requires an Affected Party to negotiate in good faith regarding a schedule for the construction of Network Upgrades.[36]

28.     Avangrid argues that Seabrook has refused to agree to a reasonable timeframe for pre-construction efforts to replace the breaker.[37]  Avangrid states that Seabrook has claimed that a 22-month period of pre-construction and project staging is necessary, but Avangrid contends that this is an attempt to convert corporate goals with respect to planned outages into imaginary regulatory mandates.[38]  Avangrid argues that, because of Seabrook's historical opposition to the NECEC Project, Seabrook's statements citing its own policies as a basis for its inability to accommodate the project lack credibility.[39]  Avangrid contends that Seabrook resorts to technical jargon without substantive support when it contends that the breaker replacement involves high consequence, low probability, station operational and project risks that require additional time and attention.  Avangrid asserts that these arguments are nothing more than efforts to delay the interconnection process for the benefit of Seabrook's and NextEra's generation in New England.

29.     Avangrid argues that Seabrook refused to perform pre-construction prior to the fall 2021 planned outage window, even though Avangrid states construction would only last seven to 14 days.[40]  Avangrid states that Seabrook has refused to conduct an engineering study, even though Seabrook was aware that the breaker would need to be replaced as early as April 8, 2020.[41]  Avangrid adds that Seabrook does not provide a reason why design work cannot be conducted and finished in time to begin ordering the materials and components that have longer lead times, particularly where Avangrid has agreed to pay for the cost of the study.

---

[35] *Id.* at 24 (citing Schedule 25, § 9).

[36] *Id.* at 25.

[37] *Id.*

[38] *Id.* at 26-28, 30.

[39] *Id.* at 27.

[40] *Id.* at 29.

[41] *Id.* at 27.

30.    Avangrid contends that Seabrook has refused to file an unexecuted facilities pursuant to FPA section 205[42] so that the Commission could resolve the parties' disagreements over terms and conditions.[43]  Avangrid contends that, pursuant to FPA section 205(c) and section 35.1(g) of the Commission's regulations, the Affected Party is required to make such a filing if the customer has so requested.[44]  Avangrid contends that it has repeatedly made that request and that Seabrook has refused to follow the Commission's requirements unless Avangrid agrees to Seabrook's unreasonable terms.

31.    Avangrid argues that the Commission should order Seabrook to cease all efforts to interfere with the interconnection of the NECEC Project in order to favor its affiliated generators.  Avangrid contends that Seabrook executives appear to have directed its affiliates to interfere with the NECEC Project's interconnection.  Avangrid states that Seabrook has long opposed the NECEC Project because of the impact it may have on the profitability of Seabrook Station.[45]  Avangrid contends that it appears that NextEra directed NextEra Seabrook to interfere with scheduling and construction of the breaker replacement, as evidenced by the communications by NextEra's executives to reduce its opposition to the NECEC Project in exchange for a substantially above-market purchase power agreement (PPA) from Seabrook Station, notwithstanding the obligations that Seabrook has to use good faith to accommodate the interconnection of the NECEC Project.[46]

### b.    Seabrook's Answer to Complaint

32.    Seabrook argues that the complaint is without merit and should be denied. Seabrook explains that sections 3.2.1.1 and 12.1 of Schedule 25 do not apply because they relate to Network Upgrades and the breaker replacement is not a Network Upgrade.[47]  Seabrook explains that the Tariff defines "Network Upgrades" as "the additions, modifications, and upgrades to the New England Transmission System required at or beyond the Point of Interconnection to accommodate the interconnection of

---

[42] 16 U.S.C. § 824d.

[43] Avangrid Complaint at 33.

[44] *Id*. at 33-34 (citing 18 C.F.R. § 35.1(g) (2021) (requiring that a public utility file all unexecuted agreements under which service will commence at the request of the customer)).

[45] *Id*. at 34.

[46] *Id.* at 35.

[47] Seabrook November 2 Answer at 24-25.

the Elective Transmission Upgrade to the Administered Transmission System."[48]
Seabrook further explains that the "New England Transmission System" is "the system of
transmission facilities . . . within the New England Control Area under the ISO's
operational jurisdiction."[49]  Seabrook argues that, therefore, the breaker does not meet the
definition of Network Upgrade and so the Tariff does not require Seabrook to replace the
breaker pursuant to these Tariff provisions.[50]

33.     Seabrook contends that most of Avangrid's arguments rely on the assumption that
the breaker is a transmission facility, but the breaker is actually part of its generating
facility.  Seabrook explains that the purpose of the breaker is to connect the generator to
offsite power and to protect the generator from faults on the transmission system.
Seabrook further explains that, when the breaker is tripped, back-feed power flows from
the switchyard through the generator step-up transformers to the station buses via the unit
auxiliary transformers, thus providing an immediate access circuit from the preferred
power supply to the onsite distribution system.  Seabrook thus asserts that the breaker is
keeping energy out when it actuates, rather than facilitating transmission.  Seabrook
concludes that the breaker is not used for the "transmission of electric energy in interstate
commerce" and is therefore not a jurisdictional transmission facility under the FPA.[51]

34.     Seabrook similarly argues that the breaker is not an interconnection facility
because the Seabrook LGIA defines "Generating Facility" as "Interconnection
Customer's device for the production of electricity identified in the Interconnection
Request, but shall not include the Interconnection Customer's Interconnection
Facilities."[52]  Seabrook contends that this means that any piece of equipment which is not
an interconnection facility is a generation facility.  Seabrook explains that, in turn, the
Seabrook LGIA defines interconnection facilities as those facilities specified in
Appendix A of the LGIA which are located between the generating facility and the point
of change in ownership.[53]  Seabrook contends that the breaker is not so located and is not
listed in Appendix A, therefore the breaker cannot be Interconnection Customer
Interconnection Facilities (ICIF), as per Order No. 807, which limits ICIF to facilities

---

[48] *Id*. at 25 (citing Schedule 25, § 1).

[49] *Id*. (citing Schedule 25, § I.2.2).

[50] *Id*. at 25-26.

[51] *Id*. at 10 (citing 16 U.S.C. § 824(a)).

[52] *Id*. at 11 (citing Seabrook LGIA at 10).

[53] *Id*. (citing Seabrook LGIA at 11).

listed in the Seabrook LGIA as ICIF.[54]  Seabrook continues that, even if the breaker was found to be ICIF, Seabrook would still not be subject to open access requirements, because Order   No. 807 granted generators owning ICIF waiver from those requirements.[55]

35.     Seabrook argues that Avangrid has not cited to any FPA or Tariff provisions or Commission orders which would subject Affected Parties that are generators to the Commission's open access requirements.[56]  Seabrook explains that, by rule, open access requirements expressly apply only to transmission facilities, meaning those that are used for the transmission of electric energy in interstate commerce.[57]  Seabrook explains that generators are only subject to open access requirements if they own interconnection facilities to which a customer seeks to connect, which is not the case here.[58]  Seabrook argues that Avangrid has not identified a single case where the Commission used its open access rules to order a utility to replace a generating facility component within a generating plant.[59]  Seabrook explains that the FPA does not provide the Commission with jurisdiction over facilities used for generation.[60]

36.     Seabrook disagrees with Avangrid's reliance on the transmission principle of comparability referenced in *Otter Tail*.[61]  Seabrook contends that the central issue in *Otter Tail* was whether a transmission-owner Affected Party should be treated comparably to other transmission providers in Midcontinent Independent Transmission System Operator, Inc. (MISO) and allowed to self-fund Network Upgrades on its system that were required for the interconnection of a facility to a different transmission system. Seabrook argues that this case has no bearing on how a generation-owner Affected Party should be treated because the Commission's open access regulations only apply to

---

[54] *Id*. at 11-12 (citing *Open Access & Priority Rts. on Interconnection Customer's Interconnection Facilities*, Order No. 807, 150 FERC ¶ 61,211, at P 113, *order denying reh'g and granting clarification*, 153 FERC ¶ 61,047 (2015)).

[55] *Id*. at 14.

[56] *Id*. at 13-14.

[57] *Id*. at 14 (citing 18 C.F.R. § 35.28(c)(1) (2021)).

[58] *Id*. at 6.

[59] *Id*. at 15.

[60] *Id*. at 12 (citing 16 U.S.C. § 824(b)(1)).

[61] *Id*. at 16 (citing *Otter Tail*, 151 FERC ¶ 61,220 at PP 2, 47).

transmission facilities owned by a transmission owner.  Seabrook adds that *Otter Tail* did not involve anyone attempting to impose an obligation on an affected party.[62]

37.    Seabrook adds that *SCE&G* and *PJM* do not support Avangrid's position that the comparability principle dictates that generation owning Affected Parties have open access obligations.  Seabrook argues that *SCE&G* and *PJM* involve local transmission planning and cost allocation requirements of Order No. 1000, which Seabrook contends are irrelevant to the dispute between Seabrook and Avangrid.[63]  Finally, Seabrook argues that the comparability principle cannot be used to find a generator should behave comparably to a transmission provider.  Seabrook argues that, as long as it treats all third parties seeking to replace its breakers equally, this principle has been satisfied.[64]

38.    Seabrook also argues that the "hold hostage" language cited by Avangrid in *Nevada Power* and *AEPSC* is irrelevant.[65]  Seabrook contends that those cases stand for the proposition that generators like Seabrook cannot be forced, as a condition of interconnection, to construct upgrades on Affected Systems.  Seabrook adds that it is not holding Avangrid's interconnection "hostage," explaining that Avangrid has not requested interconnection service from Seabrook, but instead is interconnecting to the transmission system approximately 100 miles away.  Seabrook explains that, in *Nevada Power*, the Commission found that the transmission provider could not require the generation owner, as a condition of interconnecting, to accept responsibility for upgrades on the systems of other transmission providers, because this would allow the intermediate utility to hold the generator hostage.[66]  Similarly, Seabrook explains that, in *AEPSC*, the Commission found that a generator could not be held responsible for upgrades to neighboring transmission systems, even if those systems were located adjacent to the interconnecting transmission owner and over objections from the third-party transmission provider that the interconnection would necessitate upgrades on its system.[67]

---

[62] *Id*. at 16-17.

[63] *Id.* at 17.

[64] *Id.* at 17-18.

[65] *Id.* at 18 (citing *Nevada Power*, 97 FERC ¶ 61,227; *AEPSC*, 102 FERC ¶ 61,336).

[66] *Id.* at 18-19 (citing *Nevada Power*, 97 FERC at 62,035; *Nevada Power II*, 99 FERC at 62,494).

[67] *Id*. (citing *AEPSC*, 102 FERC ¶ 61,336 at PP 14-15).

39.    Seabrook argues that Avangrid mistakenly relies on *EDF* for the proposition that Affected Parties have open access obligations.  Seabrook explains that, in *EDF*, the Commission found that the MISO, SPP, and PJM tariffs were unjust and unreasonable because they lacked transparency regarding the affected system processes among the RTOs.[68]  Seabrook contends that *EDF* does not support Avangrid's position that Seabrook has open access obligations because the tariffs in question already obligated each RTO to coordinate with the others on an affected system basis, and *EDF* did not address whether such obligations could be imposed on generators.

40.    Seabrook argues that it has negotiated with Avangrid in good faith, as demonstrated by the timing and substance of back-and-forth contract negotiations. Seabrook also argues that Seabrook could not have delayed Avangrid's interconnection, as Avangrid pushed the in-service date back as a result of court appeals and difficulty getting permits.  Seabrook also argues that Avangrid has not demonstrated that Seabrook has crossed the line from lawful petitioning activity into some form of unlawful activity.[69]  Seabrook adds that the Commission has never regulated First Amendment petitioning rights or adjudicated whether state lobbying efforts are allowable.

41.    Seabrook asserts that it is willing, but not obligated, to enter into a facilities agreement to replace the breaker, provided that it is allowed to recover all costs incurred, including opportunity costs, legal costs, and consequential damages.[70]  Seabrook states that the Tariff does not define nor provide any rules for facilities agreements.

### c.    Avangrid Answer to Seabrook's Answer to Complaint

42.    Avangrid contends that Seabrook has refused to meaningfully engage in discussions regarding the replacement of the breaker, has refused to offer reasonable terms, and has refused to file with the Commission any agreement for the construction of the breaker replacement.  Avangrid contends that Seabrook's approach of delaying negotiations was part of its overall strategy.[71]  Avangrid reiterates that the Commission should issue an order finding that Seabrook must accommodate the interconnection, not interfere with the interconnection, and file the facilities agreement.  Avangrid also reiterates that the Commission should revoke Seabrook's blanket waiver of its Standards

---

[68] *Id*. at 20 (citing *EDF*, 168 FERC ¶ 61,173 at P 20).

[69] *Id*. at 3-5.

[70] *Id*. at 21-22, 32, 36.

[71] Avangrid November 17 Answer at 5.

of Conduct, for the reasons set forth in the complaint.[72]  Avangrid argues that, after
Seabrook files the facilities agreement, the Commission should issue a subsequent order
within 60 days to finalize the terms and conditions of the facilities agreement, which
would resolve any disputed terms and conditions.[73]  Avangrid explains that any
remaining issues regarding the timing for the breaker replacement can be addressed
shortly thereafter, either through negotiation or in a hearing.  Avangrid states that it will
submit expert affidavit(s) on this issue in advance to allow the process to move forward
quickly.

43.     Avangrid reiterates that Seabrook is not immune from the Commission's open
access regulations.  Avangrid states that the Seabrook breaker was identified as a
necessary upgrade in ISO-NE's system impact study.  Avangrid contends that, taking
Seabrook's theory to its logical conclusion, if the breaker is not a transmission facility,
then ISO-NE would not have been able to identify it as part of the required Affected
System upgrades in the system impact study.  Avangrid adds that the Commission should
not allow Affected Parties the opportunity to block interconnection projects they oppose
for purely competitive reasons, as doing so would give existing market participants the
opportunity to prevent further market entry.[74]  Moreover, Avangrid contends that the
nature of the facility or where Avangrid interconnects is irrelevant since ISO-NE
identified the breaker as a necessary upgrade and Seabrook cannot refuse to
accommodate the breaker replacement.[75]

44.     Avangrid disputes Seabrook's argument that it has no open access obligations
because it is not a transmission owner and explains that the Commission has found
Affected Systems are similarly situated to transmission owners and should therefore be
treated the same with respect to transmission upgrades.[76]  Avangrid adds that the
principle of comparability is relevant here because Avangrid relies on Seabrook to
replace the breaker before Avangrid can interconnect and is therefore similarly situated to
an interconnection customer relying on a transmission owner for a physical
interconnection.  Avangrid argues that is unreasonable to find that an Affected System
has the same rights as a transmission owner but none of the transmission owner's
obligations.  Avangrid contends that, even though Seabrook is a generator, it has the

---

[72] *Id*. at 7.

[73] *Id*. at 8.

[74] *Id*. at 8-10.

[75] *Id*. at 14.

[76] *Id*. (citing *Otter Tail*, 151 FERC ¶ 61,220 at P 47).

same incentive to "frustrate the development of new, competitive generation" as any other Affected System or transmission owner.[77]

45.     Avangrid contends that Seabrook said nothing about its proposal for a significantly above-market PPA between Avangrid and Seabrook as the pay-off for removing its opposition to Avangrid's interconnection. Avangrid argues that Seabrook's statements about its First Amendment rights are a red herring that do not provide protection against Seabrook's effort to condition its removal of interference with the NECEC Project on receipt of an overpriced PPA.[78]

### d.     Supplemental Answers

46.     Seabrook argues that the Commission should dismiss the complaint, because it fails to meet the requirements of Rule 206(b)(8) of the Commission's regulations. Seabrook explains that Rule 206(b)(8) requires that a complaint "[i]nclude all documents that support the facts in the complaint in possession of, or otherwise attainable by, the complainant, including, but not limited to, contracts and *affidavits*."[79] Seabrook explains that Avangrid states that it will be submitting expert affidavit(s) on the timing of the breaker replacement in advance.[80] Seabrook contends that Avangrid's withholding of these affidavits has deprived Seabrook of any opportunity to review the alleged support for Avangrid's claims and that failure to include them violates Rule 206(b)(8). Seabrook adds that the PPA is immaterial. Seabrook states that Avangrid's argument that Seabrook's PPA proposal was dramatically above market is irrelevant and incorrect.[81]

---

[77] *Id*. at 15-18 (citing *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401, at P 13 (2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007)).

[78] *Id*. at 18.

[79] Seabrook November 30 Answer at 2 (emphasis added) (citing 18 C.F.R. § 385.206(b)(8) (2021)).

[80] *Id*. (citing Avangrid November 17 Answer at 8).

[81] *Id*. at 3.

47.    Avangrid argues that it has not withheld evidence in violation of Rule 206(b)(8). Avangrid contends that it has presented a complete, justiciable prima facie case to the Commission.[82]

### e.    Amended Complaint and Answers to Complaint

48.    In the amended complaint, Avangrid states that Seabrook has not made any efforts to accommodate the breaker replacement into the 2023 outage[83] and will not do so unless the Commission so orders.[84]  Avangrid further contends that the breaker has so little design margin to spare that Seabrook should have already replaced the breaker, consistent with Good Utility Practice.[85]  Avangrid argues that Seabrook's interpretation of the Tariff—that Seabrook is required to enter into an E&P Agreement but not construct the breaker—would render the requirement to enter into an E&P Agreement meaningless.[86]

49.    Avangrid requests that the Commission:  (1) order NextEra to comply with its interconnection obligations as an Affected Party and/or Affected System under the ISO-NE OATT; (2) direct Seabrook to cease and desist all attempts to block, delay or unreasonably increase the costs associated with the interconnection of the NECEC Project to the Administered Transmission System; (3) require the adoption of a proposed facilities agreement included with Avangrid's complaint and (4) temporarily revoke Seabrook's blanket waiver under Part 358 of the Commission's regulations.[87]  Avangrid adds that the Commission may also choose to initiate an investigation and require NextEra to preserve and provide documents related to the interconnection of the NECEC Project, although Avangrid concedes that this form of relief is not necessary.[88]

50.    In its answer, Seabrook disputes that the breaker is operated unsafely or needs to be replaced absent Avangrid's interconnection.[89]  Seabrook states that the breaker is not

---

[82] Avangrid December 7 Answer at 3.

[83] Avangrid Amended Complaint at 4.

[84] *Id*. at 7.

[85] *Id*. at 8.

[86] *Id*. at 11.

[87] *Id*. at 13.

[88]  *Id*. at 13 n.28.

[89] Seabrook March 26 Answer to Amended Complaint at 8-9.

overdutied. Seabrook argues that the margin cited by Avangrid's witnesses refers to the next change on the system, not the margin needed to safely operate Seabrook Station today.[90] Seabrook also argues that it was not given an opportunity to review Avangrid's version of the facilities agreement, as filed in the amended complaint, and disputes many of its terms.[91] Seabrook also argues that FPA section 206 does not give the Commission the ability to impose a new rate on Seabrook (i.e., Avangrid's proposed facilities agreement, when there is no existing rate in place).

51. National Grid argues that the Commission should allow ETUs like the NECEC Project to be interconnected in a timely manner subject to reasonable resolution of issues identified by ISO-NE in its interconnection studies. National Grid argues that a transmission developer's project should not be unduly delayed or obstructed, and a developer should be able to bring disputes before the Commission in a timely fashion, by the filing of unexecuted interconnection agreements if necessary.[92]

### f. Briefing Order

52. On September 7, 2021, the Commission issued the Briefing Order, seeking additional information to more fully develop the record to resolve issues raised in Avangrid's complaint. The Commission noted the disagreement between the parties as to whether the breaker was properly classified as part of Seabrook Station's generating facility and whether the ISO-NE Tariff and open access principles apply with respect to the breaker replacement. The Commission sought additional evidence regarding the nature of the breaker and whether Seabrook's LGIA obligated Seabrook to replace the breaker. Specifically, the Commission invited parties to submit briefing, evidence, and arguments on the following questions:

   i.   Whether or not Seabrook's breaker is properly identified as a part of Seabrook's generating facility.

   ii.  If Seabrook's breaker is part of Seabrook's generating facility, under what authority, if any, Seabrook may be subject to the upgrade obligations imposed on Affected Parties under the ISO-NE Tariff.

   iii. If Seabrook's breaker is part of Seabrook's generating facility, what obligations, if any, Seabrook has under its LGIA with respect to replacement of the breaker and whether or not ISO-NE Operating

---

[90] *Id*. at 9.

[91] *Id*. at 2, 12-13.

[92] National Grid Answer at 3.

Documents and Applicable Reliability Standards impose an obligation to replace the breaker.[93]  If Seabrook's breaker is appropriately classified as a system protection facility, what obligations Seabrook has to replace the breaker.[94]  If the Seabrook LGIA obligates Seabrook to act, please describe the scope of Seabrook's obligation under the LGIA.

   iv.   Whether there exists any solution for the interconnection of the NECEC Project that may be implemented without the replacement of Seabrook's breaker.

   v.    If replacement of Seabrook's breaker is necessary for the interconnection of the NECEC Project, whether there exists any interim solution for the interconnection of the NECEC Project that would allow energization of the NECEC Project prior to the replacement of Seabrook's breaker.

### i.   **Initial Briefs**

53.    Seabrook argues that the Seabrook LGIA does not require Seabrook to pay for or replace the breaker required by Avangrid's NECEC Project.  Seabrook states that the scope of the Seabrook LGIA is limited to the interconnection service provided to Seabrook and to interconnect Seabrook to the transmission system administered by ISO-NE, not provide interconnection service needed by others.  Seabrook contends that the Seabrook LGIA has nothing to do with other interconnection customers who seek to interconnect with ISO-NE after Seabrook is already interconnected.[95]  Seabrook adds that section 30.5 of the Seabrook LGIA expressly states that Avangrid and other third parties

---

[93]  The Commission also noted that, pursuant to the terms of Seabrook's LGIA, Seabrook must operate, maintain, and control, at its own expense, its generating facility in a safe and reliable manner and in accordance with the Seabrook LGIA, ISO New England Operating Documents, and Applicable Reliability Standards.  Seabrook November 2 Answer, Ex. No. 6, Seabrook LGIA, § 9.4.

[94]  *Id.* § 9.7.4.1 (requiring Seabrook to install, operate, and maintain System Protection Facilities in accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents); *see also id.*, Art. 1 (defining System Protection Facilities as "the equipment . . . required to protect:  (1) the New England Transmission System from faults or other electrical disturbances occurring at the Generating Facility; and (2) the Generating Facility from faults or other electrical system disturbances occurring on the New England Transmission System or on other delivery systems or other generating systems to which the New England Transmission System is directly connected").

[95]  Seabrook Initial Brief at 9.

are not beneficiaries of the Seabrook LGIA and so Seabrook cannot be required to fund the breaker replacement.[96]

54.    Seabrook adds that finding a benefit for Avangrid in the Seabrook LGIA would be inconsistent with past precedent, in which the Commission found that parties must clearly express their intention to benefit a third party.[97]  Seabrook argues that, in this case, neither before executing the Elective Transmission Upgrade Interconnection Agreement with Central Maine Power Company and ISO-NE (Avangrid IA) nor since, has Avangrid ever claimed that it had a right to benefit from the Seabrook LGIA, or that ISO-NE and Seabrook were misconstruing the provisions therein.

55.    Seabrook argues that Avangrid is obligated to pay for the breaker replacement. Seabrook argues that if an upgrade is not needed "but for" the interconnection request, the interconnection customer pays for the upgrade.[98]  Seabrook contends that there would be no need to replace the breaker but for the NECEC Project.  Seabrook argues that Avangrid will cause the costs at issue here and Avangrid and its customers will reap the resulting benefits from Avangrid's interconnection.  Seabrook adds that imposing the costs on Seabrook would be unduly discriminatory because Seabrook would be required to pay for a portion of Avangrid's interconnection costs, even though Avangrid pays no portion of Seabrook's.[99]

56.    Seabrook adds that it has a right to deliverability of its resource across the system of the Transmission Provider.  Seabrook explains that, once a generator obtains such a right, by paying any required upgrade costs, any subsequent interconnection customer must likewise pay its own way without undermining the deliverability rights acquired by its predecessors.  Seabrook contends that the questions posed in the Briefing Order imply

---

[96] *Id*. (citing Seabrook LGIA, § 30.5 ("No Third Party Beneficiaries.  This LGIA is not intended to and does not create rights, remedies, or benefits of any character whatsoever in favor of any persons, corporations, associations or entities other than the Parties, and the obligations herein assumed are solely for the use and benefit of the Parties, their successors in interest and, where permitted, their assigns.")).

[97] *Id*. at 10 (citing *Power Auth. of the State of N.Y. v. Long Island Lighting Co.*, 60 FERC ¶ 61,069, at 61,237-38 (1992)).

[98] *Id*. at 10-11 (citing *ISO New England Inc.*, 137 FERC ¶ 61,112, at P 9 (2011) (stating that the Commission has "pointed out that the [ISO-NE] Tariff requires ISO-NE to allocate costs directly to the interconnection customer . . . where such costs would not have been incurred 'but for' the interconnection in order to avoid adverse impacts to the transmission system")).

[99] *Id*. at 12.

that Seabrook could be denied deliverability if it declines to fund the breaker replacement needed by the NECEC Project. Seabrook argues that this would violate the fundamental guarantee that "any future transmission service request for delivery" from Seabrook does not require new upgrades.[100]

57.    Seabrook asserts that any departure from the Commission's long-standing policies on deliverability and on requiring interconnection customers to pay for the upgrades they cause must be explained by substantial evidence. Seabrook argues that it would be bad policy to tell the electric industry that third-party interconnection customers can impose costs on existing resources that are unknowable, uncontrollable, and potentially unlimited. Seabrook argue that this could have a chilling effect on investment in and financing of new facilities.[101] Seabrook explains that, under the interpretation proposed in the Briefing Order, developers would have to take the risk that they can accurately predict future development of other projects and the transmission system beyond any planning horizon currently in use, and then estimate the impact it will have on their project. Seabrook adds that a finding that existing resources must fund costs of future interconnections would also undermine the incentive of developers to efficiently site their project.[102]

58.    Seabrook argues that the Seabrook LGIA does not silently impose effects that are contrary to its purpose. Seabrook maintains that the Commission has previously disagreed with arguments that "the generator should bear the risks and costs of maintaining compatibility with an ever-changing transmission system."[103] Seabrook notes that the Commission subsequently ruled that a generator should not pay costs "that were not the result of interconnecting a generator to the transmission grid but stem from modifications to the transmission system itself."[104]

---

[100] *Id*. at 14 (citing Order No. 2003, 104 FERC ¶ 61,103 at P 756).

[101] *Id*. at 15.

[102] *Id*. at 16.

[103] *Id*. at 18 (citing *Entergy Servs., Inc*., 99 FERC ¶ 61,127, at 61,544 (2002) (*Entergy II*); *Entergy Servs., Inc*., 91 FERC ¶ 61,149, at 61,562 (2000) (*Entergy I*)). The Commission in these cases rejected Entergy's proposed OATT revision that "presume[d] that the generator is responsible for modifications to its facilities in all situations where there are changes in system requirements." *Entergy II*, 99 FERC at 61,544.

[104] *Id*. at 18 (citing *Newmont Nev. Energy Inv. LLC v. Sierra Pac. Power Co*., 147 FERC ¶ 61,030, at P 41 (2014) (*Newmont*) (holding that a generator is not required by its interconnection agreement to fund modifications to its generator caused by changes

59.    Seabrook also argues that the LGIA cannot be read expansively to impose requirements that exceed the Commission's jurisdiction.  Seabrook explains that the LGIA is an exercise of the Commission's jurisdiction over transmission service.  Seabrook explains that the LGIA cannot reasonably be construed to require interconnection customers to pay costs for service that the transmission provider provides to someone else.  Seabrook adds that the Commission cannot leverage its jurisdiction over the service provided to Avangrid to create requirements for Seabrook that are unrelated to the jurisdictional service that Seabrook is receiving.  Seabrook explains that there is no jurisdictional or contractual nexus between Seabrook and Avangrid to order one to provide service to the other.[105]

60.    Seabrook also argues that the requirement that the generator replace the breaker at its own expense would be unconstitutionally confiscatory because Seabrook would be providing a service (breaker replacement) to Avangrid without compensation.[106]

61.    Seabrook contends that the Seabrook LGIA does not obligate it to replace the breaker.  First, Seabrook argues that section 9.7.4.1 of the Seabrook LGIA, which states that Seabrook shall, at its own expense, "install, operate and maintain System Protection Facilities . . . in accordance with the ISO New England Operating Documents, Applicable Reliability Standards," does not require replacement of a facility due to an after-construction event not under the control of Seabrook.  According to Seabrook, this provision merely requires Seabrook to install the facility upon initial interconnection and keep it in good working order to serve its intended function based on the interconnection design at the time of installation.  Seabrook points to the dictionary definitions of the terms install, operate, and maintain to support its argument that replacing the original facility is not included in section 9.7.4.1.[107]  Seabrook adds that the term "modification" is governed by a separate provision in the Seabrook LGIA, section 5.19, which requires that, once interconnected, Seabrook is responsible on a going-forward basis for

---

to the transmission system and instead requiring the entity making the transmission changes to fund the generator modifications).

[105] *Id*. at 20.

[106] *Id*. at 19-21 (citing *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989); *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923); *Algonquin LNG, Inc. v. FERC*, 570 F.2d 1043, 1050 (D.C. Cir. 1978)).

[107] Seabrook argues that install means to set up for use or service; operate means to cause to function, to put or keep in operation; and maintain means to keep in an existing state, to preserve from failure or decline.  According to Seabrook, to maintain is the opposite of changing or upgrading something.  Seabrook Initial Brief at 24.

modifications that may be necessary to maintain or upgrade ICIF. Seabrook therefore argues that its cost responsibility for modifications to its facilities is limited to ICIF when new industry or regulatory requirements are present.[108]

62.    Seabrook likewise argues that the second provision of the Seabrook LGIA mentioned by the Commission, section 9.4,[109] demonstrates that Seabrook is not obligated to replace and pay for the breaker. Seabrook contends that this provision merely allocates the obligation to pay operation and maintenance expense to the generator.[110]

63.    Seabrook adds that Appendix C-1 to the Seabrook LGIA further specifies cost responsibility for modifications that Seabrook must make in response to modifications made by the *interconnecting transmission owner*:

> In addition to article 5.19 of this Agreement . . . in the event Interconnecting Transmission Owner or Interconnection Customer make a modification or functional change to its own facilities that is not required by Applicable Laws and Regulations or Government Authority, and thereby makes it necessary for the other entity to make a modification or functional change to its own facilities that is required in accordance with Good Utility Practice, the entity making the modification or functional change not required by Law or Governmental Authority shall bear the cost of the modification or functional change to the other entity's facilities required in accordance with Good Utility Practice.[111]

64.    Seabrook contends that, while this provision only addresses facilities owned by the interconnecting transmission owner, "it would make no sense under the enunciated principle to conclude that Seabrook should be required to pay for an upgrade caused by a modification to the transmission system by NECEC."[112]

---

[108] *Id.* at 25-26.

[109] Seabrook LGIA, § 9.4 (stating that the interconnection customer shall at its own expense operate, maintain and control the Large Generating Facility and the Interconnection Customer Interconnection Facilities in a safe and reliable manner).

[110] Seabrook Initial Brief at 27.

[111] *Id.* at 22 (citing Seabrook LGIA, app. C-1, § B.III) (emphasis added).

[112] *Id.* at 27.

65.    As to the requirement in section 9.7.4.1 that the installation, operation, and maintenance be in accordance with the relevant operating documents and reliability standards, Seabrook adds that it has no replacement obligations under ISO-NE Operating Documents or Applicable Reliability Standards because neither addresses the responsibility of a generator relating to an upgrade as a result of an exogenous future system condition.[113]

66.    In response to the Briefing Order, ISO-NE notes that, pursuant to Seabrook LGIA section 9.7.5,[114] Seabrook is responsible for having a breaker in place for the purpose of protecting the Seabrook Station and maintaining the breaker. ISO-NE states that the existing breaker served this purpose for many years but now needs to be upgraded because of changes on the system caused by the interconnection of the NECEC Project.  ISO-NE argues that Article 9.7.5 does not require Seabrook to upgrade the breaker for the benefit of another entity's interconnection to the system.[115]  ISO-NE further explains that it is not aware of any NERC reliability standards that impose an obligation on Seabrook to upgrade

---

[113] *Id*. at 27-28.

[114] Seabrook LGIA section 9.7.5 provides:  "Requirements for Protection. In accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and compliance with Good Utility Practice, Interconnection Customer shall provide, install, own, and maintain relays, circuit breakers and all other devices necessary to remove any fault contribution of the Large Generating Facility to any short circuit occurring on the New England Transmission System not otherwise isolated by Interconnecting Transmission Owner's equipment, such that the removal of the fault contribution shall be coordinated with the protective requirements of the New England Transmission System.  Such protective equipment shall include, without limitation, a disconnecting device or switch with load-interrupting capability located between the Large Generating Facility and the New England Transmission System at a site selected upon mutual agreement (not to be unreasonably withheld, conditioned or delayed) of the Parties.  Interconnection Customer shall be responsible for protection of the Large Generating Facility and Interconnection Customer's other equipment from such conditions as negative sequence currents, over- or under-frequency, sudden load rejection, over- or under-voltage, and generator loss-of-field.  Interconnection Customer shall be solely responsible to disconnect the Large Generating Facility and Interconnection Customer's other equipment if conditions on the New England Transmission System could adversely affect the Large Generating Facility."  Seabrook LGIA, § 9.7.5.

[115] ISO-NE Initial Brief at 12-13.

the breaker.[116]  However, ISO-NE states that, under NERC reliability standards
FAC-001-3 and FAC-002-3, ISO-NE, as a transmission planner, is required to
study the impacts on affected systems as part of its planning processes to ensure
that no generator facility ratings are violated as a result of an interconnecting
resource.[117]

67.     In response to the Briefing Order, Avangrid argues that finding that
Seabrook is not obligated to replace its breaker would set back competitive
electricity markets and impede state clean energy policies, such as the
Massachusetts program under which the NECEC Project falls.[118]  Avangrid
disputes Seabrook's contention that the breaker cannot be considered transmission
because it is not used for the transmission of energy in interstate commerce.
Avangrid argues that the breaker is the path through which Seabrook Station's
power is delivered to the transmission system and that it "facilitates transmission
and interconnection, as it is also intended to allow Seabrook Station to
interconnect to the ISO-NE grid (regardless of whether it is designed to prevent
power from flowing back into the station or whether it is located near the
generating turbine)."[119]  Avangrid argues that the breaker does not produce
electricity, so should not be deemed a generating facility.

---

[116] *Id.* at 13.

[117] *Id.* (citing NERC Reliability Standard, FAC-002-3, R1, R1.1 (emphasis added)
("Each Transmission Planner and each Planning Coordinator shall study the reliability
impact of:  (i) interconnecting new generation, transmission, or electricity end-user
Facilities and (ii) materially modifying existing interconnections of generation,
transmission, or electricity end-user Facilities.  The following shall be studied:  1.1 The
reliability impact of the new interconnection, or materially modified existing
interconnection, on *affected system(s) . . . .*"); *NERC Consideration of Comments*,
Response of Standard Drafting Team to Comments on Revisions to FAC-001 and
FAC-002, p. 48 (With regard to FAC-002 revisions, "Some commenters preferred
'interconnected [transmission] systems' to 'affected systems.'  The SDT chose to use
'affected' instead of 'interconnected' because an interconnection could impact other
systems that may not be physically interconnected to the system in question.  The SDT
chose to eliminate 'transmission' because the studies should consider the impact on more
than just the transmission system – impacts could include impacts generally on the
electric system.").

[118] Avangrid Initial Brief at 6; *see also* Avangrid Supplemental Answer at 1-2.

[119] Avangrid Initial Brief at 8.

68.     Avangrid argues that, should the breaker be determined to be generation and not a transmission facility, then ISO-NE would not have properly included the breaker in the System Impact Study and should not have required the NECEC Project to be responsible for its replacement.  Avangrid contends that generation equipment that is not transmission equipment in any respect cannot fall within the scope of the System Impact Study because the purpose of the System Impact Study is to evaluate the impacts on transmission facilities.[120]  Avangrid also argues that, if the breaker is generation, there would be no basis in the Tariff to allow the breaker to be a component of an Affected System in the System Impact Study and Avangrid Interconnection Agreement or require it be replaced as part of Avangrid's interconnection.[121]  Avangrid adds that if there is no basis to deem generation to be a component of an Affected System, then Seabrook should have to replace the breaker, just as any other generator must account for changes on the transmission system over time.[122]

69.     The Massachusetts Attorney General argues that the fact that Seabrook, a direct competitor of the NECEC Project, can thwart a major transmission project "simply by refusing to negotiate and agree to commercially reasonable terms manifests a weakness in the interconnection process that must be addressed."[123] Likewise, Massachusetts Department of Energy Resources urges the Commission to act quickly to resolve the conflicts between Avangrid and Seabrook and set clear precedent that will prevent other generation-owning utilities from unreasonably interfering with participant-funded transmission projects which a state has determined to be necessary.  Massachusetts Department of Energy Resources contends that Seabrook is unduly and unfairly leveraging its position to prevent market entry of new projects.[124]

70.     NEPGA/EPSA ask that the Commission limit its findings to the questions raised in the underlying dockets and not expand the inquiry to generators' obligations under their LGIAs.  NEPGA/EPSA argue that Commission precedent requires interconnection costs be paid by those who cause the need for the upgrade.  NEPGA/EPSA explain that this proceeding and the unique operational restrictions of a nuclear generator do not lend themselves to issues that would

---

[120] *Id.* at 10.

[121] *Id.*

[122] *Id.* at 11.

[123] Massachusetts Attorney General Comments at 2.

[124] Massachusetts Department of Energy Resources at 4.

implicate a broader swath of resources.  Should the Commission pursue these questions, NEPGA/EPSA ask the Commission to do so in a generic proceeding.[125]

### ii.        Reply Briefs and Answers

71.        In its reply brief, Seabrook disputes the Massachusetts Attorney General's claims and contends that it has negotiated in good faith to achieve terms consistent with Commission policy and has not attempted to impede state policies.[126] Seabrook argues that Avangrid provides no support for its contention that Seabrook is solely responsible for the impact on the Seabrook generating facility caused by the interconnection of the NECEC Project because it is Seabrook's responsibility to maintain its generation facilities.[127]  Seabrook contends that Avangrid provides no evidence explaining why the language of the Seabrook LGIA requires Seabrook to replace the breaker.[128]  Seabrook also argues that record evidence demonstrates that the breaker is operating in a safe and reliable manner.[129]

72.        Avangrid contends that, regardless of Seabrook's insistence that it is willing to replace the breaker under certain conditions, Seabrook's legal position, if accepted, would give Seabrook a veto right over the NECEC Project, and, potentially, many, if not all, subsequent projects in the queue.  Avangrid further asserts that Seabrook is effectively arguing that it should have this veto power, but that it does not intend to abuse it, which Avangrid contests, because Seabrook is demanding opportunity costs in exchange for replacing the breaker.[130]

73.        ISO-NE disagrees with Avangrid's assertion that the Seabrook breaker must constitute a transmission facility in the context of the System Impact Study.[131]  ISO-NE explains that generation facilities are electric systems and so can be studied and upgraded as part of a System Impact Study.  ISO-NE adds that,

---

[125] NEPGA/EPSA Initial Brief at 5-6.

[126] Seabrook Reply Brief at 14-15.

[127] *Id*. at 8.

[128] *Id*. at 12.

[129] Seabrook Supplemental Answer at 2-3.

[130] Avangrid Reply Brief at 3 n.5.

[131] ISO-NE Reply Brief at 3.

Document Accession #: 20230201-3035          Filed Date: 02/01/2023

contrary to Avangrid's assertions, section 7.3 in Schedule 25 does not limit the scope of a System Impact Study to an evaluation of the impact of the proposed interconnection on transmission facilities.  ISO-NE argues that Avangrid is implicitly arguing that the provisions of the ISO-NE tariff are unjust and unreasonable but without filing a complaint as required by Commission rules.[132]  ISO-NE contends that Avangrid did not allege in its original complaint that ISO-NE's administration of the System Impact Study or the study itself is unjust and unreasonable, and that these provisions are not at issue in Avangrid's complaint against Seabrook.[133]

### g. Commission Determination

74.    We grant the complaint in part and deny the complaint in part.  Specifically, we deny the complaint in part, because Avangrid has not shown that Seabrook is obligated to replace the breaker due to Seabrook failing to meet certain open access obligations or because Seabrook has failed to comply with Schedule 25 of the ISO-NE Tariff.  However, given the specific facts and circumstances in the record before us, we grant the complaint in part and find that, under Seabrook's LGIA, Seabrook may not refuse to replace the breaker because it is needed for reliable operation of Seabrook Station and required by Good Utility Practice.

75.    Avangrid asserts that Seabrook must replace the breaker because Schedule 25 of the Tariff obligates Seabrook to accommodate Avangrid's interconnection request and to act in good faith; Avangrid continues that Seabrook has violated these Tariff requirements by refusing to perform preconstruction activities or set and maintain a reasonable schedule for construction of the breaker replacement.  Avangrid points to three provisions of Schedule 25 to support its argument:  (a) section 3.2.1.1, specifying that Affected Parties must construct Network Upgrades needed to interconnect an External Elective Upgrade; (b) section 12.1, requiring an Affected Party to negotiate in good faith regarding a schedule for the construction of a Network Upgrade; and (c) section 9, requiring an Affected Party to enter into an E&P Agreement.

76.    However, sections 3.2.1.1 and 12.1 of Schedule 25 are specific to Network Upgrades, which the breaker replacement is not, and therefore we disagree with Avangrid that these provisions apply to the breaker replacement at issue here.  The Tariff defines "Network Upgrades" as "additions, modifications, and upgrades to the New England Transmission System required at or beyond the Point of Interconnection to accommodate the interconnection of the Elective Transmission Upgrade to the Administered

---

[132] *Id*. at 7 (citing 16 U.S.C. § 824e; 18 C.F.R. § 385.206).

[133] *Id*. at 8.

Transmission System."[134]  Avangrid has not demonstrated that the breaker can reasonably be considered a Network Upgrade.  We find that the breaker's location and purpose indicate that the breaker is a generator component and therefore cannot be reasonably considered a Network Upgrade to the Administered Transmission System.[135]  In support, we note that the breaker is used not for the transmission of energy but to connect the generator to offsite power and to protect the generator from faults on the Administered Transmission System.[136]  ISO-NE has identified the breaker as part of Seabrook's generating facility, noting that the breaker is protective equipment that is part of the generator terminal, "i.e., a protective part of the device for the production of electricity" and not included in the description of Interconnection Customer's Interconnection Facilities.[137]  Accordingly, because we find that the breaker cannot reasonably be considered a Network Upgrade, we find that sections 3.2.1.1 and 12.1 of the Tariff do not obligate Seabrook to replace the breaker.

77.     Regarding the third provision of Schedule 25, we agree with Avangrid that section 9 requires Seabrook to offer Avangrid an E&P agreement.  Section 9 of Schedule 25 applies to all Affected Parties and provides that any Affected Party (in this case, Seabrook) must provide an E&P Agreement upon request of the Interconnecting Customer.[138]  However, we note that this issue has since become moot because Seabrook filed an E&P Agreement and an Amended and Restated E&P Agreement (Amended E&P Agreement) with the Commission, and both parties agree that this issue has been resolved.[139]

---

[134] Schedule 25, at § 1.

[135] Administered Transmission System is defined as the Pool Transmission Facilities, the Non-Pool Transmission Facilities, and distribution facilities that are subject to the ISO-NE Tariff.  Schedule 25, § 1.

[136] Seabrook November 2 Answer at 10.

[137] ISO-NE Initial Brief at 7-8.

[138] *See* Schedule 25, § 9 (providing that an Interconnection Customer may request and "the Interconnecting Transmission Owner and any Affected Party shall offer the Interconnection Customer, an E&P Agreement that authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection").

[139] Seabrook Motion to Lodge, Docket No. EL21-3-000, at 2 (Sept. 20, 2021); Avangrid Motion to Lodge, Docket No. EL21-6-000, at 2-3 (Sept. 20, 2021); *see NextEra Energy Seabrook, LLC*, Docket No. ER21-2719-000 (Oct. 4, 2021) (delegated order).

78.     Avangrid also makes several broad arguments contending that Seabrook, as an Affected Party and Affected System, is bound by open access requirements and related decisions to act in good faith to accommodate interconnections.[140]  We disagree.  The Commission's open access requirements refer to transmission providers and transmission owners,[141] not generating facilities or components thereof like the breaker at Seabrook Station.  Indeed, the cases cited by Avangrid do not address affected systems that are generators, but rather deal with the responsibilities of transmission owners and operators and upgrades to transmission systems.[142]  Avangrid also cites *Otter Tail*, *SCG&E*, and *PJM* in support of its argument that Seabrook is subject to Commission open access requirements, but these cases deal with the comparability principle (i.e., that similarly situated customers should be treated comparably in the transmission planning context) and describe how transmission facilities should be treated in comparison to similar entities, rather than how generator facilities should be treated, the issue here.[143]

---

[140] Avangrid Complaint at 22-23.

[141] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,793-94 (1996) (cross-referenced at 75 FERC ¶ 61,080) (requiring public utilities that own, control or operate transmission facilities to file non-discriminatory open access transmission tariffs), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[142] *Nevada Power II*, 99 FERC ¶ 61,347 at P 10 (finding that an interconnecting utility cannot require a new generator to accept responsibility for upgrades on neighboring transmission systems); *AEPSC*, 102 FERC ¶ 61,336 at P 14 (finding that interconnection agreements are not the appropriate place to address upgrades to other transmission systems); *EDF*, 168 FERC ¶ 61,173 at P 20 (addressing coordination with affected system transmission owners and providers and whether the tariffs were sufficiently transparent).

[143] *Otter Tail*, 151 FERC ¶ 61,220 at P 47 (finding that customers of directly interconnecting transmission owners should be treated comparably to customers of non-directly interconnecting transmission owners); *SCG&E*, 143 FERC ¶ 61,058 at P 51 (addressing the comparability principle in relation to transmission owners and operators in regional transmission planning); *PJM*, 129 FERC ¶ 61,161 at P 72 (addressing comparability in the context of merchant transmission facilities).

79.     However, upon review of the record of this case, as supplemented by the additional evidence provided in response to the Briefing Order, and given the unique and unusual circumstances present here,[144] we find that:  (1) the Seabrook LGIA does not permit Seabrook to refuse to replace the breaker when replacement is needed for reliable operation of the Seabrook Station and given the concerns in the record related to the impact of any unreliable Station operation on the reliable operation of the system; and (2) Good Utility Practice[145] requires Seabrook to replace the breaker before Avangrid interconnects because the breaker will be overdutied following the interconnection.[146] For these reasons, we grant the complaint in part.

80.     As a generator interconnected to the transmission system, Seabrook's obligations with respect to its own facilities fall under the generator interconnection policies and the terms of the Seabrook LGIA.[147]  The Seabrook LGIA contemplates Seabrook making modifications to its facility that are made necessary by another entity's actions. Specifically, Seabrook's LGIA Appendix C-1, section B.III provides that:

> In addition to Article 5.19 of this [LGIA] . . . in the event Interconnecting Transmission Owner or Interconnection Customer make a modification or functional change to its own facilities that is not required by Applicable Laws and Regulations or Governmental Authority, and thereby makes it

---

[144] For example, this matter involves a nuclear generator, and the record indicates that the circuit breaker at issue here already is operating close to its maximum capability such that if the breaker is not replaced and there are additional interconnection customers, ISO-NE is concerned that system reliability will be negatively impacted.  ISO-NE Initial Brief at 5-6, 14-16.

[145] Good Utility Practice is defined in the Tariff as "any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition.  Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather includes all acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4)."  Tariff, § I.2.2; *see also* Seabrook LGIA at 10 (defining good utility practice).

[146] ISO-NE May 6 Letter at 2.

[147] Seabrook Initial Brief at 8-9 (citing Seabrook LGIA); Seabrook LGIA at 4 (stating that Seabrook is a party to the LGIA).

necessary for the other entity to make a modification or functional change to its own facilities that is required in accordance with Good Utility Practice, the entity making the modification or functional change not required by Law or Governmental Authority shall bear the cost of the modification or functional change to the other entity's facilities required in accordance with Good Utility Practice.[148]

81.     We acknowledge that Appendix C-1, section B-III generally pertains to changes made by the interconnecting transmission owner or interconnection customer, which in this case would be Seabrook and its interconnecting transmission owner, New Hampshire Transmission.  Nonetheless, we find this provision to be highly relevant here, given the specific circumstances present in this case.

82.     Appendix C-1, section B.III of the Seabrook LGIA reflects a requirement for Seabrook to make future modifications to its facility that are triggered by another entity's actions.  Specifically, this provision provides for future modifications to account for changing conditions on the system in order to maintain reliability.  This provision sets out the cost responsibility related to modifications to the generating facility post-interconnection, which notifies the parties that certain modifications may be required in order to continue the facility's operation in accordance with Good Utility Practice.  If required by Good Utility Practice, as discussed below, under this provision such changes must occur—that outcome is not open to negotiation.

83.     In citing Appendix C-1, section B-III in its initial brief, Seabrook states that this provision "specifies cost responsibility for modifications that Seabrook must make in response to modifications made by the Interconnecting Transmission Owner" and that "[w]hile the Seabrook LGIA addresses only the facilities owned by the Interconnecting Transmission Owner, it would make no sense under the enunciated principle to conclude that Seabrook should be required to pay for an upgrade caused by a modification to the transmission system by NECEC."[149]  Although we agree with Seabrook that it should not be required to pay for the direct costs of the breaker replacement, we find that in this matter, "it would make no sense under the enunciated principle" for Seabrook to be required to maintain its generation facilities consistent with Good Utility Practice only in response to reliability problems at Seabrook Station created by Seabrook or its interconnecting transmission owners.  Seabrook is required to modify or change its facilities consistent with Good Utility Practice when that modification or change is necessary for reliability and relates to a modification to New Hampshire Transmission's

---

[148] Seabrook LGIA, app. C-1, § B.III.

[149] Seabrook Initial Brief at 26-27.

or Seabrook's facilities.[150]  We find that Seabrook is similarly required to modify or change its facilities consistent with Good Utility Practice here, when that modification or change is necessary for reliability and, in the circumstances before us, relates to the Avangrid interconnection, with the entity responsible for that change, i.e., Avangrid, bearing the costs.[151]

84.     The Commission has previously found that it need not wait for an adverse event to occur before taking action.[152]  If Seabrook fails to replace the breaker prior to the energization of Avangrid's project, then it would be violating the LGIA's standard of Good Utility Practice, which requires "the exercise of reasonable judgment in light of the facts known at the time the decision was made . . . consistent with good business practices, *reliability, safety* and expedition."[153]  Seabrook would not be exercising reasonable judgment to operate the breaker from the moment Avangrid is energized because it would risk the breaker being overdutied.  We share ISO-NE's concern that operating the breaker in an overdutied condition could lead to an uninterrupted short circuit current that could lead to catastrophic equipment failure at the nuclear facility.[154]  In addition, ISO-NE points out that such a failure would create potential reliability concerns depending on system conditions.[155]  Therefore, we disagree with Seabrook's

---

[150] *See also* Seabrook LGIA, § 4.3 (stating that each party shall perform its obligations under this LGIA in accordance with, among other things, Good Utility Practice); *see also*, e.g., Tariff, § I.3 (8.0.0), § I.3.2 (Assets) (providing that market participants shall cause assets, including generator assets, it owns and operates to be designed, constructed, maintained and operated in accordance with Good Utility Practice).

[151] We discuss costs in section 2 below but note here that Avangrid has agreed to pay the direct costs of replacing the breaker.  Avangrid November 17 Answer at 12.

[152] *Cf. S.C. Pub. Serv. Auth.*, 762 F.3d 41, 64-68 (D.C. Cir. 2014) (quoting *Assoc. Gas Distribs. v. FERC*, 824 F.2d 981, 1008-09 (D.C. Cir. 1987) ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall.").

[153] Seabrook November 2 Answer, Ex. No. 6, Seabrook LGIA (emphasis added); *see also* Tariff, § I.2.2.

[154] ISO-NE Initial Brief at 5.

[155] *Id.*

contention that it is not required to replace the breaker, as that change is necessary for reliability and is consistent with Good Utility Practice.[156]

85.     We disagree with Seabrook's contention that section 30.5 of the Seabrook LGIA expressly excludes third-party beneficiaries and, therefore, precludes a requirement that Seabrook replace the breaker.[157]  Contractual prohibitions on third-party beneficiaries bar a third party who benefits from the contract's terms from enforcing a contract as if it were a party to the contract.[158]  The contractual prohibition in section 30.5, however, does not preclude the Commission from finding that a party must abide by its obligations under a jurisdictional contract.

86.     We also disagree with Seabrook that its LGIA does not govern the breaker replacement in this instance because, according to Seabrook, such replacement is for Avangrid's interconnection, not Seabrook's.[159]  We explained our reasoning above and found that Seabrook is required here to change its facilities consistent with Good Utility Practice, when that modification or change is necessary for reliability.[160]  As Seabrook states, the Seabrook LGIA provides the terms and conditions under which Seabrook needs to "flow the output of its generator into ISO-NE in a safe and reliable manner"[161] and replacing the breaker is necessary to protect the breaker from becoming overdutied and jeopardizing the generator.  As ISO-NE points out, failure to replace the breaker could lead to an uninterrupted short circuit current that could result in catastrophic equipment failure and potential grid reliability concerns, depending on grid system

---

[156] E.g., *N.Y. Indep. Sys. Operator, Inc.*, 118 FERC ¶ 61,216, at P 38 (2007) (stating that good utility practice requires that generators must meet and maintain minimum standards and that parties, including the ISO, may take remedial actions if not met or maintained); *Consol. Edison of N.Y. v. Pub. Serv. Elec. & Gas Co.*, 108 FERC ¶ 61,120, at P 186 (2004) (finding that good utility practice required transmission provider to provide a working spare transformer on transmission feeders).

[157] Seabrook Initial Brief at 7-10.

[158] *See* Restatement (Second) of Contracts § 302 (1981); *see also Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 535-36 (3d Cir. 1988).

[159] Seabrook Initial Brief at 9.

[160] *See supra* at PP 81-83.

[161] Seabrook Initial Brief at 9.

conditions.[162]  Seabrook notes that the breaker's purpose is to ensure that the generator operates in a safe and reliable manner as it flows output into the ISO-NE system.[163]

87.    Seabrook also makes several arguments related to the payment of the direct costs of the breaker replacement.  First, Seabrook argues that requiring Seabrook to pay for the direct costs of the breaker replacement would be unconstitutionally confiscatory.  Second, Seabrook argues that the Seabrook LGIA does not create unknown and unlimited investor exposure regarding potential future modifications and upgrades to the Seabrook generating facility.  Third, Seabrook argues that it has a right to the deliverability of the output of its generating facility and that any subsequent interconnection customer must likewise pay its own way without undermining the deliverability rights acquired by its predecessors.  Because we find that the cost of the breaker replacement is appropriately assigned to Avangrid, as discussed above, we need not address the merits of these arguments.

88.    Since the complaint was filed, the parties have set the breaker replacement in motion, including agreeing to and filing the E&P Agreement and the Amended E&P Agreement, which cover the terms and conditions associated with the engineering, conceptual and detailed design, and procurement of the replacement breaker.[164]  We expect both parties to the Amended E&P Agreement to adhere to the terms to which they have agreed.  In the transmittal letter for the Amended E&P Agreement, Seabrook states that the breaker replacement is now expected to take place during the Fall 2024 refueling outage and the commercial operation date for the NECEC Project is December 2024.[165]  Seabrook states that it plans to file an agreement governing installation at the earlier of 30 days prior to delivery of the breaker or 120 days prior to the start of the Fall 2024 outage.[166]  We expect that such an agreement would resolve whatever remaining issues

---

[162] ISO-NE Initial Brief at 5.

[163] Seabrook November 2 Answer at 10 ("The purpose of the Generation Breaker is to connect the generator to offsite power and to protect the generator from faults on the transmission system.").

[164] *See NextEra Energy Seabrook, LLC*, Docket No. ER21-2719-000 (Oct. 4, 2021) (delegated letter order accepting E&P Agreement); Seabrook Amended E&P Agreement, Docket No. ER22-2807-000 (filed Sept. 7, 2022).

[165] A&R E&P Agreement Between NextEra Energy Seabrook and NECEC Transmission at 2, NextEra Energy Seabrook, LLC, Docket No. ER22-2807-000 (filed Sept. 7, 2022).

[166] Amended E&P Agreement, Art. VI, Docket No. ER22-2807-000 (filed Sept. 7, 2022).

exist between the parties to allow replacement of the breaker to move forward during the 2024 outage.[167] We address certain cost issues below and note that, to the extent the parties still cannot reach agreement on specific terms, an unexecuted agreement may be filed.[168]

### 2.    **Opportunity and Legal Costs**

#### a.    **Complaint**

89.    Regarding the terms of the facilities agreement, Avangrid argues that Seabrook is unreasonably demanding that Avangrid reimburse Seabrook for all indirect and opportunity costs that may result from construction of the breaker replacement, including lost revenues accruing if Seabrook Station remains in an outage state beyond a planned refueling outage window due to Seabrook's inability to complete construction of the breaker within the planned outage timeframe.[169] Avangrid contends that the Tariff does not provide for such recovery and that Commission precedent favors the use of *pro forma* terms in the facilities agreement,[170] maintaining that the Commission has not regularly permitted such recovery. Avangrid points to, for example, Order No. 2003 in which the Commission explained that a transmission owner is not permitted to "allocate interconnection-related outage costs to the interconnection customer," even though the Commission recognized that "the Transmission Provider and owners of other generators may incur costs as a result of having to take a transmission line out of service in order to complete an interconnection," including "generator shut-down and restart costs, redispatch and purchased power costs, lost opportunity costs on sales not made, costs of

---

[167] Given our findings here, we find that Avangrid's other forms of requested relief are moot or unnecessary. Specifically, we deny Avangrid's request to revoke Seabrook's blanket waiver of Part 358 of the Commission's regulations pending an investigation into Seabrook's actions with respect to the NECEC Project. As discussed above, we find that the breaker at Seabrook Station is not a transmission asset or Network Upgrade, and therefore transmission-related Standards of Conduct concerns are irrelevant to this proceeding.

[168] Although we provide guidance on cost responsibility in this order, we do not, as Avangrid requests, require Seabrook to execute the specific facilities agreement Avangrid filed with its amended complaint.

[169] Avangrid Complaint at 31.

[170] *Id.* (citing *Duke Elec. Transmission*, 113 FERC ¶ 61,139, at P 17 (2005) (ordering Duke to include revisions to the Affected System Agreement to conform its provisions to the *pro forma* LGIA)).

power to compensate for additional line losses, and possibly other costs . . . ."[171]
Avangrid contends that the Commission declined to permit those costs to be recovered
from the interconnection customer because proposals to do so were vague, left too much
discretion to the transmission provider, and failed to provide for adequate regulatory
oversight.[172]  Avangrid further points out that the Tariff states that "[t]here shall be no
payment under this OATT of lost opportunity costs to Generator Owners for generating
units that are dispatched down or dispatched off."[173]

90.     Avangrid also argues that Seabrook is unreasonably requesting that Avangrid pay
all of Seabrook's legal costs arising from filing an unexecuted facilities agreement and
Avangrid litigating any protest regarding disputed terms in the agreement before the
Commission.  Avangrid argues that the Tariff does not allow for the recovery of legal
fees in a dispute with an interconnection customer,[174] nor does Commission precedent.[175]
Avangrid argues that it makes no sense to allow an Affected Party, such as Seabrook, to
delay the filing of a facilities agreement unless the interconnection customer agrees to
fund the Affected Party's efforts to fight the interconnection customer.

#### b.     Seabrook's Answer

91.     Seabrook argues that its request to recover opportunity costs is appropriate and
consistent with Commission precedent.[176]  Seabrook states that, in this case, opportunity
costs include lost profits, lost revenues and forgone Pay for Performance (PFP) bonuses,
which are all lost revenue due to the reduction in sales that Seabrook must make to
accommodate the NECEC Project in an extended outage.  Seabrook further argues that
the Tariff limitation on damages provision refers to damages for breach of contract and is
not a limitation on ratemaking.  Seabrook contends that the Tariff permits charging of
opportunity costs in certain circumstances, for example, reactive power,[177] which would

---

[171] *Id.* at 32 (citing Order No. 2003, 104 FERC ¶ 61,103 at P 714 (stating that a
provision limiting consequential damages will reduce litigation)).

[172] *Id.* (citing Order No. 2003, 104 FERC ¶ 61,103 at P 714).

[173] *Id.* (citing Tariff, § II.47.4).

[174] *Id.* (citing Tariff, § II.47.4; Schedule 25, § 9 (E&P Agreement provision)).

[175] *Id.* at 32-33 (citing Order No. 2003, 104 FERC ¶ 61,103 at P 714).

[176] Seabrook November 2 Answer at 29.

[177] *Id.* at 30 (citing Tariff, Schedule 2 (Reactive Supply and Voltage Control
Service) (10.0.0), § II.A).

not be possible if the limitations provision limited the recovery of opportunity costs in providing a service.[178]

92.    Seabrook further contends that the Commission has long authorized lost opportunity cost for generators who are forced to back down output in a variety of RTO contexts and has permitted opportunity costs in cost-of-service contexts.[179]  Seabrook argues that denying recovery of opportunity costs here would result in a confiscatory rate because Seabrook would be providing a service without reimbursement of costs.[180]  Seabrook argues that the fact that the opportunity costs at issue here will be recovered through a service agreement is irrelevant.[181]

93.    Seabrook adds that opportunity costs are appropriate because revenues foregone to accommodate the NECEC Project are important to Seabrook's bottom line.  Seabrook contends that Seabrook could potentially lose $560,000/day in revenues if there is an extended outage to replace the breaker and it coincides with a Pay for Performance event.  According to Seabrook, to the extent the replacement project causes an extended outage, these lost costs would not be incurred but for the NECEC Project.[182]  Seabrook

---

[178] *Id.* at 29-30.

[179] *Id.* at 30 (citing *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,282, at P 17 (2016); *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305, at P 2 (2008), *aff'd in relevant part and vacating in part*, *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (D.C. Cir. 2011); *Ameren Energy Mktg. Co.*, 117 FERC ¶ 61,334, at PP 15-16 (2006); *PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,030, at P 19 (2004), *reh'g denied*, 97 FERC ¶ 61,155 (2001), *reh'g denied*, 99 FERC ¶ 61,125 (2002), *remanded on other grounds sub nom.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003), *order on remand*, 110 FERC ¶ 61,244 (2005), *order on reh'g*, 113 FERC ¶ 61,155 (2005); *RockGen Energy, LLC*, 100 FERC ¶ 61,261, at P 18 (2002); *N.Y. Indep. Sys. Operator, Inc.*, 91 FERC ¶ 61,218, at 61,801-02 (2000); *New England Power Co.*, 65 FERC ¶ 61,153, at 61,757 (1993); *Ne. Utils. Serv. Co.*, Opinion No. 364-A, 58 FERC ¶ 61,070, at 61,201, *reh'g denied*, Opinion No. 364-B, 59 FERC ¶ 61,042, *order on reh'g*, 59 FERC ¶ 61,089 (1992), *aff'd in relevant part*, *Ne. Utils. Serv. Co. v. FERC*, 993 F.2d 937 (1st Cir. 1993); *Pa. Elec. Co.*, 58 FERC ¶ 61,278, at 61,871, *reh'g denied*, 60 FERC ¶ 61,034 (1992), *aff'd*, *Pa. Elec. Co. v. FERC*, 11 F.3d 207 (D.C. Cir. 1993)).

[180] *Id.* at 30, 32 (citing *ISO New England, Inc.*, 120 FERC ¶ 61,087, at P 52 (2007)).

[181] *Id.* at 30 (citing *Entergy Ark., Inc.*, 143 FERC ¶ 61,299, at P 74 (2013)).

[182] *Id.* at 31-32.

emphasizes that it is only seeking compensation for revenues it actually loses from any extended outages that may occur.

94.    Seabrook disputes Avangrid's reliance on *Duke Electric Transmission* for the claim that modeling the affected system agreement off of the *pro forma* LGIA is appropriate here.[183]  Seabrook avers that doing so in that case made sense because the affected system agreement was between a transmission-owner affected party—rather than a generation-owner affected party like the instant case—and an electric cooperative that was interconnecting new generating facilities to a neighboring transmission system. Seabrook further points out that the Commission declined to address issues related to the coordination with affected systems in Order No. 845 and has not since adopted any generally applicable rules.[184]

95.    Seabrook states that, while Order No. 2003 denied recovery of a transmission provider's interconnection-related outage costs, in part because the proposed methods of recovery were vague, the formula rate template Seabrook submitted sufficiently addresses this concern.[185]  Seabrook states that the Commission's other reason for denying interconnection-related outage costs in Order No. 2003, that outages of transmission and generation facilities for maintenance are normal costs of doing business, similarly does not apply because an extended outage of a nuclear facility to make a generator breaker modification "in order to accommodate someone else's [ETU]" is not a normal cost of doing business.[186]  Further, Seabrook argues there is a difference between the secondary effect of a transmission system outage as discussed in Order No. 2003[187] and the direct effect on Seabrook in this case.  Seabrook states that a generator undergoing an outage as a result of an outage on the interconnected transmission system is not providing a service as Seabrook is here and therefore, Seabrook must be compensated under the FPA.[188]  Seabrook adds that even if the money at issue represents damages rather than the cost of providing a service, there is no bar to recovery because

---

[183] *Id.* at 33 (citing *Duke Elec. Transmission*, 113 FERC ¶ 61,139 at P 17).

[184] *Id.* (citing *Reform of Generator Interconnection Procs. & Agreements*, Order No. 845, 163 FERC ¶ 61,043, at P 341 (2018)).

[185] *Id.* at 34; Marcum Petition Aff. at 8-11.

[186] *Id.* at 35 (citing Order No. 2003, 104 FERC ¶ 61,103 at P 715).

[187] *Id.* (citing Order No. 2003, 104 FERC ¶ 61,103 at P 714 (stating that generators may incur costs as a result of a transmission line being out of service to complete an interconnection)).

[188] Seabrook November 2 Answer at 35.

Seabrook is not bound by the limitation to damages provision in Avangrid's interconnection agreement and a separate facilities agreement is not required to contain a bar on recovering consequential damages.[189]

96.    Seabrook argues that recovery of legal fees is appropriate because Seabrook will be providing a service on a cost-of-service basis and the legal costs incurred in advocating and defending its right to cost-of-service reimbursement are equivalent to costs incurred in ratemaking proceedings.[190]    Seabrook explains that the Commission has allowed regulated utilities to recover reasonably incurred rate litigation costs as a legitimate cost of rendering public utility service.[191]    Seabrook avers that the general rule for rate case expenses is that they "should be collected in rates that result from the proceedings in connection with which they were incurred."[192]    Seabrook argues that courts have taken a broad view of which litigation costs entities regulated under rate-of-return ratemaking can recover.[193]    Seabrook also notes that the Tariff allows recovery of legal fees, explaining that transmission providers in ISO-NE are permitted to collect legal costs booked in Account 928 as part of the formula rate set forth in Attachment F of the Tariff.[194]

---

[189] *Id.* at 35-36 (citing Order No. 2003, 104 FERC ¶ 61,103 at P 906; *S. Cal. Edison Co.*, 151 FERC ¶ 61,273, at PP 24-26 (2015)).

[190] *Id.* at 36.

[191] *Id.* (citing *Potomac-Appalachian Transmission Highline, LLC*, Opinion No. 554, at P 135 (2017), *order on reh'g*, Opinion No. 554-A, 170 FERC ¶ 61,050 (2020)).

[192] *Id.* (citing *Pub. Serv. Co. of N.M.*, Opinion No. 133, 17 FERC ¶ 61,123, at 61,251 (1981)).

[193] *Id.* (citing *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1296 (D.C. Cir. 2004)).

[194] *Id.* at 37 (citing ISO-NE, Tariff, attach. F (revenue requirement includes, among other expenses, formal rate case expenses, salaries, fees, and expenses for attorneys and experts, defense against petitions and complaints before regulatory bodies); *Ameren Ill. Co.*, 170 FERC ¶ 61,267, at P 71 (2020) ("[E]xpenses associated with responding to and defense against formal challenges and expenses incurred in connection with other formal cases before a regulatory body would fall within the instructions of Account 928, and those expenses should therefore be recorded to Account 928.")).

97.     In its answer, Seabrook claims that Avangrid has changed its position on consequential damages and no longer is disputing that it will be liable for these damages.[195]

### c.     Avangrid's Answer to Seabrook's Answer

98.     Avangrid contends that Seabrook is not entitled to lost profits or legal fees in conjunction with the construction of the breaker upgrade.  Avangrid explains that the breaker replacement is not an investment that Seabrook would make allowing it to earn a return and, therefore, that rate of return ratemaking cases cited by Seabrook are inapposite.  Avangrid explains that, instead, under Order No. 2003, interconnection customers need only reimburse the costs of Network Upgrades, excluding lost profits and other indirect and consequential costs, and are not required to pay for litigation costs associated with the filing of an interconnection agreement.[196]  Avangrid contends that, in Order No. 2003, the Commission expressly stated that interconnection related costs may not be allocated to an interconnection customer, including "lost opportunity costs on sales not made."[197]  Avangrid explains that, accordingly, it has agreed to pay for the direct costs of engineering, procurement, and construction of the breaker upgrade, but not foregone or legal costs.[198]  Avangrid adds that the Commission's determinations in Order No. 2003 against recovery of indirect and consequential costs were based in part on input from Seabrook, which has benefited from this prohibition for over 15 years.[199]  Avangrid also argues that the Commission recently clarified that an interconnecting transmission project is not required to compensate a generator for its indirect and consequential costs, including lost profits from forgone power sales.[200]

99.     Avangrid argues that the Commission should—based on the principle that Affected Systems should be treated comparably to transmission owners and that all interconnection customers should be treated comparably—apply the limitation on

---

[195] Id. at 38-39 (citing Avangrid Complaint, Ex. D).

[196] Avangrid November 17 Answer at 12.

[197] Id. (citing Order No. 2003, 104 FERC ¶ 61,103 at P 714).

[198] Id.

[199] Id. at 12-14.

[200] Id. at 14 (citing S. Cal. Edison Co., 151 FERC ¶ 61,273 at P 25 (stating that "the ban on recovery of lost profits or revenues in Article 18.2 of the LGIA includes lost profits or revenues from foregone power sales, consistent with the discussion of this provision in Order No. 2003")).

consequential damages contained in Article 18.2 of Elective Transmission Upgrade Interconnection Agreement in Schedule 25 to the disputed consequential damages provided in the facilities agreement and forbid Seabrook from recovering lost profits or revenues from forgone sales.[201]  Avangrid also notes that the timing of the breaker replacement is entirely within Seabrook's control.[202]

### d.  Commission Determination

100.  As an initial matter, no party disputes whether Avangrid should pay for the direct cost of the breaker replacement and indeed Avangrid agrees to pay these costs.[203]  The parties disagree, however, on whether Avangrid should also have to pay opportunity costs[204] and legal costs.  We agree with Avangrid that, in this case, Seabrook should not recover opportunity and legal costs, and therefore grant the complaint in part as to the cost issues.[205]

101.  The Tariff contains no language indicating that an interconnecting Elective Transmission Upgrade customer, such as Avangrid, would be responsible for opportunity costs or legal costs, but rather states that a party planning a transmission project "shall not

---

[201] *Id.* at 17 (citing *Otter Tail*, 151 FERC ¶ 61,220 at P 47; *Mich. Elec. Transmission Co.*, 97 FERC ¶ 61,187, at 61,852 (2001) ("Under section 205 of the Federal Power Act, rates, terms, and conditions cannot be unduly discriminatory or preferential.  Indeed, the need to treat all generation interconnection customers comparably underlies the need for a *pro forma*."); Schedule 25, app. 6, art. 18.2 (explaining consequential damages)).

[202] *Id.* at 17-18.

[203] *Id.* at 12 ("Avangrid has agreed to pay for the direct costs of the engineering, procurement and construction of the Seabrook breaker replacement, but not forgone sales or legal costs.").

[204] Seabrook refers to the opportunity costs as "lost profits, lost revenues, and foregone Pay for Performance ("PFP") bonuses."  Seabrook November 2 Answer at 29.

[205] Seabrook and Avangrid have disagreed on whether Avangrid should be held liable for any consequential damages that Seabrook may incur in replacing the breaker and the inclusion of such provision in a facilities agreement.  Avangrid Complaint at 17 n.58; Avangrid Protest at 7; Seabrook Petition at 7-8 ("Seabrook should be shielded from consequential damages in replacing the Generation Breaker."); Seabrook November 2 Answer at 35-36.  However, Seabrook and Avangrid have each asserted that consequential damages is no longer a live issue, so we do not address it.  Seabrook November 2 Answer at 38-39; Avangrid Protest at 13.

proceed to implement such plan unless the . . . Transmission Owner [here, Avangrid] constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect."[206]

102.    While the Commission has allowed recovery of opportunity costs in specific circumstances, which typically involve sellers providing an ancillary service that prevents the seller from providing and being paid the market price for energy,[207] we agree with Avangrid that such circumstances are not present here. The Commission typically allows opportunity cost recovery so that the resource will be revenue neutral and therefore indifferent towards the system operator's decision as to which service the resource will provide.[208] That is not the case here. First, Seabrook is not providing an ancillary or other electric service to Avangrid.[209] Second, there is no perverse incentive that would be remedied by opportunity costs. Furthermore, Seabrook states it is providing "a service," but the precedent to which Seabrook points pertains to arrangements for the sale or transmission of electric power, rather than interconnection rules or the replacement of a

---

[206] ISO-NE, Tariff, § I.3 (8.0.0), § I.3.10 (Market Participant to Avoid Adverse Effect).

[207] *See*, e.g.*, Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 at P 2, *aff'd in relevant part and vacating in part*, *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (addressing reactive power compensation); *Ameren Energy Mktg. Co.*, 117 FERC ¶ 61,334 at PP 15-16 (finding that lost opportunity costs are an acceptable basis for establishing the cost of providing regulation and frequency response and spinning reserve services); *PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,030 at P 19 (addressing how to reimburse generators for lost opportunity costs when generators are instructed to reduce output to ensure an incentive for the generators to comply with PJM's dispatch instructions).

[208] *PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,030 at P 19 (ensuring that there is no disincentive for a generator to follow an RTO's directives and therefore create reliability issues).

[209] *See* 18 C.F.R. § 35.2 ("The term *electric service* as used herein shall mean the transmission of electric energy in interstate commerce or the sale of electric energy at wholesale for resale in interstate commerce, and may be comprised of various classes of capacity and energy sales and/or transmission services. *Electric service* shall include the utilization of facilities owned or operated by any public utility to effect any of the foregoing sales or services whether by leasing or other arrangements. As defined herein, *electric service* is without regard to the form of payment or compensation for the sales or services rendered whether by purchase and sale, interchange, exchange, wheeling charge, facilities charge, rental or otherwise.").

component of a generation facility.[210]  Seabrook does not cite any applicable cases arising from the interconnection or Affected Party context, including any in which the Commission has allowed an Affected Party to collect opportunity costs from an interconnection customer.

103.    Further, in Order No. 2003-A, the Commission found that "if authorized contractually, recovery [of outage costs] may be justified on a case-by-case basis, depending on the facts of individual cases"[211] and allowed transmission providers to propose to recover line outage costs on a case-by-case basis.  We acknowledge that Order No. 2003 does not directly apply here, because that order dealt with generator interconnection and the NECEC Project is transmission.  However, this precedent supports the finding here that Affected Parties are not automatically entitled to opportunity costs.  For the reasons explained above, in this instance, we find that opportunity costs are not justified.

104.    Seabrook further argues that denying recovery of opportunity costs could amount to confiscatory rates as it will not be able to recover its legitimate costs of providing a service.  However, Seabrook cites to inapplicable case law that relates to requiring a generator to offer capacity at a price less than its net risk-adjusted going forward and opportunity costs, rather than reimbursement of the costs to construct facilities in relation to the interconnection of a project.[212]  Seabrook further cites to inapplicable case law that concerns proper implementation of cost of service regulation for traditional, vertically

---

[210] *See* Seabrook November 2 Answer at 29-30 (*PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,282 at P 17; *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 at P 2, *aff'd in relevant part and vacating in part*, *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122; *Ameren Energy Mktg. Co.*, 117 FERC ¶ 61,334 at PP 15-16; *PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,030 at P 19, *reh'g denied*, 97 FERC ¶ 61,155, *reh'g denied*, 99 FERC ¶ 61,125, *remanded on other grounds sub nom.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, *order on remand*, 110 FERC ¶ 61,244, *order on reh'g*, 113 FERC ¶ 61,155; *RockGen Energy, LLC*, 100 FERC ¶ 61,261 at P 18; *N.Y. Indep. Sys. Operator, Inc.*, 91 FERC at 61,801-02; *New England Power Co.*, 65 FERC at 61,757; Opinion No. 364-A, 58 FERC at 61,201, *reh'g denied*, Opinion No. 364-B, 59 FERC ¶ 61,042, *order on reh'g*, 59 FERC ¶ 61,089, *aff'd in relevant part*, *Ne. Utils. Serv. Co. v. FERC*, 993 F.2d 937; *Pa. Elec. Co.*, 58 FERC at 61,871, *reh'g denied*, 60 FERC ¶ 61,034, *aff'd*, *Pa. Elec. Co. v. FERC*, 11 F.3d 207).

[211] Order No. 2003-A, 106 FERC ¶ 61,220 at P 647.

[212] Seabrook November 2 Answer at 30 (citing *ISO New England Inc.*, 120 FERC ¶ 61,087 at P 52).

integrated utilities.[213]  The instant case differs as this is not a cost of service rate matter.
And, even if these ratemaking standards applied, Seabrook does not present evidence
convincing us that it would be prevented from operating successfully or maintaining
financial integrity if it replaced its breaker without receiving opportunity costs from
Avangrid.[214]  Moreover, Avangrid will pay for the direct costs of the breaker
replacement, and merchant sellers like Seabrook are not guaranteed profits, particularly
when they are not operating due, for example, to maintenance activities required by their
LGIAs.[215]

105.    We likewise disagree with Seabrook that recovery of lost profits and revenue due
to an extended outage is appropriate because, as Seabrook argues, the breaker
replacement is done for Avangrid's benefit, at Avangrid's request, and Seabrook does not
benefit.  On the contrary, Seabrook's replacement of the breaker allows it to continue

---

[213] Seabrook Initial Brief at 19-21 (citing *Duquesne Light Co. v. Barasch*,
488 U.S. 299, 307 (1989); *Bluefield Waterworks & Improvement Co. v. Pub. Serv.
Comm'n of W. Va.*, 262 U.S. 679, 690 (1923); *Algonquin LNG, Inc. v. FERC*,
570 F.2d 1043, 1050 (D.C. Cir. 1978)).

[214] *See FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603, 605 (1944) (finding that
return on investment should be sufficient to assure confidence in the financial integrity of
enterprise so as to maintain credit and attract capital); *Bluefield Waterworks Improvement
Co. v. Pub. Serv. Comm'n of W.V.*, 262 U.S. 679, 690 (1923) ("Rates which are not
sufficient to yield a reasonable return on the value of the property used at the time it is
being used to render the service are unjust, unreasonable, and confiscatory."); *see also
Cent. Hudson Gas & Elec. Corp.*, 176 FERC ¶ 61,149, at P 32 (2021) ("[R]ather than
necessarily entitling [a party] to earn a return . . . [a party must show] that the existing
funding mechanism exposes them to uncompensated risks associated with owning,
operating, and maintaining [its assets] and that the existing funding mechanism impedes
[the party's] ability to attract future capital so as to prevent [it] from operating
successfully or maintaining financial integrity.").

[215] *See*, e.g., Order No. 2003, 104 FERC ¶ 61,103 at PP 714-715 (recognizing that
outages of transmission and generation facilities are "a routine part of electric system
operations and, in fairness, these costs also should be considered a normal part of doing
business."); *see also Bridgeport Energy, LLC*, 113 FERC ¶ 61,311, at PP 28-29 (2005)
(rejecting generator's claim that it had right to recover traditional cost-of-service despite
having applied for and received market-based rates); *see also id*. P 29 ("While we do not
deny Bridgeport's right to file for a cost-based rate, the Commission has no obligation in
a competitive marketplace to guarantee Bridgeport its full traditional cost-of-service.
Rather, in a competitive market, the Commission is responsible only for assuring that
Bridgeport is provided the *opportunity* to recover its costs.").

benefiting from the right to operate its generating facility consistent with Good Utility Practice under its LGIA.  Furthermore, Seabrook concedes that it has not demonstrated that an extended outage will be required to replace the breaker, just that an extended outage may be necessary,[216] and Seabrook is in the best position to ensure it does not extend the outage period with the design and implementation choices it makes.

106.    Furthermore, and as Avangrid points out, the cases that Seabrook cites to support recovery of legal costs involve cost-of-service ratemaking, unlike here, and are inapplicable because replacing the breaker is not providing a service as described in those cases.[217]  This breaker replacement is not an investment that Seabrook is making to earn a return, like in cost-of-service contexts; it is carrying out its obligations under the Seabrook LGIA and Good Utility Practice.  Moreover, the cases cited by Seabrook are inapposite because they relate to whether the utility could pass legal costs onto its *ratepayers* as a result of litigating a ratemaking case,[218] rather than whether a utility could pass legal costs onto a *third party* attempting to interconnect.  In the interconnection context, the Commission has denied requests that an interconnection customer pay legal costs that another party may incur during the interconnection process.[219]

---

[216] Seabrook November 2 Answer at 32.

[217] Seabrook Petition at 27 (citing *Potomac-Appalachian Transmission Highline, LLC*, Opinion No. 554, 158 FERC ¶ 61,050, at P 135 (2017), *order on reh'g*, Opinion No. 554-A, 170 FERC ¶ 61,050 (2020) (*PATH*) (finding that regulated utilities "are entitled to recover their reasonably incurred rate litigation costs" as a legitimate cost of rendering public utility service)).

[218] *See*, e.g*., PATH*, Opinion No. 554, 158 FERC ¶ 61,050 at P 135, *order on reh'g*, Opinion No. 554-A, 170 FERC ¶ 61,050; *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1296 (D.C. Cir. 2004); *SFPP, L.P.*, Opinion No. 435-A, 91 FERC ¶ 61,135, at 61,512 (2000), *aff'd in relevant part and vacated in part*, *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263 (D.C. Cir. 2004); *Pub. Serv. Co. of N.M.*, Opinion No. 133, 17 FERC ¶ 61,123, at 61,251 (1981), *order on reh'g*, Opinion No. 133-A, 18 FERC ¶ 61,036, *order on reh'g*, Opinion No. 133-B, 21 FERC ¶ 61,215 (1982), *aff'd in relevant part*, *Pub. Serv. Co. of N.M. v. FERC*, 832 F.2d 1201 (10th Cir. 1987) (internal citations omitted).

[219] Order No. 2003-A, 106 FERC ¶ 61,220 at P 291; *Ariz. Pub. Serv. Co.*, 107 FERC ¶ 61,257, at PP 1, 171 (2004); *Va. Elec. Power Co.*, 107 FERC ¶ 61,010, at PP 12, 22 (2004).

### 3.    Seabrook's Petition for Declaratory Order

#### i.    Petition

107.    Seabrook requests that the Commission declare that Seabrook is not required to incur a financial loss to upgrade the circuit breaker. Seabrook contends that it should be allowed to recover opportunity costs, including PFP bonuses, incurred as a result of an extended outage and legal costs.[220] Seabrook asserts that it is providing a service to Avangrid and that Seabrook must therefore recover its costs of providing this service, or the rate would be confiscatory.[221] Seabrook also argues cost causation principles support recovery of opportunity costs because Avangrid solely caused the costs and that Seabrook would not incur them, but for Avangrid's interconnection request. Pointing to Commission precedent, Seabrook further argues that the Commission has authorized recovery of opportunity costs for generators who are forced to back down output in a variety of contexts.[222] With its petition, Seabrook states that it submitted a formula rate template for use in determining the actual opportunity and legal costs incurred. Seabrook also requests that the Commission declare that it will not be liable for consequential damages for the service it provides to Avangrid under a facilities agreement.[223] In the alternative, Seabrook requests that the Commission declare that nothing in the Tariff requires Seabrook to enter into an agreement to replace the breaker, and, therefore, that Seabrook is entitled to bargain for appropriate terms and conditions for cost recovery and to limit liability associated with providing the service. Seabrook states that it intends to enter into a facilities agreement if it is made whole and receives appropriate protections.[224]

---

[220] Seabrook Petition at 24-27.

[221] *Id*. at 21.

[222] *Id*. at 24-26.

[223] As stated above, the parties appear to have resolved this issue. An additional issue regarding whether it is appropriate to define "Good Utility Practice" for the E&P Agreement and facilities agreement to replace the breaker in terms of the practices of the nuclear power industry has been resolved by parties and accepted by a prior Commission order. Seabrook Motion to Lodge, Docket No. EL21-3-000, at 2-3 (Sept. 20, 2021); *see* Avangrid Motion to Lodge, Docket No. EL21-6-000, at 3 n.8 (Sept. 20, 2021).

[224] Seabrook Petition at 37.

## ii.  Protests, Comments, and Answers

108.   Avangrid argues that it is not obligated to reimburse Seabrook for any indirect or consequential costs that may stem from the breaker upgrade, including opportunity costs.[225]  Avangrid argues that any Commission precedent that allows for the inclusion of indirect or consequential costs in rates is inapplicable because none relate to upgrades built at the expense of an interconnection customer.  Avangrid explains that Seabrook is not providing the type of service that allows it to obtain a return on its investment.  Avangrid adds that even Seabrook's interconnection agreement contains the *pro forma* language prohibiting the "collection of any losses, damages, costs or expenses for any special, indirect, consequential, or punitive damages, including but not limited to loss of profit or revenue" from the other party under the interconnection agreement.[226]

109.   Eversource disputes Seabrook's claim that Seabrook is under no obligation to upgrade the facility as an Affected Party by claiming that the Commission's open access transmission policies and the ISO-NE Tariff require Affected Parties, such as Seabrook, to:  (1) construct network upgrades needed to interconnect an Elective Transmission Upgrade; (2) enter into an agreement with the Interconnection Customer to conduct engineering and procurement activities; (3) negotiate in good faith to establish a schedule for construction.[227]  Eversource adds that the Commission's rules governing authorization to sell at market-based rates could be interpreted as a prohibition on generators raising barriers to entry for transmission development.[228]

110.   MMWEC and NEPGA support Seabrook's petition and ask the Commission to confirm Seabrook's requested declarations.[229]

111.   In its answer, Seabrook asks the Commission to use all reasonable expedience to resolve the issues presented in the petition.  Seabrook argues that the arguments in Avangrid's answer are circular, off-point, and repeat arguments made by Avangrid in its

---

[225] Avangrid Protest at 12.

[226] *Id.* (citing Seabrook LGIA, § 18.2).

[227] Eversource Comments at 5 (citing Schedule 25, § 12).

[228] *Id.* (citing 18 C.F.R. § 35.37(e)(3); *Mkt.-Based Rates for Wholesale Sales of Elec. Energy, Capacity & Ancillary Servs. by Pub. Utils.*, Order No. 697, 119 FERC ¶ 61,295, at P 449 (2007); NextEra Energy Seabrook, LLC, Transmittal Letter, Docket No. ER09-990-000, Transmittal Letter at 5-6 (filed Dec. 7, 2009)).

[229] MMWEC Comments at 4; NEPGA Comments at 4-5.

Document Accession #: 20230201-3035     Filed Date: 02/01/2023

complaint.[230]  Avangrid answers that it responded to many of Seabrook's arguments in the complaint proceeding and that Seabrook's arguments are meritless.[231]

### b.    Commission Determination

112.    Commission action on a petition for declaratory order is discretionary.[232]  We exercise that discretion here and decline to address the issues raised in the petition further.  We note that the issues raised in the petition have been addressed in this order, making additional findings regarding the petition unnecessary.  Accordingly, we dismiss the petition.

The Commission orders:

(A)  The complaint is hereby granted in part, as discussed in the body of this order.

(B)  The complaint is hereby denied in part, as discussed in the body of this order.

---

[230] Seabrook November 19 Answer at 2.

[231] Avangrid December 12 Answer at 2-11.

[232] *See*, e.g., 5 U.S.C. § 554(e) (stating that, under the Administrative Procedure Act, the "agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty"); *Continental Oil Co. v. FPC*, 285 F.2d 527, 527 (5th Cir. 1961) (per curiam); *Stowers Oil & Gas Co.*, 27 FERC ¶ 61,001, at 61,001 (1984) (noting that "there is ample authority for the proposition that Commission action on petitions for declaratory order is discretionary with the agency"); *accord Morgan Stanley Cap. Grp., Inc.*, 119 FERC ¶ 61,298, at P 17 (2007) (stating that Commission "has discretion as to whether to issue a declaratory order in particular circumstances in order to terminate a controversy or remove uncertainty"); *Ark. Power & Light Co.*, 35 FERC ¶ 61,358, at 61,818 (1986) (finding that granting petition for declaratory order "is a matter of agency discretion").

Document Accession #: 20230201-3035    Filed Date: 02/01/2023

(C)  The petition is hereby dismissed, as discussed in the body of this order.

By the Commission.

( S E A L )


                              Debbie-Anne A. Reese,
                              Deputy Secretary.

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **NextEra Energy Seabrook, LLC** | ) | **Docket No. EL21-3-000** |
| | ) | |
| **NECEC Transmission LLC and** | ) | |
| **Avangrid, Inc.** | ) | |
| | ) | |
| **v.** | ) | **Docket No. EL21-6-000** |
| | ) | |
| **NextEra Energy Resources, LLC and** | ) | |
| **NextEra Energy Seabrook, LLC** | ) | |

**REQUEST FOR REHEARING OF NEXTERA ENERGY RESOURCES, LLC
AND NEXTERA ENERGY SEABROOK, LLC**

NextEra Energy Resources, LLC ("NextEra Resources") and NextEra Energy Seabrook, LLC ("Seabrook") (collectively, "NextEra") hereby request rehearing of the Federal Energy Regulatory Commission's ("Commission") February 1, 2023 order in the above-captioned proceedings.[1]  The Commission has erroneously ordered Seabrook to replace the 24.5 kV generator breaker and ancillary equipment[2] at the Seabrook Nuclear Generating Station ("Seabrook Station") for the benefit of NECEC Transmission, LLC ("NECEC") and its parent, Avangrid, Inc. (collectively with NECEC, "Avangrid") without just compensation.  Seabrook has always been willing to replace the generator breaker for NECEC on commercially reasonable terms, even though the Commission, as explained below, has no authority to order that outcome.

The rub here is that the Commission has ordered NECEC to pay some, but not all, of the incremental costs that Seabrook and its co-owners—which include various municipalities and municipal utilities in Massachusetts that own approximately 11.77% of Seabrook Station

---

[1]    *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044 at P 1 (2023) ("*Order*").

[2]    All references in this Request for Rehearing to the "generator breaker" include the associated ancillary equipment that will also be installed.

(together with Seabrook, the "Seabrook Joint Owners")—will incur to extend the next planned outage at Seabrook Station in order to replace the generator breaker. The Commission agrees that NECEC must pay the cost to buy and install the new equipment. But the Commission erroneously requires the Seabrook Joint Owners to absorb all other costs created by the extended outage, including lost revenues that provide Seabrook with its sole means of obtaining return of and on its investment.

The Commission does not have any statutory authority to require Seabrook to replace the generator breaker in the first place. The Federal Power Act ("FPA") forbids the Commission from exercising jurisdiction over generating facilities.[3] It likewise forbids the Commission from ordering the "enlargement of generating facilities" in order to promote interconnected operations.[4] And the *Order* correctly holds that "the breaker's location and purpose indicate that *the breaker is a generator component*."[5] So the Commission's own factual findings show that its directive to replace the generator breaker is unambiguously unlawful.

Despite the many rounds of lengthy pleadings and briefs filed here, no one has pointed to any prior instance of the Commission or its predecessor agency ever ordering an electric generating plant to construct and enlarge generating equipment under the FPA—not to mention a nuclear power plant, which falls squarely within the exclusive jurisdiction of the Nuclear Regulatory Commission ("NRC")—the federal agency charged with ensuring the protection of public health and safety in connection with nuclear operation. The equipment inside of Seabrook

---

[3]     *See* 16 U.S.C. § 824(b)(1) (forbidding the Commission from exercising jurisdiction "over facilities used for the generation of electric energy").

[4]     *Id.* at § 824a(b).

[5]     *Order*, 182 FERC ¶ 61,044 at P 76; *see also id.* at P 78 (holding open access requirements do not apply to "generating facilities or components thereof like the breaker at Seabrook").

Station is not FERC-jurisdictional and the Commission cannot order Seabrook to change or enlarge that equipment.

To be clear, however, this is at bottom a commercial dispute about money, not about whether the generator breaker will be replaced. Seabrook has always been willing to replace the generator breaker as long as the Seabrook Joint Owners are kept whole. Seabrook already has agreed to procure the generator breaker and related equipment through the "Amended Engineering and Procurement Agreement with NECEC" (the "E&P Agreement"). But the Seabrook Joint Owners all face open-ended and real cost exposure under the Commission's ruling.[6]

Not only is the directive to replace the generator breaker unlawful, but as the Commission itself recognizes, it does not have any rate authority over Seabrook's recovery of costs from NECEC. Citing Section 35.2 of its regulations, the Commission finds that when Seabrook replaces the generator breaker, it "is not providing an ancillary or other electric service to Avangrid."[7] The Commission therefore lacks jurisdiction to set the rate to be paid by NECEC to Seabrook for replacing the generator breaker. The Commission also lacks jurisdiction to rule

---

[6]    To the extent the Commission is concerned about a ruling that could allow a generator in the future to refuse to modify a generating facility even on commercially reasonable terms, the Commission has better tools to address such a situation. For example, the Commission "instituted an additional FPA section 206 proceeding . . . to investigate the justness and reasonableness of the ISO New England Inc. (ISO-NE) Transmission, Markets and Services Tariff (Tariff), specifically, its possible application to generating facilities as Affected Parties charged with making upgrades in circumstances such as those presented here." *Order*, 182 FERC ¶ 61,044 at n.4 (citing *NECEC Transmission LLC v. NextEra Energy Res., LLC*, 176 FERC ¶ 61,148 at P 20 (2021) ("*Briefing Order*")). That proceeding remains pending. Notice and comment proceedings give a far better platform for full consideration of the rights of all affected, including generator compensation, than efforts to read into obscure contractual provisions requirements that are not there, and which therefore do not reflect the input that comes from notice and comment proceedings.

[7]    *Order*, 182 FERC ¶ 61,044 at P 102 (citing and quoting 18 C.F.R. § 35.2).

that Seabrook cannot recover all costs of that undertaking, including opportunity costs. The matter therefore should be left to reasonable commercial negotiation between the parties.

Lacking statutory authority to order Seabrook to replace the generator breaker or set any associated rate, the Commission nevertheless does both. The Commission contends that Seabrook voluntarily agreed by contract to replace the generator breaker in circumstances like those posed here. Specifically, the Commission relies on Section B.III of Appendix C-1 of Seabrook's Large Generator Interconnection Agreement ("LGIA"). The Commission claims to find that provision "highly relevant."[8]

As the Commission candidly concedes, however, the LGIA is a contract solely between New Hampshire Transmission, LLC ("New Hampshire Transmission"), as the interconnecting transmission owner, Seabrook, as the interconnection customer, and ISO New England, Inc. ("ISO-NE"). Even under the Commission's reading, Seabrook "generally" would be responsible for future equipment modifications to Seabrook Station *only* in the event that *the interconnecting transmission owner, New Hampshire Transmission,* makes changes that require conforming changes to Seabrook Station.[9]

Notwithstanding clear text creating a narrow obligation in the LGIA between New Hampshire Transmission and Seabrook, the Commission nevertheless claims authority to "enforce" that obligation by extending it broadly to benefit third parties like NECEC, even though the LGIA expressly prohibits third-party beneficiaries. No canon of contract construction allows the Commission to blink past that bedrock fact.

---

[8]    *Id.* at P 81.

[9]    *Id*. at PP 80-81.

The plain words of the LGIA cannot possibly be read to require existing interconnection customers like Seabrook to spend their own money to upgrade and expand their facilities for the benefit of some future category of unnamed, unknown, and unnumbered third parties who seek interconnection.[10] Upon examination, the provision in the LGIA that the Commission claims is "highly relevant" turns out not to be relevant at all. The Commission is not "finding that a party must abide by its obligations under a jurisdictional contract."[11] It is changing those obligations. That is arbitrary, unreasoned, and unlawful.

Nor can the Commission's contrary ruling be harmonized with the Commission's long-standing interconnection cost allocation rules, which require future interconnecting entities to pay to resolve the reliability burdens they create. Those costs are not allocated to existing interconnection customers like Seabrook, who have already paid the costs necessary to reliably interconnect without burdening others on the grid; rather, it is *future* interconnecting entities that must pay to resolve the reliability burdens they later create.

Worse still, the obligation that the Commission imposes on Seabrook—and on all other existing resources that have signed an LGIA—is sweepingly broad. The phrase "Good Utility Practice" is ubiquitous and long-standing. Now we are told that those three words in the LGIA somehow tacitly require existing resources like Seabrook Station to subsidize future interconnecting entities in effectively unlimited ways. Any resource already interconnected to the electric grid now faces open-ended liability to once again pay perhaps very large system upgrade costs because of burdens created by new resources that have not yet interconnected.

---

[10] Avangrid never argued that the LGIA imposed that broad obligation until the Commission posed the question for briefing. As Avangrid knows, no Avangrid entity has any privity of contract entitling it to any benefits under the LGIA. And Seabrook is not a party to NECEC's Elective Transmission Upgrade interconnection agreement. Avangrid thus is a prototypical third party.

[11] *Order*, 182 FERC ¶ 61,044 at P 85.

There is, moreover, no natural limit to the cost burdens that the Commission's new rule might impose on existing generators under the auspices of Good Utility Practice. If replacing the generator breaker required extending the Seabrook Station outage by months or years, nothing in the Commission's logic suggests any contrary cost-responsibility outcome.

This all is profoundly counterproductive from a policy perspective. Most interconnecting resources are project financed, where lenders assess development costs and future potential for profit. Grid upgrade costs can be highly material and are always baked in at the outset. Project finance lenders need financial certainty and the Commission reasonably has designed its entire interconnection cost allocation process to accommodate that very real commercial need.

There is no reason why the Commission can or should require existing resources like Seabrook Station to subsidize new entrants. Seabrook Station is not causing any reliability problems. It operates reliably. As attested in writing by the NRC and ISO-NE, Seabrook Station can "perform its intended function with the current margin available" reliably and safely "within its ratings" with the existing generator breaker.[12]

The Commission claims that Good Utility Practice requires Seabrook to "replace the breaker before [NECEC] interconnects because the breaker will be overdutied *following* the interconnection."[13] But this reasoning puts the cart before the horse. The ISO-NE Transmission,

---

[12]    *See NextEra Energy Seabrook, LLC*, Motion to Lodge of NextEra Energy Seabrook, LLC, November 10, 2021 Letter re: Seabrook Station, Unit No. 1 – Integrated Inspection Report 05000443/2021003 at 10, Docket Nos. EL 21-3-000 and EL21-6-000 (filed Nov. 17, 2021) ("NRC Letter") ("[T]he inspectors have reasonable assurance that the Seabrook main generator output breaker can perform its intended function with the current margin available to the rated short circuit current capability of the breaker and that NextEra remains in compliance with GDC-17."); *NextEra Energy Seabrook, LLC*, ISO New England Inc. Letter at 2, Docket Nos. EL21-3-000 and EL21-6-000 (filed May 6, 2021) ("ISO-NE Letter") ("[T]he Interconnection System Impact Study for the Project showed the duty on the Seabrook Station circuit breaker within its ratings until the addition of the Project, but over its ratings after the addition of the Project . . . .").

[13]    *Order*, 182 FERC ¶ 61,044 at P 79 (emphasis added).

Markets and Services Tariff ("Tariff") requires NECEC to fix any reliability problems NECEC will cause *before* interconnecting.[14]  If NECEC does not do so, it cannot interconnect.[15]  Therefore, a scenario in which the generator breaker becomes overdutied because of NECEC's interconnection cannot occur.

In any event, Good Utility Practice supports Seabrook's position, not the Commission's.  Replacing a generator breaker and ancillary equipment at a nuclear power plant is not like changing a household fuse in a residential closet.  The generator breaker is a massive piece of equipment that weighs 32,000 pounds and is raised about 75 feet above the ground.  Replacing it is likely to extend Seabrook Station's Fall 2024 planned outage by a week or more.

During the extended outage, the Seabrook Joint Owners will lose revenues that otherwise would be earned by selling output either into the ISO-NE energy markets or bilaterally.  Earlier in the case, Seabrook estimated that harm as totaling about $560,000 per day, though given current market volatility and pricing the actual lost revenue during the extended outage period may well be higher.  The other co-owners of Seabrook Station likewise will suffer losses, as Seabrook Station sales will not be available as a hedge against their market purchases.[16]  In addition to these lost revenues, if during the extended outage period pay for performance

---

[14]    *See* Tariff, § I.3.10 ("If the ISO notifies a Market Participant pursuant to Section I.3.9.1 that implementation of the Market Participant's or Transmission Owner's plan has been determined to have a significant adverse effect upon the reliability or operating characteristics of the Transmission Owner's transmission facilities, the transmission facilities of another Transmission Owner, or the system of one or more Market Participants, the Market Participant or Transmission Owner shall not proceed to implement such plan unless the Market Participant (or the Non-Market Participant on whose behalf the Market Participant has submitted its plan) or Transmission Owner takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect.").

[15]    *Id.*

[16]    *See NECEC Transmission LLC v. NextEra Energy Res., LLC*, NextEra Answer to Complaint of NECEC Transmission LLC and Avangrid, Inc. ("Answer"), Exh. No. 2, Prepared Affidavit of Joshua Marcum, Attachment B to Petition for Declaratory Order at 3-4, Docket No. EL21-6-000 (filed Nov. 2, 2020) ("Marcum Aff.").

penalties are imposed due to a capacity shortage condition, the Seabrook Joint Owners will lose capacity bonus payments.

The Seabrook Joint Owners likewise face various out-of-pocket expenses that could, in total, be very large. In addition to not receiving pay for performance bonus payments, a capacity shortage event declared by ISO-NE during the extended outage would leave the Seabrook Joint Owners on the hook for pay for performance penalties. These penalties could produce many millions of dollars in losses.[17]   In addition, it is undisputed that if something goes wrong during the construction work to replace the generator breaker, it could be extremely time-consuming and costly to repair. And there are various other costs, such as incremental additional labor and station power costs that Seabrook would have to pay.

In sum, the generator breaker replacement project "is expected to meet the definition of enterprise risk" under nuclear industry standards.[18]   Seabrook actually has demonstrated that it could suffer catastrophic losses posing enterprise risk, but the Commission unreasonably failed to consider that.[19]   Good Utility Practice does not require Seabrook to incur costs and face risks that threaten the "enterprise" solely for another's benefit.

The Commission never gives reasoned consideration to any of these undisputed facts, but nevertheless illogically suggests that Seabrook cannot object to any economic harm that does not

---

[17]   Pay for performance penalties paid by the Seabrook Joint Owners and others who have contracted for a capacity supply obligation would total more than $5.1 million per hour, with a monthly stop loss based on the FCA 15 starting price of $17.4 million. This assumes a 0.75 balancing ratio. 1249 MW (Seabrook Station's capacity supply obligation) x $5,455 (FCA penalty rate) x 0.75 = $5.1 million/hour. The monthly stop loss is: $13.932 (FCA 15 starting price) x 1249 MW x 1000 = $17.4 million. A 2018 shortage event lasted for 2.8 hours, and a similar outage in the Fall of 2024 would equate to a penalty for Seabrook Station being offline of about $14.3 million.

[18]   *NECEC Transmission LLC v. NextEra Energy Res., LLC*, NextEra Answer to Amended Complaint of NECEC Transmission LLC and Avangrid, Inc., Exh. No. 1 ("McCartney Second Suppl. Aff.") at 3-4, Docket No. EL21-6 (filed Apr. 15, 2021) ("Answer to Amended Complaint").

[19]   *Id.*

threaten Seabrook's financial viability under the *Hope Natural Gas* line of cases.[20]  It cannot

possibly be lawful or rational for the Commission to:

(1)     order Seabrook to replace nuclear generation equipment when the Commission
        has no statutory power to do so;

(2)     rewrite the LGIA to make NECEC a third-party beneficiary, even though the
        express terms of the contract make it crystal clear that there are no third-party
        beneficiaries;

(3)     reject Seabrook's proposal to be made whole on the ground that there is no
        contractual or Tariff language allowing that reimbursement, when the
        Commission has made up the underlying obligation to begin with; and

(4)     conclude that Seabrook can never object to any of this unless the resulting
        financial losses threaten Seabrook's financial viability.

That is not sustainable agency action either on rehearing or judicial review.

## BACKGROUND

This case began when ISO-NE determined that the NECEC Elective Transmission

Upgrade would have a significant adverse effect on Seabrook Station's existing 24.5 kV

generator breaker.  The study showed "the Seabrook Station circuit breaker upgrade was not

required 'but for' the interconnection of" NECEC's project.[21]  After receiving the ISO-NE

finding, Seabrook and NECEC engaged in "diligent[] and [] good faith" negotiations[22] that

successfully resolved all but three issues.[23]  Seabrook then filed its Petition for Declaratory

Order ("Petition") for Commission resolution of those three issues, or alternatively a

---

[20]     *Order*, 182 FERC ¶ 61,044 at P 104 (citing *FPC v. Hope Nat. Gas Co.*, 320 U.S 603, 605
(1944)).

[21]     ISO-NE Letter at 2.

[22]     Answer, Exh. No. 1, Prepared Supplemental Affidavit of Joshua Marcum.  *See also id.* at 2-6
(describing the history of such negotiations).

[23]     *See NextEra Energy Seabrook, LLC*, Petition for Declaratory Order of NextEra Energy Seabrook,
LLC at 1, Docket No. EL21-3-000 (filed Oct. 5, 2020) ("Petition").

9
**JA635**

determination that the Commission lacked jurisdiction to order Seabrook to replace the generator breaker, such that Seabrook could negotiate a fair outcome.[24]  NECEC subsequently conceded two of the issues,[25] but not the question whether Seabrook is required to incur a financial loss to upgrade the generator breaker, or the alternative question about jurisdiction.

After Seabrook filed the Petition, NECEC filed a complaint on the same issues, which it later amended.  The Amended Complaint duplicatively asked the Commission to find that Seabrook must incur a loss in replacing the generator breaker, and that it had jurisdiction to order Seabrook to replace the generator breaker.[26]  Indeed, NECEC went so far as to ask the Commission to require Seabrook to enter into a facilities agreement that Seabrook had never seen.[27]  And NECEC made entirely unsupported allegations that Seabrook Station was not being operated reliably.[28]  NextEra takes its responsibilities as owner and operator of a nuclear fleet quite seriously, and took strong exception to this allegation in particular.[29]

---

[24]    *Id.* at 1-2.

[25]    *NextEra Energy Seabrook, LLC*, Motion to Lodge of NextEra Energy Seabrook, LLC at 2-3, Docket No. EL21-3-000 (filed Sept. 20, 2021) (including an Engineering and Procurement agreement that would resolve the Good Utility Practice Issue definitional issue); *Order*, 182 FERC ¶ 61,044 at n.205 (explaining that Seabrook and NECEC have each "asserted that consequential damages is no longer a live issue").

[26]    *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Complaint and Request for Shortened Answer Period and for Fast Track Processing of NECEC Transmission LLC and Avangrid, Inc. at 2-3, Docket No. EL21-6-000 (filed Oct. 13, 2020) ("Complaint").

[27]    *Id.* at Exh. D; *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Amended Complaint and Request for Expedited Relief of NECEC Transmission LLC and Avangrid, Inc. at Exh. B, Docket No. EL21-6-000 (filed Mar. 26, 2021) ("Amended Complaint").

[28]    Amended Complaint at 8; Rolstad Aff. at 7.

[29]    Answer to Amended Complaint at 8-9 ("The affidavits also mistakenly put forth the offensive idea that Seabrook Station is not being operated safely . . . . Again, this appears to be nothing more than a pejorative smokescreen, because the Complainants do not actually use this so-called 'evidence' to support any legal argument . . . . [I]n any event, the claim is flatly wrong.  The Generation Breaker is not (before the NECEC project) over-dutied.") (citations omitted); *id.* at McCartney Second Suppl. Aff. at 6 ("The Gen Breaker satisfies the requirement that the interrupt rating of the generator circuit breaker is greater than the maximum symmetrical short circuit current that can be expected due to a fault condition, in

On September 7, 2021, the Commission issued the *Briefing Order*, where it essentially found that NECEC had not yet met its burden of proof under its Amended Complaint, such that "additional briefing [was] needed to more fully develop the record to resolve issues raised in the Complaint."[30]  The *Briefing Order* posed several questions, including whether the generator breaker is properly considered part of Seabrook's generating facility and, if so, whether and the extent to which Seabrook "may be subject to the upgrade obligations . . . . under the ISO-NE Tariff."  The Commission also raised for the first time what obligations, if any, "Seabrook has under its LGIA[.]"[31]  NextEra, NECEC, and ISO-NE filed initial and reply briefs in response. Of particular note, NECEC provided no new evidence to bolster the record the Commission had found insufficient.

Nonetheless, on February 1, 2023, the Commission issued the *Order*, finding, among other things, that Seabrook is required by the LGIA to replace the generator breaker.[32]  The Commission further found that NECEC is responsible for direct costs of the generator breaker replacement, but that Seabrook may not recover any opportunity or legal costs.[33]  The

---

accordance with ANSI/IEEE C37.013."); *id.*, Exh. No. 2, GE Alstom Letter at 1 (confirming the upratings to 165 kA); Answer to Amended Complaint, Exh. No. 3, Siemens PTI Report ("Siemens Report") at 2 ("[T]he short circuit seen by the Seabrook 52G circuit breaker based on (i) the ISO-NE model as of 12/31/2015, (ii) the ISO-NE model as of 12/31/2016, and (iii) the Base Case Review for 2021 NERC TPL 001-4 Compliance Study Short Circuit Analysis are all below the 165,000 Amp short circuit duty for the Seabrook 52G circuit breaker.").  The issue was so important to Seabrook that on November 17, 2021, it filed a Motion to Lodge including additional information to refute the claim that the generator breaker was not being operated reliably, including a November 10, 2021 letter from a Branch Chief of the U.S. Nuclear Regulatory Commission ("NRC Letter") and an NRC Inspection Report for Seabrook Station ("NRC Seabrook Report").

[30]    *Briefing Order*, 176 FERC ¶ 61,148 at P 17.

[31]    *Id.* at P 18.

[32]    *Order*, 182 FERC ¶ 61,044 at P 83.

[33]    *Id.* at PP 83, 100.

Commission denied the remainder of NECEC's Amended Complaint,[34] and dismissed the

Petition.[35]  In reaching these conclusions the Commission rejected all of the arguments of the

Amended Complaint, and instead based its conclusion on its own analysis of the LGIA issue first

raised in the *Briefing Order.*

### STATEMENT OF ISSUES AND SPECIFICATIONS OF ERROR

Pursuant to Rule 713, 18 C.F.R. § 385.713(c), Seabrook submits the following statement

of issues and specifications of error:

1. It was error to order Seabrook to replace the generator breaker under the Seabrook
   LGIA and Good Utility Practice.

   a. The Commission correctly determined the generator breaker is generation, and
      therefore exceeded its jurisdiction by ordering Seabrook to replace and
      enlarge the generator breaker.[36]  It was also error to determine that the LGIA
      permits the Commission to assert jurisdiction over the generator breaker.
      Contracts should not be interpreted to have unlawful effects.[37]  Moreover, a
      contract cannot confer jurisdiction on a federal agency; only Congress can
      alter the Commission's jurisdiction.[38]

   b. It was contrary to the plain language of the LGIA and the Tariff to determine
      that the LGIA, and Good Utility Practice, require Seabrook to replace the
      generator breaker.

---

[34]     *Id.* at P 1.

[35]     *Id.* at PP 1, 112.

[36]     16 U.S.C. § 824(b)(1); *Promoting Wholesale Competition Through Open Access*, Order No. 888,
FERC Stats. & Regs. ¶ 31,036, at 31,883 (1996) ("Order No. 888") ("[T]he Commission's jurisdiction
over generation extends only to matters directly related to the economic aspects of transactions resulting
from [generating facilities]. We do not have jurisdiction over the physical aspects of generation
facilities."); *S.C. Elec. & Gas Co.*, 29 FERC ¶ 61,350 at 61,744 (1984) ("Section 201(b) of the Federal
Power Act, as well as court cases, makes it clear that the Commission has no direct jurisdiction over
generating facilities[.]").

[37]     *See, e.g., Cole v. Burns Int'l. Sec. Servs*, 105 F.3d 1465, 1485 (D.C. Cir. 1997) ("It is well
understood that, where a contract is unclear on a point, an interpretation that makes the contract lawful is
preferred to one that renders it unlawful.").

[38]     *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to
act . . . unless and until Congress confers power upon it."); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C.
Cir. 2001) (the Commission is a "creature of statute" that has "no constitutional or common law existence
or authority, but only those authorities conferred upon it by Congress"); *Atl. City Elec. Co. v. FERC*, 295
F.3d 1, 8 (D.C. Cir. 2002) ("In the absence of statutory authorization for its act, an agency's 'action is
plainly contrary to law and cannot stand.'") (citations omitted).

2. It was error to require Seabrook to under-recover the costs and to wear all of the outage risk of replacing the generator breaker on NECEC's behalf.

    a. The Commission's finding that Seabrook is not providing an "electric service" to NECEC by replacing the generator breaker also means that the Commission cannot set the rate to be paid by NECEC to Seabrook for replacing the generator breaker, such that the Commission had no jurisdiction to rule that Seabrook cannot recover all costs of that undertaking, including opportunity costs.

    b. It was error to prevent Seabrook from being made whole.

        i. It was contrary to the plain language of the Tariff to find that the Tariff prevents Seabrook from recovering opportunity costs.[39]

        ii. If Good Utility Practice requires Seabrook to replace the generator breaker, then it was error to fail to apply the same standard to make Seabrook whole.[40]

        iii. The Commission properly found that NECEC caused the costs of replacing the generator breaker, but improperly found that Seabrook, which does not benefit from the NECEC Project, should bear some of the costs. Costs must "'be allocated to those who cause the costs to be incurred and reap the resulting benefits.'"[41] The FPA does not permit the Commission to order Seabrook to replace the generator breaker at a financial loss.

    c. The Commission also erred in applying its opportunity cost precedent, distinguishing the cases on the basis of immaterial facts and failing to address

---

[39] *See* Tariff, § I.3.10; *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (The filed rate doctrine "bars a regulated seller . . . from collecting a rate other than the one filed with the Commission and prevents the Commission itself from imposing a rate increase for [power] already sold"); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 2004) (finding that the Commission's "imposition of additional charges [outside the filed rate] . . . directly violates the filed-rate doctrine or the rule against retroactive ratemaking"). *See also Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 830 (D.C. Cir. 2022) (the tariff's "billing requirements, although non-rate terms, are part of the filed rate. The statute provides no grounds for distinguishing rate and non-rate terms, but rather binds parties to the terms in the filed tariff."); *Pac. Gas & Elec. Co.*, 173 FERC 61,051 at P 16 (2020) (describing the "plain language" of the "filed rate, terms and conditions of service" of the CAISO tariff and noting that "granting [a utility's] request [to waive a non-rate time bar condition] would fail to give effect to part of the filed rate.").

[40] Seabrook LGIA, § 1 (defining Good Utility Practice as "any of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition."); ISO-NE Tariff, § I.2 (same).

[41] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 85 (D.C. Cir. 2014) (quoting *Nat'l Ass'n of Regul. Util. Comm'n. v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007)).

the fundamental question whether Seabrook should be made whole for replacing the generator breaker.[42]

    d.    A rate is confiscatory where it provides for zero return of and on investment for an unbounded period of time for a project that presents enterprise risk, and Seabrook is not required to show that the rate would drive Seabrook out of business, because Seabrook does not have the burden of proof and that is not the standard.[43]

    e.    It was a failure of reasoned decision-making to entirely fail to address arguments that a formula is the just and reasonable way to make sure Seabrook receives, and NECEC pays, no more or less than needed to make Seabrook whole.[44]

3.    It was error to require Seabrook to pay again for deliverability rights it has already fully paid for, and to create a policy whereby existing generators will be required to subsidize potentially unlimited numbers of later entrants, as it reflects an unreasonable departure from longstanding precedent.[45]

---

[42]    *See Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 186 (D.C. Cir. 2022) (finding a Commission decision to be arbitrary and capricious and explaining that "the agency's mistake was not that it did not factually distinguish the two cases. The Commission simply failed to explain why that distinction matters").

[43]    *See N.Y. Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,004 at P 111 (2015) ("Absent a showing that costs have been imprudently incurred, the Commission allows utilities the opportunity to recover their costs."); *ISO New England, Inc.*, 120 FERC ¶ 61,087 at P 52 (2007) (recognizing that requiring an existing generating resource to offer capacity at a price less than its net risk-adjusted going forward and opportunity costs raises the possibility of confiscatory ratemaking); *Central Hudson*, 176 FERC ¶ 61,149, at P 57 (deciding confiscatory rate issues against party failing to meet Section 206 burden); *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158, at P 28 (2018), *order on reh'g*, 169 FERC ¶ 61,233 (2019) (same).

[44]    *See, e.g.*, *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (failure to respond meaningfully to objections raised by a party renders a decision arbitrary and capricious); *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 974 (D.C. Cir. 2003) (remanding decision to the Commission for failure to address an argument that New York Independent Service Operator had violated its tariff); *Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 442 (D.C. Cir. 1988) ("[A]bsence of an adequate analysis by the Commission renders meaningful review impossible.").

[45]    *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("[A]n agency changing its course must supply a reasoned analysis"); *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 65-66 (D.C. Cir. 1999) (the Commission failed to "articulate a principled rationale for departing from [its previous] methodology"); *Apache Corp. v. FERC*, 627 F.3d 1220, 1222-23 (D.C. Cir. 2010); *Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 442 (D.C. Cir. 1988); *Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001); *Jupiter Energy Corp. v. FERC*, 482 F.3d 293, 298 (5th Cir. 2007).

## ARGUMENT

To install a new generator circuit breaker at a nuclear power plant is no small matter. As the Commission acknowledges, the generator breaker is a massive piece of equipment[46] that is raised many feet above the ground. If something goes wrong, the damage to the facility can be so extremely time-consuming and costly to repair as to create enterprise risk.[47]

NextEra remains willing to replace the generator breaker to accommodate NECEC's interconnection to the New England grid, if Seabrook is made whole. But the *Order* unlawfully exposes Seabrook to enterprise risk by forcing Seabrook to replace the generator breaker and market risk during the planned outage—all without full cost compensation. Seabrook is not required to replace the generator breaker and is certainly not required to do so at a loss.

## I.      Burden of proof

Under FPA Section 206, NECEC, as the complainant, bears the burden of proof.[48] That required NECEC to support its Amended Complaint, and its responses to the *Briefing Order*,

---

[46]      *Order*, 182 FERC ¶ 61,044 at n.10 (noting that the existing generator breaker is "approximately 20 feet by 15 feet wide and weighs approximately 32,000 pounds").

[47]      Answer to Amended Complaint, McCartney Second Suppl. Aff. at 3-4 ("The Seabrook Breaker Replacement will be screened for enterprise risk, and is expected to meet the definition of enterprise risk, under Institute of Nuclear Power Operations (INPO) Event Report (IER) 14-20, *Integrated Risk – Healthy Technical Conscience*. As explained in the White Paper included as Attachment D to the Petition, and which has also been included in this docket as Exhibit C to the Complaint: '[INPO IER 14-20] prescribes additional actions for high consequence, low probability, station operational and project risks that could affect the viability of the facility (i.e., enterprise risk), such as the Breaker Project.' Any enterprise risk project requires additional layers of preparation and precaution as Seabrook Station cannot return to service until the project is successfully completed.") (citations omitted).

[48]      16 U.S.C. § 824e(b) ("In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon . . . the complainant."); *see also FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353 (D.C. Cir. 2014).

with substantial evidence.[49]  As the respondent, NextEra has no burden of proof.[50]  The Commission did not alter that distribution of burdens in ordering additional briefing in NECEC's complaint docket, Docket No. EL21-6-000.[51]

## II.    The LGIA does not and could not require Seabrook to replace the generator breaker

The Commission rejected *all* of the Amended Complaint's FPA-jurisdictional arguments for ordering Seabrook to replace the generator breaker, but still ordered Seabrook to replace the generator breaker.  The Commission found its way to this result by "asking for yet more briefing to address a completely different question—never raised in any of the pleadings—of whether [Seabrook] is obligated to complete the upgrade at its own expense under the terms of its interconnection agreement with ISO-NE."[52]

From this wobbly springboard, and with no effort by NECEC to meet its burden by introducing new evidence in response to the *Briefing Order*, the Commission leaps with little explanation to the incorrect conclusion that Seabrook is responsible for replacing the generator breaker under the Seabrook LGIA "because [the replacement] is needed for reliable operation of Seabrook Station and required by Good Utility Practice."[53]  But the Commission lacks jurisdiction over the breaker as a generation facility, and the single LGIA provision relied upon by the Commission does not have the effect claimed by the Commission, because it does not

---

[49]    *See, e.g.*, *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator*, 149 FERC ¶ 61,049 at P 116 (2014).

[50]    *See Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017).  Seabrook notes that its Petition for Declaratory Order submitted in Docket No. EL21-3-000 has been dismissed.

[51]    *See Briefing Order*, 176 FERC ¶ 61,148.  In the *Briefing Order* the Commission also initiated an investigation, which remains pending.  In that proceeding, the Commission will bear the burden of proof. 16 U.S.C. § 824e(b) (the burden of proof will be on the Commission or the complainant).

[52]    *Briefing Order*, 176 FERC ¶ 61,148 (Danly, Comm'r, dissenting at P 10).

[53]    *Order*, 182 FERC ¶ 61,044 at P 74.

apply here, and in any event Seabrook's existing generator breaker does not need to be replaced under Good Utility Practice or Reliability Standards.

### A. The Commission cannot order Seabrook to replace the generator breaker

The Commission repeatedly finds that the generator breaker is a generation facility.[54] The Commission has no jurisdiction over this generation facility.[55]  On this basis alone, the instruction to replace the generator breaker must be reversed.[56]

The *Order* seeks to sidestep the jurisdictional issue by claiming it is merely interpreting a provision of the LGIA, a contract that is binding upon Seabrook.[57]  But contracts should not be interpreted to have unlawful effects,[58] and the *Order* claims that the LGIA gives the Commission authority to "direct Seabrook to replace the breaker at [Seabrook Station]."[59]  As already established, the Commission has no authority to do that, so the contract cannot be interpreted as providing jurisdiction.  And even if a contract among Seabrook, ISO-NE and New Hampshire Transmission confers jurisdiction over Seabrook Station's interconnection, it cannot expand

---

[54]     *Id.* at PP 25, 76, 78.

[55]     16 U.S.C. § 824(b)(1); Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,883 ("[T]he Commission's jurisdiction over generation extends only to matters directly related the economic aspects of transactions resulting from [generating facilities]. We do not have jurisdiction over the physical aspects of generation facilities."); *S.C. Elec. & Gas Co.*, 29 FERC ¶ 61,350, at 61,744 ("Section 201(b) of the Federal Power Act, as well as court cases, makes it clear that the Commission has no direct jurisdiction over generating facilities[.]").

[56]     Notably, the *Order* also misconstrues the purpose of the generator breaker.  The purpose is not "to ensure that the generator operates in a safe and reliable manner as it flows output into the ISO-NE system[,]" *Order*, 182 FERC ¶ 61,044 at P 86, but rather it is to "connect the generator to offsite power and to protect the generator from faults on the Administered Transmission System" as the Commission correctly states elsewhere.  *Id.* at P 76.

[57]     *Id.* at PP 86-87.

[58]     *See, e.g.*, *Cole v. Burns Int'l. Sec. Servs*, 105 F.3d 1465, 1485 (D.C. Cir. 1997) ("It is well understood that, where a contract is unclear on a point, an interpretation that makes the contract lawful is preferred to one that renders it unlawful.").

[59]     *Order*, 182 FERC ¶ 61,044 at P 1.

jurisdiction on a federal agency, no matter what it says.  Only Congress can alter the Commission's jurisdiction.[60]  The LGIA does not and could not permit the Commission to issue that directive.

The Commission's jurisdiction over the LGIA arises solely from its jurisdiction over transmission service.[61]  In Order No. 2003, the Commission said it was exercising its authority to remedy undue discrimination with respect to rates for transmission service subject to its jurisdiction, just like it did in crafting its open access rules.[62]  Here, the Commission has already correctly held that those rules for open access cannot be applied to require Seabrook to replace the generator breaker, because the generator breaker is generation.[63]  That cannot be squared with its decision that the LGIA, which has the same jurisdictional source, can provide authority to order replacement of generation.  In any event, as explained next, even if the LGIA could provide such authority, it does not provide it here.

**B.    The LGIA provision the Commission relies upon does not require Seabrook to replace the generator breaker, and neither does Good Utility Practice**

The *Order* identifies a single "[s]pecific[]" provision of the LGIA that "contemplates Seabrook making modifications to its facility that are made necessary by another entity's

---

[60]    *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (the Commission is a "creature of statute" that has "no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress"); *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) ("In the absence of statutory authorization for its act, an agency's 'action is plainly contrary to law and cannot stand.'") (citations omitted).

[61]    *See Standardization of Generator Interconnection Agreements & Procedures*, Order No. 2003, 104 FERC ¶ 61,103 at P 4 (2003) ("Order No. 2003") (citations omitted), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220 (2004) ("Order No. 2003-A").

[62]    *See* Order No. 2003, 104 FERC ¶ 61,103 at PP 18-20.

[63]    *Order*, 182 FERC ¶ 61,044 at P 78.

actions," Appendix C-1, Section B.III.[64]  That provision does not require Seabrook to build

anything, much less build something to benefit a third party.  Appendix C-1, Section B.III says:

> In addition to Article 5.19 of this Agreement and notwithstanding the provisions of Sections B.I and B.II of this Appendix C-1, in the event *Interconnecting Transmission Owner or Interconnection Customer* make a modification or functional change to its own facilities that is not required by Applicable Laws and Regulations or Governmental Authority, and thereby makes it necessary for the other entity to make a modification or functional change to its own facilities that is required in accordance with Good Utility Practice, *the entity making the modification or functional change not required by Law or Governmental Authority shall bear the cost of the modification or functional change to the other entity's facilities* required in accordance with Good Utility Practice.  [Emphases added.]

According to the *Order*, "this provision provides for future modifications to account for

changing conditions on the system in order to maintain reliability . . . .  If required by Good

Utility Practice, as discussed below, under this provision such changes must occur—that

outcome is not open to negotiation."[65]  There are many errors embedded in this conclusion.  The

Commission wrongly concluded whose projects the provision applies to, what the provision

does, and who it does (and does not) benefit, and in any event incorrectly applies the concept of

Good Utility Practice to these facts.

### 1.    The provision does not apply to NECEC's Elective Transmission Upgrade

The LGIA is a contract subject to ordinary principles of contract construction, foremost

of which is that contracts must be interpreted according to their plain language.[66]  Here, it is

unambiguous that this provision does not apply to NECEC or its Elective Transmission Upgrade.

Rather, by its terms, this provision applies to two entities: the "Interconnecting Transmission

---

[64]    *Id.* at P 80.

[65]    *Id.* at P 82.

[66]    Restatement (Second) of Contracts § 202(3) (1981) ("[W]here language has a generally prevailing meaning, it is interpreted in accordance with that meaning").

Owner" (New Hampshire Transmission) and the "Interconnection Customer" (Seabrook).  The provision does not even apply to the other party to the LGIA, ISO-NE.[67]  The provision is triggered under certain circumstances where one of the two specifically identified entities makes a change to its facilities that renders it necessary for "the other entity" in turn to modify its own facilities.  The provision does not apply to anyone else.

The *Order* admits this: "We acknowledge that Appendix C-1, section B-III generally pertains to changes made by the interconnecting transmission owner or interconnection customer, which in this case would be Seabrook and its interconnecting transmission owner, New Hampshire Transmission."[68]  That should have ended the analysis of this provision in this case.  But erroneously, the *Order* continues on to find the provision "highly relevant," making yet more errors in construction at every step.

### 2. The provision is about cost responsibility, not construction obligations

Disregarding the plain language limiting the provision to the relationship between Seabrook and New Hampshire Transmission, the *Order* says "[n]onetheless, we find this provision to be highly relevant here, given the specific circumstances present in this case."[69]  It goes on to say:

> Appendix C-1, section B.III of the Seabrook LGIA reflects a requirement for Seabrook to make future modifications to its facility that are triggered by another entity's actions.  Specifically, this provision provides for future modifications to account for changing conditions on the system in order to maintain reliability.  This provision sets out the cost responsibility related to modifications to the generating facility post-interconnection, which notifies the parties that certain modifications may be required in order to continue the facility's operation in accordance with Good Utility Practice.  If required by Good Utility Practice, as

---

[67]    Seabrook LGIA, § 1 (defining ISO-NE as the "System Operator;" defining "Interconnecting Transmission Owner" to specifically exclude the System Operator).

[68]    *Order*, 182 FERC ¶ 61,044 at P 81.

[69]    *Id.*

discussed below, under this provision such changes must occur—that outcome is not open to negotiation.[70]

None of this accurately describes the plain language of the provision. The provision is a cost allocation provision, and no more. It does not obligate either party to construct anything. Rather, it obligates a party that imposes certain costs on the other party to compensate the other party for those costs if certain conditions are met. That's it.

The language that the Commission finds meaningful is not a construction obligation—instead it sets forth conditions that must be met before one party can claim compensation for construction from the other party. The parties sensibly created rules to prevent claims for costs that the other party did not cause. Rather, a claimant will only be compensated if the other party made a modification to its facilities, and that modification made it "necessary," under "Good Utility Practice," for the claimant to make a reciprocal modification to its own facilities. If those conditions are met, the claimant can make its claim.

Put differently, the provision describes the cost consequences of certain construction if the claimant can prove that the construction was necessitated by Good Utility Practice—it is not an obligation to conduct construction. And even if the provision could somehow be read to require construction, there is no way to read it to require construction in response to NECEC's interconnection with ISO-NE, approximately 100 miles from the facilities of the two entities to which the provision applies, Seabrook and New Hampshire Transmission. Indeed, the Commission's reading has no limiting principle; in theory it could apply to any modification anywhere in the Eastern Interconnect. As discussed next, this conclusion is doubly problematic due to the LGIA's prohibition on third-party beneficiaries.

---

[70]    *Id.* at P 82.

### 3.    The LGIA provision cannot create third-party beneficiaries

NECEC asked the Commission to order Seabrook to replace the generator breaker, and the Commission did so, based on the LGIA.  This outcome directly violates the LGIA's prohibition on third-party beneficiaries, as the Commission's own reasoning shows.

Section 30.5 of the LGIA expressly states that NECEC and other third parties are not beneficiaries of the Seabrook LGIA:

> No Third Party Beneficiaries. This LGIA is not intended to and does not create rights, remedies, or benefits of any character whatsoever in favor of any persons, corporations, associations, or entities other than the Parties, and the obligations herein assumed are solely for the use and benefit of the Parties, their successors in interest and, where permitted, their assigns.

The Commission's order violates this protection embedded in the filed rate.  And it is inconsistent with past precedent, in which the Commission found that parties must "clearly" express their intention to benefit a third party,[71] while here the Seabrook LGIA expressly says the opposite.

The *Order* rejects Seabrook's arguments on the third-party beneficiary prohibition, saying that "[c]ontractual prohibitions on third-party beneficiaries bar a third party who benefits from the contract's terms from enforcing a contract as if it were a party to the contract."[72]  Yet that is *exactly* what is happening here.  Avangrid has advocated that the Commission could choose, among other options, to "[d]irect NextEra to replace the Seabrook Breaker as a part of its obligations under its LGIA, which require it to safely maintain its generating facility."[73]  And the

---

[71]    *See, e.g.*, *Power Auth. of N.Y. v. Long Island Lighting Co.*, 60 FERC ¶ 61,069, 61,236-37 (1992), *rev'd and remanded sub nom. on other grounds Long Island Lighting Co. v. FERC*, 20 F.3d 494, 497-501 (D.C. Cir. 1994), *order on remand*, 68 FERC ¶ 61,116 (1994), *reh'g granted in part*, 71 FERC ¶ 61,126 (1995) (citations omitted).

[72]    *Order*, 182 FERC ¶ 61,044 at P 85.

[73]    *E.g.*, *NECEC Transmission LLC v. NextEra Energy Res., LLC*, Reply Brief of NECEC Transmission LLC and Avangrid, Inc. at 15, Docket No. EL21-6-000 (filed Oct. 22, 2021).

Commission is *granting NECEC's complaint* and thereby requiring Seabrook—on the basis of a provision in the same agreement that contains a third-party beneficiary prohibition—to upgrade the generator breaker at less than full compensation, for the benefit of NECEC, exactly as NECEC requested.  Under the Commission's reasoning, all third-party beneficiary prohibitions are essentially "blue-penciled" out of the agreement and are never enforceable, because even where a third party asked the Commission or a court to order a party to a contract to take an action ostensibly required under the contract, such a prohibition would "not preclude the Commission from finding that a party must abide by its obligations."[74]

Appendix C-1, Section B.III provides a good example of the importance of the bar on third-party beneficiaries.  The prohibition on third-party beneficiaries prevents an unjust and unreasonable assignment to Seabrook of an obligation without a reciprocal obligation in the same contract for just compensation and other reasonable terms and conditions governing a relationship with the beneficiary.  If it is read as the Commission suggests to require Seabrook to replace the generator breaker, that obligation would be one-sided.  NECEC is not a party to the LGIA.  Neither is any other future interconnecting entity whose interconnection might cause issues for Seabrook.

> **4.** **Reliability Standards and Good Utility Practice do not require Seabrook to replace the generator breaker**

In this record, the NRC—the agency with the requisite technical expertise and the exclusive responsibility for regulating the safe operation of Seabrook— says, "the Seabrook main generator output breaker can perform its intended function with the current margin

---

[74]    *Order*, 182 FERC ¶ 61,044 at P 85.

available . . . ."[75]  Also in this record, ISO-NE, the entity charged by the Commission with planning a reliable transmission system in New England says, "the duty on the Seabrook Station circuit breaker [is] within its ratings . . . ."[76]

No one disputes these findings.  No one has cited a single North American Electric Reliability Corporation ("NERC") Reliability Standard that is or will be violated.  These points are uncontroverted.  The Commission cannot just throw around words like "reliability" or "Good Utility Practice"[77] as a basis for decision-making without connecting them to a binding legal requirement or substantial evidence in the record.[78]

Thus, even assuming *arguendo* that the statute and the LGIA did not bar the Commission from ordering Seabrook to replace the generator breaker, the *Order* gets it wrong, because Seabrook operates the generator breaker along with the rest of its facility in accordance with Good Utility Practice and Reliability Standards, as well as the rules of the NRC.  This is further substantiated by testimony of a Seabrook officer[79] and an independent expert.[80]

---

[75]  *See* NRC Letter at 10; *see also Order*, 182 FERC ¶ 61,044 at P 85 ("No performance issues were identified during the conduct of this review and inspection.").

[76]  ISO-NE Letter at 2.

[77]  *See, e.g.*, *Order*, 182 FERC ¶ 61,044 at P 83 & n.150, P 84 & n.156.

[78]  *See PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,157 (2016) (Bay, Comm'r, dissenting) ("[T]he talismanic invocation of reliability is, by itself, inadequate to establish reasoned decision making and just and reasonable rates.").

[79]  Answer to Amended Complaint, McCartney Second Suppl. Aff. at 6 ("The Gen Breaker does not need to be replaced (absent the NECEC Project), as the Gen Breaker does not exceed its ratings . . . . The Gen Breaker satisfies the requirement that the interrupt rating of the generator circuit breaker is greater than the maximum symmetrical short circuit current that can be expected due to a fault condition, in accordance with ANSI/IEEE C37.013.").  *See also* Siemens Report at 2 ("[T]he short circuit seen by the Seabrook 52G circuit breaker based on (i) the ISO-NE model as of 12/31/2015, (ii) the ISO-NE model as of 12/31/2016, and (iii) the Base Case Review for 2021 NERC TPL 001-4 Compliance Study Short Circuit Analysis are all below the 165,000 Amp short circuit duty for the Seabrook 52G circuit breaker.").

[80]  Answer, Exh. No. 7, Prepared Affidavit of Lawrence Weber at 7 ("Weber Affidavit") ("Based on my experience, I believe the White Paper demonstrates that Seabrook is taking a reasonable approach to project execution and will meet all safety, execution, and quality standards applicable to the execution of

Sidestepping the fundamental fact that Seabrook has not caused the generator breaker to be overdutied, the *Order* argues that there is a reliability problem that needs to be fixed today because NECEC might be built in the future and cause the breaker to be overdutied:

> If Seabrook fails to replace the breaker prior to the energization of [NECEC]'s project, then it would be violating the LGIA's standard of Good Utility Practice, which requires "the exercise of reasonable judgment in light of the facts known at the time the decision was made . . . consistent with good business practices, *reliability, safety* and expedition." [footnote omitted] Seabrook would not be exercising reasonable judgment to operate the breaker from the moment [NECEC] is energized because it would risk the breaker being overdutied.[81]

This "Good Utility Practice" argument fails because it bases its legal conclusion on a factual predicate that is not possible.  The Tariff does not permit NECEC to be energized until there is no danger of the generator breaker being overdutied.  Thus, it would not be "reasonable judgment" to assume that energization of NECEC could overduty the Seabrook generator

---

major projects at nuclear power plants.  The documents referenced and approach documented in the White Paper have much more significance in the nuclear power industry than mere 'aspirational goals' as mischaracterized by Complainants. Compliance with the INPO guidance (IER-14-20) – which is committed to by every U.S. nuclear plant owner, is essential to ensuring that nuclear plant management prudently plans major and complex work tasks in a manner that minimizes the probability and consequences of a problem with project execution.").

[81]     *Order*, 182 FERC ¶ 61,044 at P 84 (emphasis in original). As an initial matter, the omitted portions of the LGIA definition are instructive.  Here is the full definition:

> **Good Utility Practice** shall mean any of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the region.

Seabrook LGIA, § 1.  We address the omitted "at a reasonable cost" language in the discussion of the appropriate charge for the generator breaker replacement in Section III, below.  Here, it is noteworthy that no proof has been offered that requiring generators to replace generation facilities to permit a third-party facility to interconnect is "engaged in or approved by a significant portion of the electric industry during the relevant time period."  The Commission has not explained why this new application of Good Utility Practice is apparently arising for the first time now, twenty years after creation of the LGIA.

breaker.[82]  Seabrook is not obligated under any legal standard or requirement to replace the generator breaker as the system exists today.  Good Utility Practice does not require actions for system changes that will not exist.  There is no NERC Reliability Standard that is violated because of conditions that will never exist.  The *Order* creates such an obligation only by conjuring a fictional future world where NECEC will attach its facilities to the grid and the lights will go out.  It cannot happen, because the Tariff and common sense require NECEC *first* to arrange for—and fully pay for—a system that will not allow that occurrence.

After an Elective Transmission Upgrade interconnection request is submitted, ISO-NE assigns a queue position and studies the request to determine whether there will be a "significant adverse effect" upon the "stability, reliability or operating characteristics" of the system.[83]  If ISO-NE determines that there will be such a significant adverse effect, the proponent of the Elective Transmission Upgrade is not permitted to proceed with its plan unless it "takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect."[84]

When the adverse impact is on an "Affected System,"[85] which can include a generator, the Elective Transmission Upgrade proponent cannot build the upgrade unless it enters into a "facilities agreement" with the Affected Party[86] (the owner of the Affected System) to remediate

---

[82]    *Order*, 182 FERC ¶ 61,044 at P 84.

[83]    *See* ISO-NE Tariff, § I.3.9.

[84]    *Id.* § I.3.10.

[85]    The Tariff defines an "Affected System" as "any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection."  *See id.*, Schedule 25, § 1.

[86]    The Tariff defines an "Affected Party," as "the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process."  *Id.*

the problem on the Affected System.[87]  Specifically, the *pro forma* Elective Transmission Upgrade Interconnection Agreement ("Elective Transmission Upgrade IA") in Schedule 25 of the Tariff, which is entered into among the Interconnection Customer,[88] Interconnecting Transmission Owner,[89] and ISO-NE, instructs the Interconnection Customer to "enter into separate related *facilities agreements* to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection" of the Elective Transmission Upgrade.[90]

There are no rules for facilities agreements of this nature.  The Tariff does not define "facilities agreement," provide a form of such an agreement, or offer any guidance as to what it must contain, other than the above-quoted language that it must "address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection" of the Elective Transmission Upgrade.[91]  The Tariff also does not purport to require an Affected Party, whose Affected System is a generator, to enter into a facilities agreement, or any agreement for the construction of a generation upgrade to accommodate an Elective Transmission Upgrade.  The "facilities agreement" requirement with respect to generators is found only in the Elective Transmission Upgrade IA, to which the Affected Party is not a party.[92]

---

[87]    *See id.*, Schedule 25, Appendix 6 at Article 11.4.4.

[88]    An Elective Transmission Upgrade "Interconnection Customer" is defined as "any entity, including a transmission owner or its Affiliates or subsidiaries, that interconnects or proposes to interconnect" its Elective Transmission Upgrade with the Administered Transmission System under Schedule 25 of the Tariff.  *See id.*, Schedule 25, § 1.

[89]    An "Interconnecting Transmission Owner" is a Participating Transmission Owner, Merchant Transmission Owner, or Other Transmission Owner that "owns, leases or otherwise possesses an interest in the portion of the Administered Transmission System at the Point of Interconnection" and is a party to the Elective Transmission Upgrade IA.  *Id.*

[90]    *See id.*, Schedule 25, Appendix 6 at Article 11.4.4 (emphasis added).

[91]    *See id.*

[92]    *See id.*, Schedule 25, Appendix 6 at Article 1 (providing that a "Party" to the Elective Transmission Upgrade IA includes the Interconnection Customer, ISO-NE, and the Interconnecting Transmission Owner).

In short, and as ISO-NE agrees,[93] NECEC's compliance with its obligation to fix the problem it will cause is a *pre-condition* to its interconnection. The "concern" of ISO-NE and the Commission "that operating the breaker in an overdutied condition could lead to an uninterrupted short circuit current that could lead to catastrophic equipment failure at the nuclear facility"[94] describes the problem that NECEC must fix to comply with the filed rate before it can be interconnected, not something Seabrook must address to avoid a problem after NECEC has complied with the filed rate. Commissioner Danly explained the sequencing well in his dissent to the *Briefing Order*:

> In order to deliver the power transmitted by the NECEC Project to New England, it is necessary for the transmission line to be interconnected with the transmission system operated by [ISO-NE]. And *before* that interconnection can occur, ISO-NE is obligated to study the effects of the interconnection on its system. Any adverse effects identified by ISO-NE's study must be mitigated *before* the interconnection is placed in operation.[95]

For these reasons, the *Order*'s claim that "Seabrook would not be exercising reasonable judgment to operate the breaker from the moment [NECEC] is energized because it would risk the breaker being overdutied" is a logical nullity, because the Tariff prevents Seabrook from being placed in that situation.[96] The Tariff is the filed rate, and under the filed rate doctrine, the

---

[93]    *See NECEC Transmission LLC v. NextEra Energy Res., LLC*, Brief of ISO New England Inc. at 9, Docket No. EL21-6-000 (filed Oct. 7, 2021) ("ISO-NE Brief") (citing to Tariff Section I.3.9.1, which requires the Market Participant to "construct[] at its expense" any necessary upgrades or the Project "shall not proceed").

[94]    *Order*, 182 FERC ¶ 61,044 at P 84.

[95]    *Briefing Order*, 176 FERC ¶ 61,148 (Danly, Comm'r, dissenting at P 4) (emphases added).

[96]    The "reasonable judgment" standard of Good Utility Practice is also particularly ill-suited to circumstances where one business ostensibly must exercise reasonable judgment to guess whether another business might proceed with announced plans. That puts companies at risk of having to make unnecessary investment, in the name of their most "reasonable judgment" about future circumstances they cannot control and about which they have no inside knowledge. The Tariff approach eliminates this problem by assigning the responsibility for fixing a reliability issue caused by an interconnection to the interconnection customer, and therefore also assigning the decision whether to fix the problem to that customer—in this case, NECEC.

Tariff must be followed.[97]  Thus, the *Order*'s claim that the Commission need not "wait for an adverse event to occur before taking action[]"[98] proceeds from the false premise that an "adverse event" is possible.  The Commission cannot conjure the possibility of an adverse event through the misapplication of the law and then assign Seabrook the costs of avoiding the unlawful, impossible future adverse event.

In sum, Seabrook is already operating reliably and in accordance with Good Utility Practice, and the *Order*'s only hypothesized scenario where it might not do so cannot come to pass.  Instead, what the *Order* effectively does is use a twisted notion of Good Utility Practice to shift NECEC's Tariff-based requirement to fix the problem it will cause from NECEC to Seabrook—and what's worse, require Seabrook to undertake this transferred obligation at a financial loss.  The *Order* fails to meaningfully grapple with NECEC's Tariff-based responsibility to fix the problem it creates, or to explain how the *Order*'s interpretation is consistent with the filed rate and the filed rate doctrine.

Moreover, the Commission's reliance on the effect of "energization" of NECEC (*e.g.*, for testing) on creating an overdutied state for the generator breaker lacks any record evidence.  Rather, in this record ISO-NE explained that NECEC through its Elective Transmission Upgrade IA may seek a deviation from the *pro forma* agreement and request that "ISO-NE and the Interconnecting Transmission Owner perform operational analysis 'to determine the extent to

---

[97]     *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (The filed rate doctrine "bars a regulated seller . . . from collecting a rate other than the one filed with the Commission and prevents the Commission itself from imposing a rate increase for [power] already sold"); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320 (D.C. Cir. 2004) (finding that the Commission's "imposition of additional charges [outside the filed rate] . . . directly violates the filed-rate doctrine or the rule against retroactive ratemaking"); *Pac. Gas & Elec. Co.*, 179 FERC ¶ 61,199 at P 77 (2022) (noting that "direct[ing a utility] to ignore the filed rate . . . would violate the FPA and filed rate doctrine").

[98]     *Order*, 182 FERC ¶ 61,044 at P 84.

which the Elective Transmission Upgrade . . . may operate prior to the completion of'" Seabrook's generator breaker replacement.[99]  The *Order* thus flips an obligation of NECEC to request an operational analysis into a finding that Seabrook would be in breach of the LGIA's Good Utility Practice provision if the upgrade is not in place prior to the NECEC energization date.  And, if the breach cannot be timely cured, presumably Seabrook could be disconnected from the ISO-NE transmission system.

Such an outcome also cannot be squared with the obligations already agreed upon by Seabrook and NECEC in the E&P Agreement.  Under the E&P Agreement, Seabrook must make Reasonable Efforts, which encompasses a definition of Good Utility Practice, to timely receive the equipment necessary to undertake the generator breaker replacement.  From the time the long lead time items are ordered, the breaker's manufacturer, Hitachi, projects it will take approximately seventeen (17) months to deliver the generator breaker, which is manufactured in Asia, to Seabrook Station.

Assume the Reasonable Efforts/Good Utility Practice requirement is met and that the replacement is not manufactured to specifications and must be re-manufactured before it can be installed or a geopolitical issue arises that delays its delivery to Seabrook Station. Notwithstanding there being no default under the E&P Agreement, the *Order* nevertheless implies that Seabrook, under the theory advanced in the *Order*, could be found in default under the LGIA for failure to comply with Good Utility Practice and disconnected from the ISO-NE system until a new generator breaker is manufactured and delivered—perhaps 1½ years later if it has to be replaced.  Such circumstances could arise due to any delay outside of Seabrook's control.  Under such circumstances, the Commission's erroneous interpretation of the LGIA to

---

[99]    ISO-NE Brief at 17.

essentially create a strict liability standard for "failure" to meet someone else's interconnection timing goals would conflict with the filed rates of both the Tariff and E&P Agreement.

### III. The Commission cannot require Seabrook to under-recover the costs of replacing the generator breaker on NECEC's behalf

The Commission's finding that Seabrook is not providing "electric service" to NECEC precludes the Commission from setting the rate that NECEC pays Seabrook for the generator breaker replacement, and therefore precludes the Commission from disallowing recovery of costs in that rate. Indeed, the *Order* consistently struggles with the idea that the Commission should be setting rates at all here in any traditional sense, which begs the question what authority the Commission purports to be exercising.

For example, despite finding that NECEC is "responsible for" the generator breaker replacement, and must "bear[] the costs,"[100] the Commission denies recovery of some costs on the facially contradictory theory that this case "is not a cost of service rate matter."[101] If the Commission continues to incorrectly assert jurisdiction to decide what rate NECEC must pay to Seabrook, its only possible basis for doing so is under its limited, FPA rate-setting jurisdiction. And if this matter is a rate matter, then the rate issue can be none other than whether NECEC is appropriately "bearing the costs" of the generator breaker replacement, as the Commission said it must.

The Tariff specifies that NECEC must bear *all* of the costs of replacing the generator breaker.[102] This is entirely consistent with longstanding rules of cost causation. And if,

---

[100]    *Order*, 182 FERC ¶ 61,044 at P 83.

[101]    *Id.* at P 104.

[102]    *See* Tariff, § I.3.10 ("[T]he Market Participant or Transmission Owner shall not proceed to implement [its] plan unless the Market Participant . . . . takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect."). The Tariff does not excuse opportunity costs.

*arguendo*, the LGIA requires Seabrook to replace the generator breaker under Good Utility

Practice, that same standard also requires Seabrook to be made whole.

NECEC's responsibility for all costs necessarily includes opportunity costs—which

might in these circumstances also be described as "make whole costs"—the costs that Seabrook

needs to recoup to be made whole for replacing the generator breaker to benefit NECEC.  The

opportunity costs at issue here represent not only potentially massive lost revenues, but also

potentially significant pay for performance penalties.  For a generator operating at market like

Seabrook, market-based sales must recoup both the costs of owning and operating the plant and

provide a return on investment.  So if there is an extended outage to benefit NECEC, Seabrook

will earn zero return of investment in any part of its facility other than the generator breaker for

the entire extended duration of the outage, which could be a long time if things do not go

smoothly, and could face additional harm through pay for performance penalties.  It is

uncontroverted that these losses would not occur *but for* NECEC's need to have the generator

breaker replaced.  So even if the FPA applies here, it does not permit the Commission to order

Seabrook both to replace the generator breaker for NECEC *and* to absorb part of the cost of

doing so.  Nor would such an outcome be fair.

A.    **The Commission's finding that Seabrook is not providing "electric service"
to NECEC means that the Commission has no jurisdiction to set the rate**

The *Order* finds that "Seabrook is not providing . . . electric service to [NECEC],"[103] and

in support quotes the definition of "electric service" from the Commission's regulations, which

reads in relevant part that, "[t]he term electric service as used herein shall mean the transmission

of electric energy in interstate commerce or the sale of electric energy at wholesale for resale in

---

[103]    *Order*, 182 FERC ¶ 61,044 at P 102.

interstate commerce . . . ."[104]  This means, on its face, that the Commission does not have jurisdiction to set the rate NECEC pays to Seabrook for replacement of the generator breaker, or to disallow recovery of any costs under that rate, because the Commission's rate jurisdiction is limited to rates for "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce."[105]

The Commission nonetheless apparently still claims authority to preclude Seabrook from obtaining full recovery of costs it incurs to replace the generator breaker for NECEC's sole benefit.  But because the Commission has no rate authority here, it lacks authority to determine the rate for replacement of the generator breaker, including the question whether Seabrook should be made whole.

**B.    If the Commission has rate jurisdiction, NECEC must pay all generator breaker replacement costs it causes**

**1.    The costs caused by NECEC that the Commission has ordered Seabrook to bear may be massive**

During an extended outage, the Seabrook Joint Owners will lose revenues that otherwise would be earned by selling Seabrook Station's output either into the ISO-NE energy markets or bilaterally.  Earlier in the case, Seabrook estimated that harm as totaling about $560,000 per day for its ownership interest, based on market prices in the Spring of 2020, though given current market volatility and pricing the actual lost revenue may well be significantly higher during the refueling outage in the Fall of 2024.  In addition, if pay for performance penalties are imposed

---

[104]    18 C.F.R. § 35.2.

[105]    16 U.S.C. § 824(b).  *See also id.* § 824d(a) (applying Section 205 to "rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges");  *id.* § 824e(a) (applying Section 206 to "any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification.").

during the extended outage, the Seabrook Joint Owners will lose capacity bonus payments during the extended outage.[106]

Other costs also may result from the replacement work.  First, in addition to lost revenues, the co-owners of Seabrook Station face various out-of-pocket expenses that could, in total, be very large.  Second, if pay for performance penalties are triggered during the extended outage, the Seabrook Joint Owners not only would lose capacity market bonus payments, but also would be on the hook for penalties.  These and penalties could produce many millions of dollars in losses.[107]  Third, if something goes wrong during the construction work to replace the generator breaker, the damage to Seabrook Station could be extremely time-consuming and costly to repair, creating potentially massive harm.  Finally, there also are various other costs, such as incremental additional labor and station power costs that the Seabrook Joint Owners would have to pay.  NECEC should pay those costs, not the Seabrook Joint Owners.

2. **The Tariff unambiguously assigns all costs of replacing the generator breaker to NECEC, and so does the LGIA, if it applies, and the FPA, if it applies**

Contrary to the holding of the *Order,* the Tariff resolves this dispute in favor of Seabrook.  So do the LGIA and Tariff "Good Utility Practice" standard that the *Order* claims is controlling, and fundamental principles of FPA rate setting.

i. **The Tariff requires NECEC to pay all costs**

The *Order* claims it is significant that the Tariff provision requiring that NECEC "construct[] at its expense such facilities as the ISO determines to be reasonably necessary to

---

[106]    Seabrook relies on market revenues to recover its annual operating costs, including depreciation, operation and maintenance, taxes, etc.

[107]    The Seabrook Joint Owners and others who have contracted for a capacity supply obligation from Seabrook Station face pay for performance penalties of more than $5.1 million per hour, with a monthly stop loss based on the FCA 15 starting price of $17.4 million.  *See supra* n.17.

avoid" the "adverse effect" of the NECEC interconnection does not contain the words "opportunity costs."[108]  But the Tariff does not excuse NECEC from any portion of the expense,[109] so there was no need for the Tariff to enumerate which costs are included—they all are.  That leaves no room for Seabrook to bear what could be quite a large portion of the expense of replacing the generator breaker, as outlined above.

### ii.    The Good Utility Practice standard (if applicable) requires NECEC to pay all costs

The idea that Seabrook should forego some cost recovery is also contradicted by the very "Good Utility Practice" definition that the Commission cites as the basis for ordering Seabrook to replace the generator breaker.  Under both the LGIA and the Tariff, Good Utility Practice includes "any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result *at a reasonable cost consistent with good business practices*, reliability, safety and expedition."[110]

The Petition and the evidence submitted with it document Seabrook's reasonable judgment that the only way for it to receive its "reasonable cost consistent with good business practices" is to be made whole.  There is no evidence that opportunity costs will be unreasonable. To the contrary, Seabrook has expressly proposed that NECEC would retain the ability to

---

[108]    *Order*, 182 FERC ¶ 61,044 at P 101.

[109]    *See* Tariff, § I.3.10; *id.* at Schedule 25, Appendix 6, Article 11.4.4 ("The Interconnection Customer shall enter into separate related facilities agreements to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection of the Interconnection Customer's Elective Transmission Upgrade.").  As discussed above, the Tariff does not require an Affected Party, whose Affected System is a generator, to enter into a facilities agreement, or any agreement for the construction of a generation upgrade to accommodate an Elective Transmission Upgrade.  The "facilities agreement" requirement with respect to generators is found only in the Elective Transmission Upgrade IA, to which the Affected Party is not a party.

[110]    Seabrook LGIA, § 1, Definitions (emphasis added); ISO-NE Tariff, § I.2 (emphasis added).

challenge the prudence of any claimed opportunity costs.[111]  There also is no evidence that it

would be a "good business practice" for Seabrook to lose what could be millions of dollars[112]

and invite enterprise risk[113] solely to benefit NECEC.  Common sense says otherwise.  In a

market negotiation free from regulatory compulsion, Seabrook would not be "exercis[ing]

reasonable judgment . . . consistent with good business practice" unless the agreement permitted

Seabrook to be made whole.[114]  So if Good Utility Practice requires Seabrook to replace the

generator breaker, it also requires that Seabrook be made whole.

That is how the Commission has interpreted Good Utility Practice previously.  In *ISO

New England, Inc.*, the Commission addressed whether Good Utility Practice would be the

appropriate standard that de-listed generators in an economic outage would need to meet in

response to a request to return to service by ISO-NE during a Cold Weather Event,[115] which

turned in part on the fact that "the Good Utility Practice standard explicitly recognizes that a

generator's obligation is not absolute, but, rather, is defined by considerations of reasonable cost

---

[111]    Answer to Amended Complaint at 7 (explaining that the formula would leave "open the potential for a prudency challenge"); *see also* Petition at 37-38 ("Seabrook is not requesting any sort of advance determination of prudence . . . . If NECEC wishes it, and the declarations are otherwise granted, Seabrook will provide in the facilities agreement Formula Rate Template protocols for providing NECEC with information about Seabrook's costs, answering questions from NECEC, and filing of a challenge, if NECEC decides it wants to dispute prudence.").

[112]    Answer, Marcum Aff. at 5-6.

[113]    Answer to Amended Complaint, McCartney Second Suppl. Aff. at 3-4 ("The Seabrook Breaker Replacement will be screened for enterprise risk, and is expected to meet the definition of enterprise risk, under Institute of Nuclear Power Operations (INPO) Event Report (IER) 14-20, *Integrated Risk – Healthy Technical Conscience* . . . .  Any enterprise risk project requires additional layers of preparation and precaution as Seabrook Station cannot return to service until the project is successfully completed.").

[114]    Indeed, Seabrook's Petition requested, in the alternative, that the Commission declare that nothing in the ISO-NE Tariff requires Seabrook to enter into an agreement to replace the generator breaker, and therefore Seabrook is entitled to bargain for the appropriate terms to recover its costs. Petition at 1-2.

[115]    *See ISO New England, Inc.* 113 FERC ¶ 61,175 at P 29 (2005).

consistent with good business practices."[116]  The Commission recognized that "Good Utility Practice includes cost considerations for . . . return[ing] to service" and that by "assuring . . . that generators will be sufficiently compensated for costs, the cost considerations have been addressed."[117]  That assurance was provided through a rate that was designed to provide "sufficient compensation for direct *and opportunity* costs."[118]  The same result is required here, for the same reasons.  The Commission cannot claim "Good Utility Practice" requires Seabrook to replace the generator breaker, and yet do so at a rate that is not consistent with "Good Utility Practice."  That is a failure of reasoned decision-making.

### iii.    The FPA (if it applies) requires NECEC to pay all costs

The Commission correctly found that NECEC caused the costs of the generator breaker replacement, stating that "the breaker will be overdutied following the [NECEC] interconnection."[119]  As ISO-NE put it, "the Seabrook Station circuit breaker upgrade was not required 'but for' the interconnection of" NECEC.  Because NECEC is "responsible for" the generator breaker replacement, it must "bear[] the costs."[120]  That much the Commission got right.

But the Commission then unreasonably contradicted its long-standing cost allocation policies.  According to the Commission, Seabrook "should not recover" opportunity costs of replacing the generator breaker on NECEC's behalf.[121]  In denying recovery of opportunity

---

[116]    *Id.* at 17.

[117]    *Id.* at 30.

[118]    *Id.* (emphasis added).

[119]    *Order*, 182 FERC ¶ 61,044 at P 79.

[120]    *Id.* at P 83.

[121]    *Id.* at P 100.

costs, the Commission allocates those costs to the entity that must absorb them, Seabrook. But the FPA prohibits this allocation. Costs must "'be allocated to those who cause the costs to be incurred and reap the resulting benefits.'"[122] NECEC caused these costs and gets the benefit of satisfying the Tariff pre-condition to building its Project. Seabrook gets no benefit from the generator breaker replacement because it is operating reliably today with the existing generator breaker. Replacement of the generator breaker does not "allow[ ] [Seabrook] to continue benefiting from the right to operate its generating facility consistent with Good Utility Practice under its LGIA,"[123] because the Tariff does not permit NECEC's project to be built if it would overduty the generator breaker, as discussed above.[124]

Seabrook must be permitted to recover its legitimate costs of providing service, or the rates would be confiscatory.[125] As Joshua Marcum explains, "because [Seabrook] sells the Seabrook Station output at market and does not receive cost-of-service recovery, it must cover its costs through market-based sales . . . . The revenue Seabrook earns in the energy markets is necessary to properly maintain and run Seabrook Station in compliance with Nuclear Regulatory Commission regulations and guidance from the Institute of Nuclear Power Operations."[126] In other words, the *Order* takes away Seabrook's ability to earn both a return *of* and *on* investment,

---

[122]    *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 85 (D.C. Cir. 2014) (quoting *Nat'l Ass'n of Regul. Util. Comm'n. v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007)).

[123]    *Order*, 182 FERC ¶ 61,044 at P 105.

[124]    The *Order* observes, in a footnote, that the record indicates that "the circuit breaker at issue here already is operating close to its maximum capability such that if the breaker is not replaced and there are additional interconnection customers, ISO-NE is concerned that system reliability will be negatively impacted." *Id.* at n.144. In this scenario where an interconnection customer other than NECEC caused the generator breaker to become overdutied, that interconnection customer would have cost responsibility.

[125]    *See N.Y. Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,004 at P 111 (2015) ("Absent a showing that costs have been imprudently incurred, the Commission allows utilities the opportunity to recover their costs.").

[126]    Answer, Marcum Aff. at 6.

and so misses the point in contending that "merchant sellers like Seabrook are not guaranteed profits."[127]

The Commission cannot direct Seabrook to replace the generator breaker at a financial loss.[128] The FPA requires that anything the Commission orders Seabrook to do under color of FPA Section 206 be compensated by a just and reasonable rate,[129] and the Commission does not cite a single case that says that it can reject a formula rate that will do no more than make a generator whole, as it did here.[130] To the contrary, the *Order* entirely fails to address Seabrook's arguments that a formula is the just and reasonable way to make sure Seabrook receives, and NECEC pays, no more or less than needed to make Seabrook whole.[131]

---

[127]    *Order*, 182 FERC ¶ 61,044 at P 104.

[128]    *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 at P 36 (2006) (stating that "[i]t is questionable whether PJM could impose, or the Commission could enforce, a requirement that generators continue to operate at a loss").

[129]    16 U.S.C. § 824e(a) ("Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate . . . subject to the jurisdiction of the Commission . . . is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.").

[130]    *Order*, 182 FERC ¶ 61,044 at PP 95, 96 (referring to the formula rate proposed in response to the Complaint as well as in the Petition and testimony supporting formula).

[131]    *Va. Elec. & Power Co.*, 123 FERC ¶ 61,098 at P 16 (2008) (explaining that formula rate "mechanisms allow the utility to recover its costs in a more timely manner while also protecting customers from inflated rates through the true-up process. Since over-collections are returned to customers with interest at the FERC interest rate, customers are made whole from any excessive projections or over collections."); *see PJM Interconnection, L.L.C.*, 108 FERC ¶ 61,030 at P 19 (2004) (stating that "[a] formula purporting to provide opportunity cost compensation should be designed such that the formula as nearly as possible results in full opportunity cost (i.e., lost profits) compensation.").

**3.    The *Order* improperly distinguishes opportunity cost cases based on irrelevant factual distinctions rather than explaining why it is just and reasonable to order Seabrook to replace the generator breaker at a loss**

The Commission says that Seabrook's opportunity cost cases are "inapplicable,"[132] but in each instance draws distinctions that are not meaningful.

The Commission has long authorized recovery of opportunity costs for generators who are forced to back down output in a variety of market contexts where a generator is foregoing market revenue to provide a service.[133]  Commission precedent also supports recovery of opportunity costs in cost-of-service contexts.[134]  Specifically, the Commission has held that

---

[132]      *Order*, 182 FERC ¶ 61,044 at PP 102, 104, 106.

[133]      *See, e.g.*, *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,282 at P 17 (2016) (explaining that in PJM, generators providing reactive service are eligible to recover "lost opportunity cost credits" in order to ensure that they are adequately compensated for any lost revenues resulting from PJM's dispatch instructions); *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 at P 2 (2008) (explaining that under the MISO tariff, generators providing reactive service are eligible to recover opportunity costs associated with reducing the MW output of the generator below rated capability to produce additional reactive power), *aff'd in relevant part and vacated in part*, *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (D.C. Cir. 2011); *N.Y. Indep. Sys. Operator, Inc.*, 91 FERC ¶ 61,218, at 61,801-02 (2000) ("*NYISO*") (noting that in New York Independent System Operator, Inc. ("NYISO,"), suppliers of spinning and non-spinning reserves are compensated for their lost opportunity costs), *reh'g denied*, 97 FERC ¶ 61,155 (2001), *reh'g denied*, 99 FERC ¶ 61,125 (2002), *remanded on other grounds sub nom.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003), *order on remand*, 110 FERC ¶ 61,244 (2005), *order on reh'g*, 113 FERC ¶ 61,155 (2005).

[134]      *See, e.g.*, *Ameren Energy Mktg. Co.*, 117 FERC ¶ 61,334 at PP 15-16 (2006) ("*Ameren*") (approving proposal to include, as a component of cost based rates, lost opportunity costs related to ancillary services but setting the matter for hearing to determine the appropriate mechanism to calculate such costs); *Ne. Utils. Serv. Co.*, 58 FERC ¶ 61,070, at 61,203 (1992) (concluding that opportunity cost pricing is appropriate for firm transmission service); *Pa. Elec. Co.*, 58 FERC ¶ 61,278, at 61,873-74 (1992) (holding that Penelec may recover opportunity costs to the extent of holding its native load customers harmless as a result of providing third-party transmission service); *New England Power Co.*, 65 FERC ¶ 61,153, at 61,757 (1993) (approving a utility's proposal to charge all transmission customers a pro rata share of average system costs, including average system opportunity costs).

"opportunity costs can be a valid basis for rates."[135]  This is particularly true where denying recovery of opportunity costs would result in a confiscatory rate, as is the case here.[136]

Uniformly, the opportunity cost cases say that a party giving up revenue to undertake a task on behalf of another entity should be made whole, and the Commission should have reached the same conclusion here.  Instead, the Commission never actually explained why it is just and reasonable to require Seabrook to incur a loss on NECEC's behalf.  That was a failure of reasoned decision-making.[137]

The Commission correctly finds that it "typically allows opportunity cost recovery so that the resource will be revenue neutral" and therefore will have "no disincentive . . . to follow an RTO's directives and therefore create reliability issues."[138]  But the Commission then applies that precedent incorrectly.  Here, NextEra is and always has been willing to replace the generator breaker to accommodate NECEC's new line, even though the Commission lacks jurisdiction to order it to do so, if NECEC is willing to be fair about it by making Seabrook whole for all the costs associated with the generator breaker replacement.  The course the Commission has chosen will create disincentives for systems affected by later upgrades to make modifications to accommodate those later upgrades, because they are not allowed to remain revenue neutral— they instead must use their own money to make those modifications.

---

[135]    *See Ameren*, 117 FERC ¶ 61,334 at P 16.

[136]    *See ISO New England, Inc.*, 120 FERC ¶ 61,087 at P 52 (2007) (recognizing that requiring an existing generating resource to offer capacity at a price less than its net risk-adjusted going forward and opportunity costs raises the possibility of confiscatory ratemaking).

[137]    *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 186 (D.C. Cir. 2022) (finding a Commission decision to be arbitrary and capricious and explaining that "the agency's mistake was not that it did not factually distinguish the two cases. The Commission simply failed to explain why that distinction matters").

[138]    *Order*, 182 FERC ¶ 61,044 at P 102 & n.208.

The *Order* claims that outages are an ordinary cost of doing business for generators,[139] implying that Seabrook should absorb outage costs. That may sometimes be true in other contexts. But here, as explained above, the Tariff explains who must bear the "expense" of the generator breaker replacement—NECEC—and in such circumstances, Good Utility Practice requires that Seabrook be made whole. Generic views of who might bear cost responsibility in other circumstances have no bearing here, where the filed rate controls, and where cost causation has been determined.

The Commission asserts that opportunity costs have only been granted in "specific circumstances, which typically involve sellers providing an ancillary service that prevents the seller from providing and being paid the market price for energy" and that "such circumstances are not present here."[140] It is true that Seabrook is not providing an ancillary service. But the underlying principle applies on all fours.

The Commission sometimes seems to be saying that opportunity cost principles do not apply here because Seabrook no longer has any choice: the Commission now is ordering Seabrook to replace the breaker. That makes matters worse. And it does not, in any event, distinguish the ancillary services cases. RTOs increasingly co-optimize their energy and ancillary services markets. That means the RTO—not the generator—chooses whether the generator ultimately sells energy or ancillary services. Opportunity cost recovery still makes the generator whole for lost revenue, even though the generator ultimately has no choice to make.

So too here. The Commission, notwithstanding the jurisdictional infirmities discussed above, has "directed" Seabrook to replace the generator breaker, and that if this results in an

---

[139]     *Id.* at n.215

[140]     *See id.* at P 102.

extension of an outage, the Commission's directive will "prevent[] the seller from providing and being paid the market price for energy."[141]

Next, the Commission says that "in Order No. 2003-A, the Commission found that 'if authorized contractually, recovery [of outage costs] may be justified on a case-by-case basis, depending on the facts of individual cases' and allowed transmission providers to propose to recover line outage costs on a case-by-case basis." The Commission says this "supports the finding here that Affected Parties are not automatically entitled to opportunity costs."[142] However, requiring case-by-case showings that cost recovery is just and reasonable is not the same as saying that the Commission has discretion whether to allow recovery of just and reasonable rates. Here, the case-specific showing is that the only just and reasonable outcome is for Seabrook to be made whole. And anyway, the *Order* acknowledges that Order No. 2003-A does not apply in this context.[143]

### 4. The *Order*'s reasoning on confiscatory rates shifts the burden of proof and gets it wrong

The Commission's answer to Seabrook's claim that causing it to operate for an unknown period of time with no return of or on investment is confiscatory seems to be that a rate would not be confiscatory unless the respondent to a complaint can prove the proposed rate would drive the respondent out of business. The *Order* says, "Seabrook does not present evidence convincing us that it would be prevented from operating successfully or maintaining financial

---

[141]    Answer, Marcum Aff. at 3-5 (describing the ways in which Seabrook will incur opportunity costs, including the joint owners' reliance on ownership interests as a physical hedge, lost revenue from power purchase agreement sales, sales into the day-ahead energy market, and lost Pay for Performance bonus payments).

[142]    *Order*, 182 FERC ¶ 61,044 at P 103.

[143]    *Id*.

integrity if it replaced its breaker without receiving opportunity costs from [NECEC]."[144]  There are numerous problems with this.

First, Seabrook does not bear the burden of proof in this proceeding, but in any event the whole point of the claim for opportunity costs during an extended outage is that during such an extended outage Seabrook would be "prevented from operating successfully."  In fact, Seabrook would be prevented, by the *Order*, from operating *at all* during such an extended outage.  The generator breaker replacement is expected to create enterprise risk.[145]  Opportunity costs will remedy this by making Seabrook whole for being "prevented from operating successfully."

Second, the potential extent and duration of an outage extension undertaken for NECEC is unknown, and therefore unbounded.  NECEC—the actual entity with the burden of proof—has not proven that Seabrook can maintain financial integrity if Seabrook earns no return of or on investment for a potentially very long time.  More generally, the Commission cites no cases where it evaluated, much less determined, that it could deprive a utility of all revenues right up to the brink of bankruptcy.  Nor does it explain why such a standard would serve to attract capital. It is not just and reasonable for the Commission to administer 999 cuts so long as it stops short of the death-bringing thousandth cut.

Third, the standard discussed in *Hope* and the other cases cited by the *Order* is for creating a return *on* investment.  Here, it is true that depriving Seabrook of revenues would deprive it of its opportunity to earn a return on investment.  But market revenues also cover Seabrook's return *of* investment.[146]  It is uncontroverted that "[t]he revenue Seabrook earns in

---

[144]    *See id.* at P 104.

[145]    Answer to Amended Complaint, McCartney Second Suppl. Aff. at 3-4.

[146]    *See supra* n.106 (describing the general purpose of market revenues).

the energy markets is necessary to properly maintain and run Seabrook Station in compliance with Nuclear Regulatory Commission regulations and guidance from the Institute of Nuclear Power Operations."[147]  These costs do not go away during an outage, or an extension of an outage.  The *Order* does not cite any case for the proposition that it can require Seabrook to operate at a loss, and certainly no case that says that Seabrook can be required to earn zero return of and on investment for a potentially long time.

Fourth, rates are unjust and unreasonable if they "are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service."[148] Seabrook will earn no return on investment, or even return of investment (other than some of the costs of replacing the generator breaker), during the time that the generator breaker is being replaced.

Fifth, the *Central Hudson* case cited by the *Order*[149] is instructive, because it shows that the *Hope* and *Bluefield* standard is about adequate compensation, not going out of business.  A group of transmission owners challenged an RTO tariff provision that did not provide the transmission owners with a return on investment for transmission upgrades funded by interconnecting generators, but owned and operated by the transmission owners, who argued that they bore the risks of such ownership and operation.  The Commission held that the transmission owners had not met their Section 206 burden to show that the lack of a return on the upgrades "impedes their ability to attract capital" because in identifying risks they did "not answer the question of whether those risks are already incorporated into the [transmission owners] current

---

[147]     Answer, Marcum Aff. at 6.

[148]     *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923).

[149]     *See Order*, 182 FERC ¶ 61,044 at n.214.

transmission rates, such that the [transmission owners] are already compensated for these alleged risks."[150]  Here, though Seabrook does not bear the burden of proof, it has proven that it will receive neither a return on nor of investment during an outage extended on NECEC's behalf.

Sixth, to reiterate, Seabrook does not have the burden of proof here.  And there is certainly no evidence that causing Seabrook to bear the potentially massive costs of an extended outage will *not* result in a confiscatory rate.[151]

Finally, even if, *arguendo*, NECEC has met its burden and shown that somehow the rate is not confiscatory in the constitutional sense, that is no answer to the fact that it is nonetheless unjust and unreasonable to deprive Seabrook of all return of and on investment for a potentially extended period.

### 5. The costs at issue are real and Seabrook's formula captures them precisely

The record shows that the costs at issue are real.  But the Commission entirely fails to give reasoned consideration to most of these costs.  The Commission lumps exposure to pay for performance penalties into the estimates of lost revenue, but that is factually incorrect.[152]  The Commission never explains why the Seabrook Joint Owners should absorb those penalties.  The Commission never even acknowledges the concordant loss of capacity market bonuses during the extended outage.  The Commission gives no reasoned consideration to the prospect of

---

[150]    *Cent. Hudson Gas & Elec. Corp.*, 176 FERC ¶ 61,149, at P 59 (2021) ("*Central Hudson*").

[151]    *See, e.g.*, *Central Hudson*, 176 FERC ¶ 61,149, at P 57 (deciding confiscatory rate issues against party failing to meet Section 206 burden); *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158, at P 28 (2018), *order on reh'g*, 169 FERC ¶ 61,233 (2019) (same).

[152]    *Order*, 182 FERC ¶ 61,044 at P 93 ("Seabrook contends that Seabrook could potentially lose $560,000/day in revenues if there is an extended outage to replace the breaker and it coincides with a Pay for Performance event.").  *See* Answer, Marcum Aff. at 7 (describing pay for performance penalties as "another category of potential costs that Seabrook should not be forced to incur" separate from lost revenues).

catastrophic damage to Seabrook Station during the construction work.  And the Commission

fails to rationally address Seabrook's case for other costs, such as legal costs and other

demonstrable incremental costs like the need to buy more station power during the extended

outage.  That is not reasoned consideration.

The Commission does factually discuss opportunity costs in the form of forgone energy

revenues, but that discussion misses the mark in several ways.  The Commission raises the

possibility that there might not be actual opportunity costs, noting that Seabrook "has not

demonstrated that an extended outage will be required to replace the generator breaker, just that

an extended outage may be necessary."[153]  But it is hardly uncommon for contracts to have

provisions for recovery of costs conditioned on actual incurrence of such costs, which is exactly

what Seabrook's formula will do.  The Commission approves formula rates all the time.

Seabrook appropriately proposed a formula to ensure that opportunity costs recovered would be

no more or less than opportunity costs incurred.[154]  It was arbitrary and capricious for the

Commission to fail even to address that proposal, given the Commission's view that it has

jurisdiction here.

The Commission's supposition that Seabrook controls the duration of the outage needed

to perform the generator breaker replacement on NECEC's behalf,[155] ignores the record

evidence, and anyway is not a reason for NECEC to avoid payment of costs prudently incurred

on its behalf.  Seabrook made it clear that any costs flowed through its formula would remain

subject to challenge if NECEC believes such costs were imprudently incurred.[156]  That means

---

[153]    *Order*, 182 FERC ¶ 61,044 at P 105.

[154]    *See* Answer, Marcum Aff. at 9-10.

[155]    *See Order*, 182 FERC ¶ 61,044 at P 105

[156]    Answer to Amended Complaint at 7.

that if NECEC challenges the prudence of costs on the ground that they were imprudently incurred because the outage did not need to be extended, and prevails, it will not pay such costs. There is no way to determine the exact duration of the outage now, which is why a formula rate subject to prudence challenges makes sense.

Nuclear power plants like Seabrook Station refuel every 18 to 24 months, often during the fall and spring when electricity demand is lower.[157]  During a refueling outage, nuclear power plants typically schedule required plant maintenance, and modifications to, or replacements of, equipment while the plant is offline.[158]  Removing and replacing the generator breaker and associated systems can only be accomplished during a refueling outage because the plant cannot operate without the generator breaker.  This work must also comply with stringent NRC requirements and Institute of Nuclear Power Operations guidance for outage planning and execution.[159]

In preparation for a refueling outage, Seabrook engages in an in-depth planning process to facilitate the orchestration of the numerous outage activities that will occur during the outage, including refueling of the reactor, required plant maintenance, and modifications or replacement of equipment.[160]  To this end, NextEra Energy, Inc., which owns one of the largest nuclear fleets in the United States and through subsidiaries currently operates seven nuclear units, has established a fleet-wide set of protocols intended to ensure that outage projects, such as replacement of the generator breaker, are engineered, procured, and installed in a safe and

---

[157]    Answer, Exh. No. 5, Prepared Affidavit of Eric McCartney, Attachment A to Petition for Declaratory Order at 4 ("McCartney Aff.").

[158]    *Id.*

[159]    *Id.*

[160]    *Id.*

reliable manner and that outages are implemented safely and predictably. Those protocols are set out in mandatory procedures and broken down into numerous activities with established deadlines set for planning milestones that must occur prior to the start of the refueling outage.[161]

The generator breaker is comprised of large, complex pieces of equipment. The existing generator breaker is approximately 20 feet long by 15 feet wide, weighs over 32,000 pounds, and occupies approximately 700 square feet on the mezzanine level on a platform inside the north wall of the Turbine Generator Building, located inside the plant's power block. Not only would the generator breaker project involve removal and replacement of the existing generator breaker, the upgrade would also require the replacement of the Control Cabinet and Interlock and the Compressed Air System. Due to the size and complexity of the generator breaker replacement project, with access confined to a mezzanine level platform, the need to coordinate nuclear fuel movement and other outage activities, and the current stage of planning, it is not possible to know in advance with a level of certainty how long the installation of the upgrade will take.[162] For planning purposes, Seabrook's good faith estimate is that upgrading the generator breaker could take 10 days longer than all other activities slated during a typical refueling outage.[163] This estimate is based primarily on the size and complexity of the generator breaker, Control Cabinet and Interlock, and Compressed Air System that must be replaced.[164] Also, as Eric McCartney explained, there is a possibility that the removal and replacement of such a system will expose further complexities that are not foreseeable at this time or even during the planning

---

[161]     *See id*. at 5-6.

[162]     *See id* at 8-9.

[163]     *See id.*

[164]     *See id.*

stage.[165]  Thus, even after engineering studies are complete, it is possible that the time planned

for the outage will have to be extended, and the estimate likewise does not take into account the

possibility of an unplanned outage extension that can result from issues identified during the

refueling outage itself.[166]  These are clearly issues that are outside Seabrook's control, and would

not occur but for the need to replace the generator breaker, and Seabrook cannot be required to

shoulder the level of uncertainty and lost opportunity costs to benefit NECEC.

## IV.    Requiring an existing generator to subsidize later entrants unreasonably controverts existing rules about generator interconnection

The *Order* effectively requires Seabrook to subsidize later entrants, such as NECEC.

This puts cause and effect backwards by assigning to existing generators costs caused by other

parties, including competitors, interconnecting to the grid at a later point in time.  This is

contrary to cost causation, as explained above, but also silently overturns longstanding

requirements that generators pay the full cost of accessing the grid on a one-time basis at the

time of interconnection.[167]  The Commission's decision here will instead chill investment

because investors and lenders will have no idea of potential future cost exposure.

Any departure from the Commission's long-standing, complimentary polices on

deliverability and on requiring interconnection customers to pay for the upgrades they cause and

---

[165]    *See id.* at 9.

[166]    *See id.* at 6, 8.  As an example of the potential massive impact of a nuclear plant outage with unexpected consequences, in 2009 the containment structure at the Crystal River Unit 3 nuclear power plant in Florida cracked during execution of a project to replace the unit's steam generators.  Despite several unsuccessful repair efforts, and the expenditure of millions of dollars in costs to evaluate the damage and repair options, Duke Energy decided to permanently shut down the unit in February 2013, resulting in the unplanned loss of a multi-billion dollar generating unit.  *See* https://news.duke-energy.com/releases/crystal-river-nuclear-plant-to-be-retired;-company-evaluating-sites-for-potential-new-gas-fueled-generation.

[167]    *See, e.g.*, Order No. 2003-A, 106 FERC ¶ 61,220 at P 613 ("[B]y placing the Interconnection Customer initially at risk for the full cost of the Network Upgrades, the upfront payment provides the Interconnection Customer with a strong incentive to make efficient siting decisions").

from which they will benefit must be explained and supported by substantial evidence.[168]  Here they were not.  Instead, the *Order* arbitrarily dismisses these concerns on the supposed ground that "the cost of the breaker replacement is appropriately assigned to [NECEC,]"[169] but that makes no sense, because opportunity costs are not assigned to NECEC.

### A.    Generators like Seabrook receive deliverability in return for paying for costs they cause, and the *Order* cannot silently revoke that paid-for deliverability

Seabrook has a right to deliverability of its resource across the system of the Transmission Provider.  Once a generator obtains such a right, by paying any required upgrade costs, as Seabrook Station did long ago, any subsequent interconnection customer likewise must pay its own way, without interrupting or undermining the deliverability rights acquired by its predecessors.  The LGIA cannot be interpreted to require Seabrook, in essence, to repurchase that deliverability right to accommodate NECEC's interconnection.

Seabrook commenced operations in 1990, before the advent of the *pro forma* LGIA, but the *pro forma* LGIA did not invent the deliverability requirement.  Seabrook is a New England Power Pool ("NEPOOL") "Pool-Planned Unit."[170]  The construction of Seabrook and other Pool-Planned Units included unit-supported transmission additions, thus requiring Pool-Planned generators to be fully deliverable to load throughout NEPOOL.[171]

---

[168]    *See, e.g.*, *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1515 (D.C. Cir. 1984).

[169]    *Order*, 182 FERC ¶ 61,044 at P 87.

[170]    ISO-NE Tariff, § I.2 (listing Seabrook as one of a number of Pool-Planned Units).

[171]    *See, e.g.*, New England Power Pool Agreement, as amended November 1, 1988, at Section 13.2 ("Each participant will be entitled to use the [Pooled Transmission Facilities] owned by other Participants for . . . the transfer to a Participant's system of its Ownership Interest or Unit Contract Entitlement in a Pool-Planned Unit which is off its system.").

The Seabrook LGIA carries forward Seabrook's deliverability right. It provides Seabrook with Network Resource Integration Service ("NRIS"),[172] which ensures that Seabrook and other generators can be operated simultaneously at peak load, and that "any output produced above peak load requirements can be transmitted to other electrical areas within the Transmission Provider's Transmission System."[173] Because Seabrook has NRIS, "any future transmission service request for delivery from the Generating Facility would not require additional studies or Network Upgrades."[174] Per the LGIA, "any Network Customer can utilize its network service under the Tariff to obtain delivery of capability from the Interconnection Customer's Large Generating Facility."[175]

Yet the *Order* says that Seabrook could be denied deliverability if it declines to fund the upgrade needed by NECEC.[176] Put differently, the *Order* makes Seabrook's continued right to deliverability contingent on a supplemental cost assessment decades after the upgrades were made that were supposed to assure Seabrook's ability to deliver power. That violates the fundamental guarantee that "any future transmission service request for delivery" from Seabrook does not require new upgrades.[177]

It also violates the existing interconnection cost causation and delivery paradigm. The interconnection customer pays for the costs caused by its interconnection in exchange for deliverability going forward. It does this knowing that it is protected by the same cost causation

---

172    Seabrook LGIA, § 4.1 and App. C.

173    Order No. 2003-A, 106 FERC ¶ 61,220 at P 531.

174    Order No. 2003, 104 FERC ¶ 61,103 at P 756.

175    Seabrook LGIA, App. C, § 4.5.

176    *Order*, 182 FERC ¶ 61,044 at P 87.

177    Order No. 2003, 104 FERC ¶ 61,103 at P 756.

principles that caused it to incur the interconnection costs in the first place.  That is, the next interconnection customer will pay for the costs of its own interconnection, and those costs will be determined by studies that assume that the previously-interconnected generators are running at peak, and are deliverable to all load.  So, the cost causation principles that causes the prior interconnection customer to pay for its costs of interconnection also protects that customer from the costs of future interconnections.

These rules provide regulatory and financial certainty.  As a result of this certainty, project developers understand the costs of deliverability when making decisions on whether to invest in a project, and similarly their lenders have that information in deciding the risks and rewards of providing financing.  Project developers will also behave efficiently by seeking to reduce the cost of such interconnection, through efficient siting decisions or otherwise.[178]  This in turn will reduce customer costs through the ordinary operation of markets.

**B.    The LGIA does not create investor exposure that is unknown and unlimited at the time of investment, or undermine developer incentives for efficient siting**

It would be bad policy to tell the electric industry that third-party interconnection customers can impose costs on existing resources that are unknowable, uncontrollable, and potentially unlimited.  This could well have a chilling effect on the investment in and basically could make new facilities unfinanceable.

Take, for example, a generator that goes through the Commission's interconnection process.  Following completion of interconnection studies, the transmission provider provides a report including the best estimates of the cost to effectuate the requested interconnection and a

---

[178]    *See, e.g.*, Order No. 2003-A, 106 FERC ¶ 61,220 at P 613 ("[B]y placing the Interconnection Customer initially at risk for the full cost of the Network Upgrades, the upfront payment provides the Interconnection Customer with a strong incentive to make efficient siting decisions").

draft interconnection agreement to the interconnection customer.[179]  At various points, the developer must make a decision on whether to proceed, presumably based on a comparison of the estimated costs against the expected economic value of the project.

A Commission finding that Seabrook is responsible for the costs of replacing the generator breaker decades after interconnection would make that comparison impossible for future interconnection customers.  The interconnection customer would have no way of knowing whether the cost estimate from the transmission provider represents the full costs of interconnection, or whether an unknown future upgrade might suddenly require an upgrade to the interconnection customer's facility, for which the existing resource (which could be a generator or an Elective Transmission Upgrade) would have to pay an unknown set of costs with no limiting principle in sight.

While there is always uncertainty in investment, until now that uncertainty has always been tethered to the economics of the project under consideration.  But the interpretation the Commission adopts here would require developers to take the risk that they can accurately predict future development of other projects and of the transmission system beyond any planning horizon currently in use, and then further estimate the impact it will have on their project.  This is not credibly what the Commission had in mind when it said, in Order No. 2003, that one of three purposes of the LGIA was to "encourage needed investment in generator and transmission infrastructure."[180]

---

[179]    *See Building for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation & Generator Interconnection*, Advance Notice of Proposed Rulemaking, 176 FERC ¶ 61,024 at P 22 (2021).

[180]    Order No. 2003, 104 FERC ¶ 61,103 at P 12.

### C. The LGIA does not require an existing generator to subsidize entry of its competitor

It would be anti-competitive to require existing interconnection customers to fund upgrades only needed by their competitors. On top of the cost causation and generator entry problems outlined above, this would run contrary to the fundamental principles of the competitive markets that the Commission has so long sought to foster.

In sum, by subverting these long-held principles, the Commission has engaged in an unreasoned departure from precedent—and has erred.

## CONCLUSION

For the reasons set forth above, NextEra requests that the Commission grant rehearing and deny the Amended Complaint.

Respectfully submitted,

*/s/ Joel D. Newton*
Charles S. Sieving
Executive Vice President & General Counsel
Joel D. Newton
Senior FERC Counsel
NextEra Energy, Inc.
801 Pennsylvania Avenue, NW
Suite 220
Washington, DC 20004
(202) 347-7126
charles.sieving@nee.com
joel.newton@nee.com

*/s/ Noel Symons*
Noel Symons
Todd Mullins
Carrie Mobley
Corban A. Coffman
McGuireWoods LLP
888 16th Street NW
Suite 500
Black Lives Matter Plaza
(202) 857-2929
nsymons@mcguirewoods.com
tmullins@mcguirewoods.com
cmobley@mcguirewoods.com
ccoffman@mcguirewoods.com

*Counsel for NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC*

Dated: March 3, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this 3rd day of March, 2023, caused to be served a copy of the foregoing upon all parties on the service list in these proceedings in accordance with the requirements of Rule 2010 of the Commission's Rules of Practice and Procedures, 18 C.F.R. § 385.2010 (2022).

Respectfully submitted,

*/s/ Corban A. Coffman*
Corban A. Coffman
McGuireWoods LLP
888 16th Street NW
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 828-2886
ccoffman@mcguirewoods.com

183 FERC ¶ 62,001
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

NextEra Energy Seabrook, LLC                                    Docket Nos.  EL21-3-001

NECEC Transmission LLC and                                                   EL21-6-001
Avangrid, Inc.

v.

NextEra Energy Resources, LLC and
NextEra Energy Seabrook, LLC

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(April 3, 2023)

Rehearing has been timely requested of the Commission's order issued on
February 1, 2023, in this proceeding.  *NextEra Energy Seabrook, LLC*, 182 FERC
¶ 61,044 (2023).  In the absence of Commission action on a request for rehearing within
30 days from the date it is filed, the request for rehearing may be deemed to have been
denied.  16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v.
FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section.  As also provided in 16 U.S.C. § 825*l*(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Kimberly D. Bose,
Secretary.

183 FERC ¶ 61,196
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | |
|---|---|
| NextEra Energy Seabrook, LLC | Docket Nos. EL21-3-001 |
| NECEC Transmission LLC and<br>Avangrid, Inc. | EL21-6-001 |
| v. | |
| NextEra Energy Resources, LLC and<br>NextEra Energy Seabrook, LLC | |
| ISO New England Inc. | EL21-94-000<br>(not<br>consolidated) |

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING AND
TERMINATING SECTION 206 PROCEEDING

(Issued June 15, 2023)

1.    NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC
(collectively, Seabrook) seek rehearing of the Commission's February 1, 2023 Order,[1]
which granted in part, and denied in part, a complaint filed by NECEC Transmission
LLC (NECEC) and Avangrid, Inc. (collectively, Avangrid) alleging that, *inter alia*,
Seabrook has been unlawfully attempting to delay and unreasonably increase the costs of
upgrading a 24.5 kV generation circuit breaker and ancillary equipment (breaker
replacement) at Seabrook Station in relation to the New England Clean Energy Connect
transmission line project (NECEC Project).  In the February 2023 Order, the Commission
also dismissed Seabrook's related Petition for Declaratory Order, filed October 5, 2020,
requesting that the Commission determine, *inter alia*, that Seabrook is not required to

---

[1] *NextEra Energy Seabrook, LLC*, 182 FERC ¶ 61,044 (2023) (February 2023
Order).

Document Accession #: 20230615-3059     Filed Date: 06/15/2023
Docket No. EL21-3-001, et al.                                                                      - 2 -

incur a financial loss in conducting the breaker replacement in connection with the
NECEC Project.

2.       Pursuant to *Allegheny Defense Project v. FERC*,[2] the rehearing request filed in this
proceeding may be deemed denied by operation of law.  However, as permitted by
section 313(a) of the Federal Power Act (FPA),[3] we are modifying the discussion in the
February 2023 Order and continue to reach the same result in this proceeding, as
discussed below.[4]  This order also terminates the FPA section 206 proceeding instituted
in Docket No. EL21-94-000.

## I.    Background

### A.    The NECEC Project and the Required Upgrade at the Seabrook Station

3.       In 2017, the Commonwealth of Massachusetts selected Avangrid to construct the
NECEC Project, a participant-funded transmission project, consisting of a proposed
320 kV overhead high voltage direct current transmission line approximately 145 miles in
length, from the Quebec-Maine border to a new converter station in Lewiston, Maine,
and a new 1.6-mile 345 kV alternating current transmission line from the new Lewiston,
Maine converter to the existing Larrabee Road Substation.  The NECEC Project will
enable the delivery of up to 1,200 MW of hydroelectric energy from Quebec to New
England for at least 20 years under Commission jurisdictional transmission contracts.[5]

4.       The ISO New England Inc. (ISO-NE) Transmission, Markets and Services Tariff
(Tariff) requires participant-funded transmission projects like the NECEC Project to
interconnect to the transmission system as Elective Transmission Upgrades (ETU) using

---

[2] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[3] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a
court of appeals, as provided in subsection (b), the Commission may at any time, upon
reasonable notice and in such manner as it shall deem proper, modify or set aside, in
whole or in part, any finding or order made or issued by it under the provisions of this
chapter.").

[4] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the
outcome of the February 2023 Order.  *See Smith Lake Improvement & Stakeholders Ass'n
v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[5] February 2023 Order, 182 FERC ¶ 61,044 at P 2 (citing Avangrid Complaint at
5-6).

Document Accession #: 20230615-3059          Filed Date: 06/15/2023

Tariff-required interconnection procedures similar to those used for generation projects.[6]
In 2017, Central Maine Power Company, on behalf of Avangrid, submitted an ETU
Schedule 25 interconnection request for the NECEC Project to ISO-NE. After
performing a system impact study, ISO-NE determined that the circuit breaker located at
the Seabrook Station, which is owned and operated by Seabrook, would need to be
replaced to accommodate the interconnection of the NECEC Project.[7] The system impact
study showed that the circuit breaker was operating at 99.6% of its capability prior to the
NECEC Project, but with the NECEC Project in service, the breaker would operate at
101.2% of its capability.[8] Based on ISO-NE's system impact study, pursuant to Schedule
25, ISO-NE determined that Seabrook Station is an Affected System and, in its capacity
as the owner of an Affected System, Seabrook is an Affected Party.[9] Schedule 25 also
provides that an Interconnection Customer may request, in order to advance the
implementation of its interconnection, an Engineering and Procurement Agreement (E&P
Agreement) that authorizes the Interconnecting Transmission Owner and any Affected

---

[6] *See* ISO-NE, Tariff, § II.H, Schedule 25 (Elec. Transmission Upgrade Inter.
Proc.) (5.0.0), § 1 (Definitions) (Schedule 25). "Elective Transmission Upgrade" is
defined as "a new Pool Transmission Facility, Merchant Transmission Facility or Other
Transmission Facility that is interconnecting to the Administered Transmission System,
or an upgrade to an existing Pool Transmission Facility, Merchant Transmission Facility
or Other Transmission Facility that is part of or interconnected to the Administered
Transmission System for which the Interconnection Customer has agreed to pay all of the
costs of said Elective Transmission Upgrade and of any additions or modifications to the
Administered Transmission System that are required to accommodate the Elective
Transmission Upgrade. An Elective Transmission Upgrade is not a Generator
Interconnection Related Upgrade, a Regional Transmission Upgrade, or a Market
Efficiency Transmission Upgrade." *Id.*

[7] February 2023 Order, 182 FERC ¶ 61,044 at P 4. The Seabrook Station is a
1,250 MW nuclear power plant located in Seabrook, New Hampshire, is located within
the control area operated by ISO-NE, and is connected to the grid through a substation
and three 345 kV high voltage lines. *Id.* P 4 n.11. The circuit breaker is approximately
20 feet long by 15 feet wide and weighs approximately 32,000 pounds. *Id.* n.10.

[8] *Id.* at 4 (citing Avangrid Amended Complaint, Ex. E at 3).

[9] *Id.* The Tariff defines an "Affected System" as "any electric system that is
within the Control Area, including, but not limited to, generator owned transmission
facilities, or any other electric system that is not within the Control Area that may be
affected by the proposed interconnection." The Tariff defines an "Affected Party" as "the
entity that owns, operates or controls an Affected System, or any other entity that
otherwise may be a necessary party to the interconnection process." Schedule 25, § 1.

Document Accession #: 20230615-3059     Filed Date: 06/15/2023

Docket No. EL21-3-001, et al.                                                                 - 4 -

Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection.[10]

### B.    Complaint and Briefing Order

5.    In its complaint, filed on October 13, 2020, as amended on March 26, 2021, Avangrid argued that Seabrook was unlawfully interfering with the interconnection of the NECEC Project and requested that the Commission direct Seabrook to take steps necessary for the breaker replacement and to execute a facilities agreement, which would cover engineering, procurement, and construction of the breaker replacement.[11] Regarding the terms of the facilities agreement, Avangrid argued that Seabrook was unreasonably demanding that Avangrid reimburse Seabrook for all indirect and opportunity costs that may result from construction of the breaker replacement, including lost revenues accruing if Seabrook Station remains in an outage state beyond a planned refueling outage window due to Seabrook's inability to complete construction of the breaker within the planned outage timeframe.[12]

6.    On September 7, 2021, the Commission issued an order requesting additional briefing in Docket No. EL21-6-000 regarding, *inter alia*, whether Seabrook was required to replace the circuit breaker pursuant to the provisions of its Large Generator Interconnection Agreement (Seabrook LGIA) with ISO-NE and New Hampshire Transmission, LLC (New Hampshire Transmission).[13] Initial Briefs in response to the Briefing Order were filed by Avangrid, ISO-NE, New England Power Generators Association, Inc. and Electric Power Supply Association, Massachusetts Attorney General Maura Healy (Massachusetts Attorney General), and Seabrook. Reply briefs were filed by Avangrid, ISO-NE, and Seabrook.[14] The Briefing Order also found that this proceeding raises issues regarding whether the provisions of the ISO-NE Tariff that ISO-NE uses to determine what upgrades are needed to accommodate an ETU interconnection request may be unjust and unreasonable. Specifically, the Commission stated that it was concerned that Schedule 25's definition of Affected Party and Tariff section I.3.10 may be unjust and unreasonable to the extent they may allow generating

---

[10] Schedule 25, § 9.

[11] February 2023 Order, 182 FERC ¶ 61,044 at PP 5-6.

[12] *Id.* P 89 (citing Avangrid Complaint at 31).

[13] *NECEC Transmission LLC v. NextEra Energy Res., LLC*, 176 FERC ¶ 61,148 (2021) (Briefing Order).

[14] The February 2023 Order contains a detailed summary of the briefs, which we will not repeat here. *See* February 2023 Order, 182 FERC ¶ 61,044 at PP 53-73.

facilities and their components to be identified as facilities on which adverse impacts must be remedied before an ETU can interconnect to the ISO-NE transmission system, even though generators are not subject to the Commission's open access transmission principles.[15]  Accordingly, the Commission invoked its FPA section 206 authority and directed ISO-NE to either (1) show cause as to why the relevant terms of Schedule 25 and Tariff section I.3.10 remain just and reasonable, or (2) explain what changes to Schedule 25 and/or Tariff section I.3.10 it believes would remedy the identified concerns if the Commission were to determine that Schedule 25 and section I.3.10 have become unjust and unreasonable.[16]  On November 2, 2021, ISO-NE filed a response to the Briefing Order.

## II.    **February 2023 Order**

7.      In the February 2023 Order, the Commission granted the complaint in part to the extent it agreed that:  (1) the Seabrook LGIA does not permit Seabrook to refuse to replace the breaker when replacement is needed for reliable operation of the Seabrook Station and given the concerns in the record related to the impact of any unreliable Station operation on the reliable operation of the system; and (2) Good Utility Practice[17] requires Seabrook to replace the breaker before Avangrid interconnects because the breaker will be overdutied following the interconnection.[18]  The Commission also agreed

---

[15] Briefing Order, 176 FERC ¶ 61,148 at P 20.

[16] *Id.* P 23.

[17] Good Utility Practice is defined in the Tariff as "any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition.  Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather includes all acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4)."  ISO-NE, Tariff, § I.2.1 (149.1.0), § I.2.2; *see also* Seabrook Answer to Complaint, Docket No. EL21-3-001, Ex. No. 6, Standard Large Generator Interconnection Agreement By and Among ISO New England Inc. and NextEra Energy Seabrook, LLC and New Hampshire Transmission, LLC, at 10 (filed Nov. 2, 2023) (Seabrook LGIA) (defining good utility practice).

[18] February 2023 Order, 182 FERC ¶ 61,044 at P 79 (citing ISO-NE May 6 Letter at 2).  In support of these findings, the Commission cited Seabrook LGIA app. C-1, § B.III.  *Id.* P 80.

Document Accession #: 20230615-3059     Filed Date: 06/15/2023

with Avangrid that Seabrook should not recover opportunity and legal costs, while noting that Avangrid will pay the costs of the replacement. However, the Commission denied the complaint in part insofar as it agreed that Seabrook's obligation to replace the breaker did not fall under Schedule 25 of the ISO-NE Tariff or under open access requirements because the breaker is a generator component and therefore could not reasonably be considered a Network Upgrade.[19]

8.     On March 3, 2023, Seabrook filed a timely request for rehearing of the February 2023 Order, in which it alleged that the Commission erred by: (1) exceeding its jurisdiction under the FPA and acting contrary to the plain language of the Seabrook LGIA and the Tariff in ordering Seabrook to replace the generator breaker at Seabrook Station; (2) denying Seabrook's request to recover opportunity costs, which could include lost revenues, potential pay for performance penalties, incremental additional labor, station power costs, and repair costs in the event of any damage, and other various costs; and (3) contravening existing rules on interconnection by requiring Seabrook to pay again for deliverability rights. We address each of these arguments below.

9.     On March 17, 2023, in Docket No. EL21-6-000, Avangrid filed a motion for clarification of the February 2023 Order, in which it requested that the Commission clarify the basis for the Commission's jurisdiction in this proceeding. On April 3, 2023, Seabrook filed an answer opposing Avangrid's motion for clarification.

## III.   Discussion

### A.   Procedural Matters

10.     Rule 713(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.713(d)(1) (2022), prohibits an answer to a request for rehearing. Though styled as a "motion for clarification," Avangrid's pleading is, in substance, an answer to Seabrook's rehearing request on the issue of whether the Commission properly exercised jurisdiction.[20] Accordingly, we reject both Avangrid's March 17, 2023 pleading and Seabrook's April 3, 2023 answer as impermissible answers.

---

[19] *Id.* PP 74, 76, 78.

[20] We evaluate a pleading based on its substance, rather than its style or form. *See, e.g.*, *Stowers Oil & Gas Co.,* 27 FERC ¶ 61,001, at 61,002 n.3 (1984) ("Nor does the style in which a petitioner frames a document necessarily dictate how the Commission must treat it.").

## B.    Jurisdiction and the Seabrook LGIA

### 1.    Rehearing Request

11.    Seabrook alleges that the Commission does not have the statutory authority to require Seabrook to replace the breaker, because the FPA forbids the Commission from exercising jurisdiction over generating facilities and likewise forbids the Commission from ordering the "enlargement of generating facilities" in order to promote interconnected operations.[21]    Seabrook contends that the Commission's own factual finding that "the breaker is a generator component" shows that its directive to replace the generator breaker is unlawful.[22]    Seabrook argues that the Commission cannot "sidestep the jurisdictional issue" by stating that it is interpreting a provision of the Seabrook LGIA because, according to Seabrook, contracts should not be interpreted to have unlawful effects, nor can they confer jurisdiction on a federal agency, which can only be done by Congress.[23]    Seabrook also maintains that the Commission's jurisdiction over the Seabrook LGIA arises solely from its jurisdiction over transmission service and cannot be applied to require Seabrook to replace the breaker, because the breaker is a component of a generation facility.[24]

12.    Seabrook argues that even if the Seabrook LGIA could provide the Commission with jurisdiction over generation facilities, the relied upon provision – Appendix C-1, section B.III – does not require Seabrook to undertake construction to benefit a third party.[25]    According to Seabrook, this provision is a cost allocation provision applicable only to Seabrook, as the Interconnection Customer, and New Hampshire Transmission, as the Interconnecting Transmission Owner.[26]    Seabrook argues that this provision is not a construction obligation but instead provides for the cost consequences of certain

---

[21] Rehearing Request at 2, 12, 17-18 (citing 16 U.S.C. § 824(b)(1)).

[22] *Id.* at 2.

[23] *Id*. at 12, 17-18 (citing *Cole v. Burns Int'l. Sec. Servs,* 105 F.3d 1465, 1485 (D.C. Cir. 1997)).

[24] *Id.* at 18.

[25] *Id.* at 19.

[26] *Id.* at 20-21.

Document Accession #: 20230615-3059          Filed Date: 06/15/2023
Docket No. EL21-3-001, et al.                                                        - 8 -

construction if the claimant can prove that the construction was necessitated by Good Utility Practice.[27]

13.     Seabrook states that, even if section Appendix C-1, section B.III of the Seabrook LGIA could be read to require construction, there is no way to read it to require construction in response to Avangrid's interconnection with ISO-NE, approximately 100 miles from the facilities of the two entities to which the provision applies, Seabrook and New Hampshire Transmission.  Seabrook contends the Commission's reading has no limiting principle and, in theory, could apply to any modification anywhere in the Eastern Interconnect.[28]

14.     Seabrook argues that the Seabrook LGIA expressly prohibits the creation of third-party beneficiaries and that the Commission's February 2023 Order violated this prohibition embedded in the filed rate.[29]  Seabrook disputes the Commission's finding that it is the Commission, rather than Avangrid, that is seeking to enforce the contract.[30]  Seabrook argues that this cannot be squared with the fact that the Commission granted Avangrid's complaint, whereby Avangrid asked the Commission to direct Seabrook to replace the breaker.[31]  Seabrook adds that, under the Commission's reasoning, all third-party beneficiary provisions are "blue-penciled" out of the agreement and unenforceable.  Seabrook maintains that the prohibition on third-party beneficiaries is important because it prevents an unjust and unreasonable assignment to Seabrook of an obligation without a reciprocal obligation in the same contract for just compensation and other reasonable terms and conditions governing a relationship with a beneficiary.[32]

15.     Pointing to testimony submitted by Eric McCartney, former Vice President of NextEra Energy Inc.'s nuclear generation fleet and an independent expert, Seabrook maintains that it operates the generator breaker, along with the rest of the facility, in

---

[27] *Id.* at 21.

[28] *Id.*

[29] *Id.* at 22 (citing Seabrook LGIA § 30.5 ("No Third Party Beneficiaries.  This LGIA is not intended to and does not create rights, remedies, or benefits of any character whatsoever in favor of any persons, corporations, associations, or entities other than the Parties, and the obligations herein assumed are solely for the use and benefit of the Parties, their successors in interest and, where permitted, their assigns.")).

[30] *Id.* at 4, 22-23.

[31] *Id.* at 22-23.

[32] *Id.* at 23.

accordance with Good Utility Practice and Reliability Standards, as well as the rules of the Nuclear Regulatory Commission.[33]  Seabrook states that it is not obligated under any legal standard or requirement to replace the generator breaker as the system exists today because Seabrook has not caused the generator to be overdutied and there is no current reliability problem.  Seabrook disputes the Commission's argument that it need not "wait for an adverse event to occur before taking action[]" because, according to Seabrook, the adverse event is not possible under ISO-NE's Tariff, which does not permit the NECEC Project to be energized until there is no danger of the generator breaker being overdutied.[34]

16.    Seabrook states that, under its executed E&P Agreement[35] with NECEC, Seabrook "must make Reasonable Efforts, which encompasses a definition of Good Utility Practice, to timely receive the equipment necessary to undertake the generator breaker replacement."[36]  Seabrook states that, even if the Reasonable Efforts/Good Utility Practice requirement is met under the E&P Agreement, there could still be circumstances outside of Seabrook's control in which the replacement must be re-manufactured before it can be installed or a geopolitical issue arises that delays its delivery.  Seabrook argues that even without any default under the E&P Agreement, the February 2023 Order implies that Seabrook could nevertheless be found in default under the Seabrook LGIA for failure to comply with Good Utility Practice, which would "essentially create a strict liability standard for failure to meet someone else's interconnection timing goals."[37]

---

[33] *Id.* at 24 (citing Answer to Amended Complaint, McCartney Second Supplemental Affidavit at 6; Answer to Complaint, Ex. No. 7, Affidavit of Lawrence Weber at 7).

[34] *Id.* at 26-29.

[35] On September 20, 2021, Avangrid and Seabrook filed motions to lodge the executed E&P Agreement between Seabrook and NECEC.  Avangrid and Seabrook state that the E&P Agreement was entered into as a result of NECEC's desire to commence immediately the engineering and conceptual design for the replacement of the circuit breaker at issue in this case.  Avangrid Motion to Lodge, Docket No. EL21-6-000, at 2 (filed Sept. 20, 2021).  The Commission granted this motion.  February 2023 Order, 182 FERC ¶ 61,044 at P 24.

[36] Rehearing Request at 30.

[37] *Id.* at 30-31.

## 2.     Commission Determination

17.     We continue to find that, pursuant to the terms of the Seabrook LGIA, Seabrook must replace the breaker because it is needed for reliable operation of Seabrook Station and required by Good Utility Practice.[38]  Seabrook is incorrect in alleging that the Commission is without jurisdiction to make this finding.

18.     Pursuant to the Commission's authority over interconnection service, which is part of jurisdictional transmission service,[39] the Commission can and does regulate the participation of generation resources in jurisdictional services and transactions.[40]  Here,

---

[38] February 2023 Order, 182 FERC ¶ 61,044 at PP 74-86.

[39] *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 104 FERC ¶ 61,103, at PP 4, 804 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401(2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) (describing Commission's authority to require the adoption of the Standard LGIA as "deriv[ing] from [the Commission's] findings of undue discrimination in the interstate electric transmission market that formed the basis of Order No. 888").  In Order No. 2003, the Commission explained that the order applies "to interconnections to the facilities of a public utility's Transmission System that, at the time the interconnection is requested, may be used either to transmit electric energy in interstate commerce or to sell electric energy at wholesale in interstate commerce pursuant to a Commission-filed OATT."  Order No. 2003, 104 FERC ¶ 61,104 at P 804.  On appeal, the court explained that "[t]o the extent that Order No. 2003 conditions a jurisdictional utility's participation in the transmission and interconnection markets on that utility's securing physical changes in the facilities, and those changes bear a close enough relation to FERC's exercise of jurisdiction over jurisdictional transactions (petitioners pose no challenge to the adequacy of that relation), the Order effects no legally material extension of the authority exercised in *Order No. 888*."  *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d at 1281-82.

[40] *See* Order No. 2003, 104 FERC ¶ 61,104 (establishing standard procedures and standard agreements for interconnection of generating facilities); *Essential Reliability Servs. & Evolving Bulk-Power Sys. Frequency Response*, Order No. 842, 162 FERC ¶ 61,128 (requiring newly interconnecting large and small generating facilities to install, maintain, and operate equipment capable of providing frequency response as a condition of interconnection); *Entergy Servs., Inc.,* 99 FERC ¶ 61,127, at 61,543 (2002) (clarifying conditions under which generators may interconnect with a transmission system); *Newmont Nev. Energy Inv. LLC v. Sierra Pac. Power Co.,* 147 FERC ¶ 61,030 (2014)

Document Accession #: 20230615-3059     Filed Date: 06/15/2023

Seabrook is subject to the terms of the Seabrook LGIA, which governs the Seabrook Station's interconnection to the transmission system under the control of ISO-NE and contains provisions that support our finding that Seabrook is required to replace the circuit breaker, as discussed further below.

19.     Contrary to Seabrook's argument on rehearing, the Commission's February 2023 Order does not exceed the Commission's authority under section 202(b) of the FPA or otherwise purport to "compel the enlargement of generating facilities," but is instead a reflection of the Commission's authority to enforce Seabrook's obligations with respect to its own facilities under the Seabrook LGIA, an agreement over which the Commission undeniably has jurisdiction.[41]  The Commission's determination to hold Seabrook to its commitments in a jurisdictional agreement relies on the Commission's existing statutory authority, and the Commission's interpretation of this agreement does not yield "unlawful effects."  To the contrary, the Commission's directive to require Seabrook to replace the generator breaker (at Avangrid's expense) ensures that Seabrook fulfills its ongoing responsibilities under the Seabrook LGIA to continue being interconnected in a safe and reliable manner.  Moreover, contrary to Seabrook's contention,[42] the Nuclear Regulatory Commission's regulatory oversight[43] of the Seabrook Station does not preclude the Commission from requiring that Seabrook abide by the terms of its Commission-jurisdictional LGIA.

20.     Next, we continue to find that the Commission's directive in the February 2023 Order is reasonably grounded in Seabrook's continuing responsibilities under the

---

(involving funding determination for generating facility modifications required by transmission network additions).

[41] As the D.C. Circuit has recognized, the "assertion of jurisdiction over specified transactions, even though affecting the conduct of the owner(s) with respect to its facilities, is not per se an exercise of jurisdiction over the facility."  *Nat'l Ass'n of Regul. Util. Com'rs v. FERC*, 475 F.3d at 1281; *see also id.* at 1280 ("[I]nterconnections appear to be relationships between parties with respect to electricity flowing over facilities . . . . By establishing standard agreements [the Commission] has exercised its jurisdiction over the *terms* of those relationships.") (emphasis in original). Seabrook acknowledges that the Commission has jurisdiction over the Seabrook LGIA.  Seabrook Rehearing Request at 18 ("The Commission's jurisdiction over the LGIA arises . . . from its jurisdiction over transmission service.").

[42] *See supra* P 15.

[43] *See Mass. v. U.S.*, 522 F.3d 115, 118-19 (1st Cir. 2008) (describing regulatory scheme governing Nuclear Regulatory Commission process for obtaining licenses to operate nuclear power plants).

Docket No. EL21-3-001, et al.                                                              - 12 -

Seabrook LGIA, all required to be carried out consistent with Good Utility Practice,[44] in relation to interconnection services provided to it by ISO-NE and New England Transmission.[45] As the Commission explained, Appendix C-1, section B.III of the Seabrook LGIA requires, in certain circumstances, Seabrook to make future modifications to its facility that are triggered by another entity's actions.[46] The provision states:

> In addition to Article 5.19 of this [Seabrook LGIA] . . . in the event Interconnecting Transmission Owner or Interconnection Customer make a modification or functional change to its own facilities that is not required by Applicable Laws and Regulations or Governmental Authority, and thereby makes it necessary for the other entity to make a modification or functional change to its own facilities that is required in accordance with Good Utility Practice, the entity making the modification or functional change not required by Law or Governmental Authority shall bear the cost of the modification or functional change to the other entity's facilities required in accordance with Good Utility Practice.[47]

This provision establishes the responsibility of the interconnection customer—here, Seabrook—to upgrade its facilities under certain circumstances as a result of certain third-party changes; specifically, when the upgrade is required by Good Utility Practice. We continue to find that future modifications to Seabrook's facilities under this provision are necessary under the Good Utility Practice standard even if triggered by an entity other than New Hampshire Transmission, as the interconnecting transmission owner.[48]

---

[44] *See* Seabrook LGIA, § 4.3 (stating that each party shall perform its obligations under this LGIA in accordance with, among other things, Good Utility Practice); *see also, e.g.,* ISO-NE, Tariff, § I.3 (8.0.0), § I.3.2 (Assets) (providing that market participants shall cause assets, including generator assets, it owns and operates to be designed, constructed, maintained and operated in accordance with Good Utility Practice).

[45] *See* February 2023 Order, 182 FERC ¶ 61,044 at P 105 ("Seabrook's replacement of the breaker allows it to continue benefiting from the right to operate its generating facility consistent with Good Utility Practice under its LGIA.").

[46] February 2023 Order, 182 FERC ¶ 61,044 at PP 80-83.

[47] Seabrook LGIA, app. C-1, § B.III.

[48] *See* February 2023 Order, 182 FERC ¶ 61,044 at PP 81-82 (finding the obligations set forth in app. C-1, § B.III of the Seabrook LGIA are "highly relevant" regarding future modifications triggered by another entity's actions).

21.     Seabrook's contention that this provision cannot be read to require construction is inconsistent with the text of the provision.  As explained in the February 2023 Order, Appendix C-1, section B.III reflects a requirement to make a future "modification" or "functional change" that is triggered by another entity's action and is required under Good Utility Practice.[49]  The terms "modification" and "functional change" are not reasonably read to preclude construction, and Seabrook acknowledges that the provision governs the "cost consequences of certain construction" where "the construction was necessitated by Good Utility Practice."[50]  We do not dispute that Appendix C-1, section B.III also serves as a cost allocation provision, and we have agreed that Seabrook should not be required to pay the direct costs for the breaker replacement.[51]  However, this does not alter our conclusions that, under this provision of the LGIA, modifications and changes required by Good Utility Practice *must* occur, and that "that outcome is not open to negotiation."[52]  The definition of Good Utility Practice, in turn, incorporates "reasonable judgment . . . consistent with good business practices, *reliability, safety* and expedition,"[53] and the Commission reasonably determined that this standard would be violated if Seabrook failed to replace the breaker prior to the energization of NECEC Project.[54]

22.     Similarly, section 9.7.5 of the Seabrook LGIA also supports the Commission's finding that Seabrook may not, in these circumstances, decline to replace the breaker as needed to respond to changing transmission system conditions.  Section 9.7.5 refers specifically to the installation and maintenance of breakers and provides:

> Requirements for Protection.   In accordance with the ISO New England Operating Documents, Applicable Reliability Standards, or successor documents, and compliance with Good Utility Practice, Interconnection Customer shall provide, install, own, and maintain relays, circuit breakers and all other devices necessary to remove any fault contribution of the Large Generating Facility to any short circuit occurring on the New England Transmission   System   not   otherwise   isolated   by   Interconnecting

---

[49] *See id.* PP 80, 82.

[50] Seabrook Rehearing Request at 21.

[51] February 2023 Order, 182 FERC ¶ 61,044 at P 83.

[52] *Id.* P 82.

[53] Seabrook November 2 Answer, Ex. No. 6, Seabrook LGIA (emphasis added); *see also* ISO-NE Tariff, § I.2.2.

[54] February 2023 Order, 182 FERC ¶ 61,044 at P 84.

Transmission Owner's equipment, such that the removal of the fault contribution shall be coordinated with the protective requirements of the New England Transmission System. Such protective equipment shall include, without limitation, a disconnecting device or switch with load-interrupting capability located between the Large Generating Facility and the New England Transmission System at a site selected upon mutual agreement (not to be unreasonably withheld, conditioned or delayed) of the Parties. Interconnection Customer shall be responsible for protection of the Large Generating Facility and Interconnection Customer's other equipment from such conditions as negative sequence currents, over- or under-frequency, sudden load rejection, over- or under-voltage, and generator loss-of-field. Interconnection Customer shall be solely responsible to disconnect the Large Generating Facility and Interconnection Customer's other equipment if conditions on the New England Transmission System could adversely affect the Large Generating Facility.[55]

Pursuant to this provision, as ISO-NE noted in response to the Briefing Order, Seabrook is responsible for having a breaker in place for the purpose of protecting the Seabrook Station.[56] Like Appendix C-1, section B.III, this provision also references Good Utility Practice and, under this standard, Seabrook has a continuing responsibility to "provide, install, own, and maintain" a circuit breaker "necessary to remove any fault contribution of the Large Generating Facility to any short circuit occurring on the New England Transmission System not otherwise isolated by Interconnecting Transmission Owner's equipment."[57] As the Commission explained in the February 2023 Order, and Seabrook does not dispute, "operating the breaker in an overdutied condition could lead to an uninterrupted short circuit current that could lead to catastrophic equipment failure at the nuclear facility,"[58] which, in turn, "would create potential reliability concerns depending on system conditions."[59] Accordingly, in these unique circumstances,[60] it would be inconsistent with Good Utility Practice for Seabrook to decline to replace the circuit

---

[55] Seabrook LGIA, § 9.7.5.

[56] February 2023 Order, 182 FERC ¶ 61,044 at P 66.

[57] As studied, upon interconnection of the NECEC Project, the Seabrook breaker will exceed its interrupting capability at 101.2% of capacity. *See supra* P 4.

[58] February 2023 Order, 182 FERC ¶ 61,044 at P 84 (citing ISO-NE Initial Brief at 5).

[59] *Id.*

[60] *See, e.g.*, February 2023 Order, 182 FERC ¶ 61,044 at P 79.

breaker. Moreover, section 9.7.5 does not limit the events that may prompt the need to "provide, install, own, and maintain" circuit breakers consistent with Good Utility Practice. Rather, section 9.7.5 appears to contemplate that transmission system conditions change over time, as they have here in response to a third-party's interconnection.[61] Accordingly, section 9.7.5 also supports the Commission's decision that Seabrook is responsible for replacing the breaker.

23.     Moreover, we note with some concern Seabrook's observation that energization of the NECEC Project cannot occur until Seabrook's breaker is replaced, coupled with its request for recovery of opportunity costs for any extended outages that may occur beyond a normally scheduled refueling outage. Seabrook's position tends to lend credence to Avangrid's argument that Seabrook may be seeking "to prevent the development and completion of the NECEC Project"[62] and further underscores our conclusion that the Good Utility Practice standard requires Seabrook to replace the breaker.[63] By refusing to replace the breaker under these circumstances, Seabrook is, in essence, exercising veto power over the interconnections of new and competing interconnection customers.[64]

24.     We disagree with Seabrook's contention that the February 2023 Order has "no limiting principle." The geographic distance between Avangrid's point of interconnection with ISO-NE to the Seabrook Station, which Seabrook estimates to be approximately 100 miles, is irrelevant. Our focus here is on the effect of that interconnection on the breaker and the fact that ISO-NE, the Regional Transmission Organization (RTO) overseeing the region in which Seabrook is a market participant, identified Seabrook's breaker as a necessary upgrade. This upgrade is required under the

---

[61] In particular, section 9.7.5 contemplates changing condition by requiring the Interconnection Customer to be "solely responsible" for disconnecting "if conditions on the New England Transmission System could adversely affect" the generation facilities.

[62] Avangrid October 13, 2020 Complaint at 20.

[63] *See* Seabrook LGIA, § 4.3 (stating that each party shall perform its obligations under this LGIA in accordance with, among other things, Good Utility Practice); *see also, e.g.,* ISO-NE, Tariff, § I.3.2 (providing that market participants shall cause assets, including generator assets, it owns and operates to be designed, constructed, maintained and operated in accordance with Good Utility Practice).

[64] *Cf. Jeffers S., LLC, v. Midwest Indep. Transmission Sys. Operator, Inc.,* 144 FERC ¶ 61,033, at P 62 (2013) (citing Order No. 2003-A, 106 FERC ¶ 61,220 at PP 128, 320) (expressing concern about interconnection customers holding other interconnection customers hostage through higher-queued projects continually making modifications or dropping out of the queue and causing risk and uncertainty for lower-queued projects).

Seabrook LGIA and Good Utility Practice[65] based on the unique circumstances present here. The record indicates that the breaker will be overdutied following the authorized interconnection of the NECEC Project, and we continue to share ISO-NE's concern that operating the breaker in an overdutied condition could result in "catastrophic equipment failure" and potential grid reliability concerns, depending on grid system conditions.[66] These concerns do not dissipate with geographical distance.

25.     Contrary to Seabrook's argument on rehearing, the Commission's determination in the February 2023 Order requiring Seabrook to replace the breaker is not precluded under section 30.5 of the Seabrook LGIA, which provides for "No Third Party Beneficiaries." As the Commission explained in the February 2023 Order, contractual prohibitions on third-party beneficiaries, such as section 30.5 of the Seabrook LGIA, bar a third-party who benefits from the contract's terms from enforcing a contract as if it were a party to the contract.[67] By contrast, here the Commission is enforcing the terms of the Seabrook LGIA to ensure that Seabrook abides by the standard of Good Utility Practice, which ensures the safe and reliable operation of the interstate transmission system and wholesale market for the benefit of all and which does not vanish by way of the "no third-party beneficiary" provision. Moreover, since Avangrid will be responsible for the direct costs of the replacement,[68] Avangrid is providing compensation for the benefits it receives.

26.     Finally, there is nothing in the record or in the February 2023 Order to support Seabrook's contention that it is being subject to a "strict liability standard" for failing to meet Avangrid's interconnection timing goals despite exercising reasonable efforts.[69] The directive in the February 2023 Order, stemming from Seabrook's obligations under the Seabrook LGIA and Good Utility Practice, was simply to replace the breaker. Any unforeseen delays caused by manufacturing specification errors or geopolitical issues will

---

[65] *See* Seabrook LGIA, app. C-1, § B.III; ISO-NE, Tariff § I.2.2 (defining Good Utility Practice); Seabrook LGIA at 10 (defining Good Utility Practice).

[66] February 2023 Order, 182 FERC ¶ 61,044 at P 84 (citing ISO-NE Initial Brief at 5); ISO-NE May 6, 2021 Letter at 2.

[67] February 2023 Order, 182 FERC ¶ 61,044 at P 84 (citing Restatement (Second) of Contracts § 302 (1981); *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 535-36 (3d Cir. 1988)).

[68] February 2023 Order, 182 FERC ¶ 61,044 at P 100 ("[N]o party disputes whether Avangrid should pay for the direct cost of the breaker replacement and indeed Avangrid agrees to pay these costs.").

[69] *See supra* P 16.

not result in Seabrook being in default under the Seabrook LGIA, provided that Seabrook continues to proceed with the replacement work under the Reasonable Efforts/Good Utility Practice requirement in the E&P Agreement.

### C.    Opportunity Costs

#### 1.    Rehearing Request

27.    Seabrook alleges that the Commission erred in finding that Seabrook cannot recover the opportunity costs associated with the breaker replacement on Avangrid's behalf.  Seabrook argues that the Commission's finding that Seabrook is not providing an "electric service" to Avangrid precludes it from setting the rate that Avangrid pays Seabrook for the breaker replacement and therefore precludes the Commission from disallowing recovery of costs in that rate.[70]

28.    Seabrook states that it has always been willing to replace the generator breaker as long as Seabrook is kept whole.[71]  Seabrook argues that the standard of "Good Utility Practice," which the Commission invokes to require Seabrook to replace the generator breaker, also requires that Seabrook be made whole.[72]  Seabrook argues that "Good Utility Practice" includes cost considerations to ensure that generators are sufficiently compensated for costs, which include direct and opportunity costs.[73]  Seabrook maintains that, consistent with the definition of Good Utility Practice, it submitted evidence documenting Seabrook's reasonable judgment that the only way for it to receive its "reasonable cost consistent with good business practices" is to be made whole.[74] Seabrook adds that there is no evidence that the opportunity costs will be unreasonable and notes that, under Seabrook's formula rate proposal, Avangrid would have the ability to challenge the prudence of the claimed opportunity costs.[75]

29.    Seabrook claims that the potential costs caused by Avangrid that the Commission has ordered Seabrook to bear may be massive because, during an extended outage,

---

[70] Rehearing Request at 31 (citing February 2023 Order, 182 FERC ¶ 61,044 at P 102).

[71] *Id.* at 3, 13, 32, 41.

[72] *Id.* at 13, 35-37.

[73] *Id.* at 36 (citing *ISO New England Inc.,* 113 FERC ¶ 61,175, at P 30 (2005)).

[74] *Id.* at 35.

[75] *Id.* at 35-36.

Docket No. EL21-3-001, et al.                                                      - 18 -

Seabrook will lose revenues that would otherwise be earned by selling Seabrook Station's
output into the ISO-NE energy markets or bilaterally.[76]  Seabrook estimates that these
costs may total at least $560,000 per day.  Seabrook states that, in addition to lost
revenues like capacity bonus payments, it may face out-of-pocket expenses from the
replacement work, including pay for performance penalties.  Seabrook also states that if
something goes wrong during construction, the damage to the station could be extremely
time-consuming and costly to repair, creating potentially massive harm.[77]

30.     Seabrook argues that, consistent with rules of cost causation, the ISO-NE Tariff
specifies that Avangrid must bear *all* of the costs of the breaker replacement.[78]  Seabrook
maintains that the Tariff does not excuse any portion of the expense and that "there was
no need for the Tariff to enumerate which costs are included" because all costs are
included.[79]

31.     Seabrook alleges that the Commission unreasonably contradicted its long-standing
cost allocation policies under the FPA whereby costs must "'be allocated to those who
cause the costs to be incurred and reap the resulting benefits.'"[80]  Seabrook argues that
Avangrid caused these costs and will receive the benefit of satisfying the Tariff pre-
condition to build its Project whereas Seabrook gets no benefit from the breaker
replacement because it is operating reliably today with the existing generator breaker.[81]

32.     Seabrook also alleges that the Commission erred in applying its opportunity cost
precedent, distinguishing the cases on the basis of immaterial facts and failing to address
the fundamental question whether Seabrook should be made whole for the breaker
replacement.[82]

33.     Seabrook takes issue with the Commission's statement that Seabrook "does not
present evidence convincing us that it would be prevented from operating successfully or

---

[76] *Id.* at 33.

[77] *Id.*

[78] *Id.* (citing ISO-NE, Tariff § I.3.10).

[79] *Id.* at 34-35.

[80] *Id.* at 37-38 (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 85 (D.C. Cir.
2014) (quoting *Nat'l Ass'n of Regul. Util. Comm'n v. FERC* 475 F.3d at 1285)).

[81] *Id.* at 38.

[82] *Id.* at 13-14, 40-43.

maintaining financial integrity if it replaced its breaker without receiving opportunity costs" from Avangrid.[83]  Seabrook maintains that it does not bear the burden of proof in this proceeding but that it surely would be prevented "from operating successfully" because it would not be able to operate *at all* during the extended outage.  Seabrook states that Avangrid – who does have the burden of proof – has not shown that Seabrook can maintain financial integrity for an extended outage whose bounds are unknown.[84]

34.     Seabrook argues that a rate is confiscatory where, as here, it provides for zero return of and on investment for an unbounded period for time for a project that presents enterprise risk.[85]  Seabrook states that the Commission does not cite any case for the proposition that it can require Seabrook to operate at a loss or that it can be required to earn zero return of and on investment during the time that it will be on outage for the breaker replacement.[86]

35.     Seabrook alleges that the Commission erred by entirely failing to address Seabrook's argument that a formula rate is the just and reasonable way to ensure that opportunity costs recovered would be no more or less than the opportunity costs incurred.[87]  Seabrook argues that its opportunity costs at issue are real and claims that the Commission incorrectly lumped exposure to pay for performance penalties into the estimates of lost revenue.  Additionally, Seabrook claims that the Commission failed to rationally address Seabrook's case for other costs, such as legal costs and other demonstrable incremental costs like the need to buy more station power during the extended outage.[88]

## 2.     Commission Determination

36.     We continue to find that Seabrook is not entitled to reimbursement from Avangrid of the potential opportunity costs and legal costs associated with the breaker replacement that might arise if Seabrook is unable to replace the breaker within the period of its

---

[83] *Id.* at 43-44 (quoting February 2023 Order, 182 FERC ¶ 61,044 at P 104).

[84] *Id.* at 44.

[85] *Id.* at 14, 38-39, 41, 43-45.

[86] *Id.* at 45.

[87] *Id.* at 14, 47.

[88] *Id.* at 47.

normal refueling outage.[89]  As a preliminary matter, we continue to believe that Seabrook is in the best position to ensure it need not extend its refueling outage in order to complete this breaker replacement.[90]  We also disagree with Seabrook's contention that the Commission lacks jurisdiction to rule on whether Seabrook may recover opportunity costs.  Consistent with our discussion above, the Commission, through its jurisdiction over interconnection service, has long set rates for Network Upgrades in the context of interconnection requests.[91]  The breaker replacement is a part of the interconnection process, and it is therefore appropriate to look to precedent from the generator interconnection process where, in ISO-NE, the Commission has found just and reasonable tariff language prohibiting the payment of "lost opportunity costs to Generator Owners for generating units that are dispatched down or dispatched off."[92]

37.     Outages to accommodate various upgrades and maintenance to generation and transmission facilities are common, and yet, Seabrook cites no precedent in which the Commission allowed for the recovery of foregone revenue associated with such outages.[93]  Here, the foregone revenues associated with the breaker replacement reflect the ordinary cost of doing business where such business involves compliance with Good

---

[89] February 2023 Order, 182 FERC ¶ 61,044 at P 100.

[90] *Id.* P 105.

[91] *See supra* note 40.

[92] ISO-NE Tariff, § II.47 (4.0.0), § II.47.4 (Compliance with Schedule 11); *see ISO New England Inc.*, 151 FERC ¶ 61,024 (2015) (accepting tariff revisions).

[93] *See* February 2023 Order, 182 FERC ¶ 61,044 at P 102 ("Seabrook does not cite any applicable cases arising from the interconnection or Affected Party context, including any in which the Commission has allowed an Affected Party to collect opportunity costs from an interconnection customer.").  We agree that Avangrid bears the burden of proof in this proceeding, and we continue to find that Avangrid has satisfied this burden, as detailed in the February 2023 Order.  *See* February 2023 Order, 182 FERC ¶ 61,044 at PP 89-90, 98-99.  Having established a *prima facie* case, the burden shifted to Seabrook, but as noted above, Seabrook has not cited any case law to support the recovery of opportunity costs in this context.  *See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by Cal. Indep. Sys. Operator Corp.,* Opinion No. 536, 149 FERC ¶ 61,116, at PP 45-49 (2014), *on reh'g*, 153 FERC ¶ 61,144 (2015), *aff'd sub nom. MPS Merchant Servs., Inc. v. FERC,* 863 F.3d 1155 (9th Cir. 2016) ("The party with the burden of proof bears the burden of production, or the need to provide sufficient evidence to establish a prima facie case.  Once it meets that burden, however, the burden of going forward shifts to the opposing party, although the ultimate burden of persuasion remains with the proponent.").

Utility Practice.  To the extent Seabrook loses profits as a result of such compliance, we continue to find that profits are not guaranteed and that the potential loss of profits in this instance does not render the rate confiscatory.[94]  Other incremental costs associated with the duration of outage, including the need to purchase additional station power, are also not appropriate because such costs are not even certain to be incurred.  Furthermore, Seabrook and any other generator could incur these types of costs related to outages at any given time; yet, Seabrook is requesting that the Commission have Avangrid entirely shield Seabrook from these risks during the period of time it takes to replace the breaker.

38.    Seabrook's argument that it is entitled to opportunity costs under the terms of the ISO-NE Tariff remains unsupported.  We continue to find, given the facts and circumstances in this proceeding, that the ISO-NE Tariff is reasonably read to limit Avangrid's cost responsibility to the direct costs of any required upgrades.[95]  The Tariff states that a party planning a transmission project "shall not proceed to implement such plan unless the . . . Transmission Owner . . . constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect."[96]  As noted in the February 2023 Order, ISO-NE's system impact study of the project determined that several upgrades would be necessary, including the replacement of the circuit breaker at issue here.[97]  Because the breaker replacement is necessary to avoid an "adverse effect,"[98] Avangrid is liable for the costs of the breaker replacement.[99]  Those costs represent the direct costs incurred in replacement of the breaker and not any opportunity costs.[100]

---

[94] February 2023 Order, 182 FERC ¶ 61,044 at P 104.

[95] *Id.* P 101.

[96] ISO-NE, Tariff, § I.3.10 (Market Participant to Avoid Adverse Effect).

[97] February 2023 Order, 182 FERC ¶ 61,044 at P 4.

[98] *See* ISO-NE, Tariff, § I.3.10 (8.0.0) (Market Participant to Avoid Adverse Effect).

[99] February 2023 Order, 182 FERC ¶ 61,044 at P 100.  Indeed, as the February 2023 Order noted, Avangrid agreed to pay the direct costs.  *See, e.g.*, *id.* at n.203 ("Avangrid has agreed to pay for the direct costs of the engineering, procurement and construction of the Seabrook breaker replacement, but not forgone sales or legal costs." (quoting Avangrid November 17 Answer at 12)).

[100] *See, e.g.*, *id*. P 100, n.203 (noting "Seabrook refers to the opportunity costs as "lost profits, lost revenues, and foregone Pay for Performance ("PFP") bonuses." (quoting Seabrook November 2 Answer at 29)).

Similarly, legal costs and station power costs are not reasonably considered breaker replacement costs under this Tariff provision.[101]

39.     Seabrook also argues that Avangrid should be liable for any costs incurred by Seabrook "if something goes wrong during the construction work to replace the generator breaker."[102]  Seabrook argues that, in that instance, "the damage to Seabrook Station could be extremely time-consuming and costly to repair, creating potentially massive harm."[103]  To the extent Seabrook is now seeking consequential damages compensation, this argument departs from Seabrook's position in response to Avangrid's complaint in which Seabrook had insisted that "this case is not about 'damages'" and that Avangrid's "insistence that Seabrook is requesting. . . all indirect and consequential damages, before Seabrook upgrades the Generator Breaker is simply untrue."[104]  The Commission looks with disfavor on parties raising new issues on rehearing.[105]  Matters that have not previously been raised by any participant in the proceeding may be raised in a rehearing request only when based on matters not available for consideration by the Commission at the time of the final order.[106]  To the extent Seabrook is now seeking recovery for

---

[101] *See* Rehearing Request at 8, 47 (describing incremental costs as including additional labor costs and the need to buy more station power during an extended outage).  Seabrook also seeks compensation in the event that performance penalties are triggered or if "something goes wrong during the construction work." *Id.* at 34.  Given the facts and circumstances here, these events are not reasonably considered to be breaker replacement costs and, in any event, are not certain to occur.

[102] *Id.* at 34.

[103] *Id.*

[104] Seabrook November Answer at 28-29, 31.

[105] *Calpine Oneta Power v. Am. Elec. Power Serv. Corp*., 114 FERC ¶ 61,030, at P 7 (2006) ("Such behavior is disruptive to the administrative process because it has the effect of moving the target for parties seeking a final administrative decision.").

[106] We typically reject such new arguments raised on rehearing, unless we find that the argument could not have been previously presented, e.g., claims based on information that only recently became available or concerns prompted by a change in material circumstances.  *Ala. Power Co.*, 179 FERC ¶ 61,128, at P 15 (2022); *KEI (Me.) Power Mgmt. (III) LLC*, 173 FERC ¶ 61,069, at P 38 n.77 (2020).  Rule 713(c)(3) of our Rules of Practice and Procedure states that any request for rehearing must "[s]et forth the matters relied upon by the party requesting rehearing, if rehearing is sought based on matters not available for consideration by the Commission at the time of the final decision or final order."  18 C.F.R. § 385.713(c)(3).

consequential damages, we reject that argument as procedurally barred because it could have been presented earlier in this proceeding but expressly was not. Furthermore, even if we were to consider this argument, we would find it unpersuasive because consequential damages are prohibited in the interconnection context.[107]

40.     Next, we disagree with Seabrook's arguments claiming that the Commission's determination was inconsistent with its precedent on opportunity costs. The February 2023 Order contains a detailed discussion for why the Commission's precedent allowing for opportunity costs in RTO and cost-of-service contexts are inapplicable to the specific facts here.[108] Contrary to Seabrook's argument on rehearing, the distinctions drawn in those cases are relevant because the rationale underpinning the Commission's determination to allow opportunity costs in those limited circumstances was to combat perverse incentives that are not present here. The allowance of opportunity costs in those limited circumstances was not, as Seabrook posits, to ensure that the utility was able to recover lost profits so as to earn a return of and on its investment.[109]

41.     Seabrook cites three Commission decisions to support its position that "the Commission has long authorized recovery of opportunity costs for generators who are forced to back down output in a variety of market contexts where a generator is foregoing market revenue to provide a service."[110] However, all three of these orders involve

---

[107] Order No. 2003, 104 FERC ¶ 61,103 at P 906 (adding a provision in the *pro forma* LGIA limiting consequential damages); *see also* Schedule 25, app. 6, art. 18.2 (ISO-NE ETU interconnection agreement provision limiting consequential damages). Seabrook's own interconnection agreement contains the *pro forma* tariff language prohibiting the collection of "any losses, damages, costs or expenses for any special indirect incidental, consequential, or punitive damages, including but not limited to loss of profit or revenue" from its counterparty under the interconnection agreement. *See* Seabrook Answer to Complaint, Docket No. EL21-3-001, Ex. No. 6; Seabrook LGIA, Section 18.2.

[108] February 2023 Order, 182 FERC ¶ 61,044 at PP 102, 104, 106 (differentiating cases).

[109] *See* Rehearing Request at 13-14, Statement of Issue 3(c) (arguing that the Commission "erred in applying its opportunity cost precedent, distinguishing the cases on the basis of immaterial facts and failing to address the fundamental question whether Seabrook should be made whole for replacing the generator").

[110] Rehearing Request at 40 and n.133 (citing *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,282, at P 17 (2016); *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 at P 2 (2008)), *aff'd in relevant part and vacated in part*, *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (D.C. Cir. 2011); *N.Y. Indep. Sys. Operator, Inc.*, 91 FERC

compensating sellers participating in a market for following dispatch instructions even when it is not in their best economic interests to do so. As discussed in the February 2023 Order, "[t]he Commission typically allows opportunity cost recovery so that the resource will be revenue neutral and therefore indifferent towards the system operator's decision as to which service the resource will provide."[111] For example, the Commission has allowed recovery of opportunity costs to mitigate economic incentives which are contrary to the dispatch instructions.[112] The Commission recognizes the importance of the incentive to follow dispatch signals in maintaining system reliability.[113] In sum, opportunity costs are typically awarded in the RTO context to combat perverse incentives by ensuring that a resource engaged in ancillary service sales will be indifferent toward the RTO's decision as to which service the resource will provide.[114] As the Commission explained in the February 2023 Order, there is no perverse incentive in the instant case that requires remedy through the recovery of opportunity costs.[115] To the contrary, perverse incentives are more likely to result if Seabrook is assured recovery of opportunity costs.

---

¶ 61,218, at 61,801-02 (2000), *reh'g denied*, 97 FERC ¶ 61,155 (2001), *reh'g denied*, 99 FERC ¶ 61,125 (2002), *remanded on other grounds sub nom.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003), *order on remand*, 110 FERC ¶ 61,244, *order on reh'g*, 113 FERC ¶ 61,155 (2005)).

[111] February 2023 Order, 182 FERC ¶ 61,044 at P 102 (footnote omitted).

[112] *See, e.g.*, *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,058, at P 138 (2019) (finding that "fast-start pricing may create an incentive to deviate from PJM's dispatch instructions in order to take advantage of higher prices that result from fast-start pricing" and accepting PJM's proposal "to use lost opportunity cost payments to offset the incentive for over-generation or price chasing" as just and reasonable).

[113] *See*, *e.g.*, *Settlement Intervals & Shortage Pricing in Mkts. Operated by Reg'l. Transmission Orgs. & Indep. Sys. Operators*, 155 FERC ¶ 61,276, at P 6 (2016).

[114] February 2023 Order, 182 FERC ¶ 61,044 at P 102. Similarly, the Commission has allowed opportunity costs in cost-of-service cases to align incentives where a seller must make a decision to sell either energy or ancillary services. *Ameren Energy Mktg. Co.*, 117 FERC ¶ 61,334, at PP 15 (2006).

[115] February 2023 Order, 182 FERC ¶ 61,044 at P 102.

42.     Seabrook mischaracterizes the February 2023 Order in claiming that the Commission has directed Seabrook to replace the breaker at a loss.[116]  There is no "loss" here because Avangrid will pay Seabrook all direct costs of replacing the breaker notwithstanding the possibility that Seabrook will earn a "zero return of and on its investment" for the duration of any extended outage.[117]  As discussed above, the Commission's directive to replace the breaker stems from Seabrook's obligations under the Seabrook LGIA.  As to the recovery of opportunity costs and other indirect costs, the Commission explained that "merchant sellers like Seabrook are not guaranteed profits, particularly when they are not operating due, for example, to maintenance activities required by their LGIAs."[118]  As noted above, Seabrook has not provided any precedent supporting granting opportunity costs for interconnection-related outages.  The foreclosure of guaranteed recovery of opportunity costs in the interconnection context, as here, does not indicate that public utilities are being forced to incur a loss, especially when that public utility is being paid for any and all direct costs arising from the interconnection project.  Here, no party disputes that Avangrid bears responsibility for the direct costs of the breaker replacement.[119]

43.     Order No. 2003 does not permit the transmission owner to allocate opportunity costs from an interconnection related outage to the interconnection customer.[120]  There, the Commission recognized that "the Transmission Provider and the owners of other generators may incur costs as a result of having to take a transmission line out of service in order to complete an interconnection," including "generator shut-down and restart costs, redispatch and purchased power costs, lost opportunity costs on sales not made, costs of power to compensate for additional line losses, and possibly other costs" but ultimately determined that proposals to recover such costs were "vague, le[ft] too much discretion to the transmission provider, and did not provide for adequate regulatory

---

[116] *See* Rehearing Request at 39 ("The Commission cannot direct Seabrook to replace the generator breaker at a loss.").

[117] *Id.*

[118] February 2023 Order, 182 FERC ¶ 61,044 at P 104.

[119] *Id*. P 100.

[120] Order No. 2003, 104 FERC ¶ 61,103 at P 714.  We recognize that the Commission re-visited this issue to some extent in Order No. 2003-A, where the Commission determined to allow the recovery of outage costs on a case-by-case basis if authorized contractually under an interconnection agreement.  Order No. 2003-A, 106 FERC ¶ 61,220 at P 647.  Here, however, there is no such agreement.

oversight by the Commission."[121]  Here, too, we find that the opportunity costs at issue are vague[122] and could present inappropriate incentives to impede efficiency of the replacement work.[123]  Seabrook's submission of a formula rate under which it proposes to collect opportunity costs does not resolve these concerns, in part because the rate has not been tendered for filing under section 205 of the FPA.  To that end, we again decline to consider the justness and reasonableness of that formula rate here, having found that Seabrook is not entitled to opportunity costs for an interconnection-related upgrade in contravention of decades of Commission precedent on interconnections.  Therefore, there is no need to consider whether Seabrook has proposed a just and reasonable mechanism for collecting these costs.

44.      Our determination to disallow the recovery of opportunity costs in this circumstance accords with principles of cost causation.  Responsibility for the direct costs of the breaker replacement falls to Avangrid, the party benefiting from the interconnection, and not to Seabrook.  Avangrid has already agreed to pay for these costs.[124]  Any additional and indirect costs associated with the breaker replacement are appropriately borne by Seabrook in accordance with the Good Utility Practice standard as discussed in the February 2023 Order.[125]  We clarify that we are not requiring Seabrook

---

[121] *Id.*  Invoking Order No. 2003, the Commission has found that an interconnecting generation project is not required to compensate a generator for its indirect and consequential costs, including lost profits from foregone power sales. *S. Cal. Edison Co.*, 151 FERC ¶ 61,273 at P 25 (2015) (confirming that "the ban on recovery of lost profits or revenues in Article 18.2 of the LGIA includes lost profits or revenues from foregone power sales").

[122] Seabrook acknowledges on rehearing that the "the potential extent and duration of an outage extension undertaken for [Avangrid] is unknown, and therefore unbounded." Rehearing Request at 44.

[123] As discussed in the February 2023 Order, we continue to find that Seabrook is in the best position to ensure it does not extend the outage period with the design and implementation choices it makes.  February 2023 Order, 182 FERC ¶ 61,044 at P 105.

[124] Avangrid November 17 Answer at 12 ("Avangrid has agreed to pay for the direct costs of the engineering, procurement and construction of the Seabrook breaker replacement, but not forgone sales or legal costs.").

[125] *See* February 2023 Order, 182 FERC ¶ 61,044 at P 105 ("Seabrook's replacement of the breaker allows it to continue benefiting from the right to operate its generating facility consistent with Good Utility Practice under its LGIA.").

to replace the breaker for the benefit of Avangrid, but rather to maintain system reliability in light of Avangrid's interconnection, consistent with Good Utility Practice.

45.    We are also unpersuaded by Seabrook's argument that the Good Utility Practice standard requires Avangrid to compensate Seabrook for opportunity costs. Were this the standard, opportunity costs would be routinely awarded in the interconnection context, but they are not. Seabrook appears to argue that it is only required under Good Utility Practice to replace a breaker "at a reasonable cost" and that the only way the breaker replacement may be performed at a reasonable cost is if Seabrook recovers opportunity costs.[126] We disagree. Nothing in the record indicates that "reasonable cost" includes or should include opportunity costs. Further, Seabrook misconstrues the Good Utility Practice standard when it argues that it would not be good business practice for Seabrook to replace the breaker without receiving opportunity costs.[127] The ISO-NE Tariff defines Good Utility Practice, in relevant part, as "any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry . . . ."[128] The Commission does not typically award opportunity costs in the interconnection context, and, thus, "a significant portion of the electric utility industry" routinely engages in similar upgrades for interconnection purposes without receiving opportunity costs. The Commission's findings are therefore entirely consistent with the Good Utility Practice standard as applied to interconnections.

46.    Contrary to Seabrook's argument on rehearing, the Commission's discussion of the Good Utility Practice standard in *ISO New England Inc.*,[129] which did not involve an interconnection, does not require the Commission to award opportunity costs in this circumstance. In that order, the Commission accepted an ISO-NE proposal to recall de-listed generators on economic outage during extreme weather to help prevent load shedding.[130] These were existing generators that did not have capacity commitments but were needed in the energy market. As such, in exchange for providing energy when they did not have a commitment to do so, ISO-NE provided these generators with the revenues they would have received had those resources cleared the capacity market and been awarded capacity commitments for the relevant period – direct costs, opportunity costs,

---

[126] Rehearing Request at 35.

[127] *Id.* at 36.

[128] ISO-NE, Tariff, § 1.

[129] *ISO New England Inc.* 113 FERC ¶ 61,175 at P 29.

[130] *Id.* P 28.

Docket No. EL21-3-001, et al.                                      - 28 -

and a capacity payment for the month.[131]  The generators were compensated for the commitment they did not make but still fulfilled.  There is no parallel to interconnection generally or Seabrook's position specifically.  For example, as explained above, the instant case does not present the same incentive concern at issue in *ISO New England Inc.*

### D.   **Deliverability Rights**

#### 1.   **Rehearing Request**

47.    Seabrook argues that the Commission erred in requiring Seabrook to pay again for deliverability rights and created a policy, contrary to longstanding precedent about generator interconnection, whereby existing generators would be required to subsidize potentially unlimited numbers of later entrants.[132]  Seabrook argues that it has a right to deliverability of its resource across the system of the transmission provider, which was conferred by paying for any required upgrade costs, and that any subsequent interconnection customer must likewise pay its own way, without interrupting or undermining the delivery rights acquired by its predecessors.[133]  In Seabrook's view, the Commission has interpreted the Seabrook LGIA as requiring Seabrook, in essence, to "repurchase" that deliverability right to accommodate Avangrid's interconnection.[134]  Seabrook adds that this interpretation and outcome violates the fundamental guarantee that "any future transmission service request for delivery" does not require new upgrades, while also violating the existing interconnection cost causation and delivery paradigm whereby the interconnection customer pays for the costs of its interconnection in exchange for deliverability going forward.[135]

48.    Finally, Seabrook argues that the February 2023 Order creates unreasonable uncertainty and investment exposure by requiring developers to take the risk that they can accurately predict future development of other projects and of the transmission system beyond any planning horizon currently in use, and then further estimate the impact it will

---

[131] *Id.* P 11.

[132] Rehearing Request at 14, 50-55.  Seabrook also argues that it would be anti-competitive to require existing interconnection customers to fund upgrades needed by their competitors.  *Id.* at 55.

[133] *Id.* at 51.

[134] *Id.* at 52 (citing February 2023 Order, 182 FERC ¶ 61,044 at P 87).

[135] *Id.* (citing Order No. 2003, 104 FERC ¶ 61,103 at P 756).

have on their project.[136]  Seabrook contends that it is bad policy to tell the electric power industry that third-party interconnection customers can impose costs on existing resources that are "unknowable, uncontrollable and potentially unlimited."[137]

## 2.  Commission Determination

49.    We continue to find that the interpretation of the Seabrook LGIA in the February 2023 Order is consistent with the Commission's interconnection precedent on deliverability rights.  The directive in the February 2023 Order to replace the breaker is unrelated to ensuring deliverability and instead reflects the Commission's interpretation of the Seabrook LGIA to ensure that Seabrook fulfills its obligations under Good Utility Practice.  Therefore, we disagree with Seabrook's contention that the Commission has required Seabrook to "repurchase" its deliverability rights.  As a generator interconnected to the grid, Seabrook's responsibilities with respect to maintaining a safe and reliable interconnection are ongoing and do not end at the moment it secures the interconnection.  Seabrook is obligated to continue to abide by its LGIA and the dictates of Good Utility Practice.  Moreover, because Avangrid will be paying the direct costs of the breaker replacement, we disagree that the Commission has required Seabrook to subsidize Avangrid's interconnection or that the February 2023 Order creates a policy of requiring existing generators to subsidize later entrants.[138]

## E.  FPA Section 206 Investigation

50.    As stated above, the Commission initiated an FPA section 206 investigation in Docket No. EL21-94-000 to determine whether the provisions of the ISO-NE Tariff that ISO-NE uses to determine what upgrades are needed to accommodate an ETU interconnection request may be unjust and unreasonable.  We now determine that the Commission's findings in the February 2023 Order that Seabrook must replace the breaker at Seabrook Station pursuant to the terms of its LGIA render the FPA section 206 investigation moot.  Therefore, we will close the FPA section 206 investigation.

---

[136] *Id.* at 54.

[137] *Id.* at 43.

[138] *See* Rehearing Request at 14 (alleging that the Commission "created[] a policy whereby existing generators "will be required to subsidize potentially unlimited numbers of later entrants").

Docket No. EL21-3-001, et al.                                                    - 30 -

<u>The Commission orders:</u>

    (A)  In response to Seabrook's rehearing request, the February 2023 Order is hereby modified and the result sustained, as discussed in the body of this order.

    (B)  The FPA section 206 proceeding in Docket No. EL21-94-000 is hereby terminated, as discussed in the body of this order.

By the Commission.

( S E A L )

                                               Kimberly D. Bose,
                                                Secretary.

ISO New England Inc. as of 07/21/2023
Electric TCS and MBR
ISO New England Inc. Transmission, Markets and Services Tariff
Effective Date:            08/30/2010                          Current Status:        Effective
FERC Docket:           ER10-02438-000   8
FERC Order:            delegated                               Order Date:            11/10/2010
Tariff Title Page and TOC, Tariff Title Page and Table of Contents (0.0.0)     A

# ISO NEW ENGLAND INC. TRANSMISSION, MARKETS AND SERVICES TARIFF

(Formerly known as FERC Electric Tariff No. 3)

**TARIFF TABLE OF CONTENTS**

| | |
|---|---|
| Section I | General Terms and Conditions |
| Section II | Open Access Transmission Tariff |
| Section III | Market Rule 1 |
| Section IV | ISO Funding Mechanisms |
| Attachment A | Market Participant Service Agreement |
| Attachment A-1 | MPSA for FTR-Only, DRP-Only and ODR-Only Customers |
| Attachment B | Pro forma ITC Operating Agreement |
| Attachment C | Mapping Document |
| Attachment D | ISO New England Information Policy |
| Attachment E | Service Agreements |
| Attachment F | Coordination Agreements |
| Attachment G | Procedure to Protect for the Loss of Phase II Imports |

ISO New England Inc. as of 07/21/2023
Electric TCS and MBR
ISO New England Inc. Transmission, Markets and Services Tariff

| | | | |
|---|---|---|---|
| Effective Date: | 03/31/2023 | Current Status: | Effective |
| FERC Docket: | ER23-00971-000   969 | | |
| FERC Order: | 182 FERC ¶ 61,211 | Order Date: | |
| | 03/30/2023 | | |
| I.2, I.2 Rules of Construction; Definitions (149.1.0) | A | | |

## I.2      Rules of Construction; Definitions

### I.2.1.   Rules of Construction:

In this Tariff, unless otherwise provided herein:

(a)      words denoting the singular include the plural and vice versa;

(b)      words denoting a gender include all genders;

(c)      references to a particular part, clause, section, paragraph, article, exhibit, schedule, appendix or other attachment shall be a reference to a part, clause, section, paragraph, or article of, or an exhibit, schedule, appendix or other attachment to, this Tariff;

(d)      the exhibits, schedules and appendices attached hereto are incorporated herein by reference and shall be construed with an as an integral part of this Tariff to the same extent as if they were set forth verbatim herein;

(e)      a reference to any statute, regulation, proclamation, ordinance or law includes all statutes, regulations, proclamations, amendments, ordinances or laws varying, consolidating or replacing the same from time to time, and a reference to a statute includes all regulations, policies, protocols, codes, proclamations and ordinances issued or otherwise applicable under that statute unless, in any such case, otherwise expressly provided in any such statute or in this Tariff;

(f)       a reference to a particular section, paragraph or other part of a particular statute shall be deemed to be a reference to any other section, paragraph or other part substituted therefor from time to time;

(g)      a definition of or reference to any document, instrument or agreement includes any amendment or supplement to, or restatement, replacement, modification or novation of, any such document, instrument or agreement unless otherwise specified in such definition or in the context in which such reference is used;

(h)      a reference to any person (as hereinafter defined) includes such person's successors and permitted assigns in that designated capacity;

**JA716**

(i)      any reference to "days" shall mean calendar days unless "Business Days" (as hereinafter defined) are expressly specified;

(j)       if the date as of which any right, option or election is exercisable, or the date upon which any amount is due and payable, is stated to be on a date or day that is not a Business Day, such right, option or election may be exercised, and such amount shall be deemed due and payable, on the next succeeding Business Day with the same effect as if the same was exercised or made on such date or day (without, in the case of any such payment, the payment or accrual of any interest or other late payment or charge, provided such payment is made on such next succeeding Business Day);

(k)      words such as "hereunder," "hereto," "hereof" and "herein" and other words of similar import shall, unless the context requires otherwise, refer to this Tariff as a whole and not to any particular article, section, subsection, paragraph or clause hereof; and a reference to "include" or "including" means including without limiting the generality of any description preceding such term, and for purposes hereof the rule of *ejusdem generis* shall not be applicable to limit a general statement, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned.

**I.2.2.  Definitions**:

In this Tariff, the terms listed in this section shall be defined as described below:

**Active Demand Capacity Resource** is one or more Demand Response Resources located within the same Dispatch Zone, that is registered with the ISO, assigned a unique resource identification number by the ISO, and participates in the Forward Capacity Market to fulfill a Market Participant's Capacity Supply Obligation pursuant to Section III.13 of Market Rule 1.

**Actual Capacity Provided** is the measure of capacity provided during a Capacity Scarcity Condition, as described in Section III.13.7.2.2 of Market Rule 1.

**Actual Load** is the consumption at the Retail Delivery Point for the hour.

**Additional Resource Blackstart O&M Payment** is defined and calculated as specified in Section 5.1.2 of Schedule 16 to the OATT.

**Asset** is a Generator Asset, a Demand Response Asset, a component of an On-Peak Demand Resource or Seasonal Peak Demand Resource, a Load Asset (including an Asset Related Demand), an Alternative Technology Regulation Resource, or a Tie-Line Asset.

**Asset Registration Process** is the ISO business process for registering an Asset.

**Asset Related Demand** is a Load Asset that has been discretely modeled within the ISO's dispatch and settlement systems, settles at a Node, has been registered in accordance with the Asset Registration Process, and is made up of either: (1) one or more individual end-use metered customers receiving service from the same point or points of electrical supply with an aggregate average hourly load of 1 MW or greater during the 12 months preceding its registration or (2) one or more storage facilities with an aggregate consumption capability of at least 1 MW.

**Asset Related Demand Bid Block-Hours** are Block-Hours assigned to the Lead Market Participant for each Asset Related Demand bid.   Blocks of the bid in effect for each hour will be totaled to determine the daily quantity of Asset Related Demand Bid Block-Hours.   In the case that a Resource has a Real-Time unit status of "unavailable" for an entire day, that day will not contribute to the quantity of Asset Related Demand Bid Block-Hours.   However, if the Resource has at least one hour of the day with a unit status of "available," the entire day will contribute to the quantity of Asset Related Demand Bid Block-Hours.

**Asset-Specific Going Forward Costs** are the net costs of an asset that is part of an Existing Generating Capacity Resource, calculated for the asset in the same manner as the net costs of Existing Generating Capacity Resources as described in Section III.13.1.2.3.2.1.1.1 (for an asset with a Static De-List Bid or an Export Bid) or Section III.13.1.2.3.2.1.1.2 (for an asset with a Permanent De-List Bid or Retirement De-List Bid).

**Assigned Meter Reader** reports to the ISO the hourly and monthly MWh associated with the Asset. These MWh are used for settlement.   The Assigned Meter Reader may designate an agent to help fulfill its Assigned Meter Reader responsibilities; however, the Assigned Meter Reader remains functionally responsible to the ISO.

**Auction Revenue Right (ARR)** is a right to receive FTR Auction Revenues in accordance with Appendix C of Market Rule 1.

**Generator Interconnection Related Upgrade** is an addition to or modification of the New England Transmission System (pursuant to Section II.47.1, Schedule 22 or Schedule 23 of the OATT) to effect the interconnection of a new generating unit or an existing generating unit whose energy capability or capacity capability is being materially changed and increased whether or not the interconnection is being effected to meet the Capacity Capability Interconnection Standard or the Network Capability Interconnection Standard.   As to Category A Projects (as defined in Schedule 11 of the OATT), a Generator Interconnection Related Upgrade also includes an upgrade beyond that required to satisfy the Network Capability Interconnection Standard (or its predecessor) for which the Generator Owner has committed to pay prior to October 29, 1998.

**Generator Owner** is the owner, in whole or part, of a generating unit whether located within or outside the New England Control Area.

**Good Utility Practice** means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather includes all acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4).

**Governance Only Member** is defined in Section 1 of the Participants Agreement.

**Governance Participant** is defined in the Participants Agreement.

**Governing Documents**, for the purposes of the ISO New England Billing Policy, are the Transmission, Markets and Services Tariff and ISO Participants Agreement.

**Governing Rating** is the lowest corporate rating from any Rating Agency for that Market Participant, or, if the Market Participant has no corporate rating, then the lowest rating from any Rating Agency for that Market Participant's senior unsecured debt.

**JA719**

the provisions of this Tariff.   The ISO New England Information Policy is Attachment D to the Transmission, Markets and Services Tariff.

**ISO New England Manuals** are the manuals implementing Market Rule 1, as amended from time to time in accordance with the Participants Agreement.   Any elements of the ISO New England Manuals that substantially affect rates, terms, and/or conditions of service shall be filed with the Commission under Section 205 of the Federal Power Act.

**ISO New England Operating Documents** are the Tariff and the ISO New England Operating Procedures.

**ISO New England Operating Procedures (OPs)** are the ISO New England Planning Procedures and the operating guides, manuals, procedures and protocols developed and utilized by the ISO for operating the ISO bulk power system and the New England Markets.

**ISO New England Planning Procedures** are the procedures developed and utilized by the ISO for planning the ISO bulk power system.

**ISO New England System Rules** are Market Rule 1, the ISO New England Information Policy, the ISO New England Administrative Procedures, the ISO New England Manuals and any other system rules, procedures or criteria for the operation of the New England Transmission System and administration of the New England Markets and the Transmission, Markets and Services Tariff.

**ITC Agreement** is defined in Attachment M to the OATT.

**ITC Rate Schedule** is defined in Section 3.1 of Attachment M to the OATT.

**ITC System** is defined in Section 2.2 of Attachment M to the OATT.

**ITC System Planning Procedures** is defined in Section 15.4 of Attachment M to the OATT.

**Joint ISO/RTO Planning Committee (JIPC)** is the committee described as such in the Northeastern Planning Protocol.

ISO New England Inc. as of 07/21/2023
Electric TCS and MBR
ISO New England Inc. Transmission, Markets and Services Tariff

| | | | |
|---|---|---|---|
| Effective Date: | 12/10/2019 | Current Status: | Effective |
| FERC Docket: | ER20-00092-000   756 | | |
| FERC Order: | 169 FERC 61,195 | Order Date: | 12/10/2019 |
| I.3, I.3 Obligations of MPs & Other Customers (8.0.0)      A | | | |

**I.3      Obligations of Market Participants and Other Customers**

The ISO acts as Counterparty for sales to its Customers of Regional Transmission Service, and for agreements and transactions with its Customers, including but not limited to assignments involving Customers, and agreements and transactions with Customers involving sale to the ISO and/or purchase from the ISO of energy, capacity, reserves, regulation, Ancillary Services, FTRs and involving other products, service and transactions, all as specified in Sections II and III of the Tariff (collectively, the "Products").

To the extent permitted by applicable law, any warranties provided by the sellers or assignors to the ISO of the Products which cover the Products, whether express or implied, are hereby passed to the Customers on a "pass through basis" and to the extent not passed through, any such warranties are hereby assigned by ISO to Customers.   Sellers and assignors to the ISO and Customers acknowledge that warranties on such Products are limited to that offered by the seller or assignor to the ISO and will exist, if at all, solely between the seller or assignor to the ISO and the Customer.   AS BETWEEN CUSTOMER AND ISO AS COUNTERPARTY, NO EXPRESS OR IMPLIED WARRANTIES ARE MADE BY THE ISO REGARDING THE PRODUCTS SOLD BY THE ISO AS COUNTERPARTY, AND ANY SUCH PRODUCTS ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS.   THE ISO MAKES NO WARRANTY OR REPRESENTATION THAT THE PRODUCTS WILL BE UNINTERRUPTED OR ERROR FREE.   THE CUSTOMER HEREBY WAIVES, AND THE ISO HEREBY DISCLAIMS, ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT.   THE ISO DOES NOT WARRANT THAT THE PRODUCTS OFFERED WILL MEET CUSTOMER'S REQUIREMENTS.   NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY THE ISO OR ANY AUTHORIZED REPRESENTATIVE OF THE ISO SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF ANY PASS THROUGH OR ASSIGNED WARRANTY.   SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CERTAIN CIRCUMSTANCES, SO THE ABOVE EXCLUSION APPLIES ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

### I.3.1.    Service Agreement:

Receipt of service under this Tariff requires the execution of a Market Participant Service Agreement in the form specified in Attachment A or Attachment A-1, as applicable, to this Tariff unless the Customer seeks transmission service only and does not participate in the New England Markets (in which case the Customer must execute a Transmission Service Agreement).   Receipt of Local Service under Section II of this Tariff requires the execution of a Transmission Service Agreement in the form specified in Attachment A to Schedule 21 of Section II of this Tariff for Local Service and shall be subject to the requirements of Schedule 21.   Receipt of OTF Service under Section II of this Tariff requires the execution of a Transmission Service Agreement in the appropriate form specified under Schedule 20 of Section II of this Tariff and shall be subject to the requirements of Schedule 20.

### I.3.2.    Assets:

Each Market Participant shall, to the fullest extent practicable, cause all of the Assets it owns or operates to be designed, constructed, maintained and operated in accordance with Good Utility Practice and the provisions of this Tariff, the ISO New England Operating Procedures, and the ISO New England Planning Procedures.

### I.3.3.    Maintenance and Repair:

Each Market Participant shall, to the fullest extent practicable:   (a) cause Assets owned or operated by it to be withdrawn from operation for maintenance and repair only in accordance with maintenance schedules reported to, and approved and published by the ISO in accordance with the ISO New England Operating Procedures, (b) restore such Assets to good operating condition with reasonable promptness, and (c) in emergency situations, accelerate maintenance and repair at the reasonable request of the ISO in accordance with the ISO New England Planning Procedures.

### I.3.4.    Central Dispatch:

Each Market Participant shall, to the fullest extent practicable, subject each of the Assets it owns or operates to central dispatch by the ISO; provided, however, that each Market Participant shall at all times be the sole judge as to whether or not and to what extent safety requires that at any time any of such facilities will be operated at less than their full capacity.

### I.3.5.    Provision of Information:

The Customers shall provide the ISO with any and all information within their custody or control that the ISO deems necessary to perform its obligations under this Tariff, subject to applicable confidentiality

ISO New England Inc. as of 07/21/2023
Electric TCS and MBR
ISO New England Inc. Transmission, Markets and Services Tariff

| | | | |
|---|---|---|---|
| Effective Date: | 12/10/2019 | Current Status: | Effective |
| FERC Docket: | ER20-00092-000  756 | | |
| FERC Order: | 169 FERC 61,195 | Order Date: | 12/10/2019 |
| I.3, I.3 Obligations of MPs & Other Customers (8.0.0)  A | | | |

## I.3     Obligations of Market Participants and Other Customers

The ISO acts as Counterparty for sales to its Customers of Regional Transmission Service, and for agreements and transactions with its Customers, including but not limited to assignments involving Customers, and agreements and transactions with Customers involving sale to the ISO and/or purchase from the ISO of energy, capacity, reserves, regulation, Ancillary Services, FTRs and involving other products, service and transactions, all as specified in Sections II and III of the Tariff (collectively, the "Products").

To the extent permitted by applicable law, any warranties provided by the sellers or assignors to the ISO of the Products which cover the Products, whether express or implied, are hereby passed to the Customers on a "pass through basis" and to the extent not passed through, any such warranties are hereby assigned by ISO to Customers.   Sellers and assignors to the ISO and Customers acknowledge that warranties on such Products are limited to that offered by the seller or assignor to the ISO and will exist, if at all, solely between the seller or assignor to the ISO and the Customer.   AS BETWEEN CUSTOMER AND ISO AS COUNTERPARTY, NO EXPRESS OR IMPLIED WARRANTIES ARE MADE BY THE ISO REGARDING THE PRODUCTS SOLD BY THE ISO AS COUNTERPARTY, AND ANY SUCH PRODUCTS ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS.   THE ISO MAKES NO WARRANTY OR REPRESENTATION THAT THE PRODUCTS WILL BE UNINTERRUPTED OR ERROR FREE.   THE CUSTOMER HEREBY WAIVES, AND THE ISO HEREBY DISCLAIMS, ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT.   THE ISO DOES NOT WARRANT THAT THE PRODUCTS OFFERED WILL MEET CUSTOMER'S REQUIREMENTS.   NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY THE ISO OR ANY AUTHORIZED REPRESENTATIVE OF THE ISO SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF ANY PASS THROUGH OR ASSIGNED WARRANTY.   SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CERTAIN CIRCUMSTANCES, SO THE ABOVE EXCLUSION APPLIES ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

must comply with the requirements, including the reliability review process, set out in Schedules 22 or 23, as applicable.

### I.3.10.  Market Participant to Avoid Adverse Effect:

If the ISO notifies a Market Participant pursuant to Section I.3.9.1 that implementation of the Market Participant's or Transmission Owner's plan has been determined to have a significant adverse effect upon the reliability or operating characteristics of the Transmission Owner's transmission facilities, the transmission facilities of another Transmission Owner, or the system of one or more Market Participants, the Market Participant or Transmission Owner shall not proceed to implement such plan unless the Market Participant (or the Non-Market Participant on whose behalf the Market Participant has submitted its plan) or Transmission Owner takes such action or constructs at its expense such facilities as the ISO determines to be reasonably necessary to avoid such adverse effect.

ISO New England Inc. as of 07/21/2023
Electric TCS and MBR
ISO New England Inc. Transmission, Markets and Services Tariff
Effective Date:            02/16/2015                        Current Status:        Effective
FERC Docket:            ER15-01050-000   422
FERC Order:            151 FERC ¶ 61,024                        Order Date:
            04/14/2015
II.47, II.47 Interconnection Procedures and Requirements (4.0.0)    A

## II.47    Interconnection Procedures and Requirements

**II.47.1 Interconnection of Generating Unit Under the Capacity Capability Interconnection Standard or the Network Capability Interconnection Standard:**   Any Generator Owner that proposes after the Compliance Effective Date (i) to place in service in the New England Control Area a new generating unit at a site which the Generator Owner owns or controls, or which it has the right to acquire or control, or (ii) to materially change and/or increase the capacity of an existing generating unit located in the New England Control Area shall comply with and be subject to the ISO New England Operating Documents, including, but not limited to, the Interconnection Procedures contained in Schedules 22 and 23 of this OATT and shall enter into an Interconnection Agreement in the form provided in Appendix 6 to Schedule 22 or Exhibit 1 to Schedule 23 of this OATT.   The ISO shall have authority to administer the Interconnection Procedures and shall be a party to the Interconnection Agreement along with the Interconnection Customer and the Interconnecting Transmission Owner (as such terms are defined in Schedules 22 and 23 of this OATT).

**II.47.2 Generator Interconnection Proposal Review:** The Generator Owner shall submit its proposal for review in accordance with Section I.3.9 of the Transmission, Markets and Services Tariff and related ISO New England Operating Documents and thereafter take any action required pursuant to Section I.3.10 of the Transmission, Markets and Services Tariff as a result of such review.

**II.47.3 Generator Right to Interconnection:** Upon the satisfaction of the obligations described in Sections II.47.1 and II.47.2, and subject to all necessary legal rights and approvals being obtained, the Generator Owner's unit shall have the right to be interconnected with the PTF or Non-PTF.

**II.47.4 Compliance with Schedule 11:** A Generator Owner proposing the interconnection of a new or materially changed generating unit shall be responsible for the costs of any required Generator Interconnection Related Upgrades that do not constitute costs of Pool Supported PTF in accordance with

**JA725**

Schedule 11 of this OATT, and shall comply with the affected PTO's requirements with respect to security, credit assurances and/or deposits in accordance with Schedule 11 of this OATT.

With respect to upgrades required to meet the Capacity Capability Interconnection Standard or the Network Capability Interconnection Standard, and consistent with reliability and safety standards, PTOs (in accordance with the TOA and applicable ISO New England Operating Documents), MTOs (in accordance with a MTOA and applicable ISO New England Operating Documents), OTOs (in accordance with an OTOA and applicable ISO New England Operation Documents), the interconnecting Generator Owner and the ISO shall jointly use their best reasonable efforts to develop Congestion Cost and Local Second Contingency Protection Resource NCPC Charge estimates and construction schedules designed to minimize, to the extent practicable, the financial impact of the upgrade-related transmission outages on all affected parties.   The development of the aforementioned construction schedule shall include consultation with any affected existing Generator Owner.   To the extent it is possible to implement a procedure that facilitates the ability of interconnecting Generator Owners and Interconnecting Transmission Owners and any affected PTO(s) to minimize, to the extent reasonably practicable, the associated Local Second Contingency Protection Resource NCPC Charge and Congestion Cost exposure prior to implementation of SMD, the parties agree to continue the use of the procedure after the implementation of SMD to the extent that such procedures are consistent with SMD.   There shall be no payment under this OATT of lost opportunity costs to Generator Owners for generating units that are dispatched down or dispatched off. In connection with the consultation required by this paragraph, the affected parties shall, as necessary, enter into nondisclosure agreements protecting commercially sensitive information from unlimited disclosure in order to facilitate the development of construction schedules designed to minimize the financial impact on the affected parties.

Where requests received by the ISO are for interconnection to the MTF or OTF, the responsibilities under Section II.47.1 of the Tariff will be solely within the MTO's or OTO's discretion. If the MTO or OTO acts to interconnect transmission facilities to its MTF or OTF, it will consult and coordinate with the ISO prior to completion of any system impact studies and facilities studies in connection with such interconnection requests. Likewise, the ISO will consult with the MTO or OTO on any proposed interconnection requests that may adversely affect the MTF or OTF. Nothing in this Tariff shall preclude the ISO from entering into an agreement(s) with the MTO or OTO for such MTO or OTO, pursuant to the ISO's supervision, to perform system impact studies and facilities studies in connection with any interconnection requests. All interconnections to MTF or OTF must conform to the pro forma interconnection rules and procedures on file with the Commission for the ISO. Nothing in this Tariff shall

preclude the performance of studies related to the interconnection of generating units by a third party consultant to the extent permitted by applicable procedures in this OATT (including procedures governing the treatment of confidential information) and provided that such studies performed by any third party consultant must include the MTO's or OTO's reasonable estimates of the costs of upgrades to such MTO's MTF or OTO's OTF needed to implement the conclusions of such studies and the MTO's or OTO's reasonable anticipated schedule for the construction of such upgrades.

**II.47.5 Interconnection of Elective Transmission Upgrades**: Any entity may undertake the design, construction and interconnection of an Elective Transmission Upgrade ("Elective Transmission Upgrade Interconnection Customer"). In undertaking the design, construction and interconnection of an Elective Transmission Upgrade, the Elective Transmission Upgrade Interconnection Customer shall comply with and be subject to the ISO New England Operating Documents, including, but not limited to, the Interconnection Procedures contained in Schedule 25 of this OATT and shall enter into an Interconnection Agreement in the form provided in Appendix 6 to Schedule 25 of this OATT. The ISO shall have authority to administer the Interconnection Procedures and shall be a party to the Interconnection Agreement along with the Interconnection Customer and the Interconnecting Transmission Owner (as such terms are defined in Schedule 25 of this OATT).

The Elective Transmission Upgrade Interconnection Customer shall submit its proposal for review in accordance with Section I.3.9 of the Transmission, Markets and Services Tariff and related ISO New England Operating Documents and thereafter take any action required pursuant to Section I.3.10 of the Transmission, Markets and Services Tariff as a result of such review.

Upon satisfaction of the obligations described in this Section II.47.5 and Schedule 25 of this OATT, and subject to all necessary legal rights and approvals being obtained, and upon satisfaction of any conditions placed on the Elective Transmission Upgrade Interconnection Customer pursuant to Sections I.3.9 and I.3.10 of the Transmission, Markets and Services Tariff, the Elective Transmission Upgrade shall have the right to be interconnected with the PTF or Non-PTF.

Any entity that constructs and/or maintains the Elective Transmission Upgrade shall be responsible for 100% of all of the costs of said upgrade and of any additions to or modifications of the PTF and Non-PTF that are required to accommodate the Elective Transmission Upgrade.   A request for rate treatment of an Elective Transmission Upgrade, if any, shall be determined by the Commission in the appropriate proceeding.

**SCHEDULE 25**

**ELECTIVE TRANSMISSION UPGRADE INTERCONNECTION PROCEDURES**

Effective Date: 6/05/2023 - Docket #: ER23-1581-000

**SECTION I.    DEFINITIONS.**

The definitions contained in this section are intended to apply in the context of the Elective Transmission Upgrade interconnection process provided for in this Schedule 25 (and its appendices).  To the extent that the definitions herein are different than those contained in Section I.2.2 of the Tariff, the definitions provided below shall control only for purposes of Elective Transmission Upgrade interconnections under this Schedule 25.  Capitalized terms in Schedule 25 that are not defined in this Section I shall have the meanings specified in Section I.2.2 of the Tariff.

**Administered Transmission System** shall mean the PTF and the Non-PTF.

**Adverse System Impact** shall mean any significant negative effects on the stability, reliability or operating characteristics of the electric system.

**Affected System** shall mean any electric system that is within the Control Area, including, but not limited to, generator owned transmission facilities, or any other electric system that is not within the Control Area that may be affected by the proposed interconnection.

**Affected Party** shall mean the entity that owns, operates or controls an Affected System, or any other entity that otherwise may be a necessary party to the interconnection process.

**Affiliate** shall mean, with respect to a corporation, partnership or other entity, each such other corporation, partnership or other entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such corporation, partnership or other entity.

**Applicable Laws and Regulations** shall mean all duly promulgated applicable federal, state and local laws, regulations, rules, ordinances, codes, decrees, judgments, directives, or judicial or administrative orders, permits and other duly authorized actions of any Governmental Authority.

**Applicable Reliability Counci**l shall mean the reliability council applicable to the New England Control Area.

Effective Date: 6/05/2023 - Docket #: ER23-1581-000

On or before the return of the executed Interconnection System Impact Study Agreement to the System Operator and Interconnecting Transmission Owner, the Interconnection Customer shall provide the technical data called for in Appendix 1, Attachment A; provided that if a PSCAD model was determined to be needed at the Scoping Meeting, then the Interconnection Customer shall have ninety (90) Calendar Days from the execution of the System Impact Study Agreement to provide the PSCAD model.

If the Interconnection Customer does not provide all such technical data when it delivers the Interconnection System Impact Study Agreement, the System Operator shall notify the Interconnection Customer of the deficiency within five (5) Business Days of the receipt of the executed Interconnection System Impact Study Agreement and the Interconnection Customer shall cure the deficiency within ten (10) Business Days of receipt of the notice, provided, however, such deficiency does not include failure to deliver the executed Interconnection System Impact Study Agreement or deposit.

If the Interconnection System Impact Study uncovers any unexpected result(s) not contemplated during the Scoping Meeting or the Interconnection Feasibility Study, a substitute Point of Interconnection identified by the System Operator, Interconnection Customer, Interconnecting Transmission Owner, or any Affected Party as deemed appropriate by the System Operator in accordance with applicable codes of conduct and confidentiality requirements, and acceptable to each Party, such acceptance not to be unreasonably withheld, will be substituted for the designated Point of Interconnection specified above without loss of Queue Position, and re-studies shall be completed pursuant to Section 7.6 as applicable. For the purpose of this Section 7.2, if the Parties cannot agree on the substituted Point of Interconnection, then Interconnection Customer may direct that one of the alternatives as specified in the Interconnection Feasibility Study Agreement or Interconnection System Impact Study depending on whether Interconnection Customer requested that the Interconnection Feasibility Study be completed as a separate and distinct study or as part of the Interconnection System Impact Study, as specified pursuant to Section 3.3.4, shall be the substitute.

### 7.3    Scope of Interconnection System Impact Study.

The Interconnection System Impact Study shall evaluate the impact of the proposed interconnection on the reliability and operation of the New England Transmission System.  The Interconnection System Impact Study will consider the Base Case as well as all generating facilities and Elective Transmission Upgrades (and with respect to (iii) below, any identified Network Upgrades associated with such higher

queued interconnection) that, on the date the Interconnection System Impact Study is commenced: (i) are directly interconnected to the New England Transmission System; (ii) are interconnected to Affected Systems and may have an impact on the Interconnection Request; (iii) have a pending higher queued Interconnection Request to interconnect to the New England Transmission System and may have an impact on the Interconnection Request; and (iv) have no Queue Position but have executed an Interconnection Agreement or requested that an unexecuted Interconnection Agreement be filed with the Commission (the "Study Case" for the Interconnection System Impact Study).  An Interconnection Customer with a CNI Interconnection Service  Interconnection Request may also request that the Interconnection System Impact Study include a preliminary, non-binding, analysis to identify potential upgrades that may be necessary for the Interconnection Customer's Elective Transmission Upgrade to enable an Import Capacity Resource(s) to qualify for participation in a Forward Capacity Auction under Section III.13 of the Tariff, based on a limited set of assumptions to be specified by the Interconnection Customer and reflected in Attachment A to the Interconnection System Impact Study Agreement.

The Interconnection System Impact Study will consist of a short circuit analysis, a stability analysis, a power flow analysis, including thermal analysis and voltage analysis, a system protection analysis and any other analyses, such as electromagnetic transient analysis, that are deemed necessary by the System Operator in consultation with the Interconnecting Transmission Owner.  The Interconnection System Impact Study report will state the assumptions upon which it is based, state the results of the analyses, and provide the requirements or potential impediments to providing the requested interconnection service, including a preliminary indication of the cost and length of time that would be necessary to correct any problems identified in those analyses and implement the interconnection.  The Interconnection System Impact Study report will provide (i) a list of facilities that are required as a result of the Interconnection Request and a non-binding good faith estimate of cost responsibility; (ii) a non-binding good faith estimated time to construct; (iii) a protection assessment to determine the required protection upgrades; and may provide (iv) an evaluation of the siting of the Interconnection Facilities and Network Upgrades; and (v) identification of the likely permitting and siting process including easements and environment work.  To the extent the Interconnection Customer requested a preliminary analysis as described in this Section 7.3, the Interconnection System Impact Study report will also provide a list of potential upgrades that may be necessary for the Interconnection Customer's Elective Transmission Upgrade to enable an Import Capacity Resource(s) to qualify for participation in a Forward Capacity Auction under Section III.13 of the Tariff.

Effective Date: 6/05/2023 - Docket #: ER23-1581-000

receives a Capacity Supply Obligation in accordance with Section III.13 of the Tariff, or (iv) a modification to a transmission project included in the Base Case, the System Operator shall notify the Interconnection Customer and Interconnecting Transmission Owner in writing. Each re-study shall be conducted serially based on the Queue Position of each Interconnection Customer, and each re-study shall take no longer than sixty (60) Calendar Days from the date the re-study commences. Any cost of re-study shall be borne by the Interconnection Customer being re-studied. If the original Interconnection Facilities Study is complete and the final invoice has been issued, the re-study shall be performed under a new Interconnection Facilities Study Agreement.

## SECTION 9.  ENGINEERING & PROCUREMENT ("E&P") AGREEMENT.

Prior to executing an ETU IA, an Interconnection Customer may request, in order to advance the implementation of its interconnection, and the Interconnecting Transmission Owner and any Affected Party shall offer the Interconnection Customer, an E&P Agreement that authorizes the Interconnecting Transmission Owner and any Affected Party to begin engineering and procurement of long lead-time items necessary for the establishment of the interconnection. However, the Interconnecting Transmission Owner or any Affected Party shall not be obligated to offer an E&P Agreement if the Interconnection Customer is in Dispute Resolution as a result of an allegation that the Interconnection Customer has failed to meet any milestones or comply with any prerequisites specified in other parts of the ETU IP. The E&P Agreement is an optional procedure and it will not alter the Interconnection Customer's Queue Position or Trial Operation Date. The E&P Agreement shall provide for the Interconnection Customer to pay the cost of all activities authorized by the Interconnection Customer, including a deposit of 100 percent of the estimated engineering and study costs, and to make advance payments or provide other satisfactory security for such costs.

The Interconnection Customer shall pay the cost of such authorized activities and any cancellation costs for equipment that is already ordered for its interconnection, which cannot be mitigated as hereafter described, whether or not such items or equipment later become unnecessary. If the Interconnection Customer withdraws its application for interconnection or an E&P Agreement is terminated by any Party, to the extent the equipment ordered can be canceled under reasonable terms, the Interconnection Customer shall be obligated to pay the associated cancellation costs. To the extent that the equipment cannot be reasonably canceled, the Interconnecting Transmission Owner or the Affected Party that is a party to an E&P Agreement may elect: (i) to take title to the equipment, in which event the

Interconnecting Transmission Owner or relevant Affected Party shall refund the Interconnection Customer any amounts paid by the Interconnection Customer for such equipment and shall pay the cost of delivery of such equipment, or (ii) to transfer title to and deliver such equipment to the Interconnection Customer, in which event the Interconnection Customer shall pay any unpaid balance and cost of delivery of such equipment.

**SECTION 10.  OPTIONAL INTERCONNECTION STUDY.**

**10.1      Optional Interconnection Study Agreement.**

On or after the date when the Interconnection Customer receives Interconnection System Impact Study report  and no later than five (5) Business Days after the study results meeting to review the report, the Interconnection Customer may request in writing, and the System Operator in coordination with the Interconnecting Transmission Owner shall perform, an Optional Interconnection Study.  The request shall describe the assumptions that the Interconnection Customer wishes the System Operator to study within the scope described in Section 10.2.  Within five (5) Business Days after receipt of a request for an Optional Interconnection Study, the System Operator shall provide to the Interconnecting Transmission Owner and the Interconnection Customer an Optional Interconnection Study Agreement in the form of Appendix 5.

The Optional Interconnection Study Agreement shall:  (i) specify the technical data that the Interconnection Customer must provide for each phase of the Optional Interconnection Study, (ii) specify the Interconnection Customer's assumptions as to which Interconnection Requests with earlier queue priority dates will be excluded from the Optional Interconnection Study case, and (iii) specify the System Operator's and Interconnecting Transmission Owner's estimate of the cost of the Optional Interconnection Study.  To the extent known by the System Operator, such estimate shall include any costs expected to be incurred by any Affected System whose participation is necessary to complete the Optional Interconnection Study.  The Optional Interconnection Study Agreement shall specify that Interconnection Customer is responsible for the actual cost of the Optional Interconnection Study, including the cost of developing the study agreement and its attachment(s).  Notwithstanding the above, the System Operator and Interconnecting Transmission Owner shall not be required as a result of an Optional Interconnection Study request to conduct any additional Interconnection Studies with respect to any other Interconnection Request.

Effective Date: 6/05/2023 - Docket #: ER23-1581-000

**APPENDIX 6**

**ELECTIVE TRANSMISSION UPGRADE**

**INTERCONNECTION AGREEMENT**

**TABLE OF CONTENTS**

| | |
|---|---|
| Article 1 | Definitions |
| Article 2 | Effective Date, Term and Termination |
| Article 3 | Regulatory Filings |
| Article 4 | Scope of Service |
| Article 5 | Interconnection Facilities Engineering, Procurement, and Construction |
| Article 6 | Testing and Inspection |
| Article 7 | Metering |
| Article 8 | Communications |
| Article 9 | Operations |
| Article 10 | Maintenance |
| Article 11 | Performance Obligation |
| Article 12 | Invoice |
| Article 13 | Emergencies |
| Article 14 | Regulatory Requirements and Governing Law |
| Article 15 | Notices |
| Article 16 | Force Majeure |
| Article 17 | Default |
| Article 18 | Indemnity, Consequential Damages and Insurance |
| Article 19 | Assignment |
| Article 20 | Severability |
| Article 21 | Comparability |
| Article 22 | Confidentiality |
| Article 23 | Environmental Releases |
| Article 24 | Information Requirements |
| Article 25 | Information Access and Audit Rights |
| Article 26 | Subcontractors |

Article 27      Disputes

Article 28      Representations, Warranties and Covenants

Article 29      Omitted

Article 30      Miscellaneous

**THIS ELECTIVE TRANSMISSION UPGRADE INTERCONNECTION AGREEMENT**
("Agreement") is made and entered into this _____ day of _____ 20__, by and between
_____, a _____ organized and existing under the laws of the
State/Commonwealth of _____ _____ ("Interconnection Customer" with an Elective Transmission
Upgrade Facility), ISO New England Inc., a non-stock corporation organized and existing under the laws
of the State of Delaware ("System Operator"), and _____, a _____ organized
and existing under the laws of the State/Commonwealth of _____ ("Interconnecting
Transmission Owner").  Under this Agreement the Interconnection Customer, System Operator, and
Interconnecting Transmission Owner each may be referred to as a "Party" or collectively as the "Parties."

**RECITALS**

**WHEREAS,** System Operator is the central dispatching agency provided for under the
Transmission Operating Agreement ("TOA") which has responsibility for the operation of the New
England Control Area from the System Operator control center and the administration of the Tariff; and

**WHEREAS**, Interconnecting Transmission Owner is the owner or possessor of an interest in the
Administered Transmission System; and

**WHEREAS**, Interconnection Customer intends to own, lease and/or control and operate the
Elective Transmission Upgrade identified in Appendix C to this Agreement; and

**WHEREAS,** System Operator, Interconnection Customer and Interconnecting Transmission
Owner have agreed to enter into this Agreement for the purpose of interconnecting the Elective
Transmission Upgrade to the Administered Transmission System.

**NOW, THEREFORE,** in consideration of and subject to the mutual covenants contained herein,
it is agreed:

When used in this Elective Transmission Upgrade Interconnection Agreement, terms with initial
capitalization that are not defined in Article 1 shall have the meanings specified in the Article in which
they are used.

**JA736**

**10.2**  **Operating and Maintenance Expenses.**  Subject to the provisions herein addressing the use of facilities by others, and except for operations and maintenance expenses associated with modifications made for providing interconnection or transmission service to a third party and such third party pays for such expenses, Interconnection Customer shall be responsible for all reasonable expenses including overheads, associated with: (1) owning, operating, maintaining, repairing, and replacing Interconnection Customer's Interconnection Facilities; and (2) operation, maintenance, repair and replacement of Interconnecting Transmission Owner's Interconnection Facilities, Stand Alone Network Upgrades, Network Upgrades and Distribution Upgrades.

## ARTICLE 11.  PERFORMANCE OBLIGATION

**11.1**  **Interconnection Customer's Interconnection Facilities.**  Interconnection Customer shall design, procure, construct, install, own and/or control the Interconnection Customer's Interconnection Facilities described in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades) at its sole expense.

**11.2**  **Interconnecting Transmission Owner's Interconnection Facilities.**  Interconnecting Transmission Owner shall design, procure, construct, install, own and/or control the Interconnecting Transmission Owner's Interconnection Facilities described in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades) at the sole expense of the Interconnection Customer.

**11.3**  **Network Upgrades and Distribution Upgrades.**  Interconnecting Transmission Owner shall design, procure, construct, install, and own the Network Upgrades, and to the extent provided by Article 5.1,  Stand Alone Network Upgrades, and Distribution Upgrades described in Appendix A (Interconnection Facilities, Network Upgrades and Distribution Upgrades).  The Interconnection Customer shall be responsible for all costs related to Distribution Upgrades.  Unless the Interconnecting Transmission Owner elects to fund the capital for the Network Upgrades, they shall be solely funded by the Interconnection Customer.

**11.4**  **Cost Allocation; Compensation; Rights; Affected Systems**

**11.4.1**  **Cost Allocation.**  Cost allocation of ETU Interconnection Related Upgrades shall be in accordance with Schedules 11 and 12 of Section II of the Tariff.

**11.4.2**  **Compensation.**  Any compensation due to the Interconnection Customer for increases in transfer capability to the PTF resulting from its ETU and associated system upgrades shall be determined in accordance with Sections II and III of the Tariff.

**11.4.3**  **Rights.**  Notwithstanding any other provision of this ETU IA, nothing herein shall be construed as relinquishing or foreclosing any rights, including but not limited to firm transmission rights, capacity rights, transmission congestion rights, or transmission credits, that the Interconnection Customer shall be entitled to, now or in the future, under any other agreement or tariff as a result of, or otherwise associated with, the transmission capacity, if any, created by the Network Upgrades.

**11.4.4**  **Special Provisions for Affected Systems.**  The Interconnection Customer shall enter into separate related facilities agreements to address any upgrades to the Affected System(s) that are necessary for safe and reliable interconnection of the Interconnection Customer's Elective Transmission Upgrade.

**11.5**  **Provision of Security.**  At least thirty (30) Calendar Days prior to the commencement of the procurement, installation, or construction of a discrete portion of an Interconnecting Transmission Owner's Interconnection Facilities, Network Upgrades, or Distribution Upgrades, Interconnection Customer shall provide Interconnecting Transmission Owner a guarantee, a surety bond, letter of credit or other form of security that is reasonably acceptable to Interconnecting Transmission Owner in accordance with the Tariff.  In addition:

**11.5.1**  The guarantee must be made by an entity that meets the creditworthiness requirements of Interconnecting Transmission Owner, and contain terms and conditions that guarantee payment of any amount that may be due from Interconnection Customer, up to an agreed-to maximum amount.

**JA738**

## CERTIFICATE OF SERVICE

I certify that, on October 30, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ John N. Estes III
John N. Estes III
JENNER & BLOCK LLP
1099 New York Ave, NW, Ste. 900
Washington, DC 20001
(202) 639-6000
jestes@jenner.com

*Counsel for Petitioners NextEra Energy Resources, LLC and NextEra Energy Seabrook, LLC*